IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF TEXAS
MARSHALL DIVISION

GENERAL ACCESS SOLUTIONS, LTD.,(   CAUSE NO. 2:23-CV-158-JRG
                                 )
            Plaintiff,           (
                                 )
vs.                              (
                                 )
T-MOBILE, USA, INC.,             (
et al.,                          )   MARSHALL, TEXAS
                                 (   APRIL 7, 2025
            Defendants.          )   9:00 A.M.
_____

VOLUME 1

_____

TRIAL ON THE MERITS

BEFORE THE HONORABLE RODNEY GILSTRAP
UNITED STATES CHIEF DISTRICT JUDGE
and a jury

_____

SHAWN McROBERTS, RMR, CRR
100 E. HOUSTON STREET
MARSHALL, TEXAS  75670
(903) 923-8546
shawn_mcroberts@txed.uscourts.gov

Shawn M. McRoberts, RMR, CRR
Federal Official Court Reporter

A P P E A R A N C E S

FOR THE PLAINTIFF:    BARTLIT BECK, LLP - DENVER
1801 WEWATTA ST., SUITE 1200
DENVER, COLORADO  80202
(303) 592-3100
BY: MR. GLEN SUMMERS
    MR. GIOVANNI SANCHEZ
    MR. NOSSON KNOBLOCH
    M.R JOHN HUGHES

BARTLIT BECK, LLP - CHICAGO
54 W. HUBBARD STREET, STE. 300
CHICAGO, ILLINOIS  60654
(312) 494-4400
BY:  MS. MEG FASULO

WARD, SMITH & HILL, PLLC
1507 BILL OWENS PARKWAY
LONGVIEW, TEXAS  75604
(903) 757-6400
BY:  MS. ANDREA FAIR

FOR THE DEFENDANTS:   ALSTON & BIRD, LLP - ATLANTA
ONE ATLANTIC CENTER
1201 WEST PEACHTREE STREET NW
#4900
ATLANTA, GEORGIA  30309-3424
(404) 881-7000
BY:  MR. JOHN HAYNES

ALSTON & BIRD, LLP - CHARLOTTE
1120 SOUTH TRYON ST., STE. 300
CHARLOTTE, NC 28203-6818
(704) 444-1000
BY:  MR. MATTHEW STEVENS

ALSTON & BIRD, LLP - DALLAS
2200 ROSS AVE., SUITE 2300
DALLAS, TEXAS  75201
(214) 922-3507
BY:  MR. TED STEVENSON

THE DACUS FIRM, PC
821 ESE LOOP 323, SUITE 430
TYLER, TEXAS  75701
(903) 705-1117
BY:  MR. DERON DACUS

oFFICIAL REPORTER:    SHAWN M. McROBERTS, RMR, CRR
                      100 E. HOUSTON STREET
                      MARSHALL, TEXAS   75670
                      (903) 923-8546

# **INDEX**

**EXAMINATION**

**Witness Name**                                                                                    **Page**

PAUL STRUHSAKER
    Direct By MR. SUMMERS ............................................... 208
    Cross By MR. STEVENSON .............................................. 255
    Redirect By MR. SUMMERS ............................................ 298
    Recross By MR. STEVENSON ........................................... 309
RUSSELL CARL McKOWN, PH.D.
    BY VIDEO DEPOSITION ................................................ 310

Shawn M. McRoberts, RMR, CRR
Federal Official Court Reporter

THE COURT:  Thank you.  Be seated, please.

Good morning, ladies and gentlemen.  Thank you for being here.

My name is Rodney Gilstrap, and I am a United States district judge stationed here in the Marshall Division in the Eastern District of Texas.  I have lived in Marshall since 1981.  I practiced law in this community and the surrounding area for 30 years before I was nominated by the president and confirmed by the Senate as a United States district judge.

They say, ladies and gentlemen, that confession is good for the soul, so we'll start out with a confession this morning.  I was not born in Texas, but I got here as quick as I could.  I moved from Florida to Texas at the ripe old age of 18 to enroll as a freshman at Baylor University in Waco, went to college there, graduated, and then stayed and went to law school at Baylor.

I am married, and my wife formerly ran a local retail florist, but she has sold that business and is now full-time housewife.  She and I had two children, a daughter and a son. They're both grown now.  The daughter passed away about two-and-a-half years ago.  The son lives in Dallas and is an Assistant United States Attorney in the Northern District of Texas.  And between the two of them, I have four wonderful grandchildren.

Now, I tell you all these things about myself because in

a few minutes I'm going to ask each of you to give me the same kind of information about each of you, and I think you're entitled to know as much about me as I'm about to find out regarding each of you-all.

Now, we are about to engage in the selection of a jury in a civil case involving allegations of patent infringement. But if you'll indulge me for a minute before we go any further, I'd like to briefly review with you how we came to have our American civil jury trial system. I think that would be helpful to you and is important.

If you go back in ancient history, ladies and gentlemen, and if you start with the first five books in the Old Testament, the Pentateuch, you'll find that the ancient Hebrew nation impaneled juries to determine issues of property ownership and property value.

The ancient Greeks began using a jury system about 1500 BC. The Romans, as in many other areas, copied the jury system from the ancient Greeks, and it was the Romans that brought the jury system to what we now know to be Great Britain when they crossed the English Channel and conquered that island in the 4th century AD.

And having done that, and having brought the jury system to Great Britain, it took root and flourished there for 800 years until the 12th century AD when a rather tyrannical king came to the throne of Great Britain named King John. And King

John became embroiled in many disputes with his nobles and his subjects that led that country to the verge of a civil war. One of the disputes among several was King John's effort to curtail the right to trial by jury.

In that particular case a civil war did not take place because the disputes between the king and his subjects were settled and resolved by way of a written agreement entered into and signed by the king and his nobles at a place in England called Runnymede. That document that resolved those disputes and enshrined the right to trial by a jury in Great Britain is something you may have heard of before. It's called the Magna Carta.

And so you can see, ladies and gentlemen, that the concept of trial by jury crossed the Atlantic Ocean with our British forefathers when they came to this continent as colonists of Great Britain. And having brought the jury trial system with them, it took root and flourished in colonial America for over a hundred years, until another rather tyrannical king came to the throne of Great Britain. This time his name was King George III.

And as you know from having studied American history, King George III, like King John, became embroiled in many, many disputes with his subjects. Only here they were his colonial subjects in North America.

And one of the disputes between his American colonists

and King George III, like King John, was King George's efforts to curtail the right to trial by jury. In fact, ladies and gentlemen, when Thomas Jefferson wrote the Declaration of Independence, which is in its simplest form a letter to the king explaining to him why the colonists here in North America felt compelled to separate and form their own independent nation, one of the express reasons in the Declaration of Independence called out by Thomas Jefferson was King George's effort to curtail the right to trial by jury.

I don't know if you've ever read the Declaration of Independence. But if you read it, you'll find it's in there expressly spelled out as one of the reasons we felt -- our forefathers felt compelled to revolt from Great Britain and form our own independent nation. And unlike the prior situation in Runnymede, we did have a revolution and we did separate from Great Britain and form our own independent nation.

And shortly after we achieved our independence, we set about the process of developing the supreme law of the land to govern our new nation. That document that you-all know of, which is, in fact, the supreme law of the United States of America, is the Constitution of the United States.

The Constitution was adopted and ratified in 1789. Several of the original 13 states who voted to ratify the Constitution did so upon the express promise that there would

immediately upon its passage be 10 important amendments that had been left out added to it.  And, in fact, immediately after the Constitution was ratified, the process of adding those 10 amendments to the Constitution started and they were adopted and they were ratified.

And you know those first 10 amendments to the Constitution as what we all call the Bill of Rights.  And if you look at the first 10 amendments to the U.S. Constitution, you'll find the Seventh Amendment.  And the Seventh Amendment to the United States Constitution guarantees to every American a constitutionally-supported right to a trial by jury in a civil case.

And the Bill of Rights was actually ratified and added to the Constitution in 1791.  It took two years from 1789 to 1791 to get that done.  So since 1791, ladies and gentlemen, every American has had a constitutionally-guaranteed right to have their civil disputes resolved through a trial by jury.

And so by being here today and presenting yourselves for jury duty in this case, you have in a very real sense done your duty to preserve, protect, and defend our constitution, including the Seventh Amendment and the right to trial by jury.

I always tell citizens like yourselves who've appeared for jury duty in this court that in my personal opinion jury service by any American is the second highest form of public

service that any citizen can render for our country.  In my personal opinion, the highest form of public service for our nation are those young men and women who serve in our armed forces.

Now, I want you to understand that as a part of this process later this morning the lawyers are going to address the panel, the venire panel it's called, all of you ladies and gentlemen, and they're going to ask questions to try and obtain relevant information to work with the Court to select and seat a fair and an impartial jury to hear the evidence in this case.

And when the lawyers ask questions as a part of this process later this morning, I want you to understand, ladies and gentlemen, that there are no wrong answers to any question you'll be asked, as long as your responses are full, complete, and truthful.  As long as your answers are full, complete, and truthful, there are no wrong answers to anything you'll be asked.

Now, I don't know if it will happen this morning, I can tell you it rarely does, as a matter of fact, I've lost the exact count, but this will be somewhere north of 125 civil jury trials that I've conducted since I've been a United States district judge, and probably two or three times in that 125-plus time frame this has happened.

But I want you to understand if you should be asked a

question this morning by one of the lawyers that you believe your own personal circumstances is so personal and so private that you're not comfortable answering it in front of everyone else on the panel, you have the option to simply say, I'd like to discuss that with Judge Gilstrap.

And if that's your response, I'll provide you an opportunity where you can answer that question outside of the presence of everyone else on the panel.  However, ladies and gentlemen, again, I think maybe two or three times out of 125-plus that's happened.  But I do want you to know, as rare as it is, you do have that option if it should present itself this morning.

The trial in this case, ladies and gentlemen, is going to commence today.  After the jury is selected, we'll begin the trial, and I expect the trial will go through the end of this week.  My expectation is that the jury that is selected from this panel will return their verdict sometime on Friday of this week.  So today is the 7th.  Friday is the 11th of April.  For those of you that would be selected to serve on this jury, you will need to be here every day from today through Friday of this week.

Now, I don't anticipate the trial will go into the following week, and for reasons I'm not going to go into right now, I have ways and means of having a pretty good idea how long the trial is going to take.  So I'm pretty confident when

I tell you the trial will finish sometime on Friday of this week.

But what I need to know at this juncture, ladies and gentlemen, is I need to know if there are any of you on the panel who have a serious impediment to being able to be here throughout the trial if you were selected to serve on this jury.

And let me explain what I mean by a serious impediment. Jury service by its very nature is inconvenient. It's a sacrifice. All of you have other things and other places to be this coming week that are important in your respective lives, and the eight of you that are ultimately selected to serve on this jury will be here throughout the week of this trial. So it is public service because it is a sacrifice and it is by its very nature inconvenient.

When I say I need to know if any of you have a serious impediment to being here this week if you're selected, I'm not asking you, is it going to be inconvenient because I can tell you it is going to be inconvenient. What I'm talking about, ladies and gentlemen, when I say serious impediment, for example, if you or an immediate family member has a surgical procedure scheduled this coming week that can't be easily rescheduled, that's a serious impediment.

If you and your family have pre-paid non-refundable airline tickets to be some place that's going to cost you

thousands of dollars if you have to be here and you can't get anything refunded, well, that's a serious impediment.  Those are the kinds of things I'm talking about.  I'm not talking about it being inconvenient.  I'm not talking about you needing to be at work and stay current with your job obligations.  If those were excuses for jury duty, we wouldn't ever get any jurors.  It is inconvenient by its very nature.

So with that explanation, if there are any of you on the panel that believe you have a serious impediment as I've described it to being here this week if you were selected to serve on this jury, I'd like you to raise your hand so I can make a note of it.  Okay.  No. 4, thank you, sir.  No. 10, thank you, sir.  No. 2.  Anybody else in the jury box?  No. 17 in the gallery, and a gentleman in the back with a mask and I can't see his number.  No. 32.  Thank you.

Okay.  So I have 2, 4, 10, 17, and 32.  Did I miss anybody?  All right.  Thank you, ladies and gentlemen.

Now, at this time I'm going to call for announcements on the record in the case of General Access Solutions, LTD., versus T-Mobile USA, Inc.; and Ericsson, Inc.  This is Civil Case No. 2:23-CV-0158.

And, counsel, as you give your announcements from the podium, if you'll introduce the members of your trial team that are present and any corporate representatives that you have with you in the courtroom.

What says the Plaintiff?

MS. FAIR:  Good morning, Your Honor.

Ladies and gentlemen, my name is Andrea Fair.  I represent General Access Solutions in this case.  I'm joined today by Mr. Glen Summers, Dr. Meg Fasulo, Mr. John Hughes, and with us is our corporate representative, Mr. Michael "Skip" Hynek.

And, Your Honor, we are ready to proceed.

THE COURT:  All right, counsel.  Thank you.

What says the Defendants, both T-Mobile and Ericsson?

MR. DACUS:  Thank you, Your Honor.

Good morning, Your Honor.

Good morning, everyone.  I'm Deron Dacus here representing T-Mobile and Ericsson, and here with me representing T-Mobile and Ericsson are Ted Stevenson, John Haines, and Scott Stephens.  And also with us are Justin Mueller, who is the senior director of networks engineering at T-Mobile, and also Sebastian Faxer, who is a chief technology officer at Ericsson.

And we're likewise ready to proceed, Your Honor.

THE COURT:  Thank you, counsel.

MR. DACUS:  Thank you.

THE COURT:  As I've told you, ladies and gentlemen, this is a patent case arising under the patent laws of the United States, and what the Plaintiff T-Mobile [sic] is

claiming is that two of its patents have been infringed by the Defendants -- excuse me.  What the Plaintiff General Access is claiming is that two of its patents have been infringed by the Defendant T-Mobile and the Defendant Intervenor Ericsson.

And let me take a minute and explain this to you.  The Plaintiff in this case is General Access Solutions.  The Defendant in this case is T-Mobile.  And Ericsson is what is known technically as a Defendant Intervenor.  What that means is when the lawsuit started, Ericsson was not a defendant; Ericsson was added as a defendant and actually intervened in the case as a defendant once the lawsuit had been in place and was ongoing.

But for practical purposes, Ericsson and T-Mobile are aligned with each other and you'll probably hear them referred to jointly as Defendants during the trial, even though T-Mobile was the original Defendant at the time the lawsuit was filed and Ericsson was added and intervened in the case, joined T-Mobile after the lawsuit was ongoing.  So technically procedurally, there's a little difference between them.  Practically, there really is no difference between T-Mobile and Ericsson in this case.

So what the Plaintiff is contending is that two of its patents have been infringed by the Defendants, and the Defendants deny that they infringe either of the Plaintiff's patents.  And they also allege that the Plaintiff's patents

are invalid.

Now, what I've just said is a very short-form informal way of telling you what this case is about.  I know you have all seen the patent video this morning prepared by the Federal Judicial Center; and having seen that, you already know more about patent cases than most citizens do in our area.

Now, as I've told you, as part of the process the lawyers are going to question the members of the panel to gather relevant information to exercise their strikes and peremptory challenges to complete the process of working with the Court to select and seat a fair and impartial jury to hear the evidence in this case.

Once again, ladies and gentlemen, there aren't any wrong answers to the questions you are asked as long as your answers are full, complete, and truthful.  If for any reason you were to be asked a question this morning that I thought was improper, I will not hesitate to stop the lawyers, but I want you to know, ladies and gentlemen, these are very experienced trial lawyers, some of the most experienced trial lawyers in our nation.  They understand the Rules of Civil Procedure, the rules of the Court, the Rules of Evidence, and I do not expect any improper questions to be asked.

One thing I do want to call your attention to before I turn any questioning over to the lawyers is what is called the burden of proof, because it's possible that the lawyers in

their questioning may ask you about your ability to apply the burden of proof if you're selected as a juror in this case.

The jury in this case may apply a burden of proof known as the preponderance of the evidence.  I'll say that again for emphasis--the preponderance of the evidence--as well as a second and different burden of proof known as clear and convincing evidence.  And I'll repeat that for emphasis--clear and convincing evidence.

Now, when responding to any possible questions from the lawyers about the burden of proof, I need to instruct you that when a party has the burden of proof on any issue, any claim or defense, by a preponderance of the evidence, that means that you, the jury, must be persuaded by the credible and believable evidence that that claim or defense is more probably true than not true.  Let me say that again for emphasis--more probably true than not true.  Sometimes this is talked about as being the greater weight and degree of credible testimony.

Let me give you an example that I hope will be helpful to you.  In front of me is our court reporter and in front of Mr. McRoberts, our court reporter, you see a statue of the Lady of Justice.  In Latin she's called Justicia.  A couple of things about that statue.  First of all, she's blindfolded.  Second of all, she holds lowered at her right side the sword of justice.  Third, she holds raised on her left side the scales

of justice.  It's those scales of justice I want you to focus on.

Think of it this way when you think about the burden of proof, ladies and gentlemen.  When the trial starts out, both sides are completely balanced and equal and in the same position just like those scales.  And over the course of the trial, the Plaintiff is going to put all of its evidence on one side of those scales.  Then the Defendants are going to put all of their evidence on the other sides of those scales.

And when all the evidence is in from both Plaintiff and Defendants and is on one side or the other of those scales, then with all the evidence in place, if those scales tip in favor of the party who has the burden of proof by a preponderance of the evidence, even if they tip ever so slightly, then that party has met its burden of proof of a preponderance of the evidence.

Now, on the other hand, a party who has the burden of proof on any defense by this second burden of proof that I mentioned to you, clear and convincing evidence, when the clear and convincing evidence burden of proof applies, it means that the jury must have an abiding conviction that the truth of the party's factual contentions are highly probable. I'll say that again for emphasis--an abiding conviction that the truth of the party's factual contentions are highly probable.

Now, this is a higher standard or burden of proof than the preponderance of the evidence.

Let's go back to the example I gave you with the statue, the Lady of Justice.  At the beginning of the trial, both sides start out equal.  Over the course of the trial, the Plaintiff's evidence goes on one side of those equal scales, the Defendants' evidence goes on the other side of those equal scales.  And when the evidence is all in, the scales aren't equal anymore.  If they tip in favor of the party who has the burden of proof on any defensive issue by clear and convincing evidence, and in this case they must do more than tip ever so slightly, if they tip definitely in the favor of the party with the burden of proof by clear and convincing evidence, then that burden of proof has been met.

Now, neither of these two burdens of proof, ladies and gentlemen, should be confused at all with a third and altogether different burden of proof that I'm sure you're all aware of, seen it in movies and television, called beyond a reasonable doubt.  Beyond a reasonable doubt is the burden of proof that applies in a criminal case.  That burden of proof has no application whatsoever in a civil case like this.

Now, you should not confuse clear and convincing evidence with beyond a reasonable doubt.  Clear and convincing evidence is not as high a burden of proof as beyond a reasonable doubt, but it is a higher burden of proof than the preponderance of

the evidence.

Now, I give you these instructions in case some of the lawyers in their questioning ask -- will ask you or want to ask you about your ability to apply these two applicable burdens of proof to the evidence that you'll hear in this case if you're selected to serve on this jury.

Now, before the lawyers address the panel and ask their questions, we've come to the point where I'm going to ask each of you to tell me the same kind of information about each of you that I gave you when I started this morning.  You'll see on your screens and you should have printed copies as well of nine standard questions I'm going ask everybody to answer.

But let me explain to you how we're going to do this, ladies and gentlemen.  This is a big room, there are a lot of people in here, and it's important that your answers are heard.  So when it's your turn to answer these nine questions, I'm going to ask you to wait until the Court Security Officer brings you a handheld microphone.  Take that handheld microphone, stand up, and then once you're standing, then answer those nine questions.

And later in the process when the lawyers are questioning you, if they should ask a specific juror or a specific member of the panel a question, then we'll do it in exactly the same way.  Don't answer the question until the Court Security Officer brings you a handheld microphone, take that handheld

microphone, stand up, hold the handheld microphone to your mouth and then answer the question.

And let me just say this, ladies and gentlemen. Having tried more than a hundred jury trials, people who show up for jury trial seem to fall into one of two or three categories when it comes to using a handheld microphone. There are some people that talk with their hands and when you're answering the question and that microphone is out here waving around as you're talking with your hands, it's not amplifying your voice. So you need to keep it near your mouth.

Second group of people are the people that as soon as they get that handheld microphone, it immediately goes to their belt buckle. They can't hold it anywhere else but their belt buckle. And if you hold it down at your waist, it's not going to amplify your voice and not everybody who needs to hear your answers are going to hear your answers.

So make a mental note when you get the handheld microphone to answer a question, take it, hold it near your mouth, and keep it there and use it to amplify your voice, if you will, and that will serve everybody's purposes well. Again, it's important that we all hear the answers to the questions that you're about to answer as well as any questions you're specifically asked by the lawyers in the case.

So with that, ladies and gentlemen, we'll begin with Panel Member No. 1, Ms. Sierra. If you'll take the

microphone, stand up and answer those nine questions for us.

THE PANEL MEMBER:  Hi.  So my name is Karen Sierra, and I live in Longview, born and raised.  I don't have any children.  I'm unemployed, but I'm currently a student at TJC. And I don't know -- do I answer No. 4 since I said I'm unemployed?

THE COURT:  Are you married at present?

THE PANEL MEMBER:  No, I'm not.

THE COURT:  Okay.  So you don't have a spouse.  And have you worked before this period of unemployment?

THE PANEL MEMBER:  Yes, I have.

THE COURT:  And what have you done when you were working?

THE PANEL MEMBER:  I was a lab -- student lab assistant at the University of Dallas, and that's when I graduated in 2023 with my Bachelor's in bio.

And I don't have a spouse, and I have not had any prior jury services.

THE COURT:  All right.  Thank you very much, ma'am. If you'll hand the microphone to Panel Member No. 2, Mr. Brooks.  If you'll answer those questions for us, sir?

THE PANEL MEMBER:  My name is Lewis Brooks.  I live in Longview.  I have two children, four grandchildren.

I'm self-employed; I'm a small business owner.  So I do contract work on oil and gas wells where I don't have a

schedule.  The work's there and I catch it every day so I usually work about 25 to 30 days a month.  I've been doing the contract work since -- for six years now.  Got a high school diploma.

My spouse's name is Omega Brooks.  She's also a homemaker and helps take care of the grandkids so the kids can work.  She's been doing that now for seven years.

And I didn't have any prior jury service.

THE COURT:  All right, sir.  Thank you very much.

Next is Panel Member No. 3, Mr. Dulaney?

THE PANEL MEMBER:  My name is Gregory Dulaney.  I live in Longview.  I have two kids, grown, four grandkids.

I am retired, worked for General Electric for 20 years.  I have a Master's degree in environmental engineering.

My spouse's name is Melanie Dulaney.  She was a teacher and librarian in Hallsville School District for 20 years.  She is retired as well.

I have no prior jury service.

THE COURT:  Tell us what you did for General Electric, Mr. Dulaney.

THE PANEL MEMBER:  I was -- I wasn't assigned a technical -- I had contracts with customers.  I was their assigned technical advisor for power plant equipment.  I also managed the commercial aspects of the contract.

THE COURT:  All right.  Thank you very much.

No. 4 is next, Mr. Ervin?

THE PANEL MEMBER:  My name is Calvin Ervin, Sr.  I have three children.  Well, let me rephrase that.  I have four children.  I have nine stepchildren.  I have 29 grandkids with seven of them that's actually mine.

I've worked for International Paper up in Domino, Texas, for 32 years.  And my education is 12th grade.

My spouse's name is Wanda G. Ervin.  My place of employment at that time was, I just said it, International Paper at Domino, Texas.  I'm retired and also on medical disability.  Let's see.

THE COURT:  Have you ever served on a jury?

THE PANEL MEMBER:  Thirteen, fourteen years ago.

THE COURT:  And what was that, sir?

THE PANEL MEMBER:  In Linden, Texas.

THE COURT:  All right.  And is your wife employed or retired?

THE PANEL MEMBER:  She has a job taking care of me.

THE COURT:  All right, sir.  It pays real well?

THE PANEL MEMBER:  Yes.  She's been paid by the state.  She takes care of me.

THE COURT:  All right.  Thank you, Mr. Ervin.

Next is No. 5, Ms. Rhodes.

THE PANEL MEMBER:  My name is Karen Rhodes.  I'm live in Marshall, Texas.  I have one child.

I work for Harrison County, and I've been there almost six years. I'm divorced. High school diploma, and I have done a jury before and it was criminal in the 71st District Court.

THE COURT: And you work in the District Attorney's Office or where in the courthouse?

THE PANEL MEMBER: I am the department head of fine collections.

THE COURT: That's a separate department now?

THE PANEL MEMBER: It is.

THE COURT: Okay. Thank you, ma'am.

No. 6 is next, Mr. Hart.

THE PANEL MEMBER: My name is Ed Hart. I live in Jefferson, Texas. I have two children and three grandchildren.

I'm retired, aircraft mechanic by trade. My previous job was at Cavanaugh Flight Museum in Dallas. I was there for approximately six years. High school graduate.

Spouse's name is Janice. She is a retired nurse in Dallas. She worked for Dr. Bill Downs at Medical City, and she was there for about 10 or 12 years.

And I've had prior jury service, civil and criminal. I was picked on a criminal, but they -- when they saw the jury, they agreed that they had what would you call it where they have --

THE COURT:  A change of plea?

THE PANEL MEMBER:  Yes.  Yes, sir.

THE COURT:  Okay.  What was the civil case about?  You said you served on a civil case?

THE PANEL MEMBER:  Civil?  It was a couple -- one of them was on an automobile.

THE COURT:  Let me ask you this, sir:  Have you ever been a juror in federal court before?

THE PANEL MEMBER:  No, sir.

THE COURT:  Okay.  Thank you then.

No. 7 is next, Mr. McCartney?

THE PANEL MEMBER:  My name is Phillip McCartney.  I have three daughters.

I am a service manager at a Chevrolet dealership.  I live in Hawkins.  I have worked for Dow for five years.  High school diploma.

My wife's name is Summer.  She is a schoolteacher at Big Sandy ISD.  She's been there for 12 years.

And no prior jury services.

THE COURT:  All right, sir.  Thank you.

And we'll take the microphone around to the back row of the juror box, and we'll start next with jury Panel Member No. 8, Ms. Lockett?

THE PANEL MEMBER:  My name is Cheryl Lockett.  I'm from Linden, Texas.  I have two children.

I'm employed with Linden Kildare Elementary School.  I've worked there for going on six years.  I'm a graduate of Jarvis Christian University.

I am divorced for many, many years.  And I've never been chosen for jury duty.

THE COURT:  All right, ma'am.  Thank you very much.

Next is No. 9, Ms. Braden.

THE PANEL MEMBER:  My name is Michelle Braden.  I live in Waskom, Texas.  I have four children and 1.5 grandchildren.

I work at Panola College.  I've been there for a total of seven years, but only one year in my current position which is a receptionist.  Before that, I did data entry.  And I'm also an English as a second language instructor.  I have an Associate's in general studies.

I'm divorced, and I have no previous jury service.

THE COURT:  All right, ma'am.  Thank you.

No. 10 is next, Mr. Hunter.

THE PANEL MEMBER:  Mike Hunter.  I've got one child.

I worked in rolling stock maintenance at Sabine Mining Company for 36 years.  High school education and a whole bunch of government safety training.

My spouse's name is Terry.  She does home health.  And the private contractor -- you have to have a score card to figure out where she's working on what day and what time.

She's done it for a long time.

The only other jury I was on, it was a car wreck.  As soon as the jury walked in and sat down in the jury box, they settled right then and we walked right back out.

THE COURT:  So did you ever work on those drag lines, those huge pieces of equipment?

THE PANEL MEMBER:  I was a drag line maintenance planner for a little while.  Mostly I spent my time in rolling stock with the big trucks and bulldozers and that kind of thing.

THE COURT:  All right.  Thank you very much.

No. 11 is next, Mr. Mackintosh?

THE PANEL MEMBER:  Yes.  My name is Matt Mackintosh. I have two children.

I work for Gladewater ISD as a facility service director. I've been there 15 years.  I have some high school diploma, also have specialized training with Texas Education Agency as a certified Texas school business official.

My wife's name is Cheryl.  She works at Good Shepherd Medical Center in infomatics, been there I think seven or eight years.

And I have served on two criminal cases.

THE COURT:  All right.  Both in a state court or have you ever served in federal court?

THE PANEL MEMBER:  No, state only.

THE COURT: All right, sir. Thank you.

No. 12 is next, Mr. -- is it Nowak?

THE PANEL MEMBER: Yes, sir. My name is Ralph Nowak. I live in Linden. I have five children.

I'm retired. Previously, I was a fence enclosure specialist for ranching. And then before that, I did some classified work where I got a confidentiality disclosure. I can't discuss it. With research and development. And before that, I was 12 years in the armed forces. I have a high school education.

My spouse -- I'm a widow and no previous jury service.

THE COURT: All right, sir. Thank you.

No. 13 is next, Mr. Kleinik?

THE PANEL MEMBER: My name is David Kleinik. I live in Harleton. I got three kids, all girls.

I work for Fleet Loop Services in Kilgore. It's an 18-wheeler service shop so I just work on trucks all day. I've been there a little over six year. Highest education is high school.

I'm divorced. And I've served on a jury one time, but it was -- it wasn't federal.

THE COURT: Where was it?

THE PANEL MEMBER: The courthouse over there.

THE COURT: All right. The state courthouse in Marshall?

THE PANEL MEMBER:  Yes, sir.

THE COURT:  Thank you.

Next is No. 14, Mr. Bergt?

THE PANEL MEMBER:  My name is Chris Bergt.  I'm from Atlanta, Texas.  My wife Jennifer and I have two children and have two grandchildren.

I went to Stephen F. Austin and got a degree in forestry and now have my own timber company.  And due to the excessive amount of rain we had last weekend, I got six men kind of waiting on me to move them to a new job.  So I'd appreciate if you-all pick these other folks.

THE COURT:  Well, that's up to me now.  You didn't raise your hand when I asked you about a serious impediment to serving.  Is it something you want to discuss with me?

THE PANEL MEMBER:  Well --

THE COURT:  Not now but at a later date?

THE PANEL MEMBER:  You said serious.  It wasn't no life threatening.

THE COURT:  All right.  I'll make a note of it. Thank you.

All right.  We're going to go to the gallery next, No. 15?

THE PANEL MEMBER:  My name is Decorian Floyd.  I am from Gladewater, Texas.  I have two daughters.  I work at Truman W. Smith Children Care Center, been there

three-and-a-half years.  I have a high school education.

I'm divorced, and no prior jury service.

THE COURT:  All right, sir.  Thank you.

No. 16 is next, Ms. Bussey.

THE PANEL MEMBER:  Julie Bussey.  Longview, Texas.  Have two kids.

I'm retired from Texas Eastman.  I worked there 26 years as a chemical operator.  High school education.

Divorced.  And I've no prior jury.

THE COURT:  And what did you do as a chemical operator?

THE PANEL MEMBER:  I worked in the propylene plant and basically it's maintaining the equipment and the operations on day-to-day basis.

THE COURT:  Thank you very much, ma'am.

No. 17 is next.

THE PANEL MEMBER:  My name is Kathy Spayde.  I live in Pittsburg, Texas.  I have six children and seven grandchildren.

I am employed full time at Pittsburg Independent School District as a paraprofessional for the last 24 years.  I also own cats and dogs cleaning and pet services, and I work for Gray Rock Landscaping.  I went to A&M Commerce.

My spouse's name is Heather Lee Harrell.  She is disabled after 22 years of ICU heart nurse work.

I have served on a patent case, federal.

THE COURT:  Was it in this courtroom?

THE PANEL MEMBER:  Yes, sir.

THE COURT:  How long ago was it?

THE PANEL MEMBER:  A couple of years, three or four years.

THE COURT:  Okay.  Did the jury return a verdict for either the plaintiff or the defendant?

THE PANEL MEMBER:  Yes, sir.

THE COURT:  And which was it for?  The plaintiff or for the defendant?

THE PANEL MEMBER:  Plaintiff.

THE COURT:  Okay.  Thank you very much, ma'am.

No. 18 is next, Mrs. Easley?

THE PANEL MEMBER:  I'm Teresa Easley.  I live in Leesburg, Texas.  I have two children, two bonus children.

I work at Whispering Pines Nursing and Rehab, and I'm the business office manager.  I've worked there 8.6 years.  I have some basic college.

And my spouse's name is David Easley.  He is retired now. He worked at the Lowe's Distribution Center as the maintenance director.  He worked there for about 15 years.

And I have served twice on two criminal cases, one in Mt. Pleasant and one in Pittsburg.

THE COURT:  Okay.  You've never served as a juror in

a federal court?

THE PANEL MEMBER:  No, sir.

THE COURT:  Thank you, ma'am.  If you'll hand the microphone back to the Court Security Officer, he'll take it to No. 19, Mrs. Green?

THE PANEL MEMBER:  I'm Misty Green.  I live in Diana, Texas.  I have three children, two are juniors in high school.  My oldest plays minor league baseball for the Yankees so he's living in Florida.  Sorry.  I'm nervous.

THE COURT:  Take your time.

THE PANEL MEMBER:  I'm an assistant manager at Gilmer National Bank.  I've been there a total of 11 years.

My spouse is Jerry Green.  He's a VP and plant manager at Mosby Mechanical.

I have an Associate's of Arts degree in college, and I have no jury services.

THE COURT:  Thank you very much, ma'am.

No. 20 is next, Ms. Baker?

THE PANEL MEMBER:  My name is Shante Baker.  I currently live in Atlanta, Texas.  I have three wonderful boys.

I work as a property manager in Queen City, Texas, for Queen City Manor Apartments.  I have worked there for a year now.  I have no college degree, but I got my medical billing and coding from Texarkana College.

I do not have a spouse.  I'm divorced, and never been on prior jury service before.

THE COURT:  Thank you very much, ma'am.

No. 21 is next, Mrs. Cornelius.

THE PANEL MEMBER:  My name is Christy Cornelius, and I live in Harleton, Texas.  And I have two children.

I work for Edward Jones Investments.  I've been there for three years.  I have a Bachelor of Science in journalism.

My husband is Jeff, and he works for Williams Companies.  And he's been there, I don't know, 11, 12 years.

And I did serve on a jury at the county courthouse.

THE COURT:  Okay.  Where is the Edward Jones office that you work in?

THE PANEL MEMBER:  It's in Longview.

THE COURT:  Okay.  Thank you, ma'am.

No. 22 is next, Mr. Wormington?

THE PANEL MEMBER:  My name is Dale Wormington.  I have one child, three grandkids.

I'm a retired construction manager, 35 years.  My educational background, I have high school, some college, and some vocational training.

My spouse's name is Sandra, and she is a homemaker.  We've been married about 15 years.

And I have no prior jury service.

THE COURT:  All right, sir.  Thank you very much.

No. 22 is next, Mr. Base?

THE PANEL MEMBER:  My name is David Base.  I live in Longview.  I have two adult children and two grandchildren.

I'm retired, but I was in energy services business for about 30 years doing large energy infrastructure projects for the federal government primarily.  Educational background, I have four-plus years of college but no degree.

I'm divorced, and I served on a criminal jury in Fort Worth.

THE COURT:  All right.  Was that in state court or federal court, sir?

THE PANEL MEMBER:  State.

THE COURT:  All right.  Thank you.

Next is No. 24, Mr. Spray.

THE PANEL MEMBER:  Yes.  My name is William Spray.  I live here in Marshall, Texas.  I have two children and five grandchildren.

And I am currently self-employed.  I have a repair and renovation business.  Take ugly houses and make them look better, and I've been doing that for 13 years now.  I have a college degree in agriculture from SFA.

My wife's name is Melody and has been my wife for 43 years now.  She was a nurse and now she's -- I'll say she's retired because she does not work outside the home.

And I did serve on a jury here a couple of years ago in

this court.

THE COURT:  Do you remember what kind of case it was?

THE PANEL MEMBER:  It was one on roofing compounds. I can't remember.

THE COURT:  Do you remember if there were patents at issue?

THE PANEL MEMBER:  Yes, there were patents at issue.

THE COURT:  And do you remember what the jury's verdict was?  Was it for the plaintiff or for the defendant or do you remember?

THE PANEL MEMBER:  I do not remember exactly.  It was somewhat mixed, but I know there was some damages that were awarded.

THE COURT:  All right, sir.  Thank you very much.

No. 25 is next, Mrs. McGowan.

THE PANEL MEMBER:  My name is Francetta McGowan.  I live here in Marshall, Texas.  I have two children and one grandson.

My place of employment is Pine Tree ISD where I serve as the librarian.  I have been in education for 33 years.  I have a Bachelor's in education.

I am a widow.  And, yes, I have served on a criminal jury in Cherokee County.

THE COURT:  All right.  You've never served as a

juror in federal court, have you, ma'am?

THE PANEL MEMBER:  No.

THE COURT:  Thank you very much.

All right.  Next is No. 26, Mr. Helgenfeld.

THE PANEL MEMBER:  Yes, sir.  My name is Walter Helgenfeld, currently residing in Omaha, Texas.  I have two kiddos, one stepchild.

I am retired with 38 years, 38-and-a-half years from AT&T in Dallas County.  I graduated high school, a couple of semesters in college, and numerous technical classes that we went through.

Currently married to Karen.  She is currently works for a small company called Cable Interiors.  They do network and data lines primarily for Wells Fargo Banking Company.  And she's been working there for about 20 years.

I do have prior jury service.  It was a criminal case in Dallas County in the '80s.

THE COURT:  All right.  Do you remember if it was in state court or federal court?

THE PANEL MEMBER:  It was in the state court, Your Honor.

THE COURT:  All right.  Thank you very much, sir.

No. 27 is next, Mr. Hill?

THE PANEL MEMBER:  Howdy.  My name is Ethan Hill. I'm from Gladewater, Texas.  I am unmarried.  I do not have

any children.

I have a Bachelor's degree from LeTourneau University in computer science. I currently work for a company out of Longview called Centris Information Services. They are a telecommunications company with major operations in Mexico.

THE COURT: Mr. Hill, could you slow down just a little bit.

THE PANEL MEMBER: I apologize.

THE COURT: Please slow down.

THE PANEL MEMBER: Man, this isn't an auction? Like, shoot.

THE COURT: No, it's not an auction. Please slow down.

THE PANEL MEMBER: My name is Ethan Hill. I'm from Gladewater, Texas. I am unmarried, and I do not have any children.

I have a Bachelor's degree from LeTourneau University in computer science. I currently work for a company out of Longview, Texas, called Centris Information Services. They are a telecommunications company with major operations in Mexico. I work as a Linux systems engineer. I've worked there for about four years. I interned there for about two before that.

And I've never been involved in any jury services before.

THE COURT: All right. Thank you very much. If

you'll hand the microphone to No. 28, Mrs. Turner.

THE PANEL MEMBER:  My name is Cindi Turner.  I live in Ore City.  I have two children and one grandchild.

I work at new Diana ISD as a classroom teacher.  I've been there 28 years.  I have a Bachelor's degree from the University of Texas.

My husband's name is Terron Turner, and he works at Gap Distribution Center in Longview, electronic mechanical maintenance there.  He's been there two or three years since it opened.

And I have no prior jury service.

THE COURT:  And what grades and what subjects do you teach?

THE PANEL MEMBER:  I teach first grade, and it's self-contained.

THE COURT:  All right.  Thank you, ma'am.

Next is No. 29, Mr. Lynch.

THE PANEL MEMBER:  My name is Kelvin Lynch.  I live in Longview, Texas.  I've been in Longview for about 13 years.  I have two sons.

My place of employment is Home Depot.  I've been there about six years.  Prior to that, I retired from Walmart where I had 35 years there.  My educational background, I have a doctorate degree in theology, and I'm also a pastor of a church as well.

My spouse's name is Donna Lynch.  Donna Lynch was a schoolteacher for many years.  She's retired now as well.  She was in the school system for about 15 years.

And I have no prior jury experience.

THE COURT:  Thank you, sir.

All right.  Next is No. 30, Ms. Goodro?

THE PANEL MEMBER:  Hi.  My name is Wanda Goodro.  I'm from Waskom.  I have two children, two grandchildren.

I am retired from the state of California Department of Motor Vehicles, 36 years.  I have a high school diploma.  I am divorced, but I have my best friend/boyfriend Derrick for 23 years.  He is retired.

And I've done -- within been on a couple of juries over at the state courthouse.

THE COURT:  All right.  You never served on a jury in a federal court?

THE PANEL MEMBER:  No, sir.

THE COURT:  Thank you, ma'am.

All right.  No. 31 is next.

THE PANEL MEMBER:  Hello.  My name is Gretchen Hedgepeth.  I live in Bevins, Texas.  I have three children.

I'm a first grade teacher, reading, at McLeod Independent School District, moving into the reading specialist position next year.  I've worked there 17 years.  I have a Bachelor's degree.

My husband is Kenneth. He is self-employed. He pulls oil wells and services and does maintenance on those. He has worked there maybe 18 to 20 years.

And I've had no prior jury services.

THE COURT: All right, ma'am. Thank you very much. Next is Mr. Donald, No. 32?

THE PANEL MEMBER: My name is Darrel Donald. I live here in Marshall. My daughter is a schoolteacher in Dallas Independent School District. My son works for Microsoft in is Seattle.

I'm a retired from U.S. Postal Service and also from the U.S. Navy. I have high school graduate and several training from the Navy.

My spouse's name is Carol Donald. She's an analyst for the Department of Defense in Warner Robins, Georgia, and I can't remember how long she's worked there.

And I've served on one civil trial here in Marshall.

THE COURT: And was that in this court or was it in the state court?

THE PANEL MEMBER: Here, this court.

THE COURT: All right. How long ago has that been, sir?

THE PANEL MEMBER: It's been a pretty good while, just before you came here.

THE COURT: I wasn't on the bench then?

THE PANEL MEMBER:  No.

THE COURT:  So that's been at least 13 years ago. Is that the only time you served in federal court?

THE PANEL MEMBER:  Yes.

THE COURT:  Do you remember what that case was about?

THE PANEL MEMBER:  Panasonic and Samsung patent trial.

THE COURT:  All right, sir.  Thank you very much, Mr. Donald.

Next is No. 33, Mrs. Newsome.

THE PANEL MEMBER:  My name is Heather Newsome.  I live in Cason, Texas.  I have three children.

My place of employment, I work for the Dallas VA, but I'm located out of the Greenville community-based clinic.  I've worked there for 17 years.  I have a high school diploma, some college courses.

My spouse's name is Derrick.  He works for Easton.  It's an oil field company, and he does coil and tubing.  And he's been doing that for about 10 years.

And no prior jury services.

THE COURT:  All right.  Thank you, Mrs. Newsome.

Thank you, ladies and gentlemen for that information.

Now, I need to say a couple of things to you before I turn the questioning over to the lawyers.

The jurors that are actually selected to serve in this case will serve in the role as the judges of the facts, and the jury selected will make the sole determination about what the facts are in this case.  Now, my job as the Judge is to rule on questions of law, evidence, and procedure, to maintain the decorum of the courtroom, and to oversee an efficient flow of the evidence during the trial.

Also, I want to say a couple of things to you about our judicial system that hopefully will put things in a proper perspective for you.  In any jury trial, besides the parties themselves, there are always three groups of participants--the jury, the judge, and the lawyers.

Now, with regard to the lawyers, it's important for each of you to understand that our judicial system is an adversary system, which simply means that during the course of the trial the parties through their counsel will seek to present their respective cases to the jury in the very best light possible.

Now, it's no surprise to any of you that lawyers as a group are sometimes criticized in the public, but the Court's observed that some of that criticism is the result of a basic misunderstanding of our adversary system in which the lawyers act as advocates for the competing parties.

And as an advocate, a lawyer is ethically and legally obligated to zealously assert his or her client's position under the rules of our adversary system.  And by presenting

the best case possible on behalf of their clients, the lawyers hopefully will enable the jury to better weigh the relevant evidence to determine the truth and to arrive at a just verdict based on that evidence.

This system of justice, this adversary system of justice has served our nation well since its founding over 200 years ago, and America's lawyers have been, are now, and will be an indispensable part of that process. So as we go forward with the trial, even though it's possible from time to time I might frown at the lawyers in the case, I'm just trying to make sure that their advocacy doesn't get outside the boundaries of our adversary system. But I think it's important for each of you to understand their role and to be aware of that role as we go forward.

Also, ladies and gentlemen, for those of you selected to serve on this jury, I can tell you that I am going to do my very best throughout the trial to make sure that you have no idea what I think about the evidence in this case, because determining the facts based on the evidence is the jury's job; it is not my job. Therefore, you -- if you're on this jury you should not take anything you see or hear or you think you see or hear as coming from me as a factor to consider in deciding the ultimate facts in this case.

All right. At this time, counsel for the parties will address the panel. Plaintiff, you may address the panel at

this time.

Ms. Fair, would you like any warning on your time?

MS. FAIR:  Yes, Your Honor.  May I have a three-minute warning, please.

THE COURT:  I'll warn you with three minutes remaining.  You may proceed.

MS. FAIR:  Thank you, Your Honor.

Good morning.  I am the first lawyer who gets to talk to you this morning, and I'm going start by saying thank you for your time.  I know this is an imposition on your time.  We don't take that lightly.  This is an important case to my client and so we recognize that even those of you who may not be here still this afternoon have made a sacrifice being here.  So let me be the first lawyer to thank you for that.

My name is Andrea Fair, as I mentioned.  I grew up on the Gulf Coast outside of Houston.  I went to school in Austin.  Ms. Turner and I have that in common.  I went back to Houston and practiced there for a few years.  And then when my husband and I had the opportunity to get out of the city and come up here, we took it gladly, and we've been up here ever since.  I've had the privilege of being in this court since that time, and we are happy to be here.

You already heard there's two patents-at-issue in this case, the '477 and the '383.  Those of you who make it on this jury are going to have those numbers memorized.  They relate

to how T-Mobile uses and processes information in the Ericsson base stations in their network.

A base station is just like a cell tower.  That's as technical as I'm going to get right now.  Those of you who make it on the jury are going to learn a lot more about the technology, maybe more than you ever thought was out there.  But for now, just know that General Access is accusing T-Mobile of being on its property without permission.  That's what patent infringement is.  You saw the video.  And we're here to pursue a royalty for that.

Now, for their part, they say they don't infringe.  They say, we're not on the property.  And they say, if we're wrong about that, the patent's invalid, your deed's no good.  And if we're wrong about that, we owe a whole lot less than what you say it is.

Now, we contend that that's $253 million.  They, I think, are going to tell you no more than $3 million.  So you can tell from that alone that this is an important case.

Some of you might be thinking, aren't you a lawyer?  You're supposed to be convincing me; it's not a very convincing argument.  I'm not here to convince you right now.  I think this is the opportunity that we get to hear from you.  So voir dire, you've heard about that, jury selection.  This is our chance to hear about life experiences, things in your background that we might not otherwise know that might impact

your views of this case.

We got your questionnaires.  I know that takes time to fill out.  We appreciate that.  We've spent time with them, and that helps us shorten this a little bit.  I'll tell you-all, those of you here in we'll call the box, you've heard that term a little bit already and those back there, the gallery.

And I'm going to let you in on a little bit of a secret: those of you in the back two rows are probably out of the zone today.  I had my opportunity to serve on a jury selection a few months ago, and I was disappointed when I got my number because I knew what that meant.  I think maybe some of you-all might not be disappointed.  But please don't take offense if I don't spend as much visiting with you-all as those of you over here.

Now, can we all agree that we all have different backgrounds before we got here?  We can agree to that.  Right?  And what experiences we had can affect the way that we view the world.  It might make us lean; it might not impact us at all.  I'm going to give you a simple example.

Mr. Dacus sitting over here, he went to A&M.  I went to UT.  Mr. Dacus played baseball for A&M.  And do we have any Aggies out there?  I think we had an A&M-Commerce.  Right?  Mrs. Spayde?  Is that right?  And I'll tell you my brother went to A&M and he might even lean in Mr. Dacus' favor with me

being a Longhorn.  Does that start you leaning?

THE PANEL MEMBER:  Sure.

MS. FAIR:  Now, Mrs. Spayde, while I have you up, if I could ask you a couple of questions.  You said you do landscaping and you work in education?

THE PANEL MEMBER:  Yes.  And I forgot I also do deliveries for Walmart.

MS. FAIR:  You're busy.

THE PANEL MEMBER:  I am.  I have seven jobs.

MS. FAIR:  Seven?  Which one is your favorite?

THE PANEL MEMBER:  The cats-and-dog business that I own.

MS. FAIR:  Why is that?

THE PANEL MEMBER:  Because I own it.

MS. FAIR:  Now, knowing that Mr. Dacus went to A&M, you said you started leaning out a little bit in his favor, in their favor.  You think you could set that leaning aside?

THE PANEL MEMBER:  I remember him from the last case I was on.

MS. FAIR:  You do?

THE PANEL MEMBER:  Yes.

MS. FAIR:  So you know that Mr. Dacus is a pretty good lawyer?

THE PANEL MEMBER:  Yes.

MS. FAIR:  Does that start you leaning a little bit

in his favor knowing you've seen him in the courtroom before? I don't know which side he was on in that case, but defending or representing a client with patents?

THE PANEL MEMBER:  No.

MS. FAIR:  It doesn't?  Thank you, Mrs. Spayde.  I appreciate it.

Now, I want to ask you, when you found out you had jury duty this morning, how many of you said, I want to be fair; I want to be fair to the parties?  Most?  Most?  Okay.

Is there anybody who said, you know what, I'm angry to be here and I'm going to take it out on somebody?  Anybody?  A little bit, Mr. Hill?  You're in the safe zone so I'll spare visiting with you because I've got some short time here.  But I'll tell you I've had, along with Mr. Hill's little, you know, maybe a little bit, I've had some more robust answers to that before.  And you want to know what happened when they gave that answer?  Nothing.  Because it was the truth and that's what we're after here.

This might be a little bit more realistic, and I think maybe, Mr. Bergt, if I may visit with you, you were called for jury duty, and you thought, you know what, I really don't want to be there, I've got a lot going on.

THE PANEL MEMBER:  Correct.

MS. FAIR:  Now, here is my question for you.  You told us a little bit about what it is you have going on.  Do

you feel like if you're on the jury, you might hold it against the parties for having you here all week when you've got your timber business going on and obviously the weather that we had over the weekend?

THE PANEL MEMBER:  Yeah, I have my mind completely somewhere else.

MS. FAIR:  So you think you'd have a hard time listening to the evidence and considering the evidence and weighing the evidence because that would be stuck in your mind while you're --

THE PANEL MEMBER:  Correct.

MS. FAIR:  Thank you, Mr. Bergt.  I appreciate that.

Now, I want to visit -- Mrs. Turner, I know you're out of the zone, but if I may -- Mr. Richardson, No. 28.

Now, Mrs. Turner, you're a teacher at New Diana ISD.  Is that right?  First grade?

THE PANEL MEMBER:  Yes.

MS. FAIR:  Do you know the Everinghams, Chad and Wendy --

THE PANEL MEMBER:  Yes, ma'am.

MS. FAIR:  -- and Emily and their son, Chance?

THE PANEL MEMBER:  Yes, ma'am.

MS. FAIR:  So Chad Everingham and I practice law together.  And I believe -- so did you teach their --

THE PANEL MEMBER:  I taught Emily, and she graduated

with my son, yes.

MS. FAIR:  And so you've known them a long time. Their kids are grown now?

THE PANEL MEMBER:  Yes, ma'am.

MS. FAIR:  Do you think that might affect your views of this case or do you think you could be fair to both sides?

THE PANEL MEMBER:  I could be fair, yes.

MS. FAIR:  Thank you, Mrs. Turner.  And I use that -- when I heard you taught there, I used that as an example of something that we might not know, a connection we have that we might not know if we didn't have this opportunity to speak with you-all.

So I'm going to pick on Mr. Dacus again.  He's from Gilmer.  I know we've got some folks from Gilmer.  His mom was a schoolteacher there for a long time.  Is there anybody who knows -- and I know Mrs. Spayde knows him from prior courtroom experiences.  Is there anybody else who knows Mr. Dacus, either from growing up in Gilmer, you know, maybe have known of his family around?

Ms. Green, I know you said you're at Gilmer National Bank.  Is that right?  No. 19?

THE PANEL MEMBER:  Yes, ma'am.

MS. FAIR:  Do you know Mr. Dacus or his family?  No? Okay.  Thank you.

Anybody know Ted Stevenson, John Haynes?  They work at

Alston & Bird. It's a multinational law firm. They've got offices all over. I think Mr. Stevenson's in Dallas. Mr. Haynes' office is out of D.C., I believe maybe Atlanta, east coast. Anybody know Alston & Bird, been represented by them, have any familiarity with that firm? No? No one?

Okay. I want to ask you-all -- so my -- our youngest, she is talkative. She talks a lot. She shares a lot about what she's thinking. You don't have to ask her how she feels about things. My husband, on the other hand, he's more reserved. So one-on-one, he's funny, he's charming, but in a big group situation, he's going to be one that's probably not going to be as outspoken.

So my question, and I'm not going to call on anyone. I know, Ms. Green, you mentioned you were nervous. I'm not going to call on you. I know I already called on you once. I'm not going to call on you again.

My question is, who is more like my daughter--you can probably figure out which parent she gets it from--more talkative, enjoys visiting with people, likes to, you know, visit about what she's thinking? Maybe you like to visit about what you're thinking. Who's more like my daughter?

Mrs. Spayde. I saw No. 17, 16, No. 5, Ms. Rhodes, and Mrs. Turner, Mr. Hill. Anybody else?

So the rest of you, who's more like my husband, prefer to just sit quietly, listen, observe, and maybe one-on-one a lot

more interested?

Mr. Brooks, may I pick on you, No. 2, if you don't mind?

THE PANEL MEMBER:  Yes.

MS. FAIR:  Which of those do you identify more with?

THE PANEL MEMBER:  I sit back and watch.

MS. FAIR:  You sit back and watch?  Can I visit with you for a minute if you don't mind?

THE PANEL MEMBER:  Yes.

MS. FAIR:  You said you've been in oil field services, a contractor for six years.  Thank you for filling out your questionnaire by the way.  You've had some supervisory roles.  Is that --

THE PANEL MEMBER:  I'm currently a supervisor.  I've started up multiple frac companies, raised money with private equity groups, and stuff like that.  I've been in the oil field since '99.

MS. FAIR:  Okay.  And I saw that answer some of this.  I saw you had some experience buying and selling businesses, start-ups, and oil field services companies.  Can you share a little bit more about that?  I mean, are you negotiating with, you know, companies that we might know of or are they other smaller shops or --

THE PANEL MEMBER:  I have in the past.

MS. FAIR:  Okay.  Can you give us some examples of that if you don't mind?

THE PANEL MEMBER:  Back in 2010, I went and raised 12 million bucks with a private equity group and started up a frac company and did it again in 2015.  Left that in 2019 and just started working for myself.

MS. FAIR:  And you've enjoyed working for yourself since then?

THE PANEL MEMBER:  A lot better, yes.

MS. FAIR:  What was it like, if you could share, negotiating and working to raise the equity to get your --

THE PANEL MEMBER:  Build a business model and have a huge customer base.

MS. FAIR:  Yeah, uh-huh.

THE PANEL MEMBER:  And so just went and did it that way.

MS. FAIR:  All right.  Thank you for sharing, Mr. Brooks.  I appreciate it.

I want to talk about the Defendants here, T-Mobile and Ericsson.  Does anybody have stock in T-Mobile or Ericsson that you know of?  Anybody?  No?

Okay.  You know, I've tried some patent cases against other companies, and I've had some jurors and frankly some friends of mine say, well, you know what, I have a hard time believing that a sophisticated industry player that makes cutting edge technology could really and would really infringe on someone else's patent.  Does anybody feel that way?

Anybody have that reaction?  No?

Anybody think, you know, these Defendants, they're trustworthy companies, I don't think they would do something like use someone else's technology?  Anyone?  No?

Okay.  T-Mobile, I think some of you-all are T-Mobile customers.

Mr. Dulaney, No. 3, may I visit with you?

THE PANEL MEMBER:  Sure.

MS. FAIR:  Thank you for your service, by the way.

THE PANEL MEMBER:  You're welcome.

MS. FAIR:  You, I believe, indicated -- and thank you for filling out the questionnaire as well.

THE PANEL MEMBER:  As well.

MS. FAIR:  You indicated that T-Mobile is your current provider and has been for several years?

THE PANEL MEMBER:  They are.

MS. FAIR:  You had a good experience with them?

THE PANEL MEMBER:  They give me a good discount for being older, yeah.

MS. FAIR:  For being older?

THE PANEL MEMBER:  Yeah.

MS. FAIR:  Having had that experience and been with them for many years and seeing them over here at the Defense table where we're asking for a royalty for them being on our property, does that start you leaning a little bit?

THE PANEL MEMBER:  No.  I mean, self-service is a commodity to me.  So I guess --

MS. FAIR:  How long were you with GE?  Can you --

THE PANEL MEMBER:  Twenty years.

MS. FAIR:  Twenty years.  And you said you were working -- you managed the commercial aspects?

THE PANEL MEMBER:  Yeah.  It's complicated.  So we had contracts with customers, power plants, some larger players, for service on their power plant equipment.  So I would be assigned a contract to manage, but I'd also be their technical advisor.

MS. FAIR:  Can you tell us what -- when you were their technical advisor, what was it that you -- were you helping them figure out how to build a product?

THE PANEL MEMBER:  I call myself sort of a jack-of-all-trades, a master of none.  You have power plant problems, be it electronic, mechanical, things like that.  I kind of was there to help them diagnose the problem, and then I could get the right expertise from GE.  Similar contracts covered that service; some, it was extra on top of the contract.  There was as many ways as you could slice the bread or, you know, or skin the cat, our contracts varied that way.  But so I would execute our obligations under the contract, I would bill under the contract, and then I also do technical support under the contract.

MS. FAIR: I see.

THE PANEL MEMBER: And I have more than one customer in some cases.

MS. FAIR: And I understand from your questionnaire that you, while you were at GE --

THE PANEL MEMBER: Right.

MS. FAIR: -- GE was involved --

THE PANEL MEMBER: Of course.

MS. FAIR: -- in some patents cases --

THE PANEL MEMBER: Sure. I don't remember --

THE COURT: Just a minute, folks. We can't keep a clear record if you're going to talk at the same time. So you have to talk one at a time. Okay?

THE PANEL MEMBER: Yes, sir.

THE COURT: Go ahead, counsel.

MS. FAIR: Thank you, Your Honor.

You were aware that they were involved in some patent cases while you were there?

THE PANEL MEMBER: Right.

MS. FAIR: Can you share with us what you knew about that or what your --

THE PANEL MEMBER: It's just peripheral news. I didn't remember the specifics of what they were. I mean, at the time before the break-up, GE was a -- I started when GE was the second largest company in the world so there was a lot

of stuff going on.  I just know it was going on.

MS. FAIR:  Do you know which side of it they were on?

THE PANEL MEMBER:  I don't remember.

MS. FAIR:  Do you think that might affect your views of this case or how you might --

THE PANEL MEMBER:  It should have no bearing except the merits of this case at all.

MS. FAIR:  All right.  Thank you, Mr. Dulaney.

Mrs. Easley, I noticed on your questionnaire--thank you for filling that out--that you had been with T-Mobile for -- you terminated their service after one month.  Now, I don't necessarily need all of the reasons why, but my question to you is I would imagine that it was out of something that went wrong.

THE PANEL MEMBER:  It was the coverage area.

MS. FAIR:  The coverage area.  And so --

THE PANEL MEMBER:  I was traveling like 45 minutes to work, and I had no coverage in that area.  So it was not good for me.

MS. FAIR:  And so having had that experience with T-Mobile, does that start you leaning against them?  Do they start a little behind or you can be fair to both parties here?

THE PANEL MEMBER:  Sure.  No.  No, ma'am.  I would not hold that against them.

MS. FAIR:  Thank you, Mrs. Easley.  I appreciate that.

Okay.  I want to talk a little bit about damages.  When I told you that General Access was seeking to recover $253 million, did anyone say to themselves, you know what, I don't care what the evidence shows, I could never consider an award that high, that is a lot of money and that is outside the range of anything I would consider reasonable?  Is there anybody who had that reaction?  No one.

I'll tell you that you heard the Court provide instructions on the burden of proof, preponderance of the evidence, barely tip the scales, and that burden on damages is the same whether it's $250 or $250 million.

Is there anybody who thinks, you know what, that might be the law, but I'm not sure I like that, I just don't think that's fair.  If you're going to come into court and ask for that kind of money, I think it should be a higher burden.

Is there anybody who thinks that?  No one?  I saw a little shrug there from -- if I can visit with you, Ms. Bussey, No. 16.

THE PANEL MEMBER:  I just really don't know that I could truthfully answer it one way or the other.  I don't know without knowing what's involved.

MS. FAIR:  Haven't heard the evidence yet?

THE PANEL MEMBER:  Yeah.

MS. FAIR:  You need to hear the evidence before you can make that decision?

THE PANEL MEMBER:  Yeah.

MS. FAIR:  You are retired at Eastman, if I could visit with you a little bit about that.  You were there --

THE PANEL MEMBER:  26 years.

MS. FAIR:  -- 26 years working on the -- on maintenance on the equipment?

THE PANEL MEMBER:  No.  I was in operations.  So we would -- daily operations, whatever needed to be done, and get equipment ready for maintenance to work on.

MS. FAIR:  What was that like working out at Eastman for all that time?

THE PANEL MEMBER:  That long ago, I was a shift worker.  Only female on shift.  I was told I was very opinionated.  And it was -- it was interesting and at times a little on the border.  I'll just put it that way.

MS. FAIR:  Yes, ma'am.

THE PANEL MEMBER:  It could be difficult.

MS. FAIR:  Yes, ma'am.  But you stayed there 26 years?

THE PANEL MEMBER:  Yeah.

MS. FAIR:  So you must have enjoyed something about it?

THE PANEL MEMBER:  Paycheck.

MS. FAIR:  Paycheck.  That's fair enough.  Fair enough.  All right.  Thank you.

Let's see.  All right.  Lawsuits.  We're here.  This is a lawsuit.  Some people have strong opinions about lawsuits.  I believe Mr. -- actually, Mrs. Spayde, may I visit with you again, please, No. 17?

I understand from your questionnaire you have experience with a lawsuit with your -- I guess a family member had been a defendant in a lawsuit?

THE PANEL MEMBER:  I don't remember.  I don't know what you're talking about.

MS. FAIR:  You don't remember?  Okay.  I thought on your questionnaire that you had had a family member who had been in an accident and then somebody sued?

THE PANEL MEMBER:  Oh, yes.  My daughter had an accident and we were sued.

MS. FAIR:  And so you've been closely related to a defendant in a lawsuit.  What was that experience like?  Can you share with us how it was resolved?

THE PANEL MEMBER:  It's not resolved yet.

MS. FAIR:  So you're still -- okay.  You're still dealing with your daughter being a defendant in a lawsuit?

THE PANEL MEMBER:  Yes.  And me and her father.

MS. FAIR:  And you and --

THE PANEL MEMBER:  Because she was on our insurance.

MS. FAIR:  Okay.  Okay.  Sounds like you're unhappy with that experience?

THE PANEL MEMBER:  I am.

MS. FAIR:  Having had this experience of being a defendant in a lawsuit, with the Defendants sitting here at this table, does that start you leaning out a little bit thinking, you know what, I can identify with that and it's -- I am not happy about it?

THE PANEL MEMBER:  It may be possible.

MS. FAIR:  It starts you leaning out, before you've heard any of the evidence, with this experience that you've got going on?

THE PANEL MEMBER:  I've already done a patent case once so I already have an idea.

MS. FAIR:  I'm sorry?

THE PANEL MEMBER:  I've already done a patent case so I have an idea.

MS. FAIR:  So it starts you leaning, that experience of having sat as a juror on a patent case, having your daughter and you and her father being defendants in a lawsuit right now, starts you leaning in the Defendants' favor before you've heard any of the evidence?

THE PANEL MEMBER:  Maybe not leaning, but I understand their plight.

MS. FAIR:  Yeah.  You identify with them before

you've heard any of the evidence.

THE PANEL MEMBER:  Yes.

MS. FAIR:  You can kind of feel for where they're sitting.

THE PANEL MEMBER:  Yes.

MS. FAIR:  Thank you, Mrs. Spayde.  I appreciate that.

Anybody else been a defendant in a lawsuit before?  Anybody else?  No one?

Mr. Noack, No. 12.  If you'll wait for the mic, please.  Thank you so much.

And thank you for your service, Mr. Noack, by the way.

THE PANEL MEMBER:  It was my pet had run out in the road and we ended up -- the judge said it was half his fault and half my fault, and we settled right there.

MS. FAIR:  Having had that experience, does that change anything about your views in this case, start you leaning in the Defendants' favor having been involved in a lawsuit?

THE PANEL MEMBER:  Again, I'm -- I have to hear what the evidence is.  I'm pretty much that way.  I'm not one way or the other for either.

MS. FAIR:  Sure.  Sure.  I believe you used to have T-Mobile's phone service and switched to Verizon.  Is that -- did I get that right from your questionnaire?

THE PANEL MEMBER:  That was my wife.

MS. FAIR:  Okay.

THE PANEL MEMBER:  She was my communicator, and I was just applicator in my business.  And whenever she had problems with services in the areas that she traveled in, she just ended up going with a different carrier.  She didn't like -- at that time that was 15, 20 years ago maybe.

MS. FAIR:  Okay.  And so does that start you leaning one way or the other --

THE PANEL MEMBER:  No, ma'am.

MS. FAIR:  Okay.  Thank you, Mr. Noack.  I appreciate that.

Now I want to talk just kind of more generally about lawsuits.  I know some of you-all have some strong views about them.

Who agrees with me there's too many lawsuits out there?  I'm raising my hand.  Right?  Too many lawsuits.  Those of you who feel like there's too many lawsuits, maybe if I could speak with Mr. Hunter, No. 10.

I believe on your questionnaire you said you're against frivolous lawsuits?

THE PANEL MEMBER:  That's correct.

MS. FAIR:  So am I.  Being against frivolous lawsuits, you know, does it start you leaning out in favor of the Defendants here because we brought this lawsuit?

THE PANEL MEMBER:  I've got to hear the facts, you know.  I just have to hear the facts in the case.

MS. FAIR:  Before you've heard the facts, does it start you leaning a little bit or are you talking more about, you know, the ads we see on TV, personal jury, that type of thing, not a business dispute like this?

THE PANEL MEMBER:  That type of thing.

MS. FAIR:  Okay.  Is there anybody -- thank you, Mr. Hunter.  I appreciate it.

Is there anybody who feels like, you know, it might be perfectly legal for you to bring this case to court as a patent owner, but I don't know that I like that very much and it starts me -- you know, it kind of starts me leaning a little bit for the Defendants.  Anybody feel that way?

Let me ask -- you saw in the video patents are -- they're like property.  Right?  And if somebody is on your property, you can do two things about it.  Right?  You can let them take it or you can do something about it.

Who out there knew before you saw the patent video today, maybe, Mr. Dulaney, maybe you knew this, but there are no patent police to call.  The jury system is where you can turn when somebody is on your property without permission.

So can all of you-all agree that you'll be fair and consider the evidence and weigh what you hear before you decide, you know what, you had to bring a lawsuit, but I

understand the system?  Can you-all all agree with that?

Okay.  I want to visit -- Miss Sierra, may I visit with you?  Thank you for filling out the questionnaire.

I understand that you are working on more schooling after getting your Bachelor's.  What is it you are working on and what do you hope to do with that?

THE PANEL MEMBER:  Yes.  So currently I'm trying to get into the PTA program at TJC.  So that's where I'm taking extra classes to, you know, get the credits for it in order to apply.

MS. FAIR:  Okay.

THE PANEL MEMBER:  And then also other stuff as well.

MS. FAIR:  And I saw on your questionnaire that you also volunteered at?

THE PANEL MEMBER:  I volunteer at -- every summer I volunteer at an MDA camp for a summer camp for kids that have muscular dystrophy.

MS. FAIR:  May I ask how you found out about that and got involved with that camp?

THE PANEL MEMBER:  Yeah.  It was through my advisor, my college professor.  They were reaching out for volunteers, and he reached out to me because I'm trying to get into physical therapy, that that would be a good experience to learn and I could apply that going into the program.

MS. FAIR:  What made you interested in physical therapy?

THE PANEL MEMBER:  I like the relationship between the physical therapist and the assistant with the patient.  I just liked the trust, the growth they had throughout rehab, and how better the patients feel after they're done with their rehabilitation.

MS. FAIR:  All right.  Thank you for sharing, Miss Sierra.  I appreciate it.

Ms. Braden, may I visit with you?  I haven't had a chance to talk with you.  You have been with the Panola College in Marshall with a couple of different jobs.  My question is, which one's your favorite?

THE COURT:  You have three minutes remaining.

MS. FAIR:  Thank you, Your Honor.

THE PANEL MEMBER:  Mostly the receptionist.  I like being able to greet people when they come in and help them with their issues right off.

MS. FAIR:  I'm going to move on mostly because I'm running out of time.  I hope you will forgive me.  I would love to visit with you more, but I want to ask, and maybe while I have you standing, if I could visit with you, are you aware -- do you have any -- are you fortunate enough to have any mineral rights?

THE PANEL MEMBER:  No, I do not.

MS. FAIR:  Are you kind of aware of how it works generally?

THE PANEL MEMBER:  No.

MS. FAIR:  Okay.  All right.

Well, let me just generally ask to the group.  I'll tell you in order to prove infringement, patent infringement, we have to prove that the Defendants are on General Access's property without permission.  It doesn't require them to know about the patents in this case.  And I expect you're going to get instructed on that.

Does anyone feel like, you know, if you're going to ask for the kind of money you're asking for, you're going to have to prove to me that they knew about these patents before you brought this case?  Anybody feel that way?  No?

Mr. Brooks, I see you nodding your head.  You feel that way?

THE PANEL MEMBER:  It's a lot of money.

MS. FAIR:  Yes, sir.  Yes, sir.  I understand it. It is a lot of money.  So you feel like, look, if you're going to ask for that kind of money, I expect you're going to show me that they knew about these patents?

THE PANEL MEMBER:  Correct.

MS. FAIR:  Let's say, are you fortunate enough to own any?

THE PANEL MEMBER:  I'm very aware of them, but I

don't own any.

MS. FAIR:  Let's say that somebody comes in on your property and they drill a well.  Exxon comes in and drills a well.  You think it would be a reasonable defense for Exxon to say we didn't know it was your property?

THE PANEL MEMBER:  No, that's not a reasonable defense.

MS. FAIR:  And why is that?

THE PANEL MEMBER:  Well, because we have mineral rights, it should have already been -- all those records are in court.

MS. FAIR:  They're all publicly available in the county office.  Right?  The deed records of who owns it?

THE PANEL MEMBER:  Correct.

MS. FAIR:  Did you know before you saw the patent video today, it's the same with patents?  They're right in the Patent Office?

THE PANEL MEMBER:  I didn't know that.

MS. FAIR:  All right.  Can you -- so do you start out leaning in their favor if we're not going to be able to show that they knew about these patents before this lawsuit?

THE PANEL MEMBER:  Not really leaning, no.

MS. FAIR:  All right.  Thank you.

I've got probably about 30 seconds left.  I can't know what to ask everyone.  I don't have time to ask all the

questions I'd like to.

My last question is, is there anybody sitting there thinking, you know, Ms. Fair, if you had just asked, based on what I've heard so far, I would have told you something you need to know that might affect how I view this case?  Anybody out there thinking that I've got something I really need to share.

Mr. Hill, you're in the safe zone.  So I'm going to spare you on that.  Is there anybody in the box that's got something, just thinking this is in my mind, I got to share it?  Nobody on the first couple of rows of the gallery?

THE COURT:  Your time's expired, counsel.

MS. FAIR:  Thank you, Your Honor.

Thank you for your time, and we look forward to presenting our case to those of you who make it on this jury.

THE COURT:  All right.  Defendants may address the panel.  Mr. Dacus, would you like a warning on your time?

MR. DACUS:  Yes, Your Honor.  If you would let me know when I have five minutes left, please.

THE COURT:  I'll warn you with five minutes remaining.  You may proceed.

MR. DACUS:  Thank you very much.

Good morning.  As I said, I'm Deron Dacus, and I represent the men and women who work at T-Mobile and at Ericsson.  And the very first place I want to start with you

is where the Judge started this morning, and that is to say that everyone at this table recognizes that you've got other things you need to be doing today, taking care of kids, jobs, grandkids, all kinds of things.

And so I want you to know that T-Mobile and Ericsson would not be here if this case was not important to them, a very important case.  And if you sit on it, you'll come to understand why pretty quickly.

This is not the time for evidence, it's not the time for me to lay out our case, but I want to say just a couple of things at a very high level.

These two patents that these folks own go back to the turn of century, early 2000s.  And in this case they claim that the base stations that Ericsson makes, that T-Mobile buys from Ericsson, that relate to 4G and 5G, probably heard those terms before, they claim that those base stations made by Ericsson use the patents.  And it's their burden to prove that that's so.

But if you sit on this jury, we're going to show you that these Ericsson base stations that T-Mobile uses in their networks do not today and have never used these two patents. That's what the case is about at a high level.

Now, it's not the time to debate that this morning.  It's time for me to talk to you a little bit and get to know you better.  Before I do it, I'll be fair to you and tell you a

little bit about me.  I wish I could tell you it was interesting enough that somebody's going to write a book or make a movie, but it ain't so.

As Ms. Fair said, I grew up in Gilmer.  I graduated from Gilmer High School, was fortunate enough to get a baseball scholarship, and went to T A&M on a baseball scholarship, graduated from A&M and, like His Honor, went to law school at Baylor where I met my wife to whom I've now been married for 30 years.

We have two grown kids, 27 and 25, one of which have just graduated from physical therapy school, the daughter, the youngest.  And every time I do this, I get to see people stand up and talk about their grandkids and I watch that big smile come across your face when you talk about them.  I don't have any yet, but that's the next goal hopefully is to have some grandkids.

Let me just clear out some of the logistics.  Does anybody know Ms. Fair?  I know we had some Longview folks here.  Ms. Fair works in Longview.  Anybody know Andrea Fair?  Okay.  I don't see any hands.

The other folks that are at her table I think are out of Denver, Colorado.  They work at a firm called Bartlit Beck.  Anybody know that firm, Bartlit Beck?  All right.

Let me ask you this, and before I do, I'm going to tell you I see a lot of hands usually go up on this.  And I tell

you before I ask, I'm not going to ask any details.  I'm not going to pry into any of your personal business.  Just like the Judge said, I'm just going to ask you some high level questions about this.

But here's what I want to know, and I'm not talking about in a court of law, but has anyone ever been falsely accused of something by someone?  Almost all of you have.  I'm just talking in your everyday life.  Anybody been falsely accused of stuff?  Okay.

Let me ask you, Mr. Floyd, you put your hand up, and I'm not going to ask you -- just so you know, Mr. Floyd, I'm not going to ask you one bit of personal stuff.  Okay?  Here's what I want to know:  How did it make you feel?

THE PANEL MEMBER:  Betrayed.

MR. DACUS:  Betrayed.  Did you feel like you had the right to defend yourself?

THE PANEL MEMBER:  Kind of.

MR. DACUS:  Okay.

THE PANEL MEMBER:  Not really.

MR. DACUS:  You can't.  Okay.  You understand that we're here because we say we've been falsely accused and we say we have the right to defend ourselves.  Do you agree with that?

THE PANEL MEMBER:  Correct.

MR. DACUS:  Let me ask you about your experience.  A

lot of folks that I talk to about this topic, they say, hey, it's really easy for someone to just point the finger at you and accuse you of something.  It really doesn't take any amount of time to do that.  Right?

THE PANEL MEMBER:  Correct.

MR. DACUS:  What's real difficult is if you're the person that's falsely accused, it's really difficult to get someone to take the time and actually listen to your side of the story.  Have you had that experience?

THE PANEL MEMBER:  Correct.

MR. DACUS:  Okay.  And you understand that that's sort of the position -- not sort of, that is the position that T-Mobile and Ericsson are in.  These folks have just pointed their finger, sued us in court, and we want somebody who will take the time and listen to our side of the story and then make a decision.  Does that sound fair?

THE PANEL MEMBER:  Correct, it does.

MR. DACUS:  Okay.  Thank you, sir.

Who else raised their hand?  Let's see.  No. 12, Mr. Noack.  You had -- I'm not asking anything about the details, but you've had experience where you were falsely accused?

THE PANEL MEMBER:  Yes, sir.  It was on --

MR. DACUS:  I don't want to know the details, Mr. Noack.  What I want to know is, did you want somebody who would take the time to listen to your side of the story?

THE PANEL MEMBER:  Yes.

MR. DACUS:  Okay.  And sometimes that's hard to get folks to do.  Right?

THE PANEL MEMBER:  Yes.

MR. DACUS:  And you understand that's the position we're in here?

THE PANEL MEMBER:  Yes.

MR. DACUS:  Okay.  You don't hold it against us in any way for defending ourselves in the courthouse?

THE PANEL MEMBER:  No, sir.

MR. DACUS:  You understand -- Mr. Noack, let me ask you this:  you understand, I presume, that anybody can file a lawsuit for any reason and ask for any amount of money.  You understand that?

THE PANEL MEMBER:  Yes, sir.

MR. DACUS:  We don't have any control over that at all.

THE PANEL MEMBER:  Correct.

MR. DACUS:  Okay.  Thank you, sir.

So here's what I want to know from the panel:  Does anybody have any inkling or feeling that T-Mobile and Ericsson don't have the right to come to court and defend themselves?  I mean, if you do, obviously I'd like to know that now.  Okay.  Good.

Let me ask a question related to that, and that's this.

I probably don't need to tell you this, you already know. T-Mobile's a pretty big company, got a lot of folks that work there.  General Access, the folks that sit at the table that brought this lawsuit, much smaller company, much smaller.

So what happens in lawsuits like this sometimes is plaintiffs, the people who bring the lawsuit, ask folks to kind of focus on this big versus small, David versus Goliath, so to speak, rather than focus on the evidence.  And what we, of course, want folks to do is focus on the evidence and not big versus small.

My question to you, does anybody have the slightest leaning, even a little bit, towards the folks at this table because they're the smaller company?  They may say the underdog.  Anybody have even a slight leaning at all?

Let me ask you, Mr. Hart, No. 6.  First of all, thank you for your service, sir.  You lean at all towards these folks because they're a smaller company than T-Mobile?

THE PANEL MEMBER:  No, sir.

MR. DACUS:  Okay.  You'd be one that would just listen to the evidence and you'd make a decision -- just like that Lady of Justice there who's blindfolded, you'd make a decision just based on the evidence --

THE PANEL MEMBER:  Yes, sir.

MR. DACUS:  All right.  Perfect.  Thank you, sir. Appreciate it.

Anybody feel any different than that?  All right.

Ms. Braden, may I ask you a question, please, ma'am, No. 9.  Did I hear you say that you have four kids?

THE PANEL MEMBER:  Yes, sir.

MR. DACUS:  Okay.  When those kids were growing up, did they ever get in little squabbles or little fights --

THE PANEL MEMBER:  Yes.

MR. DACUS:  -- all the time?  Same kind of house I grew up in.  Did you ever notice that when those kids got in squabbles and they got caught squabbling, that they didn't walk to their mom, they ran to their mom to try to tell their story?

THE PANEL MEMBER:  Yes.

MR. DACUS:  Because they want to get there first.  Right?

THE PANEL MEMBER:  Right.

MR. DACUS:  And my suspicion is, being the good mother that you were, did you just accept that story that that first kid told or did you listen to both sides?

THE PANEL MEMBER:  Depended on the kid.

MR. DACUS:  I understand.  Understood.

THE PANEL MEMBER:  My experience, it depended on the child, yes.

MR. DACUS:  Sometimes that first kid that runs and screams the loudest, maybe that story is not exactly right.

Do you agree?

THE PANEL MEMBER:  Uh-huh.

MR. DACUS:  So you know why I'm asking you these silly questions?  No.  Because these folks right here brought the lawsuit, and so they get to go first.  They ran to the courthouse, they screamed the loudest, and they get to go first.  They're going to get to put on their entire case today, tomorrow, maybe even part of Wednesday before we ever get to call our first witness.

So will you agree that, just like you did in your role as a mother, that you will listen to all the evidence before you make a decision?

THE PANEL MEMBER:  Correct.

MR. DACUS:  Okay.  Thank you.

So that's my question for everybody.  I mean, I know my story's probably a little silly, but it really is an important issue here.  These folks get to say everything they want to say before we get to put on the first witness.

Can everybody just raise your hand and let me know that you will listen to all the evidence before you make a decision?  Everybody agreeable to doing that?  Okay.

And let me ask something about T-Mobile.  Ms. Fair touched on this.  T-Mobile's obviously in the customer service business.  We're fortunate to have lots of customers and lots of folks that we serve.  But when you're in the customer

service business, guess what?  You don't make everybody happy. From time to time, you know, folks have an issue with T-Mobile like they do with anybody else.

So what I need to know, has anybody had any experience with T-Mobile where you look at them in some unfavorable way? Obviously I want to know that because if you already look at us unfavorably before we even say the first thing out of our mouth, I want to know that.  Has anybody had any unfavorable experience with T-Mobile that you think would influence you in any way in this case?  Okay.  No hands.  Good.

Mr. Kleinik -- that's not 13, I think, sir.  Maybe on your -- do you have a T-Mobile service, sir?

THE PANEL MEMBER:  Home internet, yes.

MR. DACUS:  Okay.  I thought I saw that on your questionnaire.  No complaints about it?

THE PANEL MEMBER:  No, sir.  It's great.

MR. DACUS:  All right.  Perfect.  Thank you so much, sir.

I'll tell you what, can you hand that to Mr. Noack?  I'm going to ask you one question.

Mr. Noack, I got two questions for you.  First of all, on your questionnaire, I don't even know if I can say this.  You wrote something about cryofixation systems?  What in the world is that?

THE PANEL MEMBER:  It was a government research that

I worked under for cryofixation and molecular distillation dryers.  They were trying to create the machines to dry blood and they were --

THE COURT:  Mr. Noack, hold the microphone up a little closer?

THE PANEL MEMBER:  They were in the process, and I was one of the engineers in the design of it.

MR. DACUS:  Okay.  Did you have some educational training along those lines?

THE PANEL MEMBER:  They more or less took me under their wings after I got out of the service and because of my clearance is basically one of the main factors they hired me, in fact.

MR. DACUS:  Let me ask you one other question while I have you up.  Everybody filled out these questionnaires.  By the way, many thanks to doing that.  That saves us a lot of time today, so thank you for doing that.

One of the things I noticed on there, there was a question about the award of damages or money in lawsuits, and at least as I read it, I thought you checked that maybe damages were too low.  Does that sound right to you?

THE PANEL MEMBER:  In a lot of cases for what it costs individuals to defend themselves and by the time they -- you know, it's just my opinion -- by the time they end up, you know, winning the case or losing the case, somebody's going to

get hurt.

MR. DACUS:  Okay.

THE PANEL MEMBER:  You know, I just have to hear what is being said and leave it to the leaders.

MR. DACUS:  Understood.  Thank you, sir.

Would you hand that to No. 11 right there right beside you?

And I'll ask you, Mr. McIntosh, a couple of questions.  One is on this damages question.  Do you think that damages are too low in lawsuits?

THE PANEL MEMBER:  Yeah, some are.

MR. DACUS:  Some are.  Okay.  My real question to you is, I saw in your questionnaire that you said you had some electronics training?

THE PANEL MEMBER:  Yes.  That is correct, yes.

MR. DACUS:  And help me understand that a little bit more.  What does that mean and what is your training?

THE PANEL MEMBER:  I was a TV repairman years ago and also an amateur radio operator and I have worked on radios and radio equipment, designed three antennas on my own throughout the years.

MR. DACUS:  Okay.  Have you done any work with like telecommunication carriers or --

THE PANEL MEMBER:  No, none whatsoever.

MR. DACUS:  All right.  That's what I need to know.

Thank you, sir.

Mr. McCartney--that's No. 7--can I talk to you, please, sir?  I think I saw on your questionnaire that maybe your brother had a patent or had applied for a patent?

THE PANEL MEMBER:  Yes.  But after actually talking to him after that, it was not a patent.

MR. DACUS:  Okay.  So did he ever make an application for it or do you know?

THE PANEL MEMBER:  I don't know that.

MR. DACUS:  Okay.  Here's my question to you.  You know, these are folks that have a patent now.  Does that experience with your brother in any way have you leaning in their favor?

THE PANEL MEMBER:  Absolutely not.

MR. DACUS:  Okay.  You'd just listen to the evidence and make a decision?

THE PANEL MEMBER:  Yes, sir.

MR. DACUS:  And I know I think you said you worked at a local car dealership?

THE PANEL MEMBER:  Right.

MR. DACUS:  Where is that?

THE PANEL MEMBER:  Mineola.

MR. DACUS:  At Dow or what?

THE PANEL MEMBER:  Yes, sir.

MR. DACUS:  At Dow?

THE PANEL MEMBER:  Uh-huh.

MR. DACUS:  How long have you done that?

THE PANEL MEMBER:  Same type of work for 17 years.

MR. DACUS:  Seventeen years.  Okay.  Good deal. Thank you so much, sir.

Mr. Bergt--that's No. 14 behind you--I saw on your questionnaire that you wrote something about somebody had plagiarized a postcard.  Do you remember writing that?  That's what I wrote down.

THE PANEL MEMBER:  Yeah.  Being in the timber business, reach out to private landowners trying to, I guess, get more business, and I had a postcard I sent out to the counties and had another company pretty much just put their name on top of my name and sent out the same postcard.

MR. DACUS:  So you know what I'm going to ask. Anything about that experience that maybe somebody took something from you they shouldn't have that would influence you in this case at all?

THE PANEL MEMBER:  It shouldn't influence anything. It just put a foul taste in my mouth.

MR. DACUS:  Understood, rightly so.  And, I mean, these folks are saying we took something from them; we don't agree.

THE PANEL MEMBER:  I understand.

MR. DACUS:  But would that make you lean in their

favor any way, your personal experience?

THE PANEL MEMBER:  No, sir.

MR. DACUS:  All right.  Perfect.  Thank you, Mr. Bergt.  Appreciate it.

Let's see.  Mr. Brooks, I need to ask you a couple of questions, if I could, please, sir.

I wasn't quite clear on these -- the start-up companies and the investment money.  Were you the buyer or the seller in those situations?

THE PANEL MEMBER:  No.  I was just a money raiser and started up my own company and management side of it, I guess.

MR. DACUS:  I see.  So you were trying to raise money for somebody else's ideas?

THE PANEL MEMBER:  It was sole capital, needed a lot of capital that you had to use other people's money.  So that's why I went to private equity to raise money for oil field services.

MR. DACUS:  Were you the one out there sort of touting or pitching the ideas to these investment companies to raise money?

THE PANEL MEMBER:  Yes.

MR. DACUS:  And has it been your experience that if you have a good idea, that folks are willing invest money in it?

THE PANEL MEMBER:  Yes.

MR. DACUS:  Okay.  If you don't have a good idea, then folks who have a lot of knowledge may not be willing to invest.

THE PANEL MEMBER:  That's right.

MR. DACUS:  Okay.  That's what I needed to know, sir.  Thank you so much.

No. 8, Ms. Lockett, I don't think I've had a chance to talk with you, ma'am.

I thought I heard you say you work at Linden-Kildare now?

THE PANEL MEMBER:  Yes.

MR. DACUS:  But I think I saw on your questionnaire that you had worked at Health and Human Services?

THE PANEL MEMBER:  Yes.  I worked for the Department of Aging and Disability Services, and the Food Stamp Department for 10 years.

MR. DACUS:  For 10 years?

THE PANEL MEMBER:  Yes.

MR. DACUS:  Okay.  That's what I wanted to know.  And what do you do at Linden-Kildare now?

THE PANEL MEMBER:  I am a paraprofessional.

MR. DACUS:  I gotcha.  So when you were at the Health and Human Services, was that a job that you enjoyed?

THE PANEL MEMBER:  Some days I did.

MR. DACUS:  Understood.  What were you doing there

specifically?

THE PANEL MEMBER:  I was a food stamp clerk.

MR. DACUS:  Okay.  For the entire 10 years?

THE PANEL MEMBER:  No.  For five years I worked for the Department of Aging and Disability Services in Atlanta, Texas, and I worked with the disabled and the elderly.  And then for five other years, I worked here in Marshall at the Health and Human Services here with the food stamp department.

MR. DACUS:  Okay.  Perfect.  That's what I needed to know, ma'am.  Thank you so much.

THE PANEL MEMBER:  Uh-huh.

MR. DACUS:  Who has any special expertise in what I'll call telecom or telecommunications, like -- all of us talk on the phone.  I'm talking about a little bit more than that, just talking on the phone.  Anybody have any special expertise?

Mr. Hill, you do?  Let me just ask you one or two questions on that.  What's your experience, sir?

THE PANEL MEMBER:  All right.  So I work for a call center.

MR. DACUS:  That's right.

THE PANEL MEMBER:  We have a lot of VIP services that we run, and I'm responsible for the operating system on the computers the agents use.  So I have to sort of tightly couple the software that I write with the existing network.

MR. DACUS:  And I think I saw on your questionnaire, sir, that you said that you were in favor of open source.  Did I read --

THE PANEL MEMBER:  Extremely, yes.

MR. DACUS:  And just so I know how you -- what is open source?

THE PANEL MEMBER:  All right.  It's sort of a complicated subject.  I'm not going to get into the whole thing because it will waste the rest of your time, but basically I believe patent law is outdated.  Significantly most of the software that I write does not have any kind of licensing on it.  In fact, it's licensed in such a way that in order to use the software I write, you have to also write your software open and free.

MR. DACUS:  Okay.

THE PANEL MEMBER:  So 90 percent of back-end telecommunications are based on open source software.  It's very -- Android, the operating system, is also based on open source.

MR. DACUS:  Have you yourself ever made any application for a patent?

THE PANEL MEMBER:  I considered it.  I have been encouraged to file a patent, but due to ideological reasons, I refuse to.

MR. DACUS:  Okay.  Thank you, sir.

Let me ask a related question.  Does anybody have any particular expertise in computer programming?  Like writing computer -- Mr. Hill, I know you do.  I'm not ignoring you.  By the way, I appreciate you raising your hand.

Anyone else in the jury panel have that kind of expertise?  Okay.  I don't see any hands there.

No surprise to you, this is going to be a pretty technical case.  All right?  And there are folks that I'd say kind of fall into two different categories.  Some folks say, you know what?  I got a computer, I don't care how it works, I just want it to work and that's good enough for me.  And it could be your computer, your car, or anything.

There's other folks who say, well, I'd like to know how it works, I'm just sort of naturally curious, and I like to know how things work, whether it's a computer, whether it's a car, whatever.  I call those folks tinkerers.  So that's what I want to know.

Who is in the category of I don't have a whole lot of interest in how things work, I just want it to work?  Raise your hands high.  Okay.  Who's in the category of, you know, what I kind of like to know the details and I kind of like to figure stuff out?  Who's in that category?

Let's see.  Ms. Rhodes, No. 5, please, sir.

Ms. Rhodes, you're in the category of you whether it's your occupation or not, you still just like to know how things

work and you're just naturally curious?

THE PANEL MEMBER:  Yes, sir.  I managed a Radio Shack back in the days, so I've always been a tinkerer.

MR. DACUS:  Gotcha.

THE PANEL MEMBER:  And then I don't like asking people to come show me how to do something once I -- I want to learn it and get it done.

MR. DACUS:  Fair to say you're what I'd call a details-oriented person?

THE PANEL MEMBER:  Yes, sir.

MR. DACUS:  Okay.  Perfect.  Thank you very much, Ms. Rhodes.

So let me ask you that.  Who considers themselves to be detail-oriented, you know, you like all the details?  All right.

Then there's a second question to ask related to this, and it's different but it's related.  So some folks when they get a set of facts or they get themselves in a scenario, they make a quick decision, they assess things quickly, that's who they are, and they make a decision.  Other folks are more reflective, they like to take their time, think about things, gather as much evidence as they can, and then make a decision.

So who's in the category of, you know what?  I usually assess things pretty quickly, I make a decision, and I go with it?  Who's in that category?  Okay.  Who's in the category of

I'm a little more reflective, I take my time making decisions? Okay. That's what I needed to know.

How many people on this panel consider yourself to be a leader? I apologize. Thank you for making me speak up. Who on the panel considers yourselves to be a leader? I mean, we got people who, you know, follow some lead. Who's the leader? Okay. Good number.

Everybody saw the patent video this morning. Right? Who knew before you came to this courthouse this morning that the Patent Office makes the preliminary decision on whether or not to issue a patent, but a jury, a jury, makes the ultimate determination as to whether or not a patent is valid? Did anybody know that?

I know you did, Mrs. Spayde, but nobody else. And, candidly, when I started doing this many years ago, I didn't know that, either. So let me ask a few questions about that.

Mr. Hunter, that's not something you knew. Right?

THE PANEL MEMBER: That's correct.

MR. DACUS: All right. And so let me tell you what's -- and the Judge has already alluded to this a little bit, but let me tell you why I'm asking these questions.

After Ericsson and T-Mobile were sued in this case, they took a really close look at these two patents, and one of the things they looked at was whether or not these ideas in these patents were actually new. And what we discovered was that

Ericsson, who's been in this business for 50 years, actually had all of these ideas before this patent. Okay? And that's part of the proof that we're going to put on. We'll show you other reasons why we think they're not valid, but that's part of it.

My question to you is, did you hear in the video, first of all, this morning that the interaction when you apply for a patent between the patent applicant and the Patent Office, that that's a secret process--they're the only ones participating. Did you hear that?

THE PANEL MEMBER: That's correct.

MR. DACUS: Did you know that before today?

THE PANEL MEMBER: I didn't.

THE COURT: You have five minutes remaining, counsel.

MR. DACUS: Thank you, Your Honor.

And so did you also hear from that same video that if you sit as a juror in this case, we didn't participate in that process so we're going to give you evidence that the Patent Office never had. Did you remember that from the video?

THE PANEL MEMBER: I believe so.

MR. DACUS: Okay. So my question to you, sir, ultimately is, if we prove to you that these patents are not valid for at least one reason that the ideas in them weren't new, that we had them beforehand, would you be willing to find

that the patents are invalid?

THE PANEL MEMBER:  Yes.

MR. DACUS:  Okay.  Even though the Patent Office preliminarily issued them, you'd be willing to find that they're not valid?

THE PANEL MEMBER:  I would be.

MR. DACUS:  All right.  Thank you, sir.

So that's my question to the panel, and think about this now.  Is there anybody who says, you know what?  I got some hesitation or reservation about finding a patent invalid when the Patent Office preliminarily issued it.  Anybody have any reservation at all about that?  Okay.

Let me -- Mr. Ervin, I haven't had a chance to talk to you--No. 4.  If we were to prove to you that these patents were not valid, you'd have no problem finding that?

THE PANEL MEMBER:  I do have a problem.

MR. DACUS:  Okay.

THE PANEL MEMBER:  But it's my religious reasons.

MR. DACUS:  And I was going to ask you about that, sir.  And, again, I'm not prying, but I saw on your questionnaire that you wrote very honestly, and I appreciate it, that you would not want to and you do not want to judge other people.  Is that right?

THE PANEL MEMBER:  Correct.

MR. DACUS:  And are you telling -- that's because on

a religious basis?

THE PANEL MEMBER:  Yes, it is.

MR. DACUS:  Okay.  And because of that, would you have a hard time sitting on this jury?

THE PANEL MEMBER:  Yes, I would.

MR. DACUS:  All right.  That's all I needed to know, sir.  I appreciate very much you being honest with us.

Let's see.  Can we hand the mic to Ms. Bussey, No. 16, please?

Ms. Bussey, have you ever in your life made a decision that you thought was absolutely right based on the facts that you had in front of you and you knew that your decision was right?

THE PANEL MEMBER:  Yes.

MR. DACUS:  And have you ever had a situation where you got a few more facts later in time and you realized your decision was wrong?

THE PANEL MEMBER:  Probably.

MR. DACUS:  Probably.

THE PANEL MEMBER:  Yeah.

MR. DACUS:  If you hadn't had that happen, you're the only one in the world who hadn't.  So that --

THE PANEL MEMBER:  I don't argue much about anything if I'm not pretty sure that I think I'm correct, you know.

MR. DACUS:  Understood.  But we all make decisions

based on what information we have in front of us at the time. Right?

THE PANEL MEMBER: Yeah.

MR. DACUS: So that's what we're trying to say here: Look, the Patent Office made this decision about this preliminary decision to issue this patent, but they didn't have all the information that we're going to provide to a jury. You understand that?

THE PANEL MEMBER: Yes. My question on that is, why would we have the patent process to begin with then?

MR. DACUS: Yes, ma'am. And I'm so glad you asked. Remember that video this morning said that we have this process, it's sort of this secret process, but the ultimate -- and it is our process, but ultimately under the Constitution we have the right to jury trial if we're the ones accused of infringement to come show whether or not the patent is valid. That's just how the system works. Does that make sense to you?

Let me ask you this. Will you follow the system if the Judge tells you that's the law?

THE PANEL MEMBER: If I'm told to follow something I would follow it.

MR. DACUS: Okay.

THE PANEL MEMBER: I might not agree with it, but I would follow it.

MR. DACUS:  And that's the question ultimately. Right?  Would you ultimately follow the law if the Judge tells you that's what you're supposed to do?

THE PANEL MEMBER:  Yes.

MR. DACUS:  Okay.  That's what I need to know. Thank you, ma'am.

THE PANEL MEMBER:  You put me on the spot.

MR. DACUS:  I didn't mean to.  I appreciate you being honest with me.

Let's wind up here.  I've been doing this for a while, and it didn't take me long to figure out that I do not know all of the questions that I need to be asking up here.  I wish I was smart enough to know all the questions.

So what I want to know is, is anyone sitting there thinking, you know what?  This lawyer who represents T-Mobile and Ericsson, he should have asked me this because he probably would want to know, you know, whether it's you lean against us for some reason or whatever reason.  Is anybody sitting there thinking that I didn't ask the right questions I should have asked you?  Okay.  I don't see any hands.

So I'll wind this up.

THE COURT:  That's good because your time just expired.

MR. DACUS:  I've also done it long enough to say when the judge tells me to sit down, that's what I do.  So

thank you-all very much.  Appreciate it.

Thank you, Your Honor.

THE COURT:  All right, counsel.  Approach the bench, please.

(The following was had outside the hearing of the jury panel.)

THE COURT:  Ms. Fair, does the Plaintiff have any challenges for cause?

MS. FAIR:  Yes, Your Honor.

THE COURT:  Who are you challenging for cause?

MS. FAIR:  No. 14 and No. 17 and No. 27.

THE COURT:  Mr. Dacus, do the Defendants have any challenges for cause?

MR. DACUS:  Yes, sir--No. 4.

THE COURT:  Anyone else?

MR. DACUS:  No, sir, that's all.

THE COURT:  All right.  I show that No. 2, also No. 4, No. 10, No. 14, and No. 17 all have potential scheduling problems.  So it's my intention -- let's see.  Okay.  I don't think we'll get to 27 even if all five of these were to fall off.  So I'll ask these five to stay back.  We'll meet with them here at the bench.

Everyone else, I'm going to send out for recess, including No. 27 and No. 32 who also mentioned a scheduling issue.  Anybody disagree with that?

MS. FAIR:  No, Your Honor.

MR. DACUS:  No, Your Honor.

THE COURT:  Okay.  All right.  Take your seats, please.

(The following was had in the presence and hearing of the jury.)

THE COURT:  All right.  Ladies and gentlemen, I'm going to let most of you have a recess at this time.  When I send you out for recess, if you will, exit the courtroom through the double doors in the back, and as you go through those double doors, ladies and gentlemen, if you turn to the left and go around the corner, you'll find two important things.  You'll find the water fountains and you'll find the restrooms.  I'm going to ask you not to leave this floor and not to leave the building.

Also, ladies and gentlemen, if you happen to want to have a conversation with somebody else that's on the panel while you're on recess, that's fine.  If you don't want to have a conversation with anybody else, that's fine, too.  It's up to you.

I will say this.  If you're going to have a conversation with anybody on the panel during this recess, do not talk about anything that's happened in the courtroom this morning. I can tell you there has been no evidence presented in this case and you have heard no evidence in this case.  So talk

about all the rainy weather we had, talk about your kids or grandkids, talk about whether Florida is going to beat Houston or Houston's going to beat Florida in the basketball finals tonight, talk about whatever you want to talk about, but don't talk about anything that's happened in the courtroom this morning.

So, with that, I'm going to ask the following members of the panel to stay back so I can talk with you one at a time here at the bench.  And they are:  Panel Member No. 2, Mr. Brooks; No. 4, Mr. Ervin; No. 10, Mr. Hunter; No. 14, Mr. Bergt; No. 17, Mrs. Spayde.  And I believe that's it.

If you five folks will let those around you just slip by, stay in your same seats, and then I will visit with you here one at a time at the bench.

Everyone else on the panel, with those instructions you are excused for recess.

(Whereupon, the jury panel left the courtroom.)

THE COURT:  All right.  Be seated, please.

Counsel, approach the bench.

(The following was had at the bench.)

THE COURT:  Mr. Brooks, would you come up, please?  Good morning, sir.

THE PANEL MEMBER:  Good morning.

THE COURT:  This is the microphone.  If we can just talk quietly here.

When we started, Mr. Brooks, I asked if there was anybody that would have a serious impediment to being here during the trial if they were selected and you raised your hand.

THE PANEL MEMBER:  Yes, sir.

THE COURT:  Tell me about that.

THE PANEL MEMBER:  I'm a small business owner and self-employed.  I have nobody else to take my responsibilities.  So I do a lot of oil and gas consulting work, and I've got work-over rigs going on, and if I lose work, I lose livelihood.  It's not like I can call somebody and replace me.  So I'm just a contract self-employed guy, and right now a lot of work going on.

THE COURT:  What happens when you catch the flu?  If you can't --

THE PANEL MEMBER:  Oh, I work through the flu.

THE COURT:  If you can't work, if you get sick and you can't work, what happens?  You lose everything?

THE PANEL MEMBER:  I can, yes.  I have worked through COVID, through the flu, everything you can imagine.

THE COURT:  Okay.  And I suppose --

THE PANEL MEMBER:  I do respect this process, too, by the way.

THE COURT:  I suppose when your house catches on fire, you don't want a fireman who says, I don't feel like coming or I've got a conflict and I can't be there; somebody

else will put it out.

THE PANEL MEMBER:  No, sir.

THE COURT:  Okay.  Is there anything else I need to know about your situation?

I will tell you, Mr. Brooks, I used to be self-employed as an attorney, and if I wasn't there, it wasn't getting done. I understand.  But I also understand I have certain obligations as a citizen --

THE PANEL MEMBER:  That's right.

THE COURT:  -- and sometimes those don't always line up.

But if there's anything else about your situation I need to know, please tell me now.

THE PANEL MEMBER:  That's it.  I'm just afraid to lose any more work.

THE COURT:  I understand, sir.

THE PANEL MEMBER:  Okay.

THE COURT:  I'm not minimizing that.

Ms. Fair, do you have any questions for Mr. Brooks?

MS. FAIR:  No, Your Honor.

THE COURT:  Mr. Dacus?

MR. DACUS:  I do not, Your Honor.

THE COURT:  Mr. Brooks, I'm going to let you join the rest of the panel outside the courtroom.  Just don't discuss about what we talked about in here.

THE PANEL MEMBER:  Yes, sir.  Thank you, Your Honor.

THE COURT:  Despite whatever the Plaintiff's challenges for cause are, I suspect we're going hear the same thing from No. 14.  He said as much during voir dire.

All right.  I'm going to carry the situation with

Mr. Brooks for the time being.

We'll talk to Mr. Ervin next.

Mr. Ervin, would you come up, please, sir?

Good morning, sir.

THE PANEL MEMBER:  Good morning.

THE COURT:  This is the microphone, Mr. Ervin. We're just going to talk quietly here.

THE PANEL MEMBER:  Okay.

THE COURT:  Mr. Dacus, do you have questions of Mr. Ervin?

MR. DACUS:  I do, Your Honor.

THE COURT:  Please proceed.

MR. DACUS:  Mr. Ervin, my understanding is, sir, that you would not want to judge really either party in this lawsuit based on your religious beliefs.  Is that right?

THE PANEL MEMBER:  My religious belief and also my medical condition.

MR. DACUS:  Okay.  And what is the medical condition?

THE PANEL MEMBER:  The medical condition is my

heart.

MR. DACUS:  Okay.

THE PANEL MEMBER:  I've had to have two pacemakers put in --

MR. DACUS:  Yes, sir.

THE PANEL MEMBER:  -- and they got me on nine different pills.  I've missed one this morning so I could at least stay in the courtroom.  If I hadn't, the Judge would have held me in contempt of court because I'd have to run out to the bathroom.

MR. DACUS:  You're saying in addition to your religious beliefs, you also have medical issues?

THE PANEL MEMBER:  Yes, sir.

MR. DACUS:  That's all the questions I have, Your Honor.

THE COURT:  All right.  Ms. Fair, do you have any questions of Mr. Ervin.

MS. FAIR:  No, Your Honor.

THE COURT:  Let me ask you this, Mr. Ervin.  If you take all your medicine as it's prescribed, are you able to sit for, say, an hour-and-a-half at a time?

THE PANEL MEMBER:  No, sir; maybe 30 minutes--maybe.  And, I mean, like in 30 minutes, I need to use the restroom twice already.

THE COURT:  All right.  Mr. Ervin, I'm going to let

you join the rest of the panel outside the courtroom for recess.  Just don't discuss anything we talked about in here.  All right, sir?  Thank you.

THE PANEL MEMBER:  Okay.

THE COURT:  I'm going to excuse Mr. Ervin.

Mr. Hunter, would you come up, please?

Good morning, sir.

THE PANEL MEMBER:  Good morning.

THE COURT:  This is our microphone.  If we can just talk quietly, Mr. Hunter.

When we started, I asked for a show of hands from anybody that would have a serious impediment to being here during the week if they were selected and you raised your hand.  Tell me about that, please.

THE PANEL MEMBER:  Unfortunately, I wound up being the executor of my mom's estate.  My niece is to inherit a significant sum of money on the 10th, and I'm the one that's got to give it to her.  And there is drama already and there's going to be drama that day.  I need to be free that day.  She's traveling out of Florida to come here to get the money, so I need to be -- that was my question was, you know, how long would we go.  I need time to make that happen.

THE COURT:  Are we talking about you handing her a check, or what are we talking about?

THE PANEL MEMBER:  I'll have to go to the bank with

her to get it.

THE COURT:  Okay.

THE PANEL MEMBER:  And there's going to be drama there, so I don't know -- it's also keeping my head from being in the game, I believe.  When you said the trial was going to go past Friday, or go to Friday, that's what made me raise my hand.

THE COURT:  And she'll be here Thursday.  Is that right?

THE PANEL MEMBER:  She'll be here on the 10th. That's her birthday.

THE COURT:  What time are you expecting her to be here?

THE PANEL MEMBER:  We originally said 9:00 to meet there and get this done, but that was before.

THE COURT:  The reason I ask is this, Mr. Hunter: if the trial goes as I suspect that it will -- and you can see from the way things have gone this morning, these lawyers are all on a time clock, and they have a certain amount of time to do all the things they have to do, and when their time runs out, I stop them.  So I have a pretty good idea how things are going to operate time-wise.  It is highly likely that the jury will probably have Wednesday afternoon off --

MR. DACUS:  Thursday.

THE COURT:  Thursday.  I'm sorry.  Thank you for

correcting me.  Thursday afternoon off.

THE PANEL MEMBER:  I can make that happen, if you can assure me we'll be off, because I've got to make the switch and she's got to go back to Florida.

THE COURT:  If the jury's not off Thursday afternoon, I'm in trouble, and I'm not going to get in trouble.

THE PANEL MEMBER:  Okay.

THE COURT:  If that were to be the case, does that solve your -- potentially solve your problem?

THE PANEL MEMBER:  Yeah.

THE COURT:  Okay.  Well, I'm 99.9 percent sure that's going to happen.

THE PANEL MEMBER:  Okay.  Can I give her a time maybe?

THE COURT:  Tell her sometime after 1:00.  And just tell her I said so.  Blame it on me; not on you.

THE PANEL MEMBER:  Okay.

THE COURT:  That -- I don't know if you're going to get selected or not, but I'm going leave you on the list, and if you are selected, you're not going to be here Thursday afternoon.

THE PANEL MEMBER:  Okay.

THE COURT:  All right?

THE PANEL MEMBER:  All right.

THE COURT:  If you are selected, I'm going ask you to not share that with anybody else on the jury.  All right?

If you'll join the rest of the group outside and not discuss what we talked about.

THE PANEL MEMBER:  If anybody ever asks you to be an executor of an estate, say 'un-huh'.

THE COURT:  I've done it.

All right.  Mr. Hunter stays on the list.

Mr. Bergt, if you'll come up.

Good morning, sir.

THE PANEL MEMBER:  How are you?

THE COURT:  I'm all right.

This is the microphone.  We're going to try to talk quietly into the microphone.

Let me start with seeing if Ms. Fair has any questions.

MS. FAIR:  Yes.

I understand that you -- this isn't just an issue of imposing on your work; this is going to be so preoccupying in your mind that you're not going to be able to sit and listen to the evidence, particularly given the current conditions with your timber business.  Did I understand that correctly?

THE PANEL MEMBER:  Yeah.  I got six other families that I need to get back to work.  That's what I'm --

MS. FAIR:  I understand.

THE COURT:  Tell me what you mean when you say, "I

have six other families."

THE PANEL MEMBER:  I've got a six-man crew sitting, waiting.  The amount of rain we got this past weekend, I run a six-man logging job --

THE COURT:  Yes, sir.

THE PANEL MEMBER:  And the amount of rain, they called this morning at 7:00 and said, We cannot work.

THE COURT:  I'm a tree farmer.  I just cut 70 acres of timber last fall.  I understand what you're talking about.

THE PANEL MEMBER:  They need to be moved.  I'm the one to move them to the new job.

THE COURT:  Of course you understand, Mr. Bergt, sometimes our personal circumstances don't align with our responsibilities as citizens, and if somebody's breaking into your house, you don't want a policeman who says, Well, it's not convenient, I need to see about somebody else, and leave you hanging.

THE PANEL MEMBER:  That's why I didn't raise my hand earlier.

THE COURT:  I'm taking what you're telling me seriously, but I want you to understand that it in and of itself is not a reason not serve on the jury under any circumstance.

THE PANEL MEMBER:  Like I said, that's why I didn't raise my hand.

THE COURT:  I understand.  Nobody wants you to be in a bind and everybody in this trial wants you to focus on the evidence if you are on the jury.  And if you are on the jury, you're not going to get off, you're going to be stuck, so you might as well put it out of your mind and think about the evidence if you're on the jury.

What -- I guess the question I'm asking you is, are you telling me that's going to be physically impossible for you to do if you're on this jury and you know you're going to be here until the end of the trial, whether you like it or not.  Can you focus on the evidence?

THE PANEL MEMBER:  Well, you said the end of the week.  I can't afford to sit everybody at the house for a week, you know.

THE COURT:  Well, my question is -- I understand the hardship you're describing for me.  If -- and I'm not telling you what is or isn't going to happen; I'm just asking you hypothetically, if you are on this jury and you understand you will not be released until the end of the week, will you be able to accept that and put these other worries out of your mind and listen to the evidence and follow the evidence, or are you going to be so preoccupied that you won't hear anything that's said in this courtroom.  That's what my question is.

THE PANEL MEMBER:  I'll do my best.

THE COURT: I understand, sir.

I'm going to let you join the rest of the panel outside the courtroom. Just don't discuss what we talked about in here. Thank you, sir.

THE PANEL MEMBER: Thanks.

THE COURT: All right. I'm going to talk to Mrs. Spayde. I'm going carry Mr. Bergt just like the first one, Mr. Brooks. This is a difficult situation. I've had it before.

All right. Let me talk to Mrs. Spayde.

Mrs. Spayde, would you come up, please?

How are you, Mrs. Spayde?

THE PANEL MEMBER: I'm fine.

THE COURT: This is the microphone, and we're going to both try to talk quietly here.

THE PANEL MEMBER: Okay.

THE COURT: Ms. Fair, do you have questions for Mrs. Spayde?

MS. FAIR: Yes.

Mrs. Spayde, I understand that you've sat through a patent trial before, heard Mr. Dacus make arguments, seen him in court, and are also currently a defendant in a lawsuit and your family is a defendant in a lawsuit and that that's been quite unpleasant for you, and I believe you said that that will impact how you view this case. Did I hear that

correctly?

THE PANEL MEMBER:  Yes.

MS. FAIR:  And that's something that makes you identify with the Defendants.  Before you've even heard the evidence, that's already going to be weighing in the balance on how you would decide this case?  Is that right?

THE PANEL MEMBER:  Yes.

MS. FAIR:  And so you're coming into this already leaning in favor of the Defendants, having heard no evidence.  Is that right?

THE PANEL MEMBER:  That and because of the last patent case, I kind of already know what I'm walking into.

MS. FAIR:  And that would be something you would consider and wouldn't be able to put out of your mind while you're making the decision for you to sit on this jury in this case.  Is that right?

THE PANEL MEMBER:  Yes.

THE COURT:  Do you have any questions of Mrs. Spayde, Mr. Dacus?

MR. DACUS:  I do, Your Honor.

THE COURT:  Please ask them.

MR. DACUS:  Thank you.

So, Mrs. Spayde, if you were to sit on this jury, could you -- I know you served on one before, but could you just sit and listen to the evidence in this case and make a decision

based on the evidence of this case even though you sat on the previous one?

THE PANEL MEMBER:  Yes, sir.

MR. DACUS:  And you'd be fair to both parties doing that?

THE PANEL MEMBER:  Yes, sir.

MR. DACUS:  That's all I have, Your Honor.

THE PANEL MEMBER:  I have a funeral tomorrow.

THE COURT:  Tell me about that.

THE PANEL MEMBER:  My wife's best friend passed away last week, and we're singing and doing the Eulogy tomorrow.

THE COURT:  Okay.  Where's the funeral?

THE PANEL MEMBER:  In Longview at the Hampton Suites, I think is what it's called.

THE COURT:  Okay.  How do you do seven jobs, Mrs. Spayde?

THE PANEL MEMBER:  I don't have a choice, sir.  I'm a paraprofessional.  We don't make a living wage, and my wife is disabled.

THE COURT:  All right.  Mrs. Spayde, I'm going let you join the rest of the panel outside the courtroom.  Just don't discuss anything we talked about in here.

THE PANEL MEMBER:  Yes, sir.

THE COURT:  Thank you.

I'm going excuse Mrs. Spayde for multiple reasons,

primarily because she cannot tell me that she won't be influenced by the fact that her daughter, and she peripherally, are involved as defendants in an ongoing lawsuit.

Okay.  So I've struck No. 4, I kept No. 10, struck No. 17.  We've got plenty of people.  I have a real concern about Mr. Brooks and Mr. Bergt being disgruntled jurors from the very beginning focused on their personal responsibilities outside the courtroom.

I recognize that being self-employed and having your own financial responsibilities with no one to substitute for you is not an excuse or reason not to serve on a jury, but in this particular case, given the make-up of the panel and the number of available citizens who would not risk being disgruntled from the beginning and being better able to focus on the evidence, I'm going to excuse No. 2 and No. 14.

So that means 2, 4, 14, and 17 are excused.  We'll keep No. 10 on the panel.  That means we should strike through No. 20.  Is that right?

MR. DACUS:  Yes, Your Honor.

MS. FAIR:  That is my math as well.

THE COURT:  Okay.  If you'll have your strike list to Ms. Brunson by a quarter until 12:00, please.

MS. FAIR:  Yes, Your Honor.

(The following was had in open court.)

THE COURT:  All right.  While counsel exercise their peremptory challenges, the Court will stand in recess.

(Brief recess.)

THE COURT:  Be seated, please.

Counsel, approach the bench, please.

(The following was had outside the hearing of the jury panel.)

THE COURT:  All right.  I'm told that Plaintiff has a challenge under *Edmonson versus Leesville*.  Is that correct?

MS. FAIR:  Yes, Your Honor.

THE COURT:  State your challenge.

MS. FAIR:  No. 8, Ms. Lockett, provided no reasoning in her answers today to strike her -- for the Defendants to strike her other than her race as an African-American woman. Her questionnaire was neutral, her answers were nothing different from anyone else who works for the government as in education.  There was nothing different about her answers for the Defendant to strike her other than for her race.

THE COURT:  And you believe that establishes a *prima facie* showing of discrimination?

MS. FAIR:  Yes, Your Honor.

THE COURT:  Is there a race-based neutral explanation for the exercise of the peremptory challenge from the Defendant?

MR. DACUS:  There is, Your Honor.

THE COURT:  State that for me, please.

MR. DACUS:  Thank you, Your Honor.

First, I'll state for the record there is an African-American male on the jury.

THE COURT:  I'm aware of that.

MR. DACUS:  In addition to that, Ms. Lockett, she said here both in her questionnaire and she said during the jury selection she worked for Health and Human Services for more than 10 years.  We view that as a caregiving or a helper-type occupation which we believe is friendly to the Plaintiffs.  In addition, specifically for that job, her job was providing food stamps, which we think exacerbates that caregiver or helper role.

I will also note that during the voir dire many times she was inattentive; I won't say asleep, but she was inattentive.  And this is a case that involves details.  Not only is it just a patent case; it's a case that involves a lot of details with regard to the patents and the accused products.

THE COURT:  Do either of you have a copy of her juror questionnaire?

MR. DACUS:  Yes, Your Honor.

THE COURT:  May I see it, please?

MR. DACUS:  Yes, Your Honor.

I'll say one other thing for the record, Your Honor.  As someone who's worked at Health and Human Services, she's

obviously someone who is following government rules, and a big part of this case is also an invalidity case where we're asking the jury to decide that what the government did here was not appropriate.  And so that's a secondary reason in addition to her caregiver and helper role at the Health and Human Services.

THE COURT:  Well, can you explain to me why on voir dire when you had an opportunity to interact directly with her, you didn't ask her about her views of whether the government could be wrong or how reliable they are or how she should look at or would look at any federal government action in determining whether it was subject to being reversed or not?  I don't recall any colloquy between you and she on those lines, Mr. Dacus.

MR. DACUS:  That is correct, Your Honor; we didn't.  I don't believe that's required.  Race-neutral reason is what's required, and our estimation is that the fact that she's in this caregiver/helper role with Health and Human Services, and specifically because she --

THE COURT:  As I understand it, you told me that she worked for the government and, therefore, your suspicion that she would give undue weight to government action such as the granting of these two patents, but --

MR. DACUS:  That's one of them.

THE COURT:  -- whether you inquired from her

directly about whether she would or wouldn't be inclined to give undue weight to government action, I did not see that happen.  That was my point.

MR. DACUS:  And Your Honor's correct.  I don't believe it's required.  And I certainly did not ask those questions, and the reason I didn't ask is because I did not want to infect the panel with a potentially biased answer.

I'll say for the record, my understanding of the law, Your Honor, is it's not required to ask them and elicit that; what we're required to put forward is a race-neutral reason. And this reason, her employment at Health and Human Services, and specifically in the food stamp portion, has nothing to do with race.

THE COURT:  Well, my understanding is that the challenging party in this case, the Plaintiff, has to make a *prima facie* showing of discrimination by establishing that the venire member in question is a member of a protected class, and that on its face there's not a basis to challenge the person other than the fact that they are a member of that class, and I think Plaintiffs have done that.

Step two then requires a shift or -- a shift of the burden to the challenging party--that's the Defendant--to present a neutral explanation for the challenge.  And then if the Court believes a neutral explanation has been presented, then the Court decides whether the reason is pretextual and

considers the plausibility or persuasiveness of the proponent's justification.

Do you have anything to add, Ms. Fair, other than what you've told me?

MS. FAIR:  I would point out, Your Honor, that Miss Sierra, No. 1, is -- most certainly would be viewed as a caregiver.  She has volunteered at the Muscular Dystrophy Association camp, she is in school for physical therapy and expressed out loud that she wants to be a caregiver.  And so that -- she's no different from Ms. Lockett in that regard.

And with respect to government employment, Mr. Dulaney, No. 3, who the Defendants did not strike, was a federal government employee.  He worked for the Navy.  Ms. Lockett was a state government employee.  And there's no reason to think that Mr. Dulaney or Ms. Lockett are any different in that regard in terms of their ability to follow court rules.

I would also note that Ms. Rhodes works for Harrison County in fine collections.  She's also following government rules.

And so there are other jurors who have the exact same characteristics that we've heard from the Defendants who were not struck by the Defendants.

THE COURT:  Well, let me just say this.  To the extent we all have to obey the law and file our tax returns, we all have to comply with government rules.

MS. FAIR:  Understood; yes.

THE COURT:  And I don't think it's appropriate for the Court to make this decision or to conduct its analysis based on other members of the panel, either those who also have indicated some proclivity toward caregiving, as you pointed out, Ms. Fair, or other members of the same protected class that were not struck and made the jury, like Mr. Floyd in your case.

I think the Court's got to look at the individual venire member on their own, and having done that, having considered the challenge, I think there was a *prima facie* case made by the Plaintiff.  I do think that the work history of this employee -- the employment history, the work history of Ms. Lockett and the unique circumstances of her actual job duties, which were explored during voir dire by the Defendant, do rise to the level of a race-neutral explanation.  I'm not saying that I would personally agree with it, but I think it does cross the threshold of being a race-neutral explanation.

Therefore, I'm going to deny the challenge under *Edmonson* in this case and Ms. Lockett remains off the jury.  Okay?

MR. DACUS:  Thank you, Your Honor.

MS. FAIR:  Understood, Your Honor.

(The following was had in the presence and hearing of the jury panel.)

THE COURT:  Thank you for your patience, ladies and

120

gentlemen.

In just a minute I'm going to ask our Courtroom Deputy Ms. Brunson to call the names of the eight members of our panel that have been selected to serve as jurors in this case, but before I ask her to do that, I'd like to give you some idea about what my expectation is about how you're going to be positioned in the jury box.

There are 14 seats, give or take, in the jury box, and eight of you are going to be selected to serve as jurors. Consequently, what I would like to do is I'd like to have the first four jurors positioned on the front row of the jury box and the second four jurors, jurors 5, 6, 7, and 8 on the back row or the second row of the juror box.

Whoever is called as Juror No. 1, when your name is called if you'll come forward, enter the front row of the jury box, walk all the way down to the last seat, and stand in front of the last seat. Whoever is then called as Juror No. 2, if you'll come forward, enter the front row of the jury box, walk down, and stand in front of the third seat from the end with an empty seat between Juror No. 1 and Juror No. 2. Juror No. 3 will do the same thing on the front row. Juror No. 4 will do the same thing on the front row.

Then when Juror No. 5's name is called, if you'll come forward, enter the second row or the back row of the jury box, walk all the way down, stand in front of the last chair. Then

121

Juror No. 6 will enter the second row of the jury box, walk all the way down, and stand in front of the third chair from the end so that there is an empty chair between Jurors 5 and 6.  And then juror 7 and 8 will do the same thing.

And if all that works as intended, we'll end up with the first four jurors on the front row with an empty seat between each of you and the second four jurors on the back row with an empty seat between each of you.  And those will be your seating positions throughout the trial.  You're not to switch chairs or play musical chairs with the Court--stay in the same chair that you get right now throughout the trial.

Also, I'm going to ask that all eight members of the jury remain standing until everyone is in the box and I'll give you further instructions then.

So with that, I'm going to ask Ms. Brunson to call the names of the eight members of the venire panel who've been selected to serve as jurors in this case.

THE CLERK:  Karen Sierra, Edward Hart, Michelle Braden, Michael Hunter, Decorian Floyd, Julie Bussey, Teresa Easley, Misty Green.

THE COURT:  All right.  Since I have you all standing, I'm going to ask you to raise your right hands, and I'll ask Ms. Brunson to administer the oath to you as jurors.

(Whereupon, the oath was administered by the Clerk.)

THE COURT:  Please be seated, ladies and gentlemen.

For those of you on the panel that were not selected to serve as jurors in this case, I'm about to excuse you in just a moment.  But before you get up and leave the courtroom, I want to say a word of thanks to all of you.

It is not lost on the Court or the Court staff or everyone on the trial teams here that every one of you had other places to be today and other things that were important in your respective lives, you set those other things aside, and you appeared as summonsed and presented yourself for jury duty.

And even though you weren't ultimately selected to serve on this jury, every one of you have rendered very real and important and public service.  And it's public service that matters, it's public service that is important, and it's public service that warrants a special word of thanks and appreciation from the Court.  So thank you, ladies and gentlemen.

I don't know if you'll be called again in the future.  If you are, please come with the same positive attitude I've seen from each of you today.

Now, as you leave the courtroom in just a minute, you'll turn to the right as you exit the courtroom.  To exit the building, you'll go past Ms. Clendening's office and the Clerk's Office.  She's going to retrieve from you these very valuable plastic numbers that you have attached to your

clothing.  Those are not souvenirs.  Please leave them with us.  We'll use them again with the next jury panel.

If you have any questions about your presence here today, why you were here and not at work, or anything else you need by way of information or written support for your appearance here today, Ms. Clendening will have that available for you as well.  And if you have any questions beyond that about your service, she will be happy to answer those questions.

Again, ladies and gentlemen, thank you for your presence.  Thank you for your hard work and good citizenship by presenting yourself today.  Without citizens such as yourselves--and I mean everybody in the gallery and everybody that's in the jury box--without good citizens stepping forward, and even when it's inconvenient and even when it's difficult and even when it may cost you money out of your pocket to be here, putting yourself forward to serve as a juror in this case and any other case going forward is an important part of what makes our democracy work in this country, and it is important for that to be recognized and called out, and I want to do that right now and again say thank you for your service.

With that, those members of the venire panel not selected to serve on this jury are excused.

(Whereupon, the jury panel left the courtroom.)

THE COURT:  All right.  Be seated, please.

Members of the jury, I have a few instructions I need to give you, and then I'm going to release you for lunch.

Speaking of lunch, I need you to all understand that I have ordered the Clerk of Court to provide your lunch each day while you're here on jury duty.  While you are on jury duty, you will not have to go out into the community, which is unfamiliar to several of you, and find a place to get lunch and then get back.  It will be brought to you in the jury room each day when I release you for lunch.  So plan on that throughout the trial.  It will save the Court time, it will save us all time, and it will be much more convenient for you.

Now, do not discuss this case with anyone.  And when I say do not discuss this case with anyone, I mean do not communicate about anything related to this case with anyone in the broadest sense of the term.  When all the evidence is in, when you've heard my final instructions on the law to apply, and when counsel for the competing parties have presented their closing arguments, at that point, ladies and gentlemen, I'm going to instruct you to retire to the jury room and to deliberate on your verdict.

The verdict in this case is going to be a document which will contain several questions in it, and it's your job based on the evidence to answer those questions.  And your answers to those questions will constitute the jury's verdict in this case.

The reason I give you this first instruction, and it's first because--all of them are important; this one is perhaps the most important of all--is because when you come to the point where you are considering how to answer those questions in the verdict form, it must be that the only information you have to draw upon in answering those questions is the sworn testimony of the witnesses who have appeared before you and offered testimony under oath and subject to cross examination and the exhibits which the Court has admitted into evidence as exhibits in this trial pursuant to the Rules of Evidence.

Those are the only sources of information that you must have before you when you answer those questions.  If you have any other sources of information from anywhere else, that jeopardizes the entire process.

So I'm instructing you not to communicate with anyone in any way about anything related to this trial.  That is to ensure that when you answer those questions after hearing all the evidence, the only material and information that you will have to draw upon and rely upon in answering those questions is the sworn testimony of the witnesses and the exhibits admitted and presented to you during the trial, period.

When I say don't communicate about it in any way, I mean that as broadly as I can.  That means don't talk about it, that means don't email, that means don't send a text message, if you use social media, that means do not post anything on

social media in any way.  You are not to communicate with anyone about this case.

And let me make this clear, ladies and gentlemen.  Until you've heard all the evidence, you must not communicate with each other in any way about this trial and what goes on during this trial.  Only when you've heard all the evidence and you've heard my final instructions on the law and counsel have presented their closing arguments and I have said, "Ladies and gentlemen of the jury, you may retire to the jury room and deliberate on your verdict," when I say those words and send that written document back with you that has the questions in it you're to answer, that is an important point in time because up until I say that, up until I instruct you to retire to the jury room and deliberate on your verdict, you must not communicate about the case with each other in any way.

But when you've heard all the evidence, when I've given you my final instructions on the law, when you've heard closing arguments from the attorneys, and when I send that verdict form with you and say, "Ladies and gentlemen, you may now retire to the jury room to deliberate on your verdict," then everything changes.  At that moment you go -- you, the jury, go from being prohibited from discussing the evidence and the witnesses and anything about the trial with each other to being required to discuss all the evidence presented during the trial with each other, as you work together to come up

with answers to those questions in the verdict form.

But before you've heard all the evidence, before you've received my final instructions on the law, before counsel have presented their closing arguments, and before I say you may now retire to the jury room to deliberate on your verdict, you must not discuss the case even among the eight of yourselves in any way.

And I can tell you this, ladies and gentlemen, because I'm going on my 14th year as a United States district judge, I can tell you this out of experience. Unless you live alone, when you get home tonight, whoever is there when you walk through the door, the first thing you're going to hear is, Tell me what happened in federal court today. When you get that question, don't even try to answer it, because even if you try, you'll almost assuredly violate this instruction.

So when you get that question from whoever is there when you go home this evening, just say, That very serious federal judge told me not to even try to answer that question. Blame it on me. That's part of why I'm here. But do not try to answer that question. Again, you must not communicate with anyone about this trial until you've heard all the evidence, received my instructions on the law, and have heard closing arguments from the competing lawyers and I've sent you to the jury room to deliberate on your verdict.

Also, in this same vein, ladies and gentlemen, you are

not to do any research during this trial.  You are not to go home and get on a computer and do a computer search for any of the issues, any of the parties, any of the lawyers, anything, because, quite honestly, it comes back to that same fundamental premise that when you sit down as a body of eight people and come to a decision as to how to answer those questions, the only material and information you should rely upon must be limited to the sworn testimony of the witnesses and the exhibits presented during the trial.

If you go home and do a Google search about General Access or T-Mobile or Ericsson or any of these lawyers or me or anything else about this trial, you will have information before you that did not come in from the witnesses' sworn testimony and the exhibits.  Those are the sole and only sources of information you must have, and you must be limited to only those sources of information when you answer the questions in the verdict form.

So please don't do any outside research in any way. Don't use any social media networks, don't communicate with anyone in any way about this case, including the eight of yourselves, until we get that point where I send you back to deliberate on your verdict.

Now, I don't think it will happen in this case, ladies and gentlemen, but this is an important case.  There are no unimportant cases that get to a jury trial in a United States

District Court. It is possible--I do not think it is likely--but it is possible that some outside source, some different person might approach you during this trial and try to influence you about how you decide the issues in this case. If that should happen, or if you have any approach or conversation from anyone in any way that you feel uneasy about or awkward about or doesn't seem right to you in any way, then you should immediately let Ms. Clendening know, she'll inform the Court, and the Court will deal with it. Again, I don't think it's likely, but I cannot tell you it is beyond the realm of possibility, so I want to make you aware of that.

Also, ladies and gentlemen, during the course of this trial, as you come in each day and leave each evening, there are going to be times where you're going to be in close physical proximity to some of these witnesses, some of these lawyers, some of their support staff. When that happens, none of those people are going to speak to you, none of those people are going to say good evening or good morning or how are you today. None of them are going to be friendly and outgoing like we're used to in East Texas. That's because I've instructed them not to be. That's because the only information you must have when you answer the questions in the verdict form must be limited to the sworn testimony of the witnesses that is subject to cross examination in open court and the exhibits that have been admitted into evidence.

130

So when these folks are in close physical proximity to you coming up and down the stairs, on the sidewalk, wherever it might be, and they walk right by you and they don't look you in the eye and they don't speak to you, do not hold that against them, do not think they're being rude or unfriendly; understand that they are simply following my instructions.

Now, I do want to share this with you. I've told you as a part of jury selection that I'm confident we can be through with this case on Friday, and I am confident we can be through with this case on Friday. But to reach that goal, we cannot start at 10:00 in the morning and quit at 4:00 in the afternoon. We're going to have to work longer days each day to reach that goal.

Having tried many of these cases, I have jurors after the fact tell me time and time again they would much rather be away from their families and their businesses and their other important obligations a shorter number of days, and to do that they would rather work a longer day each day to achieve that than if they had a shorter workday each day, and so that's how we're going to approach this.

Each day starting tomorrow morning when you come to the courthouse, I need you to be here in the jury room before 8:30. I want to start at 8:30 each morning. Be here at 8:15. There will be juice and pastries and things that Ms. Clendening will have for you. But be here ready to go by

or before 8:30 each morning.

I tell jurors this because I think it makes the point. My dad served in the Navy during World War II, and as I was growing up, one of his expressions that I guess came from his Navy service was, time and time again, he would say, A convoy moves only as fast as its slowest ship. Usually that was me being late for church or something getting in the car--but a convoy moves only as fast as its slowest ship.

That's true with juries, ladies and gentlemen. I can't start with six of you or seven of you; I have to have all eight of you here. And if it's 8:30 and one of you is late, I can't start. So please make your arrangements to be here every morning in time that we can have you walk into the courtroom and start each day at 8:30.

As I've told you, we'll have lunch delivered in and brought to you each day, and we will probably go each evening past 5:00. Sometimes in circumstances we may go to 5:30 or 6:00.

Some of the witnesses you're going to hear in this trial, ladies and gentlemen, are going to be on the witness stand several hours, and if there's a witness who's been on the witness stand for 2 hours and 15 minutes and it's 10 minutes until 6:00 and 15 more minutes will get them off the witness stand, we'll probably stay until 5 after 6:00 and get them off the witness stand. I don't like to break witnesses between

days if we can help it, but that is not -- that's not a science.  There's really more art than science to that.

Suffice it to say, those of your family that you want to be aware of your schedule, you're not going to be leaving here probably at 5:00 each day.  But if we do that, if we start at 8:30, if we go until 5:30 or 6:00, if we have a reduced lunchtime because it's brought in to you rather than you have to go out and find it, we can finish this trial in five days.

I have judge friends around the country, many of which are in big metropolitan downtown areas.  Their jurors can't get there until probably 9:30 or 10:00 in the morning just because of the traffic, and they don't usually run past about 4:30 or 5:00.  And we could do that, but if we did that in this case it would probably take us a week-and-a-half to two weeks to try this case as opposed to one week.

So we're going to start at 8:30 each morning and we're going to go past 5:00 each day as needed.  And I think if we do that, we can be relatively secure that we'll have your verdict in hand and be ready to complete this trial by Friday of this week.

I've got some other instructions I'm going to give you, but I'll wait and give you those after lunch.  And it is 25 minutes after 12:00, so we'll probably start, oh, about 10 or 15 minutes after 1:00.  As I say, lunch should be waiting for you in the jury room.

With that and with all the instructions I've given you, ladies and gentlemen, you are excused for lunch at this time.

(Whereupon, the jury left the courtroom.)

THE COURT:  Counsel, I'd like to see you in chambers before we start back.  We'll revisit the issue about prosecution history that we talked about this morning that I carried.  But let me see you in chambers about 10 minutes after 1:00.

Until then, we stand in recess.

(Lunch recess.)

THE COURT:  Be seated, please.

Counsel, is there anything further I need to hear you on before I bring in the jury and give them my preliminary instructions?

MR. SUMMERS:  Nothing from the Plaintiff, Your Honor.

MR. STEVENSON:  Nothing from the Defendants.

THE COURT:  Let's bring in the jury, please.

(Whereupon, the jury entered the courtroom.)

THE COURT:  Welcome back from lunch, ladies and gentlemen.  Please have a seat.

Members of the jury, you've now been sworn as the jurors in this case and as the jury, you're the sole judges of the facts.  And as such, you will decide and determine what all the facts are in this case.

As I mentioned, as the Judge, I'll give you instructions on the law, I'll decide questions of law, evidence, and procedure that arise during the trial, and I'm responsible for overflowing an efficient -- managing an efficient flow of the evidence during the course of the trial and maintaining the decorum of the courtroom.

At the end of the evidence, I'm going to give you detailed instructions about the law to apply in deciding this case, and I'll give you a list of questions that you are then to answer.  As I have mentioned, this list of questions is called the verdict form, and your answers to the questions in the verdict form will need to be unanimous.  And those unanimous answers to the questions in the verdict form will constitute the jury's verdict in this case.

Now, let me briefly tell you what this case is about. This case involves a dispute regarding two United States patents.  I know you've all seen the video prepared by the Federal Judicial Center, but I need to give you instructions now and on the record about a patent and how one is obtained.

Patents are granted or denied by the United States Patent and Trademark Office, which you'll hear referred to often as simply the PTO.  You may hear it referred simply to the Patent Office.  A valid United States patent gives the patent holder the right for up to 20 years from the date the application is filed to prevent others from making, using, offering to sell,

Shawn M. McRoberts, RMR, CRR
Federal Official Court Reporter

135

or selling the patented invention within the United States, or from importing it into the United States, without the patent holder's permission.

A patent is a form of property called intellectual property, and like other forms of property, a patent can be bought or sold.

Now, the violation of a patent holder's rights is called infringement. And a patent holder may try to enforce a patent against persons it believes to be infringers by filing a lawsuit in a United States District Court, and that's what we have in this case.

Now, the process of obtaining a patent is called patent prosecution. To obtain a patent, one first files an application with the Patent Office, the PTO. The United States Patent and Trademark Office is an agency of the United States government. It's a part of the U.S. Department of Commerce, and it employs trained examiners who review applications for patents.

Now, an application includes within it something called a specification. The specification contains a written description of the claimed invention telling what the invention is, how it works, how to make it, and how to use it. The specification in the patent concludes or ends with one or more numbered sentences, and these numbered sentences, ladies and gentlemen, are the patent claims. And when a patent is

136

granted and issued by the PTO, it is the claims that define the boundaries of its protection and give notice to the public of those boundaries.

Now, patent claims may exist in two forms referred to as independent claims and dependent claims. An independent claim in the patent does not refer to any other claim within the patent; it is independent. It's not necessary to look at any other claim within a patent to determine what an independent claim covers.

On the other hand, a dependent claim refers to at least one other claim within the patent. A dependent claim includes each of the elements and limitations of that other claim or claims to which it refers, or as we sometimes say, from which it depends, as well as the additional elements or limitations within the dependent claim itself.

So to determine what a dependent claim in a patent covers, it's necessary to look at both the dependent claim itself and the independent claim or claims to which it refers, or from which it depends.

Now, the claims of the patents-in-suit in this case use the word 'comprising'. 'Comprising' means including or containing. And a claim that includes the word 'comprising' is not limited to the methods or devices having only the elements that are recited in the claim, but also covers other methods or devices that add additional elements.

Let me give you an example. If you have a claim that recites a table comprising a tabletop, legs and glue, the claim will cover any table that contains these structures, a tabletop, legs, and glue, even if a table contains other additional structures, such as leaves to expand the size of the tabletop or wheels to go on the ends of the legs. Now, that's a very simple example using the word 'comprising' and what it means. In other words, ladies and gentlemen, it can have other features in addition to and beyond what's covered by the patent.

Now, after the applicant files their application with the PTO, the PTO assigns an examiner to review the application, and the examiner reviews the application to determine whether or not the claims are patentable--that is to say, appropriate for patent protection, and to determine whether or not the specification adequately describes the invention that is claimed.

In reviewing the patent application, the examiner reviews certain information about the state of the technology at the time the application was filed. The Patent Office searches for and reviews this type of information that is either publicly available or that might have been submitted to it by the applicant. And this type of information is called prior art. The examiner reviews this prior art to determine whether or not the invention claimed in the application is truly an

138

advance over the state of the art at the time.

Now, prior art is defined by law, and I'll give you specific instructions at a later time about what constitutes prior art. However, in general, prior art includes information that demonstrates the state of the technology that existed before the claimed invention was made or before the application for a patent was filed.

Now, a patent contains within it a certain list of prior art that the examiner has considered in reviewing the application. These items on this list are called the cited references.

Now, after the prior art search and an examination of the application, the examiner informs the applicant in writing of what the examiner has found, and whether the examiner considers any claim to be patentable, in which case it would be allowed. And this writing from the examiner to the applicant is called an office action.

Now, if the examiner rejects the claims, the applicant has the opportunity to respond to the examiner to try to persuade the examiner to allow the claims. The applicant also has the opportunity to change or amend the claims, or to submit altogether new claims. And the papers generated in this back-and-forth between the examiner and the applicant are called the prosecution history.

And this typical process, this prosecution history, may

go back and forth for some time until the examiner is ultimately satisfied that the application meets the requirements for a patent.  And in that case the application issues as a United States patent; or, in the alternative, if the examiner ultimately concludes that the application should be rejected, then no patent is ever issued.

Now, sometimes patents are issued after appeals within the Patent Office or to a court.

Now, the fact that the Patent Office grants a patent does not necessarily mean that the invention claimed in the patent, in fact, deserves the protection of a patent.  While an issued United States patent, ladies and gentlemen, is presumed to be valid under the law, a person accused of infringement has the right to argue here in federal court that a claimed invention in a patent is invalid.  It's your job as the jury to consider the evidence presented by the parties and determine independently for yourselves whether or not the Defendant has proven that a patent is invalid.

Now, to help you follow the evidence, I'm going to give you a brief summary of the positions of the competing parties.

As you know, the party that brings a lawsuit is called the plaintiff, and the Plaintiff in this case is General Access Solutions, Limited, or LTD.  And you'll hear them referred to throughout the trial simply as the Plaintiff or as General Access.  And as you know, the party or parties against

whom a lawsuit is brought are called the defendants, and in this case the Defendant is T-Mobile U.S.A, Inc., which you'll hear referred to simply as T-Mobile.  You may hear it referred to simply as Defendant.

Now, in addition to T-Mobile, and I mentioned this to you earlier, Ericsson, Inc., intervened in this case after the lawsuit was filed.  Technically that means that Ericsson is known as what we call an intervenor in this case.  But, practically speaking, Ericsson will be working cooperatively with T-Mobile to defend themselves against the allegations brought by the Plaintiff General Access.

And it's possible, probably likely, that you'll hear during the case both T-Mobile and Ericsson referred to as Defendants, even though technically T-Mobile is the Defendant and Ericsson is an intervenor.  Practically speaking, they'll be treated as co-Defendants in the case.

Now, as I told you during jury selection, this case involves allegations of patent infringement asserted by General Access against T-Mobile.  And as I mentioned to you, there are two separate United States patents at issue.  The first of these is United States Patent No. 6,947,477.  As you know, patents are commonly referred to by their last three digits.  So in this particular case Patent No. 6,947,477 is going to be referred to as the '477 Patent.  The second U.S. patent at issue in this case is United States Patent No.

141

7,099,383, which you'll hear referred to as the '383 Patent. You may hear it called the '383 Patent.

And these two patents together are referred to at various times and you will hear them referred to during the trial as the patents-in-suit. You may also hear them called the asserted patents. Patents-in-suit or the asserted patents means the two patents at issue in this case, the '477 and the '383.

Now, the Plaintiff General Access contends that T-Mobile is infringing certain claims of these patents-in-suit by making, using, selling, importing, or offering to sell in the United States, certain products that include its patented technology. General Access contends that it's entitled to money damages as a result of the infringement it asserts against T-Mobile.

General Access also alleges that T-Mobile's infringement in this case is willful.

Now, the Defendant T-Mobile denies -- actually the Defendants T-Mobile and Ericsson deny that there is any infringement of the asserted claims by T-Mobile. The Defendants also contend that certain claims of the two patents that have been asserted in this case are invalid for various reasons. And the Defendants contend that the Plaintiff is not entitled to any money damages.

Now, I know, ladies and gentlemen, that there have been a

lot of new words and a lot of new concepts that have been thrown at you since you got to the courthouse this morning. I'm going to define a lot of these terms and discuss these concepts with you as we go through these instructions, the attorneys in the case are going to discuss them in their opening statements, the witnesses are going to help you as they go through their testimony to understand these words and these concepts. So, please, do not feel overwhelmed at this stage; I promise you it will all come together as we go through the trial.

Now, one of your jobs in this case is to decide whether or not the asserted claims from the patents-in-suit have been infringed. You'll also be asked to decide whether or not the asserted claims are invalid. Now, if you decide that any asserted claim from the two patents-in-suit has been infringed by the Defendants and is not invalid, then you'll need to decide whether or not any infringement that you have found was willful. You'll also need to decide at that point what amount of money damages should be awarded to Plaintiff to compensate it for that infringement.

Now, my job in this case is to tell you what the law is, to handle rulings on evidence and procedure, to oversee the efficient conduct of the trial, and to maintain the decorum of the court. In determining the law, ladies and gentlemen, it is specifically my job to determine the meaning of any of the

language from the asserted claims that needs to be interpreted.

I've already determined the meanings of certain language from the asserted claims from the two patents-in-suit, and you must accept these meanings or interpretations, sometimes they're called constructions, that the Court has already reached when you decide whether or not a particular claim has been infringed and whether or not any claim is or is not invalid. And you're going to be given a document in a few minutes that reflects these constructions or interpretations or definitions that the Court has already reached.

Now, for any language from the asserted claims where I have not provided you with a definition or construction, you should apply the plain and ordinary meaning of that language as understood by a person of ordinary skill in the art--that is, that field of technology.

Now, if I provided you with a definition or a construction, you have to apply my definition or construction to those words and to that language throughout the trial. However, my interpretation of any language from the claims should not be taken as an indication by you that I have any personal opinion or any opinion at all regarding the issues of infringement, validity, or damages. Those issues, ladies and gentlemen, are yours to decide alone as the jury in this case.

I'm going to provide you with more detailed instructions

on the meaning of the claims before you retire to deliberate and reach your verdict.

In deciding the issues that are before you, you're going to be asked to consider specific legal rules, and I'll give you an overview of those rules now, and then at the conclusion of the case I'll give you more detailed instructions.

The first issue that you are going to be asked to decide is whether the Defendants have infringed any of the asserted claims from the patents-in-suit. Infringement, ladies and gentlemen, is assessed and determined on a claim-by-claim basis. And General Access, the Plaintiff, must show by a preponderance of the evidence that a claim has been infringed. Therefore, there may be infringement as to one claim but no infringement as to another claim.

There are also a few different ways that a patent can be infringed, and I'll explain the requirements for each of these types of infringement to you in detail at the conclusion of the case. But, in general, a defendant may infringe the asserted patents by making, using, selling, or offering to sell in the United States, or importing into the United States, a product meeting all the requirements of the claim from the asserted patent, or one that practices all the required steps of a claim from the asserted patent. And I'll provide you, as I say, with more detailed instructions on the requirements for infringement at the conclusion of the case.

Now, the second issue that you will be asked to decide is whether certain claims from the patents are invalid. Invalidity is a defense to infringement.  Therefore, even though the U.S. Patent and Trademark Office, the PTO, has allowed the asserted claims, and even though an issued United States patent is presumed to be valid, you, the jury, must decide whether those claims are, in fact, invalid after hearing all the evidence presented in this case.  And you may find a patent claim to be invalid for a number of reasons, including because it claims subject matter that is anticipated or that is obvious.

Now, if a patent claim is to be invalid because it is anticipated, the Defendants, that's T-Mobile and Ericsson in this case, must show by clear and convincing evidence that that claim is not new, and that all of the claims elements are sufficiently described in a single previously printed publication or patent.  If a claim is not new, ladies and gentlemen, it is said to be anticipated by the prior art.

For a patent claim to be invalid, it may also be invalid for another reason, because it is obvious.  The Defendants must show, again by clear and convincing evidence, that a claim would have been obvious to a person of ordinary skill in the field of the technology of the patent at the relevant time.  And you'll need to consider a number of questions in deciding whether the invention claimed in the asserted patents

is obvious, and I'll provide you with more detailed instructions on these questions at the conclusion of the trial.

Now, another way, a third way that a claim can be found to be invalid is that there may be a lack of an adequate written description. For a patent claim to be valid for a lack of a sufficient or adequate written description, the Defendants must prove, again by clear and convincing evidence, that an asserted patent's specification does not describe the claimed invention with sufficient detail so that one skilled in the art can reasonably conclude that the inventor had possession of the invention that they're claiming.

Invalidity is asserted and assessed and determined on a claim-by-claim basis. Accordingly, just like with infringement, one claim may be invalid while another claim is not invalid. And you'll need to consider a number of questions in deciding whether a patent-in-suit contains a sufficient written description, and I'll provide you with more detailed instructions on this at the conclusion of the trial.

Now, if you decide that any of the asserted claims in the two patents-in-suit have been infringed and you decide that those claims are not invalid, then you will need to decide whether the Defendants' infringement, which you have found, was and is willful.

Plaintiff in this case General Access has the burden to

prove willful infringement by a preponderance of the evidence. If you decide that any infringement that you have found is, in fact, willful, that finding of willfulness should not affect or impact any damages that you might award in this case. The Court will take willfulness into account later, if you find it.

Further, ladies and gentlemen, if you decide that any of the asserted claims from the patents-in-suit have been infringed and are not invalid, at that point you will also need to decide what amount of money damages should be awarded to the Plaintiff General Access to compensate it for that infringement.

A damage award must be adequate to compensate the patent holder for the infringement, and in no event may a damage award be less than what the patent holder would have received had it been paid a reasonable royalty for the use of its patents. However, the damages that you award, if any, are meant to compensate the patent holder, and they are not meant to punish the Defendants. And you may not include in any damages award any additional amount as a fine or a penalty above what is necessary to fully compensate the patent holder for any infringement you have found.

Also, damages in a patent case cannot be speculative, and the Plaintiff General Access must prove the amount of its damages by a preponderance of the evidence. However, the fact

that I'm instructing you on damages now does not mean that General Access is or is not entitled to recover damages.

Now, you're going to be hearing from a number of witnesses over the course of this trial, and I want you to keep an open mind while you're listening to the evidence from each and every witness and not decide any of the facts in this case until you've heard all of the evidence from all of the witnesses.

And this is important, ladies and gentlemen.  While the witnesses are testifying over the course of this trial, remember you, the jury, will have to decide and determine the degree of credibility and believability to allocate to each of the witnesses and the evidence that they give.

So while the witnesses are testifying, you should be asking yourselves things like this:  Does the witness impress you as being truthful?  Does he or she have a reason not to tell the truth?  Does the witness have any personal interest in the outcome of the case?  Does the witness seem to have a good memory?  Did he or she have an opportunity and ability to observe accurately the things that they've testified about?  Did the witness appear to understand the questions clearly and answer them directly?  And of course, does the witness' testimony differ from the testimony of another witness?  And if it does, how does it differ?

These are some of the kinds of things you should be

thinking about while you're listening to each of the witnesses over the course of the trial.

Also I want to talk to you briefly about expert witnesses.

When knowledge of a technical subject may be helpful to the jury, a person who has special training and experience in that particular field--we call them an expert witness--is permitted to testify to you about his or her opinions on those technical matters.  However, ladies and gentlemen, you're not required to accept an expert witness or any witness' opinion at all.  It's up to you to decide whether you believe what an expert witness tells you or what any witness tells you; whether you believe it's correct or incorrect, and whether you believe -- whether you do or you don't want to give it any weight.

Now, I anticipate over the course of this trial that there will be expert witnesses testifying in support of each side in this case.  But when that happens, and when they testify and give you their qualifications and then they give you an opinion and explain the basis how they reached that opinion, you will have to evaluate what they say, you will have to determine whether you believe it, and if you do, to what degree do you want to give it weight.  Remember, ladies and gentlemen, judging and evaluating the credibility and the believability of each and every witness is an important part

of your job as jurors.

Now, during the trial it's possible that there will be one or more witnesses that are going to be presented to you through what we call a deposition.  In trials like this, it's difficult to get every witness here in person to testify live in the courtroom.  So before the trial begins, the lawyers from each side take the depositions of each of the witnesses.

In a deposition, a court reporter is present, the witness is present and they are sworn and placed under oath just if they were in court, and then they are questioned by the lawyers.  And both the questions and their answers are taken down and recorded.  Often they are also video recorded.

Now, during the course of this trial if you're presented by witnesses who are presented to you through a deposition, it's possible that you will only see a portion of that deposition.  Let me explain this.  In a typical deposition of a witness, they're present, a court reporter is present, they're sworn and placed under oath, they're asked questions, and the answers they give are taken down, transcribed, and recorded.  As I told you, often video recorded.

A typical deposition goes for seven hours.  Now, it may be when it comes time for the trial, that that particular witness is not going to be able to testify in person and it may be that the lawyers determine that 20 minutes of their deposition testimony is relevant for you to hear.

Well, we don't want to listen to seven hours of recorded testimony to get 20 minutes' worth of information, so that 20 minutes will be edited, spliced, cut out, and put back together, and in all likelihood you'll be shown a video clip of that 20 minutes.  That way we see 20 minutes as opposed to having to listen to seven hours.

Now, because of that, though, there are going to be unavoidably little glitches, little irregularities.  You may hear what sounds like a different voice asking the questions.  There are going to be some things like that in there.  That's a necessary and unavoidable part of taking that 20 minutes out of seven hours of recordings and putting it together and presenting it to you.

So if you're presented with witnesses by deposition where their deposition was video recorded and for this example you see a clip of 20 minutes to save us all from listening to seven hours, don't focus on the little glitches or the irregularities or the different sounding voices; focus on the questions that were asked and the answers that were given.  And it will save us a lot of time to avoid listening to seven hours of material just to get 20 minutes' worth of relevant testimony.

Now, these deposition witnesses, ladies and gentlemen, they're entitled to the same consideration insofar as possible, and they're to be judged by you as to their

credibility and the weight to be given to their testimony, just as you would with any other witness who's going to testify live from the witness stand in open court.

Also, ladies and gentlemen, it's possible that some of the documents you may see over the course of this trial are going to have various words or sentences or paragraphs blacked out or redacted.  There are certain documents you may see where the Court has already previously ordered certain things to be redacted or blacked out.

If you're shown documents during the course of the trial that have redactions in them, don't focus on what's blacked out, don't try to guess what was there that you can't see, don't try to read what comes before and after and figure out what was blacked out in the middle; ignore the blacked out redactions.  Focus on what is legible, what you can see, and what is presented to you through the witnesses and attorneys.

The redactions should not be a distraction.  And if they're there, just know that the Court determined in advance of the trial that they were necessary and appropriate or they wouldn't be there.  But it's possible you're going to see documents with redactions.  And when you do, don't get distracted by them; focus on what you can read and what's presented in the unredacted portions of those documents.

Now, over the course of the trial, it's possible that the lawyers are going to raise certain objections, and when they

do, I will issue rulings on those objections.  You should understand it's the duty of an attorney for each side of the case to object when the other side offers evidence or testimony that the attorney believes is not proper under the rules of the Court.

Now, upon allowing the testimony or other evidence to be introduced over the objection of an attorney, the Court, in so doing, does not indicate any opinion as to the weight or the effect of that evidence.  Determining the weight and effect of the evidence is your job; it is not my job.

Also, ladies and gentlemen, you need to know that in advance of the trial, the Court has already made certain rulings about certain general categories of information that should not come in during the trial.  Those kinds of determinations by the Court are called orders in limine.

And the process of excluding certain categories of information that should not be addressed in front of the jury are called limine orders.  You may hear them called MIL, M-I-L, which stands for motion in limine.  That's a word you probably never heard before.  But if one of the lawyers raises an objection about a violation of a limine order or a violation of a MIL, I want you to understand they're talking about a category of information that I've already determined should not come in during the trial.

And I'll determine whether that objection, if it's made,

has any merit or not.  But I don't want you to be confused by an extraneous word you've probably never heard of before.  If you hear the word 'limine', that's just referring to a category of information that for reasons already discussed with the Court, the Court's determined should not ordinarily come in before the jury.  Again, that's just so you don't get confused if that should come up.

Now, as I've said, you, the jury, are the sole judges of the credibility and the believability of all the witnesses, and you are the sole judges of what amount of weight, if any, and what effect, if any, should be given to the testimony of all the witnesses and all the evidence presented.

Now, I want to compliment the attorneys in the case because, prior to today, there have been numerous pretrial hearings with the Court where they have worked with the Court to streamline this process and to get issues already out of the way so they won't be a distraction during the trial, wherever possible.

And a lot of time has been spent by the attorneys and the Court in reaching those streamlining efforts, and they've worked carefully with the Court and the Court appreciates their efforts.  And I believe it is going to streamline the trial process significantly.  But even though that's happened, there still might be objections raised during the trial, and if there are objections, I'll rule on them.

If I should sustain an objection to a question addressed to a witness, then you must disregard the question entirely, ladies and gentlemen, and you may draw no inference from its wording or speculate about what the witness would have said if I had allowed them to answer the question.

On the other hand, if I overrule an objection to a question addressed to a witness, then you should consider the question and the answer just as if no objection had been made in the first place.

Now, you should know that the law of the United States permits a United States district judge to comment to the jury on the evidence presented during a trial, but such comments on the evidence from the judge to the jury are simply an expression of the judge's opinion and the jury is free to disregard those comments entirely because, as I've told you, you, the jury, are the sole judges of the facts.  You, the jury, are the sole judges of the credibility of the witnesses. And you, the jury, are the sole judges as to how much weight, if any, to give to all of the evidence presented over the course of the trial.

And as I've told you during jury selection, even though the law may permit me to comment to you on the evidence in this case, I'm going work very hard not to comment to you on any of the evidence in this case because, as I've told you, determining what the facts are from the evidence is your job

in this trial; it is not my job.

Now, as I've mentioned earlier, in front of me is our court reporter, Mr. McRoberts, and he will take down everything that's said in the courtroom during the trial. In fact, he's taken down everything that's said during jury selection this morning. That's why I tried to stop people from talking at the same time, because it's very difficult to write accurately what's being said when two people are talking at the same time. And I'll try to enforce that same rule during the course of the trial.

But the transcript that is generated, the written record of everything that's said during the trial, I want you to understand, ladies and gentlemen, that's not going to be available for you to take to the jury room with you when you deliberate on this case. You're going to have to rely on your memory of the evidence.

Now, in a moment you're each going to be given a juror notebook, and in the back of that notebook you're going to find a brand new legal pad where you can take notes over the course of the trial if you choose to take notes. You'll also find a pen in the front flap. It's up to each of you to decide if you want to take notes over the course of the trial, and if you do, how detailed you want those notes to be.

But remember, any notes that you take are for your own personal use. You still have to rely on your memory of the

evidence, and that's why you should pay close attention to the testimony of each witness over the course of the trial.

And a juror who has not taken notes should not abandon or change their own recollection just because some other juror's notes indicate something different.  Notes, if you take them, are to refresh your recollection, and that's the only reason you should be keeping them.

I'm now going to ask Mr. Barnett, our Courtroom Security Officer, to pass out these notebooks to the members of the jury.

(Pause in proceedings.)

THE COURT:  Thank you, sir.

In these notebooks, ladies and gentlemen, you're going to see, if you'll open them up, that you each have a copy of the two patents-in-suit at the beginning of those notebooks.  And you can have these before you when you review the evidence during your deliberations.

Now, behind the two patents-in-suit, you're going to find a chart or a ledger where certain language from the asserted claims has been interpreted or construed by the Court.  The language is on one side, and the Court's construction or definition is on the other side.  And, again, where I have given you a specific definition of any language from the asserted claims, you have to apply my definition to the issues that you're asked to decide when that language is at issue,

158

including the issues of infringement and validity.

Now, after you find this ledger sheet of the claim language that the Court has construed, the next thing in there you'll find is a section of tabbed witness pages.  For each witness that I expect may testify during the trial, there should be a page with a head-and-shoulders photograph of the witness superimposed at the top of the page, their name underneath, and then the balance of that page ruled lines in case you want to take additional notes there.

The Court's found over the past many years that it's very helpful to the jury after a lengthy trial to be able to go back and see it again, a picture of each person that testified, to help you recall their testimony and to remember what they've said.

Now, behind those tabbed witnesses pages is the new legal pad that you can use for taking additional notes, and you should find a pen in the front pocket of the notebooks as I've indicated.

Now, these notebooks, ladies and gentlemen, are not to be left laying around where anyone other than yourselves can have access to them.  They should be in your possession unless I indicate otherwise.  When you leave each day to go home, I'm going ask you to take them to the jury room and leave them on the table there and the jury room will be locked.  When you come in each morning, those notebooks will be there and you

can find your notebook and bring it with you when you come into the courtroom.

Now, there will be times during the trial each day when we're going to take a short break or a short recess. Typically I take a mid-morning recess and then one or two recesses each afternoon. And those are typically times when you're going to be out of the jury box for 12, maybe 13, 14 minutes at the most.

And in those cases it's most likely that I will say, "Ladies and gentlemen, you can simply close and leave your notebooks in your chairs." If I tell you that, then you don't need to carry them back to the jury room with you. You can close them, leave them in your chairs, given those short periods of time where we may be out of the courtroom. And then they'll be there when we come back in. But unless I give you instructions, you should have those notebooks in your possession at all times.

Now, in a moment you're going to be presented with opening statements from the lawyers in the case, and these opening statements from each side are intended to give you a roadmap of what each side expects that the evidence is going to show over the course of the trial. And you should remember, ladies and gentlemen, throughout the entire trial process, that what the lawyers tell you, what the lawyers tell you, is not evidence.

The evidence is the sworn testimony of the witnesses, subject to cross examination, and presented either by live witnesses from the witness stand or deposition testimony as I've already explained to you. The evidence in this case also includes the exhibits, those documents and tangible things that the Court has admitted into evidence. And the testimony of the witnesses and the exhibits admitted by the Court, those two things constitute the evidence in this case. Nothing else is evidence in this case. I want you to be very clear about that.

Now, what the lawyers tell you is their impression of what the evidence is and what it will show, and they have a duty to point out to you what they believe the evidence is, but remember, what the lawyers tell you in these opening statements that you're going to hear and the closing arguments that you're going to hear at the end of the trial, what the lawyers tell you is not evidence.

Now, after the opening statements from each side, the Plaintiff will offer its opening statement first and then the Defendant will offer -- the Defendants will offer their opening statement. After the opening statements, we'll turn to the evidence in this case, and the Plaintiff will be permitted to call its witnesses and present its evidence. That's called the Plaintiff's case in chief.

The Plaintiff will call its witnesses. The witnesses

will testify under direct examination by Plaintiff's counsel. Then they'll be cross-examined by Defense counsel.  And when that process is finished, that witness will step down and the next Plaintiff's witness will come up.  And the next Plaintiff's witness will be directly examined by Plaintiff's counsel and cross-examined by Defense counsel.  And we follow the same process until we've heard from all of the Plaintiff's witnesses.

And when we've heard from all of the Plaintiff's witnesses, the Plaintiff will rest its case in chief.  Then we will transition or pivot to the Defendants' case in chief.

And in the same manner, the Defendants will call their witnesses one at a time.  And those witnesses, after they're sworn, will be examined on direct examination by the Defendants' lawyers, and then they'll be cross-examined by the Plaintiff's lawyers.  And after they've been examined fully and step down, then the next Defendants' witness will come forward and testify.  And we'll go through that same process until all of the Defendants' witnesses have been presented.

And then the Defendant will rest the Defendants' case in chief.

Now, when the Defendant rests the Defendants' case in chief, the Plaintiff has an option--not a requirement but an option--to call what are known as rebuttal witnesses to rebut what the Defendants have shown in their case in chief.  The

Plaintiff may call rebuttal witnesses.  The Plaintiff may opt not to recall -- to call rebuttal witnesses.  If there are no rebuttal witnesses, then at the end of the Defendants' case in chief, you will have heard all the evidence in the case.

If the Plaintiff does call rebuttal witnesses, then those rebuttal witnesses will be treated in the same way as I've described--the Plaintiff will call their rebuttal witness, the rebuttal witness will testify on direct examination by the Plaintiff's lawyers, and then they'll be cross-examined by the Defendants' lawyers.  And whether there's one, two, or more witnesses, it will depend on the Plaintiff's determination, the time still allowing in the trial, and other factors.

If there are rebuttal witnesses when the last rebuttal witness testifies, then you will have heard all the evidence in this case.  Again, if there are no rebuttal witnesses, then at the end of the Defendants' case in chief you will have heard all the evidence in this case.

Now, once all the evidence has been presented, then I will give you my final instructions on the law that you are to apply in deciding this case.  Those final instructions from the Court to the jury are often called the Court's charge to the jury.  Once I have given you those final instructions, once I have given you my charge, then the parties through their counsel will present their closing arguments.

The Plaintiff will go first because the Plaintiff has the

burden of proof on most issues.  Then the Defendants will go and give their closing arguments.  And then when you've heard all the closing arguments from both sides, then I will instruct you, "Ladies and gentlemen of the jury, you may now retire to the jury room to deliberate on your verdict."

And remember, as I told you earlier, up until that point you are prohibited from discussing any of the evidence or anything about the trial with the eight of yourselves.  But at that point, and I often think of it like turning on a light switch, when I say, "Ladies and gentlemen, you may now retire to the jury room to deliberate on your verdict," to me that's like turning the light switch on and you go from being prohibited from discussing the evidence during the trial with each other to being required to discuss the evidence presented during the trial with each other, as the eight of you work together to arrive at unanimous answers to the questions that will be presented to you in the verdict form.

Let me remind you one more time, ladies and gentlemen, that over the course of this week none of these folks affiliated with either of the trial teams are going to interact with you in any way.  And most of the people you see in the courtroom behind the bar in the gallery are affiliated with one side or the other in this trial.

There aren't many spectators out there.  They're support staff and they're witnesses and they're people that are

aligned with one side or the other of this trial.  And none of those people are going to interact with you if you come in close contact with them.  And when that happens and they don't interact with you, don't blame them, don't think they're being rude, don't be offended by it; just understand in advance they're doing what I have instructed them to do.

Because, as I've said several times and probably going to continue to say during the course of the trial, it is critical that at the time you retire to deliberate and that light switch goes on and you are required to discuss the evidence among yourselves, it must be that that evidence is limited to only the sworn testimony of the witnesses that have been presented to you during the trial and the exhibits admitted into evidence by the Court; nothing more.

And so to keep that universe of proper evidence clean and as it should be, nobody else is going to interact with you or have any conversation with you.  That's why I've said over and over again do not communicate with anyone in any way about this trial.  Because if those things happen, there will unavoidably be the injection of other evidence and material and information into this case.  And if that were to happen, it would jeopardize the entirety of the trial.

And a clear violation of that instruction where there's outside information injected into the trial, then the Court often has to declare a mistrial, dismiss the jury, impanel a

brand new jury, start all over again, and there are thousands and thousands of hours wasted and thousands and thousands of dollars wasted and many, many resources that are gone by the boards and can't be gotten back.

So it is important, it is very important, that when you retire to deliberate, the only information you will have to draw upon in answering the questions in the verdict form be limited to the sworn testimony of the witnesses and the exhibits admitted by the Court and presented to you over the course of the trial.  That's it.

And so don't be surprised when you hear me instruct you over and over this week, do not discuss the case with anyone. It's just that important, and the consequences are just that severe.  So I'll put you on notice, this is not the last time you're going hear from that from me.

All right, ladies and gentlemen.  We'll now proceed to hear opening statements from the attorneys for the competing parties.  We'll begin with the Plaintiff.

Mr. Summers, the Plaintiff may present its opening statement to the jury at this time.

MR. SUMMERS:  Thank you, Your Honor.

THE COURT:  Would you like a warning on your time.

MR. SUMMERS:  Yes, two minutes, please.

THE COURT:  I'll warn you when you have two minutes remaining.

You may proceed with Plaintiff's opening when you're ready.

MR. SUMMERS:  If I may have just a moment, Your Honor.

May it please the Court.

Men and women of the jury, my name is Glen Summers, and my team and I are proud today to represent the Plaintiff in this case, General Access Solutions.

I want to start by thanking you for your service on the jury today.  You're going to hear this a lot because it's true.  But the right to trial by jury is one of the most important rights afforded under the Constitution.  It's not just for criminal defendants.  It helps to ensure that anyone who has to come to court can have their case heard on a level playing field.  And without citizens like you, the system just wouldn't work.  So thank you.

Now, as you know, this is a patent infringement case.  And like the right to trial by jury, the patent system is also enshrined in our Constitution.  And there are important reasons.  You see, the ability to get a patent creates a powerful incentive for companies to create new technology.

And it also gives them incentive, an incentive when they file for a patent to make their patent public, because patents that are granted are held by the Patent Office and you can search them.  They are -- you can go to the U.S. Patent Office

website and search all the patents that have ever been filed right now.  It's one of the greatest repositories of knowledge on earth.

And if other companies could just come along and take your technology and use it without paying, all of that would be lost.

Now, the reason we're here today, as you know, is because we believe T-Mobile has been infringing the two General Access patents-at-issue in this case without permission and without paying for their use.  And these aren't your run-of-the-mill patents.  These patents involve critical technology at the heart of 4G and 5G wireless networks.

And the evidence will show that the infringing base station equipment, these cell towers we call base stations in the industry, that there are over 45,000 of them all over the country, including right here in Marshall, Texas.

Now, as you've heard, Ericsson is also a party to this case.  Ericsson is involved because they manufacture the equipment that allows T-Mobile to infringe the patents.  So they're on the hook to T-Mobile for the infringement caused by their equipment.

Now, let's talk about the inventions in this case and how they came to be.  A quarter of a century ago, back in 1999, a man named Paul Struhsaker started a little start-up company over in Plano called Raze Technologies.  And Mr. Struhsaker

was an extraordinary man.  He was recruited out of college to go to the NSA, the National Security Agency, where he worked for over 10 years and was exposed to some incredible technology.

And when he started Raze, he put together a world-class team of over 60 engineers, and they developed some incredible technology.  And he'll testify later this afternoon, and you'll get to hear his story.

And what you'll learn is back in the late '90s and early 2000s, the internet was just starting to become a big thing.  But many people could not get high speed internet access, especially in rural places.  In rural places, it costs a lot of money to run cables or wires to people's homes, and the big telecoms didn't want to make those investments for just a few customers.  So Mr. Struhsaker had the idea of beaming internet access to people's homes over the air without any wires.

Now, you may have noticed that in the last few years some of the telecoms like Verizon and T-Mobile have been offering what they call fixed wireless access or home internet.  They give you a little box, you plug it in, it connects to their cellular network, and then you get WiFi in your house.  That is basically the exact same product that Mr. Struhsaker and his team developed a quarter of a century ago, just in a smaller package.

Now, cellular networks existed.  You'll remember 25 years

ago we had them.  But if you remember, they only supported voice and maybe a little teeny text message with a few characters.  They did not support broadband data.  The world has come full circle and especially young people now use their phones mostly to download portfolio movies or music.  That's data.  But back 25 years ago, the cellular networks couldn't do data; they could not do broadband data.  They were designed for voice, and that's it.

And Mr. Struhsaker knew that to do broadband data over the air, to beam it to people, he would have to use several new technologies that were not being used in cellular communications.

For context, remember this was the day of the flip phone, again, years before the first smartphone was invented.  These patents were filed in April of 2001, 24 years ago.

Now, as you've heard, there are two patents-at-issue in this case, the '477 and the '383.  I find the numbers confusing so I like to give the patents nicknames.  I call the '477 the user profile patent, and I call the '383 the demodulation patent.  And you'll see why in a moment.

As you can see on the screen, there are two inventors for both of these patents, Mr. Struhsaker, who I mentioned, and one of his colleagues at Raze, Dr. Russell McKown.  Dr. McKown had a Ph.D.  He was an expert in signal processing, and one of the key engineers at Raze.

Now, creating a cellular network that could handle broadband data back then presented a number of challenges. First, data was going to be bursty. With a voice communication, the way it was done back in 2G and 3G, there was an open line of communication. Remember in the old days of the phone, there was basically a wired connection with our old wired phones from you that was switched to whoever you were talking to. The original voice cellular networks were kind of the same. They had an open channel.

Data is different. Mr. Struhsaker knew that with data, there would be little packets or bursts of information coming from users all the time. And I've shown one user here a house because that's what they were focused on, but in a real network there would have been many. And all of these bursts s would have been coming up to the base station, and the base station would have to figure them out and contend with them.

Mr. Struhsaker also realized that his system would have to support something called adaptive modulation. Remember in the old days of voice, remember those commercials, can you hear me now, the old Verizon commercials? With voice, you either had a good enough connection to hear or you didn't. Sometimes a little static, but basically it either worked or it didn't.

Data is different. With data, it's all about pushing as much data as fast as you can. And there are some we call

these things modulation schemes.  They are basically settings that determine how data is transmitted.  And in this example on the screen, if you have a house that's far away from the base station with a weak connection, it may only be able to use a modulation scheme that sends a small amount of data, but if you have a user that's close to the base station with a strong connection, it can use a modulation scheme that sends a lot of data.

So with data now, it's not about just using the same way of communicating with everyone and hopefully having a good enough connection; it's about maximizing the data throughput and using the best, the fastest possible modulation scheme given the conditions and the strength of the connection.  And that's called adaptive modulation.

Now, Mr. Struhsaker also knew that he would need to use another technology called beamforming.  In the days of 2G and 3G, the antennas were very simple and they broadcasted information over a wide area.  Mr. Struhsaker knew that he could use advanced smart antennas with many antenna elements. And so instead of one antenna, think of it like an LCD TV. There's all these little -- or LED TV, there are all these little elements.  And by slightly changing the timing of when each of those elements fires, they can send a focused beam of energy in a specific direction.  This is what's done in today's 4G and 5G networks.

172

There was a problem with this, though.  The base station antenna is powerful and sophisticated with these antennas, can do this downlink beamforming.  The signal from the base station to the user we call the downlink.  But the user's antenna, whether it be a phone today or one of those home internet routers, they don't have powerful sophisticated antennas.  They can't do beamforming.

But what Mr. Struhsaker realized, and I've tried to illustrate it on the screen, is that if you take all those elements which can transmit, they also receive, they also listen, and if they have an idea where a signal is coming from, they can hone in on that signal, they can know the signal coming from over here will hit this element before it hits this element.  It can calculate those tiny delays and hone in on a particular signal and ignore everything else.  That's called uplink beamforming.

And Mr. Struhsaker and Dr. McKown realized they were going to have to be able to use this technology to deliver the performance they wanted from their system.

And of course, with these techniques, the base station can transmit longer distances and receive from longer distances, and the signals are more powerful and can transmit more data.

And just to be clear, at the time of these inventions, these smart antennas with multiple antenna technology, had

never been used in commercial cellular wireless networks.  Mr. Struhsaker and his team had to go to the antenna manufacturers and develop specifications to even build prototypes for them to use.

Now, let's dig into the first patent, the '477, which covers the user profile.

The -- it's important to understand that, again, with a cellular network, there are typically many, many users.  Right?  These days lots of people with phones, with the product Mr. Struhsaker was doing, there would be lots of homes connected to the base station.  All of them are in different locations.  Some are far with weak connections, some are close with strong connections, and they would be using different settings to transmit; different power levels, different modulation schemes, different error correction codes.

So Mr. Struhsaker and Dr. McKown realized that these base stations were going to have to contend with all these bursts coming that are being transmitted in different ways with different signal and channel characteristics.  So their idea, what they realized is that it would be incredibly important for the base station to keep track of all the users out there.

And so what they came up with was the idea that when initial bursts of data are received by the base station, the base station will create profiles for each user, and those profiles will contain signal information, which is basically

information about the way these devices are transmitting to it, and channel information, information that helps those antennas to hone in on what they need to be listening to.

And the idea was that once the base station has those profiles and knows what to expect from each user on the network, when new bursts -- when subsequent bursts come to the base station, it doesn't need to start from scratch.  It has a leg up, and it can more quickly and more accurately process that information and it can do a better job of uplink beamforming and it can do a better job of adaptive modulation.

And, importantly, these profiles weren't just created once and then kept the same forever, they weren't static.  The patent teaches, and the Raze system actually did this, what it did is the system constantly monitored those parameters and then would update them.  So the base station, if it felt that the user could be transmitting in a better way, would send a message, let's up the throughput, raise the modulation scheme, do this, do that, actually direct the user so that at any given moment in time the user-to-user, burst-to-burst, the speed, and the throughput is being maximized.

Now, let's turn to the '383 Patent, the demodulation patent.

The basic concept we'll be talking about through this trial, we'll be talking about demodulators a lot.  This is the demodulation patent, as I mentioned.  And a demodulator is

basically something that takes a signal and converts it into the intended user data. And that can be very complicated, involve many steps. It can involve a lot of mathematics--right?--to take wave forms or binary code and convert it and distill it down to the picture or the video or whatever you're trying to transmit. But it's processing intensive and it can take a little time.

So what their idea was, was to make sure that the base station had multiple demodulators that would use the profiles. And by having multiple demodulators, I'm showing 2 but it could have been 20 or 200, any number above 2, when bursts of data come in, the work of processing those incoming bursts could be distributed among multiple demodulators. That would avoid bottlenecks and allow for greater speed and throughput.

Now, Mr. Struhsaker and his team were way ahead of their time. He realized and the team realized that their inventions had much broader application than just to the system they were building. They knew that these inventions would apply in the future to phones, to mobile devices, not just to fixed wireless. And so they went to the Patent Office to protect their rights, and the Patent Office ultimately agreed and issued the two patents-at-issue in this case.

Now, let me explain how that works. As you heard from the Court this morning, the process begins with the inventor providing a detailed description of the invention, typically a

narrative and figures.  And they provide that to the prosecuting attorney.

And the prosecuting attorney, the inventor's lawyer, then works with the Patent Office to get all the claims that the inventor is entitled to.  And there can be a lot of back and forth.  It can take years.  The examiner might say, no, I'm not so sure, and there can be amendments, and all of that is normal.  It happens all the time as you heard from the Court this morning.

And that's exactly what happened here.  And in the end, the examiners at the Patent Office granted the two patents we have before us today.

Now, after presenting -- after obtaining these patents, General Access presented its technology to the big carriers. Right?  They wanted the companies, the big telecoms like AT&T and Verizon and what's now T-Mobile, to buy their equipment and to deliver this product to consumers.  But, sadly -- and they were very, very interested in the technology.

But you'll remember back in the early 2000s, just to set the stage, we had the terror attacks of 9/11/2001, and we had something called the dot-com bubble which burst.  And at the same time, the telecom industry got very defensive and the big telecoms didn't want to spend money on new technology at that point in time.

And, sadly, by the end of 2002, Mr. Struhsaker and the

other people at Raze realized that it would be many years before the big telecoms would be ready for this technology and to pursue it.  So they decided to shut down the company's operations, and that was done in '02.  But they continued to prosecute the patents and were ultimately awarded over 25 U.S. patents.

Now, Mr. Hynek, who is here on behalf of General Access, you've already met him, he met Mr. Struhsaker in early days of Raze, and he believed in the technology and saw its enormous potential, and he put together a group of people who invested in Raze and they put a lot of money in Raze.

And when the company had to be shut down, it was a sad day for them all, but Mr. Struhsaker and Mr. Hynek never gave up on the technology.  And Mr. Hynek is here today continuing to represent the men and women who invested in the company all those years ago who now own General Access.

Now, we've talked a little bit about the patents and how they came to be.  I'd like to turn now to T-Mobile's use of the patents and how we know they infringe.

During the trial, you'll hear from Dr. Vijay Madisetti.

Dr. Madisetti, could you please stand up?

He's right there in the corner of the courtroom.  Thank you.

Dr. Madisetti is one of the leading experts in technical cases like this, cases of patent infringement.  He's a

178

professor at Georgia Tech.  And Dr. Madisetti has carefully studied these patents and he's carefully considered the evidence and he is going to show you in great detail how T-Mobile infringes the patents-at-issue.

Now, there are three claims of the '477 Patent that are infringed by T-Mobile.  The first is claim 1.  I've put the language of the claim on the screen and broken down in little elements.  Dr. Madisetti is going to go through each and every requirement of the claims and show you that they are practiced by T-Mobile's base station equipment.

The other two claims at issue are claims 3 and 6.  They only add one limitation each.  So they're going to be pretty easy once we go through claim 1, and he will show you those limitations have been met as well.

As for the '383 Patent, the demodulation patent, we're only going to present one claim to you, claim 16.  And, again, he'll show that every limitation of claim 16 has been met.

Now, you won't have to take Dr. Madisetti's word for this.  Dr. Madisetti has had access to T-Mobile and Ericsson's confidential internal documents, documents that explain how their systems work, the sort of information you only get in the context of a lawsuit like this.

He's also had access to something called their source code.  This is the actual code that runs -- that controls the software.  So he's looked at the actual programming of their

machines, and he'll present that information to you.  That information is so sensitive we're going to actually have to clear the courtroom of any unaffiliated people to show it to you.

And, of course, we've also had the opportunity to ask questions of some of their engineers under oath in what's called a deposition.  You've heard a little bit about them.  And he's reviewed their deposition testimony.  So he's considered all of this evidence, and he's going to show you the key evidence and present it all to you.

Just to give you a flavor for what some of that evidence is going to look like, a designated representative of T-Mobile to talk about how their systems work under oath has admitted that their base stations measure the signal and channel characteristics and use those parameters for subsequent communication.  He admitted that they demodulate signals from multiple users at the same time.

And we're going to look at the actual schematics of the Ericsson equipment at issue.  And what you'll see, for example, on this slide is that that equipment includes something called a DSP cluster.  The DSP is a digital signal processor, the very same piece of hardware Raze used 25 years ago.  It's a computer chip.  And the software in that computer chip performs demodulation.  You'll see they do demodulation the exact same way Raze did and exactly the way it's required

to be done under the patents.

Now let's turn for a moment to the question of how much you should award in damages for T-Mobile's infringement of the patents.

The law requires that a reasonable -- that you award damages no less than a reasonable royalty for the use made of the invention by the infringer.  So as the case proceeds, please pay attention to evidence about how much T-Mobile has used the invention and how much they have benefited financially from that use.

And Dr. Madisetti will explain that by practicing these two inventions, T-Mobile has been able to increase the performance of its network by 4 to 7 percent.  Now, that may not sound like a lot, but T-Mobile has a very big network and it's been carefully engineered to meet the needs of its customers.  And you'll see that this 4 to 7 percent increase in improvement has saved them a lot of money.

Mr. Kennedy, Mr. David Kennedy, has studied that issue.

Mr. Kennedy, can you please stand up for the jury?

Mr. Kennedy is a certified public accountant, and he's one of the leading experts on patent damages who testifies in cases like this.  He has negotiated personally over 200 patent licenses, and over the years he's done quite a bit of work for Ericsson as it turns out.

But Mr. Kennedy has done a detailed analysis of the

financial benefit to T-Mobile of infringing these patents, and I'll turn to that in just a moment.  But before I do, it's important to understand something called the damages period. As you heard in the video, patents have a term of 20 years. These patents, the terms expired in March and June of 2023, respectively.

Under the law, we're entitled to damages going six -- back six years from the date we filed the lawsuit.  So the damages period here is about six years from April of 2017 until March and June of 2023, depending on which patent we're talking about.

But what's interesting and what's important is that Mr. Kennedy has looked at all of the financial records and information and determined that during that period in which we're entitled to damages, T-Mobile spent over $37 billion building out its 4G and 5G networks--37 billion.  And what he's determined is that by practicing these patents, because of the increased performance by virtue of these patents, they were able to save $904 million building out those networks.

And looking at a number of considerations, which he will go through with you in detail, he's concluded that a reasonable royalty to General Access is $253 million, meaning that T-Mobile saved $904 million, a fair share of that for General Access is $253 million, which is about 28 percent of what T-Mobile has saved.

Now, I'd like to talk for a minute about what you should expect to hear from the Defendants.

So, first, as you've already heard from Mr. Dacus, the Defendants are going to deny that they infringe.  They're going to say we just do things differently.  And I think what they're going to try to say is that their system doesn't store all of the signal and channel-related parameters.  They're going to say they only store some, and not all of them.  That's no defense at all.

When we look at the claims, we're going see that the claims of the '477 Patent require that they store only one signal-related parameter and at least one channel-related parameter, and that they be collectively representative, tell us something about the connection.

The evidence will show that they store several signal-related and channel-related parameters, and that they are, indeed, collectively representative of the communication.  So I think the evidence will show that they infringe and that this is not a valid argument.

Turning to the '383 Patent, I think the Defendants are going to try to create the impression that the invention was limited to having two modems.  When we look at the patent, the specification and the claims, you'll see that the invention requires a minimum of two.  The idea is that we have a plurality, at least two modems.

And they're going to try to suggest that the invention is limited to sort of mechanically toggling back and forth between two demodulators.  The invention is not so limited, and we're going to see that what they do, what they do in their system, is exactly what's required by the patent--that they have multiple demodulators and that they alternately apply the various bursts that come into the demodulators to distribute the work.

Now, the Defendants are also going to argue that even if they infringe the patents, the patents aren't valid.  You heard a little bit about that this morning.  They're going to rely upon this old Ericsson equipment.  They're going to kind of take credit for these inventions themselves.  They're going to rely on the RBS 2000.  It's very unclear what this thing did, it's been so long.

But what we do know, it was a 2G product, did not support beamforming, did not support adaptive modulation, and it only had one demodulator.  Didn't come close to what is taught in these patents.

They're also going to rely on the written description and enablement requirements and somehow suggest that these patents don't describe the invention or enable a person of skill in the art to practice them.  These are requirements that the examiners at the Patent Office carefully looked for and they had all the information they needed--the specification and the

claims.  Are the claims supported by the specification?  They concluded yes.

And as you are asked to revisit that issue, please keep in mind the Court's instructions to you this morning.  Because these patents have already been reviewed and issued by the Patent Office, they're entitled to a presumption of validity.  And to overcome that presumption, the Defendants need to come forward with clear and convincing evidence.  That's a heightened standard of proof that they simply cannot meet in this case.

Now, finally, the Defendants are going to say, well, even if we infringe and even if the patents are valid, we shouldn't have to pay very much.  You heard the numbers this morning.  Maybe $3 million?  They're going to say they shouldn't have to pay much, and the way they're going to come up with that argument is they're going to parade in front of you a bunch of cherry-picked, low-dollar settlement agreements where they settled cases against other companies where the other companies had never proven that their patents were infringed, never proven that their patents were valid.

THE COURT:  Two minutes remaining.

MR. SUMMERS:  And what you're going to see, they're going to say that these patents, the patents-at-issue in those other cases, were comparable.  They're not going to present you with any evidence that those patents have the sort of

185

economic value that these patents have.

Now, again, there are only three issues for you to decide, three big issues--infringement, validity, and damages. Be on the lookout for diversions. Be on the lookout for evidence that doesn't seem to bear on any of these issues. For example, the Defendants may try to make a big deal of the fact that the system Mr. Struhsaker was working on was fixed rather than mobile. There's no dispute in this case that the claims cover both fixed and mobile. And you'll hear that the inventions in this case work exactly the same way whether it's an antenna on a house or a mobile phone.

Again, these inventions are the base station and how it's processing the information. They have nothing to do with the device, the user device, or very little to do with the user device.

Finally, you're going to hear about Ericsson claiming it has lots of patents. That's no defense. They're going to say there are lots of patents on 4G and 5G, also no defense. You're going to hear the patents don't all have the same value. The fact there are other patents out there tells you nothing about the value of the patents in this case.

Now, I have to wrap up now, but this case is very important to General Access. At the end of the trial, I think you'll conclude these patents are valid, infringed, and have significant value. And at the end we're going to be asking

you to vindicate the work Mr. Struhsaker and Dr. McKown and their colleagues did so many years ago by returning a verdict in their favor.

Thank you.

THE COURT:  All right.  Defendants may now present their opening statement to the jury.

Would you like a warning on your time, Mr. Stevenson?

MR. STEVENSON:  Yes, Your Honor.  The same as Mr. Summers--two minutes, please.

THE COURT:  All right.  I'll warn you with two minutes remaining.

You may proceed with Defendants' opening statement when you're ready.

MR. STEVENSON:  Thank you, Your Honor.

May it please the Court.

And ladies and gentlemen of the jury, my name is Ted Stevenson, and I'm privileged to represent T-Mobile in this matter as well as T-Mobile's equipment supplier, Ericsson.

And this is a case in which General Access is trying to expand the boundaries of its patent claims beyond what the Patent Office actually granted them.  So the video the Court played for you this morning likened a patent to a deed to land, and a deed sets forth specific boundaries down to the inch.  And it's important the property owners respect the boundaries in the deeds they receive and they don't try to

expand them, like by putting your fence on your neighbor's property or on public lands.

And the same is true for patent claims.  It's important for a patent owner to respect the boundaries of the claims that the Patent Office allowed and not try to expand those claims.  And in this case the Patent Office granted General Access some specific boundaries in its claims.  But General Access is now expanding those boundaries to try to accuse the equipment my clients use of infringement.

Ladies and gentlemen, we don't infringe these patents.  Our equipment was developed independently, and it works different than the claims.  And I'm going to talk about that in detail later.

In our patent system, it's up to juries like you to make sure the boundaries of claims are respected.  So on behalf of T-Mobile and Ericsson, we thank you.  We thank you for your service.  We thank you for your attention, and we thank you for listening to us.

Now, before I go into detail, one more thank you.  Thank you for introducing yourselves to us this morning.  It was good to meet you-all in the voir dire process.  Let me return the favor.  Again, my name is Ted Stevenson.  I'm a patent attorney.  I live in Dallas.

Growing up, my dad was in the steel industry so we lived in a lot of steel towns--Gary, Indiana; Birmingham, Alabama;

Pittsburgh, Pennsylvania.  I went off to study mechanical engineering.  Then I went to law school.  When I got out of school, I came to Texas as fast as I could in 1989.

I met my wife, Julie, in 1993.  We've been married 28 years, and we have three grown daughters who just got out of the house.  So that's me.

And, in addition, I want to introduce you again to a couple of people you'll be hearing from putting on witnesses over the next couple of days.  Scott Stephens.  Scott's also a patent attorney.  He's married, and he's got two grade school boys.  John Haynes.  John's a patent attorney as well.  He's married.  He's got three teenage daughters at home.

So that's us.  And, again, thank you for introducing yourselves to us.

Now let me introduce you to my client, T-Mobile.  You've heard of them, I'm sure.  T-Mobile's got one of the most advanced cellular networks in the world.  It was founded in 1994, and it is headquartered -- actually has dual headquarters in Kansas and Washington state.

At the trial, you've already been introduced to Justin Mueller.  He's a person who works within T-Mobile with base stations, with the networks, is very familiar with them.  He's going to testify.

Now, in this case General Access sued T-Mobile for infringement based on some very specific functions on the

189

circuit boards inside the base stations that T-Mobile buys from Ericsson. But when General Access filed this suit originally, they didn't sue Ericsson; they just sued Ericsson's customer, T-Mobile.

So the way Ericsson got involved in this case is Ericsson voluntarily approached the Court and asked permission to join called the intervention you've heard about which the Court granted. Now, you may be wondering, why would anybody in their right mind voluntarily join a lawsuit and go to a trial? And the reason is, and it's several--Ericsson is responsible for its products, we know the inner workings of them, we don't believe we infringe, and we want to be heard by you directly on that point.

So let me introduce you to Ericsson. Ericsson is headquartered in Plano. That's part of the Eastern District of Texas court jurisdiction. And Ericsson also recently built a 5G manufacturing facility for 5G base stations up in Lewisville, just a little north of Dallas. Ericsson's one of the leading base station companies in the world, and its parent company is out of Sweden.

Our corporate representative for the trial is Sebastian Faxer. We've already introduced you to him. He's a chief technology officer. He, too, works very closely with the inner workings of Ericsson base stations, and you'll hear from Mr. Faxer. Thank you.

So I mentioned earlier that these claims are on very specific features, and that's the opposite from a fundamental or a broad patent.  What specific means in this context is that General Access' claims cover just one way out of many different ways of arranging the circuitry within a base station.

And to give you a little better understanding and example of that, I've got an example to give you with something we're more familiar with--tires.

So suppose an inventor goes to the Patent Office in 2005 with a new tire design shown here, and the inventor would have to submit an application with a technical description and then one or more claims.  And the claims are important.  They're the legal definition of the grant of intellectual property that the inventor is requesting from the Patent Office.

So when the claim is submitted, a patent examiner, as you heard in the video this morning, reviews it to see if it claims something different than what was already in the prior art and then will decide to allow or reject the claim.  So in this example if the inventor went to the Patent Office and tried to claim just the broad fundamental idea of a rubber car tire, that's already in the prior art and the examiner would reject the claim.

Now, after that happens, one option an inventor has is to try to submit another different claim that's more specific to

try to get that allowed within requirements that aren't in the prior art. So, in this example, if the inventor takes another run at the Patent Office and submits a narrower claim to a rubber car tire with treads, the examiner may look at it and think, well, the inventor didn't narrow it down enough, didn't do a good enough job making it specific.

So the inventor could take one more try and write a claim on a more specific aspect of his design that he thinks is different than what others have done, this time requiring the treads to be curved and meet in the middle.

So if the examiner believes that that specific tread pattern is sufficiently different than what's in the prior art, he would allow the claims. And then the inventor would have a patent with a claim to a rubber car tire with curved treads that meet in the middle.

After getting the patent, if the inventor to collect royalties from tire makers, he can only get royalties on tires that infringe, only rubber car tires with curved treads that meet in the middle. In other words, every element of the claim must be present for the claim to be infringed.

So a tire that has zigzag treads doesn't infringe, doesn't owe a royalty. A tire with straight treads doesn't infringe or even curved treads if they don't meet in the middle.

Now, when I talked about expanding the boundaries of the

192

claim earlier, what that means is the inventor can't gloss over or ignore important limitations in the claims.  In this example, the limitation of requirement of curved treads that meet in the middle and claim to have invented all rubber car tires and demand a royalty from every tire maker.

So every claim in a patent is important.  It's part of the boundary that the claim establishes, and that's why we have to look at every claim in these patents, every word in every claim of the patents.

Now with that example in mind, let's get into the issue of why the patents in this case only claim very specific features and aren't infringed.

I want to make three high-level points first, and then we'll look at the individual patents.  Okay?

Point number 1.  There was a lot of prior art out there when Raze, the original applicant, filed for its patents.  And that's important, because when there's a lot of prior art, the inventor has to be more and more specific to claim something that's different than the prior art.

So by 2001 when these patents were applied for, mobile wireless networks with base stations had been running for many, many years in the United States, and these are prior art.  Long before Raze, AT&T, Verizon, Singular, T-Mobile's predecessor VoiceStream, all had mobile networks, and there were a lot of patents surrounding those mobile networks that

were also out in the prior art.

In fact, by 2001, there were already hundreds of patent applications that were filed and would later result in granted patents on demodulation, parameters and profiles, beamforming--the same features General Access is now claiming to have invented.

Now, the Court instructed you that the Patent Office lists prior art considered during examination on the face of the patent. And what you'll see in the evidence is for the '383 Patent, there were 27 patents cited as prior art; and for the '477 Patent, over a dozen.

Second point. Because of all the prior art, General Access could only obtain very specific claims on its patents. The claims of the General Access patents are very long. They have a lot of words in them, and we're going to go through those in the evidence. But like we saw in the curved tire tread example, the more limitations you add to a claim, the longer it is and the more words it has, the more specific and narrow its scope becomes.

Now, General Access' lawyer talked about the importance of beamforming adaptive modulation, but Raze did not invent those technologies. They were around long before Raze started its work. And, in fact, General Access' claims don't cover beamforming or adaptive modulation at all, don't mention them.

Now, because of all the prior art in the field, General

Access had to focus its claims on very specific tread patterns, and one specific way, for instance, of demodulating traffic, one specific way of determining and storing parameters which are different, as you will see, than what my clients do.

Third.  The technical solutions in General Access' claims are 24 years old today, and the patents have expired and technology has moved way beyond them.  The patents came out of work by Raze to deliver internet access to houses in 2001, but the internet as we know it has changed a lot since then.

In 2001, YouTube, Facebook, Spotify weren't even born. They were several years away.  If you had internet access, you were probably using a dial-up modem, one of those warbly modems that you had to plug into the phone lines.  Phones were 2G back then.  We're up to 5G now.  And they couldn't surf websites or text pictures.

Today we demand a lot more and we demand it a lot faster and we get it because we have better computer processors, we have more memory, we have higher resolution screens, we have better radio technology today than we did two decades ago.

And the technical problems that Raze was working on in 2001 are completely different than the technical problems that are needing to be solved today.  And, in fact, the patents-in-suit weren't even good solutions to those problems back in 2001 because Raze was never able to produce a

commercially-viable product.

Now, add these three points together--a crowded field of prior art, claims on very specific features, and technical solutions over 20 years old--and it's not surprising that the claims in these patents are not being used in T-Mobile's modern wireless networks.

With that, let's look at the patents individually.  And before we do, I want to emphasize something the Court told you a little while ago.  Don't worry if you don't understand this all right now.  We understand that this is a lot of technical information, and it will come together for you.

To help you, we're going to present a lot of this testimony -- a lot of this information through the testimony of Dr. Daniel van der Weide.  He's a professor of electrical engineering at the University of Wisconsin.  He's an excellent teacher, and he's going to help us understand this.

In addition, you're going to also hear from Mr. Faxer, who works every day with base stations and can help also explain the technology in Ericsson's base stations.  So this is just the introduction.  This is the first step.

With that, let's take our first step and talk about the '383 Patent.

This patent is in the area of demodulation, and demodulation has been around for a long time.  It's basically the idea of mathematically converting radio signals in the air

196

into 1s and 0s, data that can be used by a computer.

Now, in this example, radio signals would go from the houses on the left to the circuitry in the base station that's in the block diagram on the right to be demodulated.

Now, demodulation is something that's done by a specialized computer. It's a computer processor called a modem which is short for modulator demodulator. And there are two of them here. Now, Mr. Struhsaker didn't invent demodulation, he didn't invent using multiple demodulators in a base station, and he didn't invent the processors that do the math. And I predict Mr. Struhsaker won't disagree with that when he testifies.

The General Access patents, the patents they are asserting here, the claim, requires the base station to have first and second demodulators, two demodulators, and to alternate between them. And you can see in the claim language that I excerpted below -- and that's not the whole claim; there is even more limitations. But I underlined alternately applied. And you can see that claim requirement, and that's one that is going to be very important in this case.

Here's what it means in practice. Transmissions, the radio signals coming out of the houses containing data, are sent to the base station. Those are the yellow and purple blocks. That's radio waves with data in them. And they arrive at the base station continuously, one after another.

197

The base station then assigns each block to one of two modems for demodulation in an alternating fashion, back and forth, repeating a pattern like a ping-pong match.

And, in practice, a first user's transmission goes to a first demodulator to be converted.  Then a second user's signal goes to the second demodulator to be converted.  First signal goes back to the first demodulator; next signal goes to the second demodulator.  First, second, first second, back and forth, back and forth.

And the idea behind -- and the reason for alternating is that while one of the demodulators is actually doing the work, the math work, the other demodulator can load information to handle the next transmission and then it flip-flops vice versa.

Now, Mr. Summers didn't mention the alternating requirement in his opening statement.  He called it distributed, but the claim language does say alternately applied, which is different than distributed.

And we're not going to tell you here that Ericsson base stations don't demodulate.  We do.  But that's not what the patent claim says.  The claim requires alternating back and forth between demodulators.  That's the curved tread pattern, and Ericsson base stations don't alternate.  This approach may have been useful in 2000 when the internet was different, but it's not useful in today's base stations.  We're way beyond

that now.

On the right, this is how Ericsson base stations demodulate. They literally have a pool of hundreds of different processors in red boxes. And I'm just showing a small fraction. There are literally hundreds. Each red box is a processor. And they are on a circuit board that does demodulation tasks. Hundreds of users can connect to the base station at once. And as transmissions come in, the big demodulation math problems are broken up into a bunch of smaller little math problems, and then they're farmed out in parallel to many different processors to be solved simultaneously. And simultaneous is the opposite of alternating.

So instead of alternating, Ericsson base stations assign tasks to processors based on distributing the load, so every time a user sends a new transmission, it's going to go to a different group of processors. And that's what we'll show you as to why our clients don't infringe.

Now let me turn to the '477 Patent.

So this is a patent that goes to a feature that actually works with the demodulators of the '383 Patent we just looked at. So it's an add-on to the '383. And this patent generally relates to parameters that are used by the base station during the demodulation process. Okay.

Parameters are -- think of those as numbers, numbers that

describe the radio channel, the radio signal, aspects of that for every user. And these parameters are determined and used during the demodulation process we saw in the prior slide.

The idea of the '477 Patent was to create a shortcut, and let me explain what that was. When the user first sends a radio transmission to a base station, the base station has to determine a bunch of these parameters to demodulate it. And the -- after determining the parameters, the idea of the patent was let's store them in a user profile and use them to receive the next transmission so we don't have to redetermine them. That's the shortcut.

Now, these profiles, you can think of them and they're similar in concept to when you buy something over the internet. We've probably had that experience where you have to type in your shipping address, but you can save it to a profile or maybe it does -- it gets done automatically, and the next time you go to that site, you don't have to type it all in again.

So the claim the Patent Office eventually granted to General Access is at the bottom of the slide here.

And if we can go to the next slide. There it is.

And it's very specific. It requires storing and reusing the parameters that are collectively representative of, and I underlined that collectively representative language because it's important, communication of the first burst signal. That

200

requires not just a few parameters or some, but it requires the parameters, all of them that are collectively representative of the communication, all of them.  So that is a group of parameters needed to represent that signal.

And, in addition, that group has to include at least one channel and at least one signal parameter.  Those are the requirements of the claim.  And that's the curved tread.

Ericsson base stations don't work that way.  They don't do what the claim requires.  And we're not going to tell you that our base stations don't determine parameters; they do.  And we're not going to tell you they don't store parameters; they do.  Some.  But that's not what the claim requires.

The difference and the reason we don't infringe is we don't store all the parameters that are collectively representative of communication of the signal.  Instead, the way we do it is we redetermine a number of parameters that frequently change and are not stored.

Now, you may wonder, well, why not use the shortcut.  Right?  Why don't you just store them, store them all?  The reason is in mobile wireless works, phones move and the channel conditions are constantly subject to change.  And some channel-related parameters change so frequently, there's no point to storing them.

So Ericsson base stations don't store some of the frequently-changing parameters that are needed to collectively

represent the signal. Instead, they go ahead and redetermine them, and that's why Ericsson base stations don't use the '477 Patent and don't infringe.

Now, let me shift gears and talk a little bit about the validity of these patents, and I want to loop back to a point that I made earlier, that there was a lot of prior art out there.

And so the General Access patents only claim specific and narrow features, and that was so they wouldn't cover what's in the prior art because obviously if a claim covers what's in the prior art, it isn't valid. And that's, you know, something examiners look for.

Here's why that's important. If General Access now is going -- after the patents are issued, is going to expand the boundaries of its claims, they're going to undo limitations that they needed to get the patents in the first place. And so their claims will cover the prior art and they will be invalid.

Now, invalidity is a defense, and we bear the burden of proving it, and we're going meet that burden by focusing on the Ericsson RBS 2000. That is a base station that is prior art. It was in public use in U.S. wireless networks years before Raze applied for the patents. It was actually a flagship base station for Ericsson. And if you had a phone in the late '90s, there's a pretty decent chance you have made a

call at some point through the base station.

And it is prior art.  Devices in public use can be prior art.  But it wasn't considered by the Patent Office.  It's not on the list of references before the Patent Office.  Not too surprising because the Patent Office can readily search patents and publications, but they have a tough time getting information about, you know, physical devices that are out in the field.

How is General Access now expanding its claims in a way that would cover this?  Well, you're going to see it when their expert -- technical expert testifies, Dr. Madisetti, and we got a preview of his testimony because, before trial, he submitted a written report.  And I think he's going to take the view that almost anything counts as alternating and just storing a couple of the parameters is enough to collectively represent signals.

But based on positions that General Access is taking to assert infringement, they won't have any basis for distinguishing the RBS 2000 as prior art, and the claims will be invalid.

In addition, there are other validity problems that arise in this case as well, two of them called the written description requirement and the enablement requirement.  And you're going to hear about those in the evidence.

In a nutshell, they require two things--that the inventor

in his application demonstrates he possesses the idea for the full scope of the invention, and also has to teach one of skill in the art how to practice, build, and use the full scope of the claimed invention.

And the reason for this requirement is a patent is basically a bargain.  The inventor's side of the bargain, when it goes to the Patent Office, is I'm going to describe and teach the world how to use my invention, teach it to build it.  And, in return, the inventor gets 20 years of exclusive rights to that, depending on the scope of the claim allowed.  But if the inventor doesn't keep up his end of the bargain, then the claims are invalid.

Now, the General Access patents don't meet these requirements.  After filing its patents, Raze, for a long time tried to but was never able to build a successful fixed wireless product, let alone a mobile wireless product which is even harder to build and is not described or taught in the two patents that are asserted here.

And the reason that mobile wireless networks and equipment is so much harder to build than fixed is movement changes everything.  When phones move, their channel conditions change, the base station has to constantly readjust, and fixed wireless just doesn't have to deal with those changes and all that motion.

Now, finally, let me turn briefly to General Access'

damage demand.

And we can blank this.  Thank you.

With regard to damages, the response is we don't use these patents so no payment is due.  But I want to point something out not to suggest that we owe money; we don't.  But what you're going to hear in this case is that there are many thousands of patents that relate to base stations and networks there are out in the industry.  And these patents are held by dozens of companies, including Ericsson and T-Mobile.

And because of all these patents, the patent holders in the industry do something with each other called licensing. That's where they grant each other permission to use patents. And it really helps us have these interoperable networks that we all take advantage of it.

As a result, there are a lot of licenses out there that set a market rate for what a reasonable royalty is on these types of patents, because the payment -- typically in a license there's a payment for that permission and it's called a reasonable royalty.

THE COURT:  Two minutes remaining.

MR. STEVENSON:  Thank you.

General Access' royalty demands are way out of step with all the other patent holders in the industry, nearly 100 times the going rate.  And they're basing their royalty demands on features they didn't even invent--beamforming and adaptive

modulation.

And the reason this goes to credibility, and that's why I raise this point, it's a point of credibility, is if General Access is overstating their damages, they're probably overstating other parts of their case as well, like the boundaries of their patents. And I suggest you keep an eye out for that in the evidence and ask yourself, is General Access respecting the boundaries of the claims that it was allowed or is it expanding them to try to ask you for a large award of money?

In closing, ladies and gentlemen, again I'd like to thank you-all very much for your service on behalf of myself, our team, and our clients, and we look forward to presenting our case to you.

THE COURT: Counsel, does either party wish to invoke the Rule?

MR. SUMMERS: Yes, Your Honor.

THE COURT: All right. And is it my understanding that you wish to invoke the Rule in a manner that would exclude expert witnesses and corporate representatives?

MR. SUMMERS: That's correct, Your Honor.

THE COURT: All right. The Rule has been invoked. If you are a fact witness in this trial, you are required to wait outside the courtroom until you are called to testify. Expert witnesses are permitted to remain as are the corporate

representatives for the competing parties.

And, counsel, I'll rely on you to make sure that you don't see some other party's fact witness in the room who needs to be outside.  If you do, let me know.

Now, ladies and gentlemen of the jury, before we turn to the Plaintiff's case in chief and they call their first witness, we're going to take a short recess.  This is one of those times when you can simply close your notebooks, leave them in your chairs, and I don't expect us to be out of the courtroom more than 10 or 12 minutes.  We'll be back, and at that point we'll hear from the Plaintiff's first witness.

Please remember to follow all my instructions, including not to talk about anything among yourselves that relates to the trial.

With that, the jury's excused for recess.

(Whereupon, the jury left the courtroom.)

THE COURT:  Court stands in recess.

(Brief recess.)

THE COURT:  Be seated, please.

Mr. Summers, is the Plaintiff prepared to call its first witness?

MR. SUMMERS:  We are, Your Honor.  The Plaintiffs call Mr. Paul Struhsaker.

THE COURT:  Well, let me get the jury in the room and then I'll ask you again.

Let's bring the jury in.

(Whereupon, the jury entered the courtroom.)

THE COURT:  Please be seated, ladies and gentlemen.

All right, Plaintiff.  Call your first witness, please.

MR. SUMMERS:  Your Honor, Plaintiff would like to call Mr. Paul Struhsaker.

Mr. Struhsaker, please approach.

THE COURT:  If you'll come forward, Mr. Struhsaker, and be sworn by our Courtroom Deputy.

(Whereupon, the oath was administered by the Clerk.)

THE COURT:  Please come around, sir, have a seat on the witness stand.

All right.  Mr. Summers, you may proceed with direct examination.

MR. SUMMERS:  Thank you, Your Honor.

PAUL STRUHSAKER,

having been first duly sworn, testified under oath as follows:

DIRECT EXAMINATION

BY MR. SUMMERS:

Q.   Good afternoon, Mr. Struhsaker.

A.   Good afternoon.

Q.   I understand that you're the principal inventor of the '477 and '383 Patents.  Is that correct?

A.   That's correct.

Q.   Where do you live?

A.    I live in Lago Vista, Texas, north of Austin.

Q.    And how long have you lived there?

A.    I've lived in Lago Vista about 20 years.

Q.    What do you currently do for a living?

A.    I'm the executive director and chief executive officer of the Wireless Power Consortium.

Q.    What is the Wireless Power Consortium?

A.    If all of you have smartphones, the Wireless Power Consortium creates the international standards for the wireless charging of your phones that you see, so you can just set them down and not have to plug them in.

THE COURT:  Mr. Struhsaker, pull the microphone a little closer to you, please.

THE WITNESS:  Sure.

THE COURT:  Thank you.

Go ahead, counsel.

Q.    (BY MR. SUMMERS)  And what are international standards?

A.    They're bodies of companies that willingly get together and determine how to create a universal standard.  So it's sort of like plug-and-play so that you can buy different products from different manufacturers and they all work together.

Q.    So it relates to interoperability.  Is that the idea?

A.    Correct.

Q.    Now, over your career have you worked with other

international standards bodies?

A.    Yes, I have.

Q.    Which ones?

A.    In the early '90s, I was the co-chair of what's called 802.11.  Most of you will be familiar with it.  It's WiFi.  I was one of the founders of that standard, and I chaired it for about three years.

Q.    Have you been involved in developing any other standards?

A.    Yes.  In the early -- late '99 through early 2000s, I was the chair of IEEE 802.16.

Q.    And you mentioned IEEE.  Is that the organization that oversees these two standards committees?

A.    Yes.  It's the Institute of Electrical and Electronic Engineers.

Q.    And did you say what the 802.16 committee standardized or developed?

A.    It did fixed wireless and then a precursor to mobile 4G.

Q.    Now, I'd like to ask you a little bit about your educational background.  And to speed that up a bit, I'm going to put a demonstrative on the screen.  What do we see here, Mr. Struhsaker?

A.    It looks like a slide that just summarizes my post high school education and some of the companies I worked at.

Q.    Where did you go to college?

A.    I went to the University of Akron in Akron, Ohio.

Q.   And what did you study there?

A.   Electrical engineering.

Q.   Did you do well in college?

A.   Yes.

Q.   How well did you do?

A.   I graduated summa cum laude.  I was in the top one percent of my class.

Q.   And what did you do after college?

A.   I went to work at the National Security Agency of the United States.

Q.   And how did you come to work for the NSA?

A.   I was actually recruited in college.  After my freshman year, I was approached by a representative of the NSA, took several years to get a top secret security clearance, and in 1983 in my sophomore year I began working every other semester at the National Security Agency.

Q.   And how long did you work for the NSA?

A.   NSA and its affiliate intelligence agencies, a total of about 10 years.

Q.   Was the work you did at the NSA classified?

A.   Yes.

Q.   We're not going to get into the details of it, but did it touch on electronic communication or surveillance?

A.   The NSA is the world's premiere communication and electronic surveillance intelligence agency.

211

Q.   Now, during the time you were at the NSA, did you pursue any advanced degrees?

A.   Yes, I did.

Q.   Could you please tell us about them?

A.   I received a Master's degree with honors from Johns Hopkins in electrical engineering.

Q.   Did you receive a Ph.D.?

A.   No, I did not.

Q.   Why not?

A.   I had done all the work, but the NSA on review of my Ph.D. thesis classified it.  So no thesis, no Ph.D.

Q.   For those of us like myself who haven't pursued a Ph.D., is the thesis something that completes the requirements and that's required to obtain the Ph.D.?

A.   Correct.

Q.   By the way, did you do that work at Johns Hopkins?  Your Master's degree and your Ph.D. work, was that done while you were working at the NSA?

A.   Correct.  They were work-study programs.

Q.   Now, what did you do after the NSA?

A.   I went on -- after the end of the Cold War, I left the NSA, and I was a founding member of AeroNet Wireless Technologies.

Q.   And did you have a title at AeroNet?

A.   I was a chief scientist.

212

Q.   And what sorts of products did you work on at AeroNet?

A.   AeroNet created the world's first mobile WiFi subscribers and mobile access points.

Q.   Just to help us out here a little bit, what was the general time frame of your work at AeroNet?

A.   It was '92 to 1995.

Q.   Was AeroNet successful?

A.   AeroNet was extremely successful.  It ended up selling to Cisco towards the end of the '90s for roughly a billion dollars.

Q.   What did you do after that acquisition?

A.   After that acquisition, I went on to found Raze.

Q.   Well, before that, did you work at a company called Airspan?

A.   Sorry, yes.  Before that, I did work at a company called Airspan.

Q.   And what sorts of products did the Airspan do?

A.   Airspan did base station components and, for example, antennas and modems, and they built some custom products for British Telecom.

Q.   And what was your role at Airspan?

A.   I was a principal engineer.

Q.   Now, you mentioned your work at Raze.  Was that after you left Airspan?

A.   Correct.

Q.    Tell me why you decided to form Raze.

A.    Well, Airspan was part of a company that gave DSL and Alcatel that put DSL out in the United States.  And I knew for a fact that over half of America was uncovered with any kind of broadband.  So the thought was to serve the unserved and to do it wirelessly so that small towns and rural areas would have the kind of broadband that was beginning to be rolled out in cities.

Q.    Were you a founder of the company?

A.    I was a founding member of that company, yes.

Q.    And did it always have the name Raze Technologies?

A.    No.  It started off with several other names, but we had to have a name that didn't belong to other companies, so we settled on Raze.

Q.    And what was your role once the company got going?

A.    I was the chief technology officer and then the senior vice president of engineering.

Q.    Now, was -- what was the business model of Raze?

A.    Raze was going to develop cellular base station equipment and subscribers and sell those to carriers.  So big operators like Clearwire or T-Mobile or Sprint.

Q.    Was Raze a big company?

A.    No.  It was very small when it started.

Q.    How small when it started?

A.    It was myself, one of my co-workers from the NSA, and a

handful of others out of my garage funded on my own funds.

Q.   Did it get bigger over time?

A.   Yes, it did.

Q.   How so?

A.   Eventually we were funded by the investment group that Mr. Hynek led.  That provided the funds necessary to build out an engineering team and to produce working prototypes.

Q.   You're talking about the investor group that Skip Hynek put together, the man in the courtroom?

A.   Yes.

Q.   And where was Raze located?

A.   It was located in Plano, Texas.

Q.   Can you please tell the jury just a little bit about the team you assembled at Raze?

A.   I was fortunate; it was an incredible team.  They were highly skilled.  Of course, there were a few people from the intelligence agencies, there were a number of people with telecom backgrounds, and then of course we had a number of people who had consumer device backgrounds and production backgrounds in order to build things.  So a talented team, they were focused, they knew what they were doing, and they executed well.

Q.   I'd like to direct your attention now to Joint Exhibit 70.  You have it in your binder if you need to look at it, but the question I have for you is very simple:  Can you please

tell us what this document is?

A.    I believe this is sort of an introduction to Raze Technologies.

Q.    Okay.  Is it a presentation?

A.    Yes, it's a presentation.

Q.    Now, turning to page 6, I see there's a list of senior management, and that appears to be your name underneath.

A.    Correct.  That's myself and -- and my title.

Q.    And if we look down a little lower on the screen, I see there's a heading, key employees, and listed is a Dr. Russell McKown, director, signals and systems.  Do you see that?

A.    Yes, I do.

Q.    Did you recruit Dr. McKown to join Raze?

A.    Yes, I did.

Q.    Why?

A.    Russell had a very similar background to me from my NSA days.  He had worked at E-Systems and was sort of an expert on modem development and signal processing.  So he was a very good match to what we were going to do at Raze.

Q.    Was Dr. McKown involved with you in inventing the '477 and '383 Patents?

A.    Yes, he is a co-inventor with me.

Q.    Now, turning to page 7, there's the heading Business Strategy.  It says, Be first to deploy a converged voice and data fixed broadband wireless access solution at a competitive

price point.  What did you mean by converged voice and data?

A.    Well, at the time, and remember people were unserved, there was cellular around.  So you had voice, simple text. But in no way was there wide area, you know, like cellular type coverage of broadband, you know, the internet that we all know and love.

So the idea was to create a company that could serve those unserved by creating a -- something that could replace both the voice to the home and provide a broadband connection.

Q.    And what do you mean by broadband?

A.    The definition changes over the years because it becomes more and more data, but broadband is essentially the internet you know, the ability to browse web pages, at the time stream music, eventually stream video.

Q.    So fast?

A.    Fast, fast data.

Q.    Now, turning to page 8, I see a list of accomplishments, and it says at the top, Product has been successfully demonstrated in customer trials.  Did you do that?

A.    Yes.

Q.    Can you please tell the jury a little bit about the work that you did to prove that your system worked?

A.    We did a field trial with North Texas Web Services out of Sherman.  It had roughly 12 subscribers on it.  All the equipment that we talked about in various proposals and

everything else all eventually came to work as a field trial. Of course, had a few problems but then eventually we had it all up and working and were providing service. And we were hoping to convert that to our first sale.

Q. Let's turn now to Joint Exhibit 53. What do we see here?

A. That's a picture -- in the foreground, the white box, that is a subscriber unit, and that is facing a tower where our base station unit would be. So that's a shot from one of the users in Sherman, Texas.

Q. Now, if someone were to say that you never developed, never got your fixed wireless access system to work, would that be correct or incorrect?

A. That would be incorrect.

Q. Now, turning back to Exhibit 70 at page 8, the second bullet says, Developed the only redundant 99.999 percent availability, carrier-class voice and broadband data product. By the time of this presentation, had you achieved that goal?

A. We had.

Q. And then below, it says, 20 patent applications filed in the U.S. Had you done that?

A. Yeah. At the time listed, we had 20 patents applied for.

Q. Now, did this system have a name?

A. Yes. We -- we gave it a trade name of SkyFire.

Q. I'd like to turn now to Joint Exhibit 54. What do we have here, Mr. Struhsaker?

218

A.    I believe it's another presentation that uses the same exact graphic.

Q.    Did you use the same cover page for a lot of presentations?

A.    All of them, yeah.  So the next page would tell you that this is a system overview --

Q.    Okay.

A.    -- of the SkyFire system.

Q.    Great.  Let's turn now to page 12 of the document.  What do we see here?

A.    This is a picture of the end-to-end architecture of the system from the internet and the public phone network all the way to a person's house.

Q.    And the internet would be that blue bubble on the left.  Is that correct?

A.    That's correct.

Q.    And then we go through the public switch telephone network?

A.    Yep.  Just voice calls.

Q.    And then we go -- is that a cell tower?

A.    That's correct.

Q.    The lightning bolts?

A.    With the lightning bolts, yeah.

Q.    What do we have here on the far right next to the house?

A.    That's the SIAD.  That's the subscriber integrated access

device.

MR. SUMMER:  Mr. Hughes, could you please hold up a demonstrative exhibit that we brought?  I know it's heavy.

Q.   (BY MR. SUMMER)  Mr. Struhsaker, what is Mr. Hughes holding up?

A.    The SIAD.

Q.    Was this in essence the antenna that would be bolted on a house and receive signals from the base station?

A.    It's both the antenna and the software defined radio and then converters to hook up to the phone lines in your house and provide you ethernet into your house.

Q.    Now, can you please turn now to Joint Exhibit 51?  I take it this is another Raze presentation?

A.    It's another Raze presentation.  I believe this one is about -- let's take a look at it.  It's an overview of the company, the product, and the strategy.

Q.    Let's turn to page 41.  What do we see here on the top half of page 41?

A.    You're taking a look at a simplified diagram of beamforming, which is something that we were going to enhance the product with as an overlay.

Q.    Can you please explain to the jury at a very high level how beamforming works?  And let's start with the downlink.

A.    Beamforming works by having a set of antennas.  And, you know, light and radio waves are waves.  They actually travel

in time.  So as a wave comes, you add waits and delays.  And if you do it, you can do the math so I can point at somebody. I can point over to the team over there or I can point over here to the wall or one of those lights.  You can aim and focus the energy of the antenna at a specific spot.  So instead of having a flood light, it's like having a spotlight.

Q.    And why did Raze want to use beamforming?

A.    Well, of course, one of the most important aspects for the economics is that you have range that you can send to users that are as far away as a base station as possible.  The other part is capacity.  You want to be able to serve as many users with the highest amount of throughput, which is, you know, bandwidth, bits per second, that you possibly can.  So beamforming allows you to optimize those two things.

Q.    Let's turn now to page 43.  Can you tell us what we see on this slide?

A.    That's a look at the SkyBeam, which was the trade name for the upgrade to SkyFire.

Q.    So would that be the beamforming enhancement?

A.    That's the beamforming enhancement.

Q.    And what do we see here at the bottom right?  It looks like there's something called an array, and it has a bunch of sideways triangles.

A.    That's an array antenna, and each one of those triangles is to represent the concept that the array is made of a set of

smaller antennas.

Q.    Is this a beamforming antenna array?

A.    Yes, that's what it's meant to be.

Q.    Can you explain, again at a very high level, how uplink beamforming works so that -- I want to focus on the base station receiving signals from the user.

A.    Well, just like when you transmit, you can put waits and delays together with all these antenna elements and focus a beam of energy.  It's almost like putting a cone on your ear, a directional cone so you can hear better.  And so, believe it or not, the same math can be used both ways.  So you can use the math and the techniques that you go to do a downlink to the subscriber; you can use the same techniques to do an uplink.

Q.    Are there names that are used to describe these types of antennas today?

A.    Yeah.  Early on, they were called smart antennas.  But as you add coding and other capability to them they have a technical named called MIMO.  That's multiple input multiple output.

Q.    At the time you were doing your work at Raze, were these antennas being used in cellular networks?

A.    Not at all.

Q.    Were the antennas necessary to do this in cellular networks available for purchase?

A.    No.  You had to have a custom antenna developed.

Q.    Did you do work to have these antennas --

A.    Yes, we did.  We created a custom specification and found a vendor who would be able to supply one for us.

THE COURT:  Let me interrupt.  I'd like to ask both of you gentlemen to make sure the other one's finished before you jump in.  We're getting a little bit of bleed over here. We need to keep the answers and the questions separate.

MR. SUMMERS:  Yes, Your Honor.

THE COURT:  Let's continue.

Q.    (BY MR. SUMMERS)  You mentioned these waits and delays and the timing variations that are used by the antenna to hone in on certain signals.  Are there names or words that are commonly used to describe those?

A.    In some cases, people just use antenna waits.  There are some terms that are forms of delay offset or frequency offset, but those names are all interchangeable.

Q.    Now, I'd like to turn to -- I'm sorry.  Going back to this slide, I see in the middle of the text there's a line that's highlighted that says, gain a total of 10dB and more than double the cell radius.

What did you -- what were you describing there?

A.    The net effect of having that beamforming antenna versus a simple dumb broad antenna was that we could double the size of the cell or greatly increase the speed to a person twice as

far away.  So it just had an effect of improving the capacity and range of the cell.

Q.  Now, did you actually build equipment that could do beamforming?

A.  We built -- yes.  We built parts of the equipment and we had others on order.

Q.  Now, I'd like to show you a picture of something, and I'd like with the Court's permission to hand you this board.

MR. SUMMERS:  Would the Court permit me to please approach the witness?

THE COURT:  You may approach the witness.  Please hand it to the Court Security Officer, please, and he'll hand it to the witness.

THE WITNESS:  Thank you.  So this is --

Q.  (BY MR. SUMMERS)  Well, let me ask you a question.

A.  Okay.

Q.  Mr. Struhsaker, can you please explain to the jury what you're holding in your hand?

A.  This is a modem card.  It actually can demodulate and control an adaptive antenna that sits up on the tower.  So it was our first prototype, and we were making sure that the interface to the adaptive antenna could properly work and work with the timing and work with the other signal processing we were doing.

Q.  In simple terms, was that a prototype of your beamforming

modem?

A.    Yes.  This was a SkyBeam prototype, and this was the baseband controller part of it.

Q.    Now, I see a label on the device that says Dirty Harry.

A.    Right there?  Yes.

Q.    Yes.  Did you call it Dirty Harry?

A.    Yeah.  It was an inside joke amongst all the engineers. Everyone's familiar with the Clint Eastwood movies.  Dirty Harry had a .44 Magnum, and the joke was is this was our big gun to really improve broadband.  So it was a bit of an engineer's inside joke.

Q.    If I may, we'll move on.  If there's room, you can probably just leave that there.  If not -- okay.  Thank you.

       I'd like to direct your attention now to Plaintiff's Exhibit 8.  Can you please tell us what this is?

A.    This is a white paper discussing the processing capabilities within the Raze system.

Q.    Is it in any way related to the '477 and '383 Patents?

A.    It is.  There are some aspects of this white paper that cover concepts of '477 and '383.

Q.    And just at a very high level, was it your practice to create white papers like this?

A.    I did.

Q.    Under what circumstances did you do so?

A.    If an idea was useful and innovative and then, of course,

225

something we wanted to pursue, fund, and build, I would take the time to do a white paper.

Q.   Okay.  Let's turn now to section C which begins at page 38 of the white paper.  The document appears to be dated July 19, 2001, or at least this page.  Is that about the right time frame?

A.   That's correct.

Q.   And this says rev B.002.  What does that mean?

A.   Well, this is a later version of it.  A paper like this that's as long as it is takes anywhere from six to eight months to put all the work together and actually have done the research behind it.

Q.   Now, under the heading "Advanced Processing Techniques," there's a note that they're covered by multiple patents pending.  Did you have an understanding as to what patents this section discusses?

A.   It's all related to '477 and '383.

Q.   If we turn now to section C.1 titled "Advantages of Raze Air Interface Processing Approach," it says, "The Raze SkyFire Air Interface incorporates the following features, which are all designed to..." and then skipping over "maximize throughput."

Do you see that?

A.   Yes, I do.

Q.   And below that there's a heading that says "Adaptive

Modulation."

Do you see that?

A.    I do.

Q.    What were you trying to say in this part of the document?

A.    It was trying to outline the different modulations that we would use depending on the quality of the signal that was received.

Q.    So if we continue through the document, there's a reference here to a modulation called 64 QAM--Q-A-M.

Did I pronounce that correctly?

A.    You did.

Q.    And then there's one called 4 QAM.  Can you please explain to the jury -- just give us a sense for what 64 QAM and 4 QAM are?

A.    64 QAM is high-speed.  It also requires a good signal and a reasonable power to receive it.  It's roughly four times faster than 4 QAM.

Q.    Are these different modulation schemes?

A.    Yes, they are.

Q.    And if we continue through the document, it says that "On a subscriber-by-subscriber basis SkyFire automatically optimizes these modulation parameters to support the maximum possible data rate between the base station and the subspecific subscriber."

What were you trying to say there?  Why was that

significant?

A.    It was significant in that, you know, on a signal-by-signal frame-by-frame basis we were understanding what a subscriber was capable of doing; and then as we scheduled them, again, we would try to make sure that we were getting the maximum throughput that we could out of the system.

Q.    Let's turn now to page 39.  I see references here to multiple input and adaptive beamforming.  What were you saying in this portion of the documents?

A.    Well, the processing also, because it works on a burst-by-burst basis, is ideal for then looking at beamforming or other types of antenna techniques in which you would switch the beam; therefore, you'd have to switch all the parameters and have to know who you're talking to and understand exactly how to line everything up so that it could properly communicate.

Q.    In a nutshell, were you explaining that the system was going to use multiple input technologies, including beamforming?

A.    Yes.

Q.    Now, moving on to section C.3, I see a reference to "Cyclo-Stationary Frequency Domain Adaptive Filtering."  I may not be brave enough to ask about that.  But as we continue down it says, "The uplink represents a difficult signal

processing optimization problem." And it continues to say that, "Unlike the downlink, the base station receives bursts of data on demand basis from the subscribers and must contend with processing a different channel for each subscriber."

Can you please explain the problem you were addressing here?

A.    Well in the real world there's a large number of subscribers, no different than what you saw the T-Mobile representative show, and they require data at random points and random times; sometimes a lot of data because they're streaming, sometimes it's just a click of a mouse on your webpage. And so what happens is, is you have to schedule and understand when and how to control getting data to and from each one of these subscribers, and in doing so you have to coordinate it. And, of course, any system has a limit to its resources, so it's all about handling all those resources and then handling the signal parameters to them.

Q.    Now, if we continue on to figure 27, a little lower on page 48, can you please tell us what we see here?

A.    Well, this is a picture of a TDD frame. So a frame is sort of an alignment that base stations use in order to organize sending data down in the downlink and up from each subscriber in the uplink.

Q.    Organize it in time?

A.    Organizes it in time.

Q.   And what does the '2msec' at the top represent?

A.   2 milliseconds, so 1/500th of a second.

Q.   And on the left, I see we haven't highlighted, but it says 'downlink'.  What does that refer to?

A.   That's all the information that flows out to the subscribers from the base station in the downlink.

Q.   In this illustration, does that mean that the first half of this TDD frame, the first -- the one millisecond would be used for downlink from the base station to the user?

A.   Yes.  I mean, you could -- it's also variable.  It could have more than one millisecond and have a shorter period on the uplink.

Q.   And then on the right where we highlighted 'uplink', is that the uplink communications and how they'd be scheduled back to the base station?

A.   Correct.  It's the time blocks you would give to each subscriber who required one.  It shows them numerically, but it was on demand, and it is the scheduling of those subscribers to then be received by the base station.

Q.   And I see a sub (1), sub (2) sub (n).  What do those refer to?

A.   That's a burst from subscriber (1) and then a burst from subscriber (2), and then subscriber (n) a just a random -- a number that is representative of any other subscriber that's there.  There could be tens; there could be hundreds.

Q.   So (n) just means any number --

A.   Any number.

Q.   -- and just keeps going.

A.   Correct.

Q.   Now, I see that each one of those subscribers appears to have a different modulation.  There's modulation (1), modulation (2), and modulation (n).  Is that correct?

A.   That's correct.  They are located in different places and in different distances and, therefore, you have to understand what modulation could be supported so their signal could get through.

Q.   And then I see there's FEC (1), FEC (2), and FEC (n). What does that refer to?

A.   FEC is forward error correction, and even if you receive some errors, forward error correction, as its name implies, allows you to kind of fix some of the mistakes that are there. So there's also varying levels of that, just like there's varying levels of modulation.

Q.   And then I see antenna (1), antenna (2), and antenna (n). What does that refer to.

A.   Those are your beamforming or your antenna parameters for that given subscriber--what beam am I going to hit each one of them with.

Q.   And then power level (1), (2), and (n).  What does that mean?

A.   Well, just as you are further away, each subscriber requires more or less power based on the distance they are from the base station.

Q.   Now, I see we have one TDD frame here.  Would the system have been limited to one TDD frame?

A.   No.  No.  There could be frames in parallel if you had multiple beam technologies in the antenna.  And, of course, around the base station there were frames for each sector, but we won't get into that.

Q.   If you had multiple beams or multiple frames, could there be multiple subscribers transmitting to the base station at the exact same time?

A.   There could be.

Q.   It wouldn't always be one and then another then another in an order?

A.   Yes.  It would -- it could be five at once then three at once then two at once.

        THE COURT:  Counsel approach the bench, please.

        (The following was had outside the hearing of the jury.)

        THE COURT:  Two things.  I need you to slow down.

    And number two, there's always a risk with a highly knowledgeable fact witness that they become a surprise expert, and What would this be, how would this work--those all call for opinions.  He certainly can testify within his personal

knowledge as to how something works, but when you start asking him to speculate, he becomes an expert witness without any prior disclosure to the other side.

I'm not going to do anything at this point other than call it to your attention and make sure you try to avoid that.

MR. SUMMERS:  Yes, Your Honor.

THE COURT:  All right.  Let's proceed.

(The following was had in the presence and hearing of the jury.)

THE COURT:  Let's proceed, please.

Q.   (BY MR. SUMMERS)  Mr. Struhsaker, let's slow down a little bit to help the court reporter out and make sure we have a good record.

A.   Okay.

Q.   I'm going to turn now to page 51.  It says at the top, "The control CPU retains and manages the updated subscriber receiver profiles."  And then a number of things are listed. Can you give us a sense for what we see here?  And again, is this describing the Raze system?

A.   It's describing aspects of the Raze system, yes.

Q.   Okay.  So please explain what we see here about the Raze system.

A.   We won't go over every one of them, but there are two types of pieces of the profile that you see here.  In some cases you're dealing with a channel, like how distorted things

are and how the physical world distorts things, and those are actually covered by equalizer weights or, again, your position so the antenna weights that you might have.  So those are good examples of channel.

Then the other types are like forward error correction that we talked about.  Those were signal-specific parameter that you might store.  The idea is, depending on your system and how you design it, some number of signal and channel parameters are important to how you build your modems and how your system works, and so this is just a representative list of something we might have used.

Q.  Let's turn now to figure 28.  Can you please tell us what we see in this figure?

A.  This is sort of a representative flow of information on the uplink that we're trying to show.  It's -- the idea is it's walking through if you were to receive something from and it shows a subscriber (1), a subscriber (2), and then a subscriber (3) --

Q.  Pause there, please.  Are we looking at the receive operations at the base station?

A.  Yes, we are.

Q.  So we're dealing with uplink from a user from, these days, my phone, or that antenna that Mr. Hughes held up to the base station.

A.  Correct.  This is an uplink.

Q.   And what do we see on the far right, sub (1), (2), and (n)?

A.   Those are the burst transmissions from subscriber (1), subscriber (2), and, you know, eventually subscriber (n) that happened within that frame.

Q.   And then they -- it looks like there's a line taking them to this triangle and something called the IF/RN receiver. What's that?

A.   Well, that's you're -- a stage of demodulation where you take everything from being up at a very high frequency and you move it down to where you can process it with digital signal processors, or what they call baseband modems.

Q.   And what's the triangle?

A.   That's representative of an antenna, an antenna array; just any antenna feature that you had.

Q.   Okay.  Then it looks like there are two arrows, and there's a progression to modem A and modem B.  What does that represent?

A.   Well, depending on the number of modems, we're showing two, but obviously there can be more.  For any of those modems that aren't in use, you would schedule one of the packets -- like subscriber (1), you could schedule it to go into one of those modems.

Q.   Now, to the right it says at the top "burst processed by modem A," and then it says "subscriber (1)...subscriber 3."

Do you see that?

A.    I do.

Q.    Then at the bottom it says, "subscriber (2) ...subscriber (3)."  Am I correct in understanding that the subscriber (1) and (3) at the top are being processed by modem A and subscriber (2) and (3) at the bottom are being processed by modem B?

A.    Correct.

Q.    Now, it looks like there is information from subscriber (3) going to both modems in this drawing.  Is that correct?

A.    That's correct.

Q.    Was your idea that each modem had to be dedicated to a specific user or group of users?

A.    Not at all.  It's the modem that is available to process. The next burst would be the modem that you would select to do it.

Q.    Now, we've highlighted some things at the left.  You see there's channel adaptation weights memory, and there's a list subscriber weight (1), (2), (3), (n).  What do we see there in the upper left of the slide?

A.    So that's the stored set of channel and signal parameters that we're talking about.  And since you're -- the base station schedules when these subscribers transmit, they're able to send to the modem the signal conditions that are a starting point for the modems to adapt and to demodulate each

burst.

Q.    So are these arrows essentially showing that the profiles are being used by modem A and modem B to process the information?

A.    Correct.  The controller is loading modem A and modem B with the proper profiles.

Q.    And then it looks like there is a separate set of arrows that go from the modems back up through RF modem, control CPU, to the profiles.  Is that correct?

A.    That's correct.

Q.    What does that represent?

A.    Well, by the time you get done modulating, you'll have updates and improvements on what you had.  There's motion of trees, motion of cars, there's actually motion of subscribers if they're swaying in the wind for a fixed system.  What you're doing is providing an update of all those parameters to be used the next time around.

Q.    Is that how your system constantly updated the profiles?

A.    Correct.  On a burst-by-burst, subscriber-by-subscriber, frame-by-frame basis.

Q.    Now, we see two modems here.  If we go back to modem A and modem B, in your design at Raze and the system you built, did those have to be separate pieces of hardware?

A.    No.  They --

Q.    Can you just --

A.   -- actually --

Q.   Stop there and let me ask you, can you please explain to the jury how that could be done without having two separate pieces -- how you did it without two separate pieces of hardware?

A.   The Raze system was one of the -- an early version of software-defined radio.  So it used a combination of DSPs and some hardware accelerators to create a pool of demodulators. I showed you Dirty Harry.  Dirty Harry contained four demodulators.

Q.   Let me -- you mentioned software-defined radios.

MR. SUMMERS:  Let me turn back to Joint Exhibit 70 at page 251.

Q.   (BY MR. SUMMERS)  Back under "Business Strategy," I saw a reference that it says "Be the first to offer a standards compliant IEEE 802.16 product leveraging our software-defined radio technology."

Is that referring to the same stuff?

A.   Correct.

Q.   And you mentioned DSPs.  What are DSPs?

A.   They're digital signal processors.  They are a type of computer chip that is customized to do a lot of mathematics, a lot of high-speed mathematics you need to kind of process these signals that you're receiving.

Q.   Did you use DSPs in the Raze system?

238

A.    Yes.

Q.    Now I'd like to turn to page 51 of Joint Exhibit 8, the white paper.

I see a reference here, a portion of the document that says "The receiver in our implementation consists of 2 separate modems that partition the demodulation of the scheduled subscribers bursts.  Each modem processes every other transmitted subscriber burst in a ping-pong fashion."

Do you see that?

A.    Yes.

Q.    Does the word 'implementation' have a specific meaning to you?

A.    Yeah.  This was just an example.  It doesn't represent all embodiments; it was just an example in order to explain a pretty complex subject to the reader.

Q.    In your white paper, did you try to use the simplest examples or the most complicated?

A.    The simplest, so the reader could understand.

Q.    Now, as we continue, after another little paragraph and some bullets, it says, "For simplicity, the figures illustrate the subscribers burst coming in a regular order.  In actual operation, the subscriber bursts come in random order based the demand assignment that is taking place on a burst frame by burst frame basis."

Do you see that?

A.   Yes, I do.

Q.   And then it continues after the underlining, "For that reason, the control CPU maintains the subscriber profile database and manages the queuing and traffic flow."

Do you see that?

A.   Yes, I do.

Q.   What's a control CPU?

A.   If you recall the diagram we just showed, at the very top of it there was a control CPU, and it's really working about orchestrating -- there it is.  It is -- very top there highlighted it says "RF modem control CPU."

Q.   Is that known as a controller?

A.   Yes.

Q.   Now, coming back to this language, what were you trying to explain here about your system and what happens in actual operation?

A.   Well, the simple diagram I showed you would never happen in real life.  You don't just get a ping and a pong from one subscriber or another.  There's times when a subscriber needs 10 or 12 bursts in a row because they are sending up a video or a photo.  Everything comes in random order, and you have these modem resources, and you schedule them optimally to try to make as much use of them as you can.  And so the order is arbitrary and random, and it's just something that you have to update and maintain on a frame-by-frame basis in order to make

sure the system works and is working efficiently.

Q.    And again, we saw two modems in this figure.  Was there anything special about two?

A.    Not at all.  The patents speak to a plurality of modems, so two is just an example that was shown here to make it, you know, obvious and understandable to a reader.

Q.    Could there be three?

A.    There could be three, there could be four, there could be 128.

MR. SUMMERS:  Now, moving forward, let's go ahead and blank the slide.  Just blank the screen for a moment, please.

Q.    (BY MR. SUMMERS)  Did you file for patents on the ideas we've been discussing here today?

A.    Yes, I did.

Q.    When did you file the applications?

A.    I have to recall here for a second.  Sometime in the April time frame of 2001, maybe --

Q.    And did you work with Raze's patent lawyers on those applications?

A.    Yes, I did.

Q.    What was the nature of your involvement?

A.    I did what I usually do with any patent.  I'll take, for example, this white paper, I'll have notes, I'll have some hand drawings on different things that are, you know, ideas

241

that go along with it, and I would sit down with the attorney, the patent attorney, and I'd explain everything to them and -- about what I felt was important or not important about what I was telling them, and then -- you know, that's the reason you have patent attorneys.  They then do their part of their swim lane and turn those things into a patent.

Q.   Did you personally draft any of the claims at the end of the patent?

A.   No, I never draft the claims.  They're very much legal language, and I just don't feel as an engineer it's appropriate for me to draft those claims.

THE COURT:  Mr. Struhsaker, the question was did you ever draft the claims.

THE WITNESS:  I did not.

THE COURT:  You said, "No."  He didn't say, Why didn't you and did you feel it was a legal issue.  You're offering information not called for by the question.  You need to limit your answers to the questions asked.  All right?

THE WITNESS:  Yes, Your Honor.

THE COURT:  All right.  Let's proceed.

Q.   (BY MR. SUMMERS)  Mr. Struhsaker, do you recall any details of the prosecution of these particular patents after you provided your ideas to the patent attorney?

A.   I really have no recollection of the prosecution.

Q.   Did the Patent Office, to your knowledge, ultimately

issue the two patents at issue in this case, the '477 and '383?

A.    Yes, they did.

Q.    Do you have other patents?

A.    I have around 60.

Q.    And was the process you followed at Raze in obtaining these patents similar to what you saw with the patents that you obtained when you worked for other companies?

A.    Similar or basically identical.

Q.    Now, after you filed for your patents on these ideas, did you ever share your ideas with any of the big telecom companies?

A.    Yes.  I mean, we spoke about the Raze system.

Q.    Did -- can you name some of the companies that you presented to or provided information to?

A.    Clearwire, Sprint, AT&T were a few of the larger carriers.

Q.    Was Clearwire ultimately acquired by T-Mobile?

A.    Yes, I believe it was, through the acquisition of Sprint.

Q.    So it was acquired by Sprint?

A.    Correct.

Q.    And then Sprint was acquired by T-Mobile?

A.    Correct.

Q.    And did you present both to Clearwire and to Sprint before that merger?

A.   Yes, I did.

Q.   Now, who was Clearwire, just at a very high level?  What was your understanding?

A.   Clearwire was a new operator that was going to begin the first broadband rollout in the United States, so they had different frequencies that were available for them to go create a service that we felt our Raze SkyFire system would be a very good match for.

          MR. SUMMERS:  Let's turn now to Joint Exhibit 52.

Q.   (BY MR. SUMMERS)  Can you please tell us what Exhibit 52 is?

A.   This is our response to Clearwire's request for information about our system.  And if you notice, it's relative to the frequency bands that they had available.

Q.   Pause there.  Just please answer just my question.  Let's just to keep things tight so we don't run out of time.

     Did Clearwire request that you provide them information in writing about your system?

A.   Correct.

Q.   And did you do so?

A.   Yes.

Q.   Did you do anything to protect the confidentiality of that information?

A.   We did.

Q.   What was that?

244

A.    Of course we had them sign an NDA.

Q.    Non-disclosure agreement?

A.    Non-disclosure agreement, yes.

Q.    And it looks like there's some sort of big legend on this document that says "Proprietary and Confidential."  Why did you do that?

A.    We mark every page that it's proprietary and confidential to our company.  It's standard practice.

Q.    Now, it looks like the document is dated July 6, 2001.  Is that correct?

A.    Correct.

Q.    What sorts of questions did Clearwire ask in the RFI?

A.    They asked general questions about just the Raze system itself, and then they had other questions about whether or not we would support adaptive modulation or whether we supported any advanced antennas.  They had a large number of questions about all aspects of the system.

        MR. SUMMERS:  Let's turn to page 53.

Q.    (BY MR. SUMMERS)  What do we see here?

      And by the way, am I correct in understanding that this is part of your response to Clearwire?

A.    Yes.

Q.    Can you please -- I see references to MIMO and beamforming antenna technology.  What do we see here?  What were you telling Clearwire, at a very high level?

A.    At a very high level, the questions that were asked around this is what would we do to improve the efficiency of their system and whether or not there was an upgrade path for it.

Q.    And did you discuss your beamforming technology here?

A.    Correct.  It talked about the MIMO functions, and as you just put up --

Q.    If we turn to -- sorry for cutting you off.

A.    It's all right.

Q.    If we turn to page 73, what did you describe for Clearwire here?

A.    That our system used adaptive modulation on a frame-by-frame and a subscriber-by-subscriber basis.

Q.    And I see the word 'proprietary'.  What does that mean?

A.    Well, they were clearly covered by the patents we had filed two months before, and the techniques we were using are not outlined anywhere and so we just made it a point of saying that, Hey, we had developed some proprietary, unique processing that allows this to be done optimally.

Q.    If we continue, I see a reference to DSPs.  We discussed them earlier.  Did you discuss -- in this document disclose that you were using DSPs to estimate channel conditions?

A.    Yes.

Q.    Continuing on, there is a mention that the SkyFire system is purely a fixed broadband wireless access system which does

not support mobility or hand-offs.  Was that true?

A.    That was true at the time.

Q.    And why was that something that you felt you needed to mention to Clearwire?

A.    Well, first of all, their RFQ was -- their request for information was for a fixed system, but the other part of it dealt with the fact that we were terminating voice and data. And at the time voice would be more difficult to support if it were mobile.

Q.    So let me ask you some questions about that.

        MR. SUMMERS:  If we could just blank the slide for a moment.

Q.    (BY MR. SUMMERS)  Is the issue of hand-offs and -- is that something that was significant to data when you were building the Raze system?  Were you concerned about the issue of hand-offs with data?

A.    I wasn't concerned with the issues of hand-off for data.

Q.    Why not?

A.    The stack, the way data works, if you happen to lose a packet or lose two packets, data protocols will resend them. So you may have a little glitch in your video or, you know, webpage is slow, but -- you've had packet loss; I'm sure you've experienced it, each of you in the jury.  The internet protocols go, Oh, you missed a packet; let me go resend it. So they'll resend, and they'll basically take care and patch

up any issue you might have relative to that.

Q.   Was the issue of hand-offs more significant to voice communications?

A.   Yes, it was.

Q.   Why?

A.   Well, voice requires that you maintain a steady stream of packets in order not to have a glitch.  And then the second thing, of course, with voice is very noticeable if you have a gap.  If anyone remembers old cell phones, you almost used to have to dance around on a pin to sometimes get connections if you were in your house.

Q.   Do -- is a failure of a hand-off, is that sometimes what results in a dropped call if someone moves from one cell to the next?

A.   Very much so.

Q.   With data, are there any concerns with dropping a call?

A.   You don't really drop a call.  You'll lose service, you may lose some packets, and then when you get to the next cell and re-establish communication those packets that you missed will be rerouted to you.

Q.   Are hand-overs relevant at all to the inventions of the '477 and '383 Patents?

A.   They're not at all.  They haven't -- again, they -- they're not at all.

Q.   Would the inventions of the '477 and '383 Patents work

differently with mobile phones than they do with fixed -- or than they did with fixed antennas?

MR. STEVENSON:  Objection; opinion.

THE COURT:  Sustained.

Q.   (BY MR. SUMMERS)  Mr. Struhsaker, can you please explain whether and to what extent there would be any difference applying the invention to mobile versus fixed?

MR. STEVENSON:  Same objection, Your Honor.

THE COURT:  Same ruling.  It calls for an opinion. This is a fact witness.

Q.   (BY MR. SUMMERS)  Mr. Struhsaker, back at the time, did you believe that you needed to do anything differently insofar as these inventions are concerned to ultimately support mobile?

A.   With respect to these patents, no.

Q.   Are these inventions -- were these inventions, the way you designed them and implemented them in the Raze system, were they well-suited to mobile?

A.   Yes.

MR. STEVENSON:  Objection; opinion again--'well-suited'.

MR. SUMMERS:  If I may re-ask the question, Your Honor.

THE COURT:  Restate the question.

Q.   (BY MR. SUMMERS)  Would they have worked readily with

mobile?

A.   Yes.

MR. STEVENSON:  Same objection, Your Honor--opinion.

THE COURT:  Whether they would have worked with mobile calls for an opinion.  This is a fact witness.  He can talk about what he has personal knowledge of; he can't offer opinions.

Q.   (BY MR. SUMMERS)  Would you have had to do anything differently to do them with mobile phones?

MR. STEVENSON:  Same objection, Your Honor.

THE COURT:  Sustained.  He's asking him to speculate.  "Would you have had to do anything different?"  We need to talk about not what he would have done but what he did do.

Let's proceed.

Q.   (BY MR. SUMMERS)  Mr. Struhsaker, going back to your dealings with Clearwire, what happened after you provided the written response to their request for information?

A.   Clearwire requested a visit to our facility and a hands-on review of our equipment.

Q.   And did that occur?

A.   It did.

Q.   Were you present?

A.   I was.

Q.   Did they actually come into your lab?

A.    They did.

Q.    Did you provide them with additional information beyond what we saw in the written document?

A.    Yes.

Q.    What was the nature of their reaction?

A.    They were pleased with what they saw and interested in the system.

Q.    Now, you mentioned earlier that you also presented to Sprint.  What was the nature of Sprint's reaction to the information you gave them?

A.    Sprint was also interested.

Q.    And what about -- did you mention AT&T before?

A.    Yes; AT&T.

Q.    What about AT&T?  What was their reaction?

A.    They also were very interested.

Q.    Now, after you filed for these patents and had these presentations, what ultimately happened to Raze?

A.    Well, unfortunately business conditions deteriorated. It was -- 9/11 happened, and then, of course, the dot-com bust, and, frankly, the desire of the carriers to make new investments dried up and, you know, it's one of those things that happens.  Sometimes your timing is wrong, and so ultimately we had to make the decision to close Raze.

Q.    When was that?

A.    In the 2002 time frame; sort of late summer.

251

Q.    And did that in any way impact any of the intellectual property, the patents that you --

A.    No, it did not.  They were continued to be pursued.

Q.    And ultimately how many patents did you receive for your work at Raze?

A.    Ultimately I believe it was 25 patents.

Q.    Now, what did you do after Raze?

A.    I took up a position as the chief technology officer at Texas Instruments for broadband wireless in Dallas.

Q.    And how long were you there?

A.    I was there for three years.

Q.    And what did you do after that?

A.    I then went on to Motorola to be a vice president of silicon design.

Q.    Does silicon refer to chips?

A.    Chips; radio chips in particular.

Q.    What -- did you work on any specific products at Motorola?

A.    Yes.  Motorola at the time created the world's first 4G handset chipset, and I ran that team.  I recruited that team, and ultimately we were successful in fielding that new chip in what was called the Droid X.  So that was the first mobile LTE phone.

Q.    Pause there.  When you say a 4G LTE chip, are you referring to the computer chip that basically runs the 4G

phone?

A.    Yes.  It's the chip that runs all the modem and connectivity to the phone to the cell network.

Q.    Okay.  Now, the jury has heard that this case is being brought by a company called General Access.  Do you have an understanding as to how General Access came to own the patents?

A.    I believe General Access was the name of the investors, and they had -- and that General Access -- again, we decided to close Raze, and then when they did, of course, investors have first priority of what to do with assets, and General Access felt the patents were important and they took possession of them.

Q.    Are you an owner of General Access?

A.    No, I'm not.

Q.    So do you have any financial interest in the outcome of this case?

A.    I do not.

Q.    Do you have any financial arrangements with General Access at all?

A.    I do consult with them.

Q.    And how do you get paid for your consulting work?

A.    $850 an hour.

Q.    How do you feel about the fact that General Access would receive any award in this case and not you personally?

A.    I'd be happy for the members of General Access to actually be rewarded for their risk in investing in Raze.

Q.    Why is that?

A.    Well, I mean, when you're a young man and all you have is an idea and it's on paper and you can get funded and have an opportunity to build something special, you always are appreciative of what people did and the risks they took.  And they took a lot of risks and they themselves took some hard knocks, and so I would just tell you it would be great if after all that time their confidence in me had them receive something material for all the losses that they had had for such a long time.

Q.    Are you proud of your work on the '477 and '383 Patents?

A.    Of course; absolutely.

Q.    Why?

A.    They fundamentally changed the way you look at approaching beamforming, adaptive modulation, and the processing that you did, especially in -- you know, especially in adaptive modulation and antenna configuration.  They're fundamental to how wireless moved forward.

Q.    Thank you, Mr. Struhsaker.

        MR. SUMMERS:  Your Honor, I pass the witness.

        THE COURT:  Cross examination by the Defendants.

        MR. STEVENSON:  Permission to approach and pass out cross binders?

THE COURT:  Granted.

MR. STEVENSON:  May I proceed?

THE COURT:  Just a moment.

All right, Mr. Stevenson.  You may proceed with cross examination.

MR. STEVENSON:  Thank you, Your Honor.

CROSS EXAMINATION

BY MR. STEVENSON:

Q.   Good afternoon, Mr. Struhsaker.  I am Ted Stevenson.

A.   Good afternoon.

Q.   It's good to see you, sir.

You and Dr. Russell McKown were co-inventors on these patents that are being asserted here.  Correct?

A.   That is correct.

Q.   And you were involved in drafting the patent applications; not the claims, but at least the technical descriptions, I take it?

A.   Actually even the technical descriptions were drafted by the lawyers based on material I gave them.

Q.   Okay.  Were you aware when you applied for the patent that there were certain requirements that had to be present in your application?

A.   Generally, yes.

Q.   Okay.  You knew you had to submit one or more claims that defined your invention.  Right?

A.   Yes.

Q.   And you also had to have a written description of your invention.  Correct?

A.   That's correct.

Q.   Right.  In the written description, you had to demonstrate that you possessed the idea for the full scope of your invention.  Right?

A.   That's correct.

Q.   Okay.  You've heard that called the written description requirement before, I take it?

A.   Yes, I have.

Q.   And another thing the written description has to do is enable a person of skill in the art to build and use the full scope of the claims in your invention.  Right?

          MR. SUMMERS:  Objection, Your Honor; foundation.  These are legal questions now.

          THE COURT:  Sustained.  We don't need to go too far down this road.

Q.   (BY MR. STEVENSON)  But you understood, without getting into the legal part of it, that there was something called an enablement requirement you had to comply with in your application.

A.   I assume so, yes.

Q.   Right.  And did you understand that if your application failed to meet these requirements, it could be later found to

be invalid?

A.    If the court found it so, yes, I -- it would be invalid if the court found that out.

Q.    And do you know whether the -- during the prosecution anybody explained to the Patent Office, the patent examiner, whether later in time a suit over mobile wireless networks would be filed?

        MR. SUMMERS:  Objection, Your Honor; foundation, 402, 403.  It's just argumentative.

        THE COURT:  That's overruled.

    You can answer the question, Mr. Struhsaker.

        THE WITNESS:  I don't have any recollection of the prosecution in this patent.

Q.    (BY MR. STEVENSON)  Okay.  Thank you, sir.

    Let's switch topics now and talk about Raze.

    You were one of the founders of the Raze.  Is that correct?

A.    That's correct.

Q.    And the main project of Raze was a wireless communication system.

A.    Yes, sir.

Q.    And back then before Raze started its work in around the 2000 time frame, there were already multiple mobile wireless networks in the United States.  Right?

A.    There were multiple 2G networks in the United States.

Q.    Those are digital mobile wireless networks.  Correct?

A.    Correct.

Q.    Verizon, VoiceStream, Singular, AT&T, Nextel.  They were in operation.

A.    Correct.

Q.    And I'd hazard to guess you were probably one of the millions of people in the late '90s who had a mobile phone?

A.    I was.

Q.    I would assume you were an early adopter?

A.    Yes.

Q.    And the system Raze was developing was to do primarily internet access, as you said, to rural areas.  Correct?

A.    It was broadband internet access to rural areas.

Q.    And one of the problems Raze was trying to solve was how do you get data that last mile from the telephone network actually to someone's house.  Correct?

A.    Partially the telephone network; partially the internet network.

Q.    Right.  But that last mile, that's the bottleneck, isn't it?

A.    Correct.

Q.    And, in fact, I think at one point Raze was called Last Mile Solutions, wasn't it?

A.    Last Mile Systems, yes.  Yes.

Q.    Last Mile Systems.

And there were other competing technologies to bridge the gap that last mile between the public switch telephone network or the internet network and a person's house other than what you were doing.  Correct?

A.    Correct.  There were a number of different start-ups and a number of different technologies that were competing.

Q.    There are some cable solutions--DSL, there was also cable; you know, cable TV.

A.    Correct.  There was cable.  Of course, there was no optical at the time, but there was DSL.

Q.    And some people just had their old warbly modems.  Right? The 56K modems.

A.    The dial-up; correct; over phone lines.

Q.    But the idea was for you to beam radio waves to the house and people would have their internet over radio waves. Correct?

A.    Correct; radio waves and their voice service.

Q.    Okay.  And the system you were building to do that was called SkyFire.

A.    Yes, it was called SkyFire.

Q.    Now, if someone signed up for SkyFire, they couldn't drive around with that antenna and access the internet, could they?

A.    No.  At the time there were no mobile devices that were small enough to do that kind of mobility with that kind of

bandwidth.

Q.   So certainly you wouldn't call SkyFire a mobile system.

A.   No, I wouldn't call SkyFire a mobile system.

Q.   Okay.  Now let's turn to the development process for SkyFire.

You filed your -- professional applications for these patents were filed in January of 2001.  Correct?

A.   Correct.

Q.   And then you filed a utility application claiming priority to them four months later in April 2001.  Correct?

A.   Yes, I believe that's true.

Q.   I'm going to put up a timeline to keep us oriented.

MR. STEVENSON:  Can I have slide 2, please?

Q.   (BY MR. STEVENSON)  Now, during this time in early 2001, Raze was trying to build its SkyFire system, wasn't it?

A.   Correct.

Q.   And you had a team of engineers working on it?

A.   We did.

Q.   About how many?

A.   By 2001, it was 48, growing to maybe about 68.

Q.   Okay.  But Raze wasn't the first company ever to try its hand at fixed wireless, was it?

A.   No, it wasn't.

Q.   Fixed wireless had been in use before Raze.

A.   Yes.

Q.   And, in fact, when you started work on your SkyFire system in 2001, Raze had about a half dozen or so competitors that were also working on fixed wireless systems.  Correct?

A.   Yes, there were a number of competitors.

Q.   One of those competitors was a company called Navini.

A.   Yes, I believe so.

Q.   And they were just about a mile and a half down the road from you in Plano, weren't they?

A.   I think so, or Richardson; one of the two.

Q.   They were working on a fixed wireless system?

A.   I believe they were.

Q.   And, in fact, Navini beat you to market, didn't they?

A.   Yes, they did enter the market before we did.

Q.   Okay.  Now -- and where they entered the market was at a big trade show called SuperComm in Atlanta.  Right?

A.   Yes, they were at SuperComm.

Q.   That was their product launch in 2001.

A.   Yes.

Q.   June of 2001?

A.   My recollection is a little hazy, but I think June may be correct.

Q.   And you attended it that year.  Right?

A.   Correct.  Raze was there and I was there.

Q.   Okay.  So we'll show that on the timeline.

And so to orient ourselves, Navini's product launch was

five months after you filed your provisional applications.

Correct?

A.    Correct.

Q.    Okay.  Now, at this time Raze was still trying to work to get its SkyFire system up and running.

A.    Yes.  It was getting ready to head to field trials.

Q.    Right.  But it hadn't been put out in the field yet.

A.    It wasn't -- no, it was in -- it was in beta trials at our own facility at that time.

Q.    At your own facility.

A.    At our own facility.

Q.    Right.  It wasn't out to customers.

A.    It was not out to customers at that time.

Q.    Wasn't stable enough for that yet.

A.    No, it wasn't -- yeah, I would agree with you.  It was still under development and still had some issues that had to be tackled.

Q.    Okay.  And so when you went to that trade show, you visited the Navini booth, didn't you?

A.    I did.

MR. STEVENSON:  Okay.  And let's pull up slide 4, if we can.

Q.    (BY MR. STEVENSON)  Is that a picture of the booth?

A.    Yeah, I think that was it.  It's 25 years ago, so I guess it is.

Q.    Yeah.  And so if we look on the right, that's the Navini system.  Right?  You've got the antenna and then the cabinet for the base station.

A.    Yes.

Q.    Okay.  And they were demonstrating that, weren't they?

A.    I don't -- yeah, I don't know if they were demonstrating or just showing the equipment, so...

Q.    So you went over to the Navini booth when you were at the trade show to scout out the competition.

A.    Sure.

Q.    You saw their booth?

A.    Yes.

Q.    Saw their equipment?

A.    Yes.

Q.    Checked out what they were working on?

A.    Yes.

Q.    And at some point in the trade show did the Navini guys recognize you?

A.    I actually knew the Navini guys, and at some point they -- of course.  It's like they declined to talk anymore.

Q.    Did they run you off from their booth?

A.    They didn't run me off from the booth; they just -- you know, you have a conversation and it ends.

Q.    Did they tell you, Don't stand here and scope out our product?

A.   Yeah, at some point they asked me to leave.

Q.   Okay.  But you kept trying to get more information on their product even after they asked you to leave.  Right?

A.   Well, I worked at NSA.  Business intelligence is business intelligence.

Q.   Okay.  And I believe you recruited Mr. Hynek to help you out.

A.   I did ask Skip if he would go over and ask some questions because I was interested in what they were doing.

THE COURT:  Mr. Struhsaker, I'm going to ask you not to refer to individuals by first name only.

THE WITNESS:  I'm sorry.  Mr. Hynek.

THE COURT:  That would be preferable, please.

Go ahead.

MR. SUMMERS:  Your Honor, may we approach briefly?

THE COURT:  You may.  Approach the bench.

(The following was had at the bench, out of the hearing of the jury.)

THE COURT:  What is it?

MR. SUMMERS:  Your Honor, you'll recall from the Verizon trial that there was a document, a trip report about this where he talked about Mr. Hynek going into spy mode, and this is highly prejudicial material.  There is no probative value.  There's no indication that Navini had anything to do with any of these patents.  And the patent application was

filed in April of '01.  This is a trade show in June of '01, months later.

THE COURT:  What are you asking me for?

MR. SUMMERS:  I'm going to ask that this line of questioning be cut off before he starts talking about Skip Hynek going into spy mode.  It's completely prejudicial and irrelevant.

THE COURT:  Mr. Stevenson.

MR. STEVENSON:  It goes to enablement.  It goes to whether he was able to build this and whether one of skill in the art reading his patent would be able to build it.  I intend to show that he was unable to build his invention SkyFire, and that is directly relevant to whether his patent application that he wrote would then enable someone else to build the wireless system.

MR. SUMMERS:  There's no evidence, there's nothing that anything about these patents came from Navini, and so the idea that this Navini -- that him visiting that would have anything to do with the patents is complete and utter nonsense.  Maybe if he could lay some foundation that there's something to it before getting into spy mode, that might make sense, but just hopping off about spy mode with this complete and -- this nonsense doesn't -- isn't fair.

THE COURT:  What is the nexus that you believe you can connect Navini to the patents at issue?

MR. STEVENSON:  Navini doesn't have to connect the patents.  The nexus is that he couldn't build this, and he went to great lengths to find out and get competitive intelligence and find out and look at how other people had built it and they still failed to build it.  I think that's highly relevant to -- if the inventor can't build his device, then it's extremely relevant to whether his patent enables somebody else of skill in the art to build his device.

MR. SUMMERS:  There's no reference in this document sending Skip there to learn to build their system.  There's nothing about that.  There's no nexus at all.

MR. STEVENSON:  I disagree.

THE COURT:  Well, first of all, there's no need to talk about Mr. Hynek being in spy mode.  If you want to ask questions about Mr. Hynek going to the booth observing, asking questions, but you don't need to characterize it as spying, even though Mr. Struhsaker volunteered that he was an NSA employee and he knew all about spying.  But we don't need to turn this into some spying situation.

At this point I'm not inclined to grant Plaintiff's request to cut you off.  I think you've given me a fair basis to go forward, but it needs to be straight up without any characterization embedded in the questions.

And while I have both of you here at the bench, the last time I called you up here, Mr. Summers, I said I need you to

slow down.  You immediately went to the podium and told the jury, Please slow down for the court reporter so he can keep a clean record.  If I wanted to tell the jury why I wanted you up here, I would have done it without bringing you to the bench.  I don't intend you to talk with me outside of the jury's hearing and then go to the podium and characterize what was said at the bench.

MR. SUMMERS:  My apologies.  I just wanted to get the witness to slow down.  I'm sorry.

THE COURT:  There was certainly more we talked about than the speed of the witness' testimony.  But I consciously decide what I'm going to tell you in the presence of the jury and what I'm going to tell you at the bench, and I have reasons for it.  So I don't expect there to be a recital in the presence of the jury of what's been talked about at the bench.

MR. SUMMERS:  Yes, Your Honor.

THE COURT:  All right.  Let's go forward.  Okay?

MR. STEVENSON:  Yes.

(The following was had in the presence and hearing of the jury.)

THE COURT:  Let's proceed.

Q.  (BY MR. STEVENSON)  Back to Navini.  Now, you sent Mr. Hynek to look at the Navini booth, and he made a run and got some information from Navini.  Correct?

A.   Correct.  He went and asked them questions.

Q.   Okay.  And after that happened, I think you referred to this as gathering competitive intelligence?

A.   Yeah.

Q.   When you learned what you could from the Navini booth, I think you made one more run to talk to the Navini president, didn't you?

A.   I -- actually I had talked -- we had both agreed to meet and talk.

Q.   Okay.  Now, let's forward about two months to August of 2001.  I believe this is what you talked about when you said Raze was trying to get some additional funding.  Right?

A.   I'm sorry; just looking at the graphic.  No -- yeah, about 2001, of course we were looking for getting a second round of funding.  Correct.

MR. STEVENSON:  And we can go to slide 5, please.

Q.   (BY MR. STEVENSON)  And that same month you were trying to get funding, Navini who had already launched their product, closed a $50 million funding round, didn't they?

A.   I don't know the exact number, but if you say that it's 50 and you have the documentation, I guess it is.

Q.   Well, Mr. Struhsaker, will you please turn to tab C of the binder that's before you?

A.   Tab No. 1, tab -- got it.  Okay.

Q.   And before you do, let me ask you a question before you

get there.

Do you recall giving a deposition in this case?

A.   Just a second.  Yes.

Q.   That's sworn testimony under oath.

A.   Yes.

Q.   And you did so in August of 2024.  Correct?

A.   Yes.

Q.   Okay.  Your deposition is at tab C, and I'd like to ask you to turn to it at page 156, lines 7 to 9.

A.   Okay.

Q.   Please read it to yourself and then indicate once you've read it, and I'd like to see if that refreshes your recollection.

A.   Okay.

MR. SUMMERS:  Your Honor, objection.  The question and answer were substantially the same.  It's improper impeachment.

THE COURT:  Not at this point.

THE WITNESS:  Okay.  156.  Correct?  To where?

Q.   (BY MR. STEVENSON)  Line 7 through 9.

A.   Okay.

Q.   Do you have any reason to doubt, sir, that Navini got funding around $50 million at this time frame?

A.   I do not.

Q.   Okay.  Now, let's talk about what you did to line up your

269

funding.

At this time you were trying to get individual investors to invest in your company Raze.  Correct?

A.   Yes, we were pitching to different groups that had funding.

Q.   And you were trying to raise about $36 million?

A.   I don't recollect the exact number, but it could be -- there was a placement that we had and was looking to raise money.  The exact number would be there.

Q.   Okay.  Well, let's look at tab G, please.

A.   Okay.  Okay.  That's in another binder.  Correct?

Q.   I believe it is, yes, sir.

A.   Okay.  Sorry.

Q.   I'm sorry.  I should --

A.   I -- sorry.  Okay.

Q.   And if you'd please turn to page 71.7, and that's going to be in the lower right-hand corner.  And then look at the fourth paragraph and read it to yourself.

A.   One second.  JX 71.7.  Right?

Q.   Yes, sir.

A.   Ahh.  Got it.  Okay.

Q.   Okay.  Does that refresh your recollection you were trying to raise about $36 million through selling stock?

A.   Yes, it does.

Q.   Okay.  And to do that, you put together a document called

a private placement memorandum.

A.    I did not put it together, but the company did put it together.

Q.    And the private placement memorandum, please explain what its purpose is in raising money, as you understood it.

A.    It is a document that explains about the company, it explains about the technology, it explains how we would make use of the funds, and it does outline risks that could happen if you made the investment.

Q.    And the goal in this is people would read it and want to invest money and buy stock in Raze.  Right?

A.    That's the hope, yes.

Q.    Okay.  And let's look at some of the things you told them.  Do you recall telling them--and if we can go to slide 8 in your private placement memorandum--that any investment in Raze --

A.    Hold on.  Can you give me the JX page?

Q.    Yes.  It's also --

A.    Oh --

Q.    Sir, if at any time you'd like to verify what's on the slides, this is at that tab and it's the page numbers in the center.

A.    Okay.

Q.    Do you recall telling them that any investment in Raze was speculative and highly risky?

A.    Our investment bankers of course said that.

Q.    And if we go to page 45 on the next slide, you told them

your SkyFire product might not be completed.

A.    Correct.

Q.    You told them it might not be scalable.

A.    As a risk factor.  Correct.

Q.    You told them it might not even be usable.

A.    Again, as a risk factor.  That could be correct.

Q.    And that Raze's business model depended on unproven

technology.

A.    As the memorandum says, until you have everything ruled

out, you may have failure.

        MR. STEVENSON:  Object; non-responsive.

        THE COURT:  Sustained.

    Re-ask the question.

Q.    (BY MR. STEVENSON)  You told them, sir, that your

business model depends on unproven technology.

A.    It's in this memorandum.  Yes.

Q.    Okay.  And then if we go to page 46 of the business -- or

of the product placement memo, do you recall that you told

your investors--or potential investors--that if -- even if it

passed field trials, SkyFire product may encounter deployment

problems.

A.    Yes.

Q.    You told them SkyFire might fail field trials.

272

A.    That is a possibility, yes.

Q.    You told them SkyFire may fail in large-scale deployment.

A.    That's a possibility, yes.

Q.    And ultimately this stock offering was unsuccessful, wasn't it?

A.    Yes.  We did not -- the investment company did not raise any capital for us.

Q.    Right.  You got no funding.  Correct?

A.    Correct.

Q.    Okay.

         MR. STEVENSON:  We can take that slide down now.

Q.    (BY MR. STEVENSON)  And let's move on to how the field trials for SkyFire actually went.

A.    Okay.

Q.    Now, I heard you tell me -- or tell--excuse me--your attorney on direct examination that you started some field trials with North Texas Web Services.

A.    That's correct.

Q.    And how many people were involved in the field trials testing your product?

A.    There were about 10 to 12 customers.  It built up from just a couple of test units to about 10 to 12, I believe. It's a rough figure.

Q.    Is North Texas Web Services still in business?

A.    I don't know.

Q.   Okay.  Let's talk about the contractual arrangement with North Texas Web Services.  I believe it was if -- when SkyFire -- or if SkyFire passed trials, then any future product orders from North Texas Web Services' customers, that revenue you would get a part of.  Correct?

A.   I'm not privy to the terms of -- I did know we have what is called a conversion trial; that is if we successfully passed, we would convert to then having sales to North Texas Web Services.  I was not the CEO or the CFO or a sales team. I as an engineer did not -- am not privy to that information.

Q.   Okay.  But confirmed two things, though.  First, during the period of the trial, Raze wasn't getting revenue from those customers of North Texas Web Services.

A.   That is correct.

Q.   And it would be only once you passed the field trials that you could hope for revenue.  Correct?

A.   That is correct.

MR. STEVENSON:  Okay.  And we can go back now to slide 12.

Q.   (BY MR. STEVENSON)  Would you agree with me, though, that by the fall of 2001 there was still a series of defects in the SkyFire product?

A.   Yes, there were issues at the field trial that we needed to repair.

Q.   And it wasn't just defects; there was still software that

you needed to develop just to have a minimum viable product for sale.

A.    Yeah.  There are pieces that were still not complete that when you went into full service you would need.  So yes, I guess you could characterize it that way.

Q.    So your team kept working to try to fix the defects and complete the project.  Correct?

A.    Correct.

Q.    But by March of 2002, to fast forward, more than a year after you filed for your provisional application, you became personally frustrated with progress on this project, didn't you?

A.    I believe I did mention to my team that there were some issues that they needed to solve.

Q.    Well, were you personally frustrated at this point with the project.

A.    You could characterize it like that, yes.

Q.    And did you write a memo saying as much to some of your lead engineers?

A.    I don't recall, but I probably -- I could have possibly written it.  I'm sure as the head of engineering, I was definitely driving my team.  So yes, there could be one; I just don't quite recollect if there is one out there.

            MR. STEVENSON:  Well, let's pull up slide 33.

            THE WITNESS:  Okay.

275

Q.    (BY MR. STEVENSON)  Which is -- has got part of DDX 107.1 on it.  You're welcome to look at it in hard copy in your binder, or you can look at it here.

Do you remember March 9, 2002 writing this email?

A.    Yes.

Q.    And you said to Clif Alexander -- who is Clif Alexander, by the way?

A.    Clif Alexander was our head of sales.

Q.    You said, "I hate to say this, but we're still behind.  This is very, very frustrating."  Correct?

A.    Correct.

Q.    You characterized that you were having a very tough time in the next line.

A.    Hold on.  In the slide that is up?

Q.    Yes.

A.    Oh, in the next line.  I thought you said next slide.  Pardon me.

Q.    I'm sorry.

A.    Yes.  Yeah.  Tough time due to a thousand cuts, little small things that needed to be fixed.

Q.    And just below that, which has been highlighted, you said, "It's just not stable enough to provide a customer."

A.    Yes.  At that time there was an upgrade and it actually went backwards.  Correct.

Q.    Right.  And that's despite the fact that you had, in all

caps, "EVERYONE working on this around the clock."

A.   Correct.

Q.   Okay.  Now let's go to slide 14 and fast forward four months to July 2002.

Raze was still having problems with flaky chips.  Do you remember that?

A.   I don't recall exactly what the issue is, but certainly it -- you know, it could be an issue that was out there.

Q.   Okay.  Please turn to tab P --

A.   Okay.

Q.   -- of your binder.

This was a weekly report from your -- from Barry Barge, one of your engineers.  Correct?  Operational report?

A.   Yeah; correct.  It was Barry.

Q.   Please look at the fourth bullet point.  Take a moment to read the first couple of sentences to yourself and then I'll re-ask the question.

A.   Okay.

Q.   Okay.  Does that refresh your recollection that you had a problem with flaky chips?

A.   Yes.  It actually reflected an issue, if you read it, that we were concerned that TI had not given us production quality chips and that we were having in-field failures.

Q.   But isn't it true that your engineer came to you and said, I'm at a loss to explain why this chip is now flaky?

A.    When you have a flaky chip, yes, he did.

Q.    And this isn't the first time it had happened to you, is it?

A.    No.  And that is why we were concerned.  We had a quality problem with the vendor.

Q.    Okay.  And then, if you move forward, isn't it true, sir, that within a number of days of this, North Texas Web Services started to look at other vendors for equipment other than Raze?

A.    I don't recollect.

Q.    Okay.  Why don't you take a look at, then, tab S, please, in your binder.  That was an email that was written to Mark Kelley by Fabien Chenin.  Was Fabien Chenin one of your employees?

A.    I believe he was in support under Clif.  I don't believe I've ever seen this email, but go ahead.

Q.    He wrote it to North Texas Web Services.  Please read it to yourself.

A.    Okay.

Q.    Do you remember that they were telling you that they don't want to go somewhere else for stuff but they might have to, and they might have to go to a company called Trango Systems?

A.    They had this conversation -- Clif had this conversation with Mark.  I don't recollect the conversation.

Q.    Okay.

THE COURT:  Could we avoid first names, please.

THE WITNESS:  Sorry.

THE COURT:  Instead of Mark let's have complete --

THE WITNESS:  Sorry.  It was just exactly on the page I'm just reporting what's on the page.  I don't have --

THE COURT:  Do you remember their names?

THE WITNESS:  Well, it's Mr. Kelley and I believe Clif's name was Richardson, so Mr. Richardson.

THE COURT:  All right.  Thank you.

THE WITNESS:  Sorry about that.

Q.    (BY MR. STEVENSON)  You said Richardson.  Was it Clif Alexander?

A.    Alexander.  Apologies.  I'm sorry.

Q.    Just to get the record clear.

Now, moving on, is it fair to say that by the end when -- of the field trial, SkyFire had never met all the requirements and had not passed the field trial?

A.    It had not yet passed the field trial at that time.

Q.    And it never passed the field trial.

A.    No.  In 2002, if you look at your -- where flaky chips is, not more than a few weeks later we would shut down.

Q.    So, sir, am I correct that SkyFire never passed the field trials?

A.    It did not pass the field trial.

Q.   Is it fair to say it was never ready for prime time?

A.   It was not ready for production yet.

Q.   It had a lot of stability issues up until the end?

A.   I wouldn't characterize it like that.  It did have some specific issues that failed.

Q.   You had stability issues.  Would you characterize it that way?

A.   Again, I wouldn't characterize it like that at the time. The flaky chips issue is a different issue than when we had stability issues earlier, so the flaky chips dealt with one part of the system that was the subscriber, and they were chip failures due to a vendor, and the stability was the whole system being able to actually run like, for example, the base station and other things.  So I wouldn't characterize it like that.

Q.   All right.  Well, would you characterize it as you had stability issues where the base stations would go up and down?

A.   We did have those at one point.

Q.   Okay.  And you'd agree that's unacceptable for customers.

A.   Correct.  And that was corrected, the base station part.

Q.   Because you were shooting for 99.999 percent reliability. Right?

A.   Correct.

Q.   And that's what your customers demand and expect.  Right?

A.   Correct.

280

Q.    Yeah.   Now, after Raze closed its doors in August of 2002, SkyFire never became a commercially successful product, did it?

A.    It couldn't possibly have.  We weren't in existence.

Q.    Okay.  Now, to be fair, sir, you've worked for other companies and you've been founder of other companies that have had successful runs, haven't you?

A.    I have.

Q.    AeroNet; I believe the company that went public.

A.    AeroNet went public and had significant problems as it did all that.

Q.    But Raze wasn't one of your successes, was it?

A.    I wouldn't characterize it like that.

Q.    Now, you testified earlier about 9/11 and the inability to get funding.  Do you remember that?

A.    I do.

Q.    Okay.  To be fair and to be honest, you don't know and you can't really testify, can you, that you didn't get funding because of 9/11, as opposed to the market just wasn't interested in your technology.  Is that fair?

A.    It's one characterization, yes.

Q.    Is that a fair characterization?

A.    Yeah.  I would say part of it was that, yes.

Q.    Okay.  Now, let's switch gears a little bit --

          MR. STEVENSON:  And we can take this slide down.

Q.    (BY MR. STEVENSON)  -- and talk about beamforming.

Were you here for the opening statement?

A.    Yes, I was.

Q.    So you heard the discussion by General Access' lawyer about beamforming in the opening?

A.    I did.

Q.    Okay.  You didn't invent beamforming, did you, sir?

A.    No.  It was invented in the '50s.

Q.    Okay.  And beamforming, nothing about it was new in 2001, was it?

A.    How you used it in cellular systems was very new.

Q.    Now, in addition to the SkyFire project we just got done discussing, you were working on a separately named product at Raze that was going to add on to SkyFire called SkyBeam.

A.    Correct--SkyBeam.

Q.    And that separate product was a beamforming product. Right?

A.    I wouldn't characterize it as separate.  It was an upgrade, an add-on.

Q.    An add-on to SkyFire?

A.    Correct.

Q.    Okay.  And you were asked on direct examination if you built equipment that did beamforming, and you said you did parts.  Do you remember that?

A.    Yes.

Q.   Okay.  In fact, is it true, sir, that Raze was never even able to complete a prototype of the SkyBeam beamforming technology?

A.   Correct.  We were in the middle of building that when we shut our doors and we showed the part that we did.

Q.   You never had a working prototype.  Correct?

A.   Not end-to-end, no.

Q.   Of SkyBeam.  Correct?

A.   Correct.

Q.   All right.  Now, there was also a discussion in the opening about adaptive modulation.  Did you hear that?

A.   Yes.

Q.   Okay.  You didn't invent adaptive modulation, did you?

A.   No.

Q.   Okay.  In fact, are you familiar with an organization called -- or a standard that was being set called WiMAX?

A.   I'm familiar with WiMAX.

Q.   In fact, you attended meetings in 2000 long before you filed for your patents where other people were talking about adding adaptive modulation to the WiMAX standard.  Isn't that correct?

A.   Correct.  But they were not talking about the techniques that we described in the patents, so yes, there was discussions about adaptive modulation.

Q.   And so you'll agree with me that adaptive modulation was

well-known by many others before you filed for your patent.

A.    I agree the concept of it was well-known; however, what we were doing was not.

Q.    What you were doing was long after you went to presentations at WiMAX meetings where other people were talking about how to use adaptive modulation.  Correct?

A.    In IEEE adaptive modulation was discussed.  Correct.

Q.    And in addition, in the cellular standards, adaptive modulation was included in them before you filed for your patents, wasn't it?

A.    Correct.  Adaptive modulation was there, but not as it applied to these patents and the broadband thing.  So it is partially correct, yes, they were talking about it.  Was it applicable to what we're saying?  No.

Q.    Well, sir, isn't it true that the 2G EDGE standard had adaptive modulation a year before you filed for your patents?

A.    I don't know the facts around that.  That could be true. I do not know.

Q.    Well, you know adaptive modulation was in the 2G EDGE standard.  Correct?

A.    I don't -- I just don't have the standard in front of me. It could be true.  I'm not sure.  I don't recollect at this point in time.

Q.    Okay.  But you know that the EDGE standard was a mobile wireless standard that applies to base stations and cell

phones.  Right?

A.    Correct.

Q.    Okay.  Now, we also saw a slide in your direct that had all the QAMs, the Q-A-Ms.  Do you remember that?

A.    Yes.

Q.    64 QAM, 16 QAM.  Do you remember seeing all that?

A.    Yes.

Q.    You didn't invent QAM?

A.    Of course not.

Q.    It's Quadrature aptitude modulation.

A.    Correct.  It had been developed in the '40s.

Q.    Right.  So there's been a lot of talk about what you didn't invent.  Do you agree with me that what you did invent is here in writing?

A.    Which here and what writing?  I don't -- the writing of the patents?

Q.    What you invented is defined in your patents by the Patent Office.  Correct?

A.    Correct.

Q.    Okay.  And I'm happy to put it up if you need assistance with it and want to look at it, but would you agree with me that the '383 Patent doesn't say 'adaptive modulation' anywhere in the claims?

A.    Yeah, I'm not sure that it specifically calls it out.

Q.    Okay.  Well, let's be sure about it --

A.    Yeah.  I mean --

MR. STEVENSON:  May I have the elmo, please, Ms. Brunson?

THE COURT:  That's fine.  But you two gentlemen are going to have to not talk over each other.  I'm hearing Mr. Stevenson going on and Mr. Struhsaker bu, bu, bu, bu, and it's just going to be a problem in the record.  So make sure there's separation between the two of you, please.

Q.    (BY MR. STEVENSON)  I'm going to show you the '383 Patent.

A.    Okay.

Q.    And this is, for the jurors, column 14 that we'll be looking at, and claim 16, which is a copy in the jury notebook as well.  And I'm going to go down to claim 16 here.

Do you understand claim 16 is the claim that is being asserted in this case?

A.    Yes.

Q.    And that claim begins at the lower right and then it continues on to the next column.  I've gotten the next column and I'm going to put it underneath it.

A.    Okay.

Q.    Can you read that, sir?

A.    Yes.

Q.    This is the only claim that's being asserted here. Correct?

286

A.    Correct.

Q.    You understand this is the legal boundary of your invention.  Right?

A.    As the Court defines it.  Correct.

Q.    And this is what the Patent Office allowed after you submitted your patent application.  Correct?

A.    This is the patent as published.

Q.    Okay.  Do the words 'adaptive modulation' appear anywhere in claim 16?

A.    No, because claim 16 isn't about the adaptive modulation; it's about applying demodulation steps.

Q.    Right.  And the word 'beamforming' doesn't appear anywhere in there either, does it?

A.    That's not what was -- that's just not part of this 16. It's not part of it.

Q.    Correct.  'QAM' doesn't appear there, does it?

A.    No, because it's -- it doesn't deal with that.  The claim is not dealing with those aspects you just asked about.  It was asking how you -- that claim asks how you write signals here.  Of course it doesn't have those things.

Q.    And you understand, sir, that's the only claim from the '383 Patent being asserted in this case.

A.    That's my understanding.  Correct.

Q.    Let me ask you the same question with regard to the '477 Patent.

Do you understand the only independent claim being asserted on that patent is claim 1?

A.   I guess that's my understanding.

Q.   Will you agree with me that 'adaptive modulation' appears nowhere in claim 1?

A.   Can you put it up?

Q.   Yes, sir.

A.   I can't recall from -- on the top of my head what it says.

MR. STEVENSON:   Will you pull up JX 1, please? Thank you.  And go to the last page.  There we go.  We're at column 13.  No column 13.  Excuse me.  There we go.

THE COURT:   Claim 1 starts on the bottom of column 12.

MR. STEVENSON:   Yes, I was going to ask to go up. Thank you very much.

If we start on the bottom of column 12 it carries over to the top of column 13.

Q.   (BY MR. STEVENSON)   The term 'adaptive modulation' appears nowhere in here, does it?

A.   Reading the English, it does not.

Q.   The term 'beamforming' appears nowhere in here, does it?

A.   It doesn't apply there, but it's talking about the parameters, and the language of the description does provide discussion about that.

MR. STEVENSON:  Objection; non-responsive.

THE COURT:  Sustained.

MR. STEVENSON:  I would ask the Court to strike everything after the answer 'no'.

THE COURT:  Well, the witness said "it doesn't apply there."  That's responsive.  He then went on to say "but it's talking about."  After the word -- including the word 'but' and what follows, it should be struck and I'll strike that, but I'll retain the beginning responsive portion of the answer which is "it doesn't apply there."

MR. STEVENSON:  We can take this down.  Thank you.

Q.   (BY MR. STEVENSON)  I'd like to now look at some of the specifics how -- as to how SkyFire was supposed to work, in your view, before you started building it.

A.   Okay.

MR. STEVENSON:  Now, can we pull up JX 62, please?

Q.   (BY MR. STEVENSON)  Do you recognize this as a technical specification document that you were creating for SkyFire?

A.   Yes.  This is a very, very early copy of our error interface.

Q.   And a technical specification is a document before you start building it that describes how what you're building you intend to work.  Correct?

A.   Yes.  It's an overview of how you intend to build the system.

289

Q.   You were involved in drafting this.  Correct?

A.   I was.

Q.   And you drafted it in the year 2000.

A.   Yes.  This is early 2000.  It began in 1999, in fact.

Q.   And this is a description for -- if we go to page 35, and you're welcome to look on the screen or you're also welcome to review it in your witness notebook; your option, sir.

A.   Okay.  Yes.

Q.   All right.  This is a description on this page of the receiver in SkyFire.  Correct?

A.   Just let me recollect.  Correct.  This is a view of just the initial description of what we were going to do.  Of course it would be modified over time, but this is a description of the initial development that we were doing.

Q.   It's the receiver.  Correct, sir?

A.   Correct.

Q.   That's the base station.  Correct?

A.   Correct.

Q.   Okay.  And what you said in there is the receiver in your implementation consists of two separate modems.  Correct?

A.   Correct.

Q.   Now, the modems for those, you weren't intending to build your own chips, were you?

A.   Actually from day one we built our own software-defined modems.  They were DSPs and they were FPGAs.

Q.    I didn't ask about the software, sir; I was asking about the chips themselves.  You weren't building your own chips.  Correct?

A.    Correct.  We were using FPGAs and DSPs built by TI and Xilinx.

Q.    Okay.  So you were using Texas Instruments' digital signal processors--DSPs?

A.    Correct.

Q.    It's a type of computer chip.  Right?

A.    Correct.

Q.    Okay.  And then what you say here is you were going to have two separate modems on each card.  Correct?

A.    Yes.  That's what it says.

Q.    Yeah.  And these were off the chip -- these were off-the-shelf chips you were going to use for your modem.  Correct?

A.    I wouldn't characterize it like that.

Q.    It was a commercially available chip that TI sold, not just to you but to other people as well.  Right?

A.    They were commercially available general purpose chips for the FPGA function, which is completely programmable--it's basically nothing until you do your own work; and the DSP, which is a functional thing that does nothing until you write your own program.

Q.    Let's go down to how you envisioned it was going to work.

291

The next sentence says, "Each modem processes every other transmitted subscriber burst in a ping-pong fashion."

A.   That's correct.  In the earliest version we were just using a simple scheduling ping-pong algorithm.

Q.   Right.  And ping-pong, you were referring to the game ping-pong.  Right?

A.   Yes.  It's a general phrase that people use when you like to go back and forth between different things, or Round Robin if you have more than two things.

Q.   And when you say 'back and forth between two different things', that's called alternating, isn't it?

A.   It -- that is one definition of it.  It can be alternating; it can be alternating between more than one thing.  Correct?  Right?

Q.   But alternating can mean to go back and forth in a ping-pong fashion.  Right?

A.   That's correct; if there were only two things.

Q.   The next paragraph talks about the control CPU.  Do you see that?

A.   Yes.

Q.   And just at a high level, Mr. Struhsaker, what you were going to do is have two modems and then have a control processor which would basically steer the traffic in this ping-pong fashion to the modems alternately.  Right?

A.   That's a simple answer.

Q.    Okay.

A.    It was more complex than that in the end.

Q.    And then what you were planning to do is have profiles and store profiles, weren't you?

A.    That is correct.

Q.    Okay.  And the profiles were going to provide all the information necessary for a modem to demodulate the signal. Do you see that in the second line?

A.    Yes.  The concept is that the profiles would be an initial start to demodulate the signal.

Q.    Okay.  And then you said this includes and you have six bullet points.  Right?

A.    Yeah, there are six bullet points there.

Q.    So these six bullet points would be included in the information necessary to demodulate the signal that would be in the profile.  Right?

A.    Those are ones that we selected at the time, yes.

Q.    Okay.  Are there more than that?

A.    There would eventually be more and some would also be removed.

Q.    Okay.  How many eventually more would you have?

A.    Eventually we'd be having more parameters around antennas and anticipating that.  So for diversity is a very simple thing.  And when you got to beamforming and the work we were doing to create SkyBeam, obviously we do an update.

Modulation would increase.  Also we would add, as we showed in the thing to Clearwire, we would -- I think it was Clearwire. It was one of the things that we talked about earlier.  We also would allow orthogonal spreading in order to be more robust.

A lot of noise.  The point is this was an early version of it, and as we went along we improved things and we did things differently.  This is just a starting point.

Q.   So I just would like to know, how many parameters did you eventually have that you thought were needed to demodulate a signal?

A.   There are probably about four basic ones.  The weights the modulation, the FEC, and this carrier baud adjustments, and then we layered on the other ones.

Q.   Okay.  Now, if we go through these, are there some that are channel parameters and some that are signal parameters on this list of six required parameters?

A.   Yes, there are.

Q.   Which ones are the channel?

A.   Anything dealing with the antenna itself dealt with channel measurements.

Q.   Would you please, sir, just tell me which bullet points in number you think the channel parameters are?

A.   The fifth one down.

Q.   And what about equalizer filter weights?

A.    That's the second one.  The first bullet is the second one.

Q.    And are the rest signal-related parameters?

A.    At this point in time, yes.

Q.    So you had two channel-related parameters and four signal-related parameters that you were thinking about at this time?

A.    Right.  And in the very early part of the company; correct.

Q.    Now, the first one here on the list of bullets is something called equalizer filter weights.  Are those sometimes also called equalizer weights or channel weights?

A.    They're generally called equalizer weights.

Q.    Okay.  And would you agree with me that equalizer weights -- will you agree with me that equalizer weights are very critical to system performance?

A.    They are and, therefore, those weights, we had to calculate them and we had to calculate them and update them from burst to burst.  But we did it in a very intelligent way. By starting with those equalizer weights you saved, you could then converge quicker and have a better update.

            MR. STEVENSON:  I'll object as non-responsive, Your Honor.

            THE COURT:  When Mr. Struhsaker said "They are," that was responsive.  The balance of the answer goes beyond

what the question calls for and is non-responsive.  I'll maintain his answer "They are," and I'll strike the rest of his response.

MR. STEVENSON:  Thank you.

Q.   (BY MR. STEVENSON)  Do you agree that storing them, the equalizer weights, and using them to demodulate helped reduce the complexity of the base station or modem?

A.   Partially.

Q.   Okay.  Now, let's move on from talking about the SkyFire product --

MR. STEVENSON:  And we can take this down.

Q.   (BY MR. STEVENSON)  Am I correct, sir, that Raze never built a mobile base station?

A.   Raze did not build a mobile base station.

Q.   And will you agree with me that mobile wireless is more difficult from a technical standpoint than fixed?

A.   Mobile wireless adds a complication especially of hand-off they have to take care of.

Q.   Okay.  So is that a 'yes', sir?

A.   Yes.

Q.   Yes.  And if you have a fixed wireless system, would you agree it would take a tremendous amount of work to modify that to put it into mobile use?

A.   It would take significant work to do so.

Q.   Tremendous work?

A.    Depends on where you're starting from.

Q.    Will you please turn to tab B?  And I'll represent to you that this is prior testimony you have provided --

A.    Uh-huh.

Q.    -- related to these matters.

A.    Okay.

Q.    And if you'll please turn to page 380.

A.    380.

Q.    And I'll ask you to please read to yourself -- let me know when you've gotten there, sir.

A.    It's rough to move these pages.  Okay.  There we go.

Q.    Will you please read to yourself from the bottom of page 380 at line 24 to the top of page 381 at line 4.  And let me know when you finished reading it.

A.    I'm done.

Q.    Okay.  I'll ask my question again.

If you have a working fixed wireless system, do you agree it would take a tremendous amount of work to modify it to serve mobile users.

A.    Yes.  That is exactly what I answered.  I said, "It would take a tremendous amount of work.  Correct."

Q.    And it would take years and years to make those modifications, wouldn't it?

A.    I didn't say years and years; I said it would take years to get it to work.

Q.   And you'll agree with me that movement makes things more difficult.

A.   I said history would tell us.

Q.   Do you agree with -- and sir, I'm done with the deposition; I'm not --

A.   Oh, okay.  I just wanted --

Q.   -- asking you to --

A.   Sorry.

Q.   That's okay.

Would you agree with me that movement makes things more difficult from a base station perspective?

A.   It does make it more difficult.

Q.   Movement can cause rapidly changing channels.

A.   Correct.  That's why we wanted to do burst-by-burst use of parameters.

MR. STEVENSON:  I'll pass the witness, Your Honor.

THE COURT:  All right.  Is there redirect?

MR. SUMMERS:  Yes, please, Your Honor.

THE COURT:  All right.  Let's proceed with redirect.

REDIRECT EXAMINATION

BY MR. SUMMERS:

Q.   Mr. Struhsaker, at the beginning of the cross examination, counsel asked you some questions about the written description requirement.  Are you aware that the written description requirement requires that the patent

enable a person of skill in the art to practice the invention, the claimed invention?

MR. STEVENSON:  Objection, leading; and objection, legally incorrect.

THE COURT:  I'll sustain as to leading.  As to the other objection I think the door's been opened.  This is an appropriate area of inquiry.

So rephrase your question in a non-leading form counsel.

Q.   (BY MR. SUMMERS)  Mr. Struhsaker, let me ask you this. Are you aware of any requirement for a patent to be valid that it enable all sorts of other things to be done beyond what's claimed in the patent?

A.   No.

Q.   For example, you testified earlier today that you obtained 25, approximately, U.S. patents related to your work at Raze.  Correct?

A.   Correct.

Q.   Did many of those patents go into the Raze system?

A.   Yes.

Q.   How many patents are we dealing with in this case?

A.   Two.

Q.   When Mr. Stevenson asked you all these questions about how long it would take to get your system working and whether you got the system working perfectly, did all of those issues -- all of the issues that were presented relate to these two

patents?

A.   No.

Q.   Did they relate to a whole host of other things?

A.   They did.

Q.   To build a full mobility system, did that involve all sorts of things unrelated to these patents?

        MR. STEVENSON:  I'll object to leading, Your --

        MR. SUMMERS:  I'll rephrase the question, Your Honor.

        THE COURT:  Please do.

Q.   (BY MR. SUMMERS)  To build a full mobility system, Mr. Struhsaker, would you have had to address issues other than those addressed in the two patents at issue in this case?

A.   Most of the issues would be dealt -- dealing outside of these two patents.

Q.   So when you said in the document that counsel just showed you or discussed with you that it would take a lot of work and maybe years to go from fixed to full mobility, did that have anything to do with the two patents at issue in this case?

A.   It did not.

Q.   At the beginning of the examination, counsel asked you about a SuperComm trade show and a Navini booth, and I think the testimony was that the trade show was in June of 2001. Correct?

A.   Correct.

Q.   If I understood your testimony earlier, you filed provisional patent applications on the ideas in these patents in January of 2001.  Correct?

A.   Correct.

Q.   And then filed the full patent applications that result in these patents in April of 2001.  Correct?

A.   Correct.

Q.   So January you file provisionals, April you file full applications, and then a couple of months later in June you attend the trade show.  Correct?

A.   Correct.

        MR. STEVENSON:  Objection; leading.

        MR. SUMMERS:  Just getting --

        THE COURT:  Just a -- you're testifying and he's agreeing with you.  He needs to testify, so ask your questions in a non-leading format.

Q.   (BY MR. SUMMERS)  Mr. Struhsaker, was that Navini trade show before or after you had filed the patent applications leading to these patents?

A.   After.

Q.   Did you learn anything from Navini that had anything to do with these two patents?

A.   No.

Q.   Counsel showed you a private placement memorandum and he went through all these risks and risk factors.  Do you recall

that?

A.   Yes.

Q.   Have you seen other private placement memoranda?

A.   Yes.

Q.   When you've looked at these other ones, did they also discuss lots and lots of risk factors?

A.   As a private placement memorandum, you have to have every sort of proviso you can think of.  I'm surprised it didn't have earthquakes and fires in it.

Q.   Counsel showed you a document -- an email where you were frustrated with some of the progress following the trials up there in Sherman, Texas for NTWS.  Do you recall that?

A.   I do.

Q.   Did you see anything in that email about having problems with the profiles or the demodulators?

A.   None of the problems surrounded the actual base station modulation and demodulation.  The stability --

Q.   Go ahead.

A.   The stability issues surrounded essentially a bad set of silicon that we had from TI that were causing subscribers to go up and down and fail.

Q.   Counsel asked you some questions about flaky chips that were provided by Texas Instruments.  Do you recall that?

A.   Yes.  That's what I was referring to.

Q.   Are these patents directed to eliminating the problems

with flaky chips from a bad vendor?

A.    They are not.

Q.    Are they in any way related to that issue?

A.    They are not.

Q.    With the Raze system, were you building something entirely new from the ground up, or was this just an incremental improvement?

A.    Raze was new from the ground up.

Q.    Are there lots of aspects to the system or just a few?

A.    Many aspects.

Q.    Were there lots of new technologies or just a few?

A.    Lots of new technologies.

Q.    With the development and introduction of a commercial product like this, what's the normal time frame you would expect from ideas to actually having a full-blown commercial product that works flawlessly?

A.    Anywhere from three to four years.

Q.    Was there anything longer or slower or surprising about the timeline of the development work that actually occurred with this product?

A.    We were just several years in, so it was normal to have a slew of problems when you have your beta trials and alpha trials and you're working out the kinks.

Q.    Counsel asked you if the '383 Patent, what I've referred to as the demodulator patent, whether that claimed anything

about adaptive modulation.  Do you recall that?

A.    Yes.

Q.    Did you hear anything in the opening statements today where I suggested that the '383 Patent provided for adaptive modulation?

A.    It doesn't.  That's not what that patent's about.

Q.    Is that patent more focused on the demodulators?

A.    Correct.

Q.    And counsel asked you about the '477 Patent.

        MR. SUMMERS:  I'd like to pull up the '477 Patent.  This is Joint Exhibit 1.  If we could please turn to column 9, lines 38 to 42, please.  And I'd like to focus in on column 9, the left-hand side.  Just 38 to 42, please.  Yep.  All the way down to 42.  About four more lines.  One more.  One more, please.  There you go.  And can we underline --

Q.    (BY MR. SUMMERS)  Can you please read beginning at "system" on line 39 -- I'll read it for you.  "system monitors and optimize these parameters adaptively and continuously by monitoring the received signal quality optimizing the operating parameters to increase the data throughput."

        Do you see that?

A.    I do.

Q.    What does that describe?

A.    Adaptive modulation.

Q.    Are you aware that the Plaintiff in this case is

contending that the '477 Patent, that one of the benefits of it is improved adaptive modulation?

A.    Yes.

Q.    Not that they're claiming or asserting that the claims require adaptive modulation?

A.    Correct.

        MR. STEVENSON:  Object to leading again.

        THE COURT:  Sustained.

        MR. SUMMERS:  Let's go to JX 62.  This is the WestEnd broadband interface specification that counsel showed you.  Let's turn to page 35, please.  Yep.  35, please.

Q.    (BY MR. SUMMERS)  Now, in the middle of the page you see the first paragraph that says, "the receiver in our implementation consists of two separate modems," and there's a reference to the ping-pong?

A.    Correct.

Q.    That's the portion counsel showed you on cross examination.  Recall that?

A.    I do.

        MR. SUMMERS:  Please clear that.

    Let's move down two paragraphs.  Not pages.  "For simplicity."  Do you see the paragraph beginning -- lower please.  Call out that paragraph.

Q.    (BY MR. SUMMERS)  Here just two paragraphs lower the document reads "For simplicity, the figures illustrate the

subscribers burst coming in a regular order.  In actual operation, the subscriber bursts come in random order based the demand assignment that is taking place on a burst frame by burst frame basis."

       Do you see that?

A.    I do.

Q.    Isn't that -- let me ask you, is that the same sort of language -- isn't that similar to the language we looked at earlier today when I was questioning you in the white paper?

A.    Yes, it is the equivalent language.  It may potentially be word for word in the white paper, and that is why I said I wouldn't characterize it as what we did.  It was just an example starting early.

Q.    Are you saying that the ping-ponging was an example?

A.    In my testimony -- in my testimony in both cases -- I attempted in the other testimony to explain that that was just a starting point, a simplicity, as you point out in this paragraph.

Q.    And as this paragraph continues, it reads, "For that reason, the control CPU maintains the subscriber profile database and manages the queuing and traffic flow."

       Do you see that?

A.    Yes.

Q.    What is -- what queuing and traffic flow were you referring to here?

A.   It's the queuing and traffic flow of the subscribers and how you were -- how are you -- how you are scheduling them for specific bursts, specific times when they can transmit, and then how you would divvy up the resources and then make sure if you were using a -- one modem source or a second or a third, you made sure those parameters were showing up to the time and the information that was being guided to the modem. So it's a -- signals are coming in, I'm scheduling and running everything, and then they come together and they operate in that modem.

        MR. SUMMERS:  Okay.  Let's go ahead and clear this and move onto another topic.

Q.   (BY MR. SUMMERS)  Counsel asked you if part of the reason why the big telecoms didn't buy your product, he asked if that was in part because, quote, the market was not interested in your technology.  And as I recall, at first you said that was partly right or, you know, an interpretation.  What I want to ask you is --

        MR. STEVENSON:  Objection, Your Honor, to the prefatory remark of characterizing the witness' answer.  I think that stands for itself.

        MR. SUMMERS:  I'll withdraw the question.

        THE COURT:  Either restate it or move on.

Q.   (BY MR. SUMMERS)  Mr. Struhsaker, to the extent the big carriers did not want to proceed with your technology at the

time, why was that?

A.   In the end they weren't proceeding with any of the people who were working in that area.

MR. STEVENSON:  Objection, Your Honor; calls for speculation, no foundation, move to strike.

THE WITNESS:  I'm just --

THE COURT:  Just a minute.  This witness can't testify as to the thought processes of the carriers and why they did or didn't do something.  I'll sustain the objection based on speculation.

Q.   (BY MR. SUMMERS)  Mr. Struhsaker, were you familiar with the spectrum that carriers had allocated for various things?

A.   Yes.

Q.   At the time -- and are you aware of how spectrum is allocated by the Federal Communication Commission?

A.   Very.

Q.   At the time when you had to close down in the late 2002 time period, did the big carriers have access to the spectrum that would have been required to do fixed wireless access?

A.   They did not.

MR. SUMMERS:  Thank you, Your Honor.  That's all I have.  Pass the witness.

THE COURT:  Is there additional cross examination?

MR. STEVENSON:  Very briefly.

THE COURT:  All right.  Let's proceed with

additional cross.

                        RECROSS EXAMINATION

BY MR. STEVENSON:

Q.    Mr. Struhsaker, during the redirect examination,
Mr. Summers I think asked to define the name of the '383
Patent as the demodulation patent and you agreed to that.
Do you remember that?

A.    Yes.  He had said that, and I agreed with it, yes.

Q.    Did you invent demodulation?

A.    Of course not.

Q.    Did you invent having multiple demodulators in a base
station?

A.    I didn't invent that, but I invented the unique way we
were using them in this base station.

Q.    Do you think it might be better to call that '383 Patent
the alternating patent?

A.    That is a total mischaracterization.

            MR. STEVENSON:  Pass the witness.

            THE COURT:  Any additional direct?

            MR. SUMMERS:  No, Your Honor.

            THE COURT:  All right.  You may step down,
Mr. Struhsaker.

            THE WITNESS:  Thank you.

            THE COURT:  You're welcome.

        Counsel, is there a request for Mr. Struhsaker to be

released, or do you need to retain him at this point in the trial?

MR. SUMMERS:  Your Honor, we ask Mr. Struhsaker to be released.  He has some personal issues that would preclude him from returning to the trial.

THE COURT:  Is there objection?

MR. STEVENSON:  No objection.

THE COURT:  Mr. Struhsaker, you're released.  You're free to leave, you're also free to stay; it's up to you.

All right.  Plaintiff, call your next witness, please.

MS. FAIR:  Your Honor, at this time the Plaintiff calls by deposition Dr. Russell McKown.  He's the co-inventor with Mr. Struhsaker on the patents-in-suit and a former Raze employee.  This clip is 18 minutes and 46 seconds, of which 9 minutes and 4 seconds is the Plaintiff's and 9 minutes and 42 seconds is the Defendants'.

THE COURT:  All right.  Let's proceed with this witness by deposition.

RUSSELL CARL McKOWN, PH.D.,

BY VIDEO DEPOSITION

Q.   So to begin with, could you please state your full name?

A.   Russell Carl McKown.

Q.   And Dr. McKown, am I correct that at one point in time 20-plus years ago you worked for a short period of time for a company named Raze?

A.    That's correct, yes.

Q.    And what was your position at Raze, sir?

A.    I'm not sure what the title was.  I was direct -- I think I was a director of signal processing, something like that.

Q.    And do you understand, sir, that you are the Russell C. McKown who's listed as one of two inventors on two of the patents asserted against T-Mobile in this action?

A.    Yes, I am.

Q.    And those would be the '477 Patent and the '383 Patent. Are you aware of that, sir?

A.    Yes, I am.

Q.    Do you see a reference in claim 1 to a signal-related parameter and then a reference to a channel-related parameter? Do you see those, sir?

A.    I see those words, yes.

Q.    Okay.  Did you play any part in inventing any signal-related parameter or any channel-related parameter?

A.    I don't know about invention of parameters.  That's confusing to me.  I wouldn't claim -- I don't know what that means.

Q.    Is it fair to say that wireless networks were known before you began your work at Raze?

A.    Oh, sure.

Q.    In the wireless networks that were known before your time at Raze, it was also known to use parameters that were

specific to a particular user or piece of user equipment.  Is that fair, sir?

A.   Yeah, it's -- I'm not sure what the question's really asking.  I mean, there are parameters that are associated with wireless communications systems, and there's users of those systems, and, therefore, there'd be parameters that are associated with users, yes.

Q.   And was the concept in telecommunications of using different modulation indices or modulation schemes based upon the signal quality, was that already known before you began your work at Raze?

A.   I'm not sure in terms of the question whether or not -- to the degree it was known; other words, in terms of switching between modulations.  That's been a long time since I did that, and the state of the art at the time is it could have been.  It certainly could have been.

Q.   Okay.  And there were wireline systems that existed before your time at Raze, for example, DSL.  Is that right?

A.   Right.  Right.

Q.   And DSL, before your time at Raze, also used different modulations depending upon the line quality.  Isn't that true?

A.   I would suspect that that is true, sure.  That makes sense.

Q.   You're not going to -- you don't suggest to the jury that anyone has infringed the '477 or the '383 Patent.  Is that a

fair statement, sir?

A.    Again, my -- I don't feel confident to interpret the legal ramifications or the structure of the claims.

Q.    So you're not going to express to the jury any opinion as to whether any claim of either of these two patents is valid or invalid.  Is that fair?

A.    Yeah.  I wouldn't -- I wouldn't tell or express anything to the jury concerning the detailed interpretation of the claims.  That is correct.

Q.    Okay.  So let's talk about technology and what technology --

A.    Okay.  Thank you.

Q.     -- is before your time at Raze.

So as we agreed earlier, wireless communications existed before your time at Raze.  Is that fair?

A.    Right.

Q.    Are you aware that beamforming existed before your time at Raze?

A.    That I'm sure existed before my time at Raze.

Q.    We're looking at the '477 Patent, the last paragraph on column 11.  Just let me know when you have that in front of you, sir.

A.    Okay.  Got it.

Q.    Okay.  And do you see about two -- about halfway or two-thirds down there is a listing of different types of

parameters.  First --

A.    Right.  Okay.

Q.    First, there's some signal-related parameters and then it goes on to list some channel-related parameters.

A.    Right.  Right.

Q.    Okay.  The first one that's there is the -- is FEC, forward error correction.  Do you see --

A.    I right.

Q.    Right.  And forward error correction in wireless communications was known before your time at Raze.  Is that true?

A.    I would think it would be, yes.

Q.    And so you guys did not invent the notion of a parameter relating to forward error correction.  Is that true?

A.    No.  I don't think that we invented forward error correction.

Q.    The change in time or duration of a burst, that was a concept also known in wireless communications before your time at Raze.  Fair?

A.    TDD, that could be associated with the time division duplexing, yeah.

Q.    Okay.  And you're not the first to invent a parameter or a value relating to change in time of the burst.  Is that true?

A.    I wouldn't claim that.  Right.  I don't think -- I don't

314

claim to invent the change in time or duration of a burst.

Q.   Okay.  What about same question as to the power level of the burst.  That was a known concept before your time at Raze. Is that right?

A.   Right.  Those are -- the power levels is a known commodity, a known parameter.

Q.   Okay.  And then the next sentence talks about channel-related parameters, one of which is equalization weighting.  The concept of equalization weighting was known in wireless communications before your time at Raze.  Is that fair?

A.   Yeah.  There's where -- is -- technically, yes, yes, but --

Q.   Okay.

A.   -- that doesn't mean there's not considerable innovation there.

Q.   Understood.

A.   Just because something is known --

Q.   Okay.  I'm not asking you right now about any changes or any new things you added to --

A.   Oh, okay.  Okay.

Q.   I just want to --

A.   The concept of equalization -- I see where you're going. Yeah, those -- all those things are not new words.  Those had technical meaning before Raze, yes.

Q.   And that's true of all the parameters listed in this paragraph.

A.   That's true of everything in that paragraph.

Q.   So let me ask you some questions about the '383 Patent.

Can you make sure that you have that in front of you, sir?

A.   Okay.  Yeah.  Yeah.  I have it.

Q.   And if a juror were to ask you what the '383 Patent's all about, what would you tell that juror?

A.   Again, it's the concept of using the profiles to optimize communications link.

Q.   The '383 Patent talks about demodulators.  What is a demodulator?

A.   Demodulator in the -- inputs the signal at broadband or low frequency RF, and then outputs the symbols of interest.

Q.   And it's a piece of hardware that does that.  Is that fair?  Obviously there's software --

A.   It could be -- in today's -- it's been a long time since it was restricted to hardware.

Q.   Okay.

A.   In software or hardware.

Q.   At the time of Raze, was it something that was completely implementable in software, or did it need hardware?

A.   It was a software.

Q.   And what does it mean to have multiple demodulators?

316

A.    You can switch between different subroutines.  So the demodulator itself would be a software function call with parameters.  And you can have different -- so two different demodulators would be -- would have different inputs and different control parameters; different signals input and different control parameters.

Q.    Could it be the same software running on the same piece of hardware?

A.    It could -- yeah.  The function itself could be the same, but --

Q.    Okay.

A.    -- you'd call it differently.

Q.    So when we see the reference to a first demodulator and a second demodulator, the way I should actually understand that it could be the same piece of hardware running the same software; you're just doing it twice?

A.    Right.  You know, it could be different threads on the same CPU, you know, then that's a question of what you want to call.  So they're totally independent.  So I don't...

Q.    So it requires totally independent threads?

A.    It doesn't require -- it could be either way.  I'm just saying it's -- you're flexible there.

Q.    And is that any different from demodulators that were already known in the art from before your time at Raze?

A.    I think the innovations associated with multiple

demodulators would not -- it was possibly not done before Raze, yeah.

Q.   So does that mean, to your understanding, nobody had multiple demodulators before Raze?

A.   No, I'm not saying that.  I'm saying in the context of the innovation for what we were doing.

Q.   What do you believe was the innovation as it relates to having multiple demodulators at Raze?

A.   From an engineering point of view, the whole -- we were designing the optimization of the system, the base station system to communicate with multiple subscribers at the same time.  And so -- it's been a long time since how the system and engineering actually used that, took advantage of the multiple demodulators, but I can see several -- I could -- you know, I could -- I could -- it's consistent with my -- what -- how I would approach the problem today, you know.  I can see why we did it that way.  The details are flexible, but the concept is fundamental.

Q.   Help me understand what that concept is.  Help me understand what you believe was innovative about what Raze was doing with multiple demodulators at the time.

A.   Right.  That has to do with the getting back to the profiles and how you -- how you take advantage of it.

Q.   Was there anything else about multiple demodulators that you think was new or innovative or different from the

multiple --

A.    Having multiple demodulators by itself doesn't seem to be the big deal.  It's what you do with them.

Q.    I'm going to ask you some background questions regarding your time at Raze.  Is that fair?

A.    Yeah.

Q.    Okay.  Was there any point in time where you owned shares of Raze?  Were you a shareholder in Raze?

A.    I probably was in terms of -- potential shareholder, at least.

Q.    And when Raze went out of business, were you compensated for those shares or those options that you might have had at the time?

A.    I can't remember whether I was or not.  If I was compensated, it was trivial, minimal.

Q.    And you're not a shareholder or an owner in any way of General Access Solutions, the Plaintiff in this case.  Is that true?

A.    That's correct.

Q.    Okay.  And to the extent the jury were to ever award a verdict here, you wouldn't see a penny of that.  Is that true?

A.    That's correct.

Q.    And has there ever come a point in time where General Access Solutions said to you, Hey, you're a named inventor here.  You should share in some of the rewards if there were

any.  You know, we'd like to have you a part of our team?  Did that ever happen?

A.    No.

Q.    Dr. McKown, where do you presently work?

A.    L3Harris, Greenville.

Q.    Is L3Harris a defense contractor?

A.    Yes, they are.

Q.    And can you give us the gist of the nature of your job?

A.    Yeah.  I'm -- my title is software engineer, lead software engineer.  I work in the sensor software group in integration, mission integration segment.

Q.    And how long have you worked at L3Harris?

A.    Since June 2016.

Q.    And we've been calling you 'Doctor'.  Do you have a Ph.D.?

A.    Yes.

Q.    I understand you previously worked at a start-up known as Raze Technologies.  Is that correct?

A.    That's correct.

Q.    And was that in Plano, Texas?

A.    In Plano, Texas.

Q.    And what was the time frame, generally?

A.    2000, 2001.

Q.    And what was your role at Raze?

A.    I was a signal processing -- lead signal processing

director, I guess.

Q.    So were you sort of a subject matter expert in signal processing?

A.    Right.  I think I was a director of signals, signals and systems, or something like that.

Q.    And what were Mr. Struhsaker's responsibilities at Raze?

A.    He was CTO and the general technical leader.

Q.    So is CTO, chief technical officer?

A.    Absolutely, yeah.

Q.    At a high level, what aspect of the work that went into those patents did you focus on?

A.    The -- as the channel estimation and the equalization of the channel for the purposes of optimizing the communications link.

Q.    Are you proud of the work you did at Raze?

A.    Oh, yeah.  The -- that -- those two patents are very innovative in terms of wireless communications links.

Q.    And when you and Mr. Struhsaker filed the applications that led to the '383 and '477 Patents, did you think you had invented something new and useful?

A.    Oh, yeah.  Yes.  The profiling, and channel estimation, and the adjustment of the modulation and the updating of the profile when you go back to the same subscriber, that was all new to -- as far as I was concerned was new, period.

Q.    The work you did at Raze, can you describe your memories

Q.   of it?  Do you have fond memories or it, or do --

A.   Yeah.

Q.   -- how would you characterize it?

A.   It was a very exciting company to work for.  The -- with the -- it wasn't just me; it was -- I brought -- in fact, I brought in Bob Nelson and Wayne Music.  Bob Nelson worked with me on a successful biomedical start-up company, InterFlo Medical.  And Wayne had worked for me as a very highly qualified Ph.D. from my time at E-Systems during the 1980s, and he worked with me and Paul.  And so I brought in two really good people.  And they were -- the network people were state of the art and so were the RF engineers.

Q.   So was it an impressive group of people that you worked with?

A.   It was an impressive group of people and a terribly high burn rate.

Q.   'Burn rate' meaning spending money?

A.   Spending money.

Q.   Developing technology?

A.   Yeah.  It was -- and Kirk Griffin was good.  There was a lot of good engineers there.

Q.   And what about Mr. Struhsaker?

A.   He's very qualified for doing that.  He knew -- he actually knew my brother, and he heard of me.  He'd worked on 802.11 with my brother John.

Q.   And Dr. McKown, I'm going to have a few more questions.

The voice that we just heard a few moments ago asking you questions was your own lawyer.  Is that right?

A.   He's Glen.  Yeah, I wanted to be represented by the same firm.

Q.   Now, I'd like for you first to have the '477 Patent in front of you.

A.   Okay.

Q.   All right.  And if you could turn to claim 1, please.

A.   Okay.

Q.   I understand there's flexibility, but is there anything in claim 1 that requires you to use any of the parameters against the concept of equalization?

A.   Right.  The -- I don't know whether the concept of the profile that I technically described and understand is detailed properly in claim 1.  I would trust that it is, but I'm not going -- I don't -- I can't comment on it.  If it was properly represented in claim 1, it would include modulation. It would infer -- I mean, to me, I understand the concept of the innovation of channel profile and its influence on equalization and signal parameters.  And so I'm comfortable talking to that paragraph to explain it further at the bottom of column 11.

Q.   Let me ask you now to look at the '383 Patent for a moment.  Is there anything that requires channel equalization

in any way that's different than how channel equalization existed long before Raze?

A.    The technology that we innovated has the demodulator adjusting the equalization based on the channel estimate that's in the profile.

MS. FAIR:  That completes this witness by deposition, Your Honor.

THE COURT:  All right.  Thank you.

Ladies and gentlemen, we're going to stop for the evening at this point.  We'll pick up with the next witness tomorrow morning.  I understand we may have more deposition witnesses to follow before we get to the next live witness.

If you will, be sure to take your notebooks with you to the jury room.  Leave them closed on the table there.

Please make sure that you arrange your travel for in the morning so that we can start promptly at 8:30.

Let me remind you that when you get home you're going to get a question when you walk through the door.  Just blame it on me because you're not supposed to try to answer that question.  Follow all my instructions, including not to communicate with anybody in any way about the case.

Have a safe evening, and we'll see you tomorrow morning.

The jury's excused until tomorrow morning.

(Whereupon, the jury left the courtroom.)

THE COURT:  All right.  Be seated, please.

Counsel, for your information, the Plaintiff has used an hour and 25 minutes and 12 seconds today; Defendant has used an hour and 6 minutes and 37 seconds today.

I see from the list of witnesses prepared and ready to go forward today that we have four additional depositions and then Dr. Vijay Madisetti live.  Can I expect that will still be the same order for tomorrow?  Do you anticipate any changes?

MS. FAIR:  No, Your Honor.

THE COURT:  Okay.  And I did not get any overnight disputes on any of these depositions for Dr. Madisetti, and I assume that they're good and ready to go tomorrow without --

MR. SUMMERS:  Yes, they are, Your Honor.  And I would like to compliment opposing counsel.  They've been very cooperative and we've worked together very, very professionally.

THE COURT:  Good.  Said another way, nobody gets a redo on objections overnight for Dr. Madisetti.  The ship has sailed.

MR. HAYNES:  Your Honor, I'm not asking for a redo. I do believe we may not have gotten all of Dr. Madisetti's slides last night because maybe they didn't anticipate he would go through everything today.  I do expect we're going to get more slides since we only got slides on one patent.  So I hope we will be able to resolve those as well, but we have not

seen those slides yet.

THE COURT:  All right.

MR. KNOBLOCH:  That was the point I was going to make, Your Honor.

THE COURT:  All right.  Is there anything further I need to hear from you on before we recess for the evening?

MR. SUMMERS:  Nothing for the Plaintiff, Your Honor.

MR. STEVENSON:  Nothing from Defendants.

THE COURT:  All right.  Continue your productive meet and confer efforts.  I'll be available in the mornings if needed.

Otherwise, we stand in recess until tomorrow morning.

(The proceedings were concluded at 6:18 p.m.)

I HEREBY CERTIFY THAT THE FOREGOING IS A CORRECT TRANSCRIPT FROM THE RECORD OF PROCEEDINGS IN THE ABOVE-ENTITLED MATTER. I FURTHER CERTIFY THAT THE TRANSCRIPT FEES FORMAT COMPLY WITH THOSE PRESCRIBED BY THE COURT AND THE JUDICIAL CONFERENCE OF THE UNITED STATES.


S/Shawn McRoberts                    04/07/2025

_____DATE_____
SHAWN McROBERTS, RMR, CRR
FEDERAL OFFICIAL COURT REPORTER