IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF TEXAS
MARSHALL DIVISION

GENERAL ACCESS SOLUTIONS, LTD.,( CAUSE NO. 2:23-CV-158-JRG
                               )
          Plaintiff,           (
                               )
vs.                            (
                               )
T-MOBILE, USA, INC.,           (
et al.,                        ) MARSHALL, TEXAS
                               ( APRIL 8, 2025
          Defendants.          ) 8:30 A.M.
_____

VOLUME 2

_____

TRIAL ON THE MERITS

BEFORE THE HONORABLE RODNEY GILSTRAP
UNITED STATES CHIEF DISTRICT JUDGE
and a jury
_____

SHAWN McROBERTS, RMR, CRR
100 E. HOUSTON STREET
MARSHALL, TEXAS  75670
(903) 923-8546
shawn_mcroberts@txed.uscourts.gov

Shawn M. McRoberts, RMR, CRR
Federal Official Court Reporter

A P P E A R A N C E S

FOR THE PLAINTIFF:        BARTLIT BECK, LLP - DENVER
                          1801 WEWATTA ST., SUITE 1200
                          DENVER, COLORADO  80202
                          (303) 592-3100
                          BY: MR. GLEN SUMMERS
                              MR. GIOVANNI SANCHEZ
                              MR. NOSSON KNOBLOCH
                              M.R JOHN HUGHES

                          BARTLIT BECK, LLP - CHICAGO
                          54 W. HUBBARD STREET, STE. 300
                          CHICAGO, ILLINOIS  60654
                          (312) 494-4400
                          BY:  MS. MEG FASULO

                          WARD, SMITH & HILL, PLLC
                          1507 BILL OWENS PARKWAY
                          LONGVIEW, TEXAS  75604
                          (903) 757-6400
                          BY:  MS. ANDREA FAIR

FOR THE DEFENDANTS:       ALSTON & BIRD, LLP - ATLANTA
                          ONE ATLANTIC CENTER
                          1201 WEST PEACHTREE STREET NW
                          #4900
                          ATLANTA, GEORGIA  30309-3424
                          (404) 881-7000
                          BY:  MR. JOHN HAYNES

                          ALSTON & BIRD, LLP - CHARLOTTE
                          1120 SOUTH TRYON ST., STE. 300
                          CHARLOTTE, NC 28203-6818
                          (704) 444-1000
                          BY:  MR. MATTHEW STEVENS

                          ALSTON & BIRD, LLP - DALLAS
                          2200 ROSS AVE., SUITE 2300
                          DALLAS, TEXAS  75201
                          (214) 922-3507
                          BY:  MR. TED STEVENSON

                          THE DACUS FIRM, PC
                          821 ESE LOOP 323, SUITE 430
                          TYLER, TEXAS  75701
                          (903) 705-1117
                          BY:  MR. DERON DACUS

OFFICIAL REPORTER:      SHAWN M. McROBERTS, RMR, CRR
                        100 E. HOUSTON STREET
                        MARSHALL, TEXAS  75670
                        (903) 923-8546

THE COURT:  Be seated, please.

Are the parties prepared to read into the record those items from the list of pre-admitted exhibits used during yesterday's portion of the trial?

MR. HUGHES:  Yes, Your Honor.

THE COURT:  Please proceed, Mr. Hughes.

MR. HUGHES:  Your Honor, General Access moves in the following exhibits that were referenced during the testimony yesterday:  JX 51, JX 52, JX 53, JX 54, JX 70, and PX 8.

THE COURT:  All right.  Any objection from Defendants to that rendition?

MR. STEVENSON:  Your Honor, Mary Riolo will be appearing to handle exhibits for us.

MR. HUGHES:  No objection.

THE COURT:  All right.  Do Defendants have any stand-alone additional exhibits to read into the record that haven't already been set forward in the transcript?

MS. RIOLO:  We do, Your Honor.

THE COURT:  Go ahead and offer those, please.

MS. RIOLO:  On Monday, April 7th, Defendant admitted exhibits JX 1, JX 62, and JX 71.

THE COURT:  Any objection from Plaintiff?

MR. HUGHES:  No, Your Honor.

THE COURT:  All right.  Thank you, counsel.

All right.  Is there anything further I need to hear

before we bring in the jury?

MR. SUMMERS:  Your Honor, I think the Court had a good suggestion, that we move Mr. Hynek's testimony up before Dr. Madisetti.

THE COURT:  I didn't suggest it.  I just mentioned it as a possibility.

MR. SUMMERS:  Correct, Your Honor.  We think that's a good idea, and I've asked the Defendants if they would be okay with that.  We still have the depositions that we would play.  Then it would be Mr. Hynek and then Dr. Madisetti.

THE COURT:  Do Defendants have a problem with that?

MR. DACUS:  Well, we anticipated a four-and-a-half hour examination before that.  And so just to be perfectly candid with the Court, I need to get a box in the courtroom if we're going to do that.

THE COURT:  Where is this box, Mr. Dacus?

MR. DACUS:  I think it's actually in my truck, Your Honor.

THE COURT:  All right.  There are plenty of people.

MR. DACUS:  I understand.

THE COURT:  If you'll let somebody have your keys to your truck, send them out there and tell them to get it.

MR. DACUS:  I will do that, Your Honor.

THE COURT:  All right.  Other than that, I gather you don't have a problem taking Mr. Hynek before Dr.

Madisetti?

MR. DACUS:  That is correct, Your Honor.

THE COURT:  Then we'll do it that way.

MR. SUMMERS:  I'd like to thank the Defendants for their flexibility.

MR. DACUS:  Yep.

THE COURT:  All right.  Let's bring the jury in, please.

(Whereupon, the jury entered the courtroom.)

THE COURT:  Good morning, ladies and gentlemen. Welcome back.  Please have a seat.

All right, Plaintiff.  Call your next witness, please.

MS. FAIR:  At this time the Plaintiff calls by deposition Mr. Bevan Smith.  He is a principal engineer of network performance at T-Mobile.  The total run time of this clip is 7 minutes, 26 seconds, of which 6 minutes, 29 seconds, is the Plaintiff's, and 57 seconds is the Defendants'.

THE COURT:  Proceed with this witness by deposition, please.

BEVAN SMITH

BY VIDEO DEPOSITION

Q.   Good morning.  Could you please state your name for the record?

A.   Bevan Smith.

Q.   Do T-Mobile's 5G TDD base stations use beamforming to

330

process transmissions received from the user to the base station?

A.    Yes.

Q.    Why is beamforming -- why does beamforming have a bigger impact on signal gain in the uplink than in the downlink?

A.    There are more receivers.

Q.    Because the base station has a large number of receivers, it can direct its attention very specifically to a given user. Right?

A.    Yes.

Q.    By directing its attention very specifically at a user, T-Mobile's base stations are able to significantly increase the throughput of the signal received from the user.  Correct?

A.    Under certain circumstances, yes.

Q.    The base station will also perform measurements on the transmissions from the user to determine what beams to use to communicate with that user.  Correct?

A.    Correct.

Q.    The physical uplink shared channel, or PUSCH, is the channel used for -- by users to transmit uplink data to a base station.  Right?

A.    Among other things, yes.

Q.    So the base station needs to know, when receiving an uplink transmission from a user, what modulation and coding that user had been assigned for that uplink transmission.

Right?

A.    Yes, correct.

Q.    So the base station has to store somewhere information about the modulation and coding that that user is going to use in the uplink transmissions.  Right?

A.    Presumably, yes.

Q.    Does the base station create a user identity of some sort or a code of some sort for each user?

A.    Yes.

Q.    What is that called?

A.    UE context ID.

Q.    Can you describe how a base station creates a UE context ID for each user?

A.    I don't recall.

Q.    When a user is first connecting to a base station, does the base station generate a UE context ID for that user?

A.    Yes.

Q.    Ericsson base stations generate a UE context ID for each user.

A.    Yes.

Q.    How many users can simultaneously transmit uplink transmissions to a T-Mobile base station?

A.    For TDD?  Up to 16.

Q.    T-Mobile's base stations demodulate signals received from users.  Correct?

A.    Demodulation is performed by Ericsson base stations.

Q.    T-Mobile's base stations have to be able to demodulate signals received from multiple users at the same time. Correct?

A.    Yes.  That would be a required functionality.

Q.    How many user signals can T-Mobile's base stations demodulate at the same time?

A.    The limits provided by the vendors are 16 per cell in the uplink.

Q.    In T-Mobile's base stations, is the demodulation of uplink signal -- signals controlled by the radio or the baseband unit?

A.    I don't recall the specifics for each type generally, so I would suggest that would be a better question for the vendors.

Q.    Uplink link adaptation involves, among other things, the base station's determination of the modulation and coding to assign a given user for its uplink transmissions.  Right?

A.    Yes, the link adaptations decide that.

Q.    How does the base station determine what modulation and coding a user -- to assign to a user for its uplink transmissions?

A.    It would be based on the measured performance of the channel.

Q.    The base station takes measurements of the conditions of

333

the channel and signal received from the user and uses that information to determine the modulation and coding to assign that user for its uplink transmissions.  Is that right?

A.    I'm unclear of all the factors that are used in making their determination.

Q.    Generally, though, it's your understanding that the base station receives and measures signal and channel-related conditions and then uses that to determine and assign the modulation and coding that a given user is meant to use for its uplink transmissions.  Is that right?

A.    Generally the base station would use feedback, yes.

Q.    The base station will assign a modulation and coding scheme to a user that maximizes the throughput that user is able to provide within the target error rate for that user.  Correct?

A.    Yes, that would be the goal of the algorithm.

Q.    Has T-Mobile's 5G TDD network experienced congestion?

A.    In some sites, in some locations, at some times, yes.

Q.    Is it generally your expectation that user data demands increase over time?

A.    That is the trend we've seen in the industry, yes.  Yes.

Q.    T-Mobile's base stations will measure the signal and channel characteristics of a given user to determine what parameters to use for subsequent communications with that user.  Right?

A.    To an extent, yes.

Q.    If the user moves, you must be able to quickly adjust the beamform setting so that you can remain in communication with that user.  Right?

A.    Correct.

Q.    Adaptive user tracking is important for beamforming both in the downlink and the uplink.  Correct?

A.    Correct.

            THE COURT:  Does that complete this witness by deposition?

            MS. FAIR:  Yes, Your Honor.

            THE COURT:  Call your next witness, please.

            MS. FAIR:  At this time the Plaintiff calls Mr. Sanghoon Sung.  He is a principal engineer on the network technology software development team at T-Mobile.

    The total run time of this clip is 12 minutes, 39 seconds, of which 10 minutes, 48 seconds, is the Plaintiff's and 1 minute, 51 seconds, is the Defendants'.

            THE COURT:  All right.  Proceed with this witness by deposition, please.

                        SANGHOON SUNG

                      BY VIDEO DEPOSITION

Q.    Good morning.  My name is Giovanni Sanchez.  I represent General Access Solutions.  Can you please state your name for the record?

A.    My name is Sanghoon Sung.

Q.    Do you understand you are testifying under oath on penalty of perjury just as if you were testifying in a court of law?

A.    Yes, I do.

Q.    Mr. Sung, you currently work for T-Mobile.  Correct?

A.    Yes.

Q.    What's your title?

A.    I am principal engineer.

Q.    Do you understand that T-Mobile has designated you as its corporate representative on certain topics?

A.    Yes.

Q.    Do you understand that means that your testimony is binding as though you are T-Mobile?

A.    Yes.

Q.    In order for T-Mobile's base stations to perform what some refer to as uplink beamforming, the base station is required to know certain information that relates to equalization.  Correct?

A.    Yes.

Q.    A base station performing equalization must acquire channel information about the user's signal.  Correct?

A.    That is generally how I understand that.

Q.    And do you have any reason to believe that that understanding does not apply to T-Mobile's network?

336

A.    As I mentioned before, I haven't discussed exact implementation of our RAN vendors, how they implemented the receiver.  In that regard, I don't know.  But as -- I being in the area of -- you know, on this field, generally I do believe in some form of channel information from the user is required for the performance of equalization.

Q.    Dr. Sung, you do not dispute that T-Mobile's TDD base stations perform the equalization technique that is sometimes referred to as uplink beamforming.  Correct?

A.    I do know that the uplink equalization is performed by our RAN vendors because equalization is a must to have.

Q.    Dr. Sung, just a couple of yes/no questions.  Okay?  T-Mobile has used beamforming since the start of its TDD network.  Correct?

A.    Yes.

Q.    T-Mobile has tested beamforming-related software features for years.  Correct?

A.    Yes.

Q.    Beamforming -- T-Mobile continues to use beamforming even after all those years of testing the feature.  Correct?

A.    Yes.

Q.    As far as spectral efficiency concerns, T-Mobile expects that you drive vendors to prioritize features that maximize user throughput and cell coverage.  Correct?

A.    It is a main proposal of my role, yes.

Q.   T-Mobile generally expects that its vendors provide software features that maximize throughput and coverage. Correct?

A.   Yes.

Q.   One way T-Mobile enhances the coverage of its network is through optimizing the modulation schemes used by its base stations.  Correct?

A.   Yes, that's one way of improving coverage, yes.

Q.   Is that a primary way that T-Mobile enhances the coverage of its network?

A.   No, I don't think so.

Q.   Is it one of the primary ways that T-Mobile enhances the coverage of its network?

A.   Yes.

Q.   Optimizing modulation schemes is one of the primary ways T-Mobile enhances coverage of its network.  Correct?

A.   Yes.

Q.   Dr. Sung, your understanding is that, based on the initial transmission, the base station learns about the channel quality.  Correct?

A.   That is my understanding.

Q.   So the base station schedules or determines how the UE will send subsequent uplink transmissions.  Correct?

A.   The base station scheduled every transmission by UE, yes.

Q.   UEs in T-Mobile's network transmit signals to the base

338

station using different modulation schemes.  Correct?

A.    Yes.

Q.    Modulation schemes involve how bits of data get transmitted onto signals and waves in a network.  Correct?

A.    Yes.

Q.    And so lower modulation schemes might carry less amount of data per symbol and higher modulation schemes might carry higher amounts of data per symbol.  Correct?

A.    That's correct.

Q.    What are the different modulation schemes used in T-Mobile's network?

A.    In uplink that we are discussing, we have, I believe, QPSK and 16 QAM, 64 QAM, and this one, 256.

Q.    The base stations schedules UEs to use different modulation schemes depending on the channel conditions related to that user.  Correct?

A.    I believe channel condition is one of the components.

Q.    It is your understanding that T-Mobile's base stations use channel conditions, error rate, and power transmit levels, among other factors, to determine which modulation scheme a given UE should use for a given uplink transmission.  Right?

A.    That is my understanding or my expectation.

Q.    Why is it that the transmissions in T-Mobile's network switch between different modulation schemes?

A.    That is to provide a reliable link between base station

339

and UE.  For example, if a UE use a high-end modulation scheme but base station is unable to decode it, then there is no purpose of UE transmitting high modulation scheme.  So because of that, we have to adjust it to a lower modulation scheme to recover the link between base station and UE.

Q.   As part of modulation scheme adaptation, T-Mobile's base stations might lower the modulation scheme in order to ensure it can decode transmissions it's receiving from a UE. Correct?

A.   Yes.

Q.   Part of the reason T-Mobile's base stations might use higher modulation scheme is because a higher modulation scheme can result in faster throughput.  Correct?

A.   Yes.  Yes.

Q.   In T-Mobile's network, the base station is adapting the scheme for each user to ensure that it can both decode the user's transmissions but also optimize uplink speeds. Correct?

A.   That is a general description of our uplink operation regarding modulation operation.

Q.   Generally speaking, T-Mobile expects that the ability to adapt the modulation scheme will benefit its network performance.  Correct?

A.   Yes.

Q.   If the modulation scheme is too high for the radio

340

conditions, the error rate will be higher and, as a result, throughput will be lower.  Correct?

A.    Yes.

Q.    In T-Mobile's base stations, the base station determines certain information about the UE, including the channel conditions, and based on that information, selects a modulation scheme for that UE.  Correct?

A.    Generally, yes.

Q.    The base station then uses the modulation scheme it has selected to -- for subsequent uplink scheduling.  Correct?

A.    Generally, yes, but there will be -- there can be a special case, such as certain type of data service that requires higher throughput; rather, it require for link reliability.  So it require a low bit error rate.  In that case, that user have to use lower modulation even though that user's adapt condition is good enough.  So -- but if we are talking only for the data streaming service, yes.

Q.    You are T-Mobile's corporate representative on how the base stations process signals received from UEs.  Correct?

A.    At this deposition, yes, I am representing item 44.

Q.    As T-Mobile's corporate representative, your understanding is that, in performing adaptive modulation scheme, the base station considers channel conditions, error rates, and power-related information.  Correct?

A.    That is my expectation, but again, I don't know the exact

implementation by each vendor.

Q.    In 2021, one of the major network initiatives for T-Mobile was to build out its ultra capacity 5G network so that it had 200 million points of presence.  Correct?

A.    Yes.

Q.    To meet that goal, T-Mobile had to build 5G TDD-capable base stations.  Correct?

A.    Yes.

Q.    Why was it important for T-Mobile to be America's largest 5G network?

A.    I think so that we can have all United States is under the coverage that can benefit 5G network without call drops or those kind of issues, service issues.

Q.    Once the UE sends that initial transmission, does the base station create a UE identity?

A.    Base station create a temporary UE identity.

Q.    Is that temporary UE identity referred to as the RNTI?

A.    Yes.

Q.    Is that unique identifier sometimes referred to as the UE context?

A.    I don't know that RNTI is part of UE context because that is temporary.  It is not -- I believe we -- after certain procedure complete, we no longer use it.  That is because -- why we call it a temporary ID.  So because of that being temporary, I don't consider it as a UE context.  But

some people might consider it UE context.

MS. FAIR:  Your Honor, that completes this witness by deposition.

THE COURT:  All right.  Call your next witness, please.

MS. FAIR:  At this time the Plaintiff calls Mr. Geoffrey McHardy.  He is a principal developer at Ericsson with their 5G base station design and operation.

There are two exhibits used in this deposition.  The first is PX 13, the second is JX 5.

The total run time is 8 minutes, 38 seconds, of which 8 minutes, 5 seconds, is the Plaintiff's, and 33 seconds is the Defendants'.

THE COURT:  All right.  Proceed with this witness by deposition, please.

GEOFFREY McHARDY,

BY VIDEO DEPOSITION

Q.   Good afternoon, Mr. McHardy.  My name is Nosson Knobloch, and I'm one of the attorneys representing General Access in this case.

A.   Good afternoon.

Q.   You're -- what is your job at Ericsson?

A.   I work with our scheduler as a -- sort of a technical advisor.

Q.   How long have you worked at Ericsson?

A.   I think 14 years now.

Q.   Exhibit 1 is a patent on which you are one of the named inventors.  Correct?

A.   That's correct.

Q.   Does Ericsson use the invention in this patent?

A.   I would say yes.

Q.   Which Ericsson products use the invention in this patent?

A.   I believe this one was targeted towards LTE, but I would say it applies to both the LTE and NR products.

Q.   As described here, link adaptation uses information on communication link quality that is obtained from measurements or from reporting of the channel state information, CSI, by the receiver.  Correct?

A.   That's what it reads, yes.

Q.   In Ericsson's baseband 6648 is the information stored in the memory that's used for link adaptation located in the internal or external memory.

A.   I said it's -- I'd say primarily we would -- from a processing efficiency, we try to keep the data as close to the processing as possible.  So not only the configuration that's date data for users and cells is stored in common memory on die with the processors, and then external memory is used under higher load cases when we need a larger memory pool to store across many, many users.

Q.   So Exhibit 2 is a 5G radio resource management algorithm

344

specification document.  Is that right?

A.    Yes, I believe that's what this is.

Q.    At a high level, what is the RRM algorithm?  Sorry.  The RRM algorithm.

A.    It's a system-centric document that describes from a system perspective -- or tries to describe from a system perspective the core algorithms for various procedures used within the scheduler.

Q.    Are you familiar with the idea of a UE context?

A.    Conceptually, yes.

Q.    As used in Ericsson's products, a UE context is a set of information about each of the UEs in communication with the base station.  Right?

A.    I can only speak to the layer 2 scheduler or user plane control.  We tend in there to refer to them as SE sessions, scheduling entity sessions.

Q.    Is each SE session associated with a unique identifier that identifies the UE?

A.    For SE sessions that are acting as or reflecting a UE, we have an internal baseband UE ref that we use and that is a unique identifier across that baseband.

Q.    In addition to the UE reference that you use as a unique identifier for each UE, what other information does the SE session have about each of the users?

A.    It's a very large structure.  It's -- there's an uplink

representation and a downlink representation.  Each of them are bit-packed and in the range of, you know, a thousand bytes of data, so it's a lot of data stored in there.

Q.   Do the SE sessions for each user include information about the GINR for the user?

A.   I believe that for every configured cell for a UE, there -- in the uplink session there is, I believe -- GINR is stored for -- under the link adaptation information.

Q.   Do the SE sessions for each user include any information about beamforming for that user?

A.   What would you consider as beamforming information?

Q.   Any information that you think is related to beamforming.

A.   In the uplink, I believe there is information provided from layer 1 on I think its strongest -- the four strongest beams that it detected when it did decoding.  I believe that's stored in the session.

Q.   Where are the SE sessions stored?

A.   They can either be stored in common memory or in external memory.

Q.   In order to schedule a user for an uplink transmission, Ericsson's base station needs to first create an SE session for that user.  Correct?

A.   For any UE-dedicated signaling, yes, I believe that we would always have an SE session prior to UE-dedicated scheduling.

346

Q.   The assignment of the modulation setting is performed in layer 2, but the demodulation is all performed in layer 1.  Is that right?

A.   That's correct.  The allocation decision, modulation coding, that's decided in layer 2.  And then layer 1 is responsible for using that for decoding, demodulating the uplink allocation.

Q.   When receiving an uplink transmission from a user, layer 1 needs to know what modulation that user was using for that transmission.  Right?

A.   Yes, it would need to know that.

Q.   Does the layer 1 receive the unique identifier for the UEs that is generated in layer 2?

A.   Certainly we would give it our -- our SE, our BB UE ref, baseband UE ref.  I'm not sure what else in detail is passed in the signal towards layer 1, but the identifier, when passed back to the UE domain, would -- would primarily be the UE ref would be what it would use to signal when it signals the success or fail of decoding or whatever reception it was asked to be done.

Q.   Ericsson's base stations are designed and often configured to receive uplink transmissions from multiple users at the same time.  Correct?

A.   I think, yes, that would be correct.

          THE COURT:  Does that complete this witness by

deposition?

MS. FAIR:  It does, Your Honor.

THE COURT:  All right.  Call your next witness, please.

MS. FAIR:  The Plaintiff calls by deposition Mr. Sebastian Faxer.  He's chief technology officer and network solutions lead at Ericsson.  This clip is 2 minutes, 16 seconds, of which all of it is the Plaintiff's.

THE COURT:  Before we proceed with this deposition, ladies and gentlemen, let me mention to you, Mr. Faxer's in the courtroom, he's been introduced to you.  He's not going to testify live.  His testimony is going to be presented by deposition.

Under the Rules of Civil Procedure, given his status, the Plaintiff is entitled to either call him live or to call him by deposition.  In this case they've opted to present him by deposition even though he's physically here and could be called live.  There's nothing improper about him being presented to you by deposition given his status even though he's physically present here.  I just wanted to make that clear before we go forward.

All right.  Let's proceed.

MS. FAIR:  Thank you, Your Honor.

THE COURT:  Yes, Mr. Stevenson?

MR. STEVENSON:  Your Honor, Defendants do intend to

present Mr. Faxer during their case in chief live.

THE COURT:  And you have the right to do that in person when we get to your case in chief.

All right.  Let's proceed.

MS. FAIR:  Thank you, Your Honor.

SEBASTIAN FAXER

BY VIDEO DEPOSITION

Q.  One of the criteria that Ericsson base stations use for determining the settings that a user should apply to its uplink transmissions are measurements that the base station takes from prior uplink transmissions from that user. Correct?

A.  Specifically for the link adaptation and the setting of the modulation and coding scheme of the physical uplink shared channel transmission, as input to that, then the base station partially utilizes SINR measurements based on previous PUSCH transmission and the DMRS signals there that the user has transmitted.

Q.  Ericsson's base stations demodulate signals received from users.  Correct?

A.  So as part of the uplink receiver chain, Ericsson base stations perform several steps that can be considered to be demodulation steps.  So I think that's a fair statement that signals in some part are demodulated.

Q.  Which of the demodulation steps we talked about earlier

are performed in these digital signal processors?

A.    So I think that the, for instance, DMRS channel estimation steps and the MMSE weight calculation and equalization steps are taking part in the DSPs, for instance.

So anything generally that doesn't have a specific hardware accelerator for doing something, that processing takes part in the DSPs.  So that is like the things that do computations on the ASIC.

THE COURT:  Does that complete this witness by deposition?

MS. FAIR:  It does, Your Honor.

THE COURT:  All right.  Call your next witness, Plaintiff.

MS. FAIR:  Our next witness is Mr. Ashwin Thomas by video deposition.  He is a customer solutions director for the T-Mobile account team at Ericsson.

His clip is 4 minutes and 43 seconds, of which 3 minutes, 23 seconds, is the Plaintiff's, and 1 minute, 19 seconds, is the Defendants'.

THE COURT:  All right.  Proceed with this witness by deposition.

ASHWIN GEORGE THOMAS

BY VIDEO DEPOSITION

Q.    Good morning.

A.    Good morning.

Q.    What's your name?

A.    My name is Ashwin George Thomas.

Q.    What's your position at Ericsson?

A.    I am a customer solutions director for the T-Mobile account team.

Q.    It notes here that mid-band TDD is coverage limited by TDD uplink.  Do you see that?

A.    Yes.

Q.    One of the key technologies for multiband 5G networks is massive MIMO for beamforming and cell shaping.  Do you see that?

A.    I do.

Q.    Is beamforming used in both TDD and FDD in T-Mobile's 5G network?

A.    Yes.

Q.    Is beamforming used in both uplink and downlink in T-Mobile's network?

A.    Yes.

Q.    Do the TDD radios that Ericsson supplies to T-Mobile utilize beamforming for the uplink?

A.    Yes.

Q.    The baseband's responsible for modulation and demodulation.  Is that right?

A.    Yes.

Q.    The baseband unit is what contains and runs the baseband

software.  Right?

A.    Yes.

Q.    And that's where most of the intelligence that controls the cell site is located.  Right?

A.    The baseband, yes.

Q.    It is important for Ericsson customers like T-Mobile to keep growing their network to meet the increasing demands placed on their networks.  Right?

A.    Yes.

Q.    You understand that it is important for customers like T-Mobile to continue to grow their network to meet this increasing demand and expected increasing demand.  Correct?

A.    Yes, that would be T-Mobile -- T-Mobile would definitely would probably be looking into that, too.  Yes.

Q.    So one way to improve network throughput would be to increase cell density.  Correct?

A.    Yes.

Q.    Cell density refers to the number of base stations installed in a given geographic area.  Correct?

A.    Yes.

Q.    So if you increase the number of base stations in a given area, you can use that to increase your network throughput. Right?

A.    Yes.

Q.    What is Exhibit 18?

A.    It's a patent that includes me, too, along with three other folks from T-Mobile.

Q.    So you're a co-inventor on the patent shown in Exhibit 18?

A.    Yes.

Q.    It notes here that -- it says here it identifies you as being in Plano, Texas.  Did you live in Plano, Texas at the time?

A.    I did.

Q.    How long did you live in Plano?

A.    I lived in -- so I was -- so I was based out of -- I was based out of the Plano office, so I lived in Dallas in The Colony area from -- I think from 2003 to 2016.  Then I moved to Bellview.

Q.    Your relationship with T-Mobile is important to you. Yes?

A.    Yes.

Q.    Is T-Mobile an important client for Ericsson?

A.    I would -- I would believe so, yes.

Q.    And you're testifying here today to help T-Mobile in a lawsuit.  Correct?

A.    Yes.

Q.    You would like to see T-Mobile win this lawsuit. Correct?

A.    Yes.

353

Q.    Your job at Ericsson is to help T-Mobile.  Right?

A.    My job at Ericsson is to make sure Ericsson does well, and Ericsson does well when it's able to make its operators do well, make its clients do well.  And my focus is to Ericsson, definitely.  I want Ericsson to do well.

Q.    So you explain in your patent that over time the demands for data on wireless networks has gone up.  Correct?

A.    Yes.

Q.    One of the ways that networks have addressed or accommodated that demand is to include an increasing number of cell sites, sometimes referred to as base stations.  Correct?

A.    Yes.

        THE COURT:  Does that complete this witness by deposition?

        MS. FAIR:  It does, Your Honor.

        THE COURT:  All right.  Call your next witness, Plaintiff.

        MS. FAIR:  At this time the Plaintiff calls Mr. Michael Skip Hynek, the corporate representative of General Access.

        THE COURT:  All right.  Mr. Hynek, if you'll come forward and be sworn by the Courtroom Deputy, please.

        (Whereupon, the oath was administered by the Clerk.)

        THE COURT:  Please come around, have a seat on the witness stand.

All right.  Ms. Fair, you may proceed with direct examination.

MS. FAIR:  Thank you, Your Honor.

MICHAEL "SKIP" HYNEK,

having been first duly sworn, testified under oath as follows:

DIRECT EXAMINATION

BY MS. FAIR:

Q.   Good morning.

A.   Good morning.

Q.   I know the jury's heard your name, but would you take a moment to introduce yourself to them?

A.   Certainly.  My name is Michael Hynek, but I go by the name of Skip.

Q.   And how is it that you get the nickname Skip out of Michael?

A.   I don't think that you really do.  But my mother wanted to call me Skip from the day I was born, but she didn't think it was a proper first name.  So she legally named me Michael.

Q.   Now, are you here to explain to the jury infringement in this case?

A.   I am not.

Q.   Are you here to explain the validity of the patents?

A.   I am not.

Q.   Are you here to talk about a damages analysis?

A.   I am not.

Q.    So what's your role in this case?

A.    I am here as the representative of General Access Solutions, Limited.  They're the Plaintiff in this case and the owner of the patents.

Q.    When is it that you first became involved with the company we heard about yesterday, Raze Technologies?

A.    I first was introduced to Raze in the middle of the year 2000, almost 25 years ago.

Q.    And what was the context of you getting introduced to them?

A.    I was on the board of an investment entity that was looking at opportunities to invest in technology companies, and Raze was one of the companies that was introduced to this investment entity.

Q.    And did that entity decide to invest in Raze?

A.    They did.

Q.    Did they meet their commitments to invest in Raze?

A.    They did not.

Q.    And so what did you do when that entity wasn't able to meet their commitment?

A.    I had met Mr. Struhsaker through our due diligence process.  And when the investment entity wasn't able to make their commitment, I was intrigued with the opportunity and so I approached Mr. Struhsaker and asked him if he would be willing to let me try to raise the money to meet the

commitment that that investment entity made.

Q.   What was the due diligence process like?  What did you learn about Raze when you were exploring the potential investment?

A.   Well, in addition to meeting Mr. Struhsaker and I think he just had a couple of other people on his team at that time, the investment entity did do a pretty extensive due diligence. They hired technical consultants to review not only the technology that Mr. Struhsaker was wanting to develop, but also the -- how successful once that technology was created in actually performing a product would be.

Q.   And are you a technologist to be able to evaluate the technology yourself?

A.   I am not.

Q.   What's your background?

A.   I have a Bachelor's degree in civil engineering.

Q.   And what is civil engineering?

A.   I think the best way to explain civil engineering is anything that's built on the earth, in the earth, or with the earth; things like -- things that are made out of concrete, steel, roads, bridges, buildings.

Q.   And so having had this opportunity to hear the analysis of technical experts, what was your take-away about the technology that Mr. Struhsaker and his team were going to be working on at Raze at that start-up?

357

A.   I think the result of all the due diligence that was done was that it was a very intriguing opportunity, and then obviously there were people associated with developing this technology that were highly credentialed.

Q.   Can you give us an example of some of the credentials that caught your eye when you were investigating Raze?

A.   Well, Mr. Struhsaker, he's just a very, very impressive person and always has been.  I think it's pretty incredible that someone can be recruited by the NSA at a very young age, you know, out of college, but I also learned that he was the head of a technology group that created, developed what we know as WiFi today.  I think all of us are very familiar with what WiFi is.

He also was one of the leads in a technology group that was developing the next standards in telecommunications.  In the year 2000, I think most phones were 2G.  3G was just being deployed.  And this technology group was working on what we know today as 4G, or LTE.

Q.   Were you able to meet the commitment that the investment entity had not been able to?

A.   I was, over time.

Q.   By yourself?

A.   Not by myself.

Q.   How many people were behind supporting Raze as a start-up in its early days?

A.    In terms of people, I'd say it was probably over a hundred.  General Access is a limited partnership.  We have limited partners, and there is probably maybe 50 limited partners, but some of those limited partners are made up of families.

Q.    How much was the commitment that you-all filled over time?

A.    It was $12 million initially.

Q.    And how long did it take to pull together that amount?

A.    I think it took about a year.

Q.    Was there a point in time at which you became something more than just a supporter of Raze?

A.    There was.

Q.    When was that?

A.    December 2001.

Q.    What role did you take on in December of 2001?

A.    I became the acting CEO.

Q.    Why?

A.    The company had gone through a reorganization.

Q.    And as part of that reorganization, when you took over as CEO, what type of time were you spending working alongside Mr. Struhsaker and his colleagues?

A.    It was a very comprehensive endeavor.  I, with no exaggeration, was working 16 to 20 hours a day every single day.

Q.   What happened after the initial funding ran out?

A.   Our group committed to invest a little bit further.

Q.   And you said a little bit further.  Were you-all prepared and planning to continue to bring a start-up from the ground up into the telecommunications industry?

A.   No.  We committed to put another $4 million into the company.

Q.   And had you communicated to Mr. Struhsaker and the team that you-all were going to be looking for outside investment to really help this start-up get up off the ground?

A.   Well, I think the team had initially started some of those endeavors, but we did communicate that we needed to bring institutional money to this investment.

Q.   What sorts of companies were you-all looking to and exploring for this institutional money that it would take to get Raze going?

A.   We used a broker to help raise the money, but we also were in talks with what I would call strategic partners, companies that were in the industry that were familiar with the technology that we were talking about, as well as various venture capital firms and investment entities.

Q.   And we heard from Mr. Struhsaker that he met with Clearwire, Sprint, AT&T.  Did you participate in any of those meetings?  Is there one that you were involved in?

A.   I think some of those meetings happened before I actually

360

came on as the acting CEO, but I was present for a meeting that we had with AT&T.

Q.   And who specifically were you-all meeting with in this AT&T meeting?

A.   Well, I say AT&T.  Technically I guess we were meeting -- I think there were some representatives with AT&T that were there, but it was really Bell Labs, which is AT&T's, their research lab.  I think they're one of the most preeminent telecommunications research entities in the world.

Q.   How many folks from Bell Labs were -- or AT&T were at this meeting?

A.   My best recollection is it was probably maybe 40, 50.

Q.   And what was the purpose of this meeting?

A.   AT&T had deployed a fixed wireless system similar to what Raze was developing, and it didn't work.  And I believe maybe at that time they might have even had shut it down.

Q.   And so what were these engineers from Bell Labs wanting to talk to Mr. Struhsaker about?

A.   Initially I had the impression that they were really there to kind of just listen to him and basically take him to task for not really understanding how difficult it was to deploy this new technology.

Q.   What happened by the end of the meeting from your perspective?

A.   I didn't really understand everything that was being said

at the meeting.  They were talking English, but it was at such a high technical level that it was way over my head.  But I could read from the body language that everyone of the people that were in that room sat back in their chair and took notice about what Mr. Struhsaker was talking about, and his approach to solving this problem that existed.

Q.   And so having impressed this group of people, were you-all able to find investments outside of your original group?

A.   We were not.

Q.   And from your perspective as the one who was working to try and help get those investments, what was the climate like that made it difficult?

A.   There were a number of factors that were going on.  There were plenty of companies that wanted to provide broadband data to the rural areas, small businesses, but Mr. Struhsaker's idea was to combine that with carrier class voice.  So a phone service that everybody came to know and expect from their land lines, which was very unique.

But the demand for data didn't exist.  The iPhone wouldn't be invented for another five years or come out for another five years.  So the telecommunication companies had just spent billions of dollars upgrading their network to 3G, and they weren't about to go to 4G until they realized an investment on that.

Q.   What was the economic climate like at the time?

A.   The country was going through the dot-com bust.  9/11 had just happened.  And telecommunications specifically was literally on its knees.

Q.   And so Raze ultimately had to shut down?

A.   They did.

Q.   Had Raze done anything to protect the inventions that Mr. Struhsaker and others at his team had come up with?

A.   They did.

Q.   What did they do?

A.   The technologies were patented from the very beginning. That was part of the business plan.

Q.   Why was it important as a start-up to pursue patent applications with the limited resources that you-all had?

A.   Well, in addition to just protecting the investment, it was also a way of maintaining your competitive edge in the marketplace by patenting your technologies.

Q.   And so when Raze had to shut down, did you and the other supporters of Raze just throw in the towel and say forget it, I guess this isn't going to work out?

A.   We did not.

Q.   What did you do?

A.   We continued to maintain the patent portfolio.

Q.   And so did you-all continue the efforts to see these applications all the way through to issuance?

363

A.    We did.

Q.    Why was it important for you-all to continue with patent prosecution, the application process for what Mr. Struhsaker and his team had come up with?

A.    Well, again, in addition to protecting our time and effort and our investment, we also wanted to protect this technology for all the people that were involved in creating it.

Q.    We heard that the patents in this case issued in 2005 and 2006.  Was there a point in time at which you made efforts to explore the value and a potential sale of the portfolio?

A.    There was.

Q.    When was that?

A.    I don't remember the exact dates, but it probably started in about 2008.  After the iPhone came out, it became clear that the business plan that Raze was using was starting to materialize, and so we -- or I spent a considerable amount of time trying to determine what the values of these technologies were.

Q.    And what did you come to understand through those efforts was the potential licensing value?

A.    The licensing value was incredible by what I determined were very reputable people.

Q.    How did that compare with what the potential sale price would be?

Shawn M. McRoberts, RMR, CRR
Federal Official Court Reporter

A.   The patents, if I tried to sell them, were really, in a sale, I couldn't expect anything more than pennies on the dollar, literally.

Q.   Did you-all have any offers for sale that were presented to you?

A.   Nothing in writing.

Q.   Did you decide to sell for pennies on the dollar?

A.   I did not.

Q.   How long have you and Mr. Struhsaker been friends?

A.   I believe Mr. Struhsaker and I were friends since 2000, our first meeting.

Q.   And so what's it like today to be testifying in front of this jury about what Mr. Struhsaker and you started side by side at Raze all those years ago?

A.   It's been 25 years, and today I'm just as proud and honored to be here in this courtroom with him defending his technology.  It really has been a privilege.

             MS. FAIR:  I'll pass the witness.

             THE COURT:  Cross examination by the Defendants.

             MR. DACUS:  Yes, Your Honor.  May we have permission to pass out binders, please?

             THE COURT:  You may.

        All right.  Mr. Dacus, you may proceed with cross examination.

             MR. DACUS:  Thank you very much, Your Honor.

CROSS EXAMINATION

BY MR. DACUS:

Q.   Good morning, Mr. Hynek.

A.   Good morning.

Q.   I'm Deron Dacus, and I represent T-Mobile and Ericsson. Good to see you and good to meet you.

A.   Nice to see you.

Q.   I'd like to ask you a few questions, if it's okay, about some of the testimony that you gave.  Is that okay?

A.   Of course.

Q.   And I'd ask you -- I'd also like to ask you a few questions about some of the things that you didn't tell the jury.  Is that okay also?

A.   Of course.

Q.   All right.  Let's kind of start with your background to make sure I got it right.  You -- my understanding is that although you had your college education in civil engineering, you spent your professional career doing real estate deals. Correct?

A.   I think that's correct.

Q.   Okay.  Basically as a real estate developer.  Fair?

A.   Fair.

Q.   In fact, even after you met Mr. Struhsaker and invested in Raze and even through today, you continued to be a real estate developer.  True?

A.    I don't think I would characterize it that way.

Q.    Okay.  Do you have a notebook there in front of you that we just handed to you?

A.    I do.

Q.    Okay.  If you'd turn to what is tab A, there's a tab A, B, and C there.  Do you see tab A in the notebook?

A.    I do.

Q.    Can you turn to page 14 of that tab, if you would, and let me know when you're there?

A.    Okay.

Q.    And read to yourself, if you would, your sworn testimony at lines 10 -- let's see.  Lines 8 through 15, if you would, please.  Let me know when you're finished.

A.    I'm finished.

Q.    And so you agree, sir, that you continue your real estate work even through today.  Correct?

A.    It does say real estate work, but I think you told me or your question said was I developing real estate.

Q.    Okay.  It's true, sir, that at the time that you met Mr. Struhsaker in 2000, you would agree with me that you did not have the expertise or background in technology that would allow you to evaluate the technology that he was pitching or putting forward.  Correct?

A.    I would agree with that.

Q.    You did not have a background in the telecom industry,

did you, sir?

A.    I did not.

Q.    And I know you just spent some time telling us how impressed you were by his technology.  Correct?

A.    I did.

Q.    Do you allow for the possibility, sir, that although you were impressed with Mr. Struhsaker's telecom technology, that, in fact, people in the industry, actually in the telecom industry, may not have been impressed by it?  Do you allow for that possibility?

A.    I think that's fair.

Q.    Okay.  Now, please don't take that as any criticism, but I mean, if I, for example, went to an aircraft mechanic and they told me what they did, I'd probably be impressed with it because I'm not an aircraft mechanic.  Right?

A.    Right.

Q.    But somebody who's in that business, they may say, well, that's just something that we as aircraft mechanics know. Fair?

A.    Fair.

Q.    Now, I do -- I want to talk to you and ask some questions about your investment in Raze and Raze's business.  Okay?  Are you with me?  In the time frame that we're talking about?

A.    What time frame?

Q.    The time frame where you invested in Raze?

A.    Okay.

Q.    And the time that Raze was in business.  So basically 2000 to 2002.  Okay?

A.    Okay.

Q.    It's true, sir, that you and Mr. Struhsaker both attempted to get investment money from dozens, actually over a hundred different companies through the years.  True?

A.    I think that's true.

Q.    That includes many companies in the telecom industry.  Correct?

A.    I believe that's correct.

Q.    Yet it is true that in all of those years, the only companies that ever invested in Raze were two companies that you owned and controlled by the name of LM Wireless and General Access.  Correct?

A.    That's correct.

Q.    And it is true, just so we're clear, you control the Plaintiff General Access who brought this lawsuit.  True?

A.    That's true.

Q.    In fact, you're the sole managing member of the Plaintiff General Access Solutions.  True?

A.    That's true.

Q.    And you would agree, I'm sure, that what we have here at the 50,000-foot level is a dispute about whether or not these two patents and their technology is valuable and important in

the telecom business.  Fair?

A.    I think that's fair.

Q.    The folks at your table, including you, you just said that you believe these patents and this technology are important and valuable to people in the telecom industry, including T-Mobile and Ericsson.  Correct?

A.    Correct.

Q.    We dispute that.  Fair?

A.    That's my understanding.

Q.    So what often happens is jurors sit there and they think, you know what?  Mr. Hynek's sort of got a dog in this fight. To be candid, Mr. Dacus does, too.  And they say, I wonder what third parties, people who didn't have a dog in this fight, say about this issue.  You agree that would be a reasonable thing to ask?

A.    I do.

Q.    Okay.  And you know here we have a bunch of evidence on what third parties thought about this technology.  Correct?

A.    I would presume so.

Q.    Because you just said a minute ago that Raze actually hired an investment bank to go out and raise money.  True?

A.    I did say that.

Q.    Okay.  The name of that investment bank was Hoak Breedlove.  Fair?

A.    Fair.

Q.   This is a group that actually specializes in going out and raising money, particularly for start-ups.  True?

A.   I assume that's true.

Q.   And that's what Raze was.  Fair?

A.   That's fair.

Q.   As part of seeking investors and seeking money from these investors, Hoak Breedlove put together a document called a private placement memorandum.  Right?

A.   I believe they did.

Q.   We heard Mr. Struhsaker reference that private placement memorandum yesterday.  Fair?

A.   I believe that's fair.

Q.   And you're certainly aware of that private placement memorandum.  True?

A.   I've seen it.

Q.   Yeah.  And you know, based on your work in other investments including real estate, that it is very important that those private placement memorandums be completely truthful and completely accurate.  Fair?

A.   That's fair.

Q.   There's actually heavy penalties even criminal penalties associated with not having them accurate and truthful.  True?

A.   I believe that's true.

Q.   So when Hoak Breedlove went out to these investors and they described Raze's technology and business, they say that

Raze had developed --

MS. FAIR:  Objection; hearsay.  He's reading from the document.  This is their private placement memorandum, Your Honor.  It's an admission.

THE COURT:  Approach the bench, counsel.

(The following was had outside the hearing of the jury.)

THE COURT:  All right.  Tell me the objection again.

MS. FAIR:  He's reading straight from a document that a third party wrote to the witness.  If he wants to -- I mean, I don't know if it's a pre-admitted exhibit that he's reading from or not, but if he wants to use a pre-admitted exhibit with the witness or refresh the witness' recollection, I just don't think it's proper for him to be reading from something written by a third party.

THE COURT:  Are we dealing with a pre-admitted exhibit here or are we not?

MR. DACUS:  No, Your Honor.

THE COURT:  Okay.

MR. DACUS:  But he's well aware of this.  He's testified about it.  I mean, he testified about it in his deposition and other trials.  This is -- I mean, this is their private placement memorandum.  It's their admission and he's aware of it.

MS. FAIR:  Mr. Dacus just questioned the witness

that Hoak Breedlove wrote it, so it's not Mr. Hynek's.

THE COURT: If you want to go back and establish a foundation for who Hoak Breedlove is and what they were doing, we can see where this goes. Okay?

MR. DACUS: Yes, sir.

(The following was had in the presence and hearing of the jury.)

THE COURT: Let's proceed.

MR. DACUS: Thank you, Your Honor.

Q. (BY MR. DACUS) So just to make sure we're clear, Mr. Hynek, Hoak Breedlove is an investment bank that Raze retained to seek money and investments on behalf of Raze. Correct?

A. I believe that's correct.

Q. Okay. And what Hoak Breedlove on behalf of Raze said to investors --

MS. FAIR: Objection, Your Honor. Again, this is hearsay. If he wants --

THE COURT: I'm going sustain the objection. It's a third party making a statement. Now, they may have been under contract to do work for the Plaintiff, but it's still a third party statement out of court.

Q. (BY MR. DACUS) You would agree with me, sir, that Raze itself, when it was seeking investment, said that it had developed a fixed broadband wireless access system. Correct?

A. I think that's correct.

373

Q.    And that, in fact, was Raze's business.  Correct?

A.    That was its business.  Correct.

Q.    Raze was in a fixed broadband wireless business.  True?

A.    Yes.

Q.    And that was always Raze's business.  Fair?

A.    At that time.

Q.    You agree, sir, that the only business Raze was ever in was a fixed wireless business.  That is a true statement.

A.    I'm not going to argue with that.

Q.    Okay.  And I know you said you're not a technologist, but you know enough to know even at that time, I presume, that fixed wireless is different from mobile wireless.  Correct?

A.    I think that's correct.

Q.    You agree that Hoak Breedlove, the investment bank, on behalf of Raze sought investment from over 200 different companies.  True?

A.    I'm not certain on the specific number.

Q.    You certainly --

A.    But I'm sure it was plenty.

Q.    You certainly wouldn't dispute that number 200, would you, sir?

A.    I would not dispute it.

Q.    And just to be clear, this investment bank, remember we started this conversation by talking about what did third parties think about it, someone other than you and someone

other than me, what did they think about this technology.  You know that Hoak Breedlove, the investment bank, in these 200 companies included very sophisticated technology companies.  Correct?

A.   I'm sure there were.

Q.   Cisco.  You know that name.  Correct?

A.   I've heard it.

Q.   Samsung.  You know that name.  Correct?

A.   Yes.

Q.   Dell.  You know that name.  Correct?

A.   Yes.

Q.   Amazon.  You know that name.

A.   Yes.

Q.   Apple?

A.   Yes.

Q.   Google?

A.   Yes.

Q.   We can agree those are sophisticated technology companies.  Correct?

A.   I suppose.

Q.   Sought investment -- Hoak Breedlove on behalf of Raze sought investment from telecom companies.  Correct?

A.   I presume so.

Q.   Not just companies, but suppliers also.  Fair?

A.   Fair.

375

Q. Hoak Breedlove went to, I think you even said a minute ago, these what we call venture capital or venture firms. Correct?

A. I think they did.

Q. These are firms and businesses whose sole business is making investments in companies, particularly start-ups, ones that they see value in, in order to try to make big money. Fair?

A. Fair.

Q. And it's true, sir, that none, exactly zero, of those companies invested in Raze. True?

A. That's true.

Q. And to be clear, just so that we address this issue about 9/11 that I think your lawyer raised, Mr. Struhsaker raised, and maybe even you raised, all of this was before 9/11. True?

A. I'm sorry. All of what was before 9/11?

Q. This investment that Hoak Breedlove was seeking is before 9/11.

A. I don't know if that's correct.

Q. Do you have that notebook there in front of you?

A. I do.

Q. Okay. Can you turn to tab B, if you would, please, sir? Let me know when you have it.

A. I'm here.

Q. Okay. Would you turn to page 582. Please let me know

when you're there.

A.   I'm here.

Q.   Could you read lines 20 through 23 to yourself, please, sir.  Let me know when you're finished.

A.   Through 22, yes.

Q.   Through 23, 22, yes, sir?

A.   20 through 22.  I've read it.

Q.   Okay.  You agree, sir, that Hoak Breedlove was unable to get any monies before 9/11.  Correct?

A.   That is correct.

Q.   Okay.  The more accurate truth, sir, if we're all being candid, is that all of these people chose not to invest in Raze because they were skeptical or doubtful as to whether or not Mr. Struhsaker and Raze's technology would -- was or would be in demand.  True?

A.   No, I do not agree with that.

Q.   Okay.  Do you have that notebook in front of you, sir?

A.   I do.

Q.   Okay.  Turn to tab B again.  By the way, these tabs we're looking at, these are sworn testimonies that you gave.  Correct?

A.   I understand that.  The question -- you did not ask me that question.

THE COURT:  Just a minute.

THE WITNESS:  I understand.

THE COURT:  Mr. Hynek, you're here to respond to questions, not to ask questions or make uncalled for statements.

THE WITNESS:  I understand.  Sorry.

THE COURT:  Ms. Fair is going to get another chance to ask more questions of you if she thinks there's some area she needs to readdress, but that's her decision, not your decision.

THE WITNESS:  I understand, Your Honor.

THE COURT:  All right, counsel.  Go ahead.

MR. DACUS:  Thank you, Your Honor.

Q.   (BY MR. DACUS)  Can you turn to page 584, please, sir?

A.   Okay.

Q.   And can you read lines 12 through 21 to yourself?  Let me know when you're done.

A.   Through 24?

Q.   Yes.

A.   I've read it.

Q.   Thank you.

Do you agree, sir, that the reason these folks were unwilling to invest in Raze is because they were skeptical about and doubtful about whether or not this fixed wireless technology, there was going to be any demand for it.  Correct?

A.   You're talking about all the companies.

Q.   I'm talking about some of the companies that said they

didn't want to invest money was because they were skeptical and doubtful about whether or not there would be any demand for this fixed wireless that Raze was involved in.  Correct?

A.   Mr. Dacus, this reference in my prior testimony talks about one entity.

Q.   Okay.  So let's just do it that way.  You would agree that at least one company said we're skeptical or doubtful about whether or not this Raze fixed wireless, there's going to be any demand for it.  Correct?

A.   That is correct.

Q.   And surely, sir, your testimony is not to this jury that that was the only company that said that to you, is it?

A.   I did not say that.

Q.   Okay.  Good.  Because you know, in fact, what these companies were saying to you, some of them, was there were too many, quote, dead bodies in the fixed wireless arena. Correct?

A.   That could be correct.

Q.   And you know what they were saying is, look, this fixed wireless stuff has been around.  There are other competitors out there who've already done this and actually have their product working.  Isn't that true?

A.   You'd have to show me which company.

Q.   Well, let's talk about one.  You know the company Navini?

A.   I've heard of it.

Q.   And by the way, if we're talking about whether 9/11 was the reason that you couldn't get investment, you know that this company Navini got investment after 9/11.  Correct?

A.   I'm not familiar with when they got investment.

Q.   You know that Navini was a competitor to Raze.  True?

A.   They were.

Q.   And you know that they had a fixed wireless product that competed.  Correct?

A.   They had a fixed wireless product.

Q.   And you know, in fact, that Navini had a product that was ahead of Raze.  True?

A.   My understanding of the Navini product, we did not consider it a direct competitor.  Navini's product was going after a market that was different than what Raze was going after.

Q.   So when Mr. Struhsaker testified yesterday that he got kicked out of the Navini booth there at the conference and he sent you in to do NSA competitive intelligence, you were doing that because they were not a competitor.  Is that your testimony under oath?

A.   I don't really recall that SuperComm deal.  I'm sure I was there; I'm sure I went to the booth.  I just don't recall. That was a long time ago.

Q.   Well, are you saying that --

A.   I said they weren't a direct competitor.

Q.   So are you saying that what Mr. Struhsaker told us about the fact that he sent you in to do NSA-style competitive intelligence, is that true or false?

A.   Is what true?

Q.   Is what Mr. Struhsaker told this jury, that he sent you to the Navini booth after he got kicked out to do NSA-style competitive intelligence, is that --

A.   I don't have any reason to dispute Mr. Struhsaker's testimony.

Q.   Okay.  You agree, sir, that these investors that Raze was seeking out, some of them said no to Raze because they had actually invested in Navini.  Correct?

A.   I don't remember that specifically.

Q.   Okay.  Do you have the notebook still in front of you?

A.   I do.

Q.   Can you turn to tab B, your sworn testimony.  I'm sorry. This will be tab A.  And if you'd turn to page 75, please?

A.   I am here.

Q.   On page 75, start on line 25 and read through page 76 line 3.  Let me know when you're done.

A.   From 25 on 75 to where?

Q.   Line 3 on page 76.

A.   I see that.

Q.   Okay.  So it's true, sir, that some of these folks that Raze was asking for money did not invest because they had

already invested in Navini.  True?

A.    I think my answer in this sworn testimony says could have been.

Q.    Okay.  So you certainly don't deny that, do you, sir?

A.    I thought that was my answer that I just gave you.

Q.    You know, sir, you heard Mr. Struhsaker say I think yesterday that Navini raised $50 million initially.  Correct?

A.    I don't remember the specific number that he said.

Q.    Okay.  You, of course, know who the technology company Cisco is.  Right?

A.    I've heard of Cisco.

Q.    It's a very prominent telecommunications company.  Are you saying you don't know who they are?

A.    I don't know anything specific about Cisco.  I know it's a big company.

Q.    Okay.  In the early 2000s would you disagree with the fact that Cisco was one of the most prominent telecommunications equipment suppliers in the United States?

A.    I think that could be an accurate description of them.

Q.    And you know that post-9/11, just in the months post-9/11, Cisco actually bought Navini.  Correct?

A.    And I think they bought AeroNet, too.

Q.    They did, and we'll talk about that later, but now can you answer my question whether or not they bought Navini?

        THE COURT:  Mr. Dacus, if the witness is

unresponsive in your view, don't tell him to answer your question.  You raise it with me.

MR. DACUS:  I'll be happy to, Your Honor.  Thank you.

THE WITNESS:  It's my understanding that Cisco bought Navini.  Yes.

Q.   (BY MR. DACUS)  So -- and that's post-9/11.  Right?

A.   Yes.

Q.   So the reason I'm asking these questions, sir, is your counsel and then Mr. Struhsaker have all said nobody in fixed wireless or in any kind of wireless was doing anything with investment or buying anything because of 9/11, but yet here is Cisco buying a competitor of yours.  Correct?  Is that correct?

A.   Correct.

Q.   And they paid a lot of money for them.  True?

A.   I don't know what they paid.

Q.   So we kind of started this conversation about, well, what do third parties, someone other than Ericsson, someone other than General Access Solutions, what do they say about these technologies.  Do you remember that's where we started?

A.   I do.

Q.   And at least up until this point in the timeline, everyone has said no to Raze.  Correct?

A.   When you say everyone, can you quantify who you're

talking about?

Q.   I'll be happy to.  No one other than the companies you controlled had invested any money in Raze.  True?

A.   That's true.

Q.   Okay.  But you'd been -- your investment bankers had been to dozens, if not hundreds.  True?

A.   True.

Q.   And at least what your lawyer said in the opening statement and then Mr. Struhsaker echoed yesterday, was, well, this is all because of 9/11.  Correct?

A.   I don't know that that's correct.

Q.   But we know that other companies in this same space with technology that was ahead of Raze was not only getting $50 million but was eventually being purchased by Cisco.  True?

A.   There's one company that that is true for.

Q.   By the end of 2002, I think you said Raze had basically shut down its business.  Fair?

A.   I think that's fair.

Q.   So I'm going to move forward in our chronology and I want to talk about your ownership of Raze and then General Access.  Okay?

A.   Okay.

Q.   So the original monies that you and your group invested in Raze came through a company by the name of LM Wireless.  Right?

A.    That's correct.

Q.    And in return for that investment, LM Wireless received what are called preferred shares of stock.  Correct?

A.    That's correct.

Q.    And LM owned 100 percent of the preferred shares of Raze.  True?

A.    I believe that's true.

Q.    And just so we're all clear, there's really two types of shares or stock ownership in these companies.  There's what's called common shares and preferred shares.  Right?

A.    I think that's correct.

Q.    Okay.  LM owned the preferred shares.  True?

A.    True.

Q.    And by the way, before we go further down this road, you were here when the Judge read his preliminary instructions to the jury.  Correct?

A.    I was.

Q.    And you know that one of the things he said to the jury is when they're weighing the credibility of witnesses from the stand, one thing they should do is determine whether or not the witness has a financial interest in the lawsuit.  Correct?

A.    I'm sure he said that.

Q.    You would agree, sir you have a very substantial financial interest in this lawsuit.  Correct?

A.    I do.

Q.   Okay.  Now, after LM Wireless and you had these preferred shares of Raze, you were also on the board of directors of Raze.  Correct?

A.   I was.

Q.   And there came a time when you as a board member wanted to take Raze in a different direction than other board members did.  True?

A.   I think that's true.

Q.   And as a result of this difference of opinion or dispute or whatever you want to call it, you orchestrated a reorganization of Raze.  True?

A.   True.

Q.   And as a result of that reorganization, Access Solutions and then General Access Solutions was formed and created. True?

A.   True.

Q.   And as a result of this reorganization, the common shareholders, the non-preferred shareholders, so everyone other than your group --

          MS. FAIR:  Objection.  May we approach?

          THE COURT:  Approach the bench.

          (The following was had outside the hearing of the jury.)

          THE COURT:  What's the objection?

          MS. FAIR:  The objection is that this violates an

agreed limine and Rule 403.

So what happened here, Your Honor, is that they had a series of questions with Mr. Hynek through deposition trying to point to him not treating the other shareholders fairly, in other words, orchestrating this reorganization to shut out other shareholders to his own benefit or the benefit of he and his team that are still behind General Access.  And I don't know what relevance this questioning Mr. Dacus is doing has other than trying to make it look like Mr. Hynek was unfair to the other shareholders of Raze.

THE COURT:  Okay.  Well, there is an agreed limine order prohibiting --

MR. DACUS:  May I respond, Your Honor?

THE COURT:  -- testimony about General Access or their principals not treating fairly their creditors, lawyers, employees, or brokers.

MR. DACUS:  Right.  It don't doesn't say anything about investors, and this goes directly to his financial interest and how it came to be.  So this goes to his bias.

THE COURT:  If they're creditors in Raze, they're investors in Raze.  I think the MIL's applicable here.

MR. DACUS:  Well, I need to be able to ask him about his financial interest and the fact that he's the only one that has a financial interest.

THE COURT:  That's not a problem.

MR. DACUS:  Okay.  Can I --

THE COURT:  Just a minute.

MR. DACUS:  Yes, sir.

THE COURT:  But going beyond, asking him about his financial interest in the Plaintiff and implying that he somehow has mistreated others or General Access has mistreated others who invested in them and left them high and dry, that's not -- that's what the MIL is supposed to keep out.

MR. DACUS:  Okay.

THE COURT:  Okay?

MR. DACUS:  But I can say -- can I say that none of the common shareholders receive anything from this lawsuit; he receives it all?

MS. FAIR:  Your Honor, the people who don't have a financial interest doesn't tell us anything about Mr. Hynek's bias.  All it does is try and make it look like he's pushed other people out.

THE COURT:  The emphasis needs to be on him --

MR. DACUS:  Okay.

THE COURT:  -- not on anybody else.

MR. DACUS:  Understood.

THE COURT:  All right?

MR. DACUS:  Yes, sir.

(The following was had in the presence and hearing of the jury.)

THE COURT:  Let's proceed.

MR. DACUS:  Thank you, Your Honor.

Q.   (BY MR. DACUS)  You would agree, sir, that General Access Solutions, the company you control, that's the company that will receive any proceeds, if there are any, from this lawsuit.  Correct?

A.   Solely?

Q.   That's who will receive them.  Right?  Not other shareholders; you -- your group as the preferred shareholders. Correct?

A.   LM Wireless is not in existence anymore.

Q.   I'm talking about General Access Solutions.  Remember at the very first I asked you, do you control General Access Solutions, and you said yes.

A.   Yes.

Q.   You and your group are the folks who will receive any proceeds from this lawsuit.  Correct?

MS. FAIR:  Your Honor, may we approach for a clarification, please?

THE COURT:  I'll allow this question.  If we need to -- if you need to approach after that, ask me again.

The question is, would you or your group of folks receive any proceeds if there are any from this lawsuit.  You need to answer that question.

THE WITNESS:  And I'm trying to clarify if he means

solely.

Q.    (BY MR. DACUS)  I mean with respect to shareholders, shareholders of Raze, which is now General Access, the only shareholders that will receive any money is your group. Correct?

A.    I'm sorry.  I'm just confused because General Access doesn't have shareholders.

Q.    Okay.  It's a limited partnership.  Correct?

A.    Correct.

Q.    So the only folks who will receive money are the limited and general partner of General Access Solutions.  True?

            MS. FAIR:  Objection.  Your Honor, may we please approach for a clarification on the way the question is worded?

            THE COURT:  Approach the bench.

            (The following was had outside the hearing of the
            jury.)

            MS. FAIR:  I think what Mr. Hynek is struggling with is that there is -- there are other people besides the company, and we're going to be getting into attorneys' fees, funding, all kinds of stuff like that, and I know Mr. Dacus is not trying to --

            THE COURT:  Just slow down.  Slow down.

            MS. FAIR:  I apologize.  We need a question worded in a way that doesn't put Mr. Hynek in a position to not be

able to answer the question without violating the Court's limine.  I have told this witness about these limines.  That is why he is having a hard time answering Mr. Dacus' question honestly without violating a limine.

THE COURT:  All right.  I mean, anybody that makes a recovery in a lawsuit may have lawyers to pay, they may have bills to pay.  The money may not stay in their pocket, but they are the recipient of the proceeds.

I mean, if you want -- perhaps it would be advantageous for you to restate the question and say, we're not talking about any money you might owe; we're not talking about paying your lawyers.

MR. DACUS:  Okay.

THE COURT:  We are not talking about anything that you have a legal obligation to pay.  But if money is awarded and paid from this lawsuit, it is going to General Access Solutions.  I think that's fair.

MR. DACUS:  I'll be happy to.

(The following was had in the presence and hearing of the jury.)

THE COURT:  All right.  Let's proceed.

MR. DACUS:  Thank you, Your Honor.

Q.   (BY MR. DACUS)  So, Mr. Hynek, it's true, sir, and let's set aside, you know, anything that you may have to pay your lawyers.  Okay?  Any other obligations.  But it's true that

with respect to the proceeds of this lawsuit, General Access Solutions, the company that you control, will receive the proceeds.  Correct?

A.   I think that's correct.

Q.   Okay.  Now, I want to move forward in time to the time period after your group General Access Solutions acquires Raze and its patents.  Okay?

A.   Okay.

Q.   And you remember that we talked about earlier, well, what do third parties think about the value of this technology and whether or not it's beneficial to telecom businesses.  Right?

A.   I just want to back up for a second.  I don't think that General Access acquired Raze.

Q.   Okay.

A.   Just to be clear.

Q.   Okay.  They acquired the patents.

A.   They did.

Q.   Okay.  After they acquired them, as you said on direct, General Access and you actually hired patent brokers to try and sell these patents.  Correct?

A.   That's correct.

Q.   The first company that you hired was a company by the name of ICAP, I-C-A-P.  Correct?

A.   That's correct.

Q.   You actually had a written agreement with ICAP to try and

sell these patents.  Fair?

A.    Fair.

Q.    And you were actually trying to sell the entire portfolio of the Raze patents.  Right?

A.    I think it included the entire portfolio.

Q.    Yeah.  You heard Mr. Struhsaker say yesterday that Raze had many patents.  Right?

A.    I did hear him say that.  I'm not certain that they're all patents that General Access has.

Q.    Okay.  But you tried to take those Raze patents, the portfolio of them, and have this ICAP group sell them.  True?

A.    I think that's true.

Q.    And that included the two patents in this lawsuit.  Fair?

A.    I think that's right.

Q.    ICAP is a very well-known patent broker.  Fair?

A.    I suppose they are.

Q.    I mean, their business, their primary business is selling and licensing patents.  True?

A.    I think that's true.

Q.    They tried to sell these patents, including the two here, for two solid years.  Fair?

A.    Fair.

Q.    They were unable to sell the patents.

A.    They didn't sell the patents.

Q.    Indeed.  They had no offers.  Correct?

A.    I don't know that that's correct in terms of a formal written offer.

Q.    Okay.  Well, when you're talking about selling patents, you want things to be in writing, do you not?

A.    I would presume so.

Q.    And you had, as you said on direct, no written offers from anyone to buy these two patents or any in the Raze portfolio.  That's a true statement.  Correct?

A.    True statement.

Q.    Now, you hired this ICAP group in 2009.  True?

A.    I believe that's true.

Q.    I think on direct you said 2008, but to be fair to you I think if you -- it's really 2009.  Does that sound right?

A.    Well, yeah, the exercise to explore the value of the patents and look at the potential for a sale probably in my mind started in 2008-ish time frame.  I'm not really certain of the timeline, but --

Q.    Okay.  And I'm not here to quibble with you about it. What I want to know is the ICAP folks from about 2009 through 2011 tried to sell the patents.  Right?

A.    I think that's correct.

Q.    2011, you went to a different patent broker, one called RSL.  True?

A.    True.

Q.    And RSL, same thing, this is someone who is a

sophisticated patent broker who specializes in selling patents.  Fair?

A.    Fair.

Q.    And to be clear, these patent brokers, they have an incentive to sell the patents.  Right?

A.    I think they did.

Q.    They only get paid if there's a sale.  True?

A.    That's true.

Q.    It's like a real estate broker which you're very familiar with.  Right?

A.    I am familiar with real estate brokers.

Q.    Patent brokers only get paid a commission if they sell the patents.  True?

A.    True.

Q.    RSL attempted to sell the patents again for more than two years.  Correct?

A.    I think that's correct.

Q.    And by the way, RSL did a lot of research, spent tens of thousands of dollars researching these patents.  Fair?

A.    May have even been more than that.

Q.    Yeah.  And they -- after having done all that research, RSL said to you that their best estimate of the selling price was somewhere between 8 and $12 million for the entire portfolio of patents.  Correct?

A.    I don't recall that.

Q.   Okay.  Can you look at that notebook in front of you?
Turn to tab B.  Let me know when you have tab B.

A.   I have tab B.

Q.   Can you turn to page 613, please, sir?  Let me know when
you're to that page.

A.   I am on 613.

Q.   Would you start at line 22 and read through page 614,
line 4.

A.   I see that, Mr. Dacus.  What I'm not familiar with,
though, is is this for the entire portfolio?  Because your
question was for the entire portfolio.  Or is this just a
segment of the portfolio?

Q.   This is for the portfolio, sir.  What they were telling
you, you would agree, that you could expect a range between 8
to 12 million for the Raze portfolio.  Correct?

        MS. FAIR:  Objection; hearsay and misconstrues a
document that's being asked about in this part of the
testimony as Mr. Hynek is pointing out.

        MR. DACUS:  Let's do it --

        THE COURT:  Just a minute.  As to hearsay, the
witness, Mr. Hynek, is the one that stated the range of 8 to
$12 million as expected by RSL.  So to that extent it's an
admission, if anything else.  I'll overrule the hearsay
objection.

        With regard to whether or not it is all of the portfolio

or a portion of the portfolio, the testimony either without the benefit of this prior testimony or if this prior testimony is published will speak for itself and it can be dealt with on redirect.

So, in effect, I'm overruling your objection.

MS. FAIR:  Yes, Your Honor.

Q.   (BY MR. DACUS)  You would agree, sir, that even at the price that RSL was telling you was appropriate, no one made an offer.  Correct?  No one made a written offer to you. Correct?

A.   That's correct.

Q.   After RSL completes trying to sell these patents between 2011 and 2014, you actually go back to ICAP to see if they can sell the patents again.  Right?

A.   I did sign another agreement with ICAP, yes.

Q.   By the way, you agree, sir, that between 2008 when you started trying to sell them and now we're up to basically 2014, we're now 13 years post-9/11.  Correct?

A.   That's correct.

Q.   And we still got nobody offering anything for these patents.  Correct?

A.   That's correct, in a formal written offer.

Q.   And these brokers are going to telecom companies, including people like Cisco.  Correct?

A.   Yes.

Q.   And Cisco is saying no, right along with all the others?

A.   At times they had said no, I'm sure.

Q.   And you brought it up.  Mr. Struhsaker said that Cisco actually bought his other company, AeroNet.  Correct?

A.   That's correct.

Q.   I thought he said for a billion dollars.  Did I hear him right?

A.   I think it was a billion dollars.

Q.   So these folks in this industry, including Cisco, when they see something of value, they're willing to pay for it. True?

A.   I think that's true.

Q.   And when they say something that they don't think it has value, they're not willing to pay for it.  That's fair also. Right?

A.   I think that would be true as well.

Q.   I mean, at least with respect to Cisco, they bought Navini and they bought AeroNet.  True?

A.   That's true.

Q.   Now, when you went back to ICAP the second time, you went back -- ICAP actually had a different CEO or different head of the company at that time.  Right?  A guy by the name of Dean Becker.  True?

A.   That's true.

Q.   And you got sort of reintroduced -- I'm not sure that's

the right word, but sort of the introduction was made by this guy by the name of Maggio.  Right?  Frank Maggio.

A.   No.  I'd known Dean Becker for years.

Q.   And that's fair enough.  You knew Mr. Becker.  But Mr. Maggio was acting as this sort of intermediary between you and Mr. Becker for a short period of time.  True?

A.   I think that's probably true.

Q.   And one of the things that Mr. Maggio was saying to you is that, Look --

MS. FAIR:  Objection, hearsay.

THE COURT:  Sustained.

MR. DACUS:  Understood, Your Honor.

THE COURT:  That's an outside statement by a third party.

Q.   (BY MR. DACUS)  You agree, sir, that you told Mr. Maggio that you would accept $15 million for the Raze portfolio. True?

A.   Absolutely not.

Q.   Okay.  You deny that.

A.   I deny that.

Q.   Okay.  ICAP tried to sell this portfolio from 2014 until about 2016.  Correct?

A.   I'm not certain of the exact time frame, but sometime in there.

Q.   No offers.  Correct?

A.   That's correct.

Q.   So to kind of summarize this, remember we started talking about what do third parties think, someone other than Ericsson, someone other than General Access Solutions.  These patents, including the two here, from 2008 through 2016, they were attempting to be sold.  Correct?

A.   I think that's correct.

Q.   Not a single written formal offer for any amount of money.  True?

A.   I think that's true.

Q.   And by this time, sir, in 2016, we are 15 years post-9/11.  Right?

A.   I think that's true.

Q.   Can you agree that the industry -- we're -- the industry and the country, we've moved on as far as business goes.  Correct?

A.   I don't understand your question.

Q.   Fair enough.

     Are you saying in 2016 people were refusing to buy these patents because of 9/11?

A.   I didn't say that.

Q.   Okay.  Good.

     In fact, by 2016, as you said, we're now eight years past the introduction of the iPhone and smartphones.  Correct?

A.   I think that's correct.

Q.    According to you, what you just told the jury is with the introduction of the iPhone, the Raze business model and plan had been validated.  That's what you said.  Right?

A.    I'm sorry.  Can you repeat the question?

Q.    Sure.  What you said to the jury was once the iPhone came out, once smartphones came out, you thought that the Raze business plan from way back had now been validated; it was coming to fruition.

A.    I don't remember saying that specifically, but what I do believe is that the demand for broadband data had increased to the level that we had expected back when we put the business plan together for Raze.

Q.    Fair enough.  So we're eight years past when you think now there's this big demand for data.  True?

A.    I think so.

Q.    And still nobody -- you're offering to sell it to all these companies, all these investment venture capital lists, still nobody invests a dollar.  Correct?

A.    You'll have to tell me the time frame again.

Q.    Up to 2016, sir.  You tried to sell them from 2008 to 2016, introduction of the iPhone eight years post, nobody made an offer --

A.    In terms of the sale, you're correct.

        THE COURT:  One at a time, please.

        THE WITNESS:  Sorry.

Q.    (BY MR. DACUS)  Nobody made an offer, did they?

A.    Not to buy the patents.

Q.    Okay.

MR. DACUS:  That's all the questions I have, Your Honor.  I pass the witness.  Thank you.

THE COURT:  All right.  Is there redirect?

MS. FAIR:  Yes, Your Honor.

THE COURT:  All right.  Let's proceed with redirect.

REDIRECT EXAMINATION

BY MS. FAIR:

Q.    Mr. Hynek, I want to start with this Navini system we've heard some about.  Did it sound to you like the Defendants are insinuating that you copied Navini?

A.    It certainly did yesterday.

Q.    Is that true?

A.    Absolutely not.

Q.    What type of technology was Navini working on?  What type of system?  What type of information was their system intended to communicate wirelessly?

A.    My understanding was back in the early 2000s, Navini had a proprietary system.  It was unlike anything that anybody else was even developing.  Raze was developing a carrier-class voice along with the broadband.

Q.    So voice and data together?

A.    Voice and data together, which Mr. Struhsaker believed

was very, very important to create a valuable commercial product.

Q.   And what was Navini's system?  Did it include voice and data?

A.   It was my understanding it was data only.

Q.   And was Navini's system using custom-built antenna arrays like we heard about yesterday that Mr. Struhsaker and his team had to build because it didn't already exist?

A.   It's a little outside of my expertise, but I think that the antennas that Navini used were nothing like the antennas that Raze was intending to use in their system.

Q.   And by the way, we heard about this trade show that was in the summer of 2001 where I think these allegations are starting, when was the patent application filed?

A.   They were filed in January and April of 2001.

Q.   Is that before or after the trade show?

A.   It was before the trade show.

Q.   We heard a lot of questions turning to investment about all these third parties with no dog in the fight.  Back when you were doing the due diligence into Raze, as somebody who wasn't the technologist, was there a third party who evaluated the technology who didn't have a dog in the fight?

A.   There was.

Q.   Who was that?

A.   The one name that comes to mind is Dr. Hal Sobol did that

initial report a long time ago.

Q.   Who is Dr. Hal Sobol?  Is he some off the street guy?

A.   I don't believe so.  I didn't think that he was.  He's a very credentialed technologist in the telecommunications space.

Q.   In 2001/2002 when Raze was working on getting these investments, what was the demand for wireless data like?

A.   The world in telecommunications was just moving from the 2G flip phones where you had to press -- I don't remember the numbers, but you had to press a 2 like three times to get an E or something like that.  It was considerably much less demand for data than it has been certainly today.

Q.   And we heard about some of these sophisticated tech companies, some of the most sophisticated in the world that looked at Raze's commercial products.  Do you remember that?

A.   I do.

Q.   Does it seem like they were cautious and hesitant about spending money on Raze?

A.   It did.

Q.   And in your experience, are people more cautious and hesitant with something that's new and innovative and ahead of its time, or with something that's well-established and easy to invest in and not that risky?

         MR. DACUS:  Your Honor, object to leading.

         THE COURT:  Sustained.

Q.    (BY MS. FAIR)  What type of technologies are people more hesitant to invest in based on your experience?

A.    Obviously new technologies.  And one of the things that we were well-aware of is that Raze was way ahead of its time.  These patents go back to 2001.  It's now 25 years later and they are still applicable in today's telecommunications systems.

Q.    I want to fast forward to the brokers when you were exploring the potential sale of the portfolio.  What types of materials did they put together to show all these companies they were reaching out to?

A.    In the case of RSL, they had quite a bit of information that they had prepared.

Q.    And that included an explanation of the patents, including those in this case?

A.    It did.

Q.    And we heard that Cisco was shown information about the patents in this case.  And just to orient us in time, when was it that you were working with RSL?

A.    I believe it was like 2009 to 2011, generally, but I don't recall those specific dates.

Q.    Are there any other companies that RSL showed these materials to, to your knowledge, besides Cisco?

A.    Oh, yes, absolutely there were.  They had a long list as well that they showed them to.

Q.   Did it include T-Mobile?

A.   I believe it did.

Q.   Did it include Ericsson?

A.   I believe it did.

Q.   So in the early 2010s, right before the infringement started, T-Mobile and Ericsson were presented with information about these patents?

A.   Yes, I believe they were.

Q.   And in all of your years with these efforts, did any of the companies you talked to say there was anything wrong with your technology?

A.   Not to my knowledge, unless they were opposed to it just being a fixed-only system.

Q.   And to your understanding, was Raze also working on mobility?

A.   We weren't working on mobility at the time, but that was always the roadmap to the future.

Q.   And to your understanding from your experience with Raze and the technologies in this case, does it apply equally to fixed and mobile?

        MR. DACUS:   Objection, Your Honor.   Calls for opinion testimony.

        THE COURT:   Sustained.

Q.   (BY MS. FAIR)   Mr. Hynek, in your experience, what can you tell us about Mr. Struhsaker's work in 2001 and where the

market has finally gotten?

A.   Well, I think that we talked about specific third parties.  These list of companies that were on Hoak Breedlove's document.  But while I was going through that exercise, I talked to hundreds of different people, technologists, and other people that were in the industry, and got nothing but positive feedback from them.

MR. DACUS:  Your Honor, we're getting into hearsay.  He's reciting what other people told him.  I object.

THE COURT:  He's not really responding to your question, counsel.  Why don't you restate your question.

Q.   (BY MS. FAIR)  Where has the market finally gotten after all these years when you were looking at Raze in the early 2000s?

A.   It's just been an incredible validation of what Mr. Struhsaker had developed.  Most all of our competitors back then in 2000, 2001, their technologies just went away, and it just was amazing to me and a validation of our decision to continue to back that company that the technology moved right into what Mr. Struhsaker and his team developed.

MS. FAIR:  I'll pass the witness.

THE COURT:  All right.  Is there additional cross examination?

MR. DACUS:  Briefly, Your Honor.

THE COURT:  Proceed with additional cross.

MR. DACUS:  Thank you.

RECROSS EXAMINATION

BY MR. DACUS:

Q.   Mr. Hynek, I failed to ask you and I don't think your counsel did, where do you live, sir?

A.   I live in Dallas, Texas.

Q.   In Dallas, Texas, are you familiar with the term or the phrase proof is in the pudding?

A.   I've heard that before.

Q.   Okay.  It means people's actions speak louder than their words.  Right?

A.   I don't know who you're talking about, sir.

Q.   I'm just saying, in general, have you heard that phrase before, proof is in the pudding?

A.   I have heard it.

Q.   Do you understand that to mean that sort of the actions speak louder than words?

A.   I suppose you could characterize it that way.

Q.   Yeah.  And your words are up here.  You're saying that these two patents were great technology and that people needed it and it's come to fruition, that they need it now.  That's basically what you just told the jury.  Right?

A.   I believe that.

Q.   But you're here accusing base stations in both 4G and 5G networks.  Correct?

A.   The lawsuit speaks for itself.

Q.   Okay.  And you know that 4G, sir, was implemented back in 2008.  Correct?

A.   Not certain of the exact date, but I don't dispute that.

Q.   Okay.  You were out there trying to sell these patents, the very two we're here, after 2008, in fact for eight years after 2008, and not a single written offer from anyone in this industry or people who undertake investments on behalf of start-up companies; nothing.  Correct?

A.   I think that's what I testified to.

Q.   Okay.  So that's the proof that we have.  We have your words, but the proof we have is no one else other than you saw or believed that these two patents had any value to 4G and 5G technology.  Correct?

A.   That's incorrect.

Q.   Okay.

          MR. DACUS:  I pass the witness, Your Honor.

          THE COURT:  All right.  Any further direct?

          MS. FAIR:  No, Your Honor.

          THE COURT:  You may step down, Mr. Hynek.

     Ladies and gentlemen of the jury, we're going to take a brief recess at this point.  If you'll simply close your notebooks and leave them in your chairs, remember to follow all my instructions about your conduct, including not to discuss the case among each other.

And we'll be back shortly to continue with the next Plaintiff's witness.

The jury's excused for recess.

(Whereupon, the jury left the courtroom.)

THE COURT:  All right.  Be seated, please.

All right.  Mr. Haynes and I don't see Mr. Knobloch. There he is.  Would the two of you gentlemen approach the bench, please?

(The following was had at the bench.)

THE COURT:  Where are we briefly on Dr. Madisetti and the discussions we had in chambers this morning?

MR. KNOBLOCH:  So we served a revised slide deck on the '383 and all the disputes have been resolved.  So we're ready to proceed, Your Honor.

MR. HAYNES:  I believe that's the case.  I have someone handling it for me.  I've looked at some of the slides.  I haven't had a chance to see the final final, but I believe we've got it resolved and we will work it out.

THE COURT:  All right.  And Dr. Madisetti is up next?

MR. KNOBLOCH:  Yes.  We're ready to proceed with that.

THE COURT:  You-all dot the Is and cross the Ts, and I'll go on the assumption that this has been resolved.

MR. KNOBLOCH:  Thank you, Your Honor.

MR. HAYNES:  Thank you, Your Honor.

(The following was had in open court.)

THE COURT:  All right.  The Court will take a brief recess.

(Brief recess.)

THE COURT:  Be seated, please.

Are you prepared to call your next witness?

MR. KNOBLOCH:  Yes, Your Honor.

THE COURT:  Let's bring in the jury, please.

(Whereupon, the jury entered the courtroom.)

THE COURT:  Please be seated, ladies and gentlemen.

Plaintiff, call your next witness, please.

MR. KNOBLOCH:  Plaintiff calls Dr. Vijay Madisetti.

THE COURT:  All right.  Dr. Madisetti, if you'll come forward and be sworn.

(Whereupon, the oath was administered by the Clerk.)

THE COURT:  Please come around, have a seat on the witness stand.

VIJAY MADISETTI, Ph.D.,

having been first duly sworn, testified under oath as follows:

DIRECT EXAMINATION

BY MR. KNOBLOCH:

Q.   Good morning, Dr. Madisetti.

A.   Good morning, sir.

Q.   Can you please introduce yourself?

A.    My name is Vijay Madisetti.  I live in Atlanta, Georgia.

Q.    And what do you do?

A.    I'm a professor at Georgia Tech.  I teach computer science.

Q.    Why are you here today?

A.    I'm here today to offer an opinion on infringement and technical benefits of the '477 and '383 Patents.

Q.    Where did you go to school?

A.    I studied at Berkeley, and I graduated from there with a Ph.D., and then I joined Georgia Tech.

Q.    How long have you been working at Georgia Tech?

A.    Almost 30 years, 30-plus years.

Q.    What do you do as a professor at Georgia Tech?

A.    I teach in the colleges of computing and engineering, and I do a lot of research and signal processing software cybersecurity chip design.  I teach both hardware and software design classes and supervise Ph.D. students.

Q.    Have you authored or edited any books?

A.    Yes.  I like writing books.  The first book I wrote was in 1995 on the top left.  It's called *Digital Signal Processors.*  And the most recent book was last year on cloud-based micro services.

Q.    So I brought a copy of one of the books you edited here from the slide there.  Can you tell the jury, is there any specific significance to the issue of digital signal

processing in this case?

A.   Yes.  I worked for the last 30 years in DSPs.  The first book that's on DSPs is the book on the top left which is in blue, and that's on DSPs.  And the book that the counsel was carrying is a handbook published in two versions so it covers all topics in DSP.

Q.   And at the bottom of the book here, it says IEEE Press.  What does that refer to?

A.   IEEE is the largest professional body in the world.  It has about 400,000 engineers, and it publishes a lot of high quality textbooks.

Q.   Dr. Madisetti, do you have any patents?

A.   Yes.  I've been very active in the patents.  I have about 67 issued patents where I'm the lead inventor, and more than 100 applications that are pending.

Q.   What subject areas do your patents cover?

A.   They cover a wide area.  They include topics in engineering, computer science, block chain, AI, some signal processing, cybersecurity.

Q.   Have you received any professional awards?

A.   Yes.  At Georgia Tech, I got -- I was awarded the Outstanding Dissertation Advisory Board, some teacher awards, and the American Society of Engineering Education awarded me the Terman Medal for outstanding contributions to the profession while under the age of 45, and the IEEE elected me

413

as a Fellow in 2006 or '7.

Q.   You mentioned earlier doing research work.  Can you give the jury some examples of some of the research work that you've done?

A.   Yes.  Over the years the federal government has funded a lot of research.  In addition to the National Science Foundation, the defense, the Army, the Air Force, and other labs, they fund quite a bit of work for my -- for me and my students.

Q.   Aside from this case, have you done any work consulting in cases involving patents?

A.   Yes.

Q.   What kind of work have you done in other cases involving patents?

A.   Similar work for other companies and their counsel as listed in this slide and some work on more technical areas.

Q.   Have you testified as an expert witness in other cases related to wireless communications?

A.   Yes.

Q.   About how many?

A.   Probably about 20, 25 times.

Q.   Have you also served as an expert witness in cases before the Patent Office?

A.   Yes, for the -- yes.

Q.   Are you being compensated for the time you spend working

on this case?

A.   Yes.

Q.   What is your hourly rate?

A.   It's around $550 or $600.

Q.   How much time have you spent working on this case?

A.   About 300 hours.

Q.   Is your compensation connected in any way to the outcome of this case?

A.   No.  I am an independent consultant.

MR. KNOBLOCH:  Your Honor, General Access moves to qualify Dr. Madisetti as an expert witness in this case regarding wireless communications.

THE COURT:  Is there objection?

MR. HAYNES:  No objection, Your Honor.

THE COURT:  Then without objection, the Court will recognize this witness as an expert in that designated field.

Please continue, counsel.

MR. KNOBLOCH:  Thank you.

Q.   (BY MR. KNOBLOCH)  Dr. Madisetti, what were you asked to analyze as an expert in this case?

A.   Specifically for today I was asked to look at the two General Access patents and analyze them, the '477 and the '383, and specifically look at whether T-Mobile's accused base stations infringe the asserted claims, and also provide an opinion on the technical benefits of the asserted claims.

Q.    And what do we see here on this slide?

A.    These are the two patents-at-issue, the '477 and the '383, and we heard from Paul Struhsaker yesterday and Dr. McKown by video describing their inventions.

Q.    When were the '477 and '383 Patents filed?

A.    Almost 24 years ago on April 20th of 2001, so these were very early.

Q.    And what -- at a high level what conclusions or opinions have you reached about the patents in this case?

A.    Yes.  In my opinion, all accused base stations infringe claims 1 and 3 of the '477, the TDD base stations also infringe claim 6, and T-Mobile's use of claims 1, 3, and 6 improves the uplink throughput, coverage, and capacity by about 2 to 7 percent.

With respect to the '383 Patent, all accused base stations infringe claim 16, and T-Mobile's use of claim 16 improves uplink throughput, coverage, and capacity by 4 percent.

Q.    Okay.  What evidence did you consider in reaching and forming your opinions in this case?

A.    Several types of evidence.  For example, technical documents, source code, the documents from T-Mobile and Ericsson, third-party technical documents, books, deposition testimony, the website, and even 4G and 5G standards.

Q.    Did you prepare any written reports in this case?

416

A.    Yes.   I wrote several reports, and there are I think three different reports.

Q.    How long -- about how long were the reports?  You don't have to check the page number exactly, just about.

A.    Several hundred pages.

Q.    Okay.  So I'd like to start with diving into the '477 Patent some more.

What do we see here?

A.    This is the '477 Patent, which I'll cover first.

Q.    And what do we see here in this next slide?

A.    So this is an exemplary asserted claim, which is claim 1, so I will list them as follows and I provided a numbered index of each limitation and so that I can go through each limitation and analyze where the accused base stations practice that limitation.

        MR. KNOBLOCH:  Your Honor, may I also -- we prepared a board with the claim 1 language.  May I put it up on the easel here?

        THE COURT:  You may.

        MR. KNOBLOCH:  Thank you, Your Honor.

Q.    (BY MR. KNOBLOCH)  Can you see that, Dr. Madisetti?

A.    Yes, sir.

Q.    And what do we see on this next slide?

A.    These are the other two claims, the claims 3 and 6 that are also asserted.

Q.    Okay.  Beginning with the background, what is the -- what was the problem that was being addressed by the '477 Patent?

A.    As an example use case as I describe here, the base stations which are the focus of these claims, must operate and receive data bursts from a large number of subscribers on the uplink.

Q.    Did the '477 Patent identify any problems that tend to occur in those circumstances?

A.    Yes.  Because the mobile users are at different locations with different channels and different power, there are problems that occur because of the variability of the physical channels.  They may have error rates that can create trouble.

Q.    Did the '477 Patent also describe some solutions to this problem?

A.    Yes.  It provides various ways of modifying, for example, the modulation error correction and other aspects to improve upon the performance.

Q.    I think the jury has heard a little bit about modulation before.  At a high level can you explain what is modulation?

A.    Yes.  Modulation means that you take the bits and combine the bits into some sort of packet that is modulated in a more robust way of sending information across the wireless channel.  So if you take two bits at a time and create a modulated packet, that's QPSK, or you can take 16 or 64 or 256 bits at a time and send them as a packet as well.  So the more packaging

418

you do for bits, the better your data rate is for your uplink.

Q.    What is this next diagram or how do these diagrams relate to the modulation?

A.    So this shows how that particular packet travels along the wireless link.  So if you have QPSK you take two bits at a time and send it as one of those four values on the left.  If you take 6 bits or 64 QAM, you are sending them as one of these dots on this -- on the -- shown here.  And if you take 8 bits at a time, that's called 256 QAM.  You will have a lot of these dots so you can send more information in each of those dots.

Q.    Now, taking just 16 QAM as an example, what is shown here?

A.    Yes.  So if you take 16 QAM, you can package 4 bits as one of these 16 dots, and that is called a modulated symbol. And the distance between the dots tells you how much noise you can handle.

Q.    Do base stations simply use the highest modulation available all the time?

A.    They cannot.  They would like to do that, but it's difficult to do that because of noise and the channel and the signal characteristics because if you use the highest modulation, you have very little margin of error.

Q.    And what is shown here in this red arrow?

A.    The red arrow shows the opposite process, which is called

demodulation, where you receive one of these dots and you convert that back into bits.

Q.    Does modulation depend on the link quality between the user and the base station?

A.    Yes, it does.  I'm wondering how to delete that.

Q.    I think I got it.

A.    Okay.  So the modulation does depend on the link quality, and here is an example that I can show.

Q.    So what do we see with user 1?

A.    So user 1 is the furtherest away and it has the smallest power and link quality, so it uses the QPSK modulation which has the largest distance between the dots.  So that way it can handle more noise.

Q.    What do we see with user 2?

A.    User 2 has a slightly better signal.  So they can use 16 QAM.

Q.    And is this literally meant to depict that the users closest to the base station are always getting higher modulations?

A.    No.  Sometimes you can have -- you can be close to the base station, but you can have say obstacles or others things that impede your capability to use higher modulation.

Q.    And user 3 who is depicted as being closer to the base station here having a better signal, what modulation does he use?

A.    They use the better modulation of 64 QAM.

Q.    And finally user 4?

A.    The user 4 can really upgrade their uplink speeds at 256 QAM.  So they can send a much higher data rate on the uplink.

Q.    And does the '477 Patent explain how a base station can use these different modulations?

A.    Yes.  At the receiving base station, the secret sauce is called profiles.

Q.    What are profiles?

A.    So profiles are a type of some information that's maintained at the base station for signal and channel parameters for each user, or UE, which is user equipment.

Q.    And how does the base station use the profiles that it generates for each user?

A.    It uses the profiles to allow it to demodulate bursts of data received by -- received from each user.

Q.    What do we see here in this slide?

A.    This is an example from the '477 Patent, figure 1.  It shows a base station that is 110.

Q.    Is that what has been circled here?

A.    Yes.

Q.    And what is inside of this base station?

A.    So the base station has a radio unit, and it also has that workstation on the bottom which is called a baseband unit.

Q.    And what do we see here with the arrow going from user 1 to the base station?

A.    That shows a representative communication link that goes from a user UE to the base station.

Q.    And then what do we see here?

A.    Here it is a burst of data that is received by the antennas and the radio.  And then once it's received, the base station in the '477 Patent creates a profile for the user.

Q.    And what is the profile parameter determiner?  What is that?

A.    That's the component that creates the profile and populates it with the parameters so it determines the parameters and populates it.

Q.    What sort of information is -- is determined by the profile parameter determiner?

A.    There are two types of information.  First, I'll call signal parameters which represent properties of the signal which is things like power, error rate, and so on.

      The other one is the channel which is the sort of way by which the part by which the signal receives -- is received at the base station, and those are called channel parameters.

Q.    How does the base station use the signal and channel parameters determined by the profile parameter determiner?

A.    In a typical use case, it would use those to determine the modulation that UE would use to communicate with it.

Q.    What does the profile creating apparatus do with the parameters determined by the profile parameter determiner?

A.    It stores them for future use.

Q.    And is that what we see here at the bottom of this image?

A.    Yes.  It has a storage device that allows it to store these for handy reference whenever the user communicates with it in the future.

Q.    So, in short, a signal comes into the base station, that's the first step.  Right?

A.    Yes.

Q.    After that, there's a profile parameter determiner.

A.    Yes.

Q.    That determiner determines both signal and channel parameters?

A.    Yes.

Q.    And then what happens to those parameters?

A.    Those are stored, and the next time or in successive bursts those parameters are used to facilitate reception.

Q.    So we talked about signal-related parameters a moment ago.  Are there specific examples of signal-related parameters identified in the '477 Patent?

A.    Yes.  The '477 Patent, which is Exhibit JX 1 in column 5, lines 56 to 61, gives specific examples of signal-related parameters.

Q.    And what are those examples?

A.   Those examples are the FEC, which is the error correction rate; the change in frequency of the burst; change in time; power levels; and other such examples.

Q.   Does the patent specification also identify channel-related parameters?

A.   Yes.

Q.   What are those?

A.   For example, in column 11, lines 61 through 64, it describes equalization weighting, antenna parameters as additional examples of channel-related parameters.

Q.   Okay.  So I'd like to talk about your infringement analysis.  Focusing first on the preamble, which is the very first part of the claim, and we're going to walk through all of the parts of the claim, do T-Mobile's base stations include a profile-creating apparatus?

A.   Yes.

Q.   Does that apparatus create at least a first profile associated with transmission upon at least a first channel?

A.   Yes, it does.

Q.   And what do we see here in this slide depicted as the first channel?

A.   Yes.  The first channel is in this case a data burst that is received from a user 1.

Q.   And what do we see here?

A.   So when that first burst data signal comes, then at the

receiving station, which is the base station, there's a profile-creating apparatus that will be described next.

Q.   And in this example, the first burst data signal comes from which user?

A.   User 1.

Q.   Okay.  Now, it says here in the preamble that the first burst data signal is transmitted in bursts to a receiving station.  Do you see that?

A.   Yes.

Q.   What is a receiving station?

A.   The Court has construed the receiving station in claims 1 and 6 as having its plain and ordinary meaning.

Q.   Under its plain and ordinary meaning, what is a receiving station?

A.   An example of a receiving station could be a base station.

Q.   Would it be limited to a base station in a fixed or mobile network?

A.   No.  It can be both fixed and mobile.

Q.   Are T-Mobile's base stations examples of the claimed receiving station?

A.   Yes.

Q.   Okay.  And the final portion of the preamble says, said profile-creating apparatus comprising.  What does that mean?

A.   It means that there is a profile-creating apparatus that

425

we'll describe next.

Q.   And what are the accused products in this case?

A.   The accused products are identified in Exhibit JX 72, and here is an example of an accused product, and in this case it is T-Mobile base stations that are supplied by Ericsson.

Q.   On the -- in sort of the middle of the slide, there's a white rectangle.  What is that equipment?

A.   Yes.  That is the radio portion of the base station that is shown on the right.

Q.   And where do those radios reside in a real base station?

A.   They are at the top of the tower that you can see beside the freeway or the roads.

Q.   What is shown at the bottom underneath the radio?

A.   That is the -- more the -- it's called a baseband unit. That's something like a server.

Q.   Are both of these components that Ericsson provides for T-Mobile's base stations?

A.   Yes.

Q.   Is there any dispute in this case that the Ericsson base stations used in T-Mobile's network generate a profile?

A.   No.  In fact, we heard from several depositions, and Smith, for example, Bevan Smith, is a corporate representative of T-Mobile.  And he confirmed in his deposition that Ericsson base stations generate UE context for each user.

Q.   Does Mr. McHardy's testimony also inform your view on

426

this issue?

A.    Yes.  And he confirms that the UE context is also called a scheduling entity session, and that is his deposition transcript, pages 50 and 51.

Q.    Now, we talked about the channel.  In T-Mobile's base station, what is the first channel referred to in the preamble?

A.    The uplink channel is a shared channel because it's shared between multiple users, and it's called the PUSCH, or the physical uplink shared channel.

Q.    What is that first channel, the physical uplink shared channel, used to transmit in T-Mobile's network?

A.    As shown here in the document, technical document with Bates No. 7856, that it transmits data or uplink user data or PUSCH data.

Q.    How is data transmitted on the physical uplink shared channel in T-Mobile's network?

A.    Ericsson's document confirms that it's transmitted as bursts in exhibit PX 23 at page 49.  These bursts are typically short packets of information, often about 40 bytes.

Q.    And what does this JX 17 say about how data is transmitted on the physical uplink share channel in T-Mobile's network?

A.    So it describes here the data is sent on the PUSCH and it is sent in data bursts and it's transmitted in bursts as first

427

burst data signal.

Q.    And I see the red label 5G base station here, is that something you created?

A.    No.  It's from the Ericsson document.

Q.    I believe -- sorry, Dr. Madisetti.  What does NR -- I believe that is something that you created here, just to remind you.

THE COURT:  Counsel, making a statement to remind the witness of something is not proper.  Just ask him a question.  If he doesn't remember, he doesn't remember.

MR. KNOBLOCH:  Thank you, Your Honor.

Q.    (BY MR. KNOBLOCH)  What does NR cell mean?

A.    It's reference to the 5G base station, and the label on the right is what I created.  The document on the left is from Ericsson.

Q.    And NR, those letters, what do those letters stand for?

A.    It stands for 5G, new release, yeah.  New radio.

Q.    In T-Mobile's 5G base stations, is data received in the uplink as a burst?

A.    Yes, as the document JX 17 confirms that.

Q.    Based on all of the evidence you considered, what conclusion did you reach about the preamble in claim 1?

A.    That the preamble is satisfied by the accused base stations.

Q.    Okay.  So let's move on then to the first limitation

428

which we've labeled as 1[a], and what is shown here?

A.    The first limitation is broken into two parts, [a.1] and [a.2].  In this case we're talking about a profile parameter determiner that's coupled to receive an indication of an initial burst.  And we are talking about the first channel to the receiving station.  So I show here that the accused base station receives a first burst signal on the PUSCH.

Q.    And what is shown here?

A.    So in this example two bits are received as an initial burst.

Q.    When those bits of data are received by the base station, what happens?  Does the profile parameter determiner receive an indication of that?

A.    Yes.

Q.    And what do we -- and is that what we're seeing here?

A.    Yes.

Q.    Is the profile parameter determiner coupled to receive an indication of that burst?

A.    Yes.

Q.    And what do we see here on this slide?

A.    So these are example profile parameter determiners in the accused products, so the Ericsson base station components have what are called as Lynx and Eagle Owl DSPs and Trinity DSPs that are shown here.

Q.    You mentioned DSPs.  What does that stand for?

A.    It stands for a digital signal processor.

Q.    Are the digital signal processors in T-Mobile's base stations used to determine the parameters of data signals?

A.    Yes.

Q.    Do all Ericsson base stations supplied to T-Mobile include processors that measure and determine signal and channel parameters?

A.    Yes.

Q.    Does the -- are the profile parameter determiners in the base stations receive and determine parameters based on an initial burst?

A.    Yes.  Here I rely upon deposition testimony from Dr. Sung, who is T-Mobile's corporate representative who we heard on the video deposition, and he confirms this in his deposition transcript, page 88.

Q.    What is shown here?

A.    Here is an example of an initial burst.  So you have -- in the previous slide you have a bunch of time slots, and in the first slot you are sending on the PUSCH something called a DMRS, which is an example of a first burst data signal or the initial burst.

Q.    Is this the only example of an initial burst in T-Mobile's network?

A.    No, there are other examples as well, other reference signals that are sent.

430

Q.    What does this illustration show?

A.    So this shows the profile parameter determiner and how it will work next.

Q.    Does the profile parameter determiner in T-Mobile's base stations determine a value of at least one signal-related parameter?

A.    Yes.

Q.    Now, how many signal-related parameters are required by claim element 1[a]?

A.    In 1[a] -- 1[a.2}, it says here that there is at least one signal -- determining at least one signal-related parameter, so one or more.

Q.    And what are -- just to go over -- what are some of the signal-related parameters that you've identified in T-Mobile's network?

A.    Yes.  So I identified forward error correction parameters as well as power level changes.  These are consistent with the specification.

Q.    What is the first example signal-related parameter that's determined in T-Mobile's network?

A.    So in this -- as we can see from the Ericsson document where GNodeB is the base station, signal power is one example of a signal-related parameter that's measured.

Q.    What is this document?

A.    This is an example of a section of JX 5 on page 277 from

Ericsson.  It describes the RRM algorithm for the 5G.  And in section 16.1, it describes another signal-related parameter that is determined, and this is called power head room report reception that evaluates and calculates the transmit power spectral density, or PSD.

Q.    Does the RRM algorithm also take into account error correction values?

A.    Yes, it does.  The next section, 16.4 of this same exhibit, confirms that it also measures error rate, which is the forward error correction parameter.

Q.    So we've talked about a couple of signal-related parameters.  Do T-Mobile's base stations also determine channel-related parameters?

A.    Yes.  They determine the values of both signal and channel-related parameters.

Q.    And remind -- to remind me, what are the channel-related parameters that the specification identifies.

A.    Examples are provided in the specification that include equalization weighting and antenna parameters.

Q.    Does the specification provide specific examples of antenna-related parameters?

A.    Yes.

Q.    And what are one of those?

A.    Antenna combining parameters, for example, and also beamforming parameters.

432

Q.   Okay.  And I think we've heard a little bit about beamforming before, but can you please explain to the jury at a high level what is beamforming?

A.   So beamforming is a way by which you can enhance the quality of the signal.  So in this example you have a user, and the user is communicating with the base station.  And so they typically have a wide omnidirectional distribution of energy, so the power goes in all directions.

Q.   So, Dr. Madisetti, is beamforming something that base stations do just when they transmit information to users or also when they're listening to --

A.   They do it for both cases.

Q.   So in this illustration what is shown by this user's transmission?

A.   The user's transmission is omnidirectional, in all directions, so the base station will have to -- can use beamforming to improve its reception.

Q.   And what is depicted here in this next --

A.   So the base station is now listening in a particular direction, so it's trying to focus its attention and direction on the specific user itself.

Q.   When the base station focuses its attention to listen to a specific user, how does that change the level of the base station's reception of the user's signal?

A.   It greatly improves it because now you are able to focus

433

-- just like you can hear a particular way, the base station allows -- is -- allows much higher quality of the link.

Q.   What sort of parameters do T-Mobile's base stations use to assist with beamforming?

A.   As we see on the next slide, they have various antenna-related beamforming parameters that are used.

Q.   Before we get to the specifics, is there any dispute that T-Mobile's TDD base stations, in fact, use beamforming to receive signals from users?

A.   No.  Mr. Smith, who is the corporate representative, in his deposition confirms that TDD, or the time division duplexing, base stations use beamforming.

Q.   Is there any dispute that T-Mobile's base stations learn about the channel quality from the initial burst of the first burst data signal?

A.   No.  Dr. Sung in his deposition, page 88, confirms that channel quality measurements are made.

Q.   So you mentioned an example of a channel-related parameter.  Is an example of channel-related parameter shown on this slide?

A.   Yes.  It's a document from Ericsson, which is Exhibit JX 20 at page 10; identifies a specific parameter called frequency offset.

Q.   And just to start with, on the -- the beamforming algorithm at the top there, what is that?

A.    It's called -- it's called -- it's Exhibit JX 20 at 10. It's used to do uplink beamforming.

Q.    And this frequency offset, is that one of the parameters that is taken into account in the beamforming algorithm?

A.    Yes.  It's a channel-related parameter.

Q.    Is there also -- the other example channel-related parameter discussed in the specification are equalization weighting.  Is that right?

A.    Yes.

Q.    Do T-Mobile's base stations also determine equalization weighting?

A.    Yes.

Q.    What does this document show?

A.    Here is an example from JX 19 on page 45.  It confirms in section 4.23 that antenna combining and equalization parameters are also determined.

Q.    Does this document further confirm that, or this page?

A.    Yes, it confirms that you're determining the values through these equalizer calculations in the same document, section 4.22.

Q.    Does the RRM algorithm explain how the equalizer values are used by the base station?

A.    Yes.  It describes specific parameter called post EqSinr, and this is described as the average received uplink post-equalizer signal, and that's an example of a

435

channel-related parameter because it's processed in the equalizer.

Q.    What is the output from the base station's determination of the post-equalized SINR?

A.    As shown on the right, it is called the gain field average, which is the filtered channel gain.

Q.    Is the filtered channel gain calculated based on the equalization weighting in T-Mobile's base stations?

A.    Yes, because you can see the input is on the left and the output is on the right.

Q.    Is channel gain an example of a value representative of a channel-related parameter?

A.    Yes.

Q.    What does this summary slide show?

A.    So this is, again, based on Exhibits JX 5, JX 13, and JX 75, JX 20, and JX 19, and it describes -- it summarizes the various parameters, both signal-related and channel-related. So I've identified two of the signal-related parameters and three of the channel-related parameters as examples.  My report has a few more.

Q.    As far as you know, is there any dispute that T-Mobile's base stations determine all of these parameters?

A.    No.  There's no dispute.

Q.    Based on the evidence you reviewed, what do you conclude about element 1[a]?

A.    That element 1[a] is practiced by the accused T-Mobile base stations.

Q.    Okay.  So I'd like to move on to element 1[b].  And element 1[b] here, we'll start here, refers to "wherein the signal-related and channel-related parameters are collectively representative of communication of the first burst data signal over the first channel to the receiving station."

Do you see that?

A.    Yes.

Q.    And in T-Mobile's network, are the signal and channel-related parameters determined by the profile parameter determiner collectively representative as described here?

A.    Yes.

Q.    How so?

A.    So as we can see in this example, the channel parameters and the signal parameters are determined from the communications and they represent collectively the quality of the communication link or the type of modulation or coding on that particular communication link.

Q.    How does the base station use the information it obtains from the signal- and channel-related parameters?

A.    It determines the communication, say, the modulation and the coding for the successive bursts from the UE.

Q.    Are those parameters collectively representative?

A.    Yes.

Q.    How so?

A.    As we can see in the next slide that, for example, Mr. Smith's testimony confirms that you determine the modulation and coding to assign for a given user on the uplink transmission, so these link adaptation, as it's called, is determined by these channel and signal parameters.

Q.    Can you, just taking a step back, explain what link adaptation is?

A.    Link adaptation is the way by which you can change the modulation on the uplink to better suit the channel and the signal qualities of the link on the -- from the user device to the base station.

Q.    And what information do T-Mobile's base stations use to determine link adaptation?

A.    They use channel and signal parameters.

Q.    And did you prepare this graphic to sort of walk through the steps of how these -- this link adaptation process works?

A.    Yes.

Q.    Okay.  What do we see here?

A.    So we have an initial burst from a user 1, and based on that initial burst, user profile is created by the determiner.

Q.    What does the determiner do with that information about the first user?

A.    It identifies the modulation and coding requirements for the next subsequent transmissions from the user 1, which is in

438

this case QPSK.

Q.   Okay.  So that's what we see in this last step here where the arrow points down to QPSK?

A.   Yes.

Q.   Okay.

A.   So that describes the communication link.

Q.   And what about with user 2?  What happens with user 2?

A.   Based on user 2's better reception, it utilizes the modulation, say, for example, 16 QAM for the communication link from user 2 for the future.

Q.   And user 3?

A.   Yes.  The same way, there's a profile created for user 3 that is even better using 64 QAM.

Q.   And, finally, for user 4?

A.   Yes.  And we have the profile for user 4 with 256 QAM.

Q.   Is there any dispute that T-Mobile's base stations, in fact, take signal- and channel-related parameters and assign a modulation to each user?

A.   There is no dispute.  I think the deposition testimony, source code, and documents confirm this happens.

Q.   What is the name of the algorithm that T-Mobile's base stations use for link adaptation?

A.   As shown in this slide--it's Exhibit JX 5--it is called the new radio RRM, or radio resource management algorithm specification.

439

Q.    Does this algorithm -- is this what T-Mobile uses to determine modulation?

A.    Yes.  As shown in 16.7, it describes the way the Ericsson base stations for T-Mobile determine modulation.

Q.    What sorts of parameters does T-Mobile's base stations use to determine the modulation?

A.    As shown in the next slide, this is again confirmation by Mr. Smith that the base station determines the modulation, but in the next slide I think we have the listing.

Q.    And does Mr. Smith also explain that link adaptation involves the determination of the modulation?

A.    Yes.

Q.    And what is this -- what do we see here on this slide?

A.    So here are the parameters.  So as an example in this particular slide on JX 5 on pages 295, one of the inputs is the transmit power spectral density; another one is the channel gain, the filter channel gain, and then there is the interference and noise.

Q.    Are these parameters some of the parameters used to select the modulation for the following transmission?

A.    Yes.  As shown in the -- this slide section 16.7.2 confirms that the output is a selected modulation, and that is based on the parameters I just read out from the previous slide.

Q.    Are those the only parameters used to determine

modulation?

A.    The parameters that are determined here are shown in the next slide, and here are the parameters that -- in this case seven different parameters that are used by the RRM algorithm for uplink link adaptation.

Q.    Are the parameters used in the uplink link adaptation process determined by T-Mobile's base stations?

A.    Yes.

Q.    Are the parameters used in the link adaptation process stored by T-Mobile's base stations?

A.    Yes.

Q.    Are the parameters used in the link adaptation process collectively representative of communication of the first burst data signal over the first channel?

A.    Yes, because the algorithm confirms that these parameters determine the modulation, and that is evidence that they are collectively representative of the communications.

Q.    I believe we've seen this testimony.  What does this testimony confirm for you, Dr. Madisetti?

A.    Mr. Smith again confirms that T-Mobile's base stations measure signal- and channel-related communications, and then determine and design the modulation.  So that is confirming that the signal- and channel-related conditions that are measured are representative of the communication collectively.

Q.    You mentioned the channel-related parameters.  To be

Q.    clear, is information relating to beamforming one of the parameters that T-Mobile's TDD base stations use to understand the communication of the first burst data signal?

A.    Yes.

Q.    Based on all the information that we've reviewed and that you've reviewed also outside of Court, what did you conclude about element 1[b]?

A.    That element 1[b] is also practiced.

Q.    Okay.  Moving on to element 1[c], what is depicted here?

A.    This is depicting that the profile parameter -- there is a profile parameter storage device for storing values that are representative of at least one signal-related parameter and at least one channel-related parameter.

Q.    Okay.  So we've talked about the profile parameter determiner, and now we're going to move on to the profile parameter storage device.  Okay?

A.    Yes.

Q.    Is there any dispute that T-Mobile's base stations, in fact, store parameters?

A.    No.

Q.    Is the profile parameter storage device in T-Mobile's base station coupled to the profile parameter determiner?

A.    Yes.

Q.    And what does the term 'coupled to' mean?

A.    The 'coupled to' was construed by the Court as 'joined or

connected to in any way'.

Q.    And in the T-Mobile's base stations, what is the structure that's used for storing the parameters?

A.    Mr. McHardy confirmed in his deposition that this information is a very large structure for the uplink and it's stored.

Q.    And where exactly is -- are these parameters stored?

A.    He confirmed that these parameters are stored in common memory or in external memory, depending on the number of users.

Q.    And what do we see here on this slide?

A.    This is an example of a specification for one of the storage devices in the accused base stations, JX 13 at page 112.  It describes in the next slide -- in the next animation that there's an exemplary profile parameter storage device, which is the common memory.

Q.    Is this the common memory that Mr. McHardy referred to in his testimony as containing the SE session?

A.    Yes.

Q.    What is shown here?

A.    That's another example of -- that's the example of the profile parameter determiner, which is the DSP or the Phoenix five DSP and the Eagle Owl, and similarly for the Lynx DSPs.

Q.    And are the profile parameter storage device, the common memory, and the profile parameter determiner, the DSPs,

443

coupled together in T-Mobile's base stations?

A.   Yes.   As you can see from this, there's a wire between them and they're directly coupled here.

Q.   And is that true also for the Trinity product?

A.   Yes.

Q.   What do we see here?

A.   So here we see in JX 13 at page 31 that there's a common memory and that's the parameter storage device called CM.

Q.   Is the common memory coupled to this -- the profile parameter determiner?

A.   Yes.   The DSP is the profile parameter determiner and it's coupled to it.

Q.   Is there another name sometimes used to describe the structure that contains the profile parameters?

A.   Yes.   It's referred to sometimes as the SE session or the schedule entity session.

Q.   Is there another name besides SE session that's sometimes used to describe the structure for the parameters?

A.   Yes.   It's also called the UE context.

Q.   And remind me, what is UE?

A.   UE stands for the user equipment or the device that the user uses--for example, a smartphone.

Q.   And what does this book tell us about the information in the UE context?

A.   This is an example -- this is an excerpt from a textbook,

PX 14 at page 211.  It confirms that the UE context is a block of information in the 5G base station that is associated with active user equipment, and it contains the necessary information to provide 5G services to active users.

Q.   Now, just briefly, do Ericsson's documents confirm that profile parameter -- that profile parameters are stored in the UE context?

A.   Yes.  This is the document JX 5.  It confirms on page 277 that the parameter transmit PSD is stored in the UE context.

Q.   Is the error correction information also stored in the UE context?

A.   Yes.  As we can see, I have highlighted that it's stored in the UE context.

Q.   Is the equalization information stored in the UE context?

A.   Yes.  The same document, JX 5, confirms this.

Q.   Is the estimated rank also stored in the UE context?

A.   Yes.  That's an antenna channel parameter, yes.

Q.   Is the frequency offset parameter that we talked about earlier also stored?

A.   Yes.

        MR. KNOBLOCH:  And, Your Honor, the next slide has source code on it, and so I think we would need to clear the courtroom before we show it, Your Honor.

        THE COURT:  You'd like me to seal the courtroom and the record?

445

MR. KNOBLOCH:  Yes, please, Your Honor.

THE COURT:  Then based on that request and to protect the confidential information, I'll order the courtroom sealed.

I'll direct all persons present who are not subject to the protective order that's been entered in this case to exit the courtroom until it is reopened and unsealed.

MR. STEVENSON:  Your Honor, what is the ability of corporate representatives to remain?

THE COURT:  I'm not sure the source of this source code.  If it's one of the party's source code, then that would indicate that that corporate representative can remain.

MR. KNOBLOCH:  It is Ericsson's source code.

THE COURT:  Mr. Faxer should be able to remain, but T-Mobile's corporate representative should not.

MR. STEVENSON:  I think Ericsson would be fine with Mr. Mueller remaining.

THE COURT:  All right.  If Ericsson doesn't have a problem with T-Mobile's representative remaining, that's fine.

MR. STEVENSON:  I would think, though, Mr. Hynek would need to leave, though.

THE COURT:  Yes.  I assumed he had left.

(Courtroom sealed.)



Q.

?

A.

Q.                                                                      ?

A.

.

Q.                                                                      ?

A.      .

Q.

?

A.

.

Q.







A. ████████████████████████████.

Q. ████████████████████████████████

████████████████████?

A. ███████████████████████████████

████████████████████████████████

█████████████████████████████

████████████████████████████████

████████████████.

Q. ████████████████████████████████████

███████████████████████?

A. ███████████████████████████████

██████████████████████████

██████████████████████.

Q. ████████████████████████████

██████████████████████?

A.   ███.

Q. █████████████████████████████████

████████████████████?

A. ███████████████████████████.

Q. ██████████████████████████

█████████████████████████████?

A. █████████████████████████████

█████████████████████████████

██████████████████

Q. █████████████████████████████

Shawn M. McRoberts, RMR, CRR
Federal Official Court Reporter





452





(Courtroom unsealed.)

THE COURT:  All right.  The courtroom is reopened and unsealed.

Please continue, counsel.

Q.  (BY MR. KNOBLOCH)  Dr. Madisetti, is there any dispute that in T-Mobile's base stations they use the stored modulation information to help receive signals from users?

A.  No.  JX 5 at 270, for example, confirms that the RRM algorithm that these are attributes fetched from the UE context that include the channel-related parameter, equalization weighting, and signal-related parameter, the power levels.

Q.  And based on all the information you reviewed, what did you conclude about element 1[d] in claim 1 of the '477 Patent?

A.  That 1[d] is also practiced by T-Mobile's accused base

stations.

Q.   Okay.  So that completes claim 1.  Let's move on to the other claims that are asserted from the '477 Patent.

MR. KNOBLOCH:  And, Your Honor, may I switch out the boards?

THE COURT:  You may.

MR. KNOBLOCH:  Thank you.

Q.   (BY MR. KNOBLOCH)  What do we see here, Dr. Madisetti?

THE COURT:  Counsel, if you would, the board that you have taken down, turn it to where we only see the back of it.  Thank you.

MR. KNOBLOCH:  May I place this one back up?

THE COURT:  You may.

MR. KNOBLOCH:  Thank you, Your Honor.

Q.   (BY MR. KNOBLOCH)  What do we see here, Dr. Madisetti?

A.   We see here the dependent claim 3.

Q.   And what does the dependent claim 3 add to claim 1?

A.   It incorporates claim 1, and I rely on the evidence of claim 1 for this, and it adds an additional limitation called 3[b] where it says, "wherein the channel-related parameter is representative of a channel condition of the first channel."

Q.   In T-Mobile's base stations, are the channel-related parameters that are determined and stored by the base stations representative of a channel condition?

A.   Yes.  It describes the modulation schemes used on the

channel, based on the channel conditions, and this is confirmed by Dr. Sung's deposition on page 116.

Q.   And is frequency offset one of the parameters we talked about earlier, is that representative of a channel condition?

A.   Yes.  It references the beamforming aspects of the channel.

Q.   And does the -- do T-Mobile's own documents show that there's a connection between the frequency offset and a channel condition?

A.   Yes.  It refers -- JX 20 at 10 confirms that it is used in an interpolated channel estimate.

Q.   Does JX 19 further confirm that frequency offset is representative of a channel condition?

A.   Yes.  The input and the output are represented as the frequency offset and the channel time correlation, respectively.

Q.   What do these two documents show?

A.   The document, JX 19 at 25, and the Bates number 1329 at 31, confirm that the frequency offset is based on the DM-RS groups which are specific to a particular user, and these are based on the initial bursts.  So it confirms that the channel estimation is based on the channel condition based on the DM-RS.

Q.   Based on all that information, what did you conclude about element 3[b] in claim 3?

456

A.    That claim element 3[b] is also practiced by the accused T-Mobile base stations.

Q.    Okay.  Moving on to the final claim in the '477 Patent, what does claim 6 add to claim 3 of the '477 Patent?

A.    So claim 3 is included in claim 6, so I incorporate the evidence of claim 3 into 6.  And it adds element 6[b] which says that the receiving station comprises an antenna assembly, and wherein the channel-related parameter is determined by the profile parameter determiner that comprises an antenna parameter related to the antenna assembly.

Q.    Starting with the antenna assembly, do T-Mobile's base stations include an antenna assembly?

A.    Yes.

Q.    And what do we see here?

A.    So we see an example of the radio 3 antennas for each sector, and as we look in the next slide, the antenna assembly can be many kinds.

Q.    Before we get to the next slide, I see there is -- in this antenna you've zoomed in and there are these little -- I don't know what -- they're kind of triangles.  What are those shapes meant to represent?

A.    They are meant to represent different elements of the antenna that are assembled together to create the antenna.

Q.    Is this a depiction of what the inside of one of the antennas looks like?

457

A.    Yes.

Q.    What do we see on the next slide?

A.    So we see different options for that from Ericsson document ending in 4562, and they are used to create different types of beams.

Q.    Is there any dispute that the receiving stations, the base stations in T-Mobile's network, include an antenna assembly?

A.    No.  They include different types of array antennas.

Q.    Are the channel-related parameters determined by the profile parameter determiner related to the antenna assembly?

A.    Yes.

Q.    Are the beamforming parameters related to the antenna assembly?

A.    Yes.

Q.    How so?

A.    Mr. Smith confirms that in his deposition that the beamforming is based on transmissions used in transmissions from the user, and we have seen that with the frequency offset.

Q.    And what do we see here?

A.    Here is the beamforming algorithm, JX 20 at page 10 and JX 19.  It describes the beamforming algorithm that shows that the channel parameter, such as the frequency offset, are directly used to determine the selected beams.

458

Q.    Is frequency offset an antenna parameter related to the antenna assembly?

A.    Yes.

Q.    And is frequency offset used by the base station?

A.    Yes, to determine the beams, beams ID.

Q.    What do we see?

A.    Here is the example that I showed earlier that shows that you can use these parameters to focus the beam on a particular user.

Q.    And so what happens after the channel parameters are determined?

A.    Then the beam is fully aligned and the signal quality improves, as seen by the larger number of bars.

Q.    Is that what we see here, the signal passing through the listening ears of the base station?

A.    Yes.

Q.    What did all the evidence you reviewed lead you to conclude about claim 6?

A.    That claim 6 is also practiced by the accused T-Mobile base stations.

Q.    And so, to summarize, what are your conclusions about the '477 Patent infringement?

A.    That the '477 Patent, claims 1, 3, and 6, are all practiced and directly infringed in a literal manner by the accused T-Mobile base stations, and claim 6 specifically is

practiced by the TDD base stations.

Q.   And why for claim 6 are you focused only on the TDD base stations?

A.   Because the TDD base stations use that particular beamforming.

MR. KNOBLOCH:  All right.  Ms. Brunson, if I could stop sharing for a moment just to switch to the '383 Patent?

THE COURT:  Let me interrupt, counsel.  Before we go on to the next patent, it is noon.  We can hear the old courthouse bell ringing across the square.  We're going to break for lunch.

If the members of the jury will take your notebooks with you to the jury room over the lunch break.  Ms. Clendening tells me that lunch should be there waiting for you.

Please remember to follow all my instructions about your conduct, including, of course, as you might expect me to remind you, not to discuss the case among each other.  And we'll be back in about 40, 45 minutes and continue with this direct examination of Dr. Madisetti.

With those instructions, the jury's excused for lunch.

(Whereupon, the jury left the courtroom.)

THE COURT:  All right, counsel.  As of this point, we've used 3 hours, 4 minutes, and 7 seconds of designated trial time today.  At present, the Plaintiff has 7 hours and 23 minutes remaining; Defendant has 9 hours and 2 minutes

remaining.

As I told the jury, we'll take approximately 40 or 45 minutes for lunch, and then we'll reconvene.

With that, the Court stands in recess.

(Lunch recess.)

THE COURT:  Be seated, please.

Mr. Knobloch, are you prepared to continue with your direct examination?

MR. KNOBLOCH:  Yes, Your Honor.

THE COURT:  Let's bring in the jury, please.

(Whereupon, the jury entered the courtroom.)

THE COURT:  Welcome back, ladies and gentlemen. Please have a seat.

When we broke for lunch, the Plaintiff was directly examining Dr. Vijay Madisetti, their technical expert, and we'll continue with the Plaintiff's direct examination of Dr. Madisetti at this time.

Go ahead, counsel?

MR. KNOBLOCH:  Thank you, Your Honor.

Q.   (BY MR. KNOBLOCH)  Dr. Madisetti, I know before the lunch break I said we would move to the '383 Patent, but before we do that, I just wanted to review a few things about the '477 Patent.  Okay?

A.   Yes.

Q.   All right.  So looking here at this slide, which we saw

461

earlier, at the bottom left do you see it says JX 5?  Do you see that?

A.    Yes.  That's the exhibit number.

Q.    And are those the exhibits, the evidence in this case?

A.    Yes.

Q.    And on the right-hand side at the bottom here, there's a number 90.  Do you see that?

A.    Yes.

Q.    And what the does that refer to?

A.    That's the slide number.

Q.    Okay.  Does the jury get to take the slides back with them to the room when they're deliberating at the end of the trial?

A.    I don't think so.

Q.    How about the exhibits?

A.    I think so.

Q.    Okay.  So if the jury wanted to find more information about the exhibits that they're seeing today, it would be the exhibit numbers on the bottom left there?

A.    Yes.  That's my understanding.

Q.    Okay.  Now, looking at this slide, on the left-hand side there's an input.  Do you see that?

A.    Yes.

Q.    What is that an input to?

A.    That's the input to the algorithm that determines the

462

selected modulation for the uplink.

Q.   And on the left-hand side in the input here, we've identified transmit PSD.  Do you see that?

A.   Yes.

Q.   What is transmit PSD?

A.   It's a parameter; it's a signal-related parameter for the uplink.

Q.   And what is -- and then on the -- like sort of above it and we've kind of moved it over to the right there, we called out channel gain.  Do you see that?

A.   Yes, here.

Q.   And what is channel gain?

A.   That's the average channel gain.  That is a channel-related parameter because it represents the gain or the amplification of the channel.

Q.   And how are these two parameters used in T-Mobile's network?

A.   They are used to determine the carrying capacity or the condition of the uplink transmission or the communication link, and they are then -- the base station can make a judgment as to the type of modulation to use on the uplink.

So if the conditions are good, it can use a higher modulation; bad, it can choose to downgrade the modulation. So it's representative of the communication link.

Q.   And on the right-hand side of this slide, there's an

463

output.  Do you see that?

A.    Yes.

Q.    What is the output of the algorithm summarized in this slide?

A.    On the right side, it says here there's a selected modulation.

Q.    What is selected modulation?

A.    That's a parameter that determines the modulation that should be used, the QAM 16 or QAM 64 or...

Q.    Are the parameters used to determine modulation collectively representative of communication of the first burst data signal over the first channel?

A.    Yes.

Q.    And I want to briefly turn to slide 85, which describes this algorithm.  And do you see that?

A.    Yes, I see that.  It's JX 5 at 295, section 16.7.

Q.    And it talks about the carrying capacity of the channel here.  Do you see that?

A.    Yes.

Q.    What is the carrying capacity of the channel?

A.    That's the capability of the channel to carry certain data rates, so it represents, again, the condition of the communication.

Q.    So the information that the base stations are using to determine modulation, that information, is it collectively

representative?

A.    Yes.

Q.    And we've looked at some examples of signal- and channel-related parameters that we've discussed.  The -- when you look at the claims of the patent, how many signal- and channel-related parameters are required by claim 1 of the '477 Patent?

A.    Two.  One signal-related and one channel-related.

Q.    Could there be additional parameters besides the two that are required by the patent?

A.    Yes, but they're not required.

Q.    And what does Mr. Smith's testimony about how T-Mobile's base stations use the signal- and channel-related parameters?

A.    Mr. Smith on his deposition transcript, page 81, confirms that the base station, the accused base station measures signal- and channel-related conditions and then uses that to determine and assign the modulation.

Q.    And what does that mean?

A.    That means it's used to determine the carrying capacity and the condition and it is representative of the communication and its quality and health.

Q.    Okay.

        MR. KNOBLOCH:  Ms. Brunson, I'm going to switch slides.

Q.    (BY MR. KNOBLOCH)  And now I'm going to actually make

good on my earlier promise and move to the '383 Patent in a moment.

MR. KNOBLOCH:  And, Your Honor, may I switch to the '383 Patent board?

THE COURT:  You may.

MR. KNOBLOCH:  Thank you.

Q.    (BY MR. KNOBLOCH)  All right.  What do we see here on this slide in front of us now, Dr. Madisetti?

A.    So we are now looking at the '383 Patent.  This is the claim 16 that has been asserted.

Q.    At a high level, what problem does the '383 Patent address?

A.    Yes.  If you look at the next slide, so it's looking at how the base station can use multiple demodulators and user profiles to make it more efficient and improve the quality of its reception.

Q.    And on this slide, where there's two sections of text, where does this text come from?

A.    This is directly from the Exhibit JX 2, which is a copy of the specification of the patent, the '383 Patent.  It is referring to the paragraphs from column 6, lines 22 to 45, on Exhibit JX 2.

Q.    And what does the top part of the text, the first box, what does that text relate to?

A.    It refers to using at least two demodulators, which means

466

using multiple demodulators in the receive portion of a base station.

Q.   And what about the bottom part?

A.   The bottom portion talks about the profiles that are created and stored for each user device.

Q.   And what does this animation show about the problem that the '383 Patent was trying to address?

A.   Yes.  So in a base station you are receiving communication signals from many users, as many as 16 users at a time in a typical base station.  And if you have just one demodulator, there's going to be a traffic jam of a kind and all the data signals are queued up and the demodulator has to figure out how to demodulate each user's data signal.

Q.   And so what do we see here?  What is this X meant to represent?

A.   So it keeps trying to demodulate it using different ways and different algorithms, and then finally one of them works and it demodulates the user 1 and then goes through the same cycle for the other users, which are users 2 and so on.

Q.   So one of the aspects of the '383 Patent we talked about was having multiple demodulators.  Do you recall that?

A.   Yes.

Q.   What do we see here?

A.   So here is another example of multiple demodulators.  But just having more of them does not really help because --

467

Q.   And why is that?

A.   Because they still spin around trying to figure out what to use for each user.

Q.   So what do we see here?

A.   So user 1 was successfully demodulated, but users 2, 3, and 4 continue trying different algorithms before you can finally demodulate them.

Q.   And it goes through all the different users one at a time?

A.   Yes.

Q.   How does the solution of the '383 Patent address these issues?

A.   So what the secret sauce of the '383 is that, in addition to multiple demodulators, it also uses these profiles or the UE context.

Q.   So what do we see here?

A.   So here we see the same situation as before.  You have multiple packets, but then the DSPs know exactly what to use for each UE, so they know who these are beforehand using the user profiles.  And, therefore, the demodulation proceeds smoothly and efficiently and gives the benefits of how to improve the performance of base stations.

Q.   And how would -- how could the base station use these demodulators when, for example, here user 2 has two packets, not like we saw before where every user had one?

468

A.    Yeah, if a user is a heavy user, it's uploading video, for example, if you can play that again, you have two data bursts coming in.  They would be queued up and they could use these panel DSPs or alternate DSPs as well.  So you could have one DSP on the top, one demodulator, and another demodulator on the bottom.

Q.    Okay.

A.    And that improves the throughput.

Q.    All right.  So I'd like to move on to the claim, the asserted claim in the '383 Patent.  And we see I've put the board up there.  Can you see that?

A.    Yes.

Q.    Okay.  And do you see the language here on the screen?

A.    Yes.

Q.    Okay.  The first limitation of -- or the preamble, sorry, of claim 16 refers to a method for acting upon.  Do you see that?

A.    Yes.

Q.    And what is a method?  What does that mean?

A.    Method is an algorithm or a series of steps that are practiced.

Q.    And the method described here is -- involves a first subscriber station and at least a second subscriber station.  Do you see that?

A.    Yes.

Q.    What is a subscriber station?

A.    It's a user or a user equipment, or a UE.

Q.    And are these examples of these phones that you've drawn here, are those examples of subscriber stations?

A.    Yes.

Q.    And has the Court provided a construction of the term subscriber or subscriber station?

A.    Yes.  The Court has construed this term as to have its plain and ordinary meaning, which means that one of ordinary skill in the art would understand it in the light of the specification.

Q.    Now, the preamble also refers to signals transmitted to a communication station.  We talked about the subscriber stations.  There's also a communication station.  What is that?

A.    That's in this case the receiving station or the base station.

Q.    Has the Court provided a construction also for communication station?

A.    Yes.  It's again the plain and ordinary meaning.

Q.    The preamble also refers to first and second successive data signals transmitted to a communication station.  Do you see that?

A.    Yes.

Q.    And what do we see in this animation here?

A.   So these are the data signals that are sent by the user devices, so the UEs, UE 1 and UE 2.

Q.   And here's the transmission from the second user, and what would the signal be?  Is that the first or second successive data signal?

A.   The first and the second would include for the first user and the second user.

Q.   And these are both -- are these both signals that are transmitted to a communication station?

A.   Yes.

Q.   What do we see here in this map?

A.   This is an example of one of the accused base stations that is present here in Marshall on 1939 East Houston Street.

Q.   Are the communication stations accused of infringement in this case operable in a wireless communication system?

A.   Yes.  And they operate in the U.S.

Q.   Are -- do T-Mobile's base stations receive uplink signals from subscriber stations?

A.   Yes.  Here's a document from T-Mobile's website from April of 2023 that confirms that the T-Mobile's network received top rankings in terms of uplink and downlink speeds.

Q.   Which is relevant to this case, the uplink or the downlink?

A.   What would be the relevant is the upload or the uplink.

Q.   Okay.  Based on the evidence you reviewed, what did you

conclude about the preamble in claim 16?

A.   That the preamble of claim 16 of the '383 Patent is practiced by the accused base stations.

Q.   So moving on to the first element, 16a, do T-Mobile's base stations select at which of a first demodulator and second demodulator to apply data signals?

A.   Yes.  So they apply at least one of the first data signals, and the second data signals are applied to -- they are selected in the manner claimed.  And Mr. Bevan Smith from T-Mobile confirms that the base stations are able to demodulate signals from multiple users at the same time.

Q.   And what is the testimony about being able to demodulate user signals from multiple users at the same time tell you about the number of demodulators in T-Mobile's base stations?

A.   They would be two or more.

Q.   16 did Mr. Faxer's testimony also confirm that T-Mobile's base stations, the ones that are supplied by Ericsson, demodulate?

A.   Yes.  He confirms that Ericsson's base stations demodulate signals received from multiple users, and he -- as a part of his deposition transcript on page 78.

Q.   Did T-Mobile's documents confirm and further describe how they demodulate?

A.   Yes.  Exhibit JX 19 on page 3 describes several demodulator algorithms in section 4.

472

Q.   What are demodulator algorithms?

A.   These are algorithms that are used to perform the steps of demodulation.  So one or more of these algorithms would be a demodulator.

Q.   And what do we see here?  What have you called out here?

A.   These are example algorithms that are listed in the section that include residual signal calculation, beam selection, channel estimation interpolation, and soft demapping.

Q.   Are these all examples of demodulator algorithms?

A.   Yes, as per JX 19 at 3.

Q.   What are the icons shown in this image?

A.   I just used these icons as a demonstrative that shows -- I will use these as examples in subsequent slides to show some of these demodulation operations.

Q.   And can we just walk through these very, very briefly?  What is residual signal calculation?

A.   It calculates the residual after certain signal processing operations to improve upon its performance.

Q.   What is a beam selection algorithm?

A.   It would select some sort of beam ID or beam that would work best for a certain demodulation.

Q.   What is a channel estimate?

A.   This would be an estimate of how the channel responds or behaves to a signal, so you could improve your operation of

473

the channel.  Has a particular activation at a particular frequency, it could improve upon it.

Q.    And what is the last one shown here, soft demapping?

A.    That converts the dart into some sort of bit.  So it's like a modulation mapping like a QAM demodulator.

Q.    In T-Mobile's base stations, where do the demodulation steps take place?

A.    They take place in these units called DSPs.  That's the digital signal processors, and Mr. Faxer confirms that in his deposition, page 124.

Q.    What does this document show?

A.    This is an exhibit from Ericsson, JX 20 at page 7.  It confirms that the DSPs which are marked here and this here, they are actually carrying out all these different demodulator type of algorithms.

Q.    And when data comes into a T-Mobile base station, what happens to it?

A.    Yeah.  It will flow through these different DSPs which are carrying out these various algorithms.  So you would have many of these DSP threads per DSP that are carrying out these functionalities in parallel.

Q.    Now, how do T-Mobile's base stations select a first demodulator?

A.    Yes.  So as they do carry out these steps, so when you show the animation, I show here a data signal from user 1 that

474

goes to the DSP, and the DSP then based on the profile is able to demodulate that.

Q.   And how many DSPs are included in T-Mobile's base stations?

A.   There are many.  There are more than a hundred.  128 digital signal processors in both the Lynx and the Eagle Owl DSPs.  And these are Exhibit No. JX 13 at 112.

Q.   So now we've talked about the Lynx and Eagle Owl DSPs. Are those both examples of demodulators in T-Mobile's base stations?

A.   Yes.  The DSPs are examples of the claimed demodulators in the accused base stations.

Q.   Do they -- according to T-Mobile's documents, do they operate generally the same?

A.   Yes.  For example, JX 13 on page 112 confirms that the DSPs and Eagle Owl are the same as in the Lynx and Phoenix.

Q.   Do T-Mobile's base stations use these DSPs to demodulate signals from multiple users at the same time?

A.   Yes.  Mr. Smith provides additional confirmation in his deposition transcript page 79, that we also heard the deposition testimony today on the video that up to 16 users could be received at the same time.

Q.   And so how do T-Mobile's base stations then select at least a second demodulator?

A.   Yes.  Again, as we can see in this demonstration of the

T-Mobile accused products' functionality, based on the profiles, the selection takes place and the DSPs demodulate the respective data signals based on the profiles.

Q.    Now, moving on to the second part of 16a, it talks about "wherein the first and second successive data signals and any subsequent data signals are alternately applied."  Do you see that?

A.    Yes.

Q.    And what do we see here in this animation?

A.    So here is an example of how this limitation is met.  And you have data signals from both UEs, so I show that UE 2 sends two successive data signals.  And in this case they are alternatively applied to the first and second demodulators which are the DSPs based on the user profile.

So in this case they are applied to one or the other demodulator, which is the alternatively applied after selection.

Q.    And we looked -- we saw here just one user transmitting two packets of information.  And in reality there would be -- how many users would there be in T-Mobile's network?

A.    We heard today that it's up to 16.  So here I have an example with three users.

Q.    And what do we see here happening from user 1?

A.    So user 1 is sending a data signal, and it is processed based on the profile by one of the DSPs.  And, similarly, user

476

2 is being processed by another of the demodulators DSP.  And user 3 in this case sends the packet and that packet, again, is processed by another of the demodulators.

And the user 3 sends a successive signal, a data signal that is processed by one of the other DSPs that is alternatively applied.

Q.   In T-Mobile's base stations, are data signals alternately applied to the first and second demodulators?

A.   Yes.  They're applied to one or the other based on availability.

Q.   And what does this document show again?  I think we've seen it already.

A.   Yes.

Q.   What does this document show?

A.   This confirms they are alternately applied to the DSPs based on availability.  This is JX 20 at page 7.  So you see the DSP right there.

Q.   And based on all the evidence you've reviewed, in your opinion, is claim element 16a literally met?

A.   Yes.

Q.   Does T-Mobile agree with that?

A.   Agree with this?  I don't believe so.

Q.   Do you understand why T-Mobile has said that they do not meet this limitation?

A.   Yes.  We heard at the opening.

Q.    And what did you hear at opening about why T-Mobile believes this limitation is not met?

A.    T-Mobile through its expert and counsel I understand believe that the -- they believe that the claim requires that there be a dedicated demodulator for each user.

Q.    Do you believe that in order to meet this claim, there needs to be a physically separate dedicated demodulator for each user?

A.    No.  The specification makes clear otherwise.

Q.    If T-Mobile were correct that the demodulators need to be physically distinct and dedicated to a user, would there still be infringement?

A.    Yes.

Q.    Why?

A.    Because, as I discuss in my reports, I provided a theory that's called the doctrine of equivalents.

Q.    What is the doctrine of equivalents?

A.    The doctrine of equivalents says that infringement of the accused product would be satisfied if the accused product performs substantially the same function in substantially the same way to achieve the substantially the same result as the element of the claim, or that if the differences are insubstantial.

Q.    And in your opinion, are the demodulators in T-Mobile's network equivalent to having physically distinct demodulators

478

dedicated to a user?

A.    Yes.

Q.    And what specifically, what components in T-Mobile's base stations do you believe are equivalent to having physically distinct dedicated demodulators?

A.    Yes.  So as I provided my original infringement theory that was based on the DSPs being the demodulators in my doctrine of equivalents analysis, I identify that the equivalent demodulator is the combination of the DSPs, the user profiles, and the demodulator algorithms as I show on the right.  So these together satisfy the requirement for a dedicated logically segregated demodulator for each user.

Q.    Now, I just want to walk through what you're showing here on the right in a little bit more detail.

So zooming in a little bit, what do we see here at the bottom?

A.    So we see this bank of DSPs that are running these various algorithms based on the profiles.

Q.    And I see you've put nine DSPs here.  Is that how many DSPs are present in T-Mobile's base stations?

A.    There are more than a hundred.  These are a small sample.

Q.    And on the left-hand side, I see a list of four operations.  Do you see that?

A.    Yes.

Q.    What are those?

479

A.    Those are examples of the demodulator algorithms from Ericsson.

Q.    And along the top, there is a -- I see a list of -- a series of boxes labeled user 1 to user 4.  Do you see that?

A.    Yes.  Those are the user profiles or they are the UE contexts that represent the information for each profile.

Q.    Okay.  And in this animation, how are -- let's just walk through one step at a time how this actually works.

So what do we see here on the left with user 1?

A.    So user 1 is sending two bits.

Q.    And what happens to those two bits?

A.    The two bits are received by a demodulator that looks at the profile and uses the algorithm and runs it on the DSP.

Q.    Why did you light up this DSP with an orange color?

A.    To show that it's corresponding to the profile that is used for user 1.

Q.    And when I -- when we play this animation, what are these icons that appear on this DSP -- on these DSPs?

A.    Yeah.  These icons correspond to these algorithms.

Q.    And so what is this meant to represent?

A.    This is meant to represent that it is a specific logically segregated demodulator for each user that is dedicated to each user.

Q.    And what do we see here on the left with user 2?

A.    With user 2, we have the user 2 sending four bits in

green.

Q.    And how does the base station process the transmission from user 2?

A.    It looks at the profile and then does the processing based on the profile and the algorithms.

Q.    And what do we see here?

A.    So we see that it is using this logically segregated demodulator that is specifically for the user 2.

Q.    And in T-Mobile's base stations, do they select at which of these first and second demodulators to apply the first and second data signals?

A.    Yes.  Based on the UE profiles, they do that and they're able to select for the user 1 this part of this logically segregated demodulator for each user, and for user 2, that particular part --

Q.    And so what do we see here happening inside of T-Mobile's base station?

A.    So if you have two users or more users, they send their data signals as shown from the left.  Then they are based on this equivalent analysis of infringement, based on the user profile, the first demodulator is selected for user 1.  And based on the user profile of user 2, the second demodulator is selected for user 2.

Q.    And how many different DSPs might be involved in the demodulation processing for a given user?

481

A.   Several.  I mean, there are a hundred DSPs, 128 DSPs.  So there will be several DSPs; there will be more.  We can see documents like the JX 20 confirming that there are several DSPs and more.

Q.   Are the signals that come into the base station in T-Mobile's network alternately applied to these different demodulators that you've described?

A.   Yes.  They are based on the availability.  They are applied to one or another of the -- one or other of the available DSPs in combination with the profile and algorithms.

Q.   And so what do we see here?

A.   So here is an example where user 1 is being processed by the data signal from user 1 is selected and alternately applied to the DSPs shown in orange.

Q.   Now in this example I notice that user 1's signal used some different DSPs than the user 1 signal had used in the last example.  Is that right?

A.   Yeah.  So we have an alternate applying where instead of the earlier flow, you were able to alternately apply it to another of the available DSPs and the algorithms as the profile.

Q.   Is this, nonetheless, a dedicated demodulator for user 1?

A.   Yes.

Q.   How so?

A.   It's a logically segregated and dedicated demodulator

because it uses that user's profile to do the demodulation.

Q.   Now, I'm going to -- let's look for another example of user 2.  What are we seeing here?

A.   So user 2 is using, again, here selecting and applying to the green using the green profile, and they are having selectively and applying in an alternately manner as required in the claim using this logically segregated algorithm combined with the profile and the DSP, which is the demodulator.

Q.   Now, I wanted to walk through one final example with this.  What are we seeing here?

A.   So what we are seeing here is two users, each with their own -- each being processed by being selected and alternately applied to their own segregated logically separated and dedicated demodulators as shown.  As you can see, each of them has their own DSP and their own algorithms based on the profile, and they -- in this case they share a common DSP as well.

Q.   And even though -- although these two users' signals share common hardware, is it your opinion that they, nonetheless, have separate demodulators?

A.   Yes, because they have the user profile that allows them to be logically segregated and work as dedicated, distinct demodulators.

Q.   And is that, in fact, how T-Mobile's system works?  Do

they logically segregate users that way?

A.    Yes, based on the DSPs and the algorithms and the profile.

Q.    All right.

          MR. KNOBLOCH:  Your Honor, I request once again to seal this portion of the transcript and the court for -- to look at some source code.

          THE COURT:  All right.  Based on counsel's request and to protect confidential information, I'll order the courtroom sealed.

     I'll correct that everyone present who is not subject to the protective order that's been entered in this case, please exit the courtroom and remain outside until it's reopened and unsealed.

     This procedure will also seal this portion, the corresponding portion of the transcript.

                    (Courtroom sealed.)





Q. ████████████████████████████████████

████████████████████████████████████

████████████████████████████████████████

████████████████████████████████

██████████████████████████████████████

A. ███████████████████████████████████

████████████████████████.

Q. ██████████████████████████████████

████████████████████?

A. ████████████████████████████████

Q. █████████████████████████████████████

███████?

A. ████.

Q. ██████████████████████████████████████

████████████████

A. ████.

Q. ███████████████████?

A. █████████████████████████████████████.

Q. ████████████████████████████████████

█████████████████████████████████████████

████████?

A.    ████.

Q.    ████████████████████████████████

████████████████?

A.    ████████████████████████.

Q.    ████████████████████████████████

████████████████████████████████

████████████████████████████?

A.    ████.

Q.    ████████████?

A.    ████████████████████████████

████████.

Q.    ████████████████?

A.    ████████████████████████████████

████████████████████.

████████████████████████

████████████████████

████████████████████████████

████

████████████████████

████████████████████████

████████████████████████████████████

████████████████████████.

████████████████████████.

████████████████████████

487

488

Q. ███████████████████████████████████████████████

███████████████████████████████████████████?

A. ████.

Q. █████████████████████████████████████████████████

███████████████████████████████████████████████████████

████?

A. ██.

Q. ███████████████████████████████████████████████████

███████████████████████████████████████████████████?

A. ██.

Q. ███████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████?

A. █████████.

Q. █████████████████████████████████████████████████?

489



490



A. ████████████████████████████████████
████████████████████████████████████████
████████████████████████████.

Q. ████████████████████████████████████
████████████████████████████████████.
████████████████████████████████

████████████████████████████████?

A. ████████████████████████████████
████████████████████████████████████
████████.

Q. ████████████████████████████████████?

A. ████.

Q. ████████████████████████?

A. ████████████████████████████████
███████████████████████████████████████.

Q. ████████████████████████████████████
████████████████████████████?

A. ████.

Q. ████████████████████████████████████
████?

A. ████.

Q. ████████████████████?

A. ████████████████████████████.

Q. ████████████████████████████████████
████████████████████████████████████

491





Q. ██████████████████████████████████
████████████████████████?

A. ██████████████████████████████
██████████████████████████████
████████████████████████████████
█████████████████████████████████
█████████████████████████████████
███████████████████████████.

Q. ████████████████████████████
████████████████████████████
███████████████████████████
███████████████████████████████
██?

A. ████████████████████████████
█████████████████████████████████
██████████████████████████
██████████████████████████████████
███████████████████.

Q. ███████████████████████████████
████████?

A. ████████████████████████████████
██████████████████████████████.

Q. ████████████████████████████████
████████████████████████?

A. ████████████████████████████████

493

Q. ███████████████████████████████████
████████████████████████████████████████?

A. ███.

Q. ███████████████████████████████████
███████████?

A. ███████████████████████████████
██████████████████████████.

Q. ███████████████████████████████████
███████████?

A. ███████████████.

Q. ███████████████████████████████████
██████████████████████████?

A. ███████████████████████████████████
████████████████████████████████████████
███████████████████████████████████████
███████████████████████████████████
████████████████████████████████████████
███████████████████████████████████
████████████████████████████████████
███████████.

Q. ███████████████████████████████████
████████████████████████████████████████?

A. █████████████████████████████████

494



Q.

A.

495



496

Q. ████████████████████████████████████████████████
████████████████████████████████████████████████?

A. ████████████████████████████████████████████████
██████████████████████████████████████████████████.
██████████████████████████████████████████████████
██████████████████████████████████████████████████.

Q. ██████████████████████████████████████████████
██████████████████████████████████?

A. ██.

Q. ████████████████████████████████████████████████
██████████████████████████████████████████████████
██████████?

A. ████████████████████████████████████████████████
██████████████████████████████████████████████████
██████████████████████████████████████████████████
████████████████████████████████████
████████████████████████████████████
██████████████████████.

Q. ████████████████████████████████████████████████
██████████████████████████████████████?

A. ██████████████████████████████████████████████
██████████████████████████████████████████████████
██████████████████████████.





Q.

A.

Q.

A.

Q.

(Courtroom unsealed.)

THE COURT:  All right.  The courtroom is opened and unsealed.  Please continue, counsel.

MR. KNOBLOCH:  Thank you, Your Honor.

Q.  (BY MR. KNOBLOCH)  Dr. Madisetti, on this slide what do you list?

A.  Here again are some examples of how the user profile is organized and what it stores.  I've shown some representative parameters of both the signal-related and channel-related parameters and the values that are stored.

Q.   Are these profile parameters maintained by T-Mobile's base stations?

A.   Yes.  They're maintained and stored in the storage device.

Q.   And what part of the storage device?  What's the name sometimes used in T-Mobile's documents for this storage device?

A.   For example, JX 25, which is an exhibit, on page 282 shows that they're stored in something called UE context.

Q.   And are those stored profiles accessed during operations of demodulation?

A.   Yes.  We have seen that in the code.  We've also seen that through Mr. McHardy's deposition, and he confirms that the modulation that the user was using is accessed using those profiles.

Q.   Does Mr. Smith's testimony also confirm whether the modulation information is accessed -- I'm sorry, that -- where the demodulating comprises accessing the profiles?

A.   Yes.

Q.   Based on all the evidence that you've reviewed and considered, is -- are the elements of both 16[c] and 16[d] of claim 16 met?

A.   Yes.

Q.   And in your opinion, is T-Mobile infringing claim 16 of the '383 Patent?

A.    Yes, it does.

MR. KNOBLOCH:  All right.  Ms. Brunson, I'm going to switch to the next topic so if I may have a moment.

Q.    (BY MR. KNOBLOCH)  All right.  So the final issue I was hoping to cover today with you, Dr. Madisetti, has to do with the technical benefits of the claims.

A.    Okay.

Q.    At a high level, what conclusions did you reach about the technical benefits to T-Mobile of using the asserted claims?

A.    Yes.  With respect to the technical benefits, with respect to the '477 Patent, which is the patent that covered first in my opinion based on the analysis, the use of the claimed inventions increases uplink throughput, coverage, and capacity in a manner that causes an improvement of between 2 and 7 percent.

With respect to the '383 Patent, it increases the uplink throughput, coverage, and capacity network improvement by 4 percent.

MR. KNOBLOCH:  Your Honor, may I just remove this board since we've moved on?

THE COURT:  Yes, you may.

MR. KNOBLOCH:  Thank you, Your Honor.

Q.    (BY MR. KNOBLOCH)  Now, Dr. Madisetti, I'd like to start by focusing on -- before we get to the '477 Patent specifically, why are you -- why were you asked to analyze the

501

technical benefits to T-Mobile?

A.    Yes.    I was asked by Mr. David Kennedy, who is the expert on the damages who will be testifying after I will, as to the technical benefits so that he could base his damages numbers on something that was based on what a technical analysis of the inventions would provide him.

Q.    Okay.    So moving to the '477 Patent specifically, what are the benefits to T-Mobile of using the '477 Patent?

A.    The '477 Patent improves uplink throughput which is from the user devices to the base station.    It enables improved and better higher modulation through uplink beamforming for TDD base stations in claim 6, and it allows through the use of signal and channel parameters for all accused base stations which is claims 1 and 3.

Q.    How does increasing modulation improve throughput?

A.    Modulation is a way of packing more bits into a symbol. And so if you use QPSK, you can put 2 bits in a symbol.    If you use 256, you can map 256 bits -- you can map 8 bits into one symbol.    So this allows you with a corresponding increase in throughput of 2X or 3 times or four times.    So the higher the modulation, the better your bandwidth or throughput.

Q.    And what does this document show about the relationship between modulation and throughput?

A.    So this is a paper that I referenced and analyzed by -- called throughput analysis of 5G physical uplink shared

502

channels from October 2020.  This shows that throughput increases and it identifies the throughput for the different modulations.

So for QPSK, the throughput is lower.  For 256, the throughput is the highest.  And you'll notice that the throughput keeps increasing for a particular value of the signal-to-noise ratio.  So you can see a linear increase in throughput by almost 2X or 3X or 4X.

Q.   Given that relationship between throughput and modulation, do base stations always just utilize the highest available modulation?

A.   They cannot utilize the highest available modulation because the signals -- the strength or the quality of the signal is not always that good.

Q.   And what happens when the -- if the -- if you choose a modulation scheme that is too high for the given signal or connection between the user and the base station?

A.   So what that means is that if you choose a higher modulation, the dots on the modulation will be much closer, so you'll be more sensitive to noise and as a result your error rate will become much higher and your throughput will eventually be lower.  So you have to choose the right modulation for the right conditions of your signal and channel.

Q.   So I'd like to look specifically now at claim 6 and the

503

benefits you analyzed for claim 6.  How does uplink beamforming relate to modulation?

A.    Yes.  Uplink beamforming, as we discussed in this example, it allows the base station to focus on a particular UE.

Q.    So what do we see here happening when the UE transmits -- well, before I get there actually, what are the dotted lines coming out of the antenna?

A.    Those are, say, a sector of a base station that where the UE is located.

Q.    And what do we see here when the UE transmits?

A.    Yeah.  When the UE is transmitting, the signal power is going in all directions.

Q.    And how does beamforming improve the signal power?

A.    It allows the base station to listen in a particular direction.

Q.    And so, for example, here when the base station was listening with its ear open, what was the QPSK level that the user was able to achieve?

A.    Because it was having a very wide beam or very wide area of coverage, the signal strength was relatively low.

Q.    If the base station, instead, utilized beamforming to focus on the user, what would happen?

A.    The signal quality would improve, and it will be able to get a much higher throughput, and it will use a higher

504

modulation for that reason.

Q.    And does T-Mobile's base station, in fact, use adaptive modulation to optimize uplink speed?

A.    Yes.  The -- Dr. Sung confirmed that they would use and optimize uplink speeds through adapting the modulation.

Q.    Is adapting modulation important to T-Mobile's network?

A.    Yes.  It was confirmed by Dr. Sung.

Q.    What did he say about the importance of adapting modulation?

A.    He said it is the primary way that T-Mobile enhances coverage of its network by optimizing modulation.

Q.    In addition to the documents we've already looked at, did you analyze other publications when analyzing the technical benefits of the '477 Patent?

A.    Yes.  I looked at exhibits JX 31 through 33 and JX 35, JX 37, and also the Bates number 94580 at 102 [sic], so these are the exhibits that I just referenced.  In addition to that, I looked at a large number of supporting peer-reviewed technical documents.

Q.    And I want to talk specifically about one of these, which we show here from JX 32.  What did JX 32 address?

A.    It's a field trial with specifically for the uplink for 5G, and it was carried out by a field trial performed by a cellular network.

Q.    And what is the modulation distribution that the field

trial demonstrated?

A.    So using the same base station equipment as T-Mobile that allows it to be -- to us to sort of get an understanding from a technical point of view of comparable performance, JX 32 on page 5 shows that typically the -- this shows the type of usage.  So, for example, a UE would use 64 QAM, 24 percent of the time.  It would use 16 QAM, 31 percent of the time; use QPSK 43 percent of the time.  So that means that you're not able to use the highest modulation all the time, and if you're able to increase this purple line further, that would greatly increase the uplink throughput.

    But most of the time you are in the bad quality area so you're using QPSK.

Q.    Now, how does that -- well, this is -- and what do we do here to make this bar -- I'm sorry, this pie chart on the right?

A.    Yeah.  So we're looking -- so typically, even though you have higher modulations available, most of the time you are stuck with some of the lower modulations because of signal quality issues.

Q.    What did this field trial demonstrate happens to the modulations used if the users increase their power?

A.    Yeah.  If the users increase their power using something called HPU, or high power UE, what you notice is that the percentage of time that the higher modulation is used is

increased to 45 percent.  So this means that you are spending more time using a higher modulation, so that means your uplink throughput gets increased.

Q.    What do these two pie charts compare?

A.    This pie charts show that the adaptive modulation with high power which is similar to beamforming, means that you're spending more time in the purple zone, which means that your throughput is much higher.  You're only able to use 64 QAM 25 percent of the time.  But with uplink beamforming you are likely to be almost twice as -- in terms of percentage of time used with 64 QAM.

Q.    Now, the --

A.    And that results in an eight percent more spectral efficiency.

Q.    What is spectral efficiency?

A.    It's ability to put more bits into the same amount of frequency.

Q.    Now, the field trial here compared on the left just regular adaptive modulation.  Right?

A.    Yes.

Q.    And on the right, adaptive modulation with users using higher power.  Right?

A.    Yes.  So that's the key.  I mean, we are able to do adaptive modulation much better with the -- with the claims.

Q.    Now, as compared to using higher power, how does uplink

beamforming affect the extent to which users can use higher modulations?

A.   It would be very similar because beamforming allows you to focus your direction and it's equivalent in some sense to higher power.  So this is an exhibit from a very good source called Signals Ahead.  They do research.  That is followed by all the carriers.

JX 31 on page 33 says that with beamforming, you can significantly increase the uplink throughput and, in fact, they measure that you can always -- you may increase the throughput by almost seven times.

Q.   Now, did you consider in your analysis of the benefits of the '477 Patent that the beamforming of claim 6 would be worth -- would be 7X value to T-Mobile?

A.   No.  I assumed a much more conservative estimate based on the uplink or the 4G values.

Q.   And specifically what did you conclude about the relative benefit of adaptive modulation with uplink beamforming as compared to adaptive modulation without uplink beamforming?

A.   That's right.  So for claim 6, which would be modeled by my technical analysis, it improves adaptive modulation with uplink beamforming and allows you to get a benefit of 12 percent spectral efficiency because it allows the use of higher modulations.

Q.   Now, just so we understand these different pie charts,

what is the one on the left?

A.    The one on the -- base -- the baseline which I compared with which is just adaptive modulation.

Q.    And what's the one in the middle?

A.    It shows that you are doing some sort of -- using what is called a high power UE.

Q.    And what about the one on the right?

A.    This is more reflective of the claim 6 which means you're doing adaptive modulation with UL beamforming in a particular way.

Q.    Now, we mentioned at the beginning the idea of uplink -- or the idea of throughput.  What is the relationship between spectral efficiency and throughput?

A.    Yeah.  Spectral efficiency is related to pack more bits into a frequency and it's directly related to uplink throughput.  So I converted using these papers that a 15 percent increase in spectral efficiency corresponds to about 5 to 10 percent increase in uplink throughput.

Q.    Based on that, what did you conclude about the throughput benefit of adaptive modulation with uplink beamforming in accordance with claim 6 of the '477 Patent?

A.    Based on my conservative analysis, it's about 12 percent.

Q.    And what does that translate to in terms of throughput?

A.    In terms of throughput I would say that it comes to around 6 to 7 percent increase in uplink throughput, which is

509

a significant value.

Q.    All right.  So moving to claims 1 and 3 -- well, actually, before we get to claims 1 and 3, just to remind the jury, which base stations are infringing claim 6?

A.    These are the T-Mobile's TDD base stations.

Q.    And which base stations infringe claims 1 and 3?

A.    All of the accused T-Mobile base station.

Q.    Okay.  So let's talk about the benefits of claims 1 and 3.  In your analysis, can T-Mobile's base stations use adaptive modulation without profiles?

A.    In my opinion, that it would be inefficient to use adaptive modulations without profiles.  Therefore, to be commercially viable, they would require the use of profiles for adaptive modulation.

Q.    And what did you analyze and what did you focus on for the benefit of claims 1 and 3?

A.    I looked at several peer-reviewed references, and one of them is JX 33 on page 10, which is a paper by Gelgor.

Q.    Why was the Gelgor paper relevant to your analysis?

A.    It was looking at uplink and it was looking at LTE which is 4G, which is a conservative way of estimating the benefits even for 5G.

Q.    And did you look at other papers that also analyzed the benefits relevant to claims 1 and 3?

A.    Yes.  I looked at Exhibit JX 36 at 49, and that looks at

510

what is called iterative channel estimation in LTE uplink, and that shows that for a particular signal value, you have an increase in throughput for -- over non-iterative channel estimation as an example. So you are getting an improvement in throughput using the techniques that are facilitated by the claims.

Q.    And -- sorry. What did you conclude based on your review of the evidence about the spectral efficiency improvements attributable to claims 1 and 3 of the '477 Patent?

A.    That they would improve by about 5 percent for uplink.

Q.    And what did that translate into in terms of uplink throughput?

A.    About 2 to 3 percent.

Q.    Do you believe this analysis was conservative?

A.    Yes.

Q.    Why so?

A.    Because I looked at it through peer-reviewed technical information, I applied very conservative apportionment, I also looked at 4G which was less performance than 5G, I specifically focused on the specific features of the claims and I excluded even 256 QAM which is the most optimistic modulation, and therefore, I excluded the basic benefits of adaptive coding and modulation and focused instead on higher modulation due to uplink beamforming and the use of signal and channel parameters which are some of the novel features of the

invention.

Q.   So to conclude the '477 benefits, what did you conclude were the spectral efficiency benefits of claims 1 and 3?

A.   That they were 5 percent in terms of uplink.

Q.   And what did that translate into in terms of uplink throughput benefits?

A.   2 to 3 percent.

Q.   What were the spectral efficiency benefits -- what are the spectral efficiency benefits to T-Mobile of having used the claim 6?

A.   12 percent.

Q.   And how does that translate into an uplink throughput benefit?

A.   Of 6 to 7 percent.

Q.   Okay.  So let's talk now about the '383 Patent.

     What are the benefits to T-Mobile of using claim 16 of the '383 Patent?

A.   So the '383 Patent also improves uplink throughput through use of iterative processing.  It also improves the sequential processing times, and it also improves -- it gets the benefits of parallel processing so you are able to use your parallel processing hardware more efficiently.

Q.   What publications did you review to support your analysis of the technical benefits of the '383 Patent?

A.   I reviewed a number of peer-reviewed papers that include

512

JX 35, JX 36, and PX 12.

Q.   Now, is there any dispute that parallel processing improves speed?

A.   No.  Parallel processing can improve speed if done well.

Q.   What are some of the challenges of parallel processing?

A.   The problem with parallel processing is that there's a lot of sequential tasks.  So even though you can reduce the tasks that you're parallel processing to zero, this still means you're bottleneck.  So it's important to focus on both speeding up your sequential times and also focusing on parallelism.

Q.   Why is the combination of -- why is speeding up sequential tasks relevant to your analysis of the benefits of claim 16 of the '383 Patent?

A.   Because you're able to do, for example, using profiles, you're able to speed up your sequential aspects so you know better of how your UE should be received.  So, therefore, you are able to speed up not just the patent tasks with multiple demodulators, but also the sequential tasks.

Q.   Would parallelism alone conscious?

A.   Parallelism will provide some benefit if the amount of sequential time were very small, but in most cases the sequential tasks dominate.

Q.   And what is the role of iterative processes?

A.   Iterative processing allows you to improve the execution

513

time of sequential tasks.  So, for example, here is a paper by K. Long that I relied upon that show that you can have a higher throughput in your system through iterative parallel processing.

Q.   And what does this graph show about the relationship between iterative processing and spectral efficiency?

A.   It shows that you can improve spectral efficiency through iterative processing, which is Exhibit JX 36 at 38.  So it allows you that if you are using things like profiles, you are able to get much better improvement in terms of improving the sequential tasks.  So this is a paper from Linden, which is JX 36 at 38.

Q.   And why was Linden's analysis relevant to your analysis here?

A.   Yes.  It's a conservative estimate of the benefits.  It focuses on the uplink for LTE.  It also uses iterative channel estimation which means that you're starting with something that you already know and you're incrementally using the information.  So UE profiles would allow and facilitate such algorithm.

     And Linden is much later than the invention.  It's sometime in the 2015 time frame, if I recall correctly.

Q.   Is -- did Linden's analysis help you quantify the benefits of -- to T-Mobile of infringing claim 16 of the '383 Patent?

514

A.    Yes.   Linden shows that if you are able to leverage things like incremental knowledge, iterative processing, you get improvement of about .5 dB.

Q.    And based on that, what did you conclude about the benefit to T-Mobile of practicing the claim 16 of the '383 Patent?

A.    So you can measure the improvement in throughput for about .5 dB, and then that gives you direct value of about 4 percent of increase in throughput based on the sort of improvement in the SNR.

Q.    Now, do you believe that your analysis of the benefits of the '383 Patent are also conservative?

A.    Yes.

Q.    Why so?

A.    I relied on 4G and 5G benefits would be much higher.  I didn't even consider the benefits of parallelism.  I looked at -- quantified only the benefits due to iterative uplink processing which mimics the technical benefits of using profiles.

Q.    Now, if T-Mobile was not able to have the benefits of these inventions, what would they have to do?

A.    Absent the use of claim 6, they would have to modify the software and the firmware and update it, for example, to eliminate the antenna parameters with respect to claim 6, so that way they would not be using the antenna parameters such

515

as not using beamforming.

Q.   And what would that result in terms of the uplink throughput performance of their base stations?

A.   It will be a 6 to 7 percent reduction in uplink throughput.

Q.   What changes would T-Mobile have to make to avoid infringing claims 1 and 3 of the '477 Patent?

A.   So with respect to claim 6, they have to update to avoid to eliminate the channel parameters with respect to 1 and 3. I also suggest that they would have to do a software/firmware update to eliminate the channel parameters, and that would result in a 2 to 3 percent reduction in UL throughput.

Q.   And, finally, for claim 16, what would be the impact -- what change would T-Mobile have to make to not infringe claim 16?

A.   This is with respect to the '383 Patent.  With respect to the '383 Patent, claim 16, they are to modify the base station to -- with software and firmware updates to eliminate the stored profiles.  And that would result in a 4 percent reduction in uplink throughput based on my conservative estimates.

Q.   Now, if T-Mobile's base stations didn't have the benefit of utilizing General Access's patents, what would T-Mobile have to do to compensate for that?

A.   As T-Mobile supplied Ericsson's document describes here

JX 27 on page 28, it says that densifying the network is one way by which you can improve both coverage and capacity. Densifying means that you are making the base station area much smaller. So each base station covers a smaller area so that way you can put in more base stations and, therefore, you can improve your coverage and capacity.

Q. Would network densification improve the uplink capacity of T-Mobile's base stations --

A. Yes.

Q. -- or T-Mobile's network?

A. Yes. And, in fact, that is the prescribed solution that you could -- if you reduce the size of the base station from 1.5 kilometers to 1.1 kilometers, you could actually be an efficient solution as per Ericsson to improve the uplink capacity.

So that is a preferred way for T-Mobile and its suppliers to improve uplink capacity that would otherwise have been lost absent the use of the '383 and the '477 Patents.

Q. Based on this evidence and your analysis, what amount of network densification would T-Mobile have to do if it had turned off the infringing features of its base stations?

A. With respect to the '477 Patent for the TDD base stations, the effect of the required densification would be 6 to 7 percent. With respect to the '477 which covers the frequency of TDD base stations and all other base stations,

that will be 2 to 3 percent.  That is claims 1 and 3.

With respect to '383, this would be for all the accused base stations, it would be about 4 percent.

Q.   Thank you, Dr. Madisetti.

MR. KNOBLOCH:  I pass the witness, Your Honor.

THE COURT:  All right.  Cross examination by the Defendants?

MR. HAYNES:  Yes, Your Honor.  May we have a few minutes to pass out binders?

THE COURT:  Yes, you may.

MR. HAYNES:  Your Honor, may I approach?

THE COURT:  If you can manage, yes, you can.  It's not a good sign when it comes in a box.

All right.  Let's take our seats.

Proceed with cross examination, please, counsel.

MR. HAYNES:  Thank you, Your Honor.

### CROSS EXAMINATION

BY MR. HAYNES:

Q.   Good afternoon, Dr. Madisetti.

A.   Good afternoon, sir.

Q.   Now, it's your opinion that certain components inside of Ericsson's base stations that satisfy the claims of the '383 and '477 Patents.  Right?

A.   Could you be more clearer as to what you mean by components?

518

Q.    Well, we saw your testimony today when you talked about the '477.  You pointed to some DSPs and a storage device which I think you called a common memory.  Does that sound right?

A.    I pointed to certain elements within the base stations, yes.

Q.    Okay.  And things outside that base station, you're not accusing those of infringement.  Right?

A.    Not outside the base station.

Q.    Right.  So if somebody tried to calculate damages based on equipment that wasn't the base station, that wouldn't be appropriate.  Right?

A.    If -- I have based my analysis on the base station, so I'm not inferring that anything outside the base stations would be part of the infringing.

Q.    Okay.  Now, we've heard a lot in this case about how the claims of the patent are what define the invention.  You would agree with that.  Right?

A.    Yes.  The claims describe and define the invention.

Q.    Okay.  And we've heard a lot about an analogy that that's essentially a property, a deed to land and the actual metes and bounds are the claims.  Do you agree with that analogy?

A.    At a high level, yes.

Q.    Okay.  And you would agree with me if that I'm a homeowner, and I've got defined land, it's not appropriate for me to pick up my stakes and try to move them onto my

519

neighbor's property.  You'd agree with that.  Right?

A.   Yes.

Q.   So it's very important that we stick to the words of the claims and we don't ignore any of those words so that we can move our property stakes.  Right?

A.   Yes.

Q.   Okay.  Now, I'd like to start by talking about some of your opinions with the '383 Patent, and I want to keep in our mind where are our property stakes and have we moved them or not.  Okay?

A.   Okay.

          MR. HAYNES:  Now, if we could bring up claim 16 of the '383 Patent.

Q.   (BY MR. HAYNES)  Now, first of all, you agree that claim 16 is what they call a method claim.  Right?

A.   Yes.

Q.   And a method claim means to infringe that, you have to show that T-Mobile actually performed each and every step of that method.  Right?

A.   Yes.

Q.   Okay.  So it's not enough to say that the base station could in theory perform those steps; you need to show that they actually performed them.  Right?

A.   Yes.  That's what I've shown.

Q.   Okay.

MR. HAYNES:  Move to strike the second part of that as nonresponsive, Your Honor?

THE COURT:  Sustained.  Limit your answers to the questions called for, please, Dr. Madisetti.

THE WITNESS:  Yes, Your Honor.

Q.   (BY MR. HAYNES)  All right.  Now let's talk about what some of those limitations are and see if we can just understand on what some of the English words in this claim, how you use those in your analysis.  Okay?

A.   Okay.

Q.   It starts out, it's a method for acting upon first and second successive data signals.  Do you see that?

A.   Yes.

Q.   Now, you understand that a successive data signal is when you have two signals that are coming one after the other. Right?

A.   That would be one example.

Q.   Do you think you have another definition of successive that you'd like to offer?

A.   Again, it depends on the context, but that's one example.

Q.   Well, in the context of these claims, it talks about sending successive signals, first signal and a second signal, and that means one after the other.  Right?

A.   I agree that it's an example.

Q.   Sir, do you agree with me that the word 'successive'

521

means one after the other or are you applying a different definition?

A.   I agree that it is one example would be one after another.  Successive could mean different things in different contexts.  It could mean something else that may not relate to time.

Q.   Sir, you understand that the context of what we're talking about in this case is this claim.  Right?

A.   Yes.

Q.   And there's no construction of that word 'successive' by the Court.  Correct?

A.   Yes.  I applied the plain and ordinary meaning.

Q.   Right.  And you would agree with me that the plain and ordinary meaning that you should have applied was that successive means one after the other?

A.   Yes.  In my analysis, I've used that example as one of the use cases, yes.

Q.   Okay.  So can we also agree that if I have two users transmitting at the same time, that is not one after the other.  Right?

A.   In some cases, yes, because if you have alternate users, there could be other cases where they could transmit bursts in parallel.  So it depends again on the context.

Q.   Sir, the context is real simple.  Here I've got two users; they transmit at the same time.  That is not one after

the other.  Correct, sir?

A.    Again, in some contexts.

Q.    Are we talking about a context other than the claims?

A.    No.  In the context of the claim.  So I can give you an example if you want.

Q.    Your counsel will be happy to elicit all the examples he wants.

A.    True.

Q.    I want to talk about that word, the plain meaning of successive.  If I have two people moving at the same time, transmitting at the same time, that is successive?

A.    It can be if there is a queue at the receiver.

Q.    And is that the definition when you applied the plain meaning of successive in your infringement analysis, did you interpret that word to be that it can include at the same time?

A.    It -- for example, if you -- if I can give you an example if you want one.

Q.    Sir, I'm just asking --

        THE COURT:  If he wants an example, he'll ask for one, Dr. Madisetti.

Q.    (BY MR. HAYNES)  Sir, it's not a difficult question.  The word 'successive', when you applied that -- the plain meaning of that word in your analysis, did you interpret it to encompass a situation where two users are transmitting at the

same time, did you consider that to be successive, yes or no?

A.   I included both transmitting successively as following each other, successively as certain portions of the transmission could be occurring together, certain portions that could occur before and after.

Q.   Okay.  So that's the definition of successive that you used.

A.   It's not the definition.  It's the examples that I've considered as part of my infringement.

Q.   That's the interpretation that you needed in order to find infringement.  Correct, sir?

A.   That is the sort of use cases I used in my analysis of infringement.

Q.   Well, I was listening to your testimony, and the example that you gave of something that was successive was when Ericsson base stations allow 16 different users to transmit all at the same time, and you considered that to be successive signals.  Correct, sir?

A.   I can explain if you like.

Q.   Sir, yes or no.

A.   Yes.  In the context where there's a queue where the base station receives them, when they're concurrent transmissions and the packets are ordered.

THE COURT:  Dr. Madisetti, you answered the question when you said yes.  You may have a lot more to say, but it's

not up to you to decide how much to say.  Your job is to answer the question within the scope of the question as presented.

Mr. Knobloch has had two-and-a-half hours to question you, and he's going to get another chance after Mr. Haynes.  And anything he thinks needs to be revisited, clarified, shored up, he can ask you about it and he can ask you for as many examples as he wants.

But it's the lawyers that determine what is asked of the witness.  It is not the witness' job to determine how much information they need to give.  It's the questions that conform and specify the amount of information, it's not the witness' role.

So -- and I think you understand that.  So please limit your answer to the scope of the question as asked, understanding that your counsel is going to get another chance to revisit anything he thinks needs to be revisited.  Okay?

THE WITNESS:  Yes, Your Honor.

THE COURT:  Let's proceed.

MR. HAYNES:  And, Your Honor, I move to strike everything after the yes in his answer.

THE COURT:  I'll sustain that.

Q.   (BY MR. HAYNES)  Okay.  Let's move on now past the word 'successive' and talk about the first claim limitation where it talks about the notion of selecting at which of a first

525

demodulator and at least a second demodulator to apply at least one of the first data signals and the second data signals. Do you see that?

A.   Yes.

Q.   Okay. So I've got at least a first demodulator and at least a second demodulator in that claim. Right?

A.   Yes.

Q.   Okay. We're going to talk about what you thought a demodulator was in a minute, but just at a high level what's happening here, this selection is choosing between one of the -- at least one of two demodulators. Right?

A.   Yes.

Q.   Okay. And the embodiment in the patent that it gives to explain this is one user transmits, that goes to a first demodulator, second user transmits, that goes to a second demodulator. Correct?

A.   No.

Q.   That's not an embodiment that's disclosed in the patent?

A.   No.

Q.   All right. We'll come back to that.

With respect to -- I think you used an example in your slides, sir. So let's take that example.

What if I just have one user and they send a signal -- a first signal, that's going to go to a first demodulator, and a second signal would go to a second demodulator. That was the

526

example you used. Right?

A.    No.    I used it with selecting.

Q.    Sir, that's the limitation we're looking at.  Right?

A.    Yes.  So in my example I used selecting to send it to one of them.

Q.    All right.  Now let's talk about demodulators.  Now, you would agree with me, sir, that through the course of this case, you've had a real hard time deciding on what was and was not a demodulator for purposes of forming your opinions on infringement?

A.    Could you please repeat the question?  You said difficult?

Q.    Well, let me just ask you this.  In the course of this case, you've actually accused a lot of different things as being the first demodulator and the second demodulator of these claims.  Right, sir?

A.    I accused the DSPs and other components.  There were a lot of DSPs.

Q.    Okay.  I want to look at what you pointed to with respect to the DSPs.  But before we get to that, let's talk about the wherein portion of this first limitation.

        MR. HAYNES:  If we could highlight beginning at wherein and going to the end of that first step.

Q.    (BY MR. HAYNES)  Okay.  You see the language I've highlighted, Dr. Madisetti?

A.    I do.

Q.    All right.  That requires "wherein the first and second successive data signals and any subsequent data signals are alternately applied to the first and second demodulators."  Do you see that?

A.    I do.

Q.    Okay.  And the first and second demodulators means two demodulators.  Right?

A.    Two or more in this case, but first and second, yes.

Q.    Well, it says to the first and the second.  Right?  It doesn't say the at least one here, does it, sir?

A.    It does not.

Q.    Okay.  And so what I do in the selecting step is I choose at least one first one, that's the first demodulator.  Right, sir?

A.    Okay.

Q.    And then I select at least one of a second demodulator and that becomes the second demodulator.  Right?

A.    Okay.  That's an example, yes.

Q.    Well, that's what the claim language says.  Right?

A.    Yes.

Q.    Okay.  And then in this next wherein step, I am alternating that first signal and applying it to the first demodulator that I chose previously, and I'm applying a second signal to a second demodulator that I have selected

528

previously.  Right?

A.    No.  The claim says different.  It says you are alternately applied.

Q.    Maybe I misspoke so let me try it again.  You would agree with me that when it says alternately applied, I'm taking the first signal and applying it to the first demodulator, a second signal applied to the second demodulator, and I'll get to the third and fourth signals in a second.  But at least for the first two, you'd agree with me there.  Right?

A.    No.  That's one example.

Q.    You don't think that's what the language of this claim says, sir?

A.    No.  It is just one example.  Your case is just one example.

Q.    One example as recited in the words of the claims.  Right, sir?

A.    It is one example that is -- that satisfies the claim, but there are other embodiments that can satisfy the claim.

Q.    Okay.  Let me -- I expect we're going to get there in just a second, so let's talk about the other language there, "and any subsequent data signals."  Do you see that?

A.    Yes.

Q.    Okay.  Now, where does the claim tell us that the any subsequent data signals go?

A.    They could be applied to one or the other of these

demodulators.

Q.   One or the other of the first and second demodulators. Right, sir?

A.   Yes, in this case.

Q.   In this case as recited and required by the claims here. Right, sir?

A.   As -- if there are two demodulators, yes.

Q.   Sir, it says all subsequent signals are applied to -- alternately applied to the first demodulator or the second demodulator.  Right, sir?

A.   As described -- that's the language of the claim, yes.

Q.   Okay.  And you understand we're not moving our stakes yet, are we?  We're not trying to do that, are we?

A.   No.

Q.   Okay.  So you're going to stick to the words of the claims here.  Right?

A.   Yes.  But there is at least a second demodulator, and it means there could be more than one second demodulators.

        MR. HAYNES:  Your Honor, move to strike as non-responsive everything after yes.

        THE COURT:  Sustained.

Q.   (BY MR. HAYNES)  Okay.  Now, let's get to that third signal.  This says any subsequent data signals.  Right?  Any subsequent data signals.  Right, sir?

A.   Yes.

530

Q.   And any subsequent data signals are also going to one of the first or the second demodulator.  Right, sir?

A.   Yes.

Q.   Okay.  So if I've got a third data signal, the way the alternately would work is I'll have signal one go to a first demodulator, signal two go to a second demodulator, signal three goes back to the first demodulator.  Right?

A.   No.

Q.   Okay.  I think we've got another word problem.  The word 'alternate', you would agree with me that when I alternate between two things, I choose one, then I choose the other.  Would you agree with that?

A.   You used the word 'between', so I wouldn't agree.  The claim doesn't have the word 'between'.

Q.   Sir, again, this is not a term that has some special technical definition that only you would know in your field.  Right?

A.   It is -- alternate is how I interpret it in terms of the specification.

Q.   Right.  And you applied its plain and ordinary meaning of the word 'alternate'.  You didn't try to give it some special definition that would allow you to read it on Ericsson's products or T-Mobile's base stations.  Right?

A.   I did not.  I applied the plain and ordinary meaning.

Q.   That would be inappropriate if you gave the word

531

'alternate' something other than its plain and ordinary meaning in order to find infringement.  Right?

A.    That's right.

Q.    And if the jury were to decide that you actually did, that you gave the word 'alternate' something other than its main meaning to find infringement, they should reject your opinion.  Right?

A.    I trust the jury.  I applied I believe the correct one.

Q.    Okay.  So let's just see what that plain meaning that you applied was.  Okay?

A.    Okay.

Q.    All right.  Again, simple examples, not trying to get complicated.  And I talk with my hands.  I'm one of those people that the Court mentioned in the beginning of the case.

If I'm alternating, if I say alternate raising your right hand with your left hand, it's going to look something like this:  I raise my right, I raise my left, raise my right, raise my left.  You agree that's a plain and ordinary application of alternate.  Right?

A.    In your example, I would agree to that, but not in other cases.

Q.    Okay.  Well, let me just ask you this.  If I raise both my hands at the same time, am I alternating?

A.    Again, I cannot answer that.

Q.    Sir, you don't know whether raising both my hands at the

532

same time is alternating?

A.   Alternating -- ask the full question.  Alternating what?

Q.   Alternating raising my hands, sir.

A.   Yeah, but are you alternating raising the hands with some other person?  It may still be alternating.  So if you are two people, one raising both and the other not, it's still some example of alternating.

Q.   Okay.  But you at least agree with the concept that whatever I'm alternating between, one goes, then the other goes.  Right?

A.   I disagree.

Q.   Okay.  And that's the definition of alternating that you applied in order to reach your opinions on infringement in this case.  Right, sir?

A.   Yes.  I believe it's consistent.

Q.   Okay.  And, again, we're not moving our property stakes to try to get something that we don't own.  Right?

A.   Not at all.

Q.   Okay.

          THE COURT:  Mr. Haynes, I need to interrupt for a minute.  We're going to take a short recess.  Apparently one of the screens in the jury box has stopped working, and I'm going to get somebody to look at it.

     We've also been back from lunch almost two hours.  So there's not a perfect place to break this cross examination,

but we're going to make this work.

Ladies and gentlemen of the jury, if you'll Simply leave your notebooks in your chairs, follow all my instructions, and if you will, recess to the jury room for a short break, and then we'll be back to continue with his examination.

The jury's excused for recess.

(Whereupon, the jury left the courtroom.)

THE COURT:  All right.  We stand in recess.

(Brief recess.)

THE COURT:  Be seated, please.

Mr. Haynes, are you prepared to continue with your cross examination?

MR. HAYNES:  Yes, Your Honor.

THE COURT:  Let's bring in the jury, please.

(Whereupon, the jury entered the courtroom.)

THE COURT:  Please be seated, ladies and gentlemen. We'll continue with the Defendants' cross examination of Dr. Madisetti.

Mr. Haynes, you may continue.

Q.   (BY MR. HAYNES)  Dr. Madisetti, we were talking before the break about the concept of alternating.  Do you recall that?

A.   Yes.

Q.   You ever play ping-pong, Dr. Madisetti?

A.   Yes.

Q.   Okay.  Would you at least agree with me in ping-pong, when one user hits the ball over the net, the other user comes back and hits the ball back, that's a good application of the plain meaning of alternate?

A.   It's an example.  That's what I'll agree.  It's not limited to that.

Q.   Okay.  Now if -- in your interpretation as you applied it to form your infringement opinions in this case, if both people on each side of the table hit their ping-pong ball at the same time right at each other, would you characterize that as alternating?

A.   I don't think so.  Not in that context.

Q.   Would your answer change if, instead of ping-pongs, I were talking about sending bursts?

A.   Yes.  Different examples are possible.

Q.   Okay.  So in a ping-pong table, we agree it's one, then the other.  And when we start talking about sending bursts in the claims, two at the same time is okay.  Is that right?

A.   I said it's an example in ping-pong.

Q.   Let me just make sure you understood my question.  In the context of the patent, it is your view that two bursts getting sent at the same time is an example of alternating.  Is that right, sir?

A.   Two bursts?  I didn't get that question.

Q.   Two users have phones, they send data bursts, data

535

signals at the same time, would you agree with me that that is

not alternating?

A.   I don't understand the question at all.  What do you mean

by two bursts at the same time?  The claim says alternately

applied.

Q.   Let me see if I can meet you at your example.  The claim

says alternately applied to a first and second demodulator.

Correct?

MR. HAYNES:  Could you put the claim back up?

THE WITNESS:  It says alternately applied to the

first and second demodulator.

Q.   (BY MR. HAYNES)  Okay.  In your theory of infringement,

if I have two signals that are applied to two demodulators at

the same time, would that meet the claim language of

alternately applied?

A.   I don't understand the question.

Q.   Okay.  I'll move on.

Now, I told you I'd come back to the word 'demodulator',

and I've got to figure we're going to have some confusion

here, too.

MR. HAYNES:  Now, can we bring up your slide from

your first deck, 27?

Q.   (BY MR. HAYNES)  Okay.  Do you recall this slide from

your direct testimony, sir?

A.   Yes.

536

Q.   Now, I believe I understood you to say in your direct testimony that what you are accusing as the first demodulator is these DSPs.  Did I get that right?

A.   Yes, under the literal theory.

Q.   Okay.  Under literal infringement, and I want to make sure I understand that.  So under your theory -- literal theory of infringement, you believe that what I've circled, the one DSP on the right, that is one demodulator.  Is that right, sir?

A.   Yes.

Q.   Okay.  You also agree, sir, that if I have these two guys both performing some sort of function that relates to demodulation, the combination of those two things would be a demodulator, in your view.  Is that right?

A.   Yes.

Q.   Okay.  And we talked about there are 128 different DSPs in these products.  Right?

A.   Yes.

Q.   Okay.

     MR. HAYNES:  And could I have the elmo, please?

Q.   (BY MR. HAYNES)  Okay.  We saw this diagram before in your testimony.  Do you recall this diagram from JX 3 at page 112?

A.   Yes.

Q.   All right.  And that's a block diagram showing the

hardware components inside of an Ericsson base station. Right?

A.   Yes.

Q.   Okay.  And the DSPs that we were just talking about that you accuse of infringement are the pink boxes in the upper left where it says Phoenix 5 DSP 0... Phoenix 5 DSP 127. Right?

A.   Yes, those are examples of the demodulators.

Q.   Okay.  And in the Ericsson system, this is a block diagram.  In the Ericsson system, there's a whole bunch of these things.  And you had some slides that I think had nine different DSPs on one slide as an example.  Right?

A.   Yes.

Q.   And under your theory, a demodulator -- a first demodulator in the claims can be any single DSP.  Right?

A.   Yes.

Q.   And it can be any combination of one or more DSPs. Right?

A.   If they did the demodulator function.

Q.   Right.  In any demodulator function.  Right?  It doesn't have to be the same demodulator function.  Your theory is if you do any tiny step of the demodulation process, you are a demodulator.  Is that fair?

A.   Yes.

Q.   Okay.  Now, we have 128 demodulators, in your view 128

538

processors, any combination of which in your view is a separate demodulator within the meaning of these claims. Is that fair?

A.   Yes, if they perform a demodulation operation.

Q.   Okay. So actually I had to ask somebody to try to help me with this last night on the math, but maybe you'll be better at it than me. If we're talking about any combination of 128 different processors, do you understand, sir, that your opinion would mean that there are over a million demodulators in Ericsson's products?

A.   There are 128 DSPs. Depending on how you combine, you can have many different combinations.

Q.   Right. Over a million combinations which, in your view, would mean over a million separate DSPs within the meaning of this claim. Is that right, sir?

A.   No. It means that there are still 128 DSPs.

Q.   Sir, did I mishear you? Your testimony is that it's not just each DSP alone; it's any combination of one DSP with another DSPs, or one DSP with four other DSPs, or any number up to 128. Right? Any combination. Right?

A.   Yes. Yes.

Q.   Okay. And so when you look at how many combinations that is, it's actually over a million different combinations possible there. Right?

A.   The combinations are possible, yes.

Q.   And in your view, each of those over a million combinations are separate demodulators within the meaning of these claims.

A.   Each of them can be, yes.  A combination can be.

Q.   Okay.  Now, a lot of demodulators under your view. Right?

A.   Yes, because you have 128.

Q.   And certainly that's more than two demodulators.  Right?

A.   It is more than two.

Q.   So if the plain meaning of the claim language says you need to send the first and second signal and any subsequent signals to two demodulators, you would agree that under your infringement theory, that's not what happens.  Right?

A.   Again, I disagree.  I believe I explained why.

Q.   Let me see if we can keep track of our demodulation theories.  All right.  Did I capture correctly the possibilities under your infringement theory there--128 DSPs independently demodulators, over a million possible demodulators in your view?

A.   Yes.  As combinations.

Q.   Okay.  Now, I think in one part of your answer you may have used the word 'accelerator', but we didn't hear much about the hardware accelerators in Ericsson's products in your testimony.  Is that fair?

A.   That is fair.

Q.   Okay.  And -- well, before I get there, let me just ask you some questions about these DSPs.  I've been referring them to as processors.  But they're actually general purpose processors in Ericsson's products.  You agree with that, sir?

A.   I didn't understand the question.

Q.   Well, you understand that these DSPs do a lot of other things other than just demodulating.  They'll do whatever the base station programs them to do.  Fair?

A.   Could you please repeat it?

Q.   These general purpose processors, these 128 DSPs, they perform a lot of functions other than just performing the little math problem that they've been assigned that is one little piece of demodulation.  Fair?

A.   I think DSPs are more specialized so I won't agree.

Q.   Well, sir, I was asking about your testimony in the '477 Patent, and you accused these DSPs as being the profile parameter determiner in that patent.  Don't they, sir?

A.   Yes, they do DSP calculation because the determiner is DSP.

Q.   Okay.  So the determiner is a DSP or, sorry, the DSP is a determiner for the '477 Patent.  For the '383 Patent, the DSP, all of them in any combination, are demodulators.  That's your testimony.  Right?

A.   Yes.  They do DSP calculation.

Q.   Okay.  Do the DSPs meet any of your other claim

541

limitations that you couldn't find?

A.   No.

Q.   Okay.  All right.  Now I want to talk about the hardware accelerators.  I see on the right, we've got three pink boxes on the right.  Do you see that?

A.   Yes.

Q.   Now, a little hard to read, but I'm going to use some words and probably it is better if you can see them a little bit.  The two hardware accelerators that are on the bottom there, one is called Obelix and the other one is Humungus.  Do you see that?

A.   Yes.

Q.   Now, those are processors as well.  Right?

A.   Yes.

Q.   They're -- those are specially designed processors that can do certain tiny math problems really well and really fast.  Right?

A.   Yes.

Q.   And those chips actually perform some very specialized mini-tasks as part of the demodulation.  Right?

A.   I don't have an opinion on those here today.  They may do some and other facts, but I didn't offer an opinion on them.

Q.   Sir, you gave an expert report in this case, didn't you, sir?

A.   Yes.

542

Q.   And in that expert report you were required to set forth all of your opinions as to what you believed infringe these claims.  Right?

A.   I did.

Q.   And in that report what you set forth your opinions of what your belief was applying your interpretation of the claims.  Right, sir?

A.   At that time, yes.

Q.   Okay.  And at that time you said that the Obelix hardware accelerator, each one of those was also a demodulator, didn't you, sir?

A.   I have to look in my reports, but I don't specifically recall.  I didn't say that today.

Q.   All right.  Well, I'm going to give you a chance to refresh your memory.  If you'd just pull tab 5 in your binder in front of you.  It's your report at page 246.  It's paragraph 694.

A.   Which binder should I look at?

Q.   It should be in your first binder, binder 1.  It's your opening -- sorry -- your opening report on infringement, sir. And actually look at paragraph 696 instead.

A.   I have two volumes.  Volume 2, you mean.

Q.   Volume 2, your expert report as it pertains to the '383 Patent.

A.   Could you please repeat the paragraph?

Q.   Paragraph 696.  I believe it's around page 247.

THE COURT:  It's page 242.

MR. HAYNES:  Apologies, Your Honor.

THE WITNESS:  I don't have a page 242 in my volume 2.

THE COURT:  Dr. Madisetti, you have a binder that says volume 1 of 3?

THE WITNESS:  Yes.

THE COURT:  And then you have a tab 5 in that binder?

THE WITNESS:  Looking at tab 7.  Okay.

THE COURT:  Try tab 5.

THE WITNESS:  I see.  Okay.  Yeah.  I opened the correct one.  Okay.

Q.   (BY MR. HAYNES)  All right.  Just read the paragraph 696 to yourself, please, and, in particular, the second full sentence of that paragraph.

A.   Yes.  I've read that.

Q.   All right, sir.  Does that refresh your recollection as to whether or not you accused the Humungus accelerators as being the claimed demodulators in this case?

A.   Yes, in the context of claim 16, yes.  In paragraph 694 to 696, I also point to the Humungus accelerators in my report.

Q.   Okay.  Does that refresh your memory you actually did

accuse, when you wrote your expert report in this case, the Humungus accelerators as also being DSPs?

A.   In my report, yes.

Q.   You also accuse the Obelix hardware accelerators as being the claimed demodulators.  Right?

A.   In my report, yes.

Q.   Okay.  So at the time when you formed your opinions in this case applying what you believe to be the plain and ordinary meaning, it was your view that any of the general purpose DSPs, those are all demodulators, any of the Obelix hardware accelerators, those were all demodulators, and the Humungus hardware accelerators also were demodulators.  Is that right?

A.   As I said, I wouldn't call the DSPs general purpose, so I would say that I did include the Humungus accelerators and Obelix as part of my report, but I didn't talk about them today.

Q.   Okay.  So my question to you, sir, is as we sit here today, are those hardware accelerators, the Obelix and the Humungus, are those no longer DSPs?  Did you change your mind about that?

A.   No, I don't think --

Q.   Let me withdraw the question.  I didn't mean to the interrupt you.  I just realized I phrased it wrong.

As you sit here today, are the Obelix hardware

accelerators and the Humungus hardware accelerators

demodulators within the meaning of the claim or not?

A.    I do not offer an opinion on them today.

Q.    So today you have no opinion whatsoever one way or the

other.  Is that right?

A.    I didn't offer an opinion.

Q.    That's not my question, sir.  My question, sir, is, do

you believe under the plain meaning of the word 'demodulator',

that the Obelix hardware accelerators and the Humungus

hardware accelerators are demodulators within the meaning of

the claim?

A.    Yes, but I don't offer that opinion today.

Q.    Okay.  Is there anything in particular in the entirety of

this figure that you don't think is a demodulator?

A.    I just point to the accelerators and the DSPs in my

report and today just pointed to the DSPs.  Everything else is

not a demodulator.

Q.    Okay.  Now, in your definition of demodulator, I think I

heard you say that it's anything that performs a demodulation

function.  Is that fair?

A.    It is -- performs one or more operations of demodulation.

Q.    Okay.

MR. HAYNES:  If we could go back and bring up slide

7 from Dr. Madisetti's direct presentation, Mr. Carrillo.

Q.    (BY MR. HAYNES)  Do you recall when you were explaining

546

the concept of demodulation and you used this illustration?

A.    Yes.

Q.    Okay.  Now, what demodulation is in the context of a wireless system is I get a signal in that comes into the antenna and that's in an air wave.  Right?  Radio wave?

A.    A radio wave comes into the antenna, yes.

Q.    Okay.  And the process of demodulation is trying to extract user data, the 1s and 0s, the actually data that the user sent.  Right?  From that radio frequency wave.  Is that fair?

A.    That is -- in the context of my analysis, it is the process of conversion of -- it does not include RF, which is radio frequency analog conversion.

Q.    Okay.  But the demodulator needs to spit out the user data, the 1s and 0s.  That's what the demodulator does.  Right?

A.    That's one of the things it does.

Q.    Okay.  And in your theory of what a demodulator is, you're pointing to each of the little math problems, tons of different operations that happen along the way, and you're saying each brick in the road is a demodulator.  Is that right?

A.    Yes.  As a part of the down conversion operation, it is carrying out demodulation.

Q.    Okay.  So in your view a demodulator is any component

that performs any function that is in any way a part of the demodulation process.  Is that fair, sir?

A.   That's not how I would characterize that.  I would say that it's one or more demodulation operations.

Q.   Okay.  So in your view a demodulator is any component, any processor, any accelerator that performs any demodulation operation.  Fair?

A.   Yes.

Q.   Okay.  Now, you understand that only the very last -- until I get to the very last step, I don't have user data coming out of it.  Right?

A.   The user data comes out of the last step, yes.

Q.   Okay.  But you pointed to each DSP and every single step as being a separate demodulator.  Right, sir?

A.   Yes.  It does a demodulation operation.

Q.   Right.  But each one of those steps along the way does not produce the user data.  Right?

A.   It does not produce the end user data, but it produces some form of the user data.

Q.   Sir, the -- if I came to you, I'm one of your students, and I said, hey, this is my demodulator, but I don't have my 1s and 0s yet, would you say, That's a mighty fine demodulator you built there?

A.   Yes, it is still part of the demodulator.

Q.   Now, you talked about these demodulation functions.

548

Right?

A.    Yes.

Q.    Okay.  In the patent, the '383 Patent, is there any description of a demodulator that -- as being anything that performs a demodulation function?

A.    Yes.

Q.    Okay.  You believe that that's in the '383 Patent?

A.    Yes.

Q.    Okay.  I didn't see that in your direct testimony, though.  Right?

A.    No, it is in the specification.

Q.    Okay.  I expect we'll see that from your counsel when we come up and we'll talk about that after that.

THE COURT:  No need to talk about what you expect; just ask questions.

MR. HAYNES:  Apologies, Your Honor.

Q.    (BY MR. HAYNES)  Okay.  Let's bring up your slide 50.

Now, in this example, you're saying that the demodulator is any -- first demodulator is any one of the orange boxes that you've drawn.  Right?

A.    Yes.

Q.    Okay.  And I want to focus on this last box here.

Now, the DSP that you've drawn here, that's one DSP that I just drew a square around.  Is that right?

A.    Yes.

Q.   Okay.  So, in this example, would you consider that DSP to be both a first demodulator and a second demodulator because it's acting on two different signals?

A.   It would be because it would have, as I said, under the doctrine of equivalents analysis, the combination of the software and the DSP together would be the demodulator.  So this would be two different demodulators.

Q.   Okay.  So just to make sure we've got a clean answer on that, yes or no, sir, in your view a single DSP can be both a first demodulator and the second demodulator of claim 16.

A.   Single -- yes, as I described it with the software.

Q.   Okay.  I want to come back to the concept of alternating again, and I promise I'm not going to start hitting any ping-pong balls, but let's just remind ourselves.

     MR. HAYNES:  If we could go back to claim 1, Mr. Carrillo.  I'm sorry, claim 16.

Q.   (BY MR. HAYNES)  Okay.  Just to orient ourselves, we're talking about this part of the language right here where I'm -- data signals are alternately applied to the first and second demodulators.

     Now, in your direct testimony, you talked about a concept of parallel processing.  Do you recall that?

A.   Yes.

Q.   And when you're talking about that concept, what you were talking about was in the accused products.  Right?

A.    Also in the specification.

Q.    Well, the specification doesn't say that the first and second demodulators are using multiple cores that do parallel processing, do they?

A.    It does.  Column 12.

Q.    Okay.  And your view is that parallel processing in the patent is happening even when it's alternating one and then the other.

A.    Yes.  Column 12 discloses alternating with parallel processing.

Q.    Now, the concept of parallel processing, you'd agree with me that has come a long way since 2001.  Right, sir?

A.    Yeah.  Technology develops.

Q.    Right.  And what's going on in the Ericsson products is that the data signal comes in, and then it's broken up into all these tiny math problems, and those problems are spread out across the hardware accelerators and the DSPs.  Correct?

A.    Yes.

Q.    And those hardware accelerators and those DSPs, they're performing functions in parallel.  They're not alternating back and forth.  Right?

A.    I disagree.

Q.    Okay.  You saw the slide--I've been calling it the confetti slide--that we had in opening that illustrated Ericsson's products where the data bursts came in and then

551

were spread out?  Do you recall that?

A.    That's not from Ericsson's documents.  It is your own drawing.

Q.    Right.  I'm just going to ask, you agree with me that's a fairly accurate general representation of how those different data jobs are spread out in Ericsson's system.

A.    I disagree.

Q.    You disagree.  Okay.  But you do agree that in Ericsson's systems, those little math problems are broken up and spread out across multiple DSPs and multiple hardware accelerators.  Right?

A.    Yes, as in the claims, yes.

Q.    Okay.  Okay.  You said as in the claims.  I've got the claim up here.  Can you point me to the word where it says that it breaks it up, the demodulation process, into a bunch of mini-jobs?

A.    That's what the specification says.  So I would interpret in the light of the specification.

Q.    Okay.  So when you see the word 'demodulator' in the claim, you read that to be any act on any signal that relates to modulation.  Fair?

A.    As an example.  It's not limited to that.  It's an example, and the specification provides such example.

Q.    All right.  Can we go to your slide 58?

Do you recall testifying about this slide, Dr. Madisetti?

A.    Yes, sir.

Q.    And when you were talking about this slide, you were talking about an alternative theory of infringement under the doctrine of equivalents.  Right?

A.    It's my second theory.

Q.    Your second theory.  Okay.  Now, under the doctrine of equivalents, in order to satisfy that legal test, is it your understanding that the accused functionality must perform substantially the same function?  Is that fair?

A.    The difference should be insubstantial.

Q.    Right.  But you have function-way-result here.  That's a test that you were trying to apply.  Right?

A.    Yes.

Q.    Okay.  Under that test, the function needs to be substantially the same.  Right?

A.    Yes.

Q.    Okay.  And the function that we're talking about is the function of the invention as claimed.  Right?

A.    Function of the limitation -- what are you applying the DoE to?

Q.    That's fair.

A.    In this case, the demodulator.

Q.    So the DoE is actually applied element by element. Right?

A.    In this case to -- specifically to element regarding the

553

demodulator.

Q.    Okay.  And with respect to that element, you understand that the function that I'm supposed to be comparing is the function as described in the claim element.  Right?

A.    With respect to the demodulator, yes.

Q.    Okay.  Is your description of how you wrote out what you thought the function of this demodulator is, do you think that is an accurate representation of the function of what is recited in the claims?

A.    For the demodulator?  Yes.

Q.    Okay.  Let's talk about the result.  You understand the result has to be substantially the same to meet this test.  Right?

A.    Yes.

Q.    Okay.  And the result that you've described here, generating outputs of the one or more demodulation operations for a particular user, do you believe that result is a fair characterization of the result of the steps that you have on the top of the slide?

A.    As I said, under the DoE theory that required that I analyzed because of the Ericsson and T-Mobile requirement that the demodulators of the claim be limited to segregated demodulators, which is why I provided the DoE theory.

MR. HAYNES:  Move to strike as non-responsive, Your Honor.

554

THE COURT:  Sustained.

Q.   (BY MR. HAYNES)  Dr. Madisetti, my question is real simple.  You came up with these words that are on the slide. Right?

A.   Yes.

Q.   Okay.  And you understand that the result that is required by this test should be the result of the claim elements that you have on the top of the slide.  Right?

A.   Yes, under the DoE theory.

Q.   Okay.  And your opinion is the description of the result here, a fair characterization of what the result would be of the words at the top, the actual claim element?

A.   Only under the DoE theory.

Q.   Sir, that wasn't my question.

MR. HAYNES:  Apologies.  Move to strike as non-responsive, Your Honor, or I'll reask it.

THE COURT:  Restate the question.

MR. HAYNES:  Okay.

THE COURT:  And, Dr. Madisetti, one more time, listen to the question carefully and answer the question within the scope of what the question calls for.  Okay?

THE WITNESS:  Okay, Your Honor.

Q.   (BY MR. HAYNES)  Okay.  So just to be perfectly clear, Dr. Madisetti, everything on this slide is under your DoE theory.  Right?

555

A.    Yes.

Q.    Okay.  So we can focus on the question which is, under your DoE theory, you believe that a description of the result on this slide, generating outputs of the one or more demodulation operations for a particular user is a fair characterization of the result of selecting a first demodulator and a second demodulator and then alternately applying signals to either the first demodulator or the second demodulator?

A.    No, not for the entire limitation.

Q.    Okay.  What about the way?  These are your words under the way.  Right?  That's how you described the way that this test should require.

A.    Not for the entire limitation, but for the demodulator.

Q.    Okay.  For the demodulator.  Focusing on the demodulator, do you believe that the way in which the demodulator is used in 16(a.1) and 16(a.2) of your slide, do you believe the way that it is used there is properly described by the text underneath way on the right side of your slide?

A.    Can you please rephrase the question if you can using DoE?

Q.    Dr. Madisetti, I'm still talking about DoE, still the same slide.

A.    Oh, then, yes.

Q.    Are you with me?

A.    Then, yes.

Q.    Okay.  So you think underneath way, what's described there is a fair characterization of the way the claims recite demodulation.  Is that right?

A.    Yes.

Q.    Okay.  So let me just test that just a little bit.  The claims require a first and second demodulator that alternate -- and wherein first and second successive data signals are alternately applied to a first demodulator and a second demodulator.  Correct?

A.    The claim limitation, yes.

Q.    Okay.  And the way that demodulation is happening in this claim is by alternately applying to one demodulator and then to the next demodulator.  Right?

A.    No.

Q.    Okay.  Sir, see that word 'alternately' there?  Do you see it?

A.    Yeah.

Q.    Do you see it over here?

A.    But that's not -- as I explained, it's not for the entire claim.  It's for the demodulator, though.

Q.    Okay.

        THE COURT:  The question, Dr. Madisetti, was, do you see the word 'alternately' under the heading way?  That's not a complicated question.  You didn't answer it.

THE WITNESS:  I said yes, Your Honor.  I thought I did.

THE COURT:  I didn't hear you say yes to the question of was the word 'alternately' under the category way on the right side of this slide, and I'm staring right at it and I don't see it.  But you didn't answer the question. You're going to have to answer the question.  All right?

THE WITNESS:  Okay.  I will.

THE COURT:  This is not the first time you've testified.  It's not the first time you've testified in this Court.  You know what the expectations are, and you need to comply with those expectations.  Do you understand?

THE WITNESS:  Yes, Your Honor.  I will do that.

THE COURT:  Let's proceed.

Q.   (BY MR. HAYNES)  Okay.  Dr. Madisetti, did you perform any doctrine of equivalents analysis with respect to this alternately applied limitation of the claims?

A.   No.

Q.   Okay.  So if the jury were to find that the accused products do not literally alternately apply a first signal and a second signal to a first demodulator and a second demodulator, they should find no infringement.  Correct?

A.   Could you please repeat the question?

Q.   For the limitation that requires alternately applied to the first and second demodulators, if the jury determines that

558

that limitation is not met literally, then they should find no infringement of claim 16.  Correct, sir?

A.   Yes.  If they don't find it literally, they should not.

Q.   That's right.  Because every word in the claims matter and we've heard a lot about this 'alternately' word.  Right?  It's particularly important here.  Right?

A.   Yes.

Q.   Okay.  So if they look at the literal way in which the Ericsson base stations work and they determine that that is not alternately applying between a first demodulator and a second demodulator, you would agree they should find no infringement.  Correct?

A.   Yes.

Q.   And that would mean zero dollar award for the '383 Patent.  Right, sir?

A.   Yes.

Q.   Okay.  Let's talk about the '477.

     Let's bring up your slide -- actually my slide DDX 4.

     While he's bringing that up, Dr. Madisetti, we talked about there are actually three claims of the '477 Patent that are at issue.  Correct?

A.   Yes.

Q.   And for -- claim 1 is an independent claim.  Correct?

A.   Yes.

Q.   And then claims 3 and 6 are dependent claims.  Right?

559

A.    Yes.

Q.    And what that means is if the jury were to find that a single limitation of claim 1 were not satisfied, then there would be no infringement of claim 1 nor would there be infringement of claims 3 or 6.  Right?

A.    Yes.

Q.    Okay.  And, again, every word matters.  If there is even one limitation missing out of claim 1, then no infringement.  Right?

A.    Yes.

Q.    Okay.  Now, I want to start with what you said the problem was, and you have two passages from the patent that are up here.  Do you see that?

A.    Yes.

Q.    And the slides that I've pasted, these are actually your demonstratives from your direct.  I just put two of them on one slide.  Do you see that?

A.    I do.

Q.    Okay.  And generally you characterize the problem as data bursts from a lot of users, and varying channels and error rates.  Do you recall that?

A.    Yes.

Q.    Okay.  And then you also walked through what you thought the solution to this was.  Right?

A.    Yes.

Q.    All right.

MR. HAYNES:  Let's bring up your slide 24.

Q.    (BY MR. HAYNES)  Okay.  This is an excerpt from the '477 Patent at column 6, lines 1 to 9, and you testified about this on direct.  Right?

A.    I did.

Q.    Okay.  And you said that the solution of the '477 Patent was that the profile--well, let me read the whole sentence; you only highlighted part of it--was "characteristics of data bursts and the channels by which the data bursts are received are stored in memory as signal and channel profiles at the receiving station."  Did I read that first part correctly?

A.    Yes.  You read from the specification.

Q.    Okay.  The next sentence says, "The profiles are updated, as appropriate, and include the information required by the demodulators (typically the demodulators are contained in radio frequency (RF) modems and demodulators and modems will be referred to interchangeably hereinafter)"  Did I read that part correctly?

A.    Yes.

Q.    And it continues to say "To permit their operation to demodulate bursts of data received by the demodulators."

Did I get that last part right?

A.    Yes.

Q.    Okay.  And the solution that it's talking about here is

561

and I think you called it the special sauce.

A.    Secret sauce.

Q.    Secret sauce.  Sorry.  The secret sauce in your words was this concept of a user profile that had signal-related information and channel-related information, and as we see here, that information is the information required by the demodulators to permit their operation to demodulate bursts of data received by the demodulators.  That's what you characterized as the solution.  Right, sir?

A.    As -- at a high level, yes.

Q.    Okay.  All right.  Now let's look at the claims again. And again, just as the '383 Patent, you understand we're limited by those claims.  That's the metes and bounds of the invention.  We're not going to move our property stakes. Right, sir?

A.    Yes.

Q.    Okay.  Now, let's look at --

        MR. HAYNES:  If you can bring up claim 1, Mr. Carrillo, of the '477 Patent.  It's JX 1.

Q.    (BY MR. HAYNES)  Okay.  You already walked through this claim with your counsel so I'm not going to go through all of it again.  But at a high level, the entirety of the claim is to a profile-creating apparatus.  Right?

A.    Yes.

Q.    And a profile-creating apparatus is something that

creates a profile, at a high level.  Fair?

A.   Yes, at a high level.

Q.   Okay.  And then there are more detailed requirements that come below it.  Right?  I have a profile parameter determiner?

A.   Yes.

Q.   And then a profile parameter storage device.  Right?

A.   Yes.

Q.   And just to remind ourselves, you said that the profile parameter determiner here was satisfied by the same DSPs that you called demodulators in the '383 Patent.  Right?

A.   Yes.

Q.   Okay.  Now I want to go down and walk through what the profile parameter determiner does.  Right?  That needs to be capable of determining a value of at least one signal-related parameter and at least one channel-related parameter.  Correct?

A.   Yes.

MR. HAYNES:  Then if we go down to the next part, let's highlight the 'wherein' clause to the end.

Q.   (BY MR. HAYNES)  And that says that "Wherein the signal-related and channel-related parameters are collectively representative of communication of the first burst data signal."  Do you see that?

A.   Yes.

Q.   Okay.  So it doesn't say that those parameters just

relate in some way to the communication channel.  Right?

A.   Could you please repeat your question?

Q.   Let me ask a different question.

A.   Yeah.

Q.   It's very specific as to what that signal-related parameters and channel-related parameters have to do in the claims.  Right?

A.   Again --

Q.   They have to be collectively representative of the first burst data signal.  Right?

A.   Yes.

Q.   Okay.  That's a requirement.  And if I -- I've got to give meaning to that requirement or else I'd be moving my property stakes.  Right?

A.   Okay.

Q.   Okay.  And it doesn't just say representative; it says collectively representative.  Right?

A.   Yes.

Q.   Okay.  And you agree that this -- the first and second -- or first -- I'm still in demodulator.  Let me withdraw that question and try again.

     You would agree with me that the channel-related parameters and the signal-related parameters have to be collectively representative of that communication channel.  Right?

564

A.    Yes.

Q.    Okay.  Then let's carry that through.  Go down to the profile parameter storage device.

Once I have these parameters, the profile parameter storage device is coupled to that determiner and it is for storing values representative of the at least one signal-related parameter and the at least one channel-related parameter that were determined by the profile parameter determiner.  Right?

A.    Yes.

Q.    Okay.  And up above we were talking about parameters, and now what gets stored are values that are representative of the parameters that were determined.  Right?

A.    I didn't understand.  Are you reading the claim language?

Q.    No.  I'm just asking you to try to make sure we understand what's going on, the determiner determines parameters.  Correct?

A.    Yes.

Q.    And then in the storage device, it's actually storing values that are representative of those parameters.  Right?

A.    As written in the claim of the at least one signal-related parameter and at least one channel-related parameter.

Q.    Okay.  And those values that are stored at the profile parameter storage device are --

565

MR. HAYNES:  Let's go down if we can highlight the last part.

Q.    (BY MR. HAYNES)   The values that are stored "at said profile parameter storage device to be used to facilitate receive operations performed at the receiving station on subsequent bursts of the first burst data signal."

Do you see that?

A.    I do.

Q.    Okay.  Let's see if we understand what the word 'subsequent' means here.  Okay?  In your interpretation of the claims for infringement, you agree with me that a subsequent burst would be a situation where I have a first burst, and then a second burst would be a subsequent burst.  Is that fair?  Is it later in time?

A.    In this case, yes, as an example, yes.

Q.    Okay.  And so what this last part is saying is those values that I've determined, I need to use them not on the current signal but on the -- not on the current burst, but on the next burst that comes in.  Right?

A.    Subsequent bursts, yes.

Q.    That's right.  This is not saying determine values and then use them to process the current burst.  The claim requires that you use them to process the subsequent burst.  Right?

A.    Yes.

566

Q.    So if I determine values and I use them to receive and demodulate the current burst, but I don't store them and reuse them for a subsequent burst, I don't meet the claim language. Right?

A.    Yes.  You don't meet if you don't use them for subsequent bursts.

Q.    Okay.  Let's talk about some of the parameters.

MR. HAYNES:  If we could bring up JX 1 at column 11, 45 to 67.

Q.    (BY MR. HAYNES)  This is a portion of the specification, I think you had a slide on it, but I didn't get the number down.  But you recognize this passage here where it talks about the signal- and channel-related parameters, the examples in the specification?

A.    I do.

Q.    And you actually highlighted this in your direct testimony.  Right?

A.    I did.

Q.    Okay.  I want to focus in on the channel-related parameters in this passage.  Okay?

A.    Okay.

Q.    And there are two examples that it gives, equalization weighting and antenna parameters.  Right?

A.    Yes, they're called out.

Q.    Yeah.  Now, equalization is a technique that involves

567

compensating for interference in order to allow the base station to receive the user's signal. Is that sort of a fair high-level description of what that is?

A.    It is one example.

Q.    Okay. So the way that's done in Ericsson's products is there's actually a specific signal called a DRMS, a demodulation reference signal, that gets sent with every transmission, and the base station listens for that, receives it, and then it determines how much interference applied to the user's signal and then it calculates weights to correct that user's signal. Is that fair?

A.    Yes.

Q.    Okay. And so those weights that are calculated, the base station will then use those to receive that signal and facilitate demodulation of that signal. Right?

A.    No. It does it for subsequent bursts which are -- sorry. The answer is no.

Q.    I'll get to subsequent bursts in a second. But are you saying that when I receive a DMRS signal, I don't use the channel weights for -- that I calculate to receive the burst, that -- that current burst?

A.    No, you don't.

Q.    Okay. You read Mr. Faxer's deposition testimony. Right?

A.    Yes.

Q.    Okay. And you know he's going to testify later in this

568

trial?

A.   Yes.

Q.   Okay.   Who do you think knows more about Ericsson's base station operation, you or Mr. Faxer?

A.   Again, I would say that I read the same code he did, and I cannot say for Mr. Faxer's knowledge but I know the code very well.

Q.   Did you ever work at Ericsson?

A.   I developed some software for them.

Q.   Okay.   Were you ever an Ericsson employee?

A.   No.

Q.   All right.   Let's go to this concept of equalization weights.   You yourself, sir, in your report and I think earlier in your testimony, you emphasized that these equalization weights, they're pretty important parameters. Right?

A.   Yes.

Q.   Okay.   In fact, without those equalization weights, you're not getting the signal at all.   You're not just going to be able to do much with it.

A.   I don't understand the question.

Q.   Let me ask you a different question.   Were you here when Mr. Struhsaker testified and he testified that of all that list of parameters, the most important one was channel weights or equalization weights?

569

A.    I believe he said that.

Q.    You would agree with him.  Right?  That's the most important parameter.  Right?

A.    I mean, I -- again, I'm not sure what you mean by most important, so I will agree that he said it.

Q.    Okay.  Well, sir, you would at least agree with me that equalization weights are a key indicator to the base station that it uses to make decisions about that uplink signal that it's received.  Right?

A.    Yes, as I described it.

Q.    Okay.  And it's your view and you based your infringement theory in this case on your belief that equalization weights get stored and reused for subsequent bursts.  Is that right?

A.    Yes.

Q.    Okay.  And if you're wrong about that, it turns out -- and the jury hears all the testimony in this case and they conclude that in Ericsson's base stations those equalization weights are not stored and reused, you'd agree with me your infringement theory is wrong.  Fair?

A.    Yes.  If it doesn't meet the claim, it doesn't.

Q.    Okay.

        MR. HAYNES:  Can we just bring up quickly JX 13?

Q.    (BY MR. HAYNES)  Sir, I saw in your opening slide, you said you reviewed 4,000-plus Ericsson documents.  Do you recall at a high level reviewing this one?

A.    I think so, yes.

Q.    Okay.  Let's take a quick look at page 17 of this document, which is JX 13.  And I want to focus on the figure at the top.

MR. HAYNES:  Okay.  And actually if you could shrink this down a little bit and grab the first paragraph right above it.  Just this right here.

Q.    (BY MR. HAYNES)  Okay.  Now, this is -- you understand that Eagle Owl, that is sort of the internal code name for this hardware block that we looked at in the block diagram?

A.    Yes.

Q.    Okay.  And what this is talking about is the processing of the uplink in that product.  Are you familiar with that?

A.    You got cut off.  What did you say?

Q.    What this is talking about here is talking about principles for processing of uplink spatial information.  Do you see that?

A.    Yes, in the context of beams.

Q.    Okay.  But in this context, right, on the left-hand side here, do you see that?

A.    Yes.

Q.    Okay.  It says, immediate application.  Do you see that?

A.    Yes.

Q.    Okay.  Now, on the right-hand side here, there's something called delayed application.  Do you see that?

571

A.    Yes.

Q.    And I see this little box down here.  Can you tell me what that symbol normally represents in your experience?

A.    Something like a database.

Q.    Right.  Storage.  Right?

A.    Yes.

Q.    Okay.  So I don't see one of those boxes over here on the left-hand side under immediate application.  Right?

A.    There's no box there.

Q.    Right.  No storage on the left-hand side.  Right?

A.    There's no box on the left, yes.

Q.    Okay.  And the description of what's happening on the left says the uplink is processed in an immediate real-time fashion.  Do you see that?

A.    It says that.

Q.    "The DMRS symbols received are used for spatial processing to form the beam weights for the PUSCH data symbols received in the same time slot."  Do you see that, sir?

A.    Yes.

Q.    Okay.  At least in this example in this Ericsson document, it is describing that the channel estimation that's described here and the use of the DMRS symbols that are described here --

        THE COURT:  Slow down, please.

        MR. HAYNES:  Apologies, Your Honor.

572

Q.   (BY MR. HAYNES)  -- those things are being done instantaneously and only on the current burst.  Right?

A.   No, it doesn't say channel estimation.

Q.   Sir, does that not say channel estimation?

A.   That says that, but it's doing it for the beams.  Sorry.  It doesn't -- not for -- please repeat your question.

Q.   Sir, the process that's described here of uplink spatial information, that's being done instantaneously on the current burst, not on a subsequent burst.  Right?

A.   For this case, yes.

Q.   Okay.  Let's take a quick look at JX 59.  You recall reviewing this Ericsson document?  It's a little more of a marketing document, but it's one of the ones I think you looked at?

A.   Yes.

Q.   Okay.  It's talking about Ericsson's massive MIMO.  Do you see that?

A.   Yes.

        MR. HAYNES:  Let's go to page 4 of this document.

Q.   (BY MR. HAYNES)  I want to focus on what's on the left here.  Now, this processing and determining parameters, that's happening in layer 1.  Right?

A.   Yes, in this case, yes.

Q.   Okay.  And you see here, we see this word 'instantaneous' again.  Do you see that?

A.    Yes.

Q.    And in reviewing the documents, did you form an understanding that in Ericsson's massive MIMO architecture, the calculation of channel weights is instantaneous and used for the current burst and not for subsequent bursts?

A.    That's not my conclusion after reading that.

Q.    Okay.  All right.  Let's go to your slide 137.

MR. HAYNES:  Is it possible to move the red box off of that?  We don't have access to it?  Can you bring up JX 20 at page 10?

Q.    (BY MR. HAYNES)  Okay.  This is one of the documents that you looked at in your direct testimony when you were trying to talk about one parameter being representative or, sorry, one parameter -- withdrawn.

You used this to illustrate the relationship between certain parameters and values that are representative of those parameters.  Do you recall that generally?

A.    Yes.

Q.    Okay.  And I think that a parameter you pointed to was F offset.  Do you recall that?

A.    Yes.

Q.    And you said F-offset was a channel-related parameter. Is that right?

A.    Yes.

Q.    Okay.  You understand that F-offset in the patent when it

talks about changes in frequency calls that a signal parameter. Right, sir?

A.   This is not the same.

Q.   Okay. But, in your view, there's no doubt in your mind that F-offset should be a signal-related parameter not a channel-related parameter. Is that right?

A.   It is a channel-related parameter.

Q.   I'm sorry. F-offset is a channel-related parameter, in your view.

A.   Yes.

Q.   Okay. And then you pointed to this value.

Now, was it your testimony that this interpolated channel estimate is a value that is representative of F-offset?

A.   That F-offset is a representative of the communications.

Q.   Right. But you understand I have to store a value and the value that I store has to be representative of a channel-related parameter to meet the claims. Right?

A.   Yes. F-offset is stored.

Q.   I'm just trying to understand which one's the parameter and which one is the parameter value?

A.   The F-offset is a parameter and the value stored is F-offset value.

Q.   Okay. So these are both -- this is a -- F-offset is a parameter and a parameter value and interpolated channel estimate is a parameter and a parameter value. Is that fair?

575

A.    No.  I said the F-offset is a parameter and its value is the value.

Q.    Okay.  So the interpolated channel estimate, were you saying that that is representative of the F-offset?

A.    No.  That is representative of the communication between the UE device and the base station.

Q.    Is interpolated channel, is that a single or channel-related parameter, in your view?

A.    I don't have an opinion on what it is.

Q.    Okay.  So you didn't offer an opinion that the interpolated channel estimate is either a signal-related parameter or a channel-related parameter.  Fair?

A.    I did not provide an opinion on that issue, yes.

Q.    Okay.  And then you also pointed to this guy up here, 'selected beams'.  Do you see that?

A.    I do.

Q.    Okay.  Is that a channel-related parameter or a signal-related parameter?

A.    That's a channel-related value, parameter value.

Q.    Okay.  And you drew some lines, and I couldn't reproduce your slide, but basically you traced this guy all the way around here and then through that and around and around.

    Why did you draw all those lines?  What's the relationship between F-offset and the selected beams?  What are you trying to explain to us?

Shawn M. McRoberts, RMR, CRR
Federal Official Court Reporter

576

A.    It's explaining that it's -- when you have a beam, it represents a communication between the UE device and the base station.  So the F-offset is representative of that communication link because it directly links to the beam, the beam ID.

Q.    Okay.  So, in your view, a parameter is collectively representative of the communication as long as you can draw a line to it back to something that connects to a beam or an antenna?

A.    It -- no.  I meant that there is a functional relationship that says that, depending on the parameter, you get a representation of the health or the quality or the carrying capacity or some other feature of that communication link, which is, in this case, the beam.

Q.    Okay.  I'm running short on time.  I'm going to jump ahead and talk a little bit about your technical benefits discussion.  Okay?

A.    Sure.

Q.    Before I get into that, you understand that the purpose of that technical benefits discussion is for you to attempt to quantify numerically what the benefit of the claimed invention is.  Correct?

A.    At a high level, yes.

Q.    And that's the incremental benefit that the invention adds over what was already being done.  Is that fair?

A.   Yes, at high level.

Q.   Now, you're not trying to claim the benefit of a bunch of technologies that came afterwards in time that other people developed.  That wouldn't be fair, would it?

A.   At a high level, yes.

Q.   At a high level you agree with me that is not fair?

A.   At a high level, yes.

Q.   Okay.  So what we should be focused in on here is trying to find something that quantifies the claimed invention that we've been talking about in the '383 and the '477 Patent. Right?

A.   Yes.

Q.   Okay.  Shouldn't be looking off at something else that is not the claimed invention and doesn't do -- you know, have the claim limitations or perform the claim limitations.  Right?

A.   That's right.  If it doesn't infringe, it won't get the benefit.

Q.   Okay.  Let's go to your slide 48.

Now, this is an article to a Mr. Erik Linden.  And we saw this in your direct slides.  You're familiar with that. Right?

A.   Yes.

Q.   And you describe it as a simplified implementation of the '383 Patent invention.  Do you see that?

A.   Yes.

578

Q.   Did you perform an analysis of the system in Linden to determine whether or not it had the features of the '383 Patent such as alternating between -- or alternating -- alternately applying to a first and second demodulator or reusing stored -- sorry.  Just focus on demodulator.

A.   Just the using; not the former.  It did not have the former; it had the using.

Q.   Okay.  So Linden did not have two demodulators where you alternate between one and the other.  Right?

A.   Again, you used the word 'between', so I'm not sure.  It didn't have the alternating aspects of the claim, but it had the latter part--'reusing'.

Q.   Okay.  Now let's talk about that reusing.  And you used this term 'iterative channel estimation'.  Do you see that?

A.   I do.

Q.   Now, this is the system that Linden was talking about. Right?

A.   Yes.

Q.   And Mr. Linden, when he wrote this paper, he was actually a Ph.D. student getting his thesis.  Right?

A.   Yes.  In Sweden; yes.

Q.   He is trying to come up with a new idea of something -- a way to improve signal processing.  Fair?

A.   Yes.

Q.   And he wrote a thesis about it.  Right?

579

A.    Yes.

Q.    And he didn't write a thesis about your patent from 2001. Right?

A.    It is not.

Q.    Right.  He's writing something about a new invention that he thought improved the art.  Right?

A.    Yes.

Q.    And this is a depiction of it here?

A.    Yes.

Q.    This figure?

A.    Yes.

Q.    And what is happening in this figure is you go through this process and the signal comes in up here.  Right?  Fair?

A.    Yes.

Q.    Then it goes through these processes.  Some of them we've been talking about--channel estimation.  Right?  Some of these are demodulation steps and what comes out is the data signal. Right?

A.    Yes.

Q.    And what he did -- his idea in this paper was, I should re-encode those data bits at the receiver in the base station, should re-encode them, re-map them, put them back into a carrier wave, and then feed them back in and perform channel estimation again.  That was his idea.  Right?

A.    At a high level, yes.

Q.   Okay.  So this has nothing to do with a subsequent burst. Correct?

A.   It is.

Q.   Sir, this signal that gets fed in here, this iterative loop that I've shown--right?--it goes around like that.  That loop operates on the same burst that came into that antenna. Right?

A.   No.  It operates on subsequent bursts in other symbols.

Q.   Sir, the iterative process described -- when it says 'iterative channel estimation', the label there is talking about feeding in a recreation of the same burst in order to process it twice.  That was what he was describing here. Right?

A.   I disagree.

Q.   You disagree.  Okay.  If the jury were to look at this article themselves, it's JX 36 at 38, and they don't -- they think that channel estimation here is referring to one burst, you would agree it would be inappropriate to look at anything Linden says to value the current invention.  Right?

A.   I disagree.  As I said, I would disagree that it's looking at a single burst.

Q.   Sir, I gave you the assumption.  Right?  But if the jury were to disagree with you that it's the same burst, they shouldn't be looking at the Linden article because that wouldn't tell them anything about the value of the invention.

Right?

A.   Again, it's -- and I trust the jury to make the decision.

Q.   And the truth is, sir, they really shouldn't be looking at the Linden article anyway, because it didn't have two demodulators.  Right?

A.   I looked at it -- as I said, I disagree.

Q.   But the invention of the '383 Patent, we all agree it's got to at least have two demodulators.  Right?

A.   The claims have it, yes.

Q.   Okay.  And I'm trying to quantify the value of the claimed invention.  Right, sir?

A.   If you looked at my analysis, I did not -- I discounted the value of the two demodulators.  I only focused on the iterative estimation.

Q.   Sir, when you wrote that this is a simplified implementation of the '383 Patent invention, that's untrue because there's no two demodulators.  Right, sir?

A.   I disagree.

Q.   Okay.  So is it -- you simplified the invention by taking out one of the demodulators.

A.   Yes, because I gave zero value to the multiple demodulators.

Q.   Okay.  Now, the other article that you relied on is somebody called Gelgor.  Do you recall that?

A.   Yes.

582

Q.    And again, this was another one of these channel estimation iterative processes.  Right?

A.    We can look at it.

MR. HAYNES:  If we can bring up your slide 32.

Q.    (BY MR. HAYNES)  Right?  Alexander Gelgor.  Do you see that?

A.    Yes.

Q.    Okay.  And again, this title of this article is about improving BER performance of uplink LTE by using turbo equalizer.  Do you see that?

A.    Yes.

Q.    Okay.  Now, the '383 Patent doesn't describe or claim a turbo equalizer, does it?

A.    Not a turbo equalizer.

Q.    Okay.  And the benefit that's being measured here is of this turbo equalizer that Mr. Gelgor and others came up with and said was an improvement.  Right?  That's the improvement that its measuring.

A.    Yes.

Q.    Right.  And instead of -- but you're taking what they measured for their invention and trying to say that that value should be attributed to the '383 Patent, aren't you, sir?

A.    Yes, for the reasons I stated.

Q.    Okay.  Running out of time.  Let me bring up one more of your slides, slide 27.

583

All right.  Now, we saw -- in your slides you showed us an article, I believe it was a MediaTek article where these two pie charts were in it.  Right?

A.    Yes.

Q.    Okay.  And so MediaTek ran a simulation of something called HPUE.  Do you see that?

A.    Yes.

Q.    All right.  And that HPUE, that's a high power user equipment.  And the simulation that they ran is they basically turned up the power on a person's phone to double its normal power level.  Right?  That's what they were doing.

A.    I don't know if it's a simulation.  I believe it was a real test.

Q.    Okay.

A.    But they did turn up the power.

Q.    Okay.  Now, they doubled the power.  And you know this, sir--you double the power, what does that do to your battery life?  Your battery life?

A.    Okay.

Q.    If you double the power, not going -- the phone's not going to stay charged very long.  Right?

A.    Okay.  It reduces, yes.

Q.    Sure.  But the fact of the matter is what they were simulating has nothing to do with the '383 or '477 Patents. They were simulating a phone that has twice the power.  Right,

584

sir?

A.    It had twice the power, but I disagree with your assertion that it has nothing to do.

Q.    Okay.  We haven't heard anything about these inventions relating to doubling the power of a UE to get some benefit.  That's not claimed in any of these patents.  Right, sir?

A.    That's not.

Q.    Okay.  But that is what was being simulated in this MediaTek article.  Right?

A.    It was a real test, but that's what was described.

Q.    Right.  Now, I found it interesting, the actual test data that you looked at shows this QAM percentage at 45 and 38 and 17.  Right?  That was the actual reports of that MediaTek document.  Right?

A.    Yes.

Q.    A different system, but that was their results.  Right?

A.    Yes.

Q.    And then for your calculation of trying to determine what the value, in your mind, of these patents was, you actually increased that number to 55 percent.  Right?

A.    Yes.  With justification, yes.

Q.    Yeah.  Well, the justification was, Based on my experience, I estimate.  That was your justification.  Right, sir?

A.    No.  I provided additional data.

585

Q.   Right.  You understand, sir, that by increasing these numbers by 10 percent, that's millions and millions of dollars difference in the damages number at the end of the day.  Right?

A.   I don't know the damages, but I justified the numbers.

Q.   Okay.  But you didn't justify them with a simulation or a test or any real data; just your gut.  Right?

A.   I disagree.

Q.   Okay.  Did you even put your gut into it, or did you just try to get the damages number high?

A.   I didn't have anything to do with damages.

Q.   All right.  One last thing and then I'm going to sit down because I'm already out of time.

You know what the WiMAX standard is?

A.   Yes.

Q.   You're very familiar with this.  Right?  You and I have actually worked in other cases related to that.  Right?

A.   Yes.

Q.   All right.  Now, the WiMAX standard described a fixed wireless system.  Right?

A.   The early versions of WiMAX, yes.

Q.   Okay.  And the early versions of the WiMAX standard described fixed wireless system that had adaptive modulation.  Right, sir?

A.   I don't remember specifics.

586

MR. HAYNES:  Let's go to slide DDX 4.10.

Q.   (BY MR. HAYNES)  do you see the date on this document September 2000, it describes adaptive modulation as used in the upstream?  Do you see that, sir?

A.   I see that.

Q.   Okay.  2000, that's before the invention of this patent. Right?

A.   September 2000 is a few months before, yes.

Q.   The patents were filed in April 2001.  Right?

A.   Yes.

Q.   And this is a description of the WiMAX standard, which was 802.16, and it is describing that adaptive modulation is used in the upstream.  Right?

A.   Yes.  That's what section 2.6.5.1 says.

Q.   Right.  So you know, sir, that adaptive modulation in a fixed wireless system was already described in an industry standard before this invention.  Right?

A.   Yes.

Q.   Okay.  So it would be unfair to try to take credit for adaptive modulation in a fixed wireless system, to try to value that and give that money to the Plaintiffs, because they didn't invent it.  Right?

A.   I'm not sure what you're implying.

Q.   Well, you're supposed to be valuing the incremental value of what they added with their invention.  You're not trying to

587

value the prior art, are you, sir?

A.   No, I didn't value the prior art.  I said it improved upon adaptive modulation using the invention.

Q.   Okay.  But adaptive modulation -- well, and the reason you said they improved on it was because they stored user profiles.  Is that fair?

A.   Yes.

Q.   Now you know, sir, in this WiMAX standard they were also storing user profiles and using them for adaptive modulation.

A.   I don't believe that.

Q.   All right.  Let's look at page 12 of this document, I believe.  DDX 4.12.  Sorry 4.11.  Sorry.  Go to the next --

MR. KNOBLOCH:  Objection, Your Honor.  May we approach?

THE COURT:  Approach the bench.

(The following was had outside the hearing of the jury.)

MR. KNOBLOCH:  Where counsel appears to be going here is to invent and start and create a new invalidity opinion to evoke a new invalidity opinion based on prior art that has not been disclosed in the case as invalidating prior art, and that is not proper.  It is against the Court's motions -- against the Court's motions in limine.

MR. HAYNES:  Your Honor, that is not at all what I'm doing.  We're talking about valuation of the invention.  He is

taking credit and valuing adaptive modulation and coding as if they invented it, and I am saying you have to value the incremental value, what you added to the art.  You can't value AMC.  And that's what they're trying to do, and I'm just showing that this witness knows that AMC was already out there.

THE COURT:  This witness has testified in this court at least six or eight times.  He has been more intentionally argumentative and non-responsive than I've ever seen him.  I was this close to taking away trial time from you for the way he's behaved on the stand.

We're about to get him off.  I don't think at this point what counsel's raising opens the door to some new and undisclosed invalidity opinion.  I think he is entitled to hold the Plaintiff to the new incremental value in the area of basically apportioning what came before as to what comes after.

So I'm going to overrule your objection.  We're going to get this witness off the witness stand.

MR. HAYNES:  I'm almost done, Your Honor.

(The following was had in the presence and hearing of the jury.)

THE COURT:  Let's proceed.

Q.  (BY MR. HAYNES)  All right.  Sir, we're looking at table 9, section 1.2, WiMAX standard.  And it's titled "Uplink

Physical Layer Burst Profile Parameters."  Do you see that, sir?

A.    I do.  You are reading from section 1.2.

Q.    At table 9.  Right?

A.    Yes.

Q.    And the burst profile is a set of that upstream transmission properties that are associated with an IUC. Right?  The IUC there, that's the equivalent of the subscriber we've been talking about.  Right?

A.    Yes.

Q.    Okay.  Each profile contains parameters such as modulation type, preamble length, guard times, et cetera.  Do you see that?

A.    Yes.

Q.    Also in there is the FEC code type.  Do you see that?

A.    Yes.

Q.    Okay.  In the WiMAX standard that existed before this invention, they were using adaptive modulation and coding, and they were storing profiles of the user parameters, and they were using those profiles to receive transmissions from that user, both current and subsequent.  Correct, sir?

        MR. KNOBLOCH:  Objection, Your Honor.

        THE COURT:  State your objection.

        MR. KNOBLOCH:  This is the same issue we discussed. Counsel is trying to imply incorrectly that the WiMAX

standard --

MR. HAYNES:  May we approach, Your Honor?

MR. KNOBLOCH:  -- that the WiMAX standard is prior art that is invalidating of our invention.

THE COURT:  Now, what's your response?

MR. HAYNES:  Your Honor, we're not making that argument.  We're -- the witness has said that he valued adaptive modulation and coding, and that's what he relied on to get to his very high percentage throughput numbers.  I am showing that adaptive modulation and coding and storing user profiles, what he called the secret sauce, was well-known in the prior art before this patent ever came along, and that valuing it is preposterous.

THE COURT:  Objection's overruled.  Let's continue with your examination.

Q.   (BY MR. HAYNES)  Sir --

A.   I can answer.

Q.   Let me re-ask the question so we've got it all in mind.

WiMAX had adaptive modulation and coding prior to the invention.  Right?

A.   I cannot say prior to the invention, but I can say it describes adaptive modulation in the document of some kind.

Q.   In September of 2000.  Right?

A.   Yes.

Q.   Okay.  Describes storing a user profile in September of

591

2000.  Right, sir?

A.   No.  It's not the same type of claimed user profile.

Q.   Okay.  The user profile, but it's a different user profile.  Right?

A.   Yes.  Not as good.

Q.   Not as good.

I think I heard you testify on direct that a user profile only needs two parameters.  Right?

A.   Two kinds of parameters.

Q.   Okay.  So you think all these are either signal or channel, but not both.  Is that what you're saying?

A.   Again, I don't remember this document, but I don't see this description as a disclosure of user profiles of the kind of the invention.

Q.   Sir, you see FEC type there?

A.   Yeah.  Just one kind; that's what it looks.

Q.   Yeah.  But we talked about FEC type before.  Right?  You called that a channel parameter just a minute ago.

A.   No.  It is a signal parameter.

Q.   Sorry.  Signal parameter.

A.   Yeah.

Q.   All right.  Your testimony as you sit here today is that it was appropriate for you to value adaptive modulation and coding and let the Plaintiff claim credit for that invention even though the WiMAX standard had adaptive modulation and

592

coding and stored user profiles.  Right, sir?

A.   I disagree with the characterization.  That's not what I said I did.

MR. HAYNES:  No further questions.  I pass the witness, Your Honor.

THE COURT:  All right.  Is there redirect?

MR. KNOBLOCH:  Yes, Your Honor.

THE COURT:  Let's proceed with redirect.

REDIRECT EXAMINATION

BY MR. KNOBLOCH:

Q.   Dr. Madisetti, early in the cross examination you were asked about the idea of multiple users transmitting at the same time.  Do you recall that?

A.   Yes.

Q.   And I believe you testified that there was examples where users, maybe as many as 16, could be transmitting at the same time and still transmitting first and second successive data signals.

A.   Yes.

Q.   Do you recall that?

A.   Yeah.

Q.   What was the example that you had in mind?

A.   Yeah.  So let's say we have 10 people living in Dallas. They all start at the same time from their home, but some live far away.  When do they arrive?  In successive order.  So the

593

fact that this started at the same time doesn't mean they arrive at the same time.  The claim says 'transmit'.

Q.   And if two users are transmitting signals at the same time, is it possible for them to be transmitting successive data signals as well?

A.   Yes, because the data signals can be received in out of order or in order depending on how far they are.

MR. KNOBLOCH:  Your Honor, may I use the board for the patent claims?

THE COURT:  You may.

Q.   (BY MR. KNOBLOCH)  I'm putting up here, Dr. Madisetti, claim 16 of the '383 Patent, and in claim 16 of the '383 Patent, how many demodulators does the patent contemplate exist in the method?

A.   It can be two or more.  It could be 128.  It could be a million.

Q.   When the patent refers to "alternately applied to the first and second demodulators," what does that mean?

A.   It means one or the other.  If you look at column 12 of the patent -- if you can show column 12 it gives an example.

MR. KNOBLOCH:  Mr. Svenson, can we go to Joint Exhibit 2 at column 12, please?  Just the prior page, please.

THE WITNESS:  So if you look at the portion here, so when a patent in the specification provides guidance to one of skill in the art as to how the words are used, so here it

provides specific guidance as to -- if you look for the word -- it disappeared.  Column 12, please.

So if you look for the word 'alternate' in that column, so here the patent provides examples so that one of ordinary skill in the art would understand what the word 'alternate' meant.  So here it clearly describes that 'alternate' includes the example there if a modulator is not utilized you can apply the burst value to that.  So it is describing a case where the word 'alternative', 'alternately' once means that you choose a modulator that is idle.  So it says you can use it to operate where a demodulator is not being utilized.

So that confirms that 'alternating' allows you to use one or other demodulators that may be idle.  It doesn't require a ping-pong.  Ping-pong satisfies it, but it does not require it.

Q.   (BY MR. KNOBLOCH)  Now, Dr. Madisetti, turning back to the claim language of claim 16, 16[a] begins with "selecting at which of a first demodulator and at least a second demodulator to apply."

Do you see that?

A.   Yes, it says "at least."

Q.   And given the claim -- what does a person of ordinary skill in the art understand "at least a second demodulator" to include?

A.   To include one or more.

Q.   Now, in the circumstance where a -- where the method includes more than those -- than that one second demodulator, what would it mean to alternately apply to the first and second demodulator?

A.   It means you can choose one or other of maybe even five or 10 or a hundred demodulators.

Q.   Would a person of skill believe that the method refers to building a system that has a hundred demodulators but then only using two of them?

A.   No.

Q.   Now, you mentioned ping-pong, and counsel had asked you about ping-pong, too.  In ping-pong, how many players are there typically in a game?

A.   Two or four.

Q.   In a wireless communication network, how many people are typically communicating with a base station?

A.   Hundreds.

Q.   In the context of wireless communications, would a person of skill believe that ping-ponging back and forth between two demodulators is the only way to practice this claim?

A.   Not at all.

Q.   What is a demodulator?

A.   A demodulator is -- as described in the specification is a down conversion operation.

Q.   What is down conversion?  What is that?

A.    Down conversion means you are moving from one step in the process of receiving a signal down the chain, so you are moving in some sort of down conversion from a higher level of abstraction and frequency to a lower level.

Q.    Now, if T-Mobile's base stations have demodulators that perform those down conversion steps but then they decide to call them DSPs or accelerators, do those still meet the limitations of the claim?

A.    Yes.

Q.    Now, I'd like to talk briefly about collectively representative parameters.  If you can give me a moment.

And counsel asked you about equalization weights, so I'm going to turn to that.  Equalization weights are -- excuse me. What do we see here on this slide, Dr. Madisetti?

A.    We see here an excerpt from JX 5 on page 282.

Q.    And at the top there is a variable name post EqSinr.  Do you see that?

A.    Yes, that's an input.

Q.    And what is the output of -- well, what is the input? What is post EqSinr?  What does that mean?

A.    It's a channel-related parameter that's a post equalizer parameter.

Q.    And what value is stored as an output from that parameter?

A.    The value stored, for example, is the gain field average.

Q.   And what is gain field average?  What is that?

A.   It's an averaged channel gain.

Q.   Is the channel gain a value representative of equalization weighting?

A.   Yes.

Q.   How so?

A.   Because it represents the channel in terms of how the communication path is representative.

Q.   And is the gain filtered average or the channel gain stored in T-Mobile's base stations?

A.   Yes.

Q.   How is this parameter used in T-Mobile's base stations?

A.   It is used subsequently to do, for example, adaptive modulation and link adaptation.

Q.   And are the parameters used for link adaptation collectively representative of communication between users and T-Mobile's base stations?

A.   Yes.

Q.   How so?

A.   Because you are using these parameters according to this algorithm to calculate the modulation in the next time period or the next burst.

Q.   Now, you were asked near the end of your -- of the cross examination about your benefits analysis.  Do you recall that?

A.   Yes.

598

Q.    In connection with the '383 Patent, why did you focus on articles discussing the benefits of iterative processing?

A.    Because iterative processing is a proxy for use of a value that's calculated now and used in successive bursts. So this sort of -- when you use the value that you already calculated and use that to -- in a following burst, you are effectively improving the quality of your estimation or quality of your analysis because you started from something that is already a good value.

Q.    Now, counsel asked you about whether the system in Linden had multiple demodulators.  Do you recall that?

A.    Yes.

Q.    And, in fact, did the Linden system have multiple demodulators as claimed?

A.    I don't specifically remember one way or the other, but I -- as I said, I discounted the value of multiple demodulators, so whether it had or not did not affect my analysis.

Q.    Had your analysis actually included within it the benefit of multiple demodulators, would the benefit you analyzed go up or go down?

A.    It will go much higher.

Q.    Why did you not include that benefit in your analysis of T-Mobile's network?

A.    Because I was being conservative and, as I said, I

focused more on the successive use of the information in the successive burst.

MR. KNOBLOCH:  I pass the witness, Your Honor.

THE COURT:  All right.  Is there additional cross?

You need to take your board down, Mr. Knobloch.

MR. HAYNES:  Actually can he leave it up?

THE COURT:  That will be fine.

All right.  Proceed with additional cross.

RECROSS EXAMINATION

BY MR. HAYNES:

Q.   Dr. Madisetti, do you think it's possible that you didn't try to follow -- value two demodulators because Linden didn't have them but tons of prior art references did?

A.   That's not true.  I said I discontinued because supposing you have a time period -- oh, I did not.

MR. HAYNES:  Sorry, Your Honor.  I did not mean to use my hand, but move to strike everything after the 'yes' or 'no' as non-responsive.

THE COURT:  "That's not true" was responsive.  The balance of the witness' statement went beyond the question, is non-responsive, and I strike it.

Let's continue.

MR. HAYNES:  Thank you, Your Honor.

Q.   (BY MR. HAYNES)  The claim language, Dr. Madisetti?

A.   Yes.

Q.   Okay.  Keep pointing up to the "at least one demodulator," and then it says here "selecting at which of a first demodulator and of at least a second demodulator."  So I'm selecting among multiple at this point.  Right?

A.   Yes.

Q.   Okay.  But once I've selected them, then I've got the first demodulator--that's one demodulator; and I've got the second demodulator that I selected--that's the second demodulator.  Right, sir?

A.   I disagree.

Q.   So you select it and then "wherein the first and second successive data signals and any subsequent data signals are alternately applied to the first and second demodulators," that's what it says, sir.  Right?

A.   Yeah.

Q.   No 'at least' down here.  Right, sir?

A.   There's no 'at least' there.

Q.   Okay.

          MR. HAYNES:  No further questions.  Thank you, Your Honor?

          THE COURT:  Any additional direct?

          MR. KNOBLOCH:  Just one question, Your Honor.

          THE COURT:  One question.  Go ahead.

REDIRECT EXAMINATION

BY MR. KNOBLOCH:

Q.   Dr. Madisetti, does claim 16 say that you alternate between the first and second demodulators?

A.   It does not.  There's no word 'between'.  And also it says you select which of the first demodulator and at least a second demodulator, so you can select more than one second demodulator.

MR. KNOBLOCH:  Thank you.

THE COURT:  You pass the witness?

MR. KNOBLOCH:  Yes, Your Honor.

THE COURT:  Is there additional cross examination?

MR. HAYNES:  Nothing further, Your Honor.

THE COURT:  All right.  You may step down, Dr. Madisetti.

THE WITNESS:  Thank you, Your Honor.

THE COURT:  Let's pull this board down, please, counsel.

All right.  Plaintiff, call your next witness.

MS. FAIR:  At this time the Plaintiff calls by deposition Mr. Nicholas Caldwell.  He is T-Mobile managing corporate counsel with intellectual property.  This clip is 41 seconds, all of which is the Plaintiff's.

THE COURT:  All right.  Proceed with this witness by deposition.

NICHOLAS CALDWELL

BY VIDEO DEPOSITION

Q.   Mr. Caldwell, you're an attorney.  Correct?

A.   Yes, sir.

Q.   You understand that you're here to provide testimony on behalf of T-Mobile today.  Correct?

A.   Yes, sir.

Q.   In any of the dozen or so ongoing negotiations that you've been involved in on behalf of T-Mobile, has T-Mobile admitted that it infringes the patents at issue?

A.   No, sir.

Q.   In any of those negotiations that you've been involved in on behalf of T-Mobile, has T-Mobile -- has T-Mobile admitted that the patents at issue are valid?

A.   No, sir.

            THE COURT:  That completes this witness?

            MS. FAIR:  Yes, Your Honor.

            THE COURT:  Call your next witness.

            MS. FAIR:  Your Honor, the Plaintiff calls Patricio Delgado.  He is Ericsson vice president of IPR policy and commercial compliance.  This clip is 2 minutes, 21 seconds, of which 1 minute, 4 seconds is the Plaintiff's and 1 minute, 17 seconds is the Defendants'.

            THE COURT:  Proceed with this witness by deposition.

PATRICIO DELGADO

BY VIDEO DEPOSITION

Q.    Good morning, Mr. Delgado.  Thanks for being here.

Where are you testifying from today, sir?

A.    I am in Dallas, Texas.

Q.    Ericsson doesn't have patent license agreements that say Ericsson understands that it has infringed the valid patents of the other company and we're entering into this agreement to compensate them for that infringement.  Correct?

A.    I can't remember anything at that level of specificity, no.

Q.    And in none of those license agreements that Ericsson has produced in this case did Ericsson acknowledge that the patents at issue were valid, enforceable, and being infringed by Ericsson.  Correct?

A.    Not to the counterparty, that's true.

Q.    Do any of the license agreements that have been identified and produced by Ericsson state that the amounts paid to the patent holder by Ericsson is based on the extent of Ericsson's use of the patent?

A.    I don't think any of those use those words, no.

Q.    What does Ericsson look to in those negotiations when valuing the patent licenses that it's entering into?

A.    We look at the patent portfolios at issue, and we evaluate those patent portfolios in light of the various licenses that we've signed as -- as a benchmark.

604

Q.   And when you say you look into the various licenses that you've signed, are those -- do you look to those licenses when Ericsson products are implicated in the patent license?

A.   Yes.

Q.   Does Ericsson also look to its licenses when claims are made against its carriers for Ericsson products?

A.   When it relates to Ericsson's products, yes.

Q.   And in your work in negotiating deals for Ericsson, have you personally looked to Ericsson's licenses when evaluating the value of technology asserted against Ericsson products that are supplied to carriers?

A.   Yes.

THE COURT:  Does that complete this witness by deposition?

MS. FAIR:  Yes, Your Honor.

THE COURT:  Please call your next witness.

MS. FAIR:  Plaintiff calls by deposition Mr. Cam Crawford.  He is a T-Mobile senior manager of financial reporting who works predominantly in SEC compliance and disclosures.  The exhibit that is referenced in this deposition is PX 1.  The clip is 7 minutes, 55 seconds, of which -- all of which is the Plaintiff's.

THE COURT:  All right.  Proceed with this witness by deposition.

CAM CRAWFORD

BY VIDEO DEPOSITION

Q.   What's your current job title at T-Mobile?

A.   I'm a senior manager of financial reporting.

Q.   Through your job responsibilities at T-Mobile, are you familiar with T-Mobile's broader financial performance?

A.   Yes.

Q.   Are you familiar with what are the main drivers of T-Mobile's earnings?

A.   Yes.

Q.   Are you familiar with the main drivers of T-Mobile's costs or expenses?

A.   Yes.

Q.   Since you've been at the company, have both the 4G and 5G networks for T-Mobile remained important sources of revenue for the company?

A.   Yes.

Q.   Would it be accurate to describe T-Mobile's 4G and 5G networks as two of the most important sources of revenue for the company?

A.   That's my understanding, yes.

Q.   Would you expect that if T-Mobile did not maintain a competitive network that it would lose subscribers?

A.   Yes.  That's what I would expect.

Q.   And it is important for T-Mobile, from a financial perspective, to maintain a high quality and competitive

606

network.  Correct?

A.   Yes.

Q.   Does T-Mobile characterize the industry in which it competes as a highly competitive one?

A.   Yes.

Q.   And one of the dimensions on which T-Mobile competes is network quality.  Correct?

A.   Yes.

Q.   The quality of T-Mobile's network is critical to T-Mobile's viability as a business.  Correct?

A.   Yes.  There's one thing I'd like to clarify there, if I may.

Q.   Of course, yes.

A.   So you're referring, again, to the quality of the network, and back to my earlier comments, the quality that we're concerned about is the -- or yeah.  It's the quality of the customer's experience as a consequence of the use of the network.  So when we're saying quality, quality of, it's really the quality of the customer's experience.

Q.   Absolutely.  So with that -- with that understanding of what we mean when we say, you know, the quality of the network, is the quality of T-Mobile's network critical to T-Mobile's viability as a business?

A.   Yes.

Q.   Does T-Mobile need to stay a leader in its 5G network in

order to succeed as a business?

A.   I believe so, yes.

Q.   So if it -- if it costs money for T-Mobile to maintain its network quality, is T-Mobile willing to spend that money?

A.   That's my understanding, yes.

Q.   If T-Mobile's network quality were to suffer a real significant setback, would you expect T-Mobile to invest the money that is required to remedy that?

A.   Yes.

Q.   I am going to introduce the 10-Ks that we've so enthusiastically discussed already today.  Let's start with the 2020 T-Mobile 10-K.  I believe this is Exhibit 8 to today's deposition.

Do you think that T-Mobile would suffer a loss in equipment revenues if the quality of its network from a user perspective were to deteriorate?

A.   That's what I would expect.

Q.   And T-Mobile says all over every single one of its 10-Ks that one thing that could adversely impact its performance as an entity is if the quality of its network were to deteriorate.  Correct?

A.   Yep.

Q.   And I'll have you walk me through that here in just a moment, but so that we have a clean record here, close to 100 percent of T-Mobile's revenue in any given year is going to be

608

directly connected to the quality and performance of T-Mobile's network. Correct?

A. Yeah. That sounds about right to me.

Q. And the 10-K goes on to make the point that our ability to attract and retain post-paid and pre-paid customers is important to our business in the generation of service revenues, equipment revenues, and other revenues. Correct?

A. Correct.

Q. And T-Mobile's ability to attract and retain customers who sign up for post-paid or pre-paid cellular service is going to depend on the quality of experience that they're able to deliver to consumers. Correct?

A. Yes.

Q. T-Mobile's equipment sales and -- and sales of service, cell service to customers currently, are its two most important sources of revenue. Correct?

A. Yes.

Q. The -- I mean, the thing that -- the thing that drives T-Mobile's financial performance is its networks. Correct?

A. The access to them, yes. The access and utilization of the network. That's right.

Q. And, I mean, if -- looking at this six years of financial data, is it fair to say that the lifeblood of T-Mobile's business is the quality of its network?

A. Yes.

Q.    The consumer satisfaction with the T-Mobile network is the single most important thing to T-Mobile's continued financial success.  Correct?

A.    I believe -- I believe that's true, yes.

Q.    Every year of data that we've looked at today, 2018 through half of 2024, t-Mobile has spent billions of dollars on property and equipment.  Correct?

A.    Yes.

Q.    Do you have an understanding through your work in financial reporting as to why T-Mobile continues to invest in property and equipment for its network?

A.    Yes.  It's -- it goes back to the customer experience. It's there to fulfill that network strategy.

Q.    T-Mobile has a network strategy that it wants to execute over the long term.  Correct?

A.    Yes.

Q.    And it spends this money each and every year to be able to execute and deliver upon that strategy.  Correct?

A.    Yes.

Q.    T-Mobile has determined that for it to be competitively successful, it -- it needs to build out and expand its network in this way.  Correct?

A.    Yes.

Q.    And you agree with me, sir, that T-Mobile has determined that it can't sort of sit on its hands and do nothing to build

610

out its network.  Correct?

A.    Yes.

THE COURT:  Does that complete this witness by deposition?

MS. FAIR:  Yes, Your Honor.

THE COURT:  All right.

Ladies and gentlemen, we're going to take a very short recess.  We have one more witness to get through today.

If you'll leave your notebooks in your chairs, follow all my instructions, and I'm going to keep this as short as possible.

The jury's excused for recess.

(Whereupon, the jury left the courtroom.)

THE COURT:  Counsel, this will not be more than 10 minutes and I'll be back.

The Court stands in recess.

(Brief recess.)

THE COURT:  Be seated, please.

Do we have our monitors all working?  All right.

Counsel, before I bring in the jury, I've reviewed your most recent submission regarding a proposed charge and verdict form.  I'm satisfied that the Court would benefit from a new and updated submission, so I'm ordering the parties to meet and confer and jointly submit a newly proposed final jury instruction and verdict form by 4:00 tomorrow afternoon.  It's

611

to be submitted in Word format and delivered by email to my staff.

And to ensure that all the proper eyes focus on the issues and that the better angels of the parties' judgment participate in the process, I want both lead and local counsel to review the submission before it's delivered to the Court. All right?  Any questions?

MR. STEVENSON:  No questions, Your Honor.

MR. SUMMERS:  No questions, Your Honor.

THE COURT:  Mr. Dacus, everybody else doesn't have questions, but you're at the podium.

MR. DACUS:  Not on that issue, Your Honor.  May I briefly bring up one, and that is in chambers this morning you asked me to remind you related to the *Daubert* --

THE COURT:  I have a written order denying those. As soon as I can get five seconds off the bench I will sign it.

MR. DACUS:  Thank you very much, Your Honor.

THE COURT:  I'll sign it before I go home tonight.

MR. DACUS:  Much appreciated, Your Honor.

THE COURT:  All right.  Is there anything before we bring in the jury and proceed to hear from Mr. Kennedy?

MS. FASULO:  No, Your Honor.

THE COURT:  Let's bring in the jury, please.

(Whereupon, the jury entered the courtroom.)

THE COURT: Welcome back, ladies and gentlemen. Please be seated.

I'm told that all the monitors in the jury box are working again. I cannot promise that they won't go out. If one or two go out, you may just have to lean over and borrow your neighbor's. They're probably in need of replacing, but I can't do anything about that during this trial.

All right. Plaintiff, call your next witness, please.

MS. FASULO: Plaintiff calls David Kennedy.

THE COURT: All right. Mr. Kennedy, if you'll come forward and be sworn by the Courtroom Deputy.

(Whereupon, the oath was administered by the Clerk.)

THE COURT: Please come around, sir; have a seat on the witness stand.

If you need to pour a cup of water, Mr. Kennedy.

THE WITNESS: Thank you.

THE COURT: We filled the carafe just for you.

THE WITNESS: I appreciate it.

THE COURT: All right, counsel. You may proceed with direct examination.

DAVID KENNEDY,

having been first duly sworn, testified under oath as follows:

DIRECT EXAMINATION

BY MS. FASULO:

Q.    Good afternoon.

613

A.   Good afternoon.

Q.   Could you please introduce yourself to the jury?

A.   My name is David Kennedy.

Q.   What do you do for a living?

A.   I'm a managing director, senior managing director at a company called J.S. Held, and I specialize in valuing patented technology and licensing technology and also determining damages in matters like this.

Q.   Where are you from?

A.   About three years ago my wife and I moved down here to East Texas.  We live about 45 minutes north of the courthouse up in Cass County.  We still have our place in Montana and we spend the summer and fall out there.

Q.   Mr. Kennedy, what is your role in this case?

A.   I'm here to determine a fair amount that T-Mobile should pay for its use of the patents in this case.

Q.   Is there a term for the payment a company makes for the right to use a patent?

A.   Yes.  It's called a royalty.

Q.   And can you explain what a patent license is?

A.   Sure.  It gives you the right to use someone's patented technology.  It's like leasing farm land--you get to use it but you don't own it, and you pay a royalty or rent for using it.

Q.   Is your job in this case to analyze the royalty T-Mobile

614

would pay for a patent license to the two General Access patents we've been talking about this week?

A.   Yes.

Q.   Did you prepare slides to walk through the analysis you've done?

A.   Yes, I did.

Q.   Can you tell us briefly about your educational background?

A.   Sure.  I got a Bachelor's degree in accounting in 1985 from the University of Georgia, and I'm a certified public accountant.

Q.   How long have you been a certified public accountant?

A.   Thirty-eight years this May.

Q.   What kind of experience do you have valuing the use of patented technology?

A.   Well, I've valued thousands of patents over my career. I've also negotiated over 200 license agreements where I had to determine the value of the technology.

Q.   Can you tell us about the work you've done for the Military?

A.   Sure.  I've been hired by the Armed Forces to determine what a reasonable royalty should be for technology that's used in some national defense when the U.S. is using someone else's patented technology.

Q.   I see PWC on your slide.  What part of your experience

does that refer to?

A.    That's where I started.  That's -- it used to be Coopers & Lybrand, but it's one of the largest international accounting and auditing firms, and I worked there in their accounting and auditing of large companies for a number of years.

Q.    Did you do work for telecom companies at PWC?

A.    Yes.  Our largest client in the office I was in was a telecom company, a precursor to AT&T or -- it was Southern Bell at the time.

Q.    Do you have experience valuing the kind of technology that is at issue in this case?

A.    Yes.

Q.    Can you explain to us what some of that experience is?

A.    Well, over the years I valued, as I mentioned, thousands of patents; sometimes they're individual patents, sometimes they're large portfolios of patents, and many times they've been in the telecommunications space.

Q.    Can you explain to us what you're showing on the screen here?

A.    These are some of the companies I've worked for and some of the companies I've negotiated against for license agreements.  For example Sprint, Samsung, Nvidia, Broadcom, AT&T, Cisco, and Intel are companies that I've been on the other side of the table from negotiating what a royalty should

616

be in the real world in a negotiation.

Q.   And I see on this slide two very familiar companies, both T-Mobile and Ericsson.  Are these companies that hired you?

A.   Yes, I've worked for both of those companies.

Q.   Approximately how many times?

A.   At Ericsson a couple of times and T-Mobile one -- at least one time that I recall.

Q.   What did T-Mobile hire you for?

A.   They hired me to be a licensing expert in a litigation matter to talk about the licensing ecosystem or the licensing marketplace.

Q.   And what about Ericsson?  What did they hire you to do?

A.   I was involved with a case with Ericsson back in 2017, and it dealt with portfolio royalty rates, and then I also worked with Mr. Delgado, who we just saw a video deposition of, at Ericsson, and worked with him to help Ericsson determine what their 5G royalty rates would be that they'd charge people.

Q.   In a patent license negotiation, we have the patent owner on one side of the table and the company that wants to use the patents on the other side.  Is that right?

A.   Right.

Q.   Do you have experience working on both sides of those negotiations?

A.   Yes.

Q.   Have you testified in other patent infringement lawsuits?

A.   Yes; many.

Q.   And have you testified for both sides, both the patent owner and the company accused of infringement?

A.   Yes.

Q.   And have you worked more for patent owners like General Access or defendants like T-Mobile?

A.   Well, over time it's a pretty even mix over the years, but in the last five years I've worked much more for the patent holder.

Q.   Regardless of which side you're on, do you follow the same set of rules and apply the same type of analysis?

A.   Yes.  I have to follow the damages statute, and I apply the same analysis no matter which side I'm on.

Q.   Are you being compensated for your work in this case?

A.   My company is.  I work for a large company and they could -- they pay me but they bill for my time.

Q.   How does your company get paid?

A.   On an hourly rate.

Q.   And what are the hourly rates?

A.   They range from $300 for some of the experienced staff that have worked with me for a number of years, up to my rate of 995 that my company charges.

Q.   Who sets those rates?

A.   The company I work for does.

Q.    How does your company determine the hourly rates?

A.    Well, they told me that they determine it based on years of experience, expertise, and then they look at what's being charged in the marketplace.

Q.    Does your compensation depend in any way on who wins this lawsuit?

A.    No.

        MS. FASULO:  Your Honor, General Access offers Mr. David Kennedy as an expert in the negotiation of patent agreements and the calculation of patent damages.

        THE COURT:  Is there objection?

        MR. DACUS:  No objection, Your Honor.

        THE COURT:  Without objection, the Court will recognize this witness as an expert in those fields.

    Please continue, counsel.

Q.    (BY MS. FASULO)  Mr. Kennedy, what were you asked to do in this case?

A.    Determine what T-Mobile owes General Access for the use of its technology during the damages period.

Q.    Why do you say 'use'?

A.    Well, that's what the statute -- the damages statute requires.  I think I've got a slide that shows the damages statute.

Q.    Were you able to quantify the amount of money that T-Mobile saved by infringing the asserted patents?

619

A.    Yes, I was.

Q.    How much has T-Mobile benefited from infringing both asserted patents?

A.    Over $900 million.  $904 million is the economic benefit.

Q.    And have you calculated the payment, the reasonable royalty for T-Mobile's infringement of the asserted patents?

A.    Yes, I have.

Q.    And what's the amount of that reasonable royalty?

A.    $253 million.

Q.    I'd like to discuss how you reached those conclusions.

How many hours have you spent studying the damages issues in this case?

A.    Hundreds.

Q.    What types of materials did you have access to in the course of performing your work?

A.    Some are shown here.  It was a lot of materials, tens of thousands of documents that we had access to, including T-Mobile's confidential sales data and financial data related to their base stations and equipment that they purchase from different parties; also had over a dozen deposition testimonies that -- or I think a dozen that I reviewed.  And then I looked at T-Mobile license agreements and Ericsson information on the amount of equipment that was sold to T-Mobile.

Q.    In the upper left-hand corner I see 'T-Mobile financial

data'.  Is there any particular financial data that was important for your analysis?

A.    Yes.  They disclosed how much they spent on their network on an annual basis.

Q.    And what kind of Ericsson data did you have access to?

A.    Ericsson produced their pricing data and the amount called 'spend data' that that T-Mobile had spent with them on infrastructure equipment and base station equipment.

Q.    In addition to the evidence on the screen, have you been in the courtroom this week watching the evidence and testimony?

A.    Yes.  I've seen all of the fact witnesses and I saw the portion -- at least the portion of Dr. Madisetti's testimony where he was discussing the technical benefits.

Q.    You mentioned this statute earlier.  Are there legal principles that guided your work in this case?

A.    Yes.  There are a few guideposts that I have to follow, and the damages statute is one of them.

Q.    And what does the damages statute tell you you need to do?

A.    Well, it's on the screen here, but I've highlighted a portion of it, and that is in no event should the award be less than a reasonable royalty for the use made of the invention by the infringer.

Q.    And that's what you're trying to do here to figure out

the use?

A.    Yes.    I'm trying to determine the use made of the invention by T-Mobile, how they benefited from that.

Q.    Is there a framework that courts require experts to use to determine a reasonable royalty?

A.    Yes.

Q.    What is that called?

A.    It's called the hypothetical negotiation.

Q.    Can you explain just briefly what the hypothetical negotiation is?

A.    Yes.    It requires an expert to form an opinion about what would have happened if T-Mobile and General Access had sat down at the beginning of infringement to negotiate a license agreement.

Q.    In this negotiation, would we have had General Access on one side of the table and T-Mobile on the other?

A.    Correct.

Q.    What does T-Mobile get as a result of this negotiation?

A.    They get license to the patents to be able to use the technology in those two patents.

Q.    And what does General Access receive?

A.    They get a reasonable royalty.

Q.    Are there rules of the hypothetical negotiation that you are required to apply?

A.    Yes, there is three very important guidelines.

Q.   What's the first rule?

A.   That the parties must reach an agreement.  You can't walk away like you can in the real world.

Q.   What is the second rule that you apply?

A.   So both parties have access to all relevant information. You have to -- you get to see confidential documents from the other side so that you can understand what the value of the technology is to the infringer, and the other side gets to see internal documents from the patent holder.

Q.   And what is the third rule?

A.   So unlike in the real world, you have to acknowledge that the patents are valid and infringed.  If you get to the damages question, you have determined they are valid and infringed.

Q.   In the hypothetical negotiation can T-Mobile say, Actually we aren't using General Access's inventions at all?

A.   No.

Q.   So is this hypothetical negotiation kind of like playing poker but with your cards up?

A.   I have described it that way.  It is like all of the information is shared, so you know what information both parties have, so it's like playing cards face up.

Q.   And is this hypothetical negotiation different from how patent license negotiations work in the real world?

A.   Very different.

623

Q.   How so?

A.   Well, first you can walk away; you don't have to enter into a license agreement.  And second, you -- as I believe we heard Mr. Patricio Delgado--I'm sorry--testify that they don't admit that the patents are valid and infringed, and that's very common.  That just usually doesn't happen.  And then also you have access to information that you wouldn't otherwise have.  For example, we know exactly what T-Mobile has spent on building base stations and buying equipment from Ericsson and all the other costs that go into expanding their network.

Q.   Have you ever been part of a real-world negotiation where everyone admits that the patents are infringed and valid like we have to do in a hypothetical negotiation?

A.   No.

Q.   Does T-Mobile agree that we need to follow these rules of the negotiation?

A.   Yes.

Q.   How do you know that?

A.   T-Mobile has a damages expert, and that I understand from reviewing her report that she follows that same guidance.

Q.   When does this hypothetical negotiation occur?

A.   It's supposed to occur right at the point of first infringement.

Q.   And so in this case what was the date of the hypothetical negotiation?

A.    It was early 2013.

Q.    And does everyone in this room agree on the date of the hypothetical negotiation?

A.    Yes, I believe so.

Q.    Did you hear T-Mobile in opening statements refer to the '477 and '383 Patents as expired?

A.    Yes.

Q.    When you calculated the damages in this case, did you determine what T-Mobile owes from the time when those patents were in force and not expired?

A.    Yes.  I did not calculate any damages after the expiration date.

Q.    And is there anything unusual about the fact that we're having this trial now after the patents have expired?

A.    No.  It takes -- sometimes it takes years to enforce patents.  I've been in that situation myself, and it can take a long time to get to this point.

Q.    In addition to the hypothetical negotiation, are there other factors that damages experts like yourself have to consider?

A.    Yes.

Q.    And what are those?

A.    The *Georgia-Pacific* factors.

Q.    What are the *Georgia-Pacific* factors?

A.    So they're 15 factors that courts want experts to use.

And experts use and a lot of these factor are used in the real world to determine what would be the outcome of a negotiation; in this case a hypothetical negotiation, considering all of these factors.

Q.   Did you consider all 15 factors in your analysis?

A.   I considered all of them, yes.

Q.   Were there some factors that you found to be particularly relevant?

A.   Yes.

Q.   Which ones?

A.   So 9, 10, 11, and 13.

Q.   And why were these factors particularly important for you?

A.   Well, these factors relate directly to valuing the use. You see some of the words of those factors, the advantages over the benefits, the extent to which the infringers made use of the invention, and then the portion of the profit that should be credited to the invention, all of that goes to valuing the use and benefits that T-Mobile has obtained from using the technology.

Q.   What kind of methodology did you use to value the use of the asserted claims here?

A.   Well, here based on the facts in this case, I used the cost approach.

Q.   Can you briefly describe for us the cost savings approach

or the cost approach?

A.    Sure.  It's depicted here, but it's basically how much did -- cost did T-Mobile save by using the patented technology versus what it would have had to spend if it avoided using the patented technology.

Q.    Do those savings help you determine the value?

A.    Yes, they do.

Q.    How so?

A.    Well, if you look at what the savings are, the savings are an indication of the value that T-Mobile has obtained from the technology, as long as you're looking specifically at the direct benefits that they obtained from the patents.

Q.    Is the idea of a cost savings approach that one way to measure the value of the patented invention is to measure the cost of replacing it?

A.    Yes, that's exactly right.

Q.    So kind of like the cost if you weren't allowed to use the invention?

A.    Correct.

Q.    Is there any dispute in this case that a cost savings approach is an accepted way to determine a reasonable royalty?

A.    I don't believe so, no.

Q.    Before we get into the details of the calculation, can you just remind the jury briefly of your conclusion?

A.    It is that T-Mobile's economic benefit -- minimum

economic benefit--and I'll explain why that's minimum later--is $904 million.  And the reasonable royalty for that should be $253 million.

Q.    Can you please explain what the first step in your analysis was?

A.    Sure.  So I looked at T-Mobile's financial records that they produced in this matter to determine how much they were spending on infrastructure during this period of time, just during the damages period.

Q.    How much did T-Mobile invest in its infrastructure in the damages period?

A.    It was approximately $35.6 billion.

Q.    What did you do next?

A.    So then I looked at what -- the different categories that they spend that money on, and this shows during that time period what they spent on FDD and TDD, and then what they spent in total on an annual basis during the damages period.

Q.    And shown on this slide, is this what T-Mobile spent on Ericsson base station equipment during the damages period?

A.    Yes.

Q.    Why did you focus on Ericsson?

A.    Well, it's my understanding from Dr. Madisetti and listening to testimony that the Ericsson equipment is what's at issue in this case from the infringing equipment standpoint.

628

Q.   And what did you determine T-Mobile's investment in the infringing infrastructure to be?

A.   Total of $19.4 billion.

Q.   Before when we were discussing the hypothetical negotiation, you said that negotiation would have taken place in early 2013?

A.   Yes.

Q.   Why are you only showing this investment data starting in April of 2017?

A.   Well, it's my understanding that the patent law only allows a patent holder to request damages going back six years before the complaint was filed, and so that limits the amount and so I don't calculate damages from 2013 to 2017.

Q.   And why does the data end in 2023?

A.   That's when the patents expired.

Q.   And I see you have FDD and TDD labeled on this graph. What does that refer to?

A.   So those are the two different types of cellular equipment that we heard Dr. Madisetti talk about that was purchased from Ericsson.

Q.   And why are you showing this on your graph?

A.   Well, I needed to separate the two, because I understood from Dr. Madisetti and we heard him testify that there's different benefits between the two different types of equipment and the two different patents, so it needed to be

629

separated out to make the calculation.

Q.   Why did you want to understand T-Mobile's annual investment in infringing infrastructure?

A.   Well, because, as we heard from Dr. Madisetti, if they did not use T-Mobile's patented technology, they would have to densify their network and add more base stations, so I wanted to look at how much they had been spending with the benefit of the patents that they were using first.

Q.   Mr. Kennedy, I think you just referred to T-Mobile's patents.  I just want to verify, whose patents are we talking about here?

A.   General Access', yes.

Q.   Thank you.

A.   I misspoke.  Thank you.

Q.   Are the benefits of General Access' patents economically valuable to T-Mobile?

A.   Based on my analysis, very valuable.

Q.   And why is that?

A.   Well, demand is always going up.  This is a document from Ericsson, Exhibit JX 028, but it's showing that the demand for cellular services is always increasing.  And you have to keep up with that demand if you want to keep your customers happy.  And that certainly is consistent with testimony that we just heard from one of T-Mobile's representatives.

Q.   How does this testimony support your opinion?

630

A.    Yeah.    This is what we just heard, and T-Mobile knows it must keep up with the demand.  And it says that it understands it's the lifeblood of their business, and it's the single most important thing, consumer satisfaction, and that is tied to the quality of their network.

Q.    Uh-huh.  And how does this testimony support your opinion?

A.    Well, it tells me that if there was -- that T-Mobile would densify or increase its equipment to keep up with that demand even if there was any decline in that.  It's that important to them.

Q.    Were you here when Dr. Madisetti discussed the benefits of the asserted patents?

A.    Yes.

Q.    And if T-Mobile didn't have the uplink throughput benefits of the asserted patents, what would T-Mobile do?

A.    Well, his conclusion was that they would -- it would require what's called densification.

Q.    And what does that mean?  What is densification?

A.    Building more base stations, filling out for the loss in coverage or throughput if you did not use the patents.

Q.    Uh-huh.  In your opinion, would T-Mobile have said, That's okay; we can live without these throughput benefits?

A.    No, I did not think that that would be reasonable.  I think it was reasonable that they would want to -- based on

the facts I've reviewed in this case and testimony, that they would want to make sure they could meet their customers' demands.

Q. And why would they meet their customers' demand by building more base stations?

A. Well, this is an Ericsson document, and they say that increasing site density improves coverage and capacity, but you see, it also says, But it comes with a cost. It's very expensive to put in additional infrastructure.

Q. Uh-huh. What kind of costs is this document talking about?

A. It's talking about the base stations and new sites and the transmission and maintenance, all of the cost associated with deploying additional coverage or base stations.

Q. Are your opinions here based on what it would cost T-Mobile to invest in those additional base stations?

A. Yes.

Q. How much more investment would T-Mobile need to make if it didn't use the '477 Patent?

A. Well, according to Dr. Madisetti's conclusion, 6 to 7 percent for TDD base stations and 2 to 3 percent for FDD base stations.

Q. And did you pick the high end or the low end of the range?

A. To be conservative, I picked the low end of the range.

It could be the 7, but I used the 6 percent and the 2 percent, the low end.

Q.    And how much more investment would T-Mobile need to make if it didn't use the '383 Patent?

A.    Four percent additional investment.

Q.    How did you use this information from Dr. Madisetti to calculate how much more T-Mobile would have had to invest without the benefits of the asserted patents?

A.    So I looked at what they were -- how much they were investing in TDD base stations and FDD base stations, and then multiplied those amounts with the -- how much they invested in those while they were using the asserted patents.  And then I multiplied that by the low end of these ranges here to determine how much additional costs they would incur if they could not have been using the patents.

Q.    And how did you take into account the different percentages from the two different patents?

A.    So I wanted to make sure I didn't double count.  There are similar benefits, so I only took the percentage from the lowest -- or the -- one of the two.  There were no -- there's no overlapping damages in my calculation is the best way to put it.

Q.    Okay.  Doing that math, what is the additional infrastructure investment that T-Mobile would have had to make if it didn't have the benefits of the asserted patents?

A.    So the total investment amount you see there is the $19,359,000,000.  And doing the math that I just described, the total additional investment is the minimum of the $904 million.

Q.    And based on this analysis, how much more money -- let me start over.

Based on this analysis, how much money did T-Mobile save by infringing the asserted patents?

A.    A minimum of $904 million.

Q.    And you say a minimum.  Why is that?

A.    Well, first I used the low end of the range, and then secondly, there's -- because I made sure I didn't double count, I probably undercounted some of the benefits from the two patents.  I didn't count any of those overlapping benefits.

Q.    To be clear, was this additional investment in infringing equipment?

A.    No.  The additional investment would be in equipment where they are not using the patented technology.

Q.    Is this $900 million the final reasonable royalty amount that you calculated?

A.    No, although it could be.  It's -- because it's only based on the incremental benefit of the patent, this could be the final damages number, but I used my 30-plus years of experience in knowing that sometimes at the negotiation table,

even though you believe the amount you're asking for is a fair amount, you still have to negotiate. So I made further adjustments to account for that.

Q.   If we think of this as a bargaining table, is the $900 million the amount of money that would have been on the table at the beginning of the negotiation?

A.   That's correct.

Q.   Okay. Can you explain what you did next to determine how General Access and T-Mobile would have negotiated over this $900 million?

A.   So I did a couple of things. I added an additional discount for a possible additional apportionment and for determining a bargaining range.

Q.   What is apportionment?

A.   So at the beginning you want to make sure you're only capturing the value of the invention and you're not capturing any other technology, so you apportion down to the value of just the technology. And there could be additional apportionments that you look at that are more negotiating-related, and then also the bargaining range that I mentioned is a type of apportionment.

Q.   Why did you decide to do these additional apportionment steps?

A.   To be conservative and to give T-Mobile the credit that -- at the hypothetical negotiation their market power and

635

their leverage, I need to consider those things.

Q.   What was the first apportionment step you performed?

A.   So I labeled it the ecosystem apportionment.

Q.   Can you explain what ecosystem apportionment is to us?

A.   Sure.  So ecosystem or economic system, it's looking at the overall cellular marketplace.  And T-Mobile could argue that they not only get benefits from the patents, but that the cell phone manufacturers, like Apple that makes the iPhone and Samsung that make the Galaxy, that they contribute to this ecosystem that brings additional value or makes the patented technology even more valuable.  So that's the position that T-Mobile might take that I'm giving them credit for.

Q.   Uh-huh.  How would T-Mobile argue that cell phone makers like Samsung or Apple are benefiting also?

A.   Well, their -- they sell handsets and they're able to sell more handsets with better service, so if there's better service, T-Mobile is able to sell more of their handsets and they're able to make more money.

Q.   How did you determine what T-Mobile could present in the hypothetical negotiation?

A.   So I looked at the profit margins of Apple and Samsung, the two largest companies in the handset industry, and I compared that to the profits that T-Mobile makes in this business.  And so the relative profitability allows me to come up with what they may argue that they should -- or Samsung and

Apple should be responsible for, not them.

Q.    Uh-huh.  Can you explain very briefly what the -- what a profit margin is, just in general?

A.    Sure.  It's I think about my -- I bought my truck years ago and I paid a certain amount to Ford, and their profit margin is what I paid them minus the parts and the labor that went into building the truck.  So that's the profit margin.  Same with the phones.  It's the parts, the glass, the chips, everything that goes into a phone minus what they sell it for, that's the profit margin.

Q.    What about T-Mobile's profit margin?  How is that determined?

A.    So you're looking at their revenues from their network, which is primarily, as we heard testimony from one of their witnesses where they get almost a hundred percent of their revenues is operating their network where we pay for our phone bills each month, and then deducting what it costs them to make that revenue is their profit margin.

Q.    How do these gross profit margins factor into your ecosystem adjustment?

A.    So as I mentioned, I assumed that T-Mobile would argue that some of this benefit that's being created by the patents should be attributable to the handset manufacturers, and so I calculated a deduction for that amount from the overall value that I created or that I calculated.

637

Q.   And how did you calculate the amount of that adjustment?

A.   So looking at the ratio of the handset manufacturers' profit margins, and T-Mobile's profit margins, I calculated a deduction of 48 percent.  And so if you take the $904 million in cost savings and then multiply that by 48 percent, then I think the bill there is $434 million is the reduced amount of benefit that General Access would argue is a minimum benefit that T-Mobile has received.

Q.   Have you used this methodology in calculating damages before?

A.   Yes, many times.

Q.   If we go back to the bargaining table, how does ecosystem apportionment play out?

A.   So that total would then come out of or off the table and go to T-Mobile, that 48 percent.

Q.   So 48 percent of the money stays on the table and 52 percent of the money goes to T-Mobile?

A.   That's correct.

Q.   After you conducted the ecosystem apportionment, what did you do next?

A.   So then I constructed a bargaining model.

Q.   What is a bargaining model?

A.   So based on my experience negotiating license agreements, I tried to create a calculation that would take into effect or take, you know, the impact of the two parties sitting at a

638

table over that $434 million and deciding how much of that General Access is going to get.

Q.   What did you conclude would be General Access' position at this bargaining table?

A.   Well, their initial position would be we've already reduced this by this ecosystem adjustment, and these are the minimum benefits, and so they would argue that they have already reduced it enough.

Q.   And what about T-Mobile's position?

A.   So I tried to determine what I thought would be T-Mobile's most aggressive position, and that would be, well, we want to earn our full profit margin off of this amount that we're going to pay you because we're buying technology from you and we want to earn -- or buying for the right to the technology by saving those costs, basically, but we want to earn our profit margin off of that.

Q.   This is the same profit margin concept that you explained earlier with your truck?

A.   Yes.

Q.   And why did you use the network gross margin for T-Mobile's position?

A.   Well, that's where they make the money off of the infringing technology.

Q.   What is your opinion about how General Access would respond to that?

639

A.    Well, even if they went forward negotiating, I think they would push back on T-Mobile getting its full profit margin and look for a lower reduction in the royalty.

Q.    How would General Access push back?

A.    Well, I think -- based on my review of the financial information, I believe they would focus in on T-Mobile's cost of the stockholders equity; how much it cost them to raise the money that it would take to buy this equipment.

Q.    Can you give me an example of this cost of equity idea?

A.    Sure.  So if you go back to the example of my truck, I financed it, I didn't pay cash for it, so over time I was paying interest on top of that total value that I paid to the bank to use their money.  So cost of equity is similar to that.  And it's not interest, it's -- cost of equity is different, but it's that same concept.  It's how much do stockholders expect to get when they invest money in T-Mobile stock.

Q.    Why did you use T-Mobile's cost of equity for General Access' negotiation position?

A.    Well, I think that -- I don't think General Access should have to agree after the first apportionment to allow T-Mobile to earn its full profit margin, and I do think a more reasonable position, if they're going to negotiate any further, is to say, Well, you know, I'll give in on how much it costs you to raise that money to buy the equipment that you

640

saved from buying in this hypothetical negotiation.

Q.    Okay.  What did you do next?

A.    So I looked at the two bargaining positions.  General Access' position is that, You should pay minus your cost of equity 90 percent of this amount.  T-Mobile says, I think I should only have to pay 27 so I can earn my gross margin.  And I took a very conservative approach.  I gave both equal weight and came to a midpoint, calculated a midpoint and that's 58.8 percent.

Q.    Why did you give these both equal weight?

A.    Well, I think it's a conservative aspect of the calculation to give T-Mobile's position just as much weight at their full profit margin as giving General Access' position which really deals with the cost of that capital.

Q.    How many patent licenses have you negotiated in your career?

A.    It's over 200.  I don't know the exact amount.

Q.    Is the bargaining model that you applied here consistent with what you've seen in your experience?

A.    Yes.  I've used this same type of bargaining model many times.

Q.    When you used a bargaining model, do you always take the same positions?

A.    No.  It depends on the facts and circumstances of the case.  I might look at another company and think that a

different ratio is better because a particular ratio might fluctuate based on some other outside circumstances.  So it's going to be based on the specific negotiation.

Q.    What was the result of your bargaining model?

A.    A reasonable royalty of $253 million.

Q.    That's your ultimate conclusion about the result of the hypothetical negotiation?

A.    Yes.

Q.    If we go back to the bargaining table, can you help us think about what the result is here?

A.    Sure.  So this slide would show that additional cost of equity amount going over to T-Mobile and General Access retaining the $253 million as a reasonable royalty.

Q.    In the hypothetical negotiation, what does T-Mobile receive?

A.    They get a license to the patents and they save $904 million.

Q.    And what does General Access receive?

A.    They get a reasonable royalty of $253 million.

Q.    Of the total economic benefit to T-Mobile from using General Access' patents, how much does General Access receive as a royalty?

A.    It's about 28 percent.

Q.    Given these calculations, can you describe the basic economic choice that T-Mobile is faced with at the

hypothetical negotiation?

A.    Sure.  They are looking at paying a royalty of $253 million to get the benefits of the patents or spend more than three times that amount in densifying their network by buying additional equipment.

Q.    Okay.  Is $253 million the reasonable royalty for the two patents together?

A.    Yes.

Q.    Did you do an analysis to determine the reasonable royalty for each patent separately?

A.    I did.

Q.    How did you do that?

A.    So I went back to Dr. Madisetti's percentages that are broken down between the two patents and applied those percentages to the infrastructure savings separately.

Q.    So I put Dr. Madisetti's slide back on the screen.  Can you explain what you did for the '477 Patent?

A.    Sure.  I used the 6 percent and the 2 percent for the two different types of base stations, TDD and FDD.

Q.    And what did you do for the '383 Patent?

A.    Used the 4 percent for all of the network.

Q.    And what did you do next?

A.    Then multiplied that by the amount that they actually spent to see how much they were saving by using the General Access technology.

643

Q.   And after that what did you do?

A.   I did -- I walked through the same apportionment steps, negotiation steps, made the same calculations to come up with a final number for each patent.

Q.   Okay.  After you performed those apportionment steps, what is the reasonable royalty that you determined for the '477 Patent alone?

A.   $186 million.

Q.   So $186 million is the reasonable royalty that T-Mobile would pay for only the use of the '477 Patent?

A.   Correct.

Q.   And what is the reasonable royalty that you determined for the '383 Patent by itself?

A.   $208 million.

Q.   So that $208 million, that's the reasonable royalty that T-Mobile would have paid just for the use of the '383 Patent?

A.   Yes.

Q.   Okay.  And if I'm doing the math correctly, those two amounts add up to more than $253 million?

A.   Correct.

Q.   Which is -- and the $253 million is what you determined to be the reasonable royalty for both patents combined.  Right?

A.   That's correct.

Q.   Why did you not just add up the individual amounts of the

two reasonable royalties to reach your final conclusion?

A.    Well, as I mentioned before, I wanted to be careful not to double count, and there are overlapping benefits.  So when you look at each individual patent, you can't just add them together -- or you could, but to be conservative I wanted to make sure I did not double count any benefits, so I did not for the total for both.

Q.    Mr. Kennedy, you've already discussed the *Georgia-Pacific* factors that were the most important for your analysis, but are there others that you considered?

A.    I considered them all, but some weren't useful, and some I considered and did factor into just the overall leverage at the hypothetical negotiation for each party.

Q.    This slide is showing factor 2.  Can you explain what factor 2 is?

A.    Yes.  This factor requires you to look at the rates paid by the licensee for use of other patents comparable to the patent-in-suit.

Q.    Did you find this factor to be of any significance in this case?

A.    No, I did not.

Q.    Why not?

A.    Well, there weren't any licenses that were comparable both economically and technically to the patents-in-suit here.

Q.    And how did you determine that none of the licenses would

645

have been helpful at the hypothetical negotiation?

A.    I reviewed the licenses.

Q.    Why weren't the licenses that you considered comparable?

A.    Well, all of them were settlements in litigation.

Q.    In those settlements, were there admissions that the patents were valid and infringed?

A.    No, there were not.

Q.    So going back to the patent statute you showed earlier, what does the statute say about the amount of patent damages that T-Mobile should pay if it infringed the patents?

A.    It should pay a reasonable royalty for the use made of the invention by the infringer.

Q.    And has your analysis sought to do that?  Have you tried to measure the value that T-Mobile got from the patents?

A.    From the use of the patents, yes.

Q.    And after analyzing T-Mobile's use of the asserted patents, can you please summarize your royalty conclusions for the jury?

A.    Sure.  I believe that a $253 million reasonable royalty would be the outcome of the hypothetical negotiation for T-Mobile's infringement and the use of the asserted patents.

Q.    How would that payment have been made to General Access?

A.    In a lump sum at the time of the hypothetical negotiation.

Q.    Thank you, Mr. Kennedy.

646

MS. FASULO:  Your Honor, I pass the witness.

THE COURT:  All right.  Cross examination by the Defendants.

If there are binders to distribute, let's get that done.

MR. DACUS:  Permission to approach with binders?

THE COURT:  Granted.

I think I got two sets.

MR. DACUS:  Thank you, Your Honor.

THE COURT:  It's a good thing we grow trees in East Texas.

All right, Mr. Dacus, you may proceed with cross examination.

MR. DACUS:  Thank you very much, Your Honor.

CROSS EXAMINATION

BY MR. DACUS:

Q.   Good late afternoon, Mr. Kennedy.

A.   Good afternoon.

Q.   I'd like to ask you a few questions about the testimony you gave, if that's okay.

A.   Yes, sir.

Q.   Let's start with what you're not here to do.

You're not here to give any opinions on whether or not T-Mobile infringes.  Correct?

A.   That's correct.

Q.   You're not here to give any opinions on whether or not

these patents are valid or invalid.  Correct?

A.   That's correct.

Q.   In fact, I think I heard you say in your calculation of damages, you assumed that there is infringement and that the patents were valid.  True?

A.   That's correct.

Q.   You know that T-Mobile, of course, disputes infringement.  Right?

A.   Yes, I've heard that.

Q.   And they dispute whether or not these patents are valid.  Fair?

A.   Fair.

Q.   And you know that if, in fact, there is no infringement, if the jury finds there's no infringement, then the damages are zero.  True?

A.   Correct.

Q.   Or if the jury were to find that the patents are invalid, the damages are zero.

A.   Correct.

Q.   So with all due respect to you, sir, if the jury finds either that there's no infringement or that the patents are invalid, then they can ignore your testimony.  True?

A.   That's correct.

Q.   Okay.  Now, I want to make sure that we understand your experience.  Okay?

A.    Okay.

Q.    You were here when the Judge read the preliminary instructions to the jury.  Correct?

A.    Yes.

Q.    And part of what he said, particularly with respect to experts, was that the jury should pay particular attention to whether or not an expert has a bias towards one side or the; other, has experience that leans towards one side or the other.  Fair?

A.    I don't remember the exact wording, but I think that's fair.

Q.    Right.  And I think you alluded to this, sir, but you know that in the last six-plus years or so, let's say since 2018, the vast, vast majority of your work has been on behalf of folks who are bringing lawsuits.  True?

A.    I believe that's correct.

Q.    Yeah.

A.    It's been for the patent holder at least for the last five years, maybe since 2018.

Q.    Right.  I mean, in this court what you have to do if you're an expert, you have to submit an actual resume, what we call a CV, to us and to the Court.  Correct?

A.    Correct.

Q.    And part of that CV includes all of your testifying experience over the last six or seven years.  Correct?

A.    Yes.   I just don't know what the time period was, but I agree.

Q.    Yeah.   And you would agree with me, sir, that your CV in this case that you submitted showed that more than 90 percent of your work since 2018 has been on behalf of the folks who are seeking money in a lawsuit on behalf of the plaintiff. Correct?

A.    I don't know what the percentage is, but I would say it's probably close to that, or 80 to 90 --

Q.    Okay.

A.    -- off the top of my head for work where I've delivered testimony.   I've done work that didn't end up in testimony that would adjust that percentage, but based on testifying, yes.

Q.    Now, we're going to talk about the details of your calculation, but I want to make sure of a couple of things right up front before we get into the details.

     So the first thing I want to make sure that everybody understands, that $904 million that you spent a bunch of time talking about -- do you remember that?

A.    Yes.

Q.    That calculation is based solely on the percentages that you got from Dr. Madisetti.  Correct?

A.    The -- yes, that's correct.

Q.    In other words, that entire calculation is dependent upon

the accuracy of those percentages that Dr. Madisetti calculated.  Correct?

A.    Yes.

Q.    The second thing I want to talk about at a high level before we dig into the details is that $904 million that you reduced down to the $250 or so million, that includes costs to T-Mobile beyond buying base stations.  Right?

A.    Correct.

Q.    I mean, you've been here in the courtroom and you heard earlier today that the accused device or product that's accused of infringement is only and solely the base station.  You heard Dr. Madisetti say that.  Right?

A.    Yes.

Q.    Yet you have included costs and expenses--and we'll talk about the details of it--beyond the base stations.  True?

A.    That's correct.

Q.    You agree, sir, that any award of a reasonable royalty needs to be reasonable.  Fair?

A.    Yes.

Q.    And it is, in fact, the Plaintiff's burden to prove that the royalty is reasonable.

A.    Correct.

Q.    And, in fact, if we -- we're going to talk about it in detail, but if we just take it at a high level, if this jury thinks that the percentage that Dr. Madisetti calculated as a

throughput savings is not reasonable or credible, you really have no opinion to offer on that.  Isn't that a fair statement?

A.    That is correct.

Q.    Because it's the Plaintiff's burden to prove that. Right?

A.    Yes.

Q.    For example, if the jury believes that, in fact, Dr. Madisetti has taken credit for the WiMAX standard that the industry put together before these patents were filed, then you would agree that's inappropriate.  Correct?

A.    I don't know how that fits in, I -- but I agree that if the jury believes -- does not agree on -- with his percentages, that that impacts my calculation.

Q.    Well, we're just talking at a high level, sir.  You would agree that any award of a reasonable royalty should only relate to any inventive aspect of these patents.  Correct?

A.    Correct.

Q.    And to the extent Dr. Madisetti took features and functions from the WiMAX standard that existed before these patents and gave credit to these Plaintiffs, you agree that's inappropriate for damages.  Correct?

A.    Sure.

Q.    Now, let's -- I want to talk a little bit about your calculation that you did in this case and some other

652

approaches that you didn't do.  Is that fair?

A.    Sure.

Q.    You would agree with me, sir, that there is an approach called the market approach that is an accepted valuation methodology for determining a reasonable royalty.  True?

A.    Yes.

Q.    And you would also agree with me that there is an approach called the income approach that is an accepted methodology.  Correct?

A.    Yes.

Q.    And you -- in your calculation you did not use either one of those methodologies.  Correct?

A.    That's correct.

Q.    You used what you call the cost approach.

A.    Yes.

Q.    Fair?

So I want to start with the market approach, because you do agree that's an accepted methodology.  Right?

A.    Yes.

Q.    And you agree that the jury should consider evidence under the market approach.  Fair?

A.    Yes.

Q.    So that we understand what the market approach is, the market approach is based on the premise that the value of an asset can be determined by looking at other or similar

653

transactions in the marketplace.  True?

A.   Yes.

Q.   And it's true, sir, that in your career you've actually used the market approach many times.  Fair?

A.   Yes.

Q.   I heard you were really quick to tell your lawyer that you apply the same rules whether you're sitting at this table or at the other table.  Do you remember saying that?

A.   Yes.

Q.   But you've applied the market approach in many other cases.  Correct?

A.   Yes I have.

Q.   But you didn't do it in this case.  Correct?

A.   Correct.

Q.   Now, you agree with me that the market approach can include looking at similar or comparable patent licenses.  Fair?

A.   Yes.

Q.   In fact, three of those factors that you showed the jury, those *Georgia-Pacific* factors, No. 1, No. 2, and No. 12 all relate to looking at similar or comparable licenses.  Fair?

A.   Yes.

Q.   And you know, sir, that many people sort of in your line of business equate this to basically shopping for a house and looking at comparable houses.  Fair?

A.    Yeah.   I think you could simply explain it that way in a simple -- from a simple standpoint.

Q.    Well, you've testified in this court before, have you not, sir?

A.    Yes.

Q.    Have you ever bothered to read the Court's jury instructions related to damages?

A.    Yes.

Q.    You know he described it that way in the instructions. Correct?

A.    Yes.

Q.    So you would certainly expect that you and the jury should follow the instructions given by the Court.  Fair?

A.    Absolutely.

Q.    You agree, sir, that in determining a reasonable royalty and deciding what these folks would come to at this hypothetical negotiation, that we should actually look at real-world transactions and see what happened.  Correct?

A.    Yes.

        MR. DACUS:  Your Honor, may I use the flip chart?

        THE COURT:  You may.

        MR. DACUS:  May I have leave to use it?

Q.    (BY MR. DACUS)  I want to talk about some of these real-world transactions, Mr. Kennedy.  But before I do, I want to make sure we just kind of set the scenario so that the jury

understands in what industry and what realm these things are being negotiated.  Does that sound fair?

A.  Yes.

Q.  Okay.  The products accused of infringement here are base stations.  True?

A.  Yes.

Q.  T-Mobile does not make the base stations.  Correct?

A.  Correct.

Q.  It buys them from Ericsson.  Correct?

A.  Yes.

Q.  Because Ericsson makes the base stations, they generally pay if there's any royalty needed for a patent related to their equipment.  Correct?

A.  I don't know what they pay.  I do know they have to pay something, yes.

Q.  I'm not asking what they pay; I'm just saying as a general proposition the way this works is if someone accuses an Ericsson base station or someone says you're using our patent, Ericsson's the one that pays for that, not T-Mobile.  Correct?

A.  I -- yes, they -- I understand there is indemnification, as there is oftentimes.

Q.  And you would agree with me at a minimum, sir, that at this hypothetical negotiation if T-Mobile was sitting down to negotiate with General Access, T-Mobile would consult with

Ericsson about what is a reasonable royalty to pay for these patents related to these base stations.  You would agree with that.  Correct?

A.    I don't -- yeah, I don't disagree with that.

Q.    Okay.

MR. DACUS:  Your Honor, at this time we're going to go into some industry license information and I will need to seal the courtroom, and I will need to exclude the corporate representatives both from our side and their side because we have industry information outside of --

THE COURT:  All right.  Based on that request from counsel and to protect confidential information, I'll order the courtroom sealed.

I'll direct that all persons present who are not subject to the protective order that's been entered in this case should exit the courtroom and remain outside the courtroom until it's reopened and unsealed.

(Courtroom sealed.)

Q.



658

██████████████████████████████████████████

███████████████████████████████?

A. ███.

Q. ████████████████████████████████████

████

████████████████████████████████████████

████████████████?

A. ███.

Q. ██████████████████████████████████

██████████████████████████████████████████

██████?

A. █████████.

Q. ████████████████████████████████████████

█████████?

A. █████████.

Q. ████████████████████████████████████

██████████████████████████████████████

██████████████████████████████████████

█████████████████████████████?

A. ███████.

Q. ████████████████████████████████████

████████████████████████████████████

████████████████████████?

A. █████████.

Q. ████████████████████████████████████

659



A. ██.

Q. ████████████████████████████
████████████?

A. ██████.

Q. ████████████████████?

A. ██.

Q. █████████████████████?

A. ██.

Q. ████████████████████████?

A. ██████.

Q. ████████████████████████████
████████████████████████████
████████████████████?

A. ████████████████████████████
████████████████████████████
███████████████.

Q. ████████████████████████████
████████████████████████████
████████████████████?

A. ██.

Q. ████████████████████████
████████████████████████████
████████████████████?

A. ██.

Q. ████████████████████████████?

A.   ███.

Q.   ████████████████████████████████████████████
███████████████████████████████████████
███████?

A.   ████████████████████████████████████
███████████████████████████.

Q.   ████████████████████████████████████████████
██████████?

A.   ████████.

Q.   ████████████████?

A.   ███.

Q.   ██████████████████████████████████████?

A.   ████████.

████████████████████████████████████

██████████████████████████████████████████

███████████████████.

██████████████████████████████████████

Q.   ████████████████████████████████████
████████████████████████████████████
██████████████████?

A.   ████████████████████████████.

Q.   ██████████████████████████████████████?

A.   ███.

Q.   ██████████████?

A.   ███.





A. ███████.

Q. ████████████████████

A. ███.

Q. ██████████████████

A. ███.

Q. ██████████████████████?

A. ██████.

Q. ████████████████████████████████

████████████████████████████████████

████████████████████████████████████

████████████████?

A. ██████████████████████████

████████████████████████████.

Q. ██████████████████?

A. ██████████████████.

Q. ██████████

████████████████████████████████████

████████████████████████?

A. ██████.

████████████████████████████████.

████████████████████████████████

██████████████████████████

████████████████████████████████

██████████████

(Courtroom unsealed.)

THE COURT: I don't see Mr. Hynek, but let's go ahead and continue. He can join us when he gets here.

MR. DACUS: Thank you, Your Honor.

THE COURT: There he is.

Go ahead.

MR. DACUS: Thank you, Your Honor.

Q. (BY MR. DACUS) Now, we have some other real-world information related to the value of these patents in this case, don't we, Mr. Kennedy?

A. Yes.

Q. In fact, you were here when Mr. Hynek testified this morning. Correct?

A. I was.

Q. And you know that he and General Access made attempts over a period at least from 2008 through 2016 to sell these patents. Correct?

A. Correct.

Q. And you know that even before that when Raze was in existence from 2000 to 2002, they sought investment from dozens if not hundreds of companies. Correct?

A. Yes.

Q. And you know that -- we won't belabor it, but you know that those efforts to sell these very patents from 2008 to 2016 garnered exactly zero formal written offers. Correct?

A. Correct.

666

Q.   And you agree -- I think you agreed earlier, but just to make sure, I mean, the jury should be looking at real-world transactions as to what the value of these patents are at a hypothetical negotiation.  Correct?

A.   They should definitely consider them and consider whether they're relevant or not or provide useful information, yes.

Q.   You know for a fact from the work that you've done in this case that these patent brokers that were out there trying to sell these patents between 2008 and 2016, they were saying to General Access that at the beginning the most they could expect would be $25- to $30 million for the portfolio of 18 patents.  Correct?

A.   Yes, that's what they were saying.

Q.   And then by the end, when we got towards 2016 they were telling General Access that for the portfolio of 18 patents, they probably should not expect more than $15 million.  True?

A.   I believe I've seen correspondence with a $15 million number, yes.

Q.   So rough math, again, that's experienced patent brokers telling these folks that roughly a million dollars a patent is all you could ever hope or expect for and that's for people who actually use them.  Correct?

A.   I'm not sure I understand your question.

Q.   Sure.  Let me do a better job.

     Experienced patent brokers were telling General Access,

If you're going to sell these patents, you should expect roughly a million dollars a patent. Correct?

A.    Correct.

Q.    And in our house shopping example where we're looking at other people in the industry, multiple other people in the industry, that's roughly the amount that was being paid for technologically comparable patents. Correct?

A.    Paid in litigation settlements.

Q.    Okay. You're not suggesting in any way that those litigation settlements are something that under the law we should not look at, are you, sir?

A.    You're not prohibited from looking at them, but you need to consider the context of a litigation settlement in the hypothetical negotiation.

Q.    I think you -- I want to follow up on this just a bit.

I think you said during your direct that you actually have some experience with patents and buying patents and litigating patents? Did I hear you correctly?

A.    Yes.

Q.    And you know, both from that experience and from your work in this case, that there are actually statistics out there that relate to the percentage of times that patent owners come to court and a jury finds either the patent is not infringed or that the patent is invalid. Correct?

A.    Correct.

Q.   And you know at least two thirds of the time the statistics show that that's what juries find.  Fair?

A.   Yes, that's absolutely fair.

Q.   And you know from your work in this case that these patent brokers who were trying to sell these patents thought that the risk was much higher.  True?

A.   I'm sorry.  I didn't hear that question.

Q.   Okay.  You know from your work in this case that the patent brokers who were out there trying to sell these patents thought that the risk of invalidity or non-infringement was much higher than that two-thirds.  Correct?

A.   I'm not sure -- I know they identified it as a risk, but I don't recall them talking about that two-thirds.

Q.   No.  In fact, the people -- the brokers who were -- had done due diligence and looked at these patents thought the risk was as high as 98 to 99 percent.  Correct?

A.   That was the discount that they were applying to the expected proceeds.

Q.   Right.  And they were applying that discount, at least in part, based on the risk that nobody infringed these patents or that they were invalid.  Correct?

A.   In part, yes.  There were other reasons, but I agree with the 'in part'.

Q.   So there is another accepted methodology for calculating a royalty, and it relates to what's called a non-infringing

alternative.  Correct?

A.    Yes.

Q.    Okay.  And that's something we haven't really talked about, and so I want to make sure that I understand what that is and the jury understands.  Is that fair?

A.    Sure.

Q.    Okay.  Essentially, a non-infringing alternative means that the amount of royalty would be no more than the cost of a viable alternative to, for example, T-Mobile.  Correct?

A.    It could be.  There is situations where it could be more, but that is a limitation and that is if there are non-infringing alternatives that are available and viable, that is a limitation on royalties.

Q.    So let me do a better job of setting the table here.

At this hypothetical negotiation that you told the jury will occur, General Access would lean across the table and say to T-Mobile, Our expert Dr. Madisetti said you lost somewhere between 2 and 6 percent; you're going to have to replace these base stations; it's going to cost you $253 million -- or $900 million, according to you, but a reasonable royalty of 253.  Right?

A.    Yes.

Q.    And so this alternative is -- does T-Mobile have any alternative to lean back across the table to General Access and say, Even if that percentage loss is true, we don't think

it is, but even if it is, we could make that up in other ways and our other ways would only cost us, for example, $3 million.  That's what we're talking about here.  Right?

A.    Correct.

Q.    Okay.  And you know in this case that T-Mobile says not only would we not go buy more and additional base stations; we had other alternatives that were much less expensive.  You're aware of that.  Correct?

A.    Yes.  I'm aware there are experts that have presented that opinion.

Q.    And not only experts; you know Mr. Mueller is going to testify in this case.  Correct?

A.    Correct.

Q.    And you know he's going to testify on that very issue. Correct?

A.    I don't know that, but it wouldn't surprise me.

Q.    And it's true, sir, that although you recognize that as an accepted methodology to value, you did not attempt to value or even critique the non-infringing alternatives that T-Mobile puts forward.  Correct?

A.    Yeah.  They were -- that's -- I don't have the expertise to critique technical opinions of design-arounds like that.

Q.    Is that something you have to rely on Dr. Madisetti for again?

A.    Yes.

Q.   So T-Mobile says, We have other alternatives; we wouldn't have gone out and bought base stations.  Do you understand that?

A.   Correct.

Q.   And you rely on Dr. Madisetti who says, No, T-Mobile didn't really have alternatives.  All that's true.  Right?

A.   Yes.

Q.   If the jury believes, based on the testimony, that they hear in this case that, in fact, T-Mobile had alternatives that would have cost them $3 million or less, you agree that that acts as a ceiling or, as you said, a constraint on the amount of royalty they would pay.  True?

A.   Sure.  They could decide that is the ceiling or they could decide that that's to be factored in.

Q.   It wouldn't make much business or economic sense for T-Mobile to pay somebody $252 million if they had a completely feasible alternative where they paid 3, would it?

A.   No.

Q.   And you agree that's something that the jury should consider.  Correct?

A.   Yes.

Q.   I want to focus now for a few minutes, if I could, on your cost savings model or your cost saving approach.  Okay?

A.   Okay.

Q.   Before we do it, I want to talk about a few facts that --

672

to make sure that we've elicited these because I'm not sure we have, and the first is --

THE COURT: Mr. Dacus, don't tell the jury what you want to talk about.

MR. DACUS: Understood.

THE COURT: Ask the witness questions.

MR. DACUS: Apologize, Your Honor.

THE COURT: You're not the only one to do it.

MR. DACUS: Understood.  I hope to be the last.

Q.    (BY MR. DACUS)  You have seen and you know that in this industry there are thousands of patents that relate to 4G and 5G technology.  Correct?

A.    Correct.

Q.    And you agree, sir, that when you're making a determination on a reasonable royalty, you need to make that determination based within the actual industry that we're talking about.  Fair?

A.    Sure.

Q.    So when T-Mobile/Ericsson are sitting at this hypothetical negotiation, General Access is, they have to take into consideration the actual industry they're in. Fair?

A.    Yes.

Q.    So one of the factors that would be first and foremost in T-Mobile and Ericsson's mind at least is that within 4G and 5G

-- well, let's just stick with 4G.  There are 30,000 patent families declared essential to the 4G standard.  You know that.  Right?

MS. FASULO:  Your Honor, may we approach?

THE COURT:  Approach the bench.

(The following was had outside the hearing of the jury.)

MS. FASULO:  Your Honor, there is a standing order in limine not to discuss standard essential patents and the number of standard essential patents in this case.

THE COURT:  I don't see the -- I certainly don't see the relevance of going into standard essential matters.

MR. DACUS:  Can I just drop the standard essential part and just say that there are 30,000 patent families?

THE COURT:  I don't know what the evidence is, but I don't want the jury confused with what is a standard essential patent.

MR. DACUS:  I'll drop that.

MS. FASULO:  And Your Honor, the numbers that he is relying on are Ms. Dwyer's standard essential analysis numbers.  She did other searches that do not have to do with standard essentiality.  Those numbers are lower.

THE COURT:  Well, I'm not going to sit here and say one version of the facts is better than the other.  That's what you can address on redirect.  But I'm not going to allow

you to go into the concept of standard essential patents or --

MR. DACUS:  That's not my intent.

THE COURT:  -- or patent standards.

While I have the two of you up here, it's 6:30 at night. How much longer have you got?

MR. DACUS:  About 15 minutes.

THE COURT:  And I assume you've got some redirect.

MS. FASULO:  I do, Your Honor.

MR. DACUS:  If the Court wants to take a break --

THE COURT:  I don't want to take a break and come back tonight.

MR. DACUS:  No, I don't mean tonight.

THE COURT:  Well --

MR. DACUS:  We'll do whatever the Court wants, obviously.

THE COURT:  So you have 15, and you've got --

MS. FASULO:  Probably 10.

THE COURT:  I'm not going to keep the jury up here until 7:00.  We'll break now and we'll pick up in the morning.

MS. FASULO:  Thank you.

(The following was had in the presence and hearing of the jury.)

THE COURT:  Ladies and gentlemen, it's 6:30 in the evening.  These lawyers have still got more examination and

675

redirect of Mr. Kennedy. I'm not going to keep us up here any later. We're going finish Mr. Kennedy in the morning. I don't like to break a witness, but I don't think we can go as long as it's going to take to get him finished tonight.

So if you will, when you leave the jury box in just a minute, if you'll take your notebooks with you and leave them on the table.

Thank you for being prompt and on time this morning. Let me ask you to do the same thing tomorrow so that we can start at 8:30.

Please remember all my instructions, including not to discuss the case with anyone in any way, including the eight of yourselves.

Have a good evening, travel safely, and you're excused until tomorrow morning.

(Whereupon, the jury left the courtroom.)

THE COURT: All right. Be seated, please.

You can step down, Mr. Kennedy.

THE WITNESS: Thank you, Your Honor.

THE COURT: Counsel, for your benefit, we've used 8 hours 9 minutes and 12 seconds of designated trial time today. At this point the Plaintiff has 4 hours and 33--excuse me--4 hours and 37 minutes of remaining trial time and the Defendant has 6 hours and 43 minutes of remaining trial time. Mr. Summers am I correct that after the examination of

Mr. Kennedy, the Plaintiff intends to rest its case in chief, or is that incorrect?

MR. SUMMERS:  That is incorrect, Your Honor.  First we'll be calling Mr. Mueller.

THE COURT:  You're going to call him adversely?

MR. SUMMERS:  Adversely; correct, Your Honor.

THE COURT:  Okay.

MR. SUMMERS:  It should be a relatively short examination.

THE COURT:  All right.  Who's going to take the other side of Mr. Mueller tomorrow?

MR. STEVENSON:  I am, Your Honor.

THE COURT:  All right.  Is it your intention when that happens, Mr. Stevenson, to only address what's happened in direct, or do you want to go beyond the scope of the direct and fully open in your cross?

MR. STEVENSON:  I'd like to fully open and go beyond.

THE COURT:  Mr. Summers, other than Mr. Mueller, do you have other witnesses that you would call after he testifies tomorrow?

MR. SUMMERS:  No, Your Honor.  We plan to rest at that point in time.

THE COURT:  Okay.  One of the disputes that arose overnight that I haven't given you resolution on yet has to do

with disputed deposition designations and counterdesignations on Mr. Maggio. All I have is the written transcript sections that are in dispute. The basis of the Plaintiff's objections are 403. I'd like to see the video clip. I'd like you to email the video clip to me so I can see how it's actually played.

Although I think there may be an argument now that the Plaintiffs have opened the door to this given that Mr. Dacus just went into a good bit of what is covered by that deposition without any objection from the Plaintiff, but I do not feel comfortable ruling on the designations and counterdesignations before me just from the paperwork; I need to see the video.

MR. SUMMERS: And if I might, Your Honor, just very briefly. I don't think that the Plaintiffs opened the door by Mr. Dacus' examination. There were two sets of communications. Mr. Hynek was in communication with Mr. Rushford and Mr. Becker and the folks at ICAP and RSL who were brokers. Maggio was the wannabe get in the middle of this whole deal guy who was trying to make a commission.

THE COURT: I just remember some of the numbers that are the same numbers that are in the Maggio deposition designations. I'm not asking for argument on it now and I'm not asking you to admit the door's been opened, but I do want to see the video, so send it to me by email send it to my

staff.

MR. SUMMERS:  Yes, Your Honor.

THE COURT:  All right.  And let me remind you I'll be looking for a newly submitted joint proposed charge and verdict form by 4:00 tomorrow.  And I'm serious--I want lead and local counsel's eyes on the document.  I have had too many times when overly exuberant associates were not able to reasonably deal with matters that should have been dealt with, and it will save us all some time I think if lead and local counsel on both sides will review that before it's submitted.

All right.  Are there questions from either side before we recess for the day?

MR. SUMMERS:  Nothing from Plaintiff, Your Honor.

MR. DACUS:  The only thing from us, Your Honor, I'm sure I don't need to, but just to remind or ask --

THE COURT:  Mr. Kennedy's sequestered.  He's in the middle of examination.  Nobody's going to talk to him.

MR. DACUS:  Thank you, Your Honor.

THE COURT:  All right.  Without there being anything further, we'll stand in recess until tomorrow morning.

(The proceedings were concluded at 6:39 p.m.)

I HEREBY CERTIFY THAT THE FOREGOING IS A CORRECT TRANSCRIPT FROM THE RECORD OF PROCEEDINGS IN THE ABOVE-ENTITLED MATTER.

I FURTHER CERTIFY THAT THE TRANSCRIPT FEES FORMAT COMPLY WITH THOSE PRESCRIBED BY THE COURT AND THE JUDICIAL CONFERENCE OF THE UNITED STATES.

S/Shawn McRoberts                    04/08/2025

_____DATE_____
SHAWN McROBERTS, RMR, CRR
FEDERAL OFFICIAL COURT REPORTER

.