IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF TEXAS
MARSHALL DIVISION

GENERAL ACCESS SOLUTIONS, LTD.,( CAUSE NO. 2:23-CV-158-JRG
                                 )
          Plaintiff,             (
                                 )
vs.                              (
                                 )
T-MOBILE, USA, INC.,             (
et al.,                          ) MARSHALL, TEXAS
                                 ( APRIL 9, 2025
          Defendants.            ) 8:30 A.M.
_____

VOLUME 3

_____

TRIAL ON THE MERITS

BEFORE THE HONORABLE RODNEY GILSTRAP
UNITED STATES CHIEF DISTRICT JUDGE
and a jury

_____

SHAWN McROBERTS, RMR, CRR
100 E. HOUSTON STREET
MARSHALL, TEXAS  75670
(903) 923-8546
shawn_mcroberts@txed.uscourts.gov

A P P E A R A N C E S

FOR THE PLAINTIFF:     BARTLIT BECK, LLP - DENVER
                       1801 WEWATTA ST., SUITE 1200
                       DENVER, COLORADO  80202
                       (303) 592-3100
                       BY: MR. GLEN SUMMERS
                           MR. GIOVANNI SANCHEZ
                           MR. NOSSON KNOBLOCH
                           M.R JOHN HUGHES

                       BARTLIT BECK, LLP - CHICAGO
                       54 W. HUBBARD STREET, STE. 300
                       CHICAGO, ILLINOIS  60654
                       (312) 494-4400
                       BY:  MS. MEG FASULO

                       WARD, SMITH & HILL, PLLC
                       1507 BILL OWENS PARKWAY
                       LONGVIEW, TEXAS  75604
                       (903) 757-6400
                       BY:  MS. ANDREA FAIR

FOR THE DEFENDANTS:    ALSTON & BIRD, LLP - ATLANTA
                       ONE ATLANTIC CENTER
                       1201 WEST PEACHTREE STREET NW
                       #4900
                       ATLANTA, GEORGIA  30309-3424
                       (404) 881-7000
                       BY:  MR. JOHN HAYNES

                       ALSTON & BIRD, LLP - CHARLOTTE
                       1120 SOUTH TRYON ST., STE. 300
                       CHARLOTTE, NC 28203-6818
                       (704) 444-1000
                       BY:  MR. MATTHEW STEVENS

                       ALSTON & BIRD, LLP - DALLAS
                       2200 ROSS AVE., SUITE 2300
                       DALLAS, TEXAS  75201
                       (214) 922-3507
                       BY:  MR. TED STEVENSON

                       THE DACUS FIRM, PC
                       821 ESE LOOP 323, SUITE 430
                       TYLER, TEXAS  75701
                       (903) 705-1117
                       BY:  MR. DERON DACUS

oFFICIAL REPORTER:      SHAWN M. McROBERTS, RMR, CRR
                        100 E. HOUSTON STREET
                        MARSHALL, TEXAS   75670
                        (903) 923-8546

# INDEX

**EXAMINATION**

**Witness Name**                                                              **Page**

DAVID KENNEDY
    Cross By MR. DACUS ................................................. 681
    Redirect By MD. FASULO ............................................ 693
    Recross By MR. DACUS .............................................. 702
JUSTIN MUELLER
    Direct By MS. FAIR ................................................ 707
    Cross By MR. STEVENSON ............................................ 729
    Redirect By MS. FAIR .............................................. 749
SEBASTIAN FAXER
    Direct By MR. STEVENS ............................................. 755
    Cross By MR. SUMMERS .............................................. 790
    Redirect By MR. STEVENS ........................................... 808
    Recross By MR. SUMMERS ............................................ 811
GUNNAR LARSSON
    BY VIDEO DEPOSITION ............................................... 813
ANDERS AKESSON
    Direct By MR. STEVENS ............................................. 822
    Cross By MR. HUGHES ............................................... 839
    Redirect By MR. STEVENS ........................................... 848
    Recross By MR. HUGHES ............................................. 852
DANIEL VAN DER WEIDE, PH.D.
    Direct By MR. HAYNES .............................................. 853
    Cross By MR. HUGHES ............................................... 967
    Redirect By MR. HAYNES ............................................ 1008
FRANK MAGGIO
    BY VIDEO DEPOSITION ............................................... 1020
JOHANNA DWYER
    Direct By MR. STEVENSON ........................................... 1026

THE COURT:  Be seated, please.

Are the parties prepared to read into the record those items from the list of pre-admitted exhibits used during yesterday's portion of the trial?

MR. HUGHES:  Yes, Your Honor.

THE COURT:  Please proceed to do so.

MR. HUGHES:  Your Honor, Plaintiff moves in JX 1, JX 2, JX 5, JX 7, JX 8, JX 13, JX 17, JX 19, JX 20, JX 25, JX 27, JX 28, JX 31, JX 32, JX 33, JX 35, JX 36, JX 37, JX 72, PX 1, PX 12, PX 13, and PX 23.

THE COURT:  All right.  Thank you, Mr. Hughes.

Is there objection from Defendants?

MS. WELCH:  No, Your Honor.

THE COURT:  Do Defendants have a similar rendition to offer into the record?

MS. WELCH:  Yes, Your Honor.

THE COURT:  Please proceed.

MS. WELCH:  Your Honor, Emily Welch for Defendants. JX 3 and JX 59.

THE COURT:  All right.  Any objection from Plaintiff, Mr. Hughes?

MR. HUGHES:  No, Your Honor.

THE COURT:  All right.  Thank you, counsel.

All right.  Mr. Kennedy, if you'd return to the witness stand.  You remain under oath, as I'm sure you are aware.

And, Mr. Dacus, you were still doing cross examination. You can return to the podium.

All right.  Let's bring in the jury, please.

(Whereupon, the jury entered the courtroom.)

THE COURT:  Welcome back, ladies and gentlemen. It's good to see you.  Please have a seat.

When we left off yesterday, the Defendants were cross examining Mr. David Kennedy, Plaintiff's expert on damages. And we'll continue with that cross examination at this time.

Mr. Dacus, you may continue.

MR. DACUS:  Thank you very much, Your Honor.

DAVID KENNEDY,

having been first duly sworn, testified under oath as follows:

CROSS EXAMINATION continued

Q.   BY MR. DACUS:   ?

Q.   Good morning, Mr. Kennedy.

A.   Good morning.

Q.   I'd like to finish up our questioning if that's okay with you, sir?

A.   Yes, sir.

Q.   Just to kind of recap where we've been and where we were, we talked yesterday about this market approach, which is similar to or analogous to house shopping.  Do you remember that?

A.   Yes.

Q.   And we covered that -- we covered the evidence related to that.  Fair?

A.   Some of it, yes.

Q.   Yeah.  And then we also talked about this second accepted approach of looking at alternatives, whether or not T-Mobile had alternatives rather than buying base stations.  We covered that evidence related to that.  Correct?

A.   Some of that, yes.

Q.   Okay.  And related to those alternatives, I think what you said is you relied on Dr. Madisetti to assume that T-Mobile had no alternatives other than to go purchase new base stations.  Correct?

A.   Correct.

Q.   And then when we left off last night, we had turned to the specifics of your calculation that you used related to this cost savings model.  Do you remember that?

A.   Yes.

Q.   And so I want to ask you -- what we had started to do was sort of set the scenario at this hypothetical negotiation, and I want to talk about some things that may be at this negotiating table that people may be thinking about that you did not cover with the jury.  Is that fair?

A.   Sure.

          THE COURT:  Counsel, before we go any further, approach the bench briefly, please.

MR. DACUS:  Yes, Your Honor.

(The following was had outside the hearing of the jury.)

THE COURT:  Is this chart and this particular page, is that part of what we sealed the courtroom for?

MR. DACUS:  It is.  I'll turn it over.

THE COURT:  Plaintiff's corporate representative is staring it at it trying to get the benefit of the information.

MR. DACUS:  I appreciate you bringing that up, Your Honor.

(The following was had in the presence and hearing of the jury.)

THE COURT:  Let's continue.

MR. DACUS:  Thank you, Your Honor.

Q.   (BY MR. DACUS)  So, Mr. Kennedy, at this hypothetical negotiation, one thing that the parties would be considering is that with respect to these 4G and 5G standards, there are literally tens of thousands of patents related to those standards.  Correct?

A.   Yes.

Q.   For example, as related to 4G, you know from your work in this area that there are more than 30,000 patent families related just to 4G.  Correct?

A.   That are -- yes, correct; related to.

Q.   Right.  And if we look at 5G, you know that there are

probably in excess of 70,000 patent families related to 5G. Correct?

A.   I don't know the exact number, but that's reasonable to assume.

Q.   Fair to say, tens of thousands of patents?

A.   Yes, correct.

Q.   And those patents are owned by many, many different individuals and companies, but also some large companies like Qualcomm, Samsung, Apple, Motorola, all of those folks, including Ericsson, have patents related to both 4G and 5G. Correct?

A.   Correct.

Q.   And all of these -- the way this works is these companies generally have licenses between each other.  Correct?

A.   Correct.

Q.   And the reason they have licenses is to facilitate what we call interoperability.  You agree with that.  Right?

A.   For standard essential patents.

Q.   Okay.  And just so we put a finer point on this, interoperability means, you know, somebody with an Apple phone can talk to somebody with a Samsung phone.  Right?

A.   Correct.

Q.   And they can use the AT&T network or the T-Mobile network or any network to talk to each other.  Right?

A.   Yes.

Q.   So it's important that we have this interoperability. You agree with that.  Correct?

A.   Yes.

Q.   And that's why we have these standards so that these pieces of equipment and networks can work together.  Fair?

A.   Yes.

Q.   And that's an important thing because it promotes competition.  True?

A.   Yes.

Q.   It lowers prices.  True?

A.   Generally, yes.

Q.   And it provides more choices to consumers.  Fair?

A.   Yes.

Q.   And so when these folks are sitting at this hypothetical negotiation table of T-Mobile and Ericsson and General Access, they have to consider the number of patents and the cost of those patents in this particular arena or industry.  True?

A.   Depending on the type of patents they are, they could be considered.

Q.   Okay.  And we saw some of those patents yesterday and what folks paid related to a royalty on those patents.  Correct?

A.   I wouldn't agree with that characterization.

Q.   All right.  In this particular case, you're proposing and General Access is proposing that for two patents, that

T-Mobile should pay $250 million, a quarter of a billion dollars. Correct?

A. Yes.

Q. Even though there are tens of thousands of patents in this area. Correct?

A. Correct.

Q. I mean, on average, per patent you're asking for $125 million. Fair?

A. I don't look at it that way.

Q. Okay. Well, there's two patents and you're asking for $250 million. Correct?

A. That's correct.

Q. So on average, that's $125 million. Fair?

A. Just an average, not looking at the individual value of the individual patents.

Q. Understand. But my point is, sir, if all these tens of thousands of patents ask for $125 million, that's something that those people at a negotiating table would have to consider. Correct?

A. I don't believe that they would consider that every one would ask for the same amount, no.

Q. Okay. You agree that sitting at the negotiating table, part of what T-Mobile and Ericsson have to consider is they need their services and their products to be affordable and cost competitive in the marketplace. Correct?

A.    Yes.

Q.    And General Access sitting at that table has to recognize the same thing.  Fair?

A.    Correct.

Q.    And you agree, sir, that Ericsson, and you know this very well, as someone who owns thousands of patents in this area, they have a very good sense of what patents are worth in this particular 4G and 5G industry and arena.  Correct?

A.    Definitely a good idea of in general what standard essential patents are worth.

Q.    Okay.  I want to kind of turn now from that general discussion of what folks at the table would be thinking about to some of the specifics of your cost savings calculation.  Okay?

A.    Okay.

        MR. DACUS:  Ms. Brunson, may I have the document camera, please?

Q.    (BY MR. DACUS)  This is one of the slides that you showed the jury yesterday.  This is part of the basis -- or this is the basis of your calculation, these percentages right here.  Correct?

A.    Correct.

Q.    And these percentages came directly and solely from Dr. Madisetti.  Right?

A.    Correct.

Q.   And then you took these percentages and they were direct inputs into your calculation.  Fair?

A.   Fair.

Q.   And, in fact, that $904 million that you calculated, that comes directly from your calculation using Dr. Madisetti's percentages.  True?

A.   Correct.

Q.   It's also true, sir, that these percentages, you did not independently verify the accuracy or the correctness of those percentages.  Correct?

A.   Correct.

Q.   And you were here, I presume, when Dr. Madisetti was cross-examined about the articles that he relied on or the Ph.D. papers that he relied on?

A.   Yes.

Q.   You heard Mr. Haynes question him and be critical of whether or not those even applied to this particular network?  You heard that?

A.   I think that was the gist of the questions, yes.

Q.   Okay.  And you also heard the questions related to whether or not Dr. Madisetti had actually taken parts or features of the WiMAX standard that existed before the patent and included those in his percentage of savings here.  You heard those questions?

A.   I heard those questions, yes.

Q.   You would agree, sir, that if -- to the extent Dr. Madisetti's percentages are incorrect, that your calculation is incorrect.  True?

A.   It would change.

Q.   If the jury were to conclude that those percentages are not reliable, they could also conclude that your calculation is not reliable since it's based on it.  Fair?

A.   Correct.

Q.   Now, in addition to whether or not these percentages are accurate, you also relied on Dr. Madisetti to assume that T-Mobile would need to densify or buy new base stations.  Right?

A.   Correct.

Q.   That's not something you came up with; that's something you relied on Dr. Madisetti for.  Fair?

A.   That's correct.  I've used that methodology before, but I do rely on his opinion that in this particular circumstance, that's what would be required.

Q.   And you know, sir, that T-Mobile disagrees that they would need to buy new base stations.  Even if they had these 2 to 6 percent losses, you know that T-Mobile says we wouldn't have to go buy new base stations.  You understand that, right?

A.   I believe that's what they will say, yes.

Q.   In other words, they have other things that they could do that are -- that cost less than spending hundreds of millions

of dollars on base stations.  You understand that.

A.    I believe we'll hear that.

Q.    Right.  And those alternatives are something that the jury should consider.  Fair?

A.    Sure, yes.

Q.    It's true, sir, in your assumption based on Dr. Madisetti that T-Mobile would go buy new base stations, you did not even analyze or try to determine whether or not the T-Mobile network was operating at full capacity during this time from 2017 to 2023, did you?

A.    That's correct.

Q.    You agree with me, sir, that T-Mobile going out and buying equipment like base stations, that would be a last resort, so to speak.  Fair?

A.    Generally I believe they would make all other improvements that they could before they would buy base stations.

Q.    Okay.  One last topic I want to cover with you, if I could.

        MR. DACUS:  May I have the document camera, Ms. Brunson?

Q.    (BY MR. DACUS)  This $904 million that includes cost of items beyond just buying a base station.  Correct?

A.    Absolutely.

Q.    For example, it includes an increase or a potential

increase in buying new trucks, new fleets of trucks by T-Mobile.  Correct?

A.   Correct.

Q.   It includes what I'll call brick-and-mortar stores, the actual T-Mobile stores that we see around our towns at times.  It includes costs related to those.  Correct?

A.   Correct.

Q.   It includes improvements to those actual store fronts.  Correct?  What we call lease hold improvements.  Do you remember that?

A.   Correct.

Q.   In addition, this $904 million that you used, I think you said it included expenditures or savings related to both FDD and TDD.  Correct?

A.   Yes, correct.

Q.   And your calculation for both goes all the way back to 2017.  Correct?

A.   Correct.

Q.   But you know, sir, that the TDD part of the network was not even deployed until 2020.  Right?

A.   Correct.

Q.   Yet you -- even though it wasn't deployed until 2020, you've assessed damages going all the way back to 2017.  Correct?

A.   That's correct.

Q.   And you also know, sir, that as it relates to this $904 million, you actually did a calculation that was limited just to the cost of the base stations.  True?

A.   Yes.

Q.   And that calculation actually yielded, even under these assumptions that we dispute, a royalty of $86 million. Correct?

A.   That was the portion I calculated that was solely attributable to Ericsson.

Q.   Right.  So if we were to limit -- and you understand T-Mobile thinks both of these numbers are overreaching.  You understand that, of course.  Correct?

A.   Sure.

Q.   But if the jury were to say, well, what if you just limited the actual costs and expenses to the base stations, the accused products, even you admit that number is 86 million as opposed to 253.  Correct?

A.   I look at it a little differently.

Q.   Well, you would agree with the fact that if we limit the cost to the base stations, the royalty is $86 million.

A.   Ericsson's portion of the royalty would be 86 million.

Q.   Fair enough.  Fair enough.

Okay.  You were here for the opening statements, were you not, sir?

A.   I was.

Q.   And you remember when Mr. Stevenson gave the opening statement on behalf of T-Mobile and he asked the jury to pay attention to sort of the methods and the processes that General Access has gone through to get to these hundreds of millions of dollars number.  You remember that?

A.   I believe something along those lines, yes.

Q.   And you remember that what he asked the jury to do is to pay attention because sometimes when folks overreach on damages, it tells you a whole lot about what a lawsuit is really about.  You remember him saying that?

A.   Not exactly.

Q.   Okay.

MR. DACUS:  That's all the questions I have, Your Honor.  I pass the witness.

THE COURT:  All right.  Is there redirect?

MS. FASULO:  Yes, Your Honor.

THE COURT:  All right.  Let's proceed with redirect.

REDIRECT EXAMINATION

BY MS. FASULO:

Q.   Mr. Kennedy, I'd like to start where counsel just was asking you if you included costs in your analysis beyond just the infringing Ericsson products.

A.   Okay.

Q.   Why did you determine it was appropriate to include those costs?

Shawn M. McRoberts, RMR, CRR
Federal Official Court Reporter

A.    Because I'm trying to determine on the cost approach exactly what additional money had to be spent to deploy the equipment, not just buy Ericsson equipment and have it sit in a warehouse but to actually deploy it.

Q.    And to be clear, did your cost savings analysis focus on capital expenditures or operating expenditures?

A.    I just focused on capital expenditures.  I did not include any maintenance, any labor cost, any site lease cost.  That was why I say my number is conservative.

Q.    So when you determined that T-Mobile had invested $19 billion in its infringing infrastructure, you didn't include any of those operating costs that T-Mobile would include if it had to expand its network?

        MR. DACUS:  Your Honor, object to leading.

        THE COURT:  Sustained.

Q.    (BY MS. FASULO)  Mr. Kennedy, what went into your $19 billion calculation about T-Mobile's infringing infrastructure?

A.    Only the capital expenditures that they identified that they made for their network.

Q.    If you had included T-Mobile's network operating expenses in your analysis, would that have shown that T-Mobile saved more or less money from infringing the patents?

A.    A lot more.  That's why I say it's a minimum.

Q.    So why didn't you include those operating expenses?

695

A.    Well, it's, number one, to be conservative.  And, number two, the level of detail.  It would be hard to parse out what operating costs specifically relate to the towers or the network from others.  But the capital expenditures that they record that they spent on the network, that's what I used.  There's no doubt about those relate -- they say they relate to their network.

MS. FASULO:  Could we please look at Mr. Kennedy's slide 5?

Q.    (BY MS. FASULO)  Mr. Kennedy, did you consider the financial information presented in JX 12, PX 7, PX 5, PX 28, PX 29, JX 27, PX 4, JX 23, PX 1, and PX 25?

A.    Yes.  All of that information from Ericsson and T-Mobile was analyzed.

Q.    And does the financial information in those exhibits give you information about what capital expenditures are necessary for T-Mobile to spend to deploy the infringing base stations?

A.    Yes.

MS. FASULO:  Can we look at JX 12, please?

Q.    (BY MS. FASULO)  Mr. Kennedy, what does JX 12 show?

A.    These are the expenditures that -- well, the exhibit shows T-Mobile's financial records, the details of their capital expenditures for their network.

Q.    And what are some of these columns going down the side?

A.    You have software, equipment cost, services cost, and I

believe that's the categories, but they're baseband and tools, test equipment.

Q.   How did you use this kind of data?

A.   Well, this is the data that I included in the calculation from their records.

Q.   And you totaled up this kind of data to reach your $19 billion investment that you talked about yesterday?

A.   Correct.

Q.            MS. FASULO:  At this point I think we need to seal the courtroom, Your Honor.

THE COURT:  All right.  I take that as a request to protect confidential information that the courtroom should be sealed.

MS. FASULO:  Yes.

THE COURT:  Based on that and for that purpose, I'll order all persons present who are not subject to the protective order in this case to excuse themselves and remain outside the courtroom until it's reopened and unsealed.

This will also seal the corresponding portion of the transcript.

(Courtroom sealed.)

Q. ██████████████████████████████████████
████████████████████████████████?

A. ███.

Q. ██████████████████████████████████████
██████████████████████████████████████████?

A. ███.

Q. ████████████████████████████████?

A. ███.

Q. ██████████████████████████████████████
██████████?

A. ███.

Q. ████████████████████████████████
████████████?

A. ███████.

Q. ██████████████████████████████████████
██████████?

A. ████████.

Q. ██████████████████████████████████
██████████?

A. ███.

Q. ██████████████████████████████
██████?

A. ███.

Q. ██████████████████████████████████████

█████████████████████?

A.   ██.

Q.   █████████████████████████████████████████?

A.   ██.

Q.   ██████████████████████████████████

████████████████████████████████?

A.   ██.

Q.   █████████████████████████████████████████████

██████████████████████████████████████

████████████?

A.   ██.

Q.   ████████████████████████████████████

█████████████████████████████████████████████

█████████?

A.   ██.

Q.   ████████████████████████████████████?

A.   █████████████████████████████████████████████

█████████████████████████████████████.

Q.   ██████████████████████████████████████████

██████████████████?

A.   ████████████████████.

Q.   █████████████████████████████████████████████?

A.   ████████████████████████████████

████████████████████████████████

████████████████████████████████

Q.   ████████████████████████████████████████████

██████████████████████████████?

A.   ████████████████████████.

Q.   ████████?

A.   ████████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████

████████████████████████████████████████

████████████████████████████████████████

████████████████████████████████████████

███████████████████████████.

████████████████████████████████████

████████████████████████████.

████████████████████████████████████████

███████████████████████████████████████

████████████████████████████████████████

███████████████████.

                    (Courtroom unsealed.)

          THE COURT:  All right, counsel.  You may proceed.

          MS. FASULO:  Thank you.

Q.   (BY MS. FASULO)  Yesterday counsel asked you some questions about efforts by RSL and ICAP to market the General Access patents.  Do you recall that?

A.   Yes.

Q.   Are you familiar with the analysis they performed?

A.   Yes.

Q.           MS. FASULO:  Can we look at PX 26?

Q.   (BY MS. FASULO)  What is PX 26?

A.   This is a document that was produced that discusses that process and overview or executive summary on some of the things that RSL discovered and believed about the patents.

Q.   Okay.

     MS. FASULO:  Can we look at page 4, please?

Q.   (BY MS. FASULO)  And on page 4, it says a seminal patent portfolio.  What does that mean?

A.   In my opinion, the seminal patent means it's very important or foundational to a particular technology.

Q.   Lower on this page, what does this memo say about the market for these seminal patents?

A.   That the market was in 2011 $250 billion, and substantial growth was expected over the next decade.

     MS. FASULO:  Can we please turn to page 13?

Q.   (BY MS. FASULO)  Does this memo discuss the '477 Patent?

A.   Yes.  You see it highlighted here.

Q.           MS. FASULO:  And could we please turn to page 18?

Q.   (BY MS. FASULO)  Does this memo discuss the asserted '383 Patent?

A.    Yes, it does.

Q.    And what did RSL conclude was the actual value of the General Access patents once they were successfully enforced?

A.    Approximately $3 billion.

Q.    Have you bought and sold patent portfolios?

A.    Yes.

Q.    How many times?

A.    Over 20 times.

Q.    Is it customary for patents to be sold at prices that do not reflect the actual value of the use of patents to companies like T-Mobile?

A.    Almost always, yes.

Q.    Why?

A.    Well, when you buy the patent, you then have to spend the money to license the patent, and oftentimes if they're very valuable, that includes lengthy and expensive litigation, and the risk that the patents would be found invalid or not infringed by some of the companies that you may think are using the patents.  So you have that risk associated with the potential upside.  So they're usually sold at a very significant discount.

Q.    Is litigation fast?

A.    No.  Faster in East Texas, but not -- not generally.

Q.    Is litigation easy?

A.    No, not at all.

Q.   And is litigation cheap?

A.   Definitely not.

Q.   The very last thing I'd like to ask you about is where T-Mobile's counsel began yesterday.

Mr. Kennedy, do you recall counsel asking you whether you know that Ericsson has lots of experience and knowledge about what a reasonable royalty is when it comes to 4G and 5G technology?

A.   Yes.

Q.   When Ericsson needed help determining a reasonable royalty for its 4G and 5G technology they hired you, didn't they?

A.   Yes.

MS. FASULO:  No further questions.

THE COURT:  You pass the witness?

MS. FASULO:  Pass the witness.

THE COURT:  All right.  Is there additional cross?

MR. DACUS:  Yes, Your Honor.

THE COURT:  All right.  Proceed with additional cross.

MR. DACUS:  Thank you.

RECROSS EXAMINATION

BY MR. DACUS:

Q.   I won't flip over the chart because I don't want to seal the courtroom this morning, Mr. Kennedy, but you would agree

703

all of these licenses that we reviewed on here were the result of a negotiation.  Correct?

A.    It -- a settlement negotiation, yes.

Q.    It's a negotiation.  Right?

A.    Sure.

Q.    Okay.  And you said something about usage.  Let's be really clear.  All of these amounts that were paid were paid for the unlimited right to use those patents.  Correct?

A.    Correct.

Q.    In other words, those numbers which we won't say out right now but the jury knows, T-Mobile and Ericsson could have made a trillion base stations and never had to pay one penny more than what they paid.  Correct?

A.    If that's what the patents covered, correct.

Q.    And then there was some question about whether or not these things are in the same neighborhood.  You and I covered yesterday, sir, that we had our expert look at these patents involved in these licenses and conclude that they were technologically similar to the two patents here.  Correct?

A.    Yes.

Q.    And the Plaintiffs didn't put forward Dr. Madisetti or anybody to contradict that, did they, sir?

A.    That's correct.

Q.    Now, let me ask you about these efforts to sell.  You were just shown a document where General Access' brokers were

saying how much these patents were worth.  Do you remember that?

A.    It talked about the marketplace of the patents.

Q.    Okay.  Not -- and that's a good point.  They weren't saying how much the patents were worth; they were saying what could be garnered in the marketplace as far as money.  Correct?

A.    In that particular document, they were talking about the marketplace and the patents.

Q.    And by the way, that document came from a group called RSL that General Access had retained and hired to be their broker to sell these patents.  Correct?

A.    Yes.

Q.    So they're trying to put the best spin on it and the best face they can.  True?

A.    Not always, in my experience.

Q.    Okay.  You would agree with me that -- you heard me ask Mr. Hynek yesterday about this phrase of the proof is in the pudding?

A.    Yes, sir.

Q.    Are you familiar with that phrase?

A.    You've asked me that before.

Q.    I have.  And you are.  Right?

A.    Yes, I am.

Q.    So no matter what these brokers who were saying to

General Access, no matter what they said these patents are worth, the proof is when you take them to the market, do people want to pay for them.  That's the proof in the pudding.  Correct?

A.    That's one potential avenue of proof.

Q.    You would agree with me, sir, that they tried to sell these patents for really in excess of a decade and nobody made a single written formal offer to buy them.  That's a true statement.  Correct?

A.    Correct.

Q.    And the truth is, sir, you -- I think you alluded to this, but you have personal experience in buying patents, do you not?

A.    I do.

Q.    You actually bought some patents that at one time you thought would be worth close to a billion dollars.  True?

A.    Correct.

Q.    And the truth is, sir, those patents were actually found invalid in a court of law.  True?

A.    One time, and one time they were found or twice they were found valid.

Q.    Okay.  So sort of whether or not what a patent's worth is ultimately up to this jury.  Correct?

A.    Absolutely.

Q.    All right.

706

MR. DACUS:  That's all the questions I have, Your Honor.  I pass the witness.

THE COURT:  All right.  Is there further direct?

MS. FASULO:  No, Your Honor.

THE COURT:  All right.  You may step down, Mr. Kennedy.

THE WITNESS:  Thank you very much, Your Honor.

THE COURT:  You're welcome.

Plaintiff, is there a request for Mr. Kennedy to be excused?

MS. FASULO:  Yes, Your Honor.

THE COURT:  All right.  Mr. Kennedy, you're excused. You're free to stay with us; you're free to leave.

THE WITNESS:  Thank you, Your Honor.

THE COURT:  All right.  Plaintiff, call your next witness.

MS. FAIR:  At this time the Plaintiff calls Mr. Justin Mueller, the corporate representative of T-Mobile.

THE COURT:  All right.  Mr. Mueller, if you'll come forward and be sworn, please.

(Whereupon, the oath was administered by the Clerk.)

THE COURT:  Please come around, sir, have a seat on the witness stand.

If you'll pull the microphone just a little closer to you, please.  Thank you.

Shawn M. McRoberts, RMR, CRR
Federal Official Court Reporter

All right.  Ms. Fair, you may proceed with direct examination.

And I do want to let the jury know that this is a little bit different than the witnesses you've seen before because since Mr. Mueller is the corporate representative for the Defendant and is being called by the Plaintiff, he's what's known as an adverse witness, which means Ms. Fair will have to examine him in a non-leading manner and it means Mr. Stevenson on -- excuse me, in a leading manner.  She can lead him on direct, and Mr. Stevenson will have to cross-examine him for T-Mobile with direct questions and not leading questions because they're basically in reverse roles here.  Just want to make that clear.

Let's go ahead.

MS. FAIR:  Thank you, Your Honor.

JUSTIN MUELLER,

having been first duly sworn, testified under oath as follows:

DIRECT EXAMINATION

Q.   BY MS. FAIR:  ?

Q.   Good morning.

A.   Good morning.

Q.   I know that we've heard your name even just this morning when I called you, but would you introduce yourself to the jury, please?

A.   Sure.  My name is Justin Mueller.

Q.   And you and I haven't met before.  Right?

A.   Correct.

Q.   I'm Andrea Fair.  I represent General Access.  You know that by now, I think.

A.   I understand that, yes.

Q.   And we heard you're here as T-Mobile's corporate representative.  Right?

A.   That's correct.

Q.   When did you get into town?

A.   Last Wednesday.

Q.   I assume you spent time preparing for your testimony today?

A.   Yes.

Q.   And I don't want to know anything that was said, but you spent time with your lawyers getting ready?

A.   Of course.

Q.   I mean, this is an important case.  Right?

A.   Yes.

Q.   You've worked at T-Mobile for a while.  Right?

A.   I have.

Q.   Twenty-five years, I believe?

A.   26 years if you include our corporate predecessors.

Q.   They've been good to you?

A.   Yes.

Q.   You've been promoted four times.  Right?  Over those 26

years now?

A.    That's correct.

Q.    From manager to senior manager to director to senior director.  Is that right?

A.    Yes.

Q.    And you hope to be promoted again, don't you?

A.    Sure.

Q.    You do your best to do a good job for T-Mobile.  Right?

A.    Of course.

Q.    You didn't start at T-Mobile, though, did you?

A.    No.

Q.    You actually started at Ericsson.  Right?

A.    That's correct.

Q.    They treated you well, too?

A.    Yes.

Q.    Now, Ericsson, just talking about the market generally that you-all are in, is one of T-Mobile's primary suppliers of base station equipment.  Right?

A.    Correct.

Q.    You-all have a close relationship.  Right?

A.    Correct.

Q.    I mean, in this case you're sharing lawyers.  Mr. Stevenson, Mr. Dacus, Mr. Haynes, Mr. Stevens, they represent both of you.  Right?

A.    Yes.

Q.   And T-Mobile is one of three major cellular carriers in the country.

A.   Correct.

Q.   Do you know where it ranks?  Is it number -- I don't know.  Is it number one or number two, number three?

A.   Number two.

Q.   Number two?  As one of only three major carriers in the country, T-Mobile has what you might call buying power. Right?

A.   Sure, you could say that.

Q.   So when it comes to equipment suppliers like Ericsson, they want to keep T-Mobile happy.  Right?

A.   Yes.

Q.   And, in fact, T-Mobile requires as a condition for any vendor that it's going to use, you have some requirements. Right?

A.   Yes.

Q.   And one of those is something called indemnity.  Right, Mr. Mueller?

A.   Yes.

Q.   And that means that they're the ones -- Ericsson is the one that's going to write the check.  Right?

A.   If there's found to be a check to be written, yes.

Q.   This is not voluntary by Ericsson, is it?

A.   Ericsson has an agreement with T-Mobile where they've

agreed to be responsible for their equipment, and if licenses are required, they have agreed to be responsible for that.

Q.   And they make that agreement because T-Mobile, one of the only three big carriers in the country, requires it.  Right?

A.   Yes, we have no interest in buying equipment that has intellectual property problems.

Q.   And speaking of that, T-Mobile doesn't do diligence into possible infringement of its own use of Ericsson's equipment, does it?

A.   Not generally, unless needed.

Q.   This is even though T-Mobile is the one that's actually using the equipment.  Right?

A.   We are using the Ericsson equipment accused in the case, yes.

Q.   You choose which base stations you're going to buy. Right?

A.   Yes.

Q.   And where you're going to put them in the network. Right?

A.   Yes.

Q.   And how they're going to even be set up.  Right?

A.   Yes.

Q.   I mean, these aren't like off the shelf products you can go get at an Ericsson store.  Right?

A.   They are standard Ericsson products that are sold to

Shawn M. McRoberts, RMR, CRR
Federal Official Court Reporter

multiple customers.

Q.   And the ones that they sell to T-Mobile are not necessarily the same as the ones that they sell to AT&T or Verizon.  Right?

A.   Not necessarily.

Q.   Because you-all have a close working relationship where T-Mobile's engineers work with Ericsson's engineers to make sure that their equipment meets your needs.  Right?

A.   Yes.

Q.   As part of this relationship, you expect that Ericsson is going to be a good corporate citizen.  Right?

A.   Yes.

Q.   And respect other people's intellectual property.  Right?

A.   Yes.

Q.   That's not just something T-Mobile wants out of Ericsson; in fact you expect it out of them.  Right?

A.   Yes.

Q.   And we've heard this morning and yesterday and even Monday about RSL.  You were sitting here when we've heard about RSL?

A.   I was.

Q.   General Access was exploring a patent sale.  You remember hearing about that?

A.   I do.

Q.   Did it surprise you when you heard from Mr. Hynek that

713

09:14    Ericsson was approached with this patent portfolio in the early 2010s?

A.    No.

Q.    They ever tell you that when they were selling you these base stations?

A.    No.

Q.    I want to talk to you just about patents generally. Okay?

A.    Okay.

Q.    When -- you're an inventor on some patents.  Right?

A.    I am.

Q.    You have three?

A.    Correct.

Q.    Is that right?

All of them are from your time with T-Mobile?

A.    Yes.

09:15    Q.    You're proud of those, aren't you?

A.    Of course.

Q.    Now, when T-Mobile was confronted with the infringement allegations in this case, you got in touch with Ericsson, didn't you?

A.    Yes.

Q.    You made your indemnification demand.  Right?

A.    Maybe you could clarify.

Q.    You demanded of them to meet their obligations that you

Shawn M. McRoberts, RMR, CRR
Federal Official Court Reporter

required of them to indemnify T-Mobile.  Right?

A.    They chose to intervene in the case.

09:16

Q.    Based on a requirement that you have in your contract with them.

A.    Yes.

Q.    That's not all, though, is it?  That's not all you asked of them, is it?

A.    I'm not sure what you mean by that.

Q.    Well, you were here during opening.  Right?

A.    Yes.

Q.    And we heard Mr. Stevenson tell us about this RBS 2000 that Ericsson had years ago?

A.    Yes.

Q.    You got Ericsson to dig through their files, look for what they could find to invalidate the patents that are at issue in this case.  Did you?

09:16

A.    No.

Q.    They did that on their own?

A.    Yes.

Q.    Now, as someone who's been through the patent process before you've got some yourself, you would agree that not all patents are created equal.  Right?

A.    In what way?

Q.    Some might have more valuable than others.  Right (value)?

A.    Sure.

Q.    Some might be bigger advancements on technology than others.  Right?

A.    Sure.

Q.    Some might be incremental improvements some might be big improvements?

A.    Yes.

Q.    Your patents, for example do you have any idea what they would license for?

A.    I do not.

Q.    Are you aware of anyone taking a license that's focused on your patents?

A.    No.

Q.    Now, on the other hand, you're not planning to show this jury a single license where T-Mobile has acknowledged that it's using someone else's patent.  Are you planning to show them anything like that?

A.    A license or unlicensed patent?

Q.    Any admission of infringement by T-Mobile.

A.    No.

Q.    You're not planning to show them a time where T-Mobile has found a patent that it believes it's using, contacted the owner, and said, you know what, we want to be sure to pay for this.  You're not going to show them that.  Right?

            THE COURT:  Could you slow down, Ms. Fair?

MS. FAIR:  Yes, Your Honor.

THE COURT:  Please do.

THE WITNESS:  Not to my knowledge.

Q.   (BY MS. FAIR)  And you're not going to tell them about a time where an individual or a patent owner approached T-Mobile, someone from outside the industry, asked T-Mobile to take a license, and T-Mobile said, you know what?  Sure, we'd be happy to pay for what we're using.

You're not going to show them that, are you?

A.   Not to my knowledge.

Q.   We've heard a little bit about this fixed versus mobile network.  Right?

A.   Yes.

Q.   We saw that graphic in opening with the cars zooming around that Mr. Stevenson showed us?

A.   Yes.

Q.   I think we might even see it in your testimony.  Do you expect that?

A.   Sure.

Q.   Now, T-Mobile does research on its customer usage. Right?

A.   Yes.

Q.   I mean, you need to know how to meet your customers' needs, don't you?

A.   Yes.

Q.   And know how to best serve them.  Right?

A.   Yes.

Q.   And so you know that most cell phone calls are not while people are zooming around in cars.  Right?

A.   It depends on the subscriber.

Q.   80 percent of cell phone calls begin and end in a building.  Correct?

A.   I don't -- can't confirm that.

Q.   T-Mobile has a website.  Right, Mr. Mueller?

A.   Yes.

Q.   And it has press releases on that website.  Right?

A.   Yes.

        MS. FAIR:  Mr. Svenson, can we please have PX 16?

Q.   (BY MS. FAIR)  This looks like a T-Mobile document to you.  Right?

A.   Yes.

Q.   And it tells us that 80 percent of mobile calls begin and end in a building.  Right?

A.   Yes.

Q.   And that's from the company that you're here speaking on behalf of today.

A.   Yes.

Q.            MS. FAIR:  Thank you, Mr. Svenson.

Q.   (BY MS. FAIR)  Now, we've also heard about fixed versus mobile like they're two completely different networks.  Right?

718

A.   We have.

Q.   That's not really true, is it, Mr. Mueller?

A.   No.

Q.   T-Mobile has a fixed wireless network that people can buy plans for, doesn't it?

A.   No, we do not.

Q.   You have home internet that you offer customers?

A.   Yes.

Q.   You have fixed wireless internet access that you offer to small businesses, don't you?

A.   Yes.

Q.   So you have a fixed wireless access network.  Right?

A.   No.

Q.   You're saying no, I think, because it runs on the same network as the mobile phones, doesn't it?

A.   Yes.

Q.   Same base stations serve your cellular customers and your fixed customers.  Right?

A.   Yes.

Q.   The same base stations that are accused of infringement in this case.

A.   Correct.

Q.   I want to talk just a little bit about network planning. You're familiar with that at T-Mobile.  Right?

A.   I am.

719

09:21

Q.   And that includes coverage and capacity.  That's part of network planning?

A.   Yes.

Q.   What are you going to need to serve your customers. Right?

A.   Yes.

Q.   And T-Mobile tracks a lot of metrics on that, don't they?

A.   We do.

Q.   That's an important measure for T-Mobile.  Right?

A.   Which one?

Q.   How the network is performing?

A.   Yes.

09:21

Q.   And one of those metrics that you track is utilization. Right?

A.   Yes.

Q.   And that's to help you understand whether you need more capacity in your network.  Right?

A.   Correct.

Q.   And it's such an important metric that you track it on what's called a cell level and a sector level.  Right?

A.   Yes.

Q.   And so we're just talking about a single cell tower and within that cell tower the three sections that it covers. Right?  Just to visualize.

A.   Yes.

Q.   And you have these counters on the equipment to measure utilization on that level so you can make decisions about whether something needs to be done.  Right?

A.   Yes.

Q.   Is the customer experience where you want it to be. Right?

A.   That's one of the inputs, yes.

Q.   That's one of the reasons why you track it.  Right, Mr. Mueller?

A.   Yes.

Q.   And that's because capacity affects performance.  Right?

A.   In some cases, yes.

Q.   And the performance of your network matters.

A.   Yes.

Q.   I mean, you strive to have a high performing network. Right?

A.   Of course.

Q.   And having enough capacity is a priority to provide that great network experience for your customers, isn't it?

A.   Yes.

Q.   If there isn't enough capacity, that could translate into a reliability problem.  Right?

A.   Yes.

Q.   I mean, the customer might not necessarily know the root cause, but what they would experience is unreliable service.

Right?

A.    In some cases.  In other cases, not.

Q.    You don't want even some of your customers to have unreliable experiences, do you?

A.    No.

Q.    So T-Mobile has a threshold where they decide this is where a cell doesn't have enough capacity and we need to do something about it.  Right?

A.    Yes.

Q.    And you've set that threshold based on -- you, T-Mobile, have set that threshold based on being a sophisticated player in the industry.  Right?

A.    Yes.

Q.    You've got a lot of people working on this to make sure that your capacity is where it needs to be.  Right?

A.    Yes.

Q.    And when you reach this threshold where you decide this isn't where we want it, we need something more, there's a few things you can do.  Right?

A.    Correct.

Q.    One option is to offload the traffic to somewhere else. Right?

A.    Yes, generally to neighboring cells.

Q.    To neighboring cells.  So it could be we could be talking about -- it could be another antenna on the same tower or

maybe even another tower somewhere neighboring around, see if you can borrow the usage from that equipment.  Right?

A.    Yes.

Q.    You heard Dr. Sung's testimony yesterday?

A.    I did.

Q.    Do you know Dr. Sung?

A.    Yes.

Q.    Does he work for you?

A.    He works in my team, yes.

Q.    He know what he's talking about?

A.    At a high level.  I'm not quite as skilled as he is, the details.

Q.    He told us that vendors like Ericsson prioritize features that maximize throughput and coverage.  Right?  You heard that yesterday?

A.    Among other things, yes.

Q.    And that's accurate, isn't it?

A.    Yes.

Q.    You expect Ericsson to do what they can to maximize throughput and coverage.  Right?

A.    Yes.

Q.    Same for capacity.

A.    Yes.

Q.    And Ericsson is constantly updating the software on its equipment that's deployed in your network.  Right?

A.    Yes.

Q.    They do quarterly updates, I think it is.

A.    Correct.

Q.    And you expect that they're doing all they can do to give you the best performing equipment that they can.  Right?

A.    Yes.

Q.    All their engineers, all their experience, all their resources, you expect them to be giving you their best. Right?

A.    Yes.

Q.    You wouldn't want them to hold something back, would you?

A.    No.

Q.    You wouldn't want them to have some magic software fix that they haven't provided yet, would you?

A.    No.

Q.    Something they could easily develop to make your network more efficient, you wouldn't want them to be holding that from you, would you?

A.    No.  But some functionalities take some time to develop.

Q.    You don't expect that they give this to you for free, do you?

A.    Those upgrades are part of our standard software arrangement with Ericsson.

Q.    You're paying for it, aren't you?

A.    Yes.

Q.   So you go to these other fixes, the software updates, offloading traffic, you go to these other fixes first when you have a capacity issue because the other available options get expensive, don't they, Mr. Mueller?

A.   They do.

Q.   I mean, you've got spectrum that you could add.  Right?

A.   If that's an option, yes.

Q.   If that's an option because it's not even always available, is it?

A.   Not necessarily, no.

Q.   Right.  The government decides when you're able to get more spectrum from them.  Right?  You can't just go buy spectrum.

A.   The FCC auctions spectrum, and there are other secondhand marketplaces and ways to purchase spectrum from other companies.

Q.   It's expensive, isn't it, Mr. Mueller?

A.   It's a limited natural resource of the United States. It's -- it is.

Q.   Billions.  Right?

A.   Yes.

Q.   And in the worst case scenario, you add infrastructure equipment.  Right?

A.   Yes.

Q.   Buying and deploying more equipment.  Right?

A.   Yes.

Q.   Building more towers.

A.   Yes.

Q.   Right?

I think we heard from your lawyer confirm with Mr. Kennedy, that's a last resort.

A.   That's correct.

Q.   You're the source of that comment.  Right?  That this is a last resort?

A.   Yes.

Q.   You've tried everything else before you deploy more infrastructure.  Right?

A.   Correct.

Q.   You've tried the software updates, you've tried fine tuning, you've tried optimizing the network, squeeze everything out of it you've got, and only then do you spend the money to build out more cell towers.  Right?

A.   Correct.

Q.   You don't expect Ericsson is going to give you this equipment for free, do you?

A.   If Ericsson equipment were found to be infringing and wasn't able to meet its capacity specifications, we would.

Q.   You would require Ericsson to give you free equipment?

A.   If it did not meet its requirements for what the equipment was specified to do from a capacity standpoint.

Q.   Nice to have buying power, isn't it, Mr. Mueller?

A.   Ericsson is an integrity company.  They stand behind the product they offer us.

Q.   We heard the phrase proof is in the pudding.  We heard that today, we heard it yesterday.  Right?

A.   Yes.

Q.   I want to talk a little bit about T-Mobile's pudding.  Okay?

A.   Okay.

Q.   In your 25 years at T-Mobile, every year since you've been at the company, T-Mobile has been adding capacity.  Right?

A.   We've been building out our network and that generally adds capacity, yes.

Q.   Building out the network, this last resort of adding infrastructure and equipment.  Right?

A.   Yes.

Q.   Year after year after year.  Right?

A.   Yes.

Q.   And that's a last resort because it's expensive, isn't it?

A.   It's often required to expand our coverage footprint.

Q.   It's expensive, isn't it, Mr. Mueller?

A.   It is.

Q.   I mean, it's not just expensive because of the equipment,

is it?

A.    In part.

Q.    In part the equipment is expensive--antennas, baseband units, radio units.  Right?  I mean, that's expensive.

A.    That's part of the cost involved, yes.

Q.    That's part of the cost.  You need computers to support the network organization.  Right?  Can't have a network without the computers supporting it.

A.    Yes, we have computers.

Q.    You have back hall -- you have a back hall system with your network?

A.    We do.

Q.    You got to pay the labor for the people to go out and set up this equipment?

A.    We do.

Q.    You've got to buy the spectrum to deploy it?

A.    Yes.

Q.    And these aren't just expensive to build; they're expensive to maintain.  Right?

A.    We have costs to maintain our cell sites, yes.

Q.    I mean, for example, one of those is lease costs.  Right, Mr. Mueller?

A.    Yes.

Q.    You don't own the cell towers where your equipment is, do you?

A.    Not generally, no.

Q.    Those aren't cheap leases, are they?

A.    I don't know what you mean by cheap.

Q.    $1500 to $2,000 a month for a cell tower.  Right?

A.    Correct.

Q.    Something like $20,000 a year?

A.    Yes.

Q.    For every cell tower that T-Mobile has.

A.    They vary in their lease costs.

Q.    Do you know how many cell towers you have that are Ericsson base stations?

A.    I believe the number is about 42,000.

Q.    This decision to add a cell tower when you reach the capacity, you fine-tune the network you've got everything out of it you can and you go to the last resort of building another cell site, you don't do this looking years out in the future.  Right?

A.    We do, actually.

        THE COURT:  Could you speak up just a little bit, Mr. Mueller?  I want to make sure everyone hears you.

Q.    (BY MS. FAIR)  You're looking about 12 to 18 months out from the need when you decide on a new site build.  Right?

A.    Typically, yes.

Q.    And with all of its resources, all of its metrics, all the engineers, all the employees, all of the efforts dedicated

to maximizing the efficiency of your network at minimal expense, T-Mobile has spent billions year after year after year buying more infrastructure equipment and deploying it. Right?

A.   Yes.

MS. FAIR:  Pass the witness.

THE COURT:  All right.  Cross examination by the Defendants.

Q.           Proceed when you're ready, Mr. Stevenson.

MR. STEVENSON:  Thank you, Your Honor.

CROSS EXAMINATION

Q.   BY MR. STEVENSON:  ?

Q.   Good morning, Mr. Mueller.

A.   Good morning.

Q.   Let's take a moment.  Will you please tell us where you're from?

A.   Sure.  I'm from Suquamish, Washington.

Q.   How big a town is that?

A.   65,000.

Q.   Do you have a family?

A.   I do.  I have a wife of 26 years and a son and daughter, 18 and 20.

Q.   And tell us about where you grew up.

A.   I grew up outside of Chicago in a town called St. Charles.

Q.   Okay.  And a little bit about your education, please?

A.   Sure.  I went to college at Iowa State University and majored in electrical engineering.

Q.   What interested you about electrical engineering?

A.   At the time I entered college, cell phones were becoming mainstream, and I was fascinated with the technology and how it worked.  In my household, the phone generally hung on the wall with the curly cord attached to it.

Q.   So tell us about your job today.  We know your title's the senior director of radio access and engineering, but just tell us what you do on a day-to-day basis.

A.   Yes.  So I manage a team that evolves and maintains our base station equipment at all of our towers.

Q.   Okay.  How many folks on your team?

A.   About 90 engineers on my team.

Q.   And are you responsible for like the T-Mobile network and the base stations and how good they work?

A.   Yes.

Q.   I mean, does the buck stop with you --

A.   Yes.

Q.   -- if there's a problem?

A.   Yes.

Q.   The whole network nationwide?

A.   Yes.

Q.   How long have you been in that role?

A.    Since 2016.

Q.    Okay.  So besides T-Mobile, you worked at Ericsson before then.  Right?

A.    I did.  I worked at Ericsson straight out of college.

Q.    Okay.  How many years did you work at Ericsson?

A.    From 1996 to 1999, about three years.

Q.    Okay.  Where were you located when you worked for Ericsson?

A.    Plano, Texas, originally.

Q.    Okay.  What were you working on when you worked at Ericsson?

A.    Yes.  So I did about six months of training, and then I was sent out to a long-term project to build a network in the state of Wisconsin.

Q.    What kind of network was it, 2G, 3G?

A.    It was a 2G GSM network.

Q.    And what were you doing in the network build-out personally?

A.    So personally I was designing the coverage for the network where the cell sites would go and deploying the equipment.

Q.    Okay.  What equipment were you deploying out of curiosity?

A.    The base station equipment we were using at the time was the Ericsson RBS 2000.

Q.   Okay.  About how many of those did you deploy in your role?

A.   In that network in Wisconsin, about 250 to 300.

Q.   What time frame?

A.   1996 to 1999.

Q.   Were those the multiantenna RSB 2000?

A.   Yes.  They had two antennas.

THE COURT:  Gentlemen, could I ask you to slow down just a little bit?  There's just zero space between the questions and the answers.  Let's see if we can break it up a little bit.

MR. STEVENSON:  Yes, Your Honor.  Thank you.

THE COURT:  Please continue.

Q.   (BY MR. STEVENSON)  Please tell the jury how you got from Ericsson to T-Mobile.

A.   Yes.  So when the project in Wisconsin had wound down, I was about to propose to my wife who I went to college with, and Ericsson advised me that my next project was going to be in Israel or Hungary.  So I decided to leave Ericsson, and my wife and I ended up in Chicago, and I took a job there at a company named Aerial.

Q.   Okay.  It sounds like that turned out well for you?

A.   It did.

Q.   Do you-all have kids?

A.   I do.

Q.   Okay.  Now, tell us about Aerial.  What kind of business was that and where did you go after Aerial?

A.   Yeah.  Aerial was a regional cellular provider that had about eight markets through the Midwest and the South.

Q.   Okay.  Did Aerial eventually get folded in somehow to T-Mobile?  Is that how you got there?

A.   One step in between, yes.  Aerial became acquired by a company called VoiceStream that was based in Bellview, Washington, and then VoiceStream became acquired by T-Mobile.

Q.   Okay.  Let's now that we got to know you about T-Mobile, maybe introduce T-Mobile a little bit more to the jury.  Tell us a little bit about the history of T-Mobile and who T-Mobile is.

A.   Yes.  So as discussed, T-Mobile is one of the primary three wireless carriers in the United States, and we consider ourselves the uncarrier.

Q.   What does that mean?  I've heard that.

A.   So for us that means solving customer pain points, not just for our customers but for the industry in general.

Q.   What do you mean by pain points?

A.   So one of the primary things that T-Mobile pioneered was the ending of service contracts for wireless companies.

Q.   Where's T-Mobile's headquarters today?

A.   We have two headquarters, one in Kansas City and one in Bellview, Washington, and also have a large presence in

Shawn M. McRoberts, RMR, CRR
Federal Official Court Reporter

Frisco --

Q.   Okay.

A.   -- Texas.

Q.   And we've heard a lot about a lot of the companies have a Frisco presence or a Plano presence.  Why is that for T-Mobile?

A.   It's an important area for us.  A lot of telecommunications partners are headquartered there in the U.S., the likes of Ericsson, Nokia, Samsung, and others.  So it's important for us to have a solid presence there.

Q.   Okay.  Now, at some point in the past did T-Mobile have a merger with Sprint?

A.   We did.

Q.   Okay.  Tell us about that and then when that was.

A.   Yes.  So T-Mobile and Sprint merged in the year 2020.

Q.   Okay.  But it kept the T-Mobile name, I take it?

A.   Yes.  The company chose to keep the T-Mobile branding and name.

Q.   Okay.  Now, let me ask you about patents, sir.  Does T-Mobile respect the patent system of the United States?

A.   Absolutely.

Q.   And you have some personal experience with the patent system.  Right?

A.   I do.

Q.   You own a few patents.

735

A.    I do.

Q.    What do those pertain to?

A.    Location of wireless phones within the network.

Q.    Okay.  And your patents, sir, are part of a larger collection of patents that T-Mobile has.  About how many patents does T-Mobile have?

A.    T-Mobile has about 7,000 patents.

Q.    Now, you got asked a question by Ms. Fair on your direct or I guess we would call it the direct examination about were you surprised that Ericsson had been offered these patents back in 2010 and passed on them.  Do you remember that?

A.    I do.

Q.    Okay.  Let me ask you a question.  Do you think Ericsson should buy patents if it doesn't need them or use them?

A.    Not unless it sees some value in them.

Q.    Anything about that seem surprising to you?

A.    No.  I understand RSL was trying to sell those patents to anyone that might be interested.

Q.    You think there's anything disrespectful to the patent system or to the Plaintiff about that?

A.    No.

Q.    After this case was filed, did you personally investigate the allegations that are being raised here about infringement?

A.    I did.

Q.    Okay.  And why you?

A.   It was my business unit and the equipment we use that was being accused in the case.

Q.   Okay.  Could you explain to the jury, please, how much ability does T-Mobile have to, you know, like look under the hood of an Ericsson base station and see what's on the circuit board and how it ticks?

A.   So we know some, but we have to rely on Ericsson to provide us details of what's fully under the hood.

Q.   Okay.  Were you able to get with Ericsson as part of this case and learn a little bit more about their base stations and form conclusions about this case?

A.   Yes.

Q.   Okay.  What else did you do as part of, you know, getting involved in this case and investigating the allegations?

A.   Yeah.  Talked to engineers at Ericsson about the specific behaviors of their equipment, and also consulted with Dr. van der Weide.

Q.   Okay.  Did you read the patents?

A.   I did.

Q.   About how many times have you read these patents?

A.   Multiple.

Q.   Okay.  After doing all that, what did you conclude about whether T-Mobile's network infringes these patents?

MS. FAIR:  Objection, Your Honor.  This is not a disclosed expert.

THE COURT:  That question does call for somewhat of an opinion.  Do you have a response, Mr. Stevenson?

MR. STEVENSON:  I'm not asking for an opinion, but T-Mobile's been accused of infringement and I think it's fair for them to respond to those accusations by saying whether they believe they infringe these patents or not, Your Honor.

THE COURT:  He is the corporate representative for T-Mobile, and he can put forward the company's position.  But he can't speculate or offer opinions about matters that are beyond his personal knowledge.  So with that, I'll allow the question with that understanding.

MR. STEVENSON:  Thank you, Your Honor.

Q.   (BY MR. STEVENSON)  Let me ask it again.  Does T-Mobile's network infringe these patents, Mr. Mueller?

A.   No.

Q.   Now, you have two types of radio access technology that we heard about, FDD and TDD.  Do you remember some discussion about that in the case?

A.   Yes.

Q.   Will you please tell the jury just a lay level explanation what that is, what that refers to?

A.   Yeah.  So there are two different types of equipment. One is frequency division duplex in which different pieces of radio spectrum are dedicated to the uplink and the downlink. And in a TDD network, there is one piece of spectrum that is

shared in time between the uplink and downlink.

Q.   Okay.  If I am just kind of walking around on a phone and I'm connected to an FDD or a TDD, am I going to notice anything?

A.   No.

Q.   Okay.  Did you investigate both of those as part of your looking into this case?

A.   I did.

Q.   Okay.  When did T-Mobile launch its TDD 5G network?

A.   2019.

Q.   Now, I'd like to get a little oriented, please, as to these base stations, and I have a slide with a picture of a base station.  This is a T-Mobile base station.  And I'd like to ask you just to walk the jury through what the different parts of the base station are and what they do and don't worry about this board on the left.  We're going to talk about that in a second.

A.   Sure.  So what we see on the right here is a cell tower with Ericsson equipment on it.  There are antennas which are the taller boxes and then there are some radio units which are the smaller boxes that are on the tower.

Q.   Where do the radio waves come into this?

A.   So they come into the antennas, the larger white boxes.

Q.   The ones up top?

A.   Yes.

Q.    And then how do those radio waves, we've heard about getting those converted into data.  How does that get down just into the internet?

A.    Yes.  So the signals from the antennas come down into the cabinets via a cable at the bottom of the tower.  And inside there, you can see a blown-up baseband unit where the signals are processed.

And then from there, these signals exit in data in 1s and 0s via a back hall fiberoptic connection to our core network, which could be a switching center in a major metropolitan area, and that center connects to the public telephone switch network for voice calls and it connects to the internet for your data calls.

Q.    Okay.  Now, one thing I'm curious about is the patents and the stuff we've been talking about in this case, where is that inside the base station?  Where -- can you point us to it in here?

A.    Yes.  So that's shown in the blown-up picture here of one of the boards inside the cabinet at the bottom of the tower.

Q.    And how many boards are in one of these -- it may vary, but, ballpark, how many boards are in one of these base station cabinets?

A.    Yeah.  Probably 10 to 12 boards total.

Q.    And so when we're talking about the demodulators and the storage and the chips, would that be stuff on this board?

A.    Yes.   So this is a board That is part of the baseband unit which does the demodulation of the signals.

Q.    Is that board always down low in that cabinet or sometimes it's somewhere else?

A.    No.   In some of the products those chips and board might be integrated into the antenna unit that's on the tower.

Q.    Okay.   Now, I want to ask you some questions --

MR. STEVENSON:   And we can take this slide down.

Q.    (BY MR. STEVENSON)   -- about the fixed versus mobile questions you got asked.

You got shown a webpage, remember, about how 80 percent of calls begin or end in a building.   Do you remember seeing that?

A.    Yes.

Q.    Is that -- does that mean those are all fixed?

A.    No.

Q.    So if I'm walking along and I am talking on the phone and I sit down and I end the call in the building, that's not fixed, is it?

A.    No.

Q.    Okay.   Now, you-all have home wireless offering.   Right?

A.    We do.

Q.    Okay.   And about what percentage of your overall customers are doing home wireless with you?

A.    About five percent.

Q.    Okay.  And you got asked the question a couple of times do you have a fixed mobile network, and you said -- excuse me, a fixed wireless network, and you said no.

A.    Correct.

Q.    So why don't you have a fixed wireless network?

A.    So the network we've deployed is a mobile wireless network, but it is backward compatible to provide fixed wireless services.

Q.    So you don't have any fixed wireless base stations at all?

A.    No.

Q.    So is it true that every one of your base stations can handle and track a moving phone?

A.    Absolutely.

Q.    And if I -- if I -- have you ever heard of putting your phone in hotspot mode or tether mode --

A.    Yes.

Q.    -- you know, whether -- where you, like, can connect a computer to it.  Does that make this a fixed wireless phone?

A.    In some manners, yes.

Q.    But it's a mobile base station it's talking to.  Right?

A.    Yes.

Q.    Okay.  And help me understand.  How many people, how many phones or devices can connect to one of these base stations at a time, just ballpark?

A.    Could be close to a thousand in one of our busiest sites.

Q.    Okay.  And if you had like 950 mobile users and 50 fixed users--right?--five percent of them, are you doing anything, you know, different for the fixed people?

A.    No.

Q.    Okay.  Now, if I get home internet from you, what do I get in the package?

A.    Yeah.  So you would get what would look like a WiFi access point, maybe about the size of this coffee pot here.

Q.    And if I -- let's say I plug that into my car.  Right?  I actually am in the back of my SUV, I've got a little plug, a house plug, in there?

A.    Yes.

Q.    If I plug that in the back of my car and drove around with it, would it still work?  Could your network follow it?

A.    Yes.  It's designed to be plugged into a wall, but it can be plugged into any electrical outlet.

Q.    Could I put it in an RV?

A.    Yes.  In fact, we have had customers that have done that.

Q.    Okay.  So why don't you use in your network and deploy any fixed base stations?

A.    Yes.  We have a fairly limited number of fixed wireless subscribers.  And since we already have a mobile network that is backwards compatible with fixed wireless services, there's really no need to build out an adjunct strictly fixed wireless

network.

Q.   Do mobile base stations need to do things different or do more than fixed base stations?

A.   Absolutely, yes.

Q.   Give us an example.

A.   An example is a technique called hand-over.  So you may be familiar with when you're driving your car down the road and you have a phone call going on your mobile phone and you need to hand over to successive towers as you're moving down the road.  If you didn't, you could drop your call obviously.  So that process is unique to mobile networks.

Q.   Okay.  Let me switch gears a little bit and ask you a couple of questions about some of the technologies that have been discussed and you've heard about in the case.

A.   Yes.

Q.   Okay?

     You heard some discussion in this case about something called adaptive modulation?

A.   Yes.

Q.   Okay.  Can you explain to the jury, again at a lay level, what adaptive modulation is?

A.   Yeah.  So adaptive modulation is the base station instructing the phone equipment to transmit its signals in a different way.

Q.   Are you familiar with adaptive modulation?

A.   Yes, I am.

Q.   Does the T-Mobile network use adaptive modulation?

A.   Yes.

Q.   Do you need either of the patents in this suit to do adaptive modulation?

A.   No.

Q.   And what do you base that on?

A.   Yes.  So adaptive modulation was fully specified in the 2G GSM standard with a technology called EDGE back in the year 2000.

Q.   Before these patents were filed for?

A.   Yes.

Q.   Let me ask you another question about what's something called channel estimation.  Is that something that is done in the T-Mobile network?

A.   Yes.

Q.   Could you please explain to us again in lay terms what channel estimation is?

A.   Yes.  So when a signal is transmitted from a mobile phone towards the base station, it actually takes many paths with the radio waves.  You could have a direct path and many reflections that arrive at the base station at the same time, and that creates interference among the various signals.

     And the channel estimation process is a way to pull out the original desired signal from all of the various versions

745

of it that have arrived there.

Q.   Is that something your network does?

A.   Yes.

Q.   Do you need either of these patents to do that?

A.   No.

Q.   Now, Mr. Mueller, I want to switch gears and talk about some questions you got from Ms. Fair about whether you're going to need to buy more base stations or not.

A.   Okay.

Q.   Do you remember those?

A.   I do.

Q.   Okay.  Are you involved as part of your job in -- for T-Mobile figuring out how many base stations to buy and who to buy them from?

A.   Yes.

Q.   And are you personally, I mean, do you do that as a personal part of your job?

A.   Yes.

Q.   Do you spec out the different models?

A.   Absolutely.

Q.   And do you get involved with where to put them in the network?

A.   Yes.

Q.   Now, is it fair to say that T-Mobile's only going to buy base stations as a last resort if they have a capacity issue?

A.    Yes.

Q.    Okay.  Now, were you here for Mr. Kennedy's testimony about densification?  I'll let you take a sip.

A.    I was.

Q.    He said that during the time frame 2017 to 2022 if the base stations lost 4 to 7 percent capacity, T-Mobile would have to buy more of them.  Do you remember that?

A.    I remember him saying that, yes.

Q.    Okay.  Is that accurate?

A.    No.

Q.    Why not?

A.    So during that time period, not all of our cell sites were at a capacity level where that would be necessary.  We generally don't run them at that level, and we had what I would call excess capacity available in the network during those years.

Q.    Were you even close in that time frame to being between 93 and 96 percent of capacity, you know --

A.    No.

Q.    -- that close -- not even close to it?

A.    Substantially below that.

Q.    Okay.  And let me ask you this.  Even though you have excess capacity, over the years has T-Mobile increased its capacity without changing hardware or adding hardware?

A.    Yes, we have.

747

Q.    Okay.  Explain how that happens, please.

A.    Yes.  So Ericsson is continually developing the software for their product that runs on the equipment that we've purchased, and they are continually delivering new features and functions that can enhance capacity and reliability and speed, and T-Mobile is rolling those out on our network on a regular basis.

Q.    Okay.  Is that software?

A.    Yes.

Q.    How often do you get software updates from Ericsson?

A.    Every quarter or three months.

Q.    Okay.  And do those software upgrades ever enhance the or improve the capacity of your network?

A.    Yes, frequently they do.

Q.    Without adding a base station or adding hardware?

A.    Correct; just through software.

Q.    How do you get that software?

A.    Yeah.  So Ericsson delivers the software to us, and it's very similar to a software upgrade you might receive on your mobile phone that could enhance its capabilities and capacity over time.

Q.    Okay.  Let me ask you for again just an estimate of the magnitude of this.  You know, let's take the middle of the range of time that General Access is pointing to, 2017 to 2023.  So just take 2020.  In 2020 did you guys get from

Ericsson these software upgrades to your base stations?

A.    We did.

Q.    And how much did they improve the capacity?

A.    On the order of 5 to 10 percent over the course of the year 2020.

Q.    Is that within your job and your responsibilities to measure that and study that?

A.    Yes.

Q.    And what about going forward through 2023.  Were you still getting those upgrades?

A.    Yes, we were.

Q.    What were they doing in the capacity, just ballpark, in terms of order of magnitude of increase?

A.    Probably around average of 5 percent a year.

Q.    You also got asked about spectrum.  Do you remember that?

A.    Yes.

Q.    And you called it a natural resource.  Just tell us, please, for those of us who aren't in the business, what is spectrum and what does that term refer to?

A.    Yeah.  So spectrum is radio spectrum, and it is a natural and limited resource.  Much of it is in use today.  And it is kind of maintained and governed by the FCC, the Federal Communications Commission.

Q.    And why do you buy spectrum?  Why does T-Mobile buy it?

A.    For long-term strategic interest.

Q. Okay. How far out are you looking when you buy spectrum?

A. Usually five to 10 years.

Q. Okay. And do they occasionally have spectrum auctions?

A. Occasionally, yes.

Q. How often do those happen?

A. Usually about every three to five years.

Q. Okay.

MR. STEVENSON: Pass the witness, Your Honor.

THE COURT: All right. Is there redirect?

MS. FAIR: Yes, Your Honor.

THE COURT: All right. Proceed with redirect.

REDIRECT EXAMINATION

BY MS. FAIR:

Q. Mr. Mueller, we talked a little bit about capacity from 2017 to 2023 on T-Mobile's network. You remember just testifying about that?

A. I do.

Q. And you said that you-all had enough capacity during those years. Right?

A. Yes.

Q. And yet in 2017 you spent billions building out infrastructure equipment. Right?

A. Yes.

Q. And in 2018 you spent billions on your last resort of building out infrastructure. Right?

A.    Not necessarily for capacity.  We are also expanding the coverage footprint of your network with that equipment.

Q.    Coverage and capacity are important.  Right?

A.    They are.

Q.    And this last resort you spent billions in 2019.  Right?

A.    Yes.

Q.    And in 2020.  Right?

A.    Yes.

Q.    Billions in 2021.  Right?

A.    Yes.

Q.    2022?

A.    Yes.

Q.    2023?

A.    Yes.

Q.    And that is even with the 5 to 10 percent in upgrades that you just told us Ericsson was providing in all of those years.  Right?

A.    Yes.

Q.    I just want to clear up what it is that we're talking about is the invention as compared to what else is going on in T-Mobile's network.  Okay?

A.    Okay.

Q.    You understand that General Access is not claiming to have invented adaptive modulation.  Right?

A.    Yes.

Q.    You understand that General Access is not claiming to have invented mobility.  Right?

A.    Yes.

Q.    Not claiming to have invented handover.  Right?

A.    Yes.

Q.    You understand that the allegations are that you use the technologies, you use the patents, and how you process the data, whether it's received from a mobile or fixed point.  You understand that.  Right?

A.    I understand that the patents in this case were specific to fixed wireless.

Q.    You understand the Court's actually said the opposite.

A.    If that's the case, then I would accept that.

Q.    And you understand that our allegations, it doesn't matter if there's been a handover or not.  It's about how the data is processed at the base station.

A.    Yes.

Q.    The same base stations that serve your customers, whether they have a fixed piece of equipment or a mobile piece of equipment.  Right?

A.    Yes.

        MS. FAIR:  Pass the witness.

        THE COURT:  All right.  Any further cross?

        MR. STEVENSON:  Nothing further, Your Honor.

        THE COURT:  All right.  You may step down, Mr.

Mueller.  If you'll return to the counsel table.

Plaintiff, call your next witness.

MR. SUMMERS:  Your Honor, that concludes the Plaintiff's case in chief.

THE COURT:  Plaintiff rests its case in chief.  Correct?

All right.  Ladies and gentlemen we're next going to turn to the Defendants' case in chief.  But before we do that, we're going to take a short recess.

If you'll simply leave your notebooks there in your chairs; leave them closed, please; follow all my instructions.  We're going to try to keep this short, not more than 10 minutes.

The jury's excused for recess.

(Whereupon, the jury left the courtroom.)

THE COURT:  Court stands in recess.

(Brief recess.)

THE COURT:  Be seated, please.

Are Defendants prepared to go forward with their case in chief?

MR. STEVENSON:  Yes, we are, Your Honor.  I wanted to just confirm outside the presence that pursuant to the Court's practice, you'll be taking up JMOL and other motions at the close of all evidence?

THE COURT:  As Rule 50(a) says, Mr. Stevenson, if a

party has been fully heard on an issue during a jury trial and the Court finds that a reasonable jury would not have a legally sufficient evidentiary basis to find for that party on that issue, the Court may resolve the issue against the party at any time before the matter is submitted to the jury.

Yes, that is my practice.

MR. STEVENSON:  Thank you, Your Honor, for indulging my abundance of caution.  We're ready to proceed, Your Honor.

THE COURT:  All right.  Let's bring in the jury.

MR. SUMMERS:  Your Honor, may I raise one issue very quickly?

THE COURT:  Then put a hold on bringing in the jury and let me hear what Mr. Summers has.

MR. SUMMERS:  Very briefly, Your Honor.

During Mr. Mueller's examination, he said that Ericsson is an integrity company, and he's opened the door now to issues of corporate integrity.  There was a motion in limine requiring us to approach before getting into these matters, but they just blew that door wide open by saying that, Your Honor.  It was an absolute broad and unconditional statement: Ericsson is an integrity company.

THE COURT:  Well, what do you believe that opens the door to, Mr. Summers?  You're not going to get a blank check if I believe the door has been opened.

MR. SUMMERS:  Just that they pleaded guilty to a

violation of the Foreign Corrupt Practices Act and bribing six foreign countries, including China high-ranking officials. That is the antithesis, and this was a long-standing practice. They pleaded guilty, Your Honor.

THE COURT: All right. Response?

MR. STEVENSON: That was on cross examination, Your Honor. That was elicited on cross, and I don't think that rises nearly to the level of something this prejudicial and unfair. I think it was a one -- it was literally three words.

THE COURT: All right.

MR. SUMMERS: He's corporate representative and should know the rules.

THE COURT: I've heard enough, counsel. To the extent Plaintiff is asking for leave in light of the Court's order in limine to go into the matters just elicited by Mr. Summers, I don't believe the door has been opened to that extent.

You don't get the death penalty for a jaywalking ticket, and I consider what's been mentioned on the order of a small misdemeanor. And I consider what you've just asked to put before the jury as a death penalty.

The prejudicial level grossly exceeds any probative value. So your motion is denied. That's not to say that if you're asking to ask some other question regarding the issue of integrity, I'll hear your request, but that particular

request is denied.  Understood?

MR. SUMMERS:  Understood, Your Honor.

THE COURT:  Let's bring in the jury.

(Whereupon, the jury entered the courtroom.)

THE COURT:  Welcome back, ladies and gentlemen. Please have a seat.  We'll proceed with the Defendants' case in chief.

Defendants, call your first witness.

MR. STEVENS:  Your Honor, Defendants call Sebastian Faxer.

THE COURT:  All right.  Mr. Faxer, if you'll come forward and be sworn, please.

(Whereupon, the oath was administered by the Clerk.)

THE COURT:  Please come around, sir, have a seat on the witness stand.

MR. STEVENS:  Your Honor, we have some binders we passed to everyone but Your Honor.  Would you like us to --

THE COURT:  I'd like my copy, please.

All right.  Mr. Stevens, you may proceed with direct examination.

MR. STEVENS:  Thank you, Your Honor.

SEBASTIAN FAXER,

having been first duly sworn, testified under oath as follows:

DIRECT EXAMINATION

Q.   BY MR. STEVENS:   ?

Q.   Mr. Faxer, could you please introduce yourself to the jury?

A.   Sure.  My name is Sebastian Faxer.  I work at Ericsson. I currently living in New Zealand in a position as the chief technology officer for the local division there.

Q.   And, Mr. Faxer, I notice that you have just a little bit of an accent.  Where are you from originally?

A.   I'm from Sweden.  Lived the last 10 years in Stockholm.

Q.   And, Mr. Faxer, is English your native language?

A.   No.

Q.   But you feel comfortable enough talking to us here today in English, sir?

A.   Yes, absolutely.

Q.   Talk to me a little bit about what you did before you arrived at Ericsson.  Tell us a little bit about your schooling, please.

A.   So I'm an engineer.  I studied for a Master of Science in applied physics and electrical engineering at a Swedish university that's called Linköping University.

Q.   What got you into that?  What -- you know, what tickled your fancy in learning telecommunications?

A.   Well, I've always been interested in technology, and I found out the telecom sort of area is very interesting.  It's fun to do that kind of engineering, and you develop solutions that actually help out people in real life.

Q.   And what has brought you all the way to Marshall, Texas, to speak to these folks today regarding this lawsuit?

A.   So I've been working 10, 11 years with Ericsson's 4G and 5G base stations, and for the last five years I've been the responsible product manager for some of the accused functionality in this case.

Q.   Let me go back.  I skipped one question about your schooling.  In getting your Master's degree, did you have to do any sort of writing of a thesis?

A.   Yes.  So I did a master thesis actually at Ericsson as well regarding advanced systems for antennas.

Q.   So I'd like to speak a little bit more about Ericsson. What sort of products does Ericsson make?

A.   So Ericsson essentially does all of the network infrastructure equipment that the carrier like T-Mobile or any other carrier will deploy to create their 4G and 5G network.

Q.   Now, in common words, are we talking about base stations or cell towers that we might see as we drive along the road?

A.   Yes.  So we build the radios, we build the antennas, we build the baseband processors, the transport network, the core network, and a lot of other stuff as well.

Q.             MR. STEVENS:  Now, if we could put up the second slide, please?

Q.   (BY MR. STEVENS)  I see some phones on the screen here that have Ericsson on it.  Was there a point in time where

Ericsson made cell phones?

A.   Yes.  So we made cell phones for around 20 years or so, but we quit doing that around 15 years ago and now we only focus on the network part of the telecommunication.

Q.   Now, Ericsson has customers in the United States.  Is that fair?

A.   Yes.

Q.   Does Ericsson build any of these base station products right here in the United States?

A.   We do.  So we have a factory actually in Lewisville, Texas, where we do the manufacturing of a lot of the base stations that are being deployed in the United States.

         MR. STEVENS:  If we can look at the next slide, please.  If we could go back.  Excuse me.

Q.   (BY MR. STEVENS)  So in Lewisville, do you actually build some of the products that we're here this week to discuss?

A.   Yes, we do a lot of manufacturing of the base stations in Lewisville.

Q.   And are there any other locations that you have here in Texas?

A.   Yes.  So the headquarters for Ericsson in the U.S. is located in Plano.  That's what we are seeing on the picture there.

Q.   And, roughly speaking, how many folks work at the headquarters in Plano?

A.    It should be around 3,000 employees at that location.

Q.    Now, I want to talk about Ericsson as a whole for a second.  Do you have a sense for how many engineers or designers or developers or software coders that Ericsson has around the world?

A.    Globally we have around 30,000 engineers that work with R&D and product development and research, so that's a lot of people.

Q.    Now, why does it take 30,000 engineers?  Why do you have that many folks developing these cutting-edge products?

A.    I'll say that there are two aspects.  So the first one is that it's a very complicated product.  We do the entire solution to build a network, so it's a lot of different subsystems and no one person is an expert on everything.

      The other aspect is that we don't only build the products that's being deployed right now; we're looking five, 10 years ahead to create the next generation of technology.  So we have a lot of people that is working in a more forward-looking manner.

Q.    So in addition to doing R&D work on your products that you sell to folks, are you also doing R&D work on developing entirely new generations of cellular technology?

A.    Yes.  So currently we are using the 5G system.  Right?  But our engineers have been working to develop the next generation 6G system for five years already.  So we have a lot

of folks working on that aspect as well.

Q.   And was there a point in time in your career at Ericsson where you were doing some of that work?

A.   Yes.  So when I started at Ericsson around 10 years ago, I was working with research to develop what would be then the 5G standard that we have today.

Q.   And after you were doing that work on developing 5G standard, has your work at Ericsson focused on the actual products that use that standard?

A.   Yes.  So after being involved in research and standardization, I worked on the product side and I was a product manager for parts of the 4G and 5G base station equipment that we are making.

Q.   Now, you've been introduced here as corporate -- Ericsson's corporate representative for this trial.  What does that mean?

A.   That means that I'm here to speak and testify on behalf of Ericsson, so the company.  I'm not here in my personal capacity.

Q.   So let me ask you some questions about Ericsson, vis-a-vis this litigation.  Is that fair, sir?

A.   Sure.

Q.   Now, before the lawsuit was filed, before the day that General Access walked down to the courthouse and stamped its complaint, was there ever a point in time where General Access

reached out to Ericsson in any way to say, hey, I think there might be a problem, we should have a discussion regarding these patents?  Did that ever happen?

A.   Not to my knowledge, no.

Q.   Was there never a phone call or an email or a letter saying, hey, we might have a problem; we really ought to talk?

A.   No, I'm not aware of anything like that, sir.

Q.   When was the very first time that Ericsson had any knowledge that General Access Solutions believed that there was any problem with these two patents?

A.   To my knowledge, when they filed the lawsuit against T-Mobile.

Q.   Not until after they filed that lawsuit, walked down to this courthouse and had it stamped, not until after that point in time did you learn about this?

A.   Correct.

        THE COURT:  Mr. Stevens, slow down a little bit, please.

        MR. STEVENS:  I will, Your Honor.  Thank you.

        THE COURT:  Thank you.

Q.   (BY MR. STEVENS)  Now, did Ericsson voluntarily join this case?

A.   Yes.

Q.   And is Ericsson here to defend its products?

A.   Yes.

Q.    And does Ericsson have a right to defend itself when somebody's raised these accusations?

A.    Yes, I think so.

Q.    Now, as part of being an intervenor in this case, has Ericsson provided documentation, access to Ericsson engineers, and source code so that the folks at the other table can look at it?

A.    We have.

Q.    A little bit or a whole lot?

A.    We have shared everything that is relevant.

MR. SUMMERS:  Objection, Your Honor.  This violates the Court's standing orders in limine.

THE COURT:  How so?

MR. SUMMERS:  We're getting into discovery matters and also expert matters, and he's not -- I just think we're getting into those matters, Your Honor.

THE COURT:  Unless we go lower than this high level about produced lots of material, I don't think there's any violation of the Court's standing order or the limine orders of the Court.  So unless it continues at a deeper level, I'll overrule the objection.

MR. SUMMERS:  And also foundation unless he's essentially admitting he's part of the Ericsson legal defense team and knows what's going on in the lawsuit for all these years.

THE COURT:  Overruled.

Go ahead, counsel.

Q.    (BY MR. STEVENS)  Mr. Faxer, has Ericsson produced a high volume of technical documents in this case?

A.    Yes, they have.

Q.    Has Ericsson made its source code available so that folks at the other table could take a look at it?

A.    We have.

Q.    Did you yourself sit for a long deposition and have several other of your colleagues at Ericsson sat for a deposition in this case?

A.    Yes.

Q.    Now, we talked a few minutes ago about 30,000 folks doing some sort of research and development.  Do those efforts result in Ericsson getting patents?

A.    Yes.  We usually patent the technology that we invent and develop.

Q.    Roughly speaking, how many patents does Ericsson own?

A.    I think in the total portfolio, it's on the order of 60,000 patents.

Q.    60,000 patents?

A.    Yes.

Q.    What about you, sir?  Are you the named inventor on any patents?

A.    Yes.  So I have 173 granted patents in the United States

and additionally 200-plus in processing at the Patent Office.

Q.   So does Ericsson respect United States patents and the system of patent laws in the United States?

A.   Absolutely.  We think it's very important.

Q.   Now, are there points in time where Ericsson, when they have those 60,000 patents, are there points in time where they licensed those patents to other companies to allow those companies to use Ericsson's technology?

A.   Yes.  That happens all the time essentially.

Q.   Now, are there instances where Ericsson actually takes a license to other people's patents?

A.   Yes, we do that very frequently as well.

Q.   And talk to me a little bit about that in the telecommunications industry.  Why is it that there are so many companies that have these cross license deals?

        MR. SUMMERS:  Objection, Your Honor; foundation. He's not a licensing person, doesn't have any personal knowledge of their licensing activities.

        THE COURT:  He is here to speak on behalf of Ericsson as their corporate representative.  He can testify for the company.

    But I'll suggest that you try to lay a foundation.  So let's rephrase the question after you lay a foundation.  Okay?

        MR. STEVENS:  Thank you, Your Honor.

Q.   (BY MR. STEVENS)  Mr. Faxer, are you aware of at least

some of Ericsson's licensing practices and the need to license patents from others and to take licenses to other folks' patents?

A.    I am, yes.

Q.    And, again, could you tell us on a high level what is it about this industry where there's so many companies that have these cross-licensing deals?

A.    So cellular communication is based on open standards and global standards to ensure interoperability, and this means that I can have a phone, it can be an Apple phone or a Samsung phone or any other phone, and that phone, whichever vendor made the equipment, it can connect to any network globally, irrespective if Ericsson made the base stations or some other infrastructure vendor.

And in order to do that, we need to have a global standard where everybody agrees on what technology should be incorporated in it, and they agree to allow the use of their standard essential patents.

Q.    Thank you, sir.

Now, when Ericsson is approached by somebody and Ericsson looks at their patents and thinks maybe they need to take a license, has that happened on occasion?

A.    Yes.

MR. SUMMERS:  Again, Your Honor, foundation. Counsel hasn't laid any -- this is --

THE COURT:  Again, Mr. Summers, he's here to testify on behalf of Ericsson.  He can tell the jury what Ericsson would say.  I don't think that requires the kind of foundation you're asking for.  Overruled.

MR. STEVENS:  Should I re-ask the question, Your Honor?

THE COURT:  If you care to either re-ask it or move on, it's up to you.

MR. STEVENS:  I'll re-ask the question, sir.

Q.   (BY MR. STEVENS)  Have there been instances where Ericsson has taken a look at other folks' patents and said, okay, we'll take a license to those patents?

A.   Yes.

Q.   Now, when Ericsson takes a look at other folks' patents and decides itself that I'm not using that technology, what does Ericsson do in that circumstance?

A.   I mean, we don't take a license to a patent that we are not using, of course.

Q.   And is that disrespectful in any way to the patent process and the patent laws?

A.   No, I don't think so.

Q.   Does Ericsson need a patent license to the patents asserted in this case?

A.   No.

Q.   Is Ericsson using the technology claimed by the patents

in this case?

MR. SUMMERS:  Objection, Your Honor.  This is expert testimony undisclosed.  This is just a mouthpiece.  He's being a mouthpiece for their team now, for their legal team.  That was an expert opinion whether they infringe or not, absolutely improper.

THE COURT:  What's your response, Mr. Stevens?

MR. STEVENS:  There's been allegations -- I'm just asking what the corporate opinions is.  I'm not going to ask him to go through the patents.  I just think the jury should know what the corporate position is when being a defendant in this court.

MR. SUMMERS:  Your Honor, Mr. Dacus stated that in jury selection what their position was there's no question to this jury or in this courtroom about what their position is.  This is undisclosed improper expert testimony from someone supposed to be a fact witness testifying based on his personal information and knowledge only as to the facts.

THE COURT:  He is a fact witness.  He is limited to his personal knowledge and the positions of the company.  I do not find the question calls for an expert opinion.

Your objection is overruled.

Q.   (BY MR. STEVENS)  So I can't remember if there was an answer or not so I'll ask it one more time.  Does Ericsson use the technology that is claimed by the two patents that we're

here to talk about this week?

A.    We do not.

Q.    Thank you, sir.

        MR. STEVENS:  So if we could put up slide 4, please.
I'm sorry.  Slide 5, excuse me.

Q.    (BY MR. STEVENS)  We saw this just a few minutes ago, and
I'd like to ask you the same questions.  If we focus on the
right side just for a moment, what do we see on the screen?

A.    So this is an example of an Ericsson base station in
T-Mobile's network.  We have the radios on top.  There is a
TDD, massive MIMO radio.  We have antennas, and we have remote
radio units as they are called.

Q.    And then what do we see on the ground in that white
rectangle?

A.    So this is an enclosure that contains multiple processor
cards, you can say, and one of those cards is called a
baseband unit or a baseband processor.

Q.    And what do we see blown up on the left side of the
screen?

A.    So this is the inside.  It's the circuits of the baseband
unit 6648, which is a common baseband unit in T-Mobile's
network.

Q.    Sir, I'm holding up what's been marked as Defendants'
Exhibit 5.  Is this an example of one of those baseband
processor boards?

769

A.   Correct.

MR. STEVENS:  Your Honor, may I approach and hand this to the Court Security Officer?

THE COURT:  You may approach and hand it to the Court Security Officer.  He'll give it to the witness.

Q.   (BY MR. STEVENS)  So, again, what do we see on the board that you're holding, sir?

A.   So this board contains multiple different components.  So what you see here on these gray boxes, it's what's called application specific integrated circuits.

Q.   Now, let me pause you right there.  We've heard that term a little bit this week, application specific integrated circuit or ASIC.  What's that?

A.   So it's a custom made chip that we have designed ourselves.

Q.   Okay.  Go ahead, sir.

A.   Yes.  And it does all the kinds of processing that is required on the baseband unit.  So it contains hardware accelerators, it contains digital signal processors and many other things.  So this specific ASIC is called the lynx, like the animal, and there are four of these lynx chips on this baseband board.

THE COURT:  Mr. Stevens, the witness shouldn't testify in the form of a narrative.  If you want to ask him specifically what is this, what is that, that is fine.  But he

doesn't need to give the jury a lecture and everything on the board and how it works.

MR. STEVENS:  Understood.

THE COURT:  Okay.

Q.   (BY MR. STEVENS)  So lynx, L-Y-N-X, like the cat?

A.   Yes.

Q.   And how many lynx chips we do see there?

A.   So there are actually four different chips, so you have two chips inside this box and then you have another two in this box.

Q.   Okay.  We can put that down, sir.

MR. STEVENS:  I'm going to ask that we look at the next slide on the screen.

Q.   (BY MR. STEVENS)  What do we see here, this eagle owl? What do we see here?

A.   So this is another ASIC.  This one is not in the baseband unit, but it is up there in the radio unit on the tower for the TDD massive MIMO base station.

Q.   And is it somewhat similar to the lynx chip?

A.   It's a similar type of design, but there are some differences.

Q.   MR. STEVENS:  Now, if we can go to the next slide here?

Q.   (BY MR. STEVENS)  We've heard a bunch this week about the concept of demodulation.  Can you explain to the jury what

aspects of this chip are involved in the demodulation process?

A.    Yes.  So both the digital signal processors, or DSPs, as well as several of the hardware accelerators take place in the demodulation process.

Q.    And so I see on the left side, there's DSP 0 to 127.  How many total DSPs are on this chip?

A.    It's 128 DSPs.

Q.    And then on the right I see asterisks times 20 Obelix times 40 Humungus times 40.  Does that represent how many, many different hardware accelerators we see there on the right?

A.    Correct.

Q.    And we're going to get into a little bit more, but please remind us what is the concept of demodulation.  What is being done when one demodulates a signal?

A.    On a high level, you can see that you have the signal that is transmitted over the air in the radio wave, and with demodulation you are taking the radio wave and you're extracting digital information.  So data, 1s and 0s, from that radio wave.

Q.    Now, how is it that the Ericsson chips--for example, the eagle owl that we see on the screen--how is it that Ericsson's chips perform that demodulation function?

A.    So we are performing different steps of the demodulation function using different components.  So you can see that the

772

breakdown of the complex process of demodulation into several discrete steps.

Q.   Now, do you guys have two demodulators that sit side by side that you can just throw everything through in parallel?

A.   No.

Q.   Talk to me about what you mean when you say it's a distributed system.

A.   So we are breaking down the demodulation into several steps.  So in the first step we might take the signals for all of the users and put them into one of the hardware accelerators or several of the hardware accelerators, do a bit of processing, then they take the output of that and do the next step for all of the users typically and then they might send that to certain different DSPs.

So it's a dynamic and flexible allocation of these processing steps for multiple users depending on the resources -- compute resources there we have available.

Q.   Now, is that assigned out based upon the user or is it assigned out based upon something else?

A.   So it's generally assigned based on availability.  You can see that we have a pool or a cluster of compute resource, and then we have the jobs that needs to be done to demodulate different users signals.  And we are allocating the tasks that need to be done based on the available compute resources that we have, based on availability.

Q.   Now, I think there's been a focus this week on just the DSPs, but do those hardware accelerators on the right, do those play an important role in the demodulation process as well?

A.   Yes.  So the Obelix hardware accelerators perform one step of the demodulation process.  You have the Humungus hardware accelerators performing another step of the demodulation process.

Q.   And when --

THE COURT:  Counsel, approach the bench, please.

(The following was had outside the hearing of the jury.)

THE COURT:  I understand, Mr. Stevens, you haven't asked this witness for a clear-cut opinion, but this is getting very close to the exact kind of testimony an expert witness could give.  He's explaining in detail the operations of this equipment.

And in the typical case, this in an expert's report, the other side's put on notice of it in advance, and I have concern we are moving more and more toward the posture of an expert witness, understanding that you haven't asked him to speculate or give a clear-cut opinion yet.

I need some idea from you as to where this is going.

MR. STEVENS:  Sure.  First off, we did provide a disclosure, 20a disclosure, that he knows about the products,

is going to testify about the inner workings of the products. He was fully deposed on this.

So what I am going to ask him if when we have the hardware accelerators, how do they work, is the process broken up on a user basis or not, and then I'm going to ask him the same question on the DSPs, is it broken up, is it assigned on the user basis or is it not.

I'm not going to get into any patent-ish language. I'm simply going to ask how the demodulators work.

THE COURT: All right. Well, I'm not going to stop you at this point. I want you to be on notice that I think you're getting close to the line, and I'll be watching as you go forward. And if there are objections raised, I'll take them up when the objections are raised.

MR. SUMMERS: And just so the Court knows where I'm going, Your Honor, the expert disclosure said nothing about demodulators. They talk about MIMOs and --

THE COURT: Mr. Summers, you need to speak into the microphone.

MR. SUMMERS: It was all 931. It doesn't even use the word 'demodulator' or any mention of these products, number one. Nothing about this subject matter.

Number two, he hasn't even laid a foundation this witness has personal knowledge of these particular components. He's a generalist, not an expert. And in this, he's partaking the

Shawn M. McRoberts, RMR, CRR
Federal Official Court Reporter

pieces of equipment.  There's still been no foundation, and we're going to see a lot of that.  It's all expert stuff coming.

MR. STEVENS:  So, first off, on the disclosure before we got into the 931, there was a paragraph that talked about these products, that he knew the operation of the products, and the ideas that went into their design.

But, nonetheless, I've laid a foundation he personally worked on these products for five years.  I'm simply going to ask him some factual questions about how they operate.  I'm not going to come anywhere close to claim language or anything like that.  I'm going to ask him relatively high level how are things scheduled or distributed in the hardware accelerators.  That's about it.

THE COURT:  All right.  Well, as I say, I do not think the line has been crossed at this point.  I think you're getting close.  I want you to be on notice.

MR. STEVENS:  I'm on notice.  Thank you, Your Honor.

THE COURT:  All right.  Let's proceed.

(The following was had in the presence and hearing of the jury.)

Q.    (BY MR. STEVENS)  Mr. Faxer, when we left off, we were talking about the hardware accelerators on the right side.

MR. STEVENS:  If we could put that back on the screen, please.

776

Q.    (BY MR. STEVENS)  Now, when the demodulation process starts in the hardware accelerators, does that happen with a whole bunch of different users' information together?

A.    Yes.  So in the first steps, we don't do any user differentiation, so all of the user signals are sort of processed together.

Q.    And why is that?  Why do you need to do it that way?

A.    Because they cannot yet differentiate the different users.  We are not at that step yet in the demodulation process.

Q.    So is there any aspect of the hardware accelerators where a particular accelerator would be assigned to user 1, for example, me, and a different one would be assigned to user 2, for example, Mr. Mueller?

A.    No, it doesn't work that way.

Q.    Okay.  And once we get past the hardware accelerators and we get to the DSPs, again are those assigned based upon particular users or is it something else?

A.    No.  So typically we have several steps of the demodulation where we actually need to do that step for multiple users simultaneously.  So one example is the equalization step where we are scheduling for the case of multiuser MIMO.  We can have several users on the same time on frequency resource.  And in order to suppress the interference between those users, we need to do the equalization step

777

jointly for these users.

Q.    And so is there any aspect of this demodulation process that we just talked about that is assigned resources based upon someone being user 1 and someone being user 2?

A.    No.  It doesn't work that way.

Q.    And if there are two users using the system and they send data up from their phone to the cell tower and then they do it again later for the next slot or at some later point in time, are they assigned the same aspects of the demodulation or would it be different?

A.    Typically it will be different hardware resources, compute resources that would process that because we have a dynamic and flexible system.

Q.    Thank you, sir.

      Is there any aspect of the demodulation system that's assigned based upon a particular modulation scheme?  In other words, are there certain DSPs that are reserved for something we've heard this week, QPSK, versus others that would be assigned to 64 QAM?

A.    No.  That's not how it works.

Q.    Can they all address all of those different modulation schemes?

A.    Yes.

Q.    Now, back in the day when you could go to the store and buy a demodulator and use it or maybe get two of them, are

there advantages to your system?  When you personally went into the design room and were figuring out how to lay out your system, did Ericsson view there being any advantages to doing it in this manner as opposed to having it just a dedicated?

A.   demodulator path?

MR. SUMMERS:  Objection, expert testimony, Your Honor.

THE COURT:  I'll sustain that.

MR. STEVENS:  Okay.

Q.   (BY MR. STEVENS)  Is it important to Ericsson that it has the ability during demodulation to be able to see the different users and be able to help demodulation based upon information from multiple phones at the same time?  Is that an important design characteristic for Ericsson?

MR. SUMMERS:  Objection, expert testimony, getting into the importance of design consideration, Your Honor.

THE COURT:  That's overruled.  He's stating the position of the company.  I think that's appropriate.

You can answer the question, Mr. Faxer.

THE WITNESS:  Yes, that's very important.

Q.   (BY MR. STEVENS)  And tell us why.  Technologically, how does that benefit and make Ericsson's products better?

A.   So it allows it or it allows the products to have better performance, higher capacity, better uplink speeds.

Q.   Is that something that Ericsson views as a competitive

advantage to doing it that way?

A.   Yes.

Q.   I'd like to switch gears a little bit and speak about a topic called adaptive modulation.  Is that okay, sir?

A.   Yes.

Q.   And that's a term that we've heard this week.  Is there a similar term that sometimes Ericsson uses internally to the company?

A.   So I think that the industry terminology nowadays is link adaptation.

Q.   And is it okay if I just use the term adaptive modulation for link adaptation because that's what we've heard all week?

A.   Yes.

Q.   Okay.  Now, in your education and working with the products at Ericsson, is that a new idea or is adaptive modulation been around for quite some time?

A.   It's been around for quite a while, since the '90s at least, I think.

Q.   Okay.  And does Ericsson's products support adaptive modulation?

A.   Of course.

Q.   Now, did Ericsson do its own development work to figure out a proprietary way, its own special way of doing adaptive modulation?

A.   Yes, we did.

Q.    And could you tell us a little bit about that, please?

A.    Sure.  So basically the problem of adaptive modulation and scheduling is more complex in today's systems.  So in the '90s or 2000s, you had --

MR. SUMMERS:  Objection, Your Honor, expert testimony.  He's not talking about things when he was still in school, a child.  He's giving us a tutorial on the progression of technology since the 1990s.

MR. STEVENS:  He's explaining what design went into when Ericsson was sitting down at the design room, what they were basing their decisions on how to design their products on.

THE COURT:  These are factual matters.  They're not calling for opinion.  He is entitled to speak for the company just as if Ericsson were a human being on the witness stand. I don't find that he's going beyond that role.

I'll overrule that objection.

Q.    (BY MR. STEVENS)  Please continue, sir.

A.    Yes.  So back in the days the systems were simpler.  You had what's called time division multiplexing, which means that you have users transmitting in different time slots.  But in today's systems we have time division, we have frequency division, and we have spatial division.

So it's a three-dimensional problem, which means that we need to make the link adaptation and adaptive modulation

algorithms more advanced to optimize it for this case.

Q.    Now, through those design efforts, was Ericsson awarded any patents on the way it does adaptive modulation?

MR. SUMMERS:  Objection, Your Honor.  May we approach?

THE COURT:  Approach the bench.

(The following was had outside the hearing of the jury.)

THE COURT:  What's your objection, Mr. Summers?

MR. SUMMERS:  He's about to go into a patent, Your Honor.  This is Plaintiff's Exhibit 13, and this witness is not an inventor on the patent.  They're going to claim that they have their own patented system.  As the Court is aware, that is no defense to infringement.  They're going to try to create the improper inference that because they have their own patent and they do it their way, that they do not infringe, should be excluded on the 402 and 403.

THE COURT:  Mr. Stevens, what's your response?

MR. STEVENS:  First off, this is a pre-admitted exhibit, and I note that it's a Plaintiff's exhibit.

Second, they have the ones that have already brought up and played video asking whether this patent accurately shows the manner in which Ericsson uses its technology and adaptive modulation.

Fourth [sic], this is relevant because there's a DoE

argument, and separate or independent patentability is a relevant consideration for a finder of fact as it relates to DoE.

And, fourth, it also relates to damages. And what could fairly be attributed if they're right about the patents and what is not fairly attributed.

So there's four reasons why this testimony is perfectly proper.

MR. SUMMERS: None of which has been disclosed, also expert testimony, and this is just improper argument that's being brought in through a stealth expert. Again, no supporting expert testimony disclosures.

THE COURT: All right. All right, gentlemen. Given that it's a Plaintiff's pre-admitted exhibit, I'm certainly not going exclude it. I will be watching to see if it's used for any improper purpose. But at this point I'm going to overrule the objection. All right?

(The following was had in the presence and hearing of the jury.)

THE COURT: Let's continue.

Q.   (BY MR. STEVENS)  Mr. Faxer, let me ask the question again. Through its own development of its own proprietary adaptive modulation solution, was Ericsson awarded any United States patents?

A.   Yes.

MR. STEVENS:  And if we could show on the screen here Plaintiff's 13 or on slide 9, please.  Either way.  There we go.

Q.   (BY MR. STEVENS)  So we have Plaintiff's Exhibit 13 here. What do we see on the screen in United States Patent 8,669,340?

A.   So this is a patent that describes the solution for adaptive modulation that Ericsson implemented in its 4G and 5G base stations.

Q.   And you know this proprietary solution, again, what is the date that the United States Patent Office awarded Ericsson its own patent for its own solution?

A.   It's April 2014.

Q.   Thank you.

MR. STEVENS:  We can take that down.

Q.   (BY MR. STEVENS)  Mr. Faxer, do you have any personal experience at Ericsson with considerations vis-a-vis a fixed wireless network versus a mobile network?

A.   Yes, I have.

Q.   And can you give us a just a little bit of information about how you've encountered that question during your time with Ericsson?

A.   Yes.  So we have considered optimizations specifically for using our networks in a fixed manner.

Q.   And, sir, is a wireless network where it only can support

Shawn M. McRoberts, RMR, CRR
Federal Official Court Reporter

fixed users, is that the same or is that different from your actual networks that use mobility?

A.    It's a different type of network, I will say.

Q.    And is a mobile environment much more complicated than an environment that can only work with fixed folks?

A.    Certainly.  So you can take a lot of shortcuts and you can do specific optimizations in your solution if you know that the users are not moving around essentially.

Q.    For example, the concept of distortion, of a signal being distorted between the phone and the tower base station, is that different in an environment where people are moving around?

A.    Yes.  So the channel conditions and the interference conditions can change very rapidly --

THE COURT:  Mr. Faxer, you answered the question when you said yes.  If Mr. Stevens wants to know how, he'll ask you that next question.

THE WITNESS:  Sorry, Your Honor.

THE COURT:  All right.  Keep your answers within the scope of the questions asked.

Let's continue.

Q.    (BY MR. STEVENS)  And could you please explain how distortion is different in a mobile environment?

A.    Sure.  So in a mobile environment when you have users moving around, potentially at high speeds, then the

propagation pulse that the signal takes from the phone to the base station can change very quickly.  The interference situation can change very quickly.  So you need to make sure that you're able to adapt to these changes and update your demodulation algorithms.

Q.   And what is this process called?  What is this process of adapting the signal to the circumstances and cleaning it up, what is that called?

A.   So that's called channel estimation and equalization.

Q.   And are channel estimation and equalization important?  Could you get away with just not doing them?

A.   It's very important, sir.

Q.   And could you please explain why?

A.   Well, if you can't equalize the channel, essentially all you get on the receiver end is a distorted signal, which means that you cannot demodulate the signal, you cannot decode the signal.  So it's very important to do equalization in the right way.

Q.   And in a mobile environment and in your system, do you do that equalization process every single time instantaneous every time there's a receipt at the base station?

A.   We do.

Q.   You mentioned a few moments ago that another possible way would be able to take a short cut and just sort of use what you've learned in the past.  Is that the way Ericsson products

Q.   work or is that not the way Ericsson products work?

A.   That's not how Ericsson's product works.

Q.   And if you sort of relied on that old news, what you learned in the past, would your products be as successful, would they be as good as they are?

A.   They will not work very well in a mobile system, no.

Q.   So I'd like to discuss a little bit about how Ericsson's base stations store parameters about a particular phone's transmission to the tower.  Is that acceptable, sir?

A.   Sure.

Q.   Now, do Ericsson base stations use parameters as it relates to the different phones?

A.   Yes, of course.

Q.   Now, is one of the parameters that is sort of saved from the past and then applied to the future, does that include equalization or does it not include equalization?

A.   It does not include equalization.

Q.   Does that include channel estimates or does that not include channel estimates?

A.   It does not include channel estimates, either.

Q.   This notion of digital beamforming, is that information that we learned in the past that we're reapplying or is that calculated instantaneously in real time every single burst?

MR. SUMMERS:  Objection, Your Honor, again.  Same objection, expert testimony, lack of foundation.

Shawn M. McRoberts, RMR, CRR
Federal Official Court Reporter

THE COURT: I'll overrule it as expert testimony. It is clearly leading the witness, counsel. This is direct examination in your case in chief.

MR. STEVENS: Understood, Your Honor.

Q. (BY MR. STEVENS) Can you tell us how with digital beamforming, how Ericsson's products go about calculating what they need know about digital beamforming?

A. Sure. So for digital beamforming, we are doing that in an instantaneous fashion. So we are recalculating digital beamforming every time we get a new uplink transmission.

Q. I mean, wouldn't it be easier just to store this in the past and then reapply what you learned in the past to the present burst? Wouldn't that be easier?

A. It will be an easier implementation, yes.

Q. But why -- then why do you guys choose to calculate that every single time instantaneous anew as opposed to relying upon the old news from the past?

A. Because we realize that you need to do that in order to get good performance when you have a mobile system.

Q. And is this concept of recalculating this instantaneously and in real time, is that something that Ericsson believes differentiates its products from some of its competitors?

A. It is.

Q. Is this actually a feature that Ericsson promotes, telling folks about how well its products work?

788

A.   It is.

MR. STEVENS:  If we could see JX 59, please.

Q.   (BY MR. STEVENS)  What do we see on the screen here with JX 59, sir?

A.   This is a customer presentation that I prepared talking about our TDD massive MIMO solution and why it performs well in the uplink.

Q.             MR. STEVENS:  And if we could look at slide 10, please.

Q.   (BY MR. STEVENS)  Can you please tell the jury what Ericsson is actually telling the world about its product vis-a-vis whether it uses these equalization and channel estimates parameters from the past or whether it recalculates them every single time?

A.   So we are essentially trying to tell our customers and others that there is a problem you need to consider when you build a mobile network, and that is that channel conditions change instantaneously, and the solution that we have in our system for that is to do instantaneous channel estimation each time we get a new uplink transmission.

Q.   And again, by doing it that way, does Ericsson actually think its products perform better than the competition?

A.   Yes.  We realize that others were not doing it in the same way as we did, and we saw we had a performance advantage over them.

Shawn M. McRoberts, RMR, CRR
Federal Official Court Reporter

Q.   And if we look at slide 12, I'm sure there might be other advantages built in, but what are you trying to show about Ericsson's products in slide 12?

A.   We are trying to or we are providing three different proof points to support our case that our solution is better than the competition.  So, for instance, on the middle picture here, you see some field measurements that compare the uplink performance of Ericsson versus a competitor.  And you can see that there is a large advantage for the Ericsson system.

Q.   And as part of that advantage owing to the fact of this instantaneous recalculation?

A.   Yes.

Q.   So again, for equalization, does Ericsson store those parameters and then use them to apply to the next beam?

A.   No.  We calculate them instantaneously.

Q.   For digital beamforming, does Ericsson calculate them instantaneously or use past parameters?

A.   We calculate it instantaneously.

Q.   Thank you.

        MR. STEVENS:  I have no further questions at the moment, Your Honor.  I pass the witness.

        THE COURT:  All right.  Cross examination by the Plaintiff.  Are there binders to distribute?

        MR. SUMMERS:  Yes, if we may, please, Your Honor.

        THE COURT:  Yes, please do.

MR. HUGHES:  Your Honor, may I approach?

THE COURT:  You may.

All right.  Mr. Summers, you may proceed with cross examination when you're ready.

MR. SUMMERS:  Thank you, Your Honor.

CROSS EXAMINATION

BY MR. SUMMERS:

Q.   Mr. Faxer, thank you for being here this afternoon.  I'd like to ask you a few questions.

First, you said that General Access never reached out to Ericsson before filing suit in this case.  Is that correct?

A.   Yes.

Q.   Do you think Ericsson would have just met and had a nice conversation and just paid if they thought that they were using the technology?  Is that your testimony today?

A.   I don't know, sir.

Q.   You're not a part of the legal department, are you?

A.   No.

Q.   Ericsson has a big legal department, doesn't it?

A.   We have a legal department.

Q.   And Ericsson engages in a lot of patent litigation, doesn't it, both Plaintiff and defense?

A.   Yes.

Q.   And Ericsson's known in this industry for being very aggressive in litigation, isn't it?

791

A.    I'm not sure that's correct.

Q.    You don't know what steps the Ericsson legal department and its armies of outside lawyers would have taken against General Access, do you?  You have no idea?

A.    I can't say that I do, sir.

Q.    You don't even have litigation like this --

THE COURT:  Let's slow down, please.  Okay?

Q.    (BY MR. SUMMERS)  Right.  You don't even have litigation like this in Sweden, do you?

A.    Not exactly like this, no.

Q.    You said that sometimes Ericsson takes licenses when it thinks that it's using someone else's technology.  Correct?

A.    Yes.

Q.    You didn't show us a single license today, did you?

A.    No.

Q.    Not a single one where some small guy with a patent came to Ericsson and said, you infringe our patents, and you just looked at it, were honest about it, and wrote them a check. You didn't show us a single example of that ever happening in the history of your company ever, did you?

A.    I did not.

Q.    You testified you have 30,000 engineers.  Correct?

A.    Yes.

Q.    And you can't tell us here today that when RSL was out there talking to companies like Ericsson and talking to

companies like T-Mobile about buying or licensing these patents, you can't tell us that those 30,000 engineers weren't looking at our patents, can you?

A.    I have no knowledge about that, sir.

Q.    Mr. Faxer, you have worked at Ericsson your entire professional career.  Correct?

A.    Yes.

Q.    You got your master's thesis in 2014, about 10 years ago?

A.    Yes.

Q.    And you started out as a researcher at Ericsson?

A.    Yes.

Q.    And you became a senior researcher?

A.    Yes.

Q.    And then a product manager here in the United States?

A.    Not in the United States, sir; in Sweden.

Q.    Sweden.  And most recently, you've been working as the chief technology and network solutions for Ericsson in New Zealand.  Correct?

A.    Correct.

Q.    So you've been stationed in New Zealand for seven months.  Correct?

A.    I believe it's five months.

Q.    Five months.  And they brought you back to the United States to testify in this case.  Correct?

A.    Correct.

793

Q.   Not because you're a subject matter in the technology at issue in this litigation because you're not.  Correct?

A.   I wouldn't exactly characterize it that way.

Q.   You've testified in other cases for Ericsson, haven't you?

A.   Yes.

Q.   Several depositions?

MR. STEVENS:  Your Honor, objection.  May we approach?

THE COURT:  Approach the bench.

(The following was had outside the hearing of the jury.)

MR. STEVENS:  I let it go the first time, but Mr. Summers asking about other litigation directly violates your MIL regarding not talking about parties involved in other litigations.  It's a direct violation.

MR. SUMMERS:  Not in his involvement, just that he's a testifier for them.

THE COURT:  I think it's been covered enough.  And if it goes further, I'll probably sustain an objection to it.

And also, Mr. Summers, some small guy coming to Ericsson and they didn't write a check, that is the biggest David-and-Goliath analogy I've heard in a long time, and it violates the Court's limine orders.  You're not going to put your client in David's position and Ericsson in Goliath's

position.

MR. SUMMERS:  Yes, Your Honor.

THE COURT:  All right.  Let's go forward.

(The following was had in the presence and hearing of the jury.)

THE COURT:  Let's go forward, please.

Q.   (BY MR. SUMMERS)  And, Mr. Faxer, you understand that Ericsson has an indemnification obligation to T-Mobile. Correct?

A.   Yes.

Q.   So if there's a verdict in this case, Ericsson can be on the hook on it financially.  Correct?

A.   Yes.

Q.   And there are a lot of eyes -- I mean, there's $253 million at stake in this case.  Correct?

A.   That's right.

Q.   A lot of eyes on you.  Correct?

A.   I wouldn't phrase it that way.

Q.   And you very much like working at Ericsson and want to continue to work at Ericsson, don't you?

A.   Yes.

Q.   And you've been working with the Ericsson team on this matter for months, haven't you?

A.   That's right.

Q.   And you've been here for -- when did you come to Marshall

Q. for this trial?

A.  I arrived on Wednesday last week.

Q.  And you meet with the legal team and work with them and with their experts.  Correct?

A.  Correct.

Q.  Now, let's change subjects for a moment.  Ericsson's base station equipment creates something called a UE context.  Correct?

A.  Yes.

Q.  And the UE context contains information about different users operating on the base station or connected to the base station.  Correct?

A.  Yes.

Q.  And that information is stored in memory in Ericsson's base station equipment.  Correct?

A.  It is.

Q.  And that information, the UE context, includes something called the GINR.  Correct?

A.  Yes.

Q.  You didn't discuss the GINR in your direct examination at all, did you?

A.  Correct.

Q.  The Ericsson legal team didn't want to ask you about it, did they?

A.  Correct.

Q.   It's the --

THE COURT:  He doesn't have any way of knowing what the Ericsson legal team did or didn't want to ask him.  You're asking him to speculate.  Let's ask him about what he has personal knowledge of, please.

MR. SUMMERS:  Yes, Your Honor.

Q.   (BY MR. SUMMERS)  The GINR is the gain to interference and noise ratio.  Correct?

A.   Yes, that's correct, sir.

Q.   So it measures the gain which is good, that's the strength of the signal.  Correct?

A.   It's the signal strength, yes.

Q.   Signal strength.  And it compares it to the interference and noise.  Correct?

A.   Yes.

Q.   And those are bad things that counteract signals. Correct?

A.   Yes.

Q.   And it figures out a mathematical number that represents the strength versus the problems.  Correct?

A.   That's a fair characterization, yes.

Q.   And it's like a score.  Correct?  It's a number.

A.   It's a number, yes.

Q.   And several things go into calculating the GINR. Correct?

797

A.    Yes.

Q.    And one of the things that is used is the transmission power of the UE.  Correct?

A.    Yes, I believe so.

Q.    And one of the things that goes into the GINR calculation is the post-equalized SINR.  Correct?

A.    Correct.

Q.    And that's -- what does SINR stand for?

A.    It's a signal to interference and noise ratio, sir.

Q.    And if we turn -- you looked at --

        MR. SUMMERS:  Let's turn to Joint Exhibit 5, if we could.  Let's go to page 282.

Q.    (BY MR. SUMMERS)  Do you see what we have here on the screen, Mr. Faxer?

A.    Yes.

Q.    Are you familiar with this document?  It was one of the things in your binder.

A.    Yes, I am.

Q.    And if we look at the things we have here, first of all, it says algorithm at the top.  Algorithm, does that mean basically a formula or a mathematical way of calculating something?

A.    That's fair, yes.

Q.    And if we look, there are six variables.  Do you see those?

A.   You have six input parameters, yes.

Q.   Six input parameters to the GINR.

MR. SUMMERS:  Now, go ahead and go to .2, please, or .1.  Just advance, please, to the next highlighting. Please go full screen.  Click.

Q.   (BY MR. SUMMERS)  Okay.  Here we've highlighted something that is called post-EQSINR.  Do you see that?

A.   Yes.

Q.   Is that the post-equalizer signal-to-noise ratio?

A.   Correct.

Q.   And that's one of the inputs into the GINR.  Correct?

A.   That's correct.

MR. SUMMERS:  Please advance.

Q.   (BY MR. SUMMERS)  Now, the bottom, we've highlighted the ULPSD TXPHR.  That's an indication of the power.  Correct?

A.   The power spectral density to be precise, but yes.

Q.   But all six of these inputs, including the two I've just mentioned, all collectively go into calculating the GINR. Correct?

A.   They're the inputs to the GINR.

Q.   And what we have at the end of the calculus, if we'll just advance, we have an output called the GINR.  Correct? That's what we see at the bottom, GainFiltAve?

A.   No, that's not completely accurate, sir.

Q.   Okay.  What do we have here as the output?

799

A.    You have the filtered channel gain.

Q.    And channel gain is sometimes used as a synonym for GINR. Correct?

A.    No.

Q.    Channel gain is an indication of the strength of the connection.  Correct?

A.    Correct.

Q.    And it's used for adaptive modulation.  Correct?  It's used to determine the appropriate modulation scheme for the next transmission.  Correct?

A.    It's used as input to the link adaptation algorithm, yes.

Q.    The link adaptation algorithm is the formula for determining the modulation and coding schemes you're going to use on the next uplink transmission.  Correct?

A.    Yes.

Q.    And as I've underlined in red at the bottom-this information is stored in the UE context.  Correct?

A.    Yes.

Q.    And it's used for subsequent uplink purposes or transmissions.  Correct?

A.    It's used to do link adaptation for future uplink schedulings.

Q.    Now, let's change subjects for a moment.  You don't dispute that Ericsson's base station equipment performs demodulation.  Correct?

A.   I do not dispute that, no.

Q.   You don't dispute that the eagle owl chip that we've -- or board that we saw today is widely used in the Ericsson equipment that's accused of infringement in T-Mobile's network.  Correct?

A.   It's used in some base stations in T-Mobile's networks, yes.

Q.   And the eagle owl contains several DSPs.  Correct?

A.   Yes.

Q.   128.  Is that correct?

A.   That's correct, sir.

Q.   And you don't dispute that those DSPs perform several demodulation steps, do you?

A.   No, that's correct.

Q.   You mentioned that there were things that were done in your direct examination -- you mentioned things were done before the DSPs, like -- you mentioned certain things, but you don't dispute that the channel estimation and weight calculations and other equalization steps take place in the DSPs.

A.   That's accurate, yes.

Q.   And there must be a scheduler or a controller that decides which DSP to send each demodulation job to, isn't there?

A.   Yes.

Q.   And there's a formula that it applies to do that.
Correct?

A.   There is an algorithm for that, yes.

Q.   An algorithm; a form of mathematical formula to allocate
the jobs.  Correct?

A.   There's an algorithm for that.

Q.   It's not random.  Correct?

A.   No.

Q.   It's based on sending jobs to DSPs that have availability
and not sending the jobs to DSPs that are already busy doing
something else.  Correct?

A.   In part, yes.

Q.   At a very high level.  Correct?

A.   At a high level, yes.

Q.   Let's turn now to a slide you put -- or your counsel put
on the screen.

          MR. SUMMER:  Let's go to PD 7.5, please.  This is
the image of the base station with the circuit board.  PD 7.5.

Q.   (BY MR. SUMMERS)  Mr. Faxer, in your direct examination
you testified that this is one of the boards that resides in
the base station units or baseband units supplied by Ericsson.
Correct?

A.   Yes.

Q.   And you recall that we took your deposition back in
August of last year.  Correct?

802

A.   Yes.

Q.   And you were actually designated, as you are in court today, to be a corporate representative to testify for Ericsson on certain technical subjects relevant to infringement in this case.  Correct?

A.   Yes.

Q.   And as part of that, you were supposed to prepare to answer our questions, weren't you?

A.   Yes.

Q.   And you spent time talking to Ericsson's legal department or legal team before that deposition, didn't you?

A.   I did.

Q.   And in that deposition do you recall that we asked you --

MR. STEVENS:  Objection, Your Honor; improper impeachment.

THE COURT:  It's not impeachment.  We are not going to go into any discovery disputes that happened in the pretrial process, but it's not impeachment.  Overruled.

Q.   (BY MR. SUMMERS)  Do you recall that we asked you about this exact same circuit board?

A.   Yes.

Q.            MR. SUMMERS:  If we could please advance to PD 7.6.

Q.   (BY MR. SUMMERS)  We marked as an exhibit and we showed you what is put on the screen as Faxer Deposition Exhibit 9.

Do you recall that?

A.    Yes.

Q.    And looking at the two things, you know now they are the exact same circuit board, don't you?

A.    Correct.

Q.    But when we were asking you questions in deposition when you were supposed to be prepared to answer our questions, you couldn't even tell us --

MR. STEVENS:  Your Honor, objection.  This violates --

MR. SUMMERS:  This --

THE COURT:  Just a minute.  Approach the bench, counsel.

(The following was had outside the hearing of the jury.)

THE COURT:  This is getting into impeachment now.

MR. SUMMERS:  It's his bias and credibility that he doesn't know when we're asking questions and he does when they do, and this is all bias and credibility, and it goes to does he really know what he's talking about today.

THE COURT:  What's your response, Mr. Stevens?

MR. STEVENS:  But not the way he's doing it.  If he wants to ask the witness, Do you know this, then if the witness says 'no', he can say the witness doesn't know it; if the witness says 'yes' and he wants to try to impeachment him,

he can, but he's completely mischaracterizing the testimony of the deposition as well.  So what -- if we wants to show the witness doesn't really know what he's talking about, he can directly ask the witness the question.

THE COURT:  And then if the witness gives an answer today that's different than what he gave in his deposition, you can impeach him with his deposition testimony.

MR. SUMMERS:  He testified that he couldn't tell us whether it was part of a baseband or some other unit.  He had no idea what it was.

THE COURT:  Okay.

MR. SUMMERS:  So he's already impeached himself by --

MR. STEVENS:  That's entirely not --

THE COURT:  No.  I don't agree with that.

Now, if you want to ask him a question and he says he knows the answer today and then in his deposition he said he didn't know the answer to the same question earlier, that can be used as proper impeachment.  Is that clear?

MR. SUMMERS:  Yes, Your Honor.

THE COURT:  All right.  Let's proceed.

(The following was had in the presence and hearing of the jury.)

THE COURT:  All right.  Let's proceed, please.

Q.   (BY MR. SUMMERS)  Mr. Faxer, from looking at this board,

can you tell whether this is the baseband unit or radio unit?

A.   It's very difficult to know just by looking at the certain board without prior information.

Q.   And in your deposition you didn't have that prior information, did you?

MR. STEVENS:   Your Honor, same objection.

THE COURT:   Sustained.

Q.   (BY MR. SUMMERS)   Mr. Faxer, how did you come to know what this circuit board is for this trial?

A.   Well, I looked at it in detail and checked the model numbers.

Q.   Now, Mr. Faxer, you testified today that when it comes to beamforming, digital beamforming, Ericsson calculates the beamforming weights new every time.  Was that the gist of your testimony?

A.   Yes.

Q.   Were you referring to downlink or uplink?

A.   Uplink.

Q.   And you were here the other day for Mr. McHardy's testimony, weren't you?

A.   Yes.

Q.   And he testified that Ericsson stores the best for beam patterns.  Do you remember that?

A.   Yes.

Q.   And you would agree that Mr. McHardy is an expert in the

uplink scheduling, isn't he?

A.   Yes.

Q.   You were here -- you testified today about the fact that the Ericsson system is distributed and uses various DSPs and accelerators.  Do you recall that?

A.   Yes.

Q.   You were here for Mr. Struhsaker's testimony on Monday, weren't you?

A.   Yes.

Q.   And you recall he testified that the Raze system back in the day had both DSPs and accelerators.  You were here for that, weren't you?

A.   Yes.

Q.   You don't have any reason to dispute that, do you?

A.   I don't know anything about that.

Q.   And he testified they had distributed demodulation, didn't he?

A.   I'm not sure that he did.

Q.   He didn't -- don't you recall him testifying about how some of the early demodulation steps were performed at the RF transceiver up in the antenna?

A.   I don't recall specifically.

Q.            MR. SUMMERS:  Let's turn quickly to Plaintiff's Exhibit 2, the '383 Patent, page 4, figure 3.

Q.   (BY MR. SUMMERS)  If we look at figure 3 of the patent,

807

do you see that we have an RF receiver up at the antenna separated from the two modems.  Correct?

A.    Yes.

Q.    It wouldn't surprise you that an RF receiver performs some of the initial demodulation steps, would it?

A.    Potentially it could.

Q.    Mr. Faxer, this is an intensely competitive industry, the industry of wireless mobile services.  Correct?

A.    That's fair.

Q.    AT&T and T-Mobile and Verizon compete intensely, don't they?

A.    I think so, yes.

Q.    And they compete on the basis of the quality and capabilities of their networks.  Correct?

A.    Yes.

Q.    Including the coverage and speed of their networks. Correct?

A.    Certainly, yes.

Q.    And you were here for Dr. Madisetti's testimony when he testified that these patents increase not only the capacity but also the coverage and throughput of T-Mobile's networks. Correct?

A.    That's what he said, yes.

Q.    And Ericsson is constantly trying to provide its customers like T-Mobile with the very best equipment they can.

A.    Yes.

Q.    And very important.  Correct?

A.    Certainly.

Q.    Because you have competition.  Correct?

A.    Yes.

Q.    Folks like Samsung and Nokia.

A.    Correct.

Q.    And so you're constantly and always doing everything you can to maximize the performance of your base stations.  Correct?

A.    Generally, yes.

        MR. SUMMERS:  Thank you, Your Honor.  I'll pass the witness.

        THE COURT:  All right.  Is there redirect?

        MR. STEVENS:  I have a few questions, Your Honor.

        THE COURT:  All right.  Let's proceed with redirect.

                REDIRECT EXAMINATION

By MR. STEVENS:

Q.    Mr. Faxer - -?

        THE COURT:  Please proceed.

        MR. STEVENS:  I'm sorry.  Thank you, Your Honor.

Q.    Mr. Faxer, Mr. Summers over there asked you about GINR.  Do you recall that testimony?

A.    Yes.

Q.    The question he didn't ask you is, is that something

809

that's actually used by the demodulators to demodulate the next burst?

A.    No, it's not used in the demodulator.

Q.    So as far as digital beamforming or demodulation or equalization, is that used?

A.    No.

Q.    Did he show you any evidence that suggests anything other than equalization is done instantaneous on the fly every single time?

MR. SUMMERS:  Objection; leading, Your Honor.

MR. STEVENS:  I'll withdraw the question.

Q.    (BY MR. STEVENS)  There was also some questions about best for beams.  Do you remember that?

A.    Yes.

Q.    Okay.  Best for beams, is that -- in Ericsson's regular FDD and TDD equipment, is that used -- is that a thing in the vast majority of Ericsson's equipment that's at T-Mobile?

A.    The best for beams is used in Ericsson's mmWave equipment.  It's not used in the FDD or the (unintelligible) equipment.

Q.    So in the FDD equipment and in the TDD equipment that we're actually here this week to talk about, is that even used?

A.    It's only used in the mmWave equipment, which is sort of a niche product.  It's not very deployed.

Q.   Out of curiosity, we heard roughly 40,000 base stations. How many mmWave base stations has Ericsson ever sold to T-Mobile?

A.   It's very few.  I think it's on the order of 400 base stations or so.

Q.   So 400 divided by a little bit more than 40,000--check my math here--less than one percent?

A.   I think that's accurate, yes.

Q.   If we could pull up the figure from the '383 Patent that counsel asked you about.  And this is the figure he showed you from one of their two patents.  Is that right?

A.   Yes.

Q.   And here in this figure he directed your attention to box 302 and 304 which is labeled modem A on the one hand and labeled modem B on the other hand.  Do you see that?

A.   Yes.

Q.   Anything in Ericsson equipment that has two separate modems?

A.   No.

Q.   Anything in Ericsson's equipment that has two separate modems or demodulators that alternates between each other depending upon the user?

MR. SUMMERS:  Objection, Your Honor; again, expert testimony.

MR. STEVENS:  He opened the door right to this

811

figure.

THE COURT:  Overruled.

Q.   (BY MR. STEVENS)  Anything -- is there anything in Ericsson's base stations that have two demodulators or two modems that alternate between one another based upon the user?

A.   No.  It works in a different way, sir.

Q.   Thank you, Mr. Faxer.

MR. STEVENS:  Your Honor, I pass the witness.

THE COURT:  All right.  Is there additional cross?

MR. SUMMERS:  Yes, very briefly, Your Honor.

THE COURT:  Proceed with additional cross examination.

MR. SUMMERS:  Yes.

RECROSS EXAMINATION

Q.   BY MR. SUMMERS:  ?

Q.   Mr. Faxer, you were here for Mr. Struhsaker's testimony.  Correct?  We covered this.

A.   Yes.

Q.   And you understand that he testified that what Raze was doing was using software-defined radios?

A.   Yes, I heard that.

Q.   Software routines within things like DSPs?

A.   I heard that, yes.

Q.   And did you hear that he explained that the drawing showing two physically separate and distinct demodulators,

Shawn M. McRoberts, RMR, CRR
Federal Official Court Reporter

812

that was for simplicity to try to explain the basic process?

A.    He said that, I believe, yes.

Q.    And you don't dispute that the GINR is stored in the UE context.  Correct?

A.    That's correct.

Q.    You don't dispute that it is used to determine the modulation scheme to be used in subsequent transmissions from the user, do you?

A.    I do not.

Q.    And you don't dispute that the demodulators, in order to demodulate, need to know what demodulation scheme has been applied to those transmissions.  Correct?

A.    That's correct.

Q.    And that information is provided by the baseband -- by the base station equipment to the demodulators or to the DSPs that are performing the demodulation.  Correct?

A.    Correct.

Q.    Thank you.

          MR. SUMMERS:  No further questions.

          THE COURT:  You pass the witness, Mr. Summers?

          MR. SUMMERS:  Yes.

          THE COURT:  Anything further of this witness, Mr. Stevens?

          MR. STEVENS:  No, Your Honor.

          THE COURT:  Then you may step down, Mr. Faxer.

THE WITNESS:  Thank you.

THE COURT:  If you'll return to the counsel table as the corporate representative for Ericsson.

All right.  Defendants, call your next witness.

MR. HAYNES:  Your Honor, we call Dr. Daniel van der Weide --

MR. STEVENS:  Not exactly, Your Honor.

MR. HAYNES:  Can we take that back, Your Honor?

MR. STEVENS:  The Defendants call Gunnar Larsson by a video deposition.  It is 2 minutes and 48 seconds charged to Plaintiff and 9 minutes and 4 seconds charged to Defendant.

THE COURT:  All right.  Proceed with this deposition witness, please.  .

GUNNAR LARSSON

BY VIDEO DEPOSITION

A.    My name is Gunnar Larsson.

Q.    Mr. Larsson, where do you currently work?

A.    I work for Ericsson.  I am in the San Francisco area.

Q.    And we'll talk about the details of your employment a bit later, I think, but how long have you been at Ericsson?

A.    I started in 1990, so 34 years.

Q.    And where were you located, which Ericsson office, when you started in 1990?

A.    In 1990 I started in Linköping, Sweden.  And I moved to Stockholm, Sweden in 1939, and in 1995 I was brought to the

814

U.S. to help with the GSM introduction.

Q.   So you mentioned that you started at Ericsson in 1990.
Correct?

A.   Correct.

Q.   And that was as a test engineer?

A.   Yes.

Q.   And what was that next position that you held?

A.   I think the title was cell planning engineer.  These days we call them RF engineer.

Q.   What were your responsibilities as a cell planning engineer?

A.   It was the very early days of GSM, so my responsibilities were to design GSM systems in new markets, and then, when they were built, go drive test and optimize those systems and make sure they worked as well as possible before they were turned up.  And then it evolved into collecting statistics from those systems when they started carrying traffic and continue optimizing those systems with the additional drive testing, and then from that statistics we pulled from the RBS 200 -- or RBS 2000 base stations.

Q.   So when was the RBS 2000 family of base stations introduced?

A.   In the late '90s sometime.

Q.   So I just want to take that step by step.

     So the RBS 2000 was the first family of base stations

815

that you used in the United States.

A.    Correct.

Q.    And the RBS 2000 family was available in the United States beginning around 1996?

A.    Yeah; '95 or '96, yeah.

      I should probably qualify my answer there.  It's the first GSM base station family we used in North America.

Q.    So was the RBS 2000 family of base stations the first Ericsson base stations to implement GSM that were deployed in the United States?

A.    Correct.

Q.    And that would have been around 1995 or 1996?

A.    Yeah.

Q.    Were you still a cell engineer at Ericsson as of that time?

A.    Yes.

Q.    And what was the nature of your work with the RBS 2000 family of base stations during that period?

A.    So initially in 1995, I -- and into 1996, I was part of a technology group that was responsible for writing and developing guidelines for how to use the Ericsson GSM system in the North America market and specifically with North America frequencies.  Then I moved to services teams in 1996 and went to several markets to design and build and optimize networks with the GSM system and RBS 2000 base stations.

816

And our technology group was in Plano, Texas, or actually Richardson, Texas in the beginning.

Q.    I'm marking as Exhibit 2 a document bearing Bates number GAS_TMO_0015342.

Up at the top of the first page of Exhibit 2 it says, "Amended and restated acquisition agreement."

Do you see that?

A.    Yes.

Q.    Are you familiar in this context with what an acquisition agreement is?

A.    Yes.  It's basically a purchase agreement.

Q.    Do you see the second line from the top on the page ending in 344, it says, "Ericsson CMS personally communication system"?

A.    Yes.

Q.    Do you know what that is?

A.    Yes.  CMS 40 was a code name for our GSM system in the PCS, personal communication system, spectrum, which is 1900 megahertz.

Q.    So CMS 40 refers to an RBS 2000 family base station that has been configured to operate in a certain spectrum?

A.    Yes.  The RBS 2000 is part of the system, together with the base station controller, the switch, which is the MSC, multiple other nodes, like home location register, handle descriptions, and so on.  But yes, the RBS 2000 base station

is configured then for the PCS frequencies -- is part of that CMS 40 system.

Q.   This acquisition agreement relates to the sale of the CMS 40 PCS systems from Ericsson to VoiceStream.  Is that right?

A.   Yes.  The purchase agreement that they took over from Omnipoint, I believe this specifically is for -- right?  Yeah.  VoiceStream acquired Omnipoint and took over, possibly renegotiated the purchase agreement that Omnipoint already had in place.

Q.   And both before and after that takeover of Omnipoint, the subject of the purchase agreement was these Ericsson CMS 40 systems.  Right?

A.   Correct.

Q.   Do you know when Ericsson first offered CMS 2000 systems for sale in the United States?

A.   CMS 40.  In 1995 we offered the system.  I believe that they were probably installed mainly in 1996, but maybe they were -- they were offered for sale in 1995.

Q.   And if VoiceStream -- turning back to Exhibit 2, if VoiceStream did purchase any CMS 40 systems under this acquisition agreement, do you know what VoiceStream did with those CMS 40 systems or where they were deployed?

A.   Well, by then VoiceStream became a nationwide operator, more or less, so they would have expanded gradually in all of the markets and possibly into new territories as well.  The

growth --

Q.   At that --

A.    -- was tremendous -- sorry.  The growth was tremendous in those days, so they needed to add base stations, RBS 2000 base stations and base station controllers and switches, et cetera, all over the country very quickly in those days.

Q.   Great.  And we'll mark as Exhibit 3 the document bearing Bates No. ERIC_GAS_TMO_00052127.

On the first page of that document under the graphic it says, "Ericsson GSM system BSS R7."  Do you see that?

A.   Yes.

Q.   And then it says "RBS 2101, RBS 2102, RBS 2103, RBS 2202 reference manual."

Do you see that?

A.   Yes.

Q.   And that next page, Bates number ending in 144, there is a chart there listing all of the different pieces of documentation that the customers would receive.  Right?

A.   Correct.

Q.   So the customers would receive, for example, in that left column the transport instructions if they purchased a CMS 40 system?

A.   Right.

Q.   And Ericsson maintains other documentation about these systems that would not be provided to customers.  Is that

correct?

A.    That's correct, yeah.

Q.    So for example, customers wouldn't be provided with the documentation of the source code that was running on the base station itself.  Right?

A.    That's right.

Q.    And customers wouldn't be provided with documentation of the individual function blocks?

A.    Correct.

Q.    That information, the source code and the function blocks and information like that is confidential to Ericsson. Correct?

A.    Correct.

Q.    Mr. Larsson, we talked at the beginning about the fact that the case here is that General Access is asserting in the federal court in Texas that the defendants in this case infringe certain claims of its patents.  Do you recall that?

A.    Yes.

Q.    And you testified that you have not looked at any of General Access' patents.  Correct?

A.    Correct.

Q.    So you don't have any opinions about whether the RBS 2000 practices any of the claims of General Access' patents.  Is that right?

A.    I'm not familiar with the claims, so no.

820

Q.   And you don't have any opinions about how the RBS 2000 and the features of the RBS 2000, how those relate to any of the claims of General Access' patents.  Is that right?

A.   Correct.  I am not familiar with the claims at all.

THE COURT:  Does that complete this witness by deposition?

MR. STEVENS:  It does Your Honor.

THE COURT:  All right.  Ladies and gentlemen, it's a quarter till 12:00.  We're going to break for lunch at this point.

If you'll take your notebooks with you to the jury room, please.  Continue to follow all my instructions, including not to discuss the case with each other.  And we'll be back in about 40, 45 minutes and continue with the next Defendants' witness.

The jury's excused for lunch.

(Whereupon, the jury left the courtroom.)

THE COURT:  All right, counsel, be seated, please.

As of right now we've used 2 hours, 52 minutes and 39 seconds of designated trial time this morning.  As of now the Plaintiff General Access has 3 hours and 22 minutes of designated trial time remaining.  Defendant and Intervenor have 5 hours and 6 minutes of designated trial time remaining.

Now, Mr. Stevenson since you're lead counsel for the Defendants, who is the next witness for the Defendants?  You

missed the fruit basket turnover we had while you were out of the room.

MR. STEVENSON:  Anders Akesson.

THE COURT:  Followed by Dr. van der Weide.

MR. STEVENSON:  Followed by Dr. van der Weide.

THE COURT:  Then with that, we stand in recess for lunch.

(Lunch recess.)

THE COURT:  Be seated, please.

Defendants, are you prepared to proceed with your next witness?

MR. STEVENS:  We are, Your Honor.

THE COURT:  All right.  Let's bring in the jury, please.

(Whereupon, the jury entered the courtroom.)

THE COURT:  Welcome back from lunch, ladies and gentlemen.  Please have a seat.

Defendants, call your next witness, please.

MR. STEVENS:  Defendants call Anders Akesson.

THE COURT:  All right.  If you'll come forward, Mr. Akesson and be sworn.

(Whereupon, the oath was administered by the Clerk.)

THE COURT:  Please come around, sir, have a seat on the witness stand.

MR. STEVENS:  Your Honor, I understand the binders

have already been passed out including to the bench.

THE COURT:  It appears to be the case.

All right.  Mr. Stevens, you may proceed with direct examination.

MR. STEVENS:  Thank you, Your Honor.

ANDERS AKESSON,

having been first duly sworn, testified under oath as follows:

DIRECT EXAMINATION

Q.   BY MR. STEVENS:   ?

Q.   Good afternoon, sir.  Could you please introduce yourself to the jury?

A.   Yes.  My name is Anders Akesson, and I'm working for Ericsson.  I'm from Stockholm in Sweden.

Q.   And, sir, for how long have you been employed with Ericsson?

A.   I'm been employed since 1995, so it's 30 years almost.

Q.   And I think you mentioned a moment ago, but where do you currently reside?

A.   Now I'm in Stockholm.

Q.   And what's brought you all the way from Stockholm to us today here in Marshall?  What are you going to talk about here today?

A.   I'm here to talk about the RBS 2000.

Q.   And we've heard references so far this week to the RBS 2000.  But could you please tell the jury just what is it?

What is the RBS 2000?

A.    Yes.  So the RBS 2000 is a radio base station that is used for the GSM standard or for the second generation of mobile telephone system.

Q.    And so RBS.  Do those three letters mean anything?

A.    Yes.  That's radio base station.

Q.    So radio base station 2000.  Do I have that correct?

A.    Yes.

Q.    And you mentioned 2G or GSM.  Do me a favor.  Help us sort of place that in time.  When did the 2G standard roll out and get used commercially?

A.    I would say it's before -- in the beginning of the '90s.

Q.    Was it before you actually joined the company in 1990?

A.    Yes, it was.

Q.    And so we're here this week to talk about much more modern Ericsson products.  Just to give us some perspective, the RBS 2000 from the '90s, where are we today?  What product generation are we at today?

A.    Now we are at the RBS 6000.

Q.    A lot of innovation and differences in between.  Is that fair?

A.    Yes.

Q.    Okay.  Now, do you understand that the Defendants will be calling an expert witness, Dr. van der Weide here in a few minutes to actually analyze the questions of invalidity in

12:42

this case?  Do you understand that?

A.    Yes.

Q.    And are you here to provide the jury direct opinions regarding validity or invalidity?

A.    No.

Q.    And have you had the opportunity to speak with Dr. van der Weide to answer any questions he might have about how the RBS operated back in the 1990s?

A.    Yes, we have talked.

Q.    Now, so in your personal experience, when was the first time you encountered the RBS 2000?

12:42

A.    It was when I started at Ericsson in like '95.

Q.    So did it already exist before you joined the company?

A.    Yes.

Q.    And starting from '95 when you began with Ericsson, for how many years did you work with the RBS 2000 product?

A.    I worked about 10 years, a little bit more than 10 years with RBS 2000.

Q.    So very roughly, 1995 to 2005?

A.    Yes.

12:43

Q.    During those 10 years, was working with the RBS 2000 a primary aspect of your responsibility?

A.    Yes, it was.

Q.    And could you explain that to the jury?  What did you do with the RBS 2000?

825

A.    I worked as an integrator and troubleshooting, which is, say it's -- the integration is to test and find faults early in the development process, see that it works, and also working then with troubleshooting and trying to find what kind of fault that is in the product when we release it, say.

Q.    And through that work, were you exposed to Ericsson's source code back in the 1990s as it relates to the RBS 2000?

A.    Yes.  I would say that that was a big part of the ability to kind of read the source code and understand how it works and so on, to be able to troubleshoot and see what could be wrong.

Q.    Thank you.

Now, when you joined the company, do you recall there being any interest about the fact that the RBS 2000 was going to be brought to the United States?

A.    Yes.  I actually remember in the beginning there that it was a little bit buzz, you could say, about that it was -- that GSM actually was introduced in the United States back then as we had like these kind of stand-up meetings where they talked about and the product manager talked about the status and it was here and it had like a cowboy hat and those things.  So, yes, it was --

Q.    Can I ask you to speak just a little bit slower, please, sir?

A.    Yes, sorry.

826

Q.   And one word that you said, was it buzz, B-U-Z-Z?  Was there a buzz about the project?

A.   Yeah.  It was interest in our organization about this.

Q.   Now, looking back to 2G or GSM in the '90s, did it use the same frequency band here in the States as it did in Europe?

A.   No.  It's different frequency band in different part of the world.

Q.   What was the frequency band for 2G here in the United States?

A.   In the United States, this was 1900 megahertz.

Q.   Okay.  So if I wanted to write this down so that I can remember it, so I write down U.S. equals 1900 megahertz, is that right?

A.   That's right.

Q.   Okay.

THE COURT:  You have leave to use the easel, Mr. Stevens.

MR. STEVENS:  Thank you, Your Honor.

THE COURT:  Everybody else has asked.

MR. STEVENS:  Apologize for my rudeness not asking first.  I will do so next time.

Q.   (BY MR. STEVENS)  Okay.  So have I written this down accurately, sir, 2G GSM in the States 1900.  Is that right?

A.   That is right.

827

Q.   Okay.  Great.  Now, when you were in those meetings discussing the RBS 2000, back in the '90s, were there discussions about specifically the 1900 megahertz version?

A.   Yes, that was kind of the -- the new thing then.

Q.   And so when we see documents that talk about 1900 megahertz, can there be any question about whether that was the U.S. version?

A.   No.

Q.   Have you ever heard of VoiceStream, sir?

A.   Yes.

Q.   And was VoiceStream one of Ericsson's customers here in the United States?

A.   Yes.

       MR. STEVENS:  If we could pull up JX 45, please.

Q.   (BY MR. STEVENS)  Sir, it's also on your screen and in your binder.

A.   Yes.

Q.   Can you tell the jury what we see here on JX 45?

A.   It's an amendment and restated acquisition agreement.

Q.   And what is it an acquisition agreement for?  What is being sold?

A.   It is the Ericsson CMS 40 system personal PCS.

Q.   Did that Ericsson CMS 40, did it include the RBS 2000 base station?

A.   Yes.  The CMS 40 was the U.S. version of the DSM system

that was provided, and that -- so -- yeah.  And that includes the base station, the RBS.

Q.    Thank you, sir.

MR. STEVENS:  If we could turn to page 3 of this agreement.

Q.    (BY MR. STEVENS)  And we see here some 'whereas' clauses. Now, did there come a point in time when VoiceAge had purchased another company called Omnipoint?

A.    Yes.

Q.    And what does this agreement tell us about how long prior to this particular year that Ericsson had been selling the RBS 2000 to Omnipoint?

A.    It says it's from April 16th, 1996.

Q.    Okay.  So any question about whether the RBS 2000 was on sale in the United States back in the '90s?

A.    No.

Q.    Okay.

MR. STEVENS:  So we can take that down.

Q.    (BY MR. STEVENS)  I'd like to switch gears and talk a little bit about the functionality that was in the RBS 2000 back in the '90s.  Is that okay, sir?

A.    That's okay.

Q.    So, for example, pretty basic question here:  Could you make a phone call on the RBS 2000 using the 2G standard back in the '90s?

A.    Yes, of course.

Q.    And did it support that from the very beginning?

A.    Yes; otherwise, it's not so much use of the system.

Q.    Fair enough, sir.

Was there source code that allowed the RBS 2000 to work from its very inception?

A.    Yes.

Q.    And, again, I asked this before, but I want to be clear about it.  In your job role, did you personally have experience dealing with that source code back in the 1990s?

A.    Yes.  So it was to read it and understand the source code.

Q.    Now, over the years, it's been a long time since the 1990s, obviously, does Ericsson keep track of the versions of its source code?

A.    Yes.  We have like a source code database, you could say, to version control the source code.

Q.    So if adjustments or modifications were made in the future, can we turn back the clock and figure out what the code was at a particular point in time in the past?

A.    Yes.

Q.    And do you understand that in this litigation, Ericsson has gotten some of that code and given it to the folks at the other table to take a look at?

A.    Yes.

830

Q.   Were you personally involved in collecting that code and finding it?

A.   Yes, I collected that code.

Q.   And tell me a little bit about what you did in order to do that.

A.   I went into our source code database and collected an early version of the source code.

Q.   And for that code that's dated before 2000, is that how the code that you pulled existed in those particular years in the '90s?

A.   Yes.

Q.   So I'd like to take a quick peek at some of that source code.

        MR. STEVENS:   If we could pull up JX 8.694, please.

Q.   (BY MR. STEVENS)   And so what do we see here?

A.   So this is a header file from the source code in the CPU.

Q.   And if I look there at lines 35 through 39, I see some version or some dates.  Could you tell us what we see here?

A.   Yes.  So this is the revision history of this particular file.

Q.   And what does it tell us about the last date that this particular file was modified?

A.   Here we see that the last version of this file was the 7th of October, 1998.

Q.   And so is that where I see 981007, is that 1998 October

7th?

A.    Yes.   That's the way we write it in Sweden.   We write the year, month, and date.

Q.    Okay.   And from a big picture point of view, what functionality is this particular header file related to?

A.    This particular header file defines certain memory areas, memory buffers that we use in the RBS.

Q.    And these particular memory buffers, did they store parameters?

A.    Yes.   That's the purpose of these memory buffers.

Q.    So back in the 1990s when somebody wanted to make a call on the GSM system, were there buffers and memory stored and were parameters used to help the base station receive those signals?

A.    Yes, it was.

Q.    Okay.   So we'll come back to the source code here in a minute, but I want to talk about another document.

          MR. STEVENS:   If we could mull up JX 41?

Q.    (BY MR. STEVENS)   Could you tell the jury what this document is, please?

A.    This is a reference manual for a number of RBS variants.

Q.    Now, I think I know that you weren't the author of this document, but are you familiar with it?

A.    Yeah, I'm familiar with it.

Q.    Okay.

832

MR. STEVENS: If we could turn to page -- I'm sorry. Before we do --

Q.   (BY MR. STEVENS)  This reference manual, who is the target audience?

A.   Yes.  So the reference manual you can see it's a customer documentation that's provided to the customers that buy the system.

Q.   Thank you.

A.   Manual, you could say.

Q.   Thank you.

MR. STEVENS: If we could turn to page 17, please.

Q.   (BY MR. STEVENS)  First off, I want to start down at the tiny font in the lower left corner.  Could you tell us the date of this document?

A.   Yes.  This is 2000, April 28th.

Q.   April 28th of the year 2000?

A.   Yes.

Q.   Thank you.  And if we zoom back out, I see near the top of the page 1.1, Objectives.  What does this tell us about whether this included the version that was actually shipped into the United States?

A.   It states here that is for the 900, 1800, and the 1900 megahertz.

Q.   And so is that 1900 megahertz, is that what we talked about a few minutes ago?

833

A.    Yes, exactly.

Q.    So was this document available after it was created to United States customers of the RBS 2000?

A.    Yes.

Q.    Okay.

MR. STEVENS:  We can take that down.

Q.    (BY MR. STEVENS)  So I want to go back to my question about, you know, could you make a phone call on it.

So if I had a phone and I wanted to initiate a phone call and so I'm sending information to the base station, what's the first thing that happens there in that process?

A.    The first thing that happens is that the mobile station sends a signal that's called channel request, that they want to request access to the system, I should say.

Q.    So if I had a phone in my hand, the phone would send a channel request to the base station?

A.    Yes.

Q.    And what would the base station do with that?

A.    When it receives that, it would activate -- do a channel activation and activate a traffic channel that we could use for this phone call.

Q.    And as part of that channel activation procedure, did it set up a profile for the particular user?

A.    Yes.  Then it configures a number of memory buffers like we saw on the header file there, a number of those, and memory

buffers with certain parameters to be used then in this particular call.

Q.   And, roughly speaking, how many different parameters did the RBS 2000 back in the '90s, how many different parameters did it store regarding my uplink communications?

A.   At least a dozen, I would say.

Q.   Okay.  So let's take one more peek at the original source code that I asked you to look at.

MR. STEVENS:  So JX 8.695.

Q.   (BY MR. STEVENS)  And if I look at these lines, I see bit field_16 and then a little bit of a break and there is various parameters like RF RxDiv over on the right.  What are we seeing here with these names on the right side?

A.   Yeah.  We see -- we see a number of parameters here, and I should say RXD, for instance.  We have a number of reference to other memory buffers that's used.  We have training sequence code.  We have reference to -- we used ciphering on the -- so we have reference to ciphering.  Algorithms that should be used on this particular call and so on.

Q.   And are everything that you just mentioned in your answer, are all those different parameters that were stored and saved and then applied to the uplink transmission?

A.   Yes.

Q.   So I want to flip back to the reference manual for a second.

MR. STEVENS:  If we could look at JX 41, page 312.

Q.   (BY MR. STEVENS)  Have you ever heard of something called receive or receiver diversity, sir?

A.   Yes.

Q.   And so this picture, figure 95 here, does this show receive diversity?

A.   Yes, exactly.

Q.   Do me a favor.  Explain to the jury what receive diversity meant especially back in the 1990s.

A.   Yes.  So receive diversity is you have two antennas to the radio base station to be able to receive the signal -- to hear the signal better on the uplink, the signal that comes up from the mobile up to the radio base station.

You can maybe compare to that you have two ears, so you hear better if you have two ears instead of just one ear.  So that you can see.  And then you combine these two signals together.

Q.   Did you always use both or if -- you know, to run your ear analogy, if something's coming from over here, were there times where I just would have used this ear?

A.   Normally you would use both because you hear a little bit also on the other ear going around if you had two ears.

Q.   Got it.  And were there parameters that were stored that let the system know whether to listen with antenna A versus antenna B versus both antennas?

A.    Yes.  We had this RxDiv element or RxDiversity parameter that we used before that describe if you have one ear, if you have a right ear or if you have a left ear, or if you have both ears.

Q.    And RxDiv, is RX shorthand for receiver in this industry?

A.    Yes, that's correct.

Q.    And div for diversity?

A.    Yes.

Q.    Thank you.  And all that functionality, did it exist in the RBS 2000 back in the 1990s?

A.    Yes, it did.

Q.    Okay.  Now, did you collect any source code that corresponds to what we've been talking about this week as layer 1, the lowest layer, layer 1 processing?

A.    Yes.  I collected source code also for the signal processing the layer 1 parts.

Q.    And for the RBS 2000 back in the '90s, was that particular code -- was it in a particular language?

A.    Yes.  So this -- the first generation you could say of the RBS 2000 had -- then we had -- and that was an ASIC, application specific integrated circuit, like a little hard coded chip.  And the functionality of this chip is then described in programming language called VHDL, which stands for hardware description descriptive language.

Q.    Okay.

837

MR. STEVENS:  Your Honor, may I approach the easel again?

THE COURT:  You may.

MR. STEVENS:  Thank you.

Q.   (BY MR. STEVENS)  So if I wanted to make sure I was looking at the old 1990s RBS 2000 code for layer 1, it would be in VHDL language?

A.   Yes, that's correct.

Q.   Okay.  Now, there was some other code produced in this case in a different language called assembly language, and I think this is going to come up with the expert, so I just want to touch on it with you.

If we see assembly code, did that actually relate to the old product of the 1990s or was that a different product later in time?

A.   No, it would be from the second generation, the second generation of RBS 2000, which we had to (unintelligible) that used an assembly language, and you could say that you run the signal processing in software instead of hardware as we have in the first generation.

Q.   So if there's a debate later about whether we're looking at the 1990s code or a different code and we're talking about layer 1, VHDL would be old from the '90s, assembly would be a later generation.  Is all that fair?

A.   Yes.  VHDL is the old hardware language and then assembly

Shawn M. McRoberts, RMR, CRR
Federal Official Court Reporter

838

is the newer.

Q.    Okay.

A.    Yeah.

Q.              MR. STEVENS:  So let's look at JX 8.1622.  I want to peek at some of this.

Q.    (BY MR. STEVENS)  Is this some of that older VHDL code?

A.    Yes.  So this is a VHDL file for the burst demodulator lock.

Q.    And if we look down at page 1623, we see lines -- I'm sorry.  1628.  I misspoke.  On lines 454 and 455, I see a chA and a chB.  Does this have anything to do with the parameters for received diversity that we spoke about a few minutes ago?

A.    Yes.  So this is to extract this RxDiversity parameter that is actually two bits, you can say.  So this is to extract the A bit and the B bit to see if channel A, meaning one of the antennas, or the one of the UAs, you could say, is enabled.  And if channel B, the other ear, is enabled, then you can use that.

Q.    Thank you.

        MR. STEVENS:  We can take that down.

Q.    (BY MR. STEVENS)  So just to recap, back in the '90s, did the RBS 2000 create a profile for a user and store parameters related to the uplink transmissions from that user?

A.    Yes.

Q.    Did some of those parameters relate to qualities of the

839

signal it was receiving?

A.   Yes.

Q.   And did some of those parameters relate to the antennas that were to be used on the receive side?

A.   Yes.

        MR. STEVENS:  I have nothing further at this moment, Your Honor.  I pass the witness.

        THE COURT:  All right.  Turn the pad on the easel to a clean sheet, please.

    Is there cross examination by the Plaintiff?

        MR. HUGHES:  Yes, Your Honor.  May I have a moment to pass out the binders?

        THE COURT:  Yes, you may.

        MR. HUGHES:  Your Honor, may I approach?

        THE COURT:  You may.

    All right.  Mr. Hughes, you may proceed with cross examination.

        MR. HUGHES:  Thank you, Your Honor.

                    CROSS EXAMINATION

BY MR. HUGHES:

Q.   Mr. Akesson, we met right before you went on the stand just now.  Good afternoon and, again, nice to see you.  I'm John Hughes.

A.   Good afternoon.

Q.   Now, we heard a lot about your work on the RBS 2000

during your direct. That's a product that you worked on from 1995 until the mid-2000s. Correct?

A. That's correct.

Q. And it's not a product that Ericsson sells today. Correct?

A. No, I don't think that RBS 2000 is sold anymore.

Q. Okay. And you haven't done work, other than your work related to this case, you haven't done work relating to the RBS 2000 product in years. Correct?

A. That is correct.

Q. In fact, until you started to prepare for your deposition in September of 2024, the most recent time you had looked at and you reviewed documents related to the RBS 2000 was more than 10 years ago. Correct?

A. That's correct.

Q. And the only reason you have recently looked at the RBS 2000 is because of this case. Correct?

A. That's correct.

Q. And were you here for opening statement?

A. Yes, I was.

Q. Okay. And you understand that Ericsson and T-Mobile are using the RBS 2000 to try to claim that the patents asserted by General Access in this case are invalid. You understand that. Right?

A. That I understand.

841

Q.   Okay.  And you I think you covered this with Mr. Stevens but I want to make it clear, you are not here to give us an opinion on whether or not the '383 or '477 Patents are invalid.  Correct?

A.   No, that's correct.

Q.   And you haven't studied the claims of those patents or compared them to the RBS 2000.  Correct?  At least when we took your deposition.  Right?

A.   No, I have not.

Q.   And, likewise, you are not here today to tell the jury whether or not Ericsson and T-Mobile infringe the General Access patents in this case.  You're not here to do that, either.  Correct?

A.   No, that's correct.

Q.   And you understand that those issues, the issues of infringement and validity, are going to be addressed by the experts like Dr. Madisetti and Dr. van der Weide.  Right?

A.   That's correct.

Q.   Okay.  Now, let's shift gears a little bit.  You're familiar with the concept of beamforming.  Correct?

A.   Yes.

Q.   And the RBS 2000 was not capable of beamforming under any definition of that -- of beamforming.  Correct?

A.   That's correct.

Q.   Okay.  And, therefore, the RBS 2000 did not do anything

842

that you would describe as uplink beamforming.  Correct?

A.    That's correct.

Q.    Okay.  Now, I want to shift to another topic which is modulation schemes.  You understand what a modulation scheme is in the context of the type of equipment we're talking about?

A.    Yes.

Q.    Okay.  And a modulation scheme is a way to transmit digital information to a physical channel or frequency.  Right?

A.    Yes.

Q.    Okay.  And the jury has heard about certain modulation schemes, QPSK and various QAM, Q-A-M, modulations.  You're familiar with those based on all your years at Ericsson.  Correct?

A.    Yes.

Q.    Those were not the modulation schemes used in the RBS 2000.  Correct?

A.    Not in this earlier version of the RBS 2000.

Q.    In the early version, the one that was sold before 2001, there was only one modulation scheme.  Correct?

A.    Yes.

Q.    And that one modulation scheme was GMSK.  Correct?

A.    That is correct.

Q.    And you talked about that maybe in later years after 2001

the RBS 2000 had new functionality implemented that resulted in more than one modulation scheme.  Correct?

A.   That's correct.

Q.   And that was when Ericsson implemented the 2G EDGE functionality into the RBS 2000.  Correct?

A.   Yes, that's correct.

Q.   And that did not happen, I think you told us, until sometime in 2003 and 2004 in the Ericsson equipment.  Correct?

A.   That's correct.

Q.   And that was part of the GSM standard, that EDGE functionality that wasn't implemented in your equipment until 2003 and 2004.  Is that correct?

A.   Yes.

Q.   And that's kind of an example I think of what you told Mr. Stevens, and I'll talk to you about more this in a minute, the functionality of the RBS 2000 changed over time as new features and software and updates were added.  Correct?

A.   Yes.

Q.   That was part of your job.  Right?

A.   Yes.

Q.   Okay.  And that included updating the software on the RBS 2000 that was part of what you did.  Correct?

A.   I was more troubleshooting the software that someone else implemented, but yes.

Q.   But your colleagues were working on software updates for

the installed RBS 2000 base stations that you sold to your customers.  Correct?

A.    Correct.

Q.    Okay.  And we heard earlier that updates to current Ericsson base stations happen, at least in the United States, on a quarterly basis.  Was that basically true back at this time when you were working on the RBS 2000?

A.    I don't think we updated as often as quarterly, but two times a year maybe.

Q.    Okay.  So a couple of times a year.  And there would -- the base stations would get updated and that would result to changing features and functions and how the system worked.  Correct?

A.    Yes, that could extend with new features and functionality, yes.

Q.    And that was happening during the entire time that you were working on the RBS 2000 from 1995 to the mid-2000s. Correct?

A.    Correct.

Q.    Now, you talked with Mr. Stevens about demodulation.  You remember that?

A.    Yes.

Q.    Okay.  And, first of all, I want to make sure everybody's on the same page here.  A demodulator is not the same thing as a receiver.  Correct?

845

A.   No, that's correct.

Q.   Right.  A demodulator is like a component, a part of the larger receiver.  Right?

A.   Yes.

Q.   Okay.  And so let's talk about the demodulator in the RBS 2000.

MR. HUGHES:  And, Mr. Svenson, if you could put up pre-admitted exhibit JX 43, page 41.  I thought we had a part of this.  There we go.

Q.   (BY MR. HUGHES)  So, Mr. Akesson, you are familiar with this diagram.  Correct?

A.   Yes, that's correct.

Q.   And this is a diagram -- it's a function block diagram that relates to the RBS 2000.  Correct?

A.   Correct.

Q.   All right.  And the function block is not a physical thing; it's something that can be realized by a combination of hardware and software.  Correct?

A.   This specific is hardware block.

Q.   Okay.  And the hardware block that I've got highlighted, that's the bDem or burst demodulator.  Is that right?

A.   That's right.

Q.   And that's the hardware block that did the demodulation in the RBS 2000.  Correct?

A.   That's correct.

Q.   And there was only one demodulator block in the RBS 2000 so at least -- RBS 2000, at least for the time frame that we're talking about prior to 2001.  Correct?

A.   Correct.

Q.   Okay.  And, in fact, the RBS 2000 during that time frame was only capable of receiving a signal from one mobile device at a time.  Correct?

A.   Yes.

Q.   Now, one last issue, Mr. Akesson.

        MR. HUGHES:  And, Mr. Svenson, if you could leave that on the screen, maybe just put up the first page actually of JX 43?

Q.   (BY MR. HUGHES)  You can't tell how the RBS 2000 works just by -- we'll get to this in a second.  You can't tell how the RBS 2000 works just by looking at the box that it comes in.  Right?

A.   You mean --

Q.   If you just -- let ask a better question.  The RBS 2000 is a base station and it looks like a box when it's out in a field.  Right?

A.   Yes.

Q.   And if you just -- if I just walked up to the box and looked at it, I wouldn't know how it worked.  Correct?

A.   That's correct.

Q.   All right.  And so you need to look at the things that

you looked at to give your testimony with Mr. Stevens like Ericsson technical documents and Ericsson source code in order to figure out the functionality of the RBS 2000 at any given time.  Correct?

A.    Yes.

Q.    Okay.  And the document that I've got in front of you on the screen, that's an Ericsson technical document.  Correct?

A.    That's correct.

Q.    And it's marked confidential.  Correct?

A.    Yes.

Q.    And it's an internal Ericsson document.  It's not a document that was provided to Ericsson customers who purchased an RBS 2000 base station.  Correct?

A.    No, this was not provided to customers.

Q.    Right.  And same thing for the source code you looked at. That also was not provided to customers who purchased an Ericsson base station.  Correct?

A.    No, it was not.

Q.    Yeah.  That's proprietary confidential Ericsson source code.  Right?

A.    Yes.

Q.    Okay.  Thank you, Mr. Akesson.

         MR. HUGHES:  I pass the witness, Your Honor.

         THE COURT:  All right.  Is there redirect, Mr. Stevens?

MR. STEVENS:  Yes, Your Honor.

THE COURT:  All right.  Proceed with redirect, please.

REDIRECT EXAMINATION

BY MR. STEVENS:

Q.   So you were asked some questions about beamforming and adaptive modulation.  Those didn't exist in the RBS 2000 in the '90s.  Is that fair?

A.   That is correct.

Q.   But it did set up a profile and store parameters for the user.  Is that right?

A.   That is --

MR. HUGHES:  Your Honor; leading.  I object to leading.

THE COURT:  Sustained as to leading.

Q.   (BY MR. STEVENS)  Again, if you could remind the jury, what would happen vis-a-vis profiles or parameters once the channel activation started?

A.   What happens with the profile?

Q.   Correct.  What is created?

A.   We create these memory buffers and we fill the different fields with certain parameters that represent the channel.

Q.   And is that the signal and channel in the uplink direction?

A.   Both in uplink and in downlink.

849

Q.   And in the uplink direction, are some of those parameters related to qualities of the signal?

A.   Yes, we have parameters, for instance, for RX coil and signal quality.

Q.   And were some related to the antenna?

A.   Yes, like diversity, and we have also signal level for each of these antennas.

Q.   And did all of that exist in the product that was in use in the United States in the 1990s?

A.   Yes, it did.

Q.   So one question about demodulators.  Counsel asked you is there one single demodulation block.  Do you remember that?

A.   Yes.

Q.   Now, there's been -- I know you haven't been allowed to be in the courtroom, but there's been some testimony this week about, well, is it --

        MR. HUGHES:  Your Honor, I object to the characterization of the prior testimony.  This witness hasn't been there to listen to it.  I can't possibly see a proper question coming here.

        THE COURT:  I'm going to let counsel frame their question.

    Now, it's not going to be so extensive that it effectively violates the rule, but you can give him some context and then you can address it on additional cross if you

choose to.

MR. HUGHES:  Thank you, Your Honor.

Q.  (BY MR. STEVENS)  So there's been some testimony this week that, well, isn't hardware sort of similar to software or virtualization of demodulators.  And so my question for you, sir --

THE COURT:  Just a minute.

MR. HUGHES:  Same objection.  This is the whole reason we have the Rule that excludes fact witnesses from watching the trial is to avoid precisely this kind of questioning.

THE COURT:  Mr. Hughes, I don't think that's detailed enough to violate the Rule, and with every fact witness who's not permitted in the courtroom, there is a small amount of latitude to give them some context for the question. I don't think this exceeds that so I'm going to allow it.

MR. HUGHES:  Thank you, Your Honor.

Q.  (BY MR. STEVENS)  And so if we apply that rubric just for a quick moment, and you had that A and B antennas, and when you fed that through the demodulator, was it fed through with a different context each time?

A.  It was the same configuration for the two antennas since it's from the same mobile station.

Q.  And was what was being fed through different each time?

A.  It's different signals in -- since it comes from -- from

851

different antennas.

Q.    And would those be -- those two signals one from antenna A and one from antenna B, would those be demodulated independently?

A.    Yes, they are independent demodulated.

Q.    And would it have alternated?  Did it say let me do the first one first and then let me do the second one second?

MR. HUGHES:  Your Honor, leading.

THE COURT:  Sustained.

Q.    (BY MR. STEVENS)  When it received those two, how did it demodulate those two independently?

A.    It demodulated one at a time, so to say.

Q.    And then only after demodulation -- when was it put back together?

A.    It's combined in a separate hardware block that is called burst combiner where you merge these two signals, you could say.

Q.    And that was the state of Ericsson's product back in the 1990s before these folks ever went to the Patent Office.  Is that right?

A.    Yes.

Q.    Thank you.

MR. STEVENS:  I pass the witness, Your Honor.

THE COURT:  All right.  Is there additional cross?

MR. HUGHES:  Very briefly, Your Honor.

852

THE COURT:  Proceed with additional cross.

RECROSS EXAMINATION

BY MR. HUGHES:

Q.  Mr. Akesson, just returning to where Mr. Stevens left off, regardless of whether the signal came from antenna A or antenna B, those signals were demodulated by the same hardware, the demodulation block.  Correct?

A.  That's correct.

Q.  Thank you.

MR. HUGHES:  Pass the witness.

THE COURT:  All right.  Any additional redirect?

MR. STEVENS:  No, Your Honor.

THE COURT:  Okay.  You may step down, Mr. Akesson.

THE WITNESS:  Thank you, Your Honor.

MR. STEVENS:  May Mr. Akesson be excused, Your Honor?

THE COURT:  Yes, the witness is excused.  He is free to stay; he is free to leave.

All right.  Defendants, call your next witness.

MR. HAYNES:  Your Honor, I think I've got the timing right this time.  Defendants would like to call Dr. Daniel Van der Weide.

THE COURT:  All right.  Dr. van der Weide, if you'll come forward and be sworn.

853

MR. HAYNES:  Your Honor, may we pass out binders?

THE COURT:  Yes, you may.

(Whereupon, the oath was administered by the Clerk.)

THE COURT:  Please come around, have a seat on the witness stand, sir.

Mr. Barnett, let's move those prior binders.

All right, counsel.  You may proceed with direct examination.

MR. HAYNES:  Thank you, Your Honor.

DANIEL VAN DER WEIDE, Ph.D.,

having been first duly sworn, testified under oath as follows:

DIRECT EXAMINATION

Q.   BY MR. HAYNES:   ?

Q.   Good afternoon, Dr. van der Weide.

A.   Good afternoon.

Q.   Can you just start by introducing yourself to the jury?

A.   My name is Daniel van der Weide.  I live in Madison, Wisconsin, with my wife and three adult children.

Q.   Dr. van der Weide, what do you do for a living?

A.   I'm a full professor of electrical and computer engineering at the University of Wisconsin in Madison.

Q.   And were you retained by the Defendants in this case to analyze the '383 and '477 Patents and form your own opinions related to the issues of infringement and validity?

A.   Yes.

Q.   Okay.  Before we get to those opinions, I'd like to just talk a little bit about your background and experience.  Is that all right?

A.   Sure.

Q.   Can you start just by walking us through your educational background?

A.   Yes.  It's kind of briefly summarized here.  I got a Bachelor's degree in electrical and computer engineering and a minor in Latin at the University of Iowa in 1987.

I then went full time to Motorola in Schaumburg, Illinois, for about a year before going to graduate school in electrical engineering at Stanford where I got a Ph.D. in 1993.

And I went back to work in the defense industry with -- I had been working for a while until I was recruited as a post-doctoral researcher in the laboratory of Nobel prize winner Klaus von Klitzing that was in solid state physics.

I worked there for two years.  That set me up for an academic career, and I worked at the University of Delaware for four years as an assistant and associate professor before being recruited to the University of Wisconsin in the fall of 1999 where I've been ever since.

Q.   Has your work as a professor, do you teach classes?

A.   I do.

Q.   Give us some examples of the classes you teach and how

they might relate to the things the jury's been hearing about this week.

A.   I teach basic undergraduate circuits, the kind of weed-out course that some people like and some people don't. I teach electromagnetic theory, antennas, high frequency circuits, communication circuits.  I'm teaching one of those right now, both theoretical as well as a laboratory courses.

Q.   Just at a broad level, how would you characterize your area of expertise?

A.   Well, given my background in physics, I tend to view things as kind of being all the same thing, and I like to apply high frequency concepts, measurement concepts, communication concepts to new areas like human health, for example.  I started companies that do tumor ablation using microwaves or wireless surgical navigation for breast cancer.

Q.   Now, I see you've got the Motorola logo at the bottom left of your slide there.  Can you tell us a little bit about your involvement with Motorola?

A.   Yeah.  I worked there, as I said, first as my first full-time job, and I was involved in the international cellular subscriber division.  So I traveled to Hong Kong and Thailand and high density urban environments to test the original mobile phones for coverage and battery life and things like that in complex urban environments.

Q.   All right.  And then in the upper right, I see a

reference to IEEE. We've heard a little bit about that in this case. Can you just tell us what that is and how your experience relates to that?

A.    Sure. The IEEE is the largest professional organization in the world, and about every year there is 1/10 of one percent of its population is available to be elevated to its highest grade, which is the Fellow grade. I was elevated a few years ago.

But I'm also involved in a standards working group having to do with testing antennas and error rates between them for mobile phones.

Q.    And then the bottom right, I see a number of company names. Can you just give us a brief overview of what you did with these companies?

A.    Sure. So Optametra was a company that a Stanford Lab mate and I started back in 2007 when we recognized that the same kinds of modulation techniques that were being explored in the wireless area were also going to be used to make long-haul optical fiber communications a lot more efficient as well.

So we developed the hardware and software to do analysis of coherent signaling in optical fiber, and that company competed successfully with the largest test and measurement company in the world. And we were eventually acquired by Tektronix, which is a well known test and measurement company.

Q.    What about the second company you have listed there, Antennex?

A.    Antennex is a company that I started with a number of other people from the Technical University of Eindhoven in the Netherlands.  Just because I have a Dutch last name doesn't mean that I speak Dutch, but they made me an honorary member. And Antennex has some very high end antenna measurement techniques that are rapidly gaining traction in the marketplace these days.

I'm a founder and advisor, but I'm not day-to-day with the company at all.

Q.    All right.  What about ThroughPuter?  What's that?

A.    ThroughPuter is a company that has intellectual property, primarily for multicore processors and data centers.

I also happen to be the inaugural director of the Wisconsin Chip Center.  So I have some familiarity with integrated circuits and multicore processing, and ThroughPuter licenses its technology.

THE COURT:  Dr. van der Weide could you slow down just a little bit?

THE WITNESS:  Yes, yes, Your Honor.

THE COURT:  It would be helpful if you would. All right.  Let's continue.

MR. HAYNES:  Thank you, Your Honor.

Q.    (BY MR. HAYNES)  Now, the companies you listed there,

including your time at Motorola, do any of those companies also work with Ericsson or T-Mobile?

A.    Antennex, even before I signed on with the company, they had some consulting work that they do with Ericsson.  I'm not sure where that stands these days.

Q.    Okay.  Is any of the work that Antennex did with Ericsson back in the day, is that something you have involvement in or that might somehow influence your testimony?

A.    No.

Q.    All right.  All right.  I see here on the next slide, Dr. van der Weide we've got a lot of patents and a lot of publications.  Can you just tell us a little bit about the patents on which you're a named inventor?

A.    Sure.  I have over 80 applications outstanding and over 60 issued patents in the U.S. and abroad.  And they have to do with the same kinds of things I do my research in:  high frequency measurements, applications of microwave energy to human health, and new ways of amplifying very high frequency waves.

Q.    All right.  What about the publications?  What at a high level do your publications relate to?

A.    Yeah.  I have well over a hundred peer-reviewed publications in -- in reputable journals, and many of those touch on the same topics that I've already covered.

Q.    All right.

MR. HAYNES: Your Honor, at this point I would request that Dr. van der Weide be qualified as an expert in the field of telecommunications, electrical engineering, and the subject matter of the patents-in-suit.

THE COURT: Is there objection?

MR. HUGHES: No objection, Your Honor.

THE COURT: All right. Without objection then, this witness will be recognized by the Court as an expert in those designated fields. Let's continue.

MR. HAYNES: Thank you, Your Honor.

Q.   Dr. van der Weide I want to get to your opinions. But before I do that, I want to understand some of the rules you followed when you were forming those opinions. Is that all right?

A.   Okay.

Q.   Now, you understand that certain of the opinions that you provide today must be provided from the perspective of what is called the person of ordinary skill in the art. Can you just explain to us what you understand that person to be?

A.   Yeah. A person of ordinary skill in the art, sometimes abbreviated POSITA, is a fictitious individual who is presumed to be aware of all the prior art that existed at the time of the invention, and this person has ordinary skill in the art.

They're not some sort of super genius. They have an ordinary level of education and work experience that's been

defined by the Court, as I understand it, and I have adopted that perspective in order to understand the patents-in-suit.

Q.   I think you said that the Court has defined that.  Did you apply the Court's definition of a person of ordinary skill in the art in forming your opinions?

A.   Yes.

Q.   All right.  What about you yourself, Dr. van der Weide?  If we go back in time to 2001 when these patents were filed, were you a person of ordinary skill in the art?

A.   I was that and more.

Q.   Do you understand that the Court has also construed certain words in the claims of these patents?  He's given them a meaning.  Do you understand that?

A.   I do.

Q.   In forming your opinions, did you apply the Court's constructions of the terms in the claims of the patent?

A.   Yes.

Q.   Okay.  Now, you understand that not all of the words in the claims were construed by the Court.  Is that right?

A.   That's my understanding.

Q.   Okay.  What definition did you apply if the Court had not provided a specific meaning?

A.   I was instructed to apply the plain and ordinary meaning of a word as it would have had meaning to that POSITA, that one of ordinary skill in the art at the time of the

861

inventions.

Q.   All right.  Okay.  So let's start talking a little bit about your opinions.  Let's begin with the '383 Patent.

Can you just give us a high level summary of your -- what opinions you formed with respect to infringement and validity.

A.   Yes.  I analyzed the single asserted claim of the '383 Patent.  That's claim 16.  And I found that the accused products from Ericsson did not infringe.

Q.   Okay.  What about validity?  Did you form any opinions with respect to validity of the '383 Patent?

A.   I also performed an analysis of that same claim language under General Access' broader view of the claim language asserted for infringement, and under that interpretation I found that the -- every element of claim 16 was present in the prior art RBS 2000 system that we just heard about.

Q.   Okay.  You mentioned General Access' view.  You've been in the courtroom through the duration of the trial?

A.   Yes.

Q.   Okay.  You picked up that there's a disagreement as to the plain and ordinary meaning of certain words in these claims.

A.   Yes.

Q.   Okay.  For purposes of your validity analysis, who's interpretation were you using to determine whether or not the claims were valid or invalid?

A.    I was using the interpretation as I understood Dr. Madisetti describing it.

Q.    Okay.  For purposes of determining -- did you agree with some of those interpretations from Dr. Madisetti that you applied when you did your validity analysis?

A.    I did not agree with them, but I adopted them for the purposes of my validity analysis.

Q.    Okay.  Applying what you believe to be the correct plain and ordinary meaning of the claims, did you use that with respect to your infringement analysis?

A.    Yes.

Q.    Okay.  So under your view of what the claims mean, the plain and ordinary meaning of the claims together with the Court's constructions, what did you determine with respect to infringement?

A.    That there's no infringement.

Q.    Okay.  But if we stretch the claims and give it that broader view from Dr. Madisetti, what opinion did you form with respect to validity?

A.    Well, then using that interpretation of the claims, which is broader, then I found that every element of asserted claim 16 in the '383 was present in the prior art RBS 2000 system.

Q.    Okay.  Let's talk about the '477.  Did you form opinions on infringement for the '477?

A.    I did.

Q.   Okay.  Did you apply your understanding of the plain and ordinary meaning with respect to your infringement analysis for the '477?

A.   Yes.

Q.   And what conclusion did you reach?

A.   I concluded that there is no infringement of the accused products of asserted claims 1, 3, and 6 of the '477 Patent.

Q.   Okay.

THE COURT:  Let me stop for a minute.

Mr. Haynes, if you could slow down.  You're speaking awfully fast.

And, Dr. van der Weide, if you could raise your volume a little bit.  That way I think the jury would hear and comprehend what you both have to say, and that's our goal here.  All right.

MR. HAYNES:  I appreciate the reminder, Your Honor.

THE COURT:  Let's go forward.

Q.   (BY MR. HAYNES)  Okay.  For validity of the '477 Patent, did you again apply that broader interpretation that Dr. Madisetti and General Access have been advocating?

A.   Yes.

Q.   And under that broader view of the claims, what did you conclude with respect to validity?

A.   Well, like I did with the '383 Patent, when I applied Dr. Madisetti's broader interpretation of the claim language that

864

he used for purposes of infringement, I found that every element of every asserted claim of the '477 Patent was present in the prior art RBS 2000 system.

Q.   So let me see if I -- with respect to infringement, did I label this right?  Your conclusion under the plain and ordinary meaning of the claims is that they are not infringed for both the '383 and the '477?

A.   That's correct.

Q.   Okay.  Then if you take a broader view as General Access and Dr. Madisetti has that the claims are interpreted under the plain meaning that we heard from Dr. Madisetti, what is -- did you decide that those patents would be invalid under that broader view?

A.   Yes.

Q.   Okay.  Now, we also heard in the opening, which you were here for, something about the written description requirement. Do you remember that?

A.   I do.

Q.   We're going to talk about that later.  But what was your opinion as to whether the patents were valid or invalid under the written description and enablement requirement?

A.   Yes.  So I also performed an analysis of the asserted claims of the '383 and '477 Patent under a different test, which is was there sufficient written description to set forth the invention and show that the inventors had possession of

it, and -- and also was it enabled, in other words, was there enough there to teach one of ordinary skill in the art how to practice the invention without undue experimentation.  And I found that those tests showed me that neither the '383 Patent claim 16 nor the '477 Patent claims 1, 3, and 6 were valid under those tests.

Q.   Okay.  So with respect to written description and enablement, do I need to stretch the claims for them to be invalid under that theory, or did you apply plain and ordinary meaning as you understand it?

A.   The latter, just the plain and ordinary meaning.

Q.   Okay.  All right.  We're going to get into the details of those opinions, but first I'd like to talk a little bit at a very high level at this point just about the sources of the information that you considered in forming those opinions.

A.   Well, I'm showing on the screen here a representation of the different types of documents and conversations that I had in doing my research.

I included, of course, reading the '383 and '477 Patents, as well as their prosecution histories; source code from both the accused products as well as from the RBS 2000; many, many technical documents from both T-Mobile and Ericsson; also many relevant standards that applied to the GSM system, the RBS 2000 that we heard about, and others; as well as discussions to confirm my understanding with both T-Mobile engineers and

866

01:37   Ericsson engineers.

And, of course, I read Dr. Madisetti's reports and his deposition transcripts.

Q.    Okay.  Are you being compensated at your normal hourly rate for the work you've done in this case?

A.    Yes, I am.

Q.    And what's that rate?

A.    $700 an hour.

Q.    Is your compensation in this case in any way dependent on the opinions that you originally formed or the ultimate outcome of this case?

A.    No.

01:38   Q.    Okay.  What I'd like to do now is just walk through a little bit of the background, some of the concepts that we've heard a little bit about so far and see if we can get a better understanding of what those are.  Is that all right?

A.    Sure.

Q.    All right.  Let's start sort of the basics.  Can you show me what I'm seeing on the screen now?

A.    Well, I found pictures of some dial-up modems, the kind

01:38   that I used back in the '90s, and some of us may remember these kinds of things attached to our computers for AOL and things like that.  And so I'm showing two modems with a wire connecting them.

Q.    Okay.  Now, this word 'modem', everybody's been throwing

867

it around a lot. Where did that word come from?

A.    It's just a contraction of modulator/demodulator, so people just call it modem.

Q.    And this blue wire that you have connecting the two modems in sort of the simple example, what is that wire doing?

A.    That wire is the physical channel--we've heard that term a lot--that carries the modulated waves between the two modems.

Q.    Okay. We've heard a lot about fixed wireless access networks. I think we're starting to get an understanding, but can you just see if you can illuminate us a little more as to what a fixed wireless access system is?

A.    Sure. It might just help to start with what is a fixed wired network, and that would be a good example of a modem at your internet service provider and a modem at your home with a wire or coaxial cable like cable TV between them. Those are fixed; you're not going to be moving them around very much.

And, likewise, a fixed wireless access system is just replacing that coaxial cable or phone line or fiberoptic with waves that propagate through free space between two antennas like I'm showing here.

Q.    Okay. I see you've got something up here. What's that?

A.    That's the fixed antenna that is mounted on the subscriber's building, for example.

Q.    Okay. And in a fixed wireless access network, is that

antenna going to be moving around a lot?

A.    No.

Q.    Okay.  We talked about modems.  Do we see one of those inside the house down here?

A.    That is one.

Q.    Okay.  Would there also be a modem up here in the tower?

A.    Yes.

Q.    All right.  Now, I want to talk a little bit about a mobile access -- mobile wireless access network and see if you can help us understand what's different about a mobile wireless access versus a fixed wireless access network.

So can you just start with the concept?  What's a mobile wireless access network?

A.    Well, mobile wireless access network has mobility.  Mobility is the key distinction.  It has to account for the very real possibility that these mobile phones or transceivers are moving around, sometimes at a very high rates of speed, you know, going down the highway.  I've even had coverage while flying in an airplane, which is remarkable.  So.

There are a lot of challenges, as we've heard something about in -- from previous testimony, in maintaining that link while the user equipment is moving around like it is.

Q.    Okay.  Now we heard some testimony earlier today that, you know, maybe sometimes those mobile phones aren't moving.  Does that transform a mobile wireless network into a fixed

869

wireless network somehow?

A.    No.

Q.    How come?

A.    Because at least when you might have your phone in your house, you might be turning around a little bit, that's going to change the channel conditions that we have been talking about.  But also nobody expects to have to switch over to a different network when they get in their car and start driving around.  In other words, the mobile wireless access network has to be prepared to handle the maximum mobility that it's specified to handle.

Q.    Okay.  In a mobile wireless access system, is it designed to handle the phones moving around or for the phones to be stationary?

A.    Well, it can handle both, actually.

Q.    Okay.  And are there different design criteria that are required if you're going to handle both the phone sitting still and moving around?

A.    Oh, yes.

Q.    Can you give me some examples?

A.    Well, we heard some testimony about handovers, for example, but also just the fact that as the phones are moving around, there are rapidly changing channel conditions such as fading.  I'll give you a quick example of fading.

Many of us have been listening to FM radio stations in

our car and maybe you're driving through Dallas or some, you know, big crowded city, and you pull up to a stop sign and the station fades out and then you inch ahead and then it comes back in.

If you've experienced that at all, that's due to interference between, let's say, a direct wave and a reflected wave that cancel each other out.  And that cancels out the signal of the radio station, and that's called fading.  It's really bad for mobile systems because you lose the signal.

There are ways around that, but that rapidly-changing fading condition, that interference from direct and reflected waves, that multipath, is one of the biggest challenges in mobile environments.  That really isn't an issue in fixed environments because the channel isn't changing that rapidly.

Q.   Also heard a whole lot about demodulation.  I think we're starting to get there, but can you just remind us, what is demodulation?

A.   Yeah.  I like to use that old dial-up wireless modem that maybe you remember hearing.  When you dial it up, your heard this kind of high-pitched chirping sound.  That sound is the sound of modulated data.  So those 1s and 0s that are how your computer communicates and processes data need to be converted as what we've heard before, two waves, so they can be sent through a channel, which is a wire or, in some cases, they're very high frequency waves sent through antenna into free

space.

But in any case that modulation needs to be paired with demodulation. In other words, we need to take the waves and put them back into bits. So demodulation is that process of converting the waves back into bits.

Q.   Okay. The next concept I'd like to discuss is equalization.

MR. HAYNES:  But with the Court's permission, could Dr. van der Weide approach the easel to answer some questions about demodulation?

THE COURT:  I'm not going to have him walk all the way over there. I will allow you to move the easel up to this railing, and he can step down, if necessary, for a brief period of time.

MR. HAYNES:  Thank you, Your Honor.

THE COURT:  Okay?

MR. HAYNES:  May Dr. van der Weide come down?

THE COURT:  No, sir. This is the kind of thing you should have asked me about before the jury's in the middle of the room.

All right. That's fine.

And, Dr. van der Weide if you want to step down there and stand on this side of the easel, Mr. Haynes can stand on the other side and he can ask you a few questions.

MR. HAYNES:  Thank you, Your Honor.

Shawn M. McRoberts, RMR, CRR
Federal Official Court Reporter

872

THE WITNESS:  Thank you.

All right.  I'll try to speak up a little bit, but --

Q.   (BY MR. HAYNES)  Let me ask the questions first, Dr. van der Weide.

A.   I'm sorry.

Q.   So we've heard about equalization.  Can you just explain to the jury, give us an example of what equalization is and how it works?

THE COURT:  And, Mr. Hughes, if you need to move so you can see the chart, you're free to do that.

MR. HUGHES:  Thank you, Your Honor.  I can see from where I am.  I appreciate it, though.

THE COURT:  All right.

THE WITNESS:  All right.  So equalization can be explained in the context of this multipath concept that I just talked about previously.

Let's just take a cell tower right here.  I'm going to draw that cell tower.  I'm going to put just one antenna on there like that.  And we have a mobile device down here, just going to make a rectangle.  And there might have been -- I'll use green for a tree.  So I have a tree down here.  And then I might have a building in the background.  Let's say a skyscraper like that.  And I have a wave traveling between the base station and the phone.

Q.   (BY MR. HAYNES)  Let me interrupt you there for a second.

A.    Sure.

Q.    That wave traveling between the two, is that traveling over some sort of channel?

A.    That is.  That's the channel of free space here.  That's what we call it.

So if I have a little antenna inside this phone, then I'm going to have a wave that's traveling between the base station antenna and the phone.  It's kind of a direct line of sight.

In the most ideal situation, there wouldn't be anything else around and it would be a very simple equalization problem because the wave would not experience this multipath interference and fading like the FM radio.

However, real-world scenarios are a lot different.  We have -- this wave is actually not a laser beam; it's spreading out over a large distance like when you throw a pebble into a pool, for example.  Right?  That's not a focused wave; it's spreading out.

So, likewise, even if this antenna has a little bit of focus, it's still going to spread some of that beam and it's going to hit some object because of where your phone is and it's going to bounce off and then arrive at your phone.  Well, that can create fade.

Q.    Let me interrupt you one more time just so we have a clear record of what you've drawn.  On the right, you've got an antenna.  Is there a base station on the upper right?

874

A.    Base station on the upper right.

Q.    And then on the left hand of the easel, you've drawn a little square, that's your cellular phone?

A.    Your cellular phone.

Q.    I've got a green tree at the bottom and then a skyscraper at the top.  I've got two signals, one going straight from the phone to the antenna and another one that's bouncing off the building.  Did I describe that right?

A.    That's right.

Q.    Okay.

A.    I got to give you one more.

Q.    Okay.

            THE COURT:  Wait a minute.

            MR. HAYNES:  So can you explain, sir --

            THE COURT:  Just -- just a minute.

            MR. HAYNES:  Apologies, Your Honor.

            THE COURT:  We are going to do this with questions and answers, and we're not going to have a narrative presentation by a college professor who's used to giving a lecture.  We're going to do it with discrete questions and discrete answers, and we're going to do it one at a time so we don't talk over each other.

      So ask your next question, Mr. Haynes.

Q.    (BY MR. HAYNES)  Okay.  So what happens when the waves that are coming out or bouncing off the buildings and the

Shawn M. McRoberts, RMR, CRR
Federal Official Court Reporter

875

trees?

A.    Well, this channel, the net channel, the addition of everything, and if I took yet another wave and went through, bounced off the street through this tree, that would absorb some of the wave, too.  So we have a complicated multipath situation.  We add these all up.  When they get added up, sometimes that creates channel distortion.

Q.    Okay.  So what does the base station do to try to accommodate or fix that channel distortion?

A.    So I like to use that concept of sound we heard Mr. Akesson talk about, two ears, for example.  I think that's very useful.  We hear about dial-up modem and that sound that modulated data makes.

So if we think about sound, maybe some of us have had a graphic equalizer on our stereos or something that lets us boost the treble or bass.  That's called an equalizer.  And the idea is really similar.

In the radio world, we're trying to make the sound as uniform as possible so that we hear every note.  And so the computer systems are doing exactly the same thing, only much faster and in a much more sophisticated way.  And there's a particular technique that they use for making this happen that I could explain in a few seconds.

Q.    So that technique, what's it called?

A.    That's called using -- it's equalization using a

demodulation reference signal.

Q.   Okay.  I don't want to get too far into the demodulation reference signal, but in the context of equalization how do you go about fixing these different waves that are coming in at different times and get them all jumbled together?

A.   Well, I have to refer to the demodulation reference signal because that's like in a song book, you know, the base station will give the user equipment song 60, and the user equipment sings that song.  And the base station knows what song it expects, and then it hears distorted data, and it tries to make that data sound like the song.

So in a way all these communications are just like playing chords.  Okay?  And if the chords don't sound quite right, you'll play equalization and then you can hear all the chords correctly.  That's what's going on here.

Q.   Have you heard of the term 'equalization weight'?

A.   Equalization weights are just --

Q.   You've heard that term, sir?

A.   I have heard it.

Q.   Okay.  Can you explain to us how equalization weights fit into the process of equalization?

A.   Yeah.  Equalization weights are just the settings on the equalizer, okay, to boost the treble or lower the bass or something like that.  That's the effective way in which weights are applied.  So they're just numbers.

THE COURT:  Can he can return to the witness stand?

Move the chart back.  Let's continue with direct examination.

Q.   (BY MR. HAYNES)  All right.  I think we've got the background concepts covered.  Let's talk about the '383 Patent a little bit.  All right?

A.   Okay.

Q.   Start with the easy questions.  When was it filed?

A.   April 20th, 2001.

Q.   And is it still in force?

A.   No.  It expired in March of 2023.

Q.   Okay.  We're going to get into the details, but can you just summarize for us at a high level what the '383 Patent is directed to?

A.   It's -- the title says, "Apparatus and associated method for operating upon data signals received at a receiving station of a fixed wireless access communication system."  But the basic idea is to speed up communication in the base station by using two hardware modems and alternating between them.

Q.   And you mentioned hardware modems.  Does the patent give us any examples of the types of modems that could be used?

A.   Yes.  The patent at column 8, lines 53 through 64, and I've highlighted a couple of citations to the specification, refers to an RF modem shelf and what that modem shelf -- that

it contains RF modems capable of modulating and demodulating RF signals.

Q.   Then you've got a picture on the right.  I think we saw this in Mr. Akesson's testimony.  What are we seeing?

A.   This is a picture of an RBS 2000, and I'm circling the modems in the modem shelf here.

Q.   All right.  Now, I want to talk about what the '383 Patent describes as an example of how it improved over the prior art.  Okay?

A.   Okay.

Q.   And I'm using figure 3 of the patent as that example.  All right?

A.   Okay.

Q.   So see if we -- first thing that happens is I've got a signal from that first subscriber, it goes around and lands at the modem.  Can you describe what's happening there?

A.   Yeah.  This is a communication, data signal, from subscriber 1, which is represented as a house with an antenna on it.  And it's sending an uplink signal to a base station.  It's being received by the base station, and that signal is then being routed to a first demodulator, which in the patent is described as modem B.

Q.   That went pretty fast.  Let's just look at that one more time.

     All right.  So that signal comes in.  It gets to modem B.

What does the patent describe happens next?

A.   Well, it is demodulated, and then the result's provided to the RF modem control CPU like this.

Q.   Okay.  And that RF modem control CPU, is that the box labeled 316?

A.   That's right.

Q.   Okay.  What happens in that RF modem control CPU?

A.   Well, certain parameters are determined and stored in element 318.

Q.   Okay.  So I determine parameters in box 316.  Is that right?

A.   That's right.

Q.   And once I determine those parameters, I store them in 318?

A.   Right.

Q.   Okay.  Now, you've highlighted something called subweight 1.  What is that?

A.   Well, that's short for subscriber 1 equalization weights.  That's what I just explained previously about equalization.

Q.   Okay.  So now I see we sent a second signal from the second subscriber in purple and that goes to modem A.  Can you explain to us what's happening there?

A.   That's a nearly identical process to the first one, but subscriber 2 may be a different distance away, maybe it has a tree in their yard or something like that, so the channel

880

conditions are in general going to be different.  And the weights associated with subscriber 2's equalization of that channel are likely to be different as well.

Q.   Okay.  What happens while that first modem A is processing that second signal from the second demodulator?

A.   Well, as I illustrated, what happens is this RF modem control CPU of the patent retrieves the subscriber weights from subscriber 1, it goes back to the library, looks those up, and provides those to modem B in an effort to speed up, prime that modem for the next communication.

Q.   Okay.  So once modem A is done demodulating and it sends the signal down to RF modem control, then what happens next?

A.   Well, then the same thing happens with the signal from subscriber 2.  It also gets processed by RF modem control CPU and stored in its own location called subscriber weight 2.

Q.   Okay.  So I see modem B at the top, you've got a yellow box labeled W.  What are you illustrating with that?

A.   That is where the weights that were retrieved are provided to facilitate communication from subscriber 1.

Q.   Okay.  So now I get another burst from subscriber 1. What's happening now?

A.   Well, now this modem B is ready to go, and according to the patent, this scheme speeds up the system.

Q.   All right.  So what does the patent tell us about why we would want to, I think you called it, prime modem B with those

stored parameters while modem A was demodulating?

A.   Well, I have a citation to the patent specification to explain that at some point.

Q.   We'll get to that in a second, but just general level why am I priming the pump while the other modem is working?

A.   I think it makes a lot of sense.  You can imagine that while one modem is actively involved in demodulating, the other one can be loaded with these corresponding subscriber weights so it doesn't have to do as much processing, it's ready to go, and the overall system can be speeded up during that down time.

Q.   Okay.

        MR. HAYNES:  Mr. Carrillo, if you can bring up JX 2 at column 12, line 1 through 11.

Q.   (BY MR. HAYNES)  Okay.  And can you just explain to us what we're seeing in this second sentence where it says, By utilizing at least two separate modems, alternating ones of the modems are utilized to demodulate successive bursts of data?

A.   This is how the patent is describing what I attempted to summarize previously--that by using two separate modems, it's possible to speed things up by alternating between the two because we're alternatingly using one or the other of the modems to demodulate successive bursts of data.

Q.   Okay.  Let's go to the next sentence.  It says, "During a

882

time period in which a demodulator is not being utilized to operate upon a data burst, values associated with another channel upon which a subsequent data burst is expected to be transmitted is applied to the unused modem."

What does the patent tell us as to why it's doing that?

A.    This is just the process of recalling those subscriber weights that I illustrated and feeding them back into the modem that is not currently occupied with demodulating a burst.

And this, again, speeds things up because you're -- as it says in the following sentence, the modem is primed to operate upon the burst of the uplink data signal.  So it's priming the modem to be able to operate more quickly.

MR. HAYNES:  If we could go back to the slides, please.

Q.    (BY MR. HAYNES)  Okay.  I'm going to run an animation and ask if you can just narrate to us what we're seeing with the house on the top subscriber 1 sending yellow boxes and the house on the bottom sending purple boxes.

A.    Well, this is just the ongoing process as the patent describes in one embodiment of how subscriber 1 in yellow or subscriber 2 in purple or pink upload or uplink their data signals to a base station, and then those communications that data signal is alternately applied to either modem B for the yellow subscriber 1 or modem A the purple for subscriber 2.

Q.    Did you ever hear that process of alternately applying a signal to first one modem and then another modem referred to as ping-ponging?

A.    I have.

Q.    Is that something a person of ordinary skill in the art would have understood back in 2001?

A.    Well, indeed that was a very well-known way of multiplexing or combining two slower circuits to speed up the net result.  I applied that in some design of some measurement equipment as well.  So it was a well-known technique.

Q.    Okay.  We've been talking about an example embodiment of the patent.  But are the things we've been talking about, this alternately applied and two demodulators, are those things in the claim as well?

A.    In asserted claim 16, that language is present.

Q.    All right.  Let's look at asserted claim 16.  Can you just -- we've got some highlighted language.  Can you show us where the claim 16, the metes and bounds of the invention, recite this concept of alternate applying that we saw with your example?

A.    Well, I highlighted the general language right here, and specifically it says, "Wherein the first and second successive data signals and any subsequent data signals are alternately applied to the first and second demodulators."  That's very clear.

884

Q.   Okay.  Just so we're clear, what does that claim language say is alternately applied to the first and second demodulators?

A.   The first and second successive data signals and any subsequent data signals.

Q.   Okay.  And where is that language about any subsequent data signals?

A.   Right here.  I'll just go ahead underline that, any subsequent data signals.

Q.   Now, this portion that you've underlined here and that's in yellow, was that limitation present in the patent application when it was filed?

A.   No.

MR. HUGHES:  Your Honor, may we approach?

THE COURT:  Approach the bench.

(The following was had outside the hearing of the jury.)

MR. HAYNES:  I'm going to do exactly what you told me.  Was this in the original application?  And then is the part of the back and forth at the Patent Office.  That's it.

THE COURT:  We're not getting into the prosecution history any deeper than that.

MR. HUGHES:  Just so I understand what's going to happen, you're not going to show the prosecution history.

MR. HAYNES:  Nope.

MR. HUGHES:  You're not going to show a red-lined claim.  We're not going to talk about prior --

MR. HAYNES:  None of that.

MR. HUGHES:  Was this part of a --

MR. HAYNES:  I literally just told you the question.

MR. HUGHES:  Okay.

MR. HAYNES:  And that's it.

MR. HUGHES:  Thanks, Mr. Haynes.

(The following was had in the presence and hearing of the jury.)

Q.   (BY MR. HAYNES)  Okay.  Let me ask --

THE COURT:  Just a minute, Mr. Haynes.

MR. HAYNES:  Apologies.

THE COURT:  Let Mr. Hughes have a seat.  I'll tell you when to go, it's time.

Please proceed.

MR. HAYNES:  Thank you, Your Honor.

Q.   Dr. van der Weide, the language that's highlighted here, was that in the patent application when it was filed back in 2001?

A.   No.

Q.   Is that limitation that we're looking at something that was added as part of the back-and-forth between the applicant and the Patent Office?

A.   It was an amendment.

Q.   Okay.  All right.  So this limitation that we've highlighted here, and I'm going to get rid of some of the -- well, I'm going to leave the underlining on.  Is that limitation satisfied in T-Mobile's accused base stations?

A.   No.

Q.   So have I adequately described your opinion or at least one reason why these claims don't infringe?

A.   That's an adequate summary.

Q.   Okay.  So are signals in T-Mobile's base stations alternately applied to the first and second demodulator?

A.   No.

Q.   Okay.  We've seen this block diagram several times, but can you just remind us one more time what we're looking at?

A.   This is a block diagram of the Ericsson Eagle Owl.

Q.   Okay.  And you've labeled on the left 128 Phoenix 5 DSPs.  Do you see that?

A.   Yes.

Q.   Are those 128 processors involved in some way with demodulation?

A.   They can be.

Q.   And then on the right, you've got 80 hardware accelerators.  Are those 80 hardware accelerator processors involved in some way with the process of demodulation?

A.   Yes.

Q.   Now, you've said they're involved in the process of

887

Q.    demodulation, but are any of those chips demodulators?

A.    No.

Q.    Why not?

A.    Well, going back to the start of my testimony, the foundational reason is I was charged with analyzing the asserted claims as one of ordinary skill in the art at the time of the inventions.  So I analyzed these claims from that perspective.  And according to that analysis, these general purpose processors do not qualify as the demodulators of the asserted claim.

Q.    Okay.  Is any one of these single DSPs or accelerators taking a radio wave signal and extracting the user data from it?

A.    Not on its own.

Q.    Okay.  We talked about the demodulation process is a big math problem.  Can you explain to us what we're looking on the screen and why I'm looking at this messy chalk board?

A.    Well, I'll be the first to admit I'm just using this as an illustration of how complicated the process of demodulation is.  This is not representative of the math involved in demodulation, but there is certainly a lot of math here.

And the way to solve the problem of demodulation in modern systems like the Ericsson system is to break that problem up into smaller pieces, little math problems that can be distributed to available resources in a pool of resources.

Q.   Okay.  So in the T-Mobile system, when it's doing the complicated math problem of demodulation, where would it draw -- what would happen to just one little bit of the overall equation, one tiny little problem?

A.   Well, there's software that provides that little piece of a problem to an available DSP, for example, much like, hey, I have work, who's available to do the work.  And that's the way these modern distributed parallel processing systems work.

Q.   Okay.  Let's see if we can see what that looks like using six different users that are communicating with a base station.  Okay?

A.   Okay.

Q.   All right.  So on this slide we see sort of some of those -- well, what are we seeing on this slide?

A.   Well, I'm highlighting a sample of the entirety of the 128 DSP cores that exist on the Eagle Owl.  I couldn't draw them all so I put these dots or ellipses between these columns of DSP cores to illustrate there's a whole bunch more than what I'm showing.

But then I have six different users whose uplink data signals I've color-coded, and I just want to illustrate graphically how this process operates in the Ericsson system.

Q.   Okay.  Now we've added -- let's see.  We've got sub 1 through sub 6 in different colors.  What are you illustrating there?

A.   Well, I've color-coded each of the uplink data signals for each of these six subscribers.

Q.   All right.  So those uplink data signals now move down below the pink blocks labeled Humungus and Obelix.  What's happening there?

A.   Well, as we heard previously from Mr. Faxer's testimony, the Humungus and the Obelix are both special purpose processors that do one thing really well, in this case they're fast fourier transforms if you want to get technical about them,  but those are processing these signals even before the system knows exactly which signal belongs to which subscriber.

     And so that's kind of a general processing that happens before then the jobs get split out into the little math problems that I want to talk about.

Q.   Okay.  All right.  I call this a confetti slide.  I had the signals, and now I've got a bunch of little tiny blocks.  What's being illustrated there?

A.   Well, those are portions -- those are the math problems themselves that I've color-coded according to the individual users.  So as you can see, these are uniformly distributed now to the available resources, and that maximizes the throughput of this system.

Q.   All right.  So when user signals come in, they go into the hardware accelerators and then are spread out across all of these different processors.  How does -- how do you

890

actually end up with a demodulated signal at the end of the day?

A.   Well, that's the magic, if you will, of this multicore processing/parallel processing architecture, that these -- there are caches and other things that keep track of where these math problems are being performed, and then the results are reassembled at the output.

Q.   Okay.  So, see, we've got some little green boxes that are spread around.  Those correspond to the green user's signal before they're broken up into the math problems?

A.   That's right.

Q.   Okay.  When the next signal comes in from that user, are those little green boxes going to go to the same processors or are they going to go somewhere else?

A.   Not in general.  They go to the available resources in the pool of resources.  They're not specifically directed to a dedicated DSP core.

Q.   Okay.  Is there anything in this process of breaking it up into math problems and spreading it out to processors based on availability of the processors?  Is there any concept that you saw in the source code or Ericsson documents that is alternately applying anything?

A.   No.

Q.   Now, we've seen this one before.  Can you just explain to us what you're showing in this illustration?

Shawn M. McRoberts, RMR, CRR
Federal Official Court Reporter

A.    Yeah.  I'm showing that these users are providing their uplink signals simultaneously, and they are being processed by a couple of hardware accelerators in that green bar down below, and then their individual demodulation jobs are being broken up and distributed to available resources in this pool of resources.

Q.    Okay.  Applying the framework of a person of ordinary skill in the art back in 2001, is any of the red boxes that illustrate those DSP processors, are any of those demodulators as a person of ordinary skill in the art would understand?

A.    No.  They're just DSP cores.

Q.    All right.  What about the hardware accelerators?  Are any of those hardware accelerators demodulators as a person of ordinary skill in the art would have understood it?

A.    Not in the language of the patent claims.

Q.    Okay.  Can you explain to me what you're showing here?  I see we've got an example from the patent and the claim language on the left and the illustration of T-Mobile's system on the right.

So just remind us, in the '383 Patent, what does the claim language at the bottom require?

A.    The claim language from claim 16 says, first of all, there's a first demodulator and a second demodulator.  I've color-coded those.  And without reading the entirety of that claim language on the screen, skipping down and importantly it

892

says, these data signals are alternately applied, and I've underlined that, to the first and second demodulators.  And I'm illustrating that process here on the left.

So this is the '383 Patent alternately applying the data signals to alternate modems, the first and second demodulators.

Q.   Okay.  And then on the right, we've got the T-Mobile system.  Any alternately applying going on there?

A.    There is no alternately applying going on there.  This is a distribution of math problems to available resources.

Q.   Okay.  Any ping-ponging back and forth between anything that you could identify as a first and second demodulator?

A.    No.

Q.   Were you here when Dr. Madisetti testified?

A.    Yes.

Q.   Let me show you one of his slides.  One of the things that he testified about was the theory under which -- assuming that you're right, that there is no infringement because the claim language is not met, did you hear Dr. Madisetti offer a theory under the doctrine of equivalents where he said there would be infringement anyway?

A.    Yes.

Q.   Okay.  Do you agree that the claims are infringed under the doctrine of equivalents?

A.    No.

Q.   Were you here when I asked him about his description in his slide 58 of the function-result-way?

A.   Yes.

Q.   Okay.  Looking at the claim language that we're talking about at the top, do you agree with Dr. Madisetti that the function of that claim language in 16[a.1] and [a.2] is performing one or more demodulation operations on data signals received from a particular user?

A.   No.

          MR. HUGHES:  Your Honor, I don't believe this has been disclosed.

          THE COURT:  Your objection is that the witness is testifying beyond --

          MR. HUGHES:  Testifying outside the boundaries of the report.

          THE COURT:  You know, if you and I could talk one at a time, Mr. Hughes, it will help the record.  Trial lawyers don't seem to be worried about the record until they get to the Court of Appeals.  And part of my job is to make sure the record is clear.  That's why I ask people to slow down, that's why I ask people to talk one at a time.  There is a reason behind the way and the reason that we do things.

     Now, your objection is the witness is testifying beyond the scope of his report.  Correct?

          MR. HUGHES:  Yes, sir.

894

THE COURT: What is your response, Mr. Haynes?

MR. HAYNES: He did do a function-way-result analysis in his report. I don't think actually these particular words were the way Dr. Madisetti described them in his report, but he absolutely did a function-way-result analysis.

THE COURT: Then why don't you examine him on the way he did the function-way-result analysis in his report.

MR. HAYNES: Fair enough.

THE COURT: To the extent you haven't, I'll sustain that objection.

MR. HAYNES: May I proceed, Your Honor?

THE COURT: You may proceed.

Q.   (BY MR. HAYNES)  Dr. Madisetti [sic], did you do your own analysis of the function-way-result?

A.   I'm not Dr. Madisetti so I can't answer that question.

THE COURT: Not even close.

Q.   (BY MR. HAYNES)  Dr. van der Weide, did you do your own function-way-result analysis?

A.   Yes.

Q.   Okay.  What is the function of the demodulator in claim 16?

A.   It is to provide a demodulated output.

Q.   Okay.  What is the result of that demodulation step using a first and second demodulator in this claim language?

A.   The result is there is demodulated data provided.

Q.   Okay.  And what does the claim language tell us as the way that you get to that result?

A.   By providing the first and second successive data signals and any subsequent data signals alternately to the first and second demodulators.  That's a paraphrase of the claim language 16[a.2] that I see on the screen.

Q.   Okay.  Anything in the claim language that suggests to you that the way the claim is performing these steps is -- has anything to do with utilizing a combination of hardware and software that is logically distinct?

A.   No.

Q.   Okay.  Applying the actual function-way-result, is this limitation met under the doctrine of equivalents?

A.   Not in my opinion.

Q.   Let's go back to our slide where we've got the '383 Patent on the left and the T-Mobile system illustration on the right.

     Is the way that the '383 Patent performs demodulation using two demodulators substantially similar to the way that T-Mobile performs demodulation functions?

A.   No.

Q.   Is it even a little similar?

A.   No.

          THE COURT:  Ladies and gentlemen, this has got a

considerable length of time to go, the examination with this witness. We've been back almost two hours from lunch. We're going to take a short recess at this juncture.

If you'll simply close your notebooks and leave them in your chairs, follow all my instructions, we'll try to keep this short and we'll be back to continue with this examination in just a minute.

The jury's excused for recess.

(Whereupon, the jury left the courtroom.)

THE COURT: Be seated, please.

All right, counsel. We're going to go back to first principles. I see about 14 or 15 lawyers in the room. I don't see anybody who has not practiced in front of me in this courtroom before.

I have a consistent and regular approach to how things are done in this courtroom, but it appears that everybody has forgotten that, even though local counsel continue to try cases in front of me. I see Ms. Fair and Mr. Dacus on an ongoing basis. I see who I think is a former law clerk of mine, although I can't tell with all that woods he's got on his face.

But here are the rules for how I expect counsel to comport themselves in this courtroom.

Number one, when you're going to examine a witness, either on direct or cross, do not start asking questions until

I tell you to proceed.  That gives me an opportunity to make sure the witness is properly seated, that the microphone is where it needs to be to amplify their voice, that if they're going to pour themselves a cup of water, they do that not in the middle of your first question.

There's a reason why I tell you to proceed with either direct or cross examination.  I don't want lawyers to go to the podium and just launch into their examination.  That's happened during this trial.  It shouldn't have.

Also, the rule in this courtroom has been for at least 20 years, long before I got here, that you have freedom to move at the podium as long as you're within an arm's length of the podium.  That means, Mr. Haynes, if you're going to go to that easel you're more than an arms length away and you ask leave of the Court.

Same for you Mr. Stevens.

And if you're going to use an easel or a board or a demonstrative or a part of a base station that's big and heavy or anything other than a visual slide that's going to be presented on the screen, then you need to talk to me about that before the jury's in the box and before we start asking the witness to come down and go all the way across the courtroom and start marking on an easel.  And then you know where to put it, you know how to use it, and you know what my expectations are.  But that can't happen if you don't ask me

in advance.

MR. HAYNES:  Understood, Your Honor.

THE COURT:  Next, the Plaintiffs should not walk across the well of the courtroom in front of the Defendants' counsel table when the jury's in the box.  You walk around.  Everybody has done that except in this trial.  It seems that you've completely forgotten that.

And that is not only rude, it obstructs the Defendants' counsel's view of the jury.  There's no reason why you should walk right in front of all the Defense lawyers to go back and forth to the podium.  Go around.  That's very simple.  That's the way it's been done for years.  That's the way I have seen all of you do it in the past, but for some reason it's been forgotten during this trial.

I would just tell you that I work very hard to have a consistent set of rules of conduct and to enforce them consistently and regularly so that nobody is surprised and everybody knows what to expect, not only for themselves but for -- from their opposing counsel.  And for some reason all of these rules seem to have been ignored by various, if not all, of you during this trial, and I'm not going to have it anymore.

These are simple rules.  There is a thought-through reason for them.  There's a logical basis for it.  When I tell you not to talk over each other, I'm trying to protect your

899

record.  And if you're on the losing side of this case, you're going to care about your record if and when you get to the Court of Appeals.

I have a job to do, and I expect you to comport yourselves in the way that I instruct you so that I can do my job.

Now, I will not expect any further violations of these rules, and if I see them, whether you're doing something intentionally or you're ignoring and forgetting what I've just told you, then I'll consider that you're doing it intentionally and I'll take appropriate action, which hopefully I won't have to do because I promise you, you won't like it if I have to do it.

Does anybody have any questions about what I've just said?  Does anybody not understand what I've just said?  If you don't, raise your hand and I'll explain it further.

All right.  That's the way we're going to go forward through the remainder of this trial.

Now, we are going to take about a five-minute recess and the time I just used to give you all a refresher course on rules you should have known and applied throughout the trial without me having to do this is going to be equally applied against your remaining trial time.

We'll take five minutes, and then we'll be right back in here.

900

The Court stands in recess.

(Brief recess.)

THE COURT:  Be seated, please.

Are you ready to continue with your examination, Mr. Haynes?

MR. HAYNES:  Yes, Your Honor.

THE COURT:  All right.  Let's bring in the jury.

(Whereupon, the jury entered the courtroom.)

THE COURT:  Please be seated.

We'll continue with the Defendants' direct examination of Dr. Daniel van der Weide.

Go ahead, counsel.

MR. HAYNES:  Thank you, Your Honor.

Q.    (BY MR. HAYNES)  Dr. van der Weide, right before we broke, we were discussing infringement with respect to the '383 Patent.  What was your ultimate conclusion?

A.    My conclusion was that the accused products do not infringe the asserted claim 16 of the '383 Patent.

Q.    Okay.  So did I label that right?

A.    Yes.

Q.    Did you also form some opinions with respect to the '477 Patent?

A.    I did.

Q.    Okay.  Can you tell us what we're seeing here?

A.    This is the facing page of the '477 Patent, and I'm

Shawn M. McRoberts, RMR, CRR
Federal Official Court Reporter

highlighting the date when it was filed, which was the same as for the '383--April 20, 2001.

Q.    Okay.  And this is JX 01.  Is that right?

A.    Yes.

Q.    Okay.  Is the '477 Patent still in force today?

A.    No, it's expired.

Q.    All right.  About when did it expire?

A.    Again, 2023.

Q.    Can you just explain to us generally what the '477 Patent relates to?

A.    It's related to the '383 Patent.  It is directed to generally determining parameter profiles, storing those, and then retrieving those to apply to subsequent communications.

Q.    Okay.  I see figure 3 on the slide.  Can you explain to us what the highlighting you've done to the bottom of figure 3?

A.    Yes.  Similar figure to what we saw with the '383 Patent, but highlighting the particulars of the '477 Patent claims that go to the boxes that I've labeled in green and blue.

Q.    What with respect to the '477 Patent happens in the RF modem control CPU?

A.    That's where profile parameters are determined.

Q.    Okay.  With respect to the '477 Patent, what happens in the box that you've labeled blue with those subweights in it?

A.    That's a storage area or memory where certain profile

902

parameters or the values associated with them are being stored.

Q.    Okay.  Did you prepare an example to explain how the '477 Patent claims work?

A.    Yes.

Q.    Okay.  Can you tell us what we're seeing here?

A.    Yes.  So this is a similar example to what I showed with the '383 Patent.  I'm highlighting that there is a modem in the base station and that modem is going to demodulate and provide the demodulated signal to a profile parameter determiner in green down at the lower right of the screen.

Q.    Okay.  Can you explain what we're seeing on the screen now as the sub 1 box moves across.

A.    Yes.  That's an uplink data signal from subscriber 1 in yellow that has been received by the base station and demodulated at the modem and then provided to the profile parameter determiner.

Q.    Okay.  Once that subscriber signal gets to the profile parameter determiner, what does the determiner do with it?

A.    The profile parameter determiner determines values of certain profiles and the patent does provide some specific examples, but it then sends those parameters or the numbers associated with them, the values, to the profile parameter storage device.

Q.    Okay.  You mentioned that determines some parameters.

What have you illustrated here with the boxes labeled S and C?

A.    These are different types of parameters that are specified by the patent specification as well as the asserted claim 1.  They are S for signal-related parameters and C for channel-related parameters, and I've just highlighted a handful of them to distinguish them in different colors.

Q.    Okay.  Does the patent give any examples of what the signal-related parameters and channel-related parameters can be?

A.    Yes.  I've highlighted a section of the patent from column 11, lines 56 through 67, and there you can read that it provides examples of what it contemplates as signal-related parameters, and those would include in blue the amount of forward error correction, abbreviated FEC, sometimes pronounced FEC, of the burst.  In green, change in frequency of the burst.  This is the uplink signal from the user, by the way.  And in purple, changes in time of the burst.

Q.    What about channel-related parameters?  What examples does he give of those?

A.    Yes.  So the channel-related parameters, as the patent contemplates them, include in red, equalization weighting, that's something we've heard about before, and in orange I highlighted antenna parameters, either at the subscriber station or at the base station, and others that it doesn't specify.

Q.   When we looked at figure 3, there was a box that said sub weight.  What kind of parameter was that?

A.    Those sub weights, the subscriber weights, those were equalization weights so those would be the equalization weighting, that red text here.

Q.    Okay.  What are you illustrating on this slide with the boxes for the Ss and the Cs being drawn out of the subscriber signal?

A.    Well, this is that the claim language is specifying that the signal- and channel-related parameters are collectively representative of this communication.  In other words, they all belong together to enable the demodulation of that uplink burst from some subscriber, in this case subscriber 1.  So they're not some random thing; they belong together.

Q.    Okay.  Once the profile parameter determiner has determined these parameters, what happens to those parameters?

A.    They are stored in the profile parameter storage device.

Q.    And is that the blue square on the left that we see here?

A.    That's correct.

Q.    And once those parameters are stored by the storage device, what happens next with respect to the parameters?

A.    Well, then finally they're recalled, much like I described with the '383 Patent, and provided back to the modem in this feedback arrangement to facilitate subsequent receive operations.

Q.   Okay.  And what happens when the next signal comes in from the subscriber?

A.   Well, as it comes in, I'm illustrating that it goes to the modem and the modem has these parameters loaded in it to facilitate receive operations.  So it's working faster this way.

Q.   Does the patent give any examples of how often the parameters that are getting determined by the profile parameter determiner, how often those get updated?

A.   Yes.

Q.   What example does it give?

A.   The patent describes that the channel conditions, the radio conditions between the two antennas are changing slowly, as they would in a fixed wireless access system.  So the patent describes to one of ordinary skill in the art that these parameters get updated between five and 20 times a second, which the patent teaches is much slower than the data rate.

Q.   Okay.  What would happen if in this type of system the channel conditions were changing very rapidly, much faster than five to 20 times a second?

A.   Well, then it would be using profile parameters that were out of date, a little bit like checking the weather when the weather is changing very rapidly if you live in a place where it doesn't change very rapidly like in California, you don't

worry about whether it's going to rain.  But around here, I want to check the weather every morning.

Q.   All right.  So we've been talking about this in the context of an example.  Are the limitations we've been talking about, are those also present in the asserted claims?

A.   Yes.

Q.   Okay.  Let's take a look at that.  Well, first of all, can you just underline on claim 1 for us where we see the requirement of the profile parameter determiner?

A.   Well, the preamble speaks to a profile-creating apparatus, and then says that it includes this apparatus of profile parameter determiner.

Q.   Okay.  And we also discussed a profile parameter storage device.  Where is that in the claims?

A.   That's down here.

Q.   Okay.  You also mentioned the example that the parameters that are determined have to be collectively representative.  Is that required by the claims?

A.   Yes, it is.  I'm underlining collectively representative right here.

Q.   Now, the limitation that the parameters, the signal- and channel-related parameters, are collectively representative of communication, is that collectively representative requirement present in the patent when it was originally filed?

A.   No.

Q.    Was that added as part of the back-and-forth with the Patent Office?

A.    It was added as an amendment.

Q.    Okay.  Heard a lot of testimony about the metes and bounds of property.  Do you recall that, generally?

A.    Yes.

Q.    Is that requirement of collectively representative, is that part of the metes and bounds of this claim?

A.    Yes, it is.  It narrows the scope of the original claim language.

Q.    Now, I want to direct your attention down to the bottom.  You -- we discussed how you store parameters, but does the claim language require that you actually use those stored parameters with respect to a subsequent burst?

A.    It does.  The very last element of the claim speaks to that.

Q.    Can you just underline that language for us as well?

A.    So the values stored at this profile parameter storage device are specifically to be used to facilitate receive operations performed at the receiving station, that's the modem, on subsequent bursts of the first burst data signal.

Q.    Okay.  Does the T-Mobile base station satisfy these claim elements that you've underlined here that the channel and signal parameters must be collectively representative?

A.    No.

908

Q.   Do the T-Mobile base stations satisfy the requirement that the values stored at said profile parameter storage device to be used to facilitate receive operations performed at the receiving station on subsequent bursts of the first data signal?

A.   No.

Q.   All right.  Now, let's talk -- shift gears a little bit and talk about how T-Mobile's system works as it pertains to some of these parameters.  Okay?

A.   Okay.

Q.   So in T-Mobile's system, does it determine any parameters?

A.   Yes.

Q.   And are there parameters that get stored -- sorry.  With respect to the claim language, are -- does the claim language require that you store parameter values needed for the next signal?

A.   Yes, it does.

Q.   And does the claim language require that you reuse those stored parameter values for the next signal?

A.   Yes.

Q.   Okay.  And are those three steps there, the three requirements, are those related to the underlined language we looked at just a second ago?

A.   That's correct.

909

Q.   Okay.  Now let's talk about T-Mobile's system.

Can you explain to us what you're illustrating on this slide?

A.   Sure.  You may remember before the break I was talking about fading, for example, and rapidly changing channel conditions.  Here I'm illustrating this blue car driving through a city and illustrating its first uplink data burst being communicated from the user to the base station.

And you can see that in this case the blue uplink burst is being shadowed by a building.  So there is some, you know, alteration, distortion of the channel.

Q.   Okay.  And when that signal from the blue car goes up to the base station, does it determine parameters?

A.   Yes, it does.

Q.   Okay.  And then when it goes -- that signal goes up to the base station, are all of the parameters that are determined stored?

A.   No.

Q.   Which ones are not stored?

A.   Equalization weights.

Q.   Well, what types of parameters don't get stored?

A.   The things that get out of date very, very quickly and need to be measured on a continuous basis, as I heard Mr. Faxer testify.

Q.   Okay.  Let's advance forward.  The car has now moved, not

as blocked by the building. Can you explain what we're seeing now?

A.    Yeah, that the channel conditions now have changed. It's now clear line of sight, there's completely different equalization coefficients that would be needed for this instance of the radio channel versus the previous illustration. And so it wouldn't make any sense to store and apply those old channel equalization weights, and the Ericsson system doesn't do it.

Q.    Okay. So car's moved, I don't have any stored equalization weights. How do I process this second signal?

A.    Well, you may member when I was explaining up at the easel the reference signals, the kind of referenced song, if you will. It makes new measurements and applies those corrections to that instant burst.

Q.    Were you here when Mr. Struhsaker testified about equalization weights and whether or not they were important?

A.    Yes.

Q.    Do you recall -- what do you recall him saying about those equalization weights?

A.    That they were important to demodulating a signal.

Q.    Do you agree with Mr. Struhsaker?

A.    To the extent that demodulation relies on equalization weights and has for decades, yes.

Q.    Okay. Were you here when Mr. Faxer testified about how

Ericsson's base stations work with respect to these equalization weight parameters?

A.   Yes.

Q.   Do you recall what Mr. Faxer said with respect to whether or not those parameters are stored and reused for subsequent bursts?

A.   I do.

Q.   And what do you recall him saying?

A.   Well, to paraphrase what he said, it's a memoryless system.  It doesn't remember those previous values for equalization weights because in a rapidly changing channel environment that wouldn't make any sense.  They actually improve their system performance by making frequent measurements of the channel and applying those equalization weights rather than using prior ones.

Q.   Now, you reviewed Ericsson's documents and source code in connection with forming your opinions.  Is that right?

A.   Yes.

Q.   When you reviewed those documents, did you see any evidence to suggest that the parameters that change frequently such as equalization weights are stored and used for purposes of receiving and demodulating the subsequent burst?

A.   Not equalization weights, no.

Q.   Did you -- were you here in the courtroom when Mr. Faxer walked through several different Ericsson documents that

discussed which parameters get stored or not stored?

A.    Yes.

MR. HUGHES:  Your Honor, may we approach?

THE COURT:  Approach the bench.

(The following was had outside the hearing of the jury.)

THE COURT:  What is it, Mr. Hughes?

MR. HUGHES:  I'm going to concerned that we are going to talk about a document that Mr. Faxer was shown on direct examination that was not cited by this witness in his expert report.

MR. HAYNES:  Which exhibit is it?

MR. HUGHES:  It's the massive MIMO document.  I think it's either JX 13 or --

MR. HAYNES:  I won't show these documents.  I'll change the question.

MR. HUGHES:  I think we need to because it goes to right where the Court ruled this morning on the thing he couldn't comment on.

MR. HAYNES:  Well, he's not going to talk about --

THE COURT:  It doesn't appear this is a problem, but I'm going to remind you trips to the bench are not because you anticipate something might come up.  Objections are raised when something improper has come up, and you object to it.

We can't have trips up here just because you think

something's coming that may be a problem.  But in this case it looks like we don't have anything to discuss so let's move on.

MR. HUGHES:  Thank you, Your Honor.

(The following was had in the presence and hearing of the jury.)

THE COURT:  All right.  Please continue, counsel.

Q.   (BY MR. HAYNES)  Let's look at this slide with respect to the -- we talked about the '477 Patent and the three things that it requires on the left.  Do you see those?

A.   Yes.

Q.   And is the claim language at the bottom, is that claim language what requires the three things that you are showing up above?

A.   It does.

Q.   Okay.  Let's compare that to the T-Mobile system.

Do the claims require determining, storing, and reusing parameters that are needed to facilitate receive operations like demodulation?

A.   Correct.

Q.   Okay.  And do the claims require that those parameters be collectively representative of the communication channel?

A.   They do.

Q.   All right.  And are equalization weights needed to receive and demodulate signals?

A.   Absolutely.

914

Q.    And in T-Mobile's base stations, are the equalization weights stored or determined for one signal and then stored and reused for a subsequent signal?

A.    No.

Q.    Are the parameters that are collectively representative of the channel stored and reused for a subsequent burst in T-Mobile's system?

A.    No.

        MR. HUGHES:  Objection; beyond the scope of his report and move to strike.

        THE COURT:  What's your response, Mr. Haynes?

        MR. HAYNES:  That last question I believe is squarely disclosed in his report.

        THE COURT:  Do you want to give me a paragraph so I can verify that, please?

        MR. HAYNES:  Paragraph 139 of his opening report. And even the heading under section 7, I think discloses that last question.

        THE COURT:  What's the paragraph number?

        MR. HAYNES:  It's page 70, paragraph 139.

        THE COURT:  All right.  Based on that, I'm going to overrule the objection.

    Let's proceed.

Q.    (BY MR. HAYNES)  Dr. van der Weide, if the base stations in T-Mobile's network do not store parameters that are

                Shawn M. McRoberts, RMR, CRR
                Federal Official Court Reporter

915

collectively representative of the signal and are reused for subsequent bursts, do those products infringe?

A.    There is no infringement.

Q.    Okay.  Now, the language that's in the lower left that we've been talking about, does that appear in claim 1?

A.    Yes.

Q.    You understand that there are actually two other claims that are asserted in this case, claims 3 and claim 6?

A.    Yes, I do.

Q.    Okay.  Do you understand that claims 3 and claim 6 are dependent claims?

A.    Yes.

Q.    Can you just remind us of what that means to your understanding?

A.    My understanding, I'm not a lawyer, but independent claims stand on their own, and dependent claims depend from the independent claims.  I think we heard this in the opening remarks about some of the finer points of patent law.

So a dependent claim is necessarily narrower than the independent claim from which it depends.  So long story short, if you don't infringe the independent claim, you can't infringe dependent claims.

Q.    Okay.  So if the jury were to conclude that independent claim 1 is not infringed, what would that mean with respect to your opinion on claims 3 and 6?

916

A.    That neither of those is infringed, either.

Q.    Okay.  So just to summarize your opinions with respect to infringement, have I labeled this correctly, '477 Patent, not infringed?

A.    Correct.

Q.    Now, I want to shift gears a little bit and talk about your opinions with respect to the value of the patents-in-suit.  Okay?

A.    Okay.

Q.    Now, were you here when Dr. Madisetti talked about how the inventions were very valuable because they enhance things like adaptive modulation, uplink beamforming, parallel processing?

A.    I heard Dr. Madisetti's testimony.

Q.    Do you agree that the '383 and '477 -- well, let me withdraw that question.

      Do the '383 and '477 Patents ever describe how you might used the claimed inventions in things like beamforming or for parallel processing?

A.    No.

Q.    Do the patents ever talk about how you could take the claimed inventions and improve processes like adaptive modulation and beamforming and parallel processing by deploying the inventions into those known concepts?

A.    No.

Q.   And just remind us, those three -- the concepts I just mentioned, adaptive modulation, parallel processing, beamforming, did those exist before the '383 and '477 Patents?

A.   Yes.  In fact, I remember seeing recently a Nobel prize lecture from Carl Brown back in 1903 that showed a picture of three antennas doing beamforming.

Q.   Is it technically possible and feasible to do things like adaptive modulation, uplink beamforming, and parallel processing without using these claimed inventions?

A.   Yes.

Q.   Now, you mentioned before that you also formed some opinions regarding validity?

A.   I did.

Q.   Okay.  I'd like to first talk about your opinions with respect to the RBS 2000.  Okay?

A.   Okay.

Q.   Before we get into the details of that system, can you just summarize at a high level what your opinion is on validity and whether or not the RBS 2000 discloses the elements of the asserted claims?

A.   I analyzed the asserted claims under Dr. Madisetti's broader interpretation of the claim language for infringement, and using that broader interpretation, I found that every element of every asserted claim was present in the RBS 2000 prior art system.

Q.   Can you explain to us what we're looking at on this slide?

A.   The upper left is a photograph that I showed in one of the opening slides illustrating that RF modem shelf, that was quoted in the '383 Patent specification.  I'll just remind us of where that was, but that was up here.  And this is a line drawing of that same product.  So these are the transceiver units that comprise the RF modem shelves.

Q.   Okay.  Did you personally work on the RBS 2000?

A.   No.

Q.   So how did you educate yourself as to how that product functioned?

A.   Well, not only did I speak to representatives of Ericsson who were familiar with the product, but I also immersed myself in the documentation surrounding it as well as source code and even contemporaneous standards.

Q.   Okay.  And educating yourself about the product, did you have an opportunity to speak to Mr. Akesson?

A.   I did.

Q.   And can you just at a high level give us an idea of what you learned from him?

A.   Well, I also heard his testimony earlier today, and I had learned a lot about the inner workings of the RBS 2000.

Q.   Okay.  Did you get an opportunity to speak to Mr. Larsson?

A.    Yes, I did.

Q.    And can you -- at a high level, can you explain to us what you learned from him?

A.    Yeah.  I recall that he had moved to the U.S. and had, you know, done a lot of technical work kind of laying the groundwork for these systems back in the early days, the late 1990s.

Q.    Okay.  Did you just rely on Ericsson witnesses to educate yourself?  Did you look at other things?

A.    No, I looked at other things, too, and of course I learned also from Mr. Mueller that he had sold these in Wisconsin, but I looked at things like the VoiceStream contract, JX 45.

Q.    Let me interrupt you there, Dr. van der Weide.  You mentioned the VoiceStream contract.  Can you just explain to us what that is?

A.    Certainly.  That was a sales contract between Ericsson as the seller of the system and VoiceStream, which I had heard about this morning and we have heard about, memorializing a sale of an RBS 2000 in the United States at -- in the year 2000.

Q.    Having reviewed that contract and listening to the testimony and reviewing other documents, what's your opinion as to whether or not the RBS 2000 was -- had been sold in the United States and used in the United States prior to the

920

filing date of the patents-in-suit?

A.    There is no doubt in my mind.

Q.    All right.  Let's go to the next document, JX 74.  What is that document?

A.    Well, we've heard a little bit about standards today, that they promote interoperability, and this is an example of the GSM standard, the 2G standard, that I consulted to understand some of the parameters.

Q.    Okay.  So why were you looking at a GSM standard to try to understand how the RBS 2000 product worked?

A.    Well, because the RBS 2000 is compliant with that GSM standard.  So the GSM standard describes certain parameters.  And I know, because it's compliant, I can look to the standard.

Q.    What about JX 44, the transceiver system document?  What is that?

A.    That's the TRS document.  There's a transmitter and receiver in each one of those modem blocks that goes into the RF modem shelf.  And so that describes that hardware.

Q.    What about JX 43, the traffic function subsystem?

A.    The TFS is the software that runs on the TRS hardware, essentially.

Q.    Okay.  And then JX 41, the customer reference manual.

A.    That's the manual that gets delivered with the sale of the RBS 2000 when a customer receives it.

Q.   Okay.  And then JX 8, excerpts of RBS 2000 source code, what is that referring to?

A.   I looked at a lot of source code and these are just some representative excerpts that I relied on.

Q.   Okay.  Having reviewed the documents -- well, is this the only documents that you reviewed with respect to the RBS 2000?

A.   No.  I reviewed many more than this.

Q.   Okay.  Having reviewed these documents as well as other documents, were you able to gain an understanding of the functionality and features of the RBS 2000 as it was sold and used prior to the patents-in-suit?

A.   Yes.

Q.   All right.  Let's talk a little bit about how that worked.  Okay?

A.   Okay.

Q.   Explain to us what we're seeing here.

A.   This is a high-level block diagram of the hardware architecture of the RBS 2000.  This is figure 8 from the transceiver system document, JX 44 at page 30.  And I'm highlighting the two TRUs that are here.  Those are those transmit receive units.

Q.   Okay.  Why have you highlighted the transmit receive units?

A.   Well, because those are relevant to the hardware that is used to, for example, demodulate an incoming signal.

Q.    Okay.  This is an excerpt from JX 43 on page 8.  Can you explain what this block diagram from figure 2 is showing?

A.    This is figure 2 from the TFS TRUD platform, so this is a little more detail of the hardware that is in that TRU.

Q.    And on the next slide, I see we've got excerpts from both JX 44, page 30, and JX 43.8.  What are you illustrating here?

A.    I'm just showing that high level block diagram that I previously showed.  If we zoom in on that, then we see this more detailed block diagram of the hardware components that are in the TRUD hardware platform.

Q.    Okay.  So the components in the big red box on the left are actually what's inside the TRU box on the right?

A.    That's correct.

Q.    Okay.  Let's talk about some of those components.  I see you've labeled that figure 2 with a couple of dashed boxes.  Can you explain to us what you labeled as processing components in the red-dashed box?

A.    Processing components are components that can process an incoming signal and determine profile parameters, for example.

Q.    Okay.  And then on the left-hand side, you've got some blue boxes that you've labeled memory components.  What are those?

A.    That's storage; in other words, where profile parameters can be stored, values of those can be stored.

Q.    Okay.  And then I see a green line with an antenna symbol

on the top of it.  What is that illustrating?

A.    Well, RX we've heard before.  It's shorthand for receiver.  So that's the receiver bus.  That's where the received signals come in and are presented to the processing components.

Q.    Okay.  Are you familiar with something called an establishment procedure that could be performed by the RBS 2000?

A.    Yes.

Q.    Okay.  At a high level, can you just explain to us what the call establishment procedural was?

A.    Well, a user, just trying to make a phone call with a mobile -- in a mobile system like GSM system is going to open their phone, maybe it's turned on already, but they're going to dial a number, punch it in, and hit send.  And that's a random event.

The system doesn't know that that's going to happen, and so there is a form of random access request for a channel, basically, hey, I'm knocking on your door, can I please establish a communication channel.

Q.    Is that call establishment procedural specified by one of those industry standards you talked about previously?

A.    Oh, yes.  That is just laid out in very, very great detail in the GSM standards.

Q.    Okay.  So how was that call establishment procedure

related to your opinions on validity?

A.    Well, the RBS 2000 at a very minimum had to be able to host a phone call.  Regardless of texting or anything else that it might have been able to do, a basic phone call is something that it had to be able to do in order to be sold.  So that's what I analyzed is the most basic functionality.

Q.    Did you compare a couple of slides to try to illustrate how that procedure worked?

A.    Yes, I did.

Q.    All right.  Can you explain to us what you're illustrating in this first slide that has step 1, channel request?

A.    The channel request is that random event, the user in the lower left-hand corner is initiating a phone call, and that's basically a knock on the door to the base station, saying, hey, I'd like to make a phone call.  And that's called a channel request.

Q.    Okay.  And once that channel request comes up to the base station and hits the antenna, what happens to it?

A.    Well, then that request is passed down to the TRS 2000 -- the RBS 2000, excuse me.  And I'm illustrating this here with this downward arrow.

Q.    Now, before that channel request message came in, does the base station know anything about that user or their phone or the channel?

925

A.    No.  As I previously mentioned, that's a random event. That person could have been inside a building, out on the street, in a car.  The base station doesn't know anything about this user yet.

Q.    Okay.  Let's look at what happens inside the RBS 2000 when that channel request comes in.  Okay?

A.    Okay.

Q.    Can you just explain to us what happens when the channel request comes into the antenna and goes across that RX bus?

A.    I'm illustrating that channel request coming in through the RX bus, and it's being provided to those processing components, and therein there are certain parameters that are determined for that particular user.

Q.    Okay.  And what -- well, what parameters are being determined -- what is the -- when it creates those parameters or determines those parameters, what's it trying to do in the RBS 2000?

A.    Well, it's trying to determine a number of things about the user and about the user's channel and their phone.  And it more or less sets up like a restaurant order, I think of it, you know, like you're ordering at Burger King and you have a certain template about what is going to go or not go into this particular burger.  And so it sets up that set of buffers that hold these different values associated with a given user's profile.

926

Q.    So once it determines the parameter values and has this profile, where does it store the profile?

A.    Those profile values are stored in a number of buffers that are in the CMA and in many cases mirrored by that DRAM, dynamic random access memory, up in the upper left-hand corner.

Q.    All right.  You mentioned some buffers.  Can you tell us a little bit more about those using the illustration you have on this slide?

A.    Yeah.  Buffers are just memory locations that are sort of preconfigured to store specific values of different parameters.  And so I've highlighted a number of the buffers here and labeled them, but I'd like to like zoom in on the channel context buffer just to give a few more examples.

Q.    Okay.  This is some excerpts from JX 8 at page 695.  Can you just explain to us what we're seeing here?

A.    Yes.  So this is an excerpt from the source code for the RBS 2000, and you can see in the lower right-hand corner of the screen the enlargement of that source code so you can read it, and there are a variety of parameters here that are associated with the channel context.

Q.    Okay.  Can you give us an example?  RX div, what is that parameter in the RBS 2000?

A.    Well, we heard a little bit about this same parameter from Mr. Akesson this morning or this afternoon, and RX,

again, stands for receiver, div stands for diversity.  And so this had to do with those A/B parameters that we've heard about previously.

Q.   Okay.  Now you mentioned that it determines parameters plural.  Can you give us a few examples of the types of parameters that the RBS 2000 would determine as part of this call establishment procedure?

A.   Well, it stores tens of parameters so I've only highlighted a few for time limitations.  But I'm highlighting in this light green color signal-related parameters, and as I'll show later in yellow channel-related parameters, but mobile station power, MS power signal parameter; timing advance, signal parameter; and then receiver diversity, that A/B value; and also some quality metrics of the radio link such as RX QUA, RX level A, RX level B.  Those are things that are measured and stored as well.

Q.   Why is it that the RBS 2000 store these parameters in the buffers?  What does it do with them?

A.   So it can apply them to facilitate subsequent receive operations.

Q.   All right.  I don't want to have to read a whole bunch of source code here, but can you just tell us what you're illustrating here with these various source code excerpts?

A.   I'm just showing a snippet of some of the evidence that I looked at, some of the source code and citing at JX 8 at 488

for MS power at 1967; JX 8 at 488, line 2006 for timing advance; JX 8 at 695, line 120 for RX div; JX 8, 352, at line 258 for RX quality; and JX 8.905 at lines 143 to -44 and 145 to -46 for RxLev, which is receive level.

Q.   So this list of parameters that you gave us before, were you able to find those parameters in the actual RBS 2000 source code?

A.   Yes.

Q.   All right.  Let's come back to our channel -- sorry, call establishment procedure.  And explain to us what happens after we created these buffers.

A.   Yes.  So the channel request was made and goes down into the RBS 2000 where it's processed.  There are parameters that are determined and stored.  And then based on those, the GSM standard describes an immediate assignment action that basically says, I'm going give you a channel so that you can communicate on it.  And that's how the call is made.

Q.   All right.  Now we have a little bit better understanding of how the RBS works, I'd like to talk about your invalidity opinions with respect to the RBS 2000 system.  Okay?

A.   Okay.

Q.   Now, you understand that it is Defendants' burden to show that each limitation of the claims is disclosed in the RBS 2000 system in order to establish invalidity.  You understand that?

A.    I do.

Q.    So what I want to do is walk through each claim element, apologies in advance, and see if we can find where that's disclosed in the RBS system.  Okay?

A.    Okay.

Q.    So we'll start with the '477 Patent, claim 1, and we'll begin with the very first piece there, the preamble.

The preamble recites, "Profile-creating apparatus for creating at least a first profile associated with transmission upon at least a first channel of at least a first burst data signal transmitted in bursts to the receiving station, said profile-creating apparatus comprising."

So that broad description of this profile-creating apparatus, is that something that was new and invented by the inventors of the '477 Patent or did that exist in the RBS 2000 system?

A.    That existed in the RBS 2000.

Q.    Can you just explain why?

A.    Well, as I've previously highlighted, this block diagram is the hardware that creates a profile from a channel request that I just explained.

Q.    Okay.  All right.  So can I put a checkmark in that preamble as being disclosed by the RBS 2000 --

A.    Yes.

Q.    -- at least that high level concept?

930

All right.  Let's go to the first actual claim element, "A profile parameter determiner that's coupled to receive an indication of an initial burst of the first burst data signal transmitted upon the first channel to the receiving station, said profile parameter determiner for determining a value of at least one signal-related parameter and at least one channel-related parameter."

Is that concept of having a processor or some sort of determiner that determines both signal-related parameters and channel-related parameters, is that something that was new to the '477 Patent or was that disclosed in the RBS 2000?

A.    That is present in the RBS 2000.

Q.    Okay.  Can you explain to us where in the RBS 2000 those limitations would have been present?

A.    Those are in those buffers that I previously described, context buffers, and I'm providing some example parameters as I have done previously to show that there are both signal-related parameters that I've highlighted in green and channel-related parameters that I've highlighted in yellow.

Q.    Okay.  And as part of that call establishment procedure that we walked through, would the other elements that I read aloud of this first profile parameter determiner limitation be satisfied?

A.    Yes.

Q.    Now, claim 1[a] requires both a signal-related parameter

or at least one signal-related parameter and at least one channel-related parameter.  Are there at least one of those, each of those in the RBS 2000?

A.    Yes.

Q.    And of the ones you've listed here, which ones are signal-related parameters?

A.    The ones on the left that I've color-coded in the light green color.

Q.    So that's MS power and timing advance?

A.    Yes.  There are others, but I've just highlighted those two.

Q.    Okay.  And remind us which are the channel parameters?

A.    I've coded those in yellow, receiver diversity, which are those A/B values, and also RxQualand RxLev A, RxLev B, those are channel-related.

Q.    Okay.  Let's just walk through a couple of examples of these parameters.  You mentioned timing advance.  Can you explain what that timing advance parameter was in the RBS 2000 system?

A.    Yes.  This is where I cited to JX 74 at 67, which is the GSM standard governing the interoperability of these systems and highlighting from Section 9.3.24, the section in that standard entitled Timing Advance is describing what this parameter is.  And I highlighted some text from that.  It is calculated by BTS.  BTS stands for base transceiver

station--that's the GSM term for a base station--at the reception of a channel request message.

Q.    Okay.  And what's a timing advance parameter used for?

A.    The timing advance parameter is to help align the user's uplink signal in a slot, in a time slot.  As you can imagine, different users might be different distances away from the base station, and radio waves propagate as we probably all know at the speed of light.  They're not infinitely fast.  It takes time.

And so that time actually has to be adjusted in the base station so the base station can properly demodulate the signal.  It needs to know when it's coming in, and it tells the user equipment to shift it around if it's not quite right.

Q.    Okay.  Let's talk about one of the channel-related parameters.  Can you explain to us what you're illustrating on this slide from JX 41, page 312, figure 95?

A.    Yeah.  Figure 95 speaks to diversity.  We heard a little bit about diversity from Mr. Akesson, but the idea that -- I worked on diversity when I was working at Motorola back in 1987.

Some of us may remember the car phones with the little antenna and the pigtail on them?  Some of the more fancier car phones had actually two antennas which was a big deal because that was receiver diversity.  That enables one or the other antenna to pick up a stronger signal and avoids this fading

business like the FM radio problem that I described earlier. That's what diversity's all about.

Q.   Okay.  And so which parameters are related to these diversity issues you just described?

A.   Well, the RX div and, of course, RxLev A and B, those A/B parameters.

Q.   Okay.  Can you explain to us just at a high level, what are these RxLev and RxQual, what are they used for?

A.   Well, again, for determining the quality of the channel, the RxLev stands for receiver level, and that's determined on the -- on the basis of A or B since there are two ears, like Mr. Akesson said.  Those are measured and then accumulated.

And then statistical parameters like the reported RxQual, that's measuring the bit error rate; in other words, how many errors are there present in the down converted bit determined signal.  The more errors there are, the lower the quality of the channel and vice versa.

Q.   Okay.  The parameters that we just talked about in the channel-related parameters, I see on the left here we're looking at the GSM standard.  Did the GSM standard actually specify these parameters and how they are used in GSM systems?

A.   Yes, it does.

Q.   Okay.  And does the RBS 2000 product follow that GSM standard with respect to these parameters?

A.   Yes.  I like to think of standards as defining the what

but not the how.  In other words, they say what has to be done, but it doesn't tell each vendor how to do it.  So each vendor has freedom to do things better than their competitor, but they all have to meet this standard.

Q.    Okay.  So can I put a checkmark under element 1[a], the profile parameter determiner, as being disclosed by the RBS 2000?

A.    Yes.

Q.    All right.  The next limitation is 1[b], "Wherein the signal-related and channel-related parameters are collectively representative of communication of the first burst data signal over the first channel to the receiving station."  Do you see that language?

A.    I do.

Q.    Okay.  Is this some of the language that, in forming your opinions on validity, you applied Dr. Madisetti's view of the claims?

A.    That's exactly right.  So in this particular instance, I used Dr. Madisetti's broader opinions, broader conception or interpretation of the claim language, and found that these elements were present in the RBS 2000.

Q.    So explain to us under at least Dr. Madisetti's broader view of the claims what parameters did you identify as satisfying this limitation?

A.    Well, just one of each, essentially.  So timing advance

935

is definitely present there; receiver diversity, definitely present there. Those are all that's necessary in his view, as I understand it, for infringement. So I applied that same definition and found that they are present, indeed, and stored and applied to subsequent to receive operations in the RBS 2000.

Q. Just to be clear is it your opinion that the plain meaning of collectively representative is met if I just store one parameter, one signal parameter and one channel parameter regardless of what the parameters are?

A. Not in my opinion of the plain and ordinary meaning to one of ordinary skill in the art at the time of the invention, but, rather, applying Dr. Madisetti's broader interpretation.

Q. All right. So at least under Dr. Madisetti's interpretation of the claim where I need only two parameters regardless of what they are, is that element disclosed in the RBS 2000?

A. Yes.

Q. Can I put a checkmark there?

All right. That brings us to the next element relating to the storage device. This element requires "a profile parameter storage device coupled to said profile parameter determiner, said profile parameter storage device for storing values representative of the at least one signal-related parameter and the at least one channel-related parameter

936

determined by said profile determiner."  Did I read that right?

A.    Almost.

Q.    Almost.  Applying the actual words if I did misread it, is that concept something that was new to the '477 Patent or is that something that was disclosed in the RBS system -- RBS 2000 system?

A.    That's in the RBS 2000.

Q.    Okay.  And can you just explain to us, you know, again where's the profile parameter determiner in the RBS 2000 system?

A.    I've boxed it in red here and labeled it as profile parameter determiner.  That's the hardware associated with the TRUD.

Q.    And we're looking at JX 43.8, figure 2.

And remind us what the profile parameter storage device would be in the RBS 2000.

A.    That's the combination of the dynamic random access memory attached to the AMD microprocessor that's in the upper left-hand corner and the common memory area, CMA, that's attached to the ToRA ASIC, application specific integrated circuit there.

Q.    Is what you labeled as the profile parameter storage device coupled to what you've labeled as the profile parameter determiner?

A.    Yes.

Q.    Okay.  Can you explain to us what you labeled there with coupled to?

A.    Yeah.  In pink or purple, I've just labeled the wires that are connecting the profile parameter storage device to the profile parameter determiner.

Q.    Okay.  So can I put a checkmark next to element 1[c]?

A.    Yes.

Q.    That takes us to the last element, which is that "the values stored at said profile parameter storage device to be used to facilitate receive operations performed at the receiving station on subsequent bursts of the first burst data signal."  Did I read that one right?

A.    You did.

Q.    All right.  Good.  Now, is this limitation disclosed at least under Dr. Madisetti's broader view of the claims?

A.    Yeah.  This is another one of those claim elements that I analyzed under Dr. Madisetti's broader interpretation of the claim language that he used for infringement, and under that analysis I found that it is present -- this element is present in the RBS 2000.

Q.    Okay.  So can you explain to us how in RBS 2000, at least under Dr. Madisetti's view of what it means to facilitate receive operations, how that's done with the timing advance in the RBS 2000?

938

A.    Yes.  For example, the GSM standard which governs how this is supposed to work has the language that I've highlighted here regarding timing advance.  I've highlighted another section of it, and it says, the timing advance is to be used by MS--that's the mobile station--in subsequent communications.  So it is stored and reused for subsequent bursts.

Q.    What about an example of a channel parameter?  Can you explain to us what the RBS system tells us about whether a channel parameter can be used to facilitate receive operations, at least under Dr. Madisetti's broader view of what that means?

A.    Well, I've already spoken to those A/B parameters like RxLev A and B, and here we also have the RX div parameter which is a two-bit value.  So every time a time slot is being processed, the ToRA, that ASIC that is doing this demodulation, is going to look for which of antenna A or B or both is activated.

And that's what that -- what we call a truth table down there in the lower right-hand corner governs.

Q.    Okay.  So can you just explain a little bit more how that truth table is used in order to facilitate receive operations, at least under Dr. Madisetti's broader view of that?

A.    Yes.  Depending on whether the antenna A's signal is being -- is meant to be processed or antenna B's signal is

meant to be processed or both of them is meant to be processed, that governs whether the ToRA does this or not.  So it has to look to this value every time.

Q.   Okay.  So when it gets a subsequent burst, how does it use the A/B value to facilitate receive operations?

A.   That controls which of the two streams or both streams are being demodulated.

Q.   Okay.  What about some of the other parameters we've been talking about, RxLev and RxQual?  Under Dr. Madisetti's view, are those also used to facilitate receive operations?

A.   Yes.  Those are stored and used to facilitate subsequent receive operations.

Q.   So can I put a checkmark under 1[d], at least under Dr. Madisetti's view?

A.   Yes.

Q.   All right.  So just to summarize it, with respect to your opinions on validity with respect to claim 1, are each of the limitations of claim 1 disclosed in the RBS 2000 system as implemented prior to the invention, at least under the way that Dr. Madisetti is applying the claim language to T-Mobile and Ericsson's current products?

A.   Yes.

Q.   Okay.  Under that view, if the jury were to find that the claims are not infringed by adopting your view of the claim scope, with respect to your opinion on validity with respect

to the RBS 2000, what conclusion should follow from that?

A.    Well, if the jury found that under my opinion of the plain and ordinary meaning or how the Court has construed certain claim terms that the accused products do not infringe, then if applying that theory to invalidity, there's no reason to invalidate the patents.

Q.    For example, in the accused products, they don't store equalization weights.  Right?

A.    That's correct.

Q.    And that's, in your opinion, one reason why they don't infringe.  Right?

A.    That's correct.

Q.    The RBS 2000 system, does it store equalization weights?

A.    Under --

Q.    Under your interpretation.

A.    Under my interpretation, no.

Q.    Okay.  So that's -- is that an example of how they find infringement without equalization weights, then the prior art system shouldn't need equalization weights, either?

A.    Right.

Q.    Okay.  Let's talk a little bit about claim 3.  Claim 3 adds a limitation to claim 1, that the channel-related parameter is representative of the channel condition of the first channel.  Do you see that?

A.    Yes.

941

Q.   Okay.  Is that something that was disclosed in the RBS 2000 system?

A.   Yes.  Those are those A/B weights.

Q.   So are these -- the things you talked about, RxLev, RxLev B, and RxQual, are each of those representative of channel condition?

A.   Correct.

Q.   So can I put a checkmark on claim 3?

A.   Yes.

Q.   All right.  Looking at claim 6, it again adds another limitation, and here it requires the "receiving station comprises an antenna assembly and wherein the channel-related parameter determined by said profile parameter determiner comprises an antenna parameter related to the antenna assembly."  Did I read that right?

A.   Yes.

Q.   And did the RBS 2000 disclose an antenna assembly?

A.   Yes.  That's that A/B parameter that I've spoken about previously.

Q.   Okay.  So in this figure 95 that we've been looking at from JX 41, page 312, what's the antenna assembly?

A.   Well, this is, again, a description of diversity, and so that parameter RxDiv, that would select between these two or both of them would be an example of the antenna assembly, and the channel-related parameter comprises a parameter related to

the antenna assembly.  RxDiv definitely does that.

Q.   Okay.  What about those other ones you talked about--RxLev and A and B?

A.   RxLev and the A and B parameters also apply.

Q.   All right.  So can I put a checkmark with respect to claim 6?

A.   Yes.

Q.   Okay.  So looking at all the claims in the claim limitations, what's your ultimate conclusion, at least under Dr. Madisetti's broader view of the claims, as to whether or not the claim elements are satisfied by the RBS 2000 system?

A.   They're all present in the RBS 2000 system under Dr. Madisetti's interpretation of the claim language.

Q.   Okay.  And what does that mean in terms of your opinion on validity or invalidity?

A.   Well, that the '477 asserted claims are invalid under Dr. Madisetti's interpretation of the claim language.

Q.   Okay.  Now, we haven't had a chance to talk to Dr. Madisetti yet with respect to his invalidity opinions, but have you reviewed his expert reports?

A.   Yes.

Q.   And do you understand that he had certain areas where he disagreed with you as to what the RBS system disclosed or did not disclose?

A.   I do.

943

Q.    Do you understand that one of his critiques, at least in his report, was that things like timing advance or receiver diversity, that those parameters are not used to facilitate subsequent receive operations.  Do you recall those opinions from him, generally?

A.    Yes.

Q.    What is your response to that if Dr. Madisetti offers those same opinions to the jury later this week?

A.    I disagree.

Q.    Why?

A.    Well, I've already explained, but I'll do it again.  The timing advance is definitely necessary to facilitate subsequent receive operations because you have to align that uplink burst within a certain slot.  That's dependent on how far the user is away from the base station.

            THE COURT:  Can you slow down, please, Professor?

            THE WITNESS:  I apologize, Your Honor.

            THE COURT:  All right.

            THE WITNESS:  So the timing advance is definitely stored and used to facilitate subsequent receive operations.

Q.    (BY MR. HAYNES)  Okay.  Is that under your view of the claims or Dr. Madisetti's view of the claims?

A.    That's under Dr. Madisetti's view of the claims.

Q.    Okay.  Now, we did hear from Dr. Madisetti on infringement with respect to what's required to facilitate

receive operations.  Is that right?

A.    Yes.

Q.    Okay.  What's your view as to whether or not Dr. Madisetti's opinions on infringement as to what is required, how those compare with what you understand his opinions to be on invalidity with respect to that element of facilitating subsequent receive operations?

A.    Well, as a broad characterization, it seems like the scope of Dr. Madisetti's interpretation changes based on whether it is directed to infringement or validity, and I found that not to be applicable.  I used the same interpretation for both analyses.  I also -- I'd like to mention that the channel-related parameters such as RxDiv are also stored and recalled.

Q.    Okay.  You understand that another point that Dr. Madisetti made in his -- with respect to your opinions was that he doesn't believe that certain antenna parameters are actually determined in the RBS 2000.  What's your response to that?

A.    That's what I just remembered and wanted to remind us all of--that that RxDiv parameter is, indeed, retrieved for every -- for processing every subsequent burst.

Q.    Okay.  What about whether or not the antenna values, such as those A/B values, what's your response if Dr. Madisetti were to say that those A/B values are not determined because

945

there's only three options?

A.    Well, first of all, they are measured, and they are used as an average, but they are determined.  And if the understanding of 'determined' were somehow to be limited to not measured, then, in my opinion, it would have been obvious to one of ordinary skill in the art to actually measure them, even though it's my opinion that they are measured.

Q.    Okay.  What about the values that were in that truth table that we talked about where it sets which antenna you're going to receive from?  Are those values determined, in your view?

A.    Yes, they are.  That's RxDiv that's determined.

Q.    Okay.  Can you just sum up for us what your opinion with respect to the validity of '477 Patent is, at least under Dr. Madisetti's broader view of the claims?

A.    Certainly.  Under Dr. Madisetti's broader view of the claims that he applied to the accused products for the purposes of infringement, I adopted those and found that every element of every asserted claim of the '477 Patent was present in the prior art system, the RBS 2000.

Q.    Okay.  So can we label that invalid with an asterisk just to indicate that's only under an overly expansive view of the claims?

A.    That's fine.

Q.    Okay.  Now I want to shift gears and talk about the '383

Patent.  Is that all right?

A.    Okay.

Q.    Now, just briefly, we talked about the '383 for infringement, but just to reorient ourselves, can you remind us what the '383 Patent is about?

A.    Sure.  This is applying uplink bursts from subscriber 1 and subscriber 2 to one of two demodulators, as I'm illustrating here.

Q.    Okay.  At a high level, what is your opinion with regard to whether or not the RBS 2000 invalidates the '383 Patent?

A.    Again, under Dr. Madisetti's broader view of the claim language for infringement, I found these elements of asserted claim 16 of the '383 Patent to be present in the RBS 2000 system.

Q.    Okay.  Now, similar to what we did for the '477 Patent, I'd like to just walk through claim 16 and see whether or not those are disclosed, at least under Dr. Madisetti's view of the claims.  Okay?

A.    Okay.

Q.    We'll start with the preamble:  "A method for acting upon first and second successive data signals transmitted to a communication station operable in a wireless communication system by a first subscriber station and at least a second subscriber station."

        Did I read that right?

947

A.   Except for the last part you missed.

Q.   "The method comprising."

So was that something that the RBS 2000 disclosed, that high-level concept?

A.   Yes.

Q.   And can you just explain to us briefly how it is that the RBS 2000 meets this limitation?

A.   Yes.  I'm illustrating here a radio frame, which is a way of organizing slots that are associated with different users, like subscriber 1 and subscriber 2, as you can see there on the left, and those are subsequent bursts that are -- data signals that are being provided to the base station.  And so that method is -- the preamble is disclosed in the RBS 2000.

Q.   And that TDA uplink frame, are each of those signals that go into the box algorithms, those successive data signals?

A.   They are successive data signals.

Q.   And what does the word 'successive' mean to you, Dr. van der Weide?

A.   I would say the -- to me or one of ordinary skill in the art?

Q.   Are those different in this case?

A.   I don't have a distinction.  'Successive' means one right after the other with no gaps.

Q.   Okay.  All right.  So can I put a checkmark next to this first element?

A.   Yes.

Q.   The second element requires "selecting at which of a first demodulator and at least a second demodulator to apply at least one of the first data signals and the second data signals, wherein the first and successive data signals and any subsequent data signals are alternately applied to the first and second demodulators."

Do you see that limitation?

A.   I do.

Q.   Now, does the RBS 2000 have two separate demodulators in it?

A.   Under Dr. Madisetti's broader interpretation where, as I understand it, any user signal essentially spawns a demodulator, the answer is yes.

Q.   Okay.  What about under what a person of ordinary skill in the art would have understood a demodulator to be back in 2001?  Are there two of those in the RBS 2000?

A.   No.

Q.   Okay.  So your opinion on validity here, is this one of those areas where it only applies if you believe that a demodulator is some sort of logical construct, similar to what we heard Dr. Madisetti talk about yesterday?

A.   That's a fair summary.

Q.   All right.  Under that -- Dr. Madisetti's broader view of the claims, would the RBS 2000 disclose two demodulators, at

least under that broader view?

A.   Under Dr. Madisetti's broader view of the claims, then the RBS 2000 does disclose multiple demodulators, two demodulators.

Q.   And can you just circle on the screen where the demodulator is in the RBS 2000 on this figure on the right, which is figure 18 of JX 43 on page 8?

A.   Yeah.   This is a routine called BDem It stands for burst demodulator.   That's running on the ToRA ASIC and is the software -- the code that is demodulating one of those streams, the A or B.

Q.   Okay.   In order to demodulate one of those streams, the A or B stream, does that BDIM need to get some information out of those buffers that make up the user profile?

A.   Yeah, it does.   And it gets that from this common memory area right here.

Q.   Okay.   So coming back to the claim language, can I put a checkmark next to the first element of having a first and second demodulator, under at least Dr. Madisetti's broad view?

A.   Yes.

Q.   Okay.   We didn't talk about the word 'alternately' with respect to the RBS 2000, but is that 'alternately applied', is that done in the RBS 2000, under your plain meaning interpretation of the claims?

A.   According to what I learned from Anders Akesson, there is

950

alternating going on between the A and B streams, so there is at least a portion of that, but it would also apply under Dr. Madisetti's broader view.

Q.   Right.  And when you use the word 'alternately' there, let's just all be clear, are you making up some special meaning for that, or are you applying the plain meaning?

A.   That's the plain and ordinary meaning.

Q.   Okay.  So would you agree with me, sir, that 'alternating' means sort of one going up and then the next--ping-ponging?

A.   I would agree with your demonstration of 'alternating'.

Q.   Okay.  So can I put a checkmark under 16[a], at least under Dr. Madisetti's view of the claims?

A.   Yes.

Q.   All right.  Let's go to the next element.  And I've combined two elements here because they are sort of parallel. The first is "demodulating the at least one of the first" -- try it again.  "demodulating at least" -- "the at least one of the first and at least second data signals at the first demodulator when the first demodulator is selected during the operation of selecting."  And the second one is "demodulating the at least one of the first and at least second data signals at the second demodulator when the second demodulator is selected during the operation of selecting."

Okay.  So do you understand that both of these are

describing separate demodulation steps by different demodulators depending by -- on which one gets selected first?

A.   I do.

Q.   Okay.  So is this notion of demodulating one of the first and second signals and then demodulating at least one of the second signals at a second demodulator, is that disclosed, at least under Dr. Madisetti's broader view of the claims?

A.   Yes.

Q.   Okay.  And again, I see we've highlighted that bDem here. Is that what you identified as the demodulator?

A.   Yes.

Q.   All right.  So can I put a checkmark under 16[b] and [c], under Dr. Madisetti's view?

A.   Yes.

Q.   All right.  That takes us to the last element which requires "maintaining profiles associated with each of the first and at least second data signals transmitted upon the first and at least second channels, respectively, and wherein the operations of demodulating further comprise accessing the profiles."

     Do you see that?

A.   I do.

Q.   Is that disclosed in the RBS 2000?

A.   Yes.

Q.   And can you just explain to us where it discloses

Q.    accessing the profiles?

A.    This is a slide I've shown before from JX 8 at 695.  It's some of the source code and excerpts from the source code, including different buffers like the channel context buffer, and those profile values are stored in those buffers and then subsequently retrieved to perform operations of demodulating.

Q.    Okay.  So in the RBS 2000, as part of the demodulating done by that component, we identified BDem.  Would it access the profile information in these context buffers?

A.    Yes.

Q.    Okay.  So can I put a checkmark under claim element 16[d]?

A.    Yes.

Q.    Now, Dr. Madisetti has said that as long as there is two separate demodulation steps, did that -- might get you to a first and second demodulator under some interpretation of the claims.

       If you look at the claims like that and determine that a person of ordinary skill would not find that the one demodulator in the RBS 2000 could be two demodulators, at least under Dr. Madisetti's view, would it have been obvious to modify it to have two demodulators?

A.    In my opinion, it would have been obvious to one of skill in the art at the time of the invention to simply add a second ToRA, for example, and ping-pong back and forth between those

two.

Q.    Okay.  And we say 'obviousness'.  We haven't really talked about that much.  Can you just explain to us what you understand 'obviousness' to be as you applied it for your validity opinions?

A.    Sure.  So 'obviousness', as I understand the law--and I'm not a lawyer--is you have to put yourself in a position of one of ordinary skill in the art at the time of the invention.  And remember that person is a fictitious individual that is surrounded by all the prior art.  Right?  Everything that is possible to know.  And I found many citations of prior art--in other words, patents or disclosures--having multiple demodulators like four; not just two.  And so, in my opinion, one of skill would have been looking to disclosures like that and applying those in this instant situation.  So that's what 'obviousness' would be to me.

Q.    Okay.  Just to summarize your opinions, what is your view, at least under Dr. Madisetti's interpretation of the claims, as to whether claim 16 would be valid in the event that that broad interpretation of the claims was adopted?

A.    Under the broad interpretation that Dr. Madisetti has used to substantiate his infringement contentions, every element of claim 16 of the '383 Patent is disclosed in the RBS 2000.

Q.    Okay.  So, again, can we label that invalid with an

asterisk just to indicate that that is under this much broader view of the claims?

A.   Yes.

Q.   I want to switch now to talk about written description and enablement.

And just to be clear, when you performed your analysis of written description and enablement, were you using that broader interpretation of the claims from Dr. Madisetti, or what you understand to be the plain meaning of those claims as interpreted by the Court?

A.   The latter.  I was just using plain and ordinary meaning or what the Court -- how the Court had construed certain claim terms.

Q.   Okay.  So can you just explain at a high level why it is this written description requirement requires an inventor to describe their invention in the patent itself?

A.   Yeah.  I think we heard in the opening about what a patent is.  It's a social contract.  Essentially, in exchange for an inventor fully disclosing the property that they want to claim, the intellectual property, the government, society, gives that inventor a right to exclude, like you can't trespass or I'll sue you.  But that's a deal.  You know, you can't not disclose the metes and bounds of your claim language or the scope of your invention and then expect to sue somebody later on.  They won't know whether they're trespassing or not.

So that's the basic idea.

Q.   Okay.  So when you talk about 'disclose the scope of the claims', can you -- is it enough just to disclose part of the scope, some of the limitations, or do you have to disclose the full scope in your interpretation?

A.   Well, if you wish to enforce an exclusion right on a certain scope of claims, it needs to be disclosed in the written description.  That's the deal.  That's my understanding of the deal.

Q.   Now, you understand that there's actually a construction in this case that says that the claims themselves don't specifically restrict the invention to a fixed wireless system; that, at least in theory, they could apply to a mobile wireless system.

A.   That's my understanding.

Q.   Okay.  Does the patent description ever describe an invention or that either of the claimed inventions could be used in a mobile wireless system?

A.   No.

Q.   And can you just remind us--you were here in the courtroom--were the inventors ever able to build a working prototype of their product in a wireless network?

A.   I saw no evidence of that.

Q.   Did you even see where they tried to build a working prototype in a wireless -- or a mobile wireless network where

956

the receivers are moving around or the transmitters are moving around?

A.    I didn't see any evidence of that.

Q.    Okay.  So in the patent itself, what does it describe the scope of its invention to be?

A.    I went through the patent in detail looking for how it described the scope of its invention.

Q.    Okay.  And what does it describe the invention to be? What does it say?

A.    Fixed wireless access.

Q.    All right.  Let's just walk through a little bit of that description.

A.    Okay.

Q.    Before I do that, does the patent ever say anywhere in it that the inventors think that what's claimed can be done in a mobile wireless network?

MR. HUGHES:  Your Honor, may we approach?

THE COURT:  Approach the bench.

(The following was had outside the hearing of the jury.)

MR. HUGHES:  Your Honor, I object to the question. The Court has ruled the claims cover both fixed and mobile; that the plain and ordinary meaning of the relevant claim terms that this was the subject of the dispute.  We prevailed. And the Court also struck all of Dr. van der Weide's opinions

Shawn M. McRoberts, RMR, CRR
Federal Official Court Reporter

concerning limiting the scope of the claims to 'fixed'.

MR. HAYNES:  Yeah.  And just to be clear, I asked the question--you construed the claims as not limited to fixed, but now they've got to describe it and enable it.  It's a completely different requirement.  Right?  The claims as construed are broad.  The written description has to support that.

THE COURT:  Well, I don't see that the prior ruling prohibits Defendant from making their written description or enablement argument.  If there's a place where you see that those come in direct conflict, Mr. Hughes, point it out to me.

MR. HUGHES:  I believe the question was aimed at making the suggestion that the claims themselves are limited to 'fixed', and that's not the question of written description.  The question of written description is whether or not the written description supports the scope of the claims as they've been construed by the Court.  So he's trying to imply that the claim scope is narrower than it actually is by virtue of the Court's ruling.

THE COURT:  Are you arguing, Mr. Haynes, that the claims are limited to a fixed system?

MR. HAYNES:  No, I'm not.  I'm actually doing the opposite.

MR. HUGHES:  I thought the question heavily implied that, and I think the jury is confused on this, which is why

I -- maybe you can ask a new question that would make that clear.

MR. HAYNES:  I started this by asking the question about the construction, Your Honor, to make it clear I wasn't trying to do this.

THE COURT:  Okay.  In light of this discussion, let me suggest that you ask the witness if the claims are limited to a fixed system.  Have him say 'no', and maybe that will clear things up.

MR. HUGHES:  That will be wonderful.

THE COURT:  Let's do that.

MR. HUGHES:  Thank you, Your Honor.

(The following was had in the presence and hearing of the jury.)

THE COURT:  Let's proceed.

Q.   (BY MR. HAYNES)  Dr. van der Weide, I just want to make one thing very clear.  The claim language itself, the plain meaning of those words, are they limited to just a fixed system as construed by the Court?

A.   No.

Q.   Okay.  So the claims, the scope of the claims are broader than just a fixed system.  Is that right?

A.   I can agree with that.

Q.   Okay.  So if the claims are broader, do you need to describe that breadth of the invention in your specification?

959

A.    My understanding is that one of skill in the art is to read the claims in light of the specification, so the specification gives meaning to the claims.

Q.    Just to be clear, I'm not asking about claim construction; I'm talking about the written description requirement.  Are you required to describe the full breadth of your invention in the patent in order for it to be valid?

A.    That's my understanding.

Q.    Okay.  I'm talking about just the written description requirement.  And I want to see how the patent describes what the inventor thought he invented.  Okay?

A.    Okay.

Q.    So let's start with the title.  What did the inventor tell us he thought his invention was in the title of the patent?

A.    Well, I've highlighted certain language in the title of the patent that says "Fixed Wireless Access Communication System."

Q.    Okay.  Anything about the title suggest to you that the inventor thought he had invented anything that could be used in a mobile wireless network?

A.    The title of the '383 Patent does not indicate that to me.

Q.    Okay.  What about the abstract of both patents?  What do they tell you the inventor thought he had invented with

Shawn M. McRoberts, RMR, CRR
Federal Official Court Reporter

respect to the system?

A.   The abstract is common to both patents, and the only description of the particular communication system that's described to me is a fixed wireless access communication system.

Q.   Okay.  Any discussion in the abstract that the inventor thought his invention could be applied in a mobile wireless network where the phones are moving around?

A.   I don't see the word 'mobile' here.

Q.   Okay.  What about the summary of the invention?  What did the inventor tell the world he thought that his invention was in the summary of the invention?

A.   That it -- the highlighted language is "a fixed wireless access communication system."

Q.   What about in the preferred embodiment, in the figures?  What do the figures tell you the inventor thought his invention was and informed the public regarding his invention?

A.   I understand the figures are part of the specification, even though they're, you know, graphics, they're not written in words, but what I see depicted here is a base station in the middle and three houses connected to it by a wireless channel.  And houses aren't ordinarily mobile, so I would understand this as fixed.

Q.   Now, I didn't have space on the slide for all of it, but I've put up passages from the specification.  Can you just at

a high level tell us, in your review of the specification as you were going through it, what did the inventor describe his invention to be?

A.   Well, I've highlighted several portions of the specification from both the '477 and '383 Patent.  I've cited to the various places where I found this language, but without reading all of it on the screen, I think it's clear that every time there is a communication system, it's cited as "fixed wireless access" in general, at least.  I couldn't find any description of an alternative other than a wired system.

Q.   Okay.  So is it fair to say that throughout the patent specification it describes -- the inventor describes his invention as being a fixed wireless broadband system?

A.   A fixed wireless access communication is how it's described.

Q.   Okay.  At any point is there any suggestion where the inventor told the world, You know what; I know I said fixed a lot and I describe it as fixed, but you could also use it in mobile if you wanted to?  Does that show up anywhere in this patent?

A.   I didn't see it.

Q.   Okay.  Now, you mentioned that there is some description of some other ways you could use this invention.  Is that right?

A.   That's right.

Q.   All right.  Let's see what that looks like.  Here is a passage from column 9, lines 11 to 25.  And can you just explain to us what this is describing where the inventor said, Well, if you're not going to do a fixed wireless network, you could also use my invention in some other places?  What did he tell the public -- what did he tell them you could use that invention?

A.   Yeah.  I think it's important to read not only the highlighted portion but the portion above it, because it's saying that essentially, even though this invention as described is a fixed wireless network, then as I go down to the highlighted portion of the specification, it reads, "alternate embodiments of the present invention, a subscriber integrated access device according to the principles of the present invention may be implemented in other types of broadband access systems, including wireline systems, (i.e., digital subscriber line DSL, cable modem, fiberoptic, and the like) in which a wireline connected to the subscriber integrated access device carries forward and reverse channel signals."

Q.   Okay.  So just to be clear, when it refers to how the present invention can be implemented in other types of broadband access systems, what does it say about what would be required of such systems?

A.   This goes back to that earlier picture I gave of the two

modems and the wire between them.  That is also considered by engineers to be a channel, and it needs to have equalization coefficients.  That's one reason DSL actually works.  And to me this language just says some of these principles in our invention can also be applied to wired systems, not mobile wireless systems.  I didn't see that anywhere.

Q.   Okay.  Now, at the time--we're talking about early 2001--were mobile wireless networks, were those known?

A.   Oh, yeah.

Q.   So this is not a situation where the inventor may not have known that there were wireless networks out there; he would have been aware -- well, let me withdraw that question.

Would a person of ordinary skill in the art have been aware that wireless networks were out there?

A.   Yes.

Q.   And if this invention covered them, having listed a laundry list of other alternatives, did the inventor describe that you could use this in a mobile network?

A.   I saw no such description.

Q.   All right.  Now, we've heard a fair bit about the difference between a fixed network and a mobile network. Can you explain why or whether or not it would be possible to implement this invention in a mobile wireless network?

A.   Well, I didn't see enough in the specification to enable one of ordinary skill in the art, in my opinion, to implement

this in a mobile wireless access system.

Q.   Okay.  Are there special conditions in a wireless mobile network that would have impacted a person of ordinary skill's ability to put this invention in a mobile system as opposed to a fixed system?

A.   Well, setting aside the roaming issues and all that stuff which aren't the subject of this patent, the rapidly changing channel conditions that I've spoken about previously make it extremely challenging to perform this equalization.  And in my opinion what is being described in these two patents has to do with retaining prior information to speed up a certain arrangement of modems.  But that, as we've heard from Mr. Faxer and I've independently concluded, don't work in a mobile wireless system because the channel conditions are changing so rapidly.

Q.   Okay.

        MR. HAYNES:  Can we bring up JX 1 at column 6, lines 1 to 9?

Q.   (BY MR. HAYNES)  This is an excerpt from the '477 Patent. Can you explain to us what's being described here and whether or not that would be easy to do in a mobile wireless system?

A.   Well, it says characteristics--these are the profiles of these data bursts and the channels by which the data bursts are received "are stored in memory"--which I've already explained--"as signal and channel profiles at the receiving

965

station.  The profiles are updated, as appropriate, and include the information required by the demodulators to permit their operation to demodulate bursts of data received by the demodulators."

Again, this is -- involves that memory and retention and recall, which may have been appropriate for this fixed wireless access system that was being contemplated, but is not applicable to a rapidly changing channel condition characteristic of a mobile network.

Q.    And does the patent explain how you might be able to overcome that challenge of these rapidly changing channel conditions such that you could still store in a mobile system parameters collectively representative of a burst?

MR. HUGHES:  Your Honor, may we approach?

THE COURT:  Approach the bench.

(The following was had outside the hearing of the jury.)

THE COURT:  What is it?

MR. HUGHES:  Your Honor, we're getting way beyond what's required for enablement, suggesting that we have to enable a commercially viable product every implementation of the claims.  The claims are agnostic to fixed versus mobile. We have to enable the claims, not some broader commercialized mobile network, as all these questions and answers are implying.  We've got to stick to what everybody knows is the

requirement of enablement, which is to enable the claims as construed by the Court.

THE COURT: Well, I don't hear the witness overtly saying you've got to enable some other system or product. I understand your point. I think your point can fairly be made on cross examination.

MR. HUGHES: Thank you, Your Honor.

THE COURT: All right. Let's proceed.

(The following was had in the presence and hearing of the jury.)

THE COURT: Let's proceed.

Q. (BY MR. HAYNES) Dr. van der Weide, does the patent provide any description or teaching that would enable a person of ordinary skill in the art to implement the claimed inventions in a wireless--sorry--in a mobile wireless network where the channel conditions are changing very rapidly?

A. I saw nothing in the specification of either patent to accomplish that.

Q. All right. So in light of that, can you just summarize your opinion with respect to whether or not these patents satisfy the written description and enablement requirements?

A. Well, to summarize, because of that, I find that the patents as applied to mobile wireless access system are invalid due to lack of written description and/or enablement.

Q. And is your opinion with respect to invalidity on the

written description and enablement requirements, does that depend on whether the jury adopts your interpretation of the claims or Dr. Madisetti's much broader interpretation of the claims?

A.    No.

Q.    Okay.  So did the inventor describe and enable either invention, either the one in the '383 or the '477, under either interpretation of the claims?

A.    Not to one of ordinary skill in the art at the time of the invention using the plain and ordinary meaning of these terms, or as the Court has construed certain terms.

Q.    Thank you.

MR. HAYNES:  I have no further questions.  Pass the witness.

THE COURT:  All right.  There's cross examination, I assume.

MR. HUGHES:  Yes, Your Honor.

THE COURT:  All right.  Let's go off the record for just a minute.

(Discussion off the record.)

MR. HUGHES:  Ms. Brunson, can I be put on the screen, please?

THE COURT:  All right.  We're back on the record. Let's proceed with cross examination, Mr. Hughes.

CROSS EXAMINATION

968

BY MR. HUGHES:

Q.    Good afternoon, Dr. van der Weide.  Is that right?

A.    Van der Weide; that's close.

Q.    Van der Weide.  I'll get it by the end of the afternoon.

      We haven't met yet.  I'm John Hughes.  I represent General Access.  It's nice to meet you, sir.

A.    Likewise.

Q.    Dr. van der Weide, you're getting paid for your time testifying today.  Correct?

A.    Yes.

Q.    Your hourly rate is $700 an hour?

A.    That's correct.

Q.    And like Dr. Madisetti, you spent hundreds of hours working ON this case and are getting paid for all of those hours.  Correct?

A.    Yes.

Q.    And you have been retained by T-Mobile and Ericsson in this case.  Correct?

A.    That's correct.

Q.    And this is not the first time where you have been paid to give sworn testimony by a telecom company, including the two telecom companies here in court with us today.  Correct?

A.    Correct.

Q.    In fact, in some years up to 50 percent of your income comes from being hired by companies involved in litigation.

Correct?

A.    Correct.

Q.    And in 2024, roughly half of your income came from being hired to testify for companies involved in litigation. Correct?

A.    Yeah, I can agree with that.

Q.    And 25 percent of your 2024 income came from the work that you have been doing on behalf of Ericsson. Correct?

A.    Sounds about right.

Q.    Ericsson is a repeat client. Right?

A.    I guess you could characterize the situation that way.

Q.    They keep hiring you and you keep saying yes. Correct?

A.    So far.

Q.    And you keep getting, to use your words, the business from very large companies involved in lawsuits. Correct?

A.    I have used that term.

Q.    I want to focus on the litigation consulting work you have done for telecom companies. Are you focused on that, sir?

A.    Sure.

Q.    Okay. And first, to frame the issue, in this case your opinion is that the Defendants don't infringe either of the patents. Correct?

A.    That's correct.

Q.    And it's also your opinion that the patents are invalid;

that the Patent Office just got it plain wrong and should not have issued the claims at issue in this case.  Correct?

A.    I'm not sure I agree with the premise.

Q.    Sir, you just got finished telling us that the claims at issue in this case are invalid for a lack of written description and enablement, and you know from your experience with your own 60-plus patents that the patent examiners evaluate the patent applications to see whether or not those requirements are satisfied before a United States patent issues.  You know that.  Right?

A.    I do.

Q.    And the jury saw that -- you've seen the patent video that the jury watched at the beginning of the week.  Right?

A.    I didn't watch it this time, but I think I know what you're talking about.

Q.    You've seen it before, and you know in that video that it explains that the patent examiners evaluate whether a patent application satisfies the requirement of written description and enablement.  Correct?

A.    For the scope of the claims being sought, yes.

Q.    Right.  And those are the claims that -- we'll come back to that in a moment.

So it's your opinion at a minimum in this case that the patents are invalid and not infringed.  Correct.

A.    It's more of an either/or.

Q.   Well, it's not either/or when it comes to written description or enablement, is it?  You applied the plain -- you applied different views of what you think the patent means.  For your opinions on non-infringement, you take what you say is the plain and ordinary meaning, which is narrower than Dr. Madisetti.  That's your view.  Right?

A.   Correct.

Q.   And when you're telling us that the RBS -- Ericsson -- RBS 2000 Ericsson base station makes the patents invalid, you take a broader view, a different view of what the patents mean.  Right?

A.   Dr. Madisetti's view, yes.

Q.   Okay.  But when you're saying that the patents aren't valid because of written description and enablement, you're required to take the exact same view that you say you applied to your non-infringement opinions.  Correct?

A.   I think I was careful to make that distinction.

Q.   You're agreeing with me.  Right?

A.   Could you restate the question, please?

Q.   Your opinion as to non-infringement adopts the same understanding of the meaning of the patents as your opinion on written description and enablement.  Yes or no.

A.   Yes.

Q.   Now, focusing on your work for the telecom industry in other cases other the last four years, you've been involved in

a number of cases for the telecom industry related to patents. Correct?

A.   Correct.

Q.   And you understand, as part of this process, you gave us a list of the different litigation matters and testimony that you've given for telecom companies and others over approximately the last four years.  Right?

A.   Yes.

Q.   Okay.  And in addition to Ericsson and T-Mobile, you've been paid to give testimony by companies like AT&T, Verizon, Nokia, in cases relating to patents.  Correct?

A.   Yes.

Q.   And most, if not all, of those cases you've given sworn written or oral testimony to the companies involved in disputes with your telecom clients have invalid patents. That's an opinion you've given over and over again.  Correct?

A.   When I reached that conclusion I would provide that opinion.

Q.   I took a look at the testimony on the list you provided, and I'm sure it wouldn't surprise you that you've said over two dozen U.S. patents are invalid when you were hired by telecom companies in the last four years.  Does that sound about right to you?

A.   It sounds about right.  I could agree with that.

Q.   And in those cases that you listed on your testimony list

that you provided for us where you were representing the telecom companies, I didn't see a single time that you gave the opinion that the Patent Office got it right regarding that any of the patents asserted against your telecom clients. You never found the Patent Office got it right in any of those cases, did you?

A.   Of course it depends on the infringement theory, but I agree with you.

Q.   And a lot of times you're hired by telecom companies like Ericsson and T-Mobile when they are involved in disputes with smaller companies, including companies whose business it is to license patents like General Access. This isn't the first time you've been involved in a case with a licensing entity like General Access. Correct?

A.   That's correct.

Q.   So the Patent Office happens to just keep getting it wrong on all the patents that are asserted against your telecom clients, at least in the last four years. Is that right?

A.   I disagree.

Q.   Let's move on to where you ended with Mr. Haynes, which was on validity. And I want to focus -- we'll get to the specifics of that in a minute. Before that, I want to clear up a few preliminary matters.

You told us on direct that you have a number of your own

974

patents and are generally familiar with the process of

04:33  obtaining a patent.  You've got 60 of them.  Right?

A.   I may -- that seems like a fair characterization of my

testimony.

Q.   Yeah.  And you're familiar with the back and forth with

the Patent Office from your experience with your patents.

Correct?

A.   I have prosecuted my own patent pro se.

Q.   Okay.  And you've done it some pro se, which means

without a lawyer.  Right?

A.   I'll only do it once.

Q.   And then the rest of the time you hired patent counsel to

help you with the process.

04:33  A.   Absolutely, sir.

Q.   So you know it's very common in the back and forth with

the Patent Office, that can take years, that claims get

rejected, amended, added.  That's a common thing.  That's

happened on your patents.  Correct?

A.   Oh, yeah.

Q.   And there's absolutely nothing wrong with that; that's

just part of the process.

A.   I agree.

Q.   And I just want to touch on that because you talked with

Mr. Haynes about the fact that a couple of -- there were a

couple of amendments to the General Access patents, but you're

975

not implying there was anything wrong about that.  That's just a normal part of the practice.  Correct?

A.   Generally inventors seek broader coverage, and then it gets narrowed through the process of prosecution.

Q.   And you're proud of your patents and inventions.  Right?

A.   Yes.

Q.   And you believe in the importance of the U.S. patent system.  That's why you keep filing for patents.  Correct?

A.   I'm a firm believer in the patent system, and our system of government in general.

Q.   And you understand when the Patent Office issues a U.S. patent, it's a piece of property that can be bought and sold. Right?

A.   I understand that.

Q.   And you also agree that a U.S. patent is presumed to be valid.  It's called the presumption of validity.  You understand that.  Right?

A.   Yes, I do.

Q.   And were you here for jury selection when Ms. Fair and Mr. Dacus asked questions to the jury pool before we selected our jury?

A.   I was not.

Q.   I want to see if you can help me clear something up. Issued U.S. patents are not preliminarily approved by the Patent Office.  Issued U.S. patents create property rights

976

that are presumed valid.  Correct?

A.    Correct.

Q.    You don't refer to your issued U.S. patents on your CV as preliminarily approved.  Right?

A.    Nope.

Q.    And you don't use those words in any of your expert reports.  Correct?

A.    Not to my recollection.

Q.    Now, I want to focus on your written description and enablement opinions where you ended with Mr. Haynes.  And as to the '477 Patent, your opinion is the Patent Office got it wrong because the '477 Patent lacks written description and is not enabled.  Correct?

A.    For a mobile wireless access system, yes.

Q.    And so not enabled, lack of written description--two reasons -- you remember there were two examiners on the '477 Patent.  Right?

A.    I don't have it in front of me, but I'll take that as a representation.

Q.    Okay.  And so they both got it wrong when that patent issued.  The patent, you say, lacked written description and enablement.  Correct?

A.    For a mobile wireless access system.

Q.    Right.  And you understand that everybody in here agrees, I think you told your counsel, that the claims that issued

from the Patent Office cover both a fixed and mobile wireless access device, including the claims at issue in this case. You understand everyone here agrees on that.

A.    I accept the Court's ruling on that.

Q.    Okay.  And the '383 Patent, your opinion is that patent should [sic] have issued, but you just say that's because it lacks written description.  Correct?

A.    Yes.

Q.    And there were two different examiners on that patent. Right?  Two different patent examiners.

A.    Again, I don't have it in front of me, but I'll accept that as a representation.

Q.    Thank you.

Now, written description means the claims are supported by the disclosure.  Right?

A.    That's my understanding of the law.

Q.    And the disclosure is the description at the front; all the drawings and the columns of text, everything in the specification that comes before the claims.  Correct?

A.    That's my understanding.

Q.    That's where the applicant sets out the background of the invention, the problem being solved, the prior art that's out there, and what the inventor has come up with.  Correct?

A.    Again, that's my understanding.

Q.    And that's one of the first things filed with the Patent

Office.  Right?

A.   In my experience, yes.

Q.   And then ultimately for issued claims, that's a determination by the Patent Office, as we've already discussed, that the issued claims are enabled and have written description.  Correct?

A.   I agree, although I am also aware that many patents have subsequently been found invalid.

MR. HUGHES:  Your Honor, I move to strike everything after "I agree."

THE COURT:  Sustained.

Q.   (BY MR. HUGHES)  Now, you had the same information in front of you as the Patent Office had in front of it.  You had the disclosure, the figures, all the words, everything leading up to the claims, and the same issued claims.  You had the same thing as they did.  Right?

A.   I agree with that.

Q.   Now, I want to talk -- I want to show you something that you looked at with Mr. Haynes.  You remember looking at this part of I believe it's column 9 of the '477 and '383 Patent specification with Mr. Haynes in your testimony?

A.   Yes, I do.

Q.   And you see you've got kind of the bottom half of what you had called out on your slide highlighted.  Correct?

A.   Yes.

Q.   And the top, though, reads--that you didn't highlight--"It should be noted that network 100 was chosen as a fixed wireless network only for the purposes of simplicity and clarity in explaining a subscriber integrated access device according to the principles of the present invention. The choice of a fixed wireless network should not be construed in any manner that limits the scope of the present invention."

      Do you see that?

A.   Yeah.   And I believe if you look at my testimony, you'll see I actually pointed that out.

Q.   I just asked you if you saw it.

      Do you -- and now -- but that's not what -- you did not highlight the language that I just pointed out to you. Correct?

A.   I did not.

Q.   That the use of the fixed wireless network word that you pointed to us over and over should not be construed in any manner that limits the scope of the present invention in any way.   That's what the applicants told the Patent Office. Correct?

A.   Well, there's context there.

           MR. HUGHES:   Your Honor, it's non-responsive.   I move to strike.

           THE COURT:   Overruled.

Q.    (BY MR. HUGHES)  Now, one last point here before we move on, Dr. van der Weide.

As to enablement, you understand that the patent applicant only has to enable one to practice one embodiment of the claims.  You understand that's the appropriate rule to apply.  Correct?

A.    As I've said repeatedly, I'm not an attorney, so I will accept that as the law, but I'm not specifically aware of the law on that point.

Q.    Okay.  Now, let's move on; shift gears a little bit.

You've been here for all of the -- you've been here since opening statements and for all the testimony in the trial.  Is that right.

A.    Except for a little bit last night, yes.

Q.    And you were here this morning when Mr. Faxer testified about Ericsson's 60,000 patents, and I think he even talked about one patent in particular in court today.  You were here for that?

A.    Yes.

Q.    Okay.  And the fact that Ericsson has patents is not relevant to any of your non-infringement opinions.  You're not relying on any Ericsson patent to say Ericsson and T-Mobile don't infringe.  Right?

A.    No.

Q.    And the fact that Ericsson has patents is not relevant to

981

any of your invalidity opinions.  You're not here in court pointing to some Ericsson patent and saying that's a reason that the General Access patents are invalid.  Correct?

A.    Correct.

Q.    And so the fact that Ericsson has patents doesn't give it a get-out-of-jail-free card to use other people's intellectual property; you've got to compare the issued claims to what their network actually does.  Correct?

A.    I'd agree with that.

Q.    Now, let's talk about a few more -- a few other things we've heard about since you've been here observing the trial.

You've been here when we heard about WiMAX a few times this week.  Right?

A.    Yes.

Q.    And you know that Mr. Struhsaker was actually the co-chair of the WiMAX standards committee.  Did you know that?

A.    I heard his testimony.

Q.    Okay.  And as for the opinions that you are offering here at this trial, WiMAX doesn't factor into your invalidity or non-infringement opinions.  That's not something you pointed the jury to in your testimony with Mr. Haynes.  Correct?

A.    Although I cited to it in my reports, I did not talk about it with Mr. Haynes.

Q.    Right.  You're not coming here to court pointing to WiMAX as a reason the patents are not infringed or invalid.

982

Correct?

A.    Not in this courtroom.

Q.    And so as the jury is evaluating the opinions that you're giving in this trial in this courtroom, they can put WiMAX out of their minds as far as your opinions are concerned. Correct?

A.    I'm not the judge, but I would -- so I don't know how the law works there.

Q.    Okay.  But they don't relate to anything you're saying in court this week.  Correct?

A.    I haven't testified about WiMAX in this courtroom.

Q.    And the same is true -- we've heard something about 2G EDGE.  I talked about it with Mr. Akesson.  You don't rely on that in any way for your infringement or validity opinions. Correct?

A.    That's correct.

Q.    Okay.  And lastly, we've heard some questioning about a product by a company made by a company called Navini.  That's not relevant to any of the opinions that you're giving in opinions in Court this week either.  Correct?

A.    That's correct.

Q.    Now, I want to transition now and talk with you about the RBS 2000, as we kind of work backwards through your direct testimony.

       First of all, you relied on conversations with

Mr. Akesson when you were coming up with your opinions concerning the RBS 2000. Correct? That's one of the things you relied on?

A.    As I testified, I confirmed my understanding with experts such as Mr. Akesson.

Q.    And you were here for his testimony today.

A.    Yes.

Q.    And so you -- and you don't have any reason to disagree with anything he said in his testimony. Correct?

A.    I can't think of any at the moment.

Q.    So when he said there was no beamforming, only one modulation scheme, and only one demodulator, you agree with all of those things. Correct?

A.    I think he qualified that as a very early example of the RBS 2000 and not the later ones, but to that extent I would agree.

Q.    But the early example is the one you say makes the General Access patents invalid. Right?

A.    Generally, yes.

Q.    Okay. Now, and to be clear, this -- let me ask you one different question.

You then talked with Mr. Haynes about how certain things were in the prior art--beamforming, modulation schemes--but you're familiar with the concept, based on your experience with patents, that if you assemble things that came in the

prior art in a novel way, known things but assembled in a novel way, that's a basis for getting a patent. Right?

A.    I suppose it could be.

Q.    And I suspect some of your 60 patents rely on things that were known in the past and that you've assembled things in a novel way to get some of your patents. Would you agree with that?

A.    I haven't gone through them, but I don't have a reason to disagree with that.

Q.    And you agree in this exercise related to the validity of the General Access patents that you need to demonstrate that there is prior art that comes before the priority date of the patents that discloses all of the elements of the claims or renders them obvious. That's the exercise you're doing here. Right?

A.    That's my understanding of the law.

Q.    Okay. And here everyone agrees that the priority date of the patents is January 19, 2001. Right?

A.    I don't recall that date. I'll accept that as a representation, but I thought I saw the file as April 20th.

Q.    You know what? I misspoke and misread my outline, Dr. van der Weide. Thank you for that. It is April.

So -- I'm sorry. That's not right. I believe you agreed with your counsel that it's January of '01, but they can clear that up with you. I believe it's January 19th.

985

Q.   In any event, you told us in your direct about all the work that went into forming your opinions in this case. Right?

A.   I cited to a summary of what I did.

Q.   And you reviewed transcripts, thousands of documents, and so forth.

A.   I did.

Q.   And you put your opinions and the basis of your opinions in your report.  Correct?

A.   To the best of my ability, I believe I did.

Q.   And that's what you and the other experts in the case are required to do.  You write down all your opinions, you cite all the evidence that you think support those opinions, and you give it to us so you know what your opinions and your support are going to be.  Correct?

A.   I believe that's the way the system works.

Q.   And part of what you did in your report, you have a section of your report where you explain why the -- why the RBS 2000 is prior art--in other words, that it came before the 2001 priority date of the patents in this case.  Right?

A.   I have recollection of that.

Q.   And in those sections you cite to Ericsson manuals, sales documents, technical documents, and source code concerning the RBS 2000.  Correct?

A.   Yes.

986

Q.   And you have a chart that lists out some of those documents, and that chart includes the dates that all come before the 2001 priority date of the patents in this case. You recall that?

A.   Yes.

Q.   Okay.  And, in fact, you have -- and you did the same thing in court here today.  You actually showed some documents with dates on them here in court today.  Right?

A.   Yes.

Q.   This was the slide that you reviewed with Mr. Haynes?

A.   That's correct.

Q.   Now, you have sections of your report where you tell us all the reasons you think the RBS 2000 makes both the '477 and '383 patents invalid, where you cite the documents you say support your opinion that the RBS 2000 is invalidating prior art.  Correct?

A.   Yes.

Q.   And I want to talk about what you cited in those sections of your report, Dr. van der Weide.

     I counted all the times you cited any Ericsson document or source code in those sections, and the grand total is 316 times you cited those sources.  Will you accept my representation?

A.   Yes.

Q.   Okay.  And again, these are the documents and source code

987

you were citing in support of your opinion that the RBS 2000

base station that was on the market before the 2001 priority

date makes the General Access patents in this case invalid.

Correct?

A.   Again, under Dr. Madisetti's broad view of the claim

language for infringement, yes.

Q.   But you know that a number of the citations in these

sections of your report are to an RBS 2000 document dated June

10, 2003, over two years after the priority date of the

General Access patent.  You know that.  Right?

A.   I think there may be some cases where the document was

dated that, but the material I was citing to in the source

code was earlier.

Q.   Okay.  I'm not asking you about source code; I'm asking

you -- it's in your binder right in front of you Dr. van der

Weide.  Turn to tab VC 24.

A.   Victor Charlie 24?

Q.   Yes, sir; Victor Charlie 24.

A.   I don't have anything between that and Victor Charlie 30.

There's no -- it's just blank.

Q.   Your binder that looks like my black binder?

        MR. HUGHES:  Your Honor, do you have VC 24?

        MR. SANCHEZ:  Your Honor, may I approach?  There's a

binder here that appears to have the tab.

        THE COURT:  All right.  Let's swap out binders.

988

Hand it to the Court Security Officer, Mr. Sanchez:

THE WITNESS:  Thank you.

This appears to have a red tab flagged on it.

Q.   (BY MR. HUGHES)  Yeah.  I'm not sure we need to get to that.

You see the first page of VC 24.  Right?

A.   Yes.  I'm looking at a page under the tab VC 24.

Q.   And you recognize this as an Ericsson technical document that relates to the RBS 2000.  Correct?

A.   It appears to be.

THE COURT:  Doctor, you need to speak up.  I want to make sure everybody hears you.

THE WITNESS:  It appears to be.

Q.   (BY MR. HUGHES)  And you see that the date at the top of the document is June 10, 2003.  Do you see that?

A.   I do.

Q.   And if you kind of flip through the first few pages, you'll see the date appears at the top page, the top of every page in the document.  Correct?

We don't need to flip through all the pages.  Will you agree the date appears at the top of the pages?

A.   I agree that the date appears at the top of the page, but I wanted to verify that every date label is the same.

Q.   I'm sorry, sir.

Sir, I'm on a clock, so I'll ask my questions in a way

Shawn M. McRoberts, RMR, CRR
Federal Official Court Reporter

that hopefully won't require you to flip through every page.

You know you cited this document in the sections of your report concerning the validity of the '383 and the '477 Patent. You know that. Right?

A.   I have a recollection of citing this document.

Q.   And, in fact, Dr. Madisetti pointed out to you in his rebuttal report that you had cited this document over and over and over again for your opinion that the RBS 2000 invalidated patents issued in 2001 based on a June 2003 document. He told you that in his rebuttal report. Right?

A.   I don't have a specific recollection of that, but I'll accept that as a representation.

Q.   Okay. And we counted it up. Of your 326 citations, 71 citations are to this 2003 document in the sections of your report dealing with the validity of the '477 and '383 Patents as to the RBS 2000 cited.

THE COURT:  Put that in the form of a question, counsel. You're making a statement.

Q.   (BY MR. HUGHES)  Will you accept my representation?

A.   I'll accept your representation.

Q.   And will you accept my representation you cited this document more than any other Ericsson document in the sections of your report related to the validity of the patents in this case as to the RBS 2000?

A.   I haven't gone through my report to count them up, but

for -- I'll provisionally accept the representation.

Q.    Dr. van der Weide, did you know when you signed your report that the document you cited over and over again in the sections of your report saying that patents issued in 2001 were invalidated, the most cited document was from June of 2003?  Did you know that when you signed your report?

A.    I have a recollection of a discussion about the actual contents of this document and the date.  My recollection is a bit incomplete, but I do have a recollection of that--probably going to be need to be refreshed.  But I was satisfied that the -- what I was referring to was reflected in the earlier version of the RBS 2000.

Q.    So the question was --

A.    Yes.

Q.    Okay.  Thank you, Dr. van der Weide.

So you knew the date, but nowhere in your report did you tell the reader, not us, not the Court, anyone, the date of this document.  You know that.

A.    I don't recall not doing that, but clearly you're pointing it out now.

Q.    Even though you had the chart with all the dates in the prior art section--you showed us all the dates here on your screen with the document--the document you cited the most times, you never told the reader the date a single time. Right?

A.    I'm not recalling that particular detail, but I gave a recollection of my previous --

Q.    Okay.

A.    -- process.

Q.    And you certainly didn't come in here to court today and rely on a June 2003 document to tell the jury that patents that issued in early 2001 are invalid.  You didn't present this document to the jury.  Correct?

A.    I did not.  And as I previously stated, I relied on information that was reflective of the earlier Ericsson RBS 2000.

Q.    Okay.  Let's turn to the materials that you did consider and rely on today here in court.

        MR. HUGHES:  And I think we can still stay on the same slide that's on the screen.

Q.    (BY MR. HUGHES)  These materials, and others like them, are what you are relying on to say the RBS 2000 invalidates the '477 and '383 Patents.  Correct?

A.    Well, the title of the slide is "Exemplary Materials Considered," so it's not the sum total; it's just examples that I used in my direct.

Q.    Right.  These documents, and others like them.  Right?

A.    I guess you could characterize it that way.

Q.    Okay.  And you don't rely on any single one of these documents to say the patents are invalid; you rely on the

collection of information that you gleaned from these and other documents to reach your opinions. Correct?

A. Well, these are very complicated systems, so I had to look at many documents.

Q. So you don't, for example, rely on the JX 74, the standard document, in and of itself as a reason that the patents are invalid. Correct?

A. That's true.

Q. And you don't rely on customer reference manual JX 41 or other customer reference manuals as an independent reason why the patents are invalid here. You've got to combine that with the other types of material that are on the screen. Correct?

A. That's right.

Q. And when you formed -- you can't tell how an RBS 2000 system works just by looking at the hardware. Right?

A. Oh, you can gain a lot of information about looking at the boards, but not -- you can't look at the software by looking at the hardware. That's true.

Q. And when you formed your opinions in this case, you had not even looked at the actual RBS 2000 hardware itself. Correct?

A. I did not look at the hardware when I was forming my opinions. That's true.

Q. You relied on the documents and the source code, like the ones we've got up here on the screen. Correct?

A.    That's right.

Q.    And you had to do that because the patent claims are technical involving the inner workings of circuitry and software.  Correct?

A.    Patent claims aren't really directed to that level of detail necessarily, you know, to software or hardware.  I'm not sure I'd characterize the claims in quite that way.

Q.    Let me ask a better question.  You had to look at the source code, the technical documents in order to determine whether the RBS 2000 disclosed the claims of the asserted patents.  Correct?

A.    Certainly that played a significant role in my analysis.

Q.    And other than the standards documents, you agree that the Patent Office did not and could not have had access to the source code, the internal Ericsson documents, and so forth.  That's not something the Patent Office could have had.  Right?

A.    It's a hard question to answer 'yes' or 'no' because it really depends on what the inventor might disclose to the examiner.

Q.    You're not suggesting General Access had internal Ericsson documents.

A.    No.  I'm just answering the question in general, counselor.

Q.    Okay.  But for these you have no reason to believe the Patent Office had -- had or could have obtained any of this

other than the standards document.  Right?

A.    Please repeat the question.

Q.    The Patent Office could not have obtained internal Ericsson documents from anyone other than Ericsson.  Right?

A.    That's true.

Q.    And Ericsson is not the applicant of the patents in this case.  Correct?

A.    That's true.

Q.    Okay.  And you know the Ericsson technical documents and the source code are not distributed outside Ericsson.  You heard Mr. Akesson testify to that today.  Correct?

A.    I did.

Q.    Those documents are confidential and, in fact, marked 'confidential' in this litigation all these years later.  True?

A.    Yeah, I agree with that.

Q.    And the same is true of the source code.  Correct?

A.    In general, that's the way source code is treated.

Q.    So many of the features of the RBS 2000 that you say invalidate the asserted claims are only -- you can only determine that they're present by relying on documents, internal Ericsson documents that were not available or disclosed to the public or a person of skill in the art.  Correct?

A.    That's true.

Q.    Okay.  And you understand--I think you actually talked about this with Mr. Haynes--that the patent system is a bargain and one -- in exchange for getting patent rights, the upshot for the public is the public disclosure of important new advances in technology and science.  Correct?

A.    But the applicant makes that disclosure, yes.

Q.    And the public benefits from that.  Correct?

A.    That's my understanding of the bargain.

Q.    Right.  But your view is the General Access patents can be invalidated based on things that weren't known to the public.  Correct?  The internal Ericsson technical documents and source code.  Correct?

A.    My understanding is if a product has been on sale in the United States, it can qualify as prior art, and my analysis was proving that up.

Q.    Let's shift gears to a different subject, which is infringement.

I think we've made this pretty clear by now, but you are -- none of your infringement claims in this case are based on any notion that the claims of the patent are limited to fixed wireless networks.  Right?

A.    I'd agree with that.

Q.    Yeah.  So when the jury's determining infringement, it doesn't need to be worried about this whole fixed versus mobile issue we've heard so much about.  That does not relate

to the question of whether or not T-Mobile infringes the patents in this case.  Correct?

A.    I understand that's been essentially adjudicated.

THE COURT:  Counsel, approach the bench, please.

(The following was had outside the hearing of the jury.)

THE COURT:  How much longer do you think your cross is going to be?

MR. HUGHES:  About 15 to 20 minutes, but I'm at a very logical breaking point.

THE COURT:  I've got a juror who needs to go to the restroom.  They passed me with note.  So we'll take a short recess.

(The following was had in the presence and hearing of the jury.)

THE COURT:  Ladies and gentlemen we're going to take a very short recess.  If you'll close your notebooks, leave them in your chairs, follow all my instructions.

We're going to keep this to under 10 minutes, hopefully five, so we can get back in here and continue with this testimony.

But with that in mind, the jury's excused for recess.

(Whereupon, the jury left the courtroom.)

THE COURT:  We'll keep this very short, counsel.

The Court stands in recess.

Shawn M. McRoberts, RMR, CRR
Federal Official Court Reporter

997

(Brief recess.)

THE COURT:  Be seated, please.

Are you ready to continue, Mr. Hughes?

MR. HUGHES:  Yes, Your Honor.

And I ask, Ms. Brunson, if I could get back on the screen.

THE COURT:  All right.  Let's bring in the jury.

(Whereupon, the jury entered the courtroom.)

THE COURT:  Be seated, please.

All right, counsel.  Continue with your examination of the witness, please.

MR. HUGHES:  Thank you, Your Honor.

Q.   (BY MR. HUGHES)  I'm just waiting for you to fill your water cup, Dr. van der Weide.

Let's shift gears now.  We've talked about the fixed mobile.  Now I want to talk about the substantive non-infringement opinions you gave today on direct.  And I want to start with the '477 Patent and your opinion on the collectively representative limitation.  Okay?

A.   Okay.

Q.   All right.  And this argument -- just so everybody's clear, the 'collectively representative' argument applies to the '477 Patent, but it does not apply to the '383 Patent. Correct?

A.   That's correct.

998

Q.   All right.  And I've got here on the screen part of claim 1 of the '477 Patent.  You recognize this as some of the key language that relates to the 'collectively representative' issue.  Correct?

A.   I do.

Q.   And you showed some of this language during your direct testimony.  Right?

A.   Yes.

Q.   Okay.  And what claim 1 says is that "a profile parameter determiner for determining a value of at least one signal-related parameter and at least one channel-related parameter, wherein the signal-related and channel-related parameters are collectively representative," and then it goes on.  Correct?

A.   That's correct.

Q.   So in the words of the patent, it could be sufficient for a product to use the invention with one signal-related parameter and one channel-related parameter so long as those parameters, when combined together, were collectively representative of communication of the first burst data signal.  Correct?

A.   I agree with that.

Q.   Okay.  And there's nothing here in this claim and what I'm showing you on the screen or anywhere else in the claim that says that if you don't keep every parameter, somehow that

means that you necessarily don't infringe.  There's no requirement in the claim to keep every parameter.  Correct?

A.    I don't see a requirement like that.

Q.    So long as the combination of one signal-related parameter and one channel-related parameter are collectively representative, there's infringement -- or -- of that claim limitation.  Correct?

A.    I'd agree with that.

Q.    Okay.  And -- now, you evaluated whether or not the RBS 2000 satisfied this -- disclosed this claim limitation and either anticipated it or made it obvious.  Right?  In your validity opinion.

A.    Yes, under Dr. Madisetti's broader interpretation of the claims.

Q.    Okay.  And this is one of the slides that you showed on direct when you were giving that analysis.  Correct?

A.    Yeah, I think so.

Q.    And on the left in green, light green, that's the signal parameter.  Those are categories of signal parameters.  Correct?

A.    That's how I color-coded them, yes.

Q.    And on the right in yellow, those were what you said are channel-related parameters.  Correct?

A.    Yes.

Q.    And we heard a lot about equalization during your

discussion of this claim limitation with regards to T-Mobile's current system and infringement.  But when you were trying to figure out whether or not the RBS 2000 used the claim limitation at issue here, you did not identify as a channel-related parameter a diversity--sorry--an equalization parameter.  Right?

A.    I didn't point to equalization weights.

Q.    That's not what you're pointing to on this slide.  Right?

A.    I'm not pointing to equalization weights here.  That's true.

Q.    Okay.  Now, last, Dr. van der Weide, let's move onto the '383 Patent.  And there you talked about with Mr. Haynes your opinion about 'alternately selecting'.  You remember that claim limitation?

A.    Yes.

Q.    And again, just to be clear that the 'alternate select' non-infringement argument applies to the '383 Patent; it does not apply to the '477 Patent.  Correct?

A.    The 'alternate' term is in the context of claim 16 of the '383.  That's correct.

Q.    Right.  And it doesn't have anything to do with the other patent.  Right?  With the '477.

A.    I don't recall that term being in the asserted claims of the '477.

Q.    So I've got part of claim 16 of the '383 Patent here on

1001

the screen.  You see that.  Right, sir?

A.    I see it.

Q.    And let's just -- I want to walk -- and you agree that -- and I think this has been said several times, but I just to make sure.  You agree that the things that control the metes and bounds of the claims are the words in the claims as construed by the Court.  Right?

A.    I agree.

Q.    Yeah.  And as we're looking at this here, I've got highlighted "a first subscriber station and at least a second subscriber station."

So I want to pause there.  The subscriber station in the parlance of the '383 Patent claim 16, that's like the phone or the thing that's connecting to the tower.  Right?

A.    It is a -- yeah, the subscriber, as disclosed in the patent.  That's right.

Q.    Which could be a phone or something that's connecting to the base station.  Correct?

A.    I didn't specifically see a phone disclosed in the '383.

Q.    How about -- well, so we're not in an area of disagreement, sir, some device that is connecting to the tower.  Right?

A.    I can agree with that.

Q.    And again, remember, this claim has been construed to cover both mobile and fixed wireless networks.  Right?

A.    That's a summary of my understanding.

Q.    Okay.  And then it goes on.  So to dwell on the first and second -- 'at least second subscriber' language a little more, there could be a third, a fourth, a fifth; there could be numerous different devices connecting to the base station because the words 'at least' mean at least a second or more. Right?

A.    At this point of the claim language, I agree with that.

Q.    Okay.  Then if we go on to the next highlighting, "selecting at which of a first demodulator and at least a second demodulator."

      Do you see that?

A.    I do.

Q.    And so, here again, we've got a first demodulator like we had a first subscriber station.  Correct?

A.    Yeah, I see that correspondence.

Q.    And we have at least a second demodulator like we had at least a second subscriber station.  Correct?

A.    Yes.

Q.    So just like with the subscriber stations, the users that are connecting--there can be more than two users connecting--there can also be more than two demodulators. Correct?  That's what the word 'at least' -- the words 'at least' mean.

A.    Right, although I am bearing in mind this is a method

claim.

Q.   Okay.  But the claim can be practiced in a system that -- where more than -- by -- in a system where more than one -- more than two subscribers are connecting and more than two demodulators are operative.  Correct?

A.   Well, it's describing apparatus that includes at least a second subscriber station and apparatus that includes at least a second demodulator.  But that's not the entirety of the claim, so I just want to be clear about that.

Q.   Right.  But the part we're looking at envisions the possibility that you could have more than two subscribers.  We've already established that.  Right?

A.   Stations; the apparatus, yeah.

Q.   Yeah.  And that you can have more than two demodulators; at least a second demodulator.  Correct?

A.   Again, apparatus.  Yes, I agree.

Q.   And there's not a requirement of a one-to-one correspondence between the two.  In other words, the claim doesn't say you only have to have two subscribers; you could have more than two subscribers and still practice the claim.  Correct?

A.   Counselor, I'm hearing 'subscribers' and not 'subscriber stations', so I --

Q.   I'm sorry.  I'm sorry --

A.   -- don't see the correspondence --

1004

Q.   -- I'm using --

THE COURT:  Gentlemen, one at a time.  There's no reason you have to speak over each other.  Okay?

MR. HUGHES:  Okay.

THE COURT:  Go ahead and finish your response, Doctor, and then we'll hear whatever the next follow-up question, unless you've already finished.

THE WITNESS:  With all due respect, I believe he understands my response.

THE COURT:  Well, we'll see.  I'm not sure.

Q.   (BY MR. HUGHES)  I'm going to ask a better question, I hope?

THE COURT:  We'll see about that, too.

    Go ahead.

MR. HUGHES:  Thank you, Your Honor.

Q.   (BY MR. HUGHES)  The claim envisions the possibility that you can have more than two subscriber stations connecting to the network.  Correct?

A.   I agree with that.

Q.   Okay.  And it also envisions a possibility you could have more than two demodulators.  Correct?

A.   I'd agree with that.

Q.   And it includes a situation where you had three or more subscriber stations and only two demodulators.  That's permitted by the claim.  Correct?

1005

A.    I see no reason to disagree with that.

Q.    And it includes a situation where maybe you only had three or four subscriber stations but six or eight demodulators.  That's also something that's possible under the claim language that we're looking at here.  Correct?

A.    Under the 'at least' language.

Q.    That's what 'at least' means.  Right?

A.    I agree.

Q.    And then we get down to the 'wherein', let's look at that language--"wherein the first and second successive data signals and any subsequent data signals are alternately applied to the first and second demodulators."

And I just want to make sure I understand your opinion.  I think I do.  Your view is that this part of the claim means you've got to have -- that no matter how many demodulators are in a system, there's got to be an alternation of signals sent to just two of those demodulators.  Is that your view of what the claim means?

A.    Well, that might be kind of a summary statement, but I think the analysis of this claim deserves a bit more attention, so I'm a little uncomfortable answering it based on the superficial analysis that we've engaged in up till now.

Q.    Well, if there were -- let's say there are three subscriber stations --

Let's go back.  Let's say there's two subscriber stations

1006

and three demodulators.  Is it your testimony that there's only infringement if the signals from those two different subscriber stations are bounced back and forth just between demodulator A and demodulator B and it doesn't really matter what's happening with demodulator C?  Is that what you -- how you understand the structure of the patent?

A.    I'm focused on the part that hasn't been highlighted in the middle of that claim element--"at least one of the first data signals and the second data signal."  So it's talking about, regardless of the apparatus, there is still further limitations here such as the data signals themselves.

And we've got a first data signal and a second data signal that are going to be alternately applied to the first and second demodulators.  I think that makes it much more clear as to what's going on.  Regardless how many subscriber stations or how many demodulators there are, this -- what's been highlighted really is not as relevant to how limited this claim is as what I just pointed to.

Q.    So you limit it to signals coming from a first subscriber station and a second subscriber station and say that those signals from those first and second subscriber stations have to bounce back and forth or alternate--to use Mr. Haynes', you know, arm motions--that's the way -- that's the only way you can practice this claim limitation, according to you.  Is that right?

1007

A.   Well, in my opinion, one of ordinary skill in the art would certainly have understood the plain and ordinary meaning of this term, especially in this context, as being precisely that.

Q.   Okay.  And Dr. Madisetti just disagrees with you about what is required by the claim.  Right?

A.   I wasn't able to divine exactly what his opinion was.

Q.   In any event, at the end of the day, sir, to you or to Dr. Madisetti or to me to decide whether or not T-Mobile's network uses the claims of the patents, that's a question for the jury to decide.  Correct?

A.   Absolutely.

          MR. HUGHES:  No further questions, Your Honor.  I pass the witness.

          THE COURT:  All right.  Is there redirect?

          MR. HAYNES:  Yes, Your Honor.

          THE COURT:  All right.  Let's proceed with redirect.

Q.          MR. HAYNES:  May I proceed Your Honor?

          THE COURT:  You may.

     Are you going to use this drawing?

          MR. HAYNES:  I am not.  Should I turn it over, Your Honor?

          THE COURT:  Please do.

     All right.  Please proceed with redirect.

          MR. HAYNES:  Mr. Carrillo, can we bring back up

claim 1 of the '383 Patent?  Sorry.  I meant claim 16 of the '383 Patent.

REDIRECT EXAMINATION

BY MR. HAYNES:

Q.   Dr. van der Weide, you were being asked some questions about the -- this portion right here of the claim language.  Do you recall those questions?

A.   Yes.

Q.   Okay.  And you were asked some questions about whether we're talking about a signal from a first subscriber and a second subscriber.  Do you recall that?

A.   I do.

Q.   Okay.  Does the claim also talk about any subsequent data signals?

A.   Yes.

Q.   Okay.  And what does the claim tell you those subsequent data signals, where they must be applied?

A.   Alternately applied to the first and second demodulators.

Q.   Okay.  Does the claim say or allow for a third demodulator to get in the mix there?

A.   No.

Q.   Okay.  Now, you were asked a bunch of questions about the language up top when you were doing the selecting, and you can select "at which of a first demodulator and at least a second demodulator."  So at that point in the claim is it possible

that the system might have more than two demodulators?

A.    Yes.

Q.    Okay.  But once I've selected the first one and at least one of how many of the rest of them there are, how many demodulators get selected?

A.    Two.

Q.    Okay.  And once I've done that selection, what does the first demodulator and the second demodulator refer to?

A.    A selected first one and second one.

Q.    Okay.  Once I've done that selection, where must the first data signal and the second data signal and any subsequent data signals be applied?

A.    To the first and second demodulators.

Q.    Okay.  You recall being asked a bunch of questions --

        MR. HAYNES:  We can take that down, Mr. Carrillo.

Q.    (BY MR. HAYNES)  Do you recall being asked a bunch of questions about a 2003 document that you cited in your expert report that has some details about the RBS 2000?

A.    I do.

Q.    And I didn't get all the statistics, but I think he said I think it was 326 citations and 71 were to this 2003 document.  Do you recall that?

A.    Vaguely, but it was something like that, yeah.

Q.    Okay.  Did you also cite the documents that you testified about today that were all prior to 2001?

1010

A.    Yes, I did.

Q.    Okay.

MR. HAYNES:  Your Honor, may I grab a piece of paper from behind me here?

THE COURT:  You may.

MR. HAYNES:  May I have the elmo, please?

MR. HUGHES:  Your Honor, I object.  This was excluded.  He's got it on the screen.

MR. HAYNES:  This is the 2003 document he asked about.

THE COURT:  What is your objection, Mr. Hughes?

MR. HUGHES:  This is not an admitted exhibit.  This was excluded.  I was very careful not to put it on the screen because it wasn't admitted.  That's the basis of my objection.

THE COURT:  Mr. Haynes, how do you intend to use this?

MR. HAYNES:  He was asked about the dates of this document for 15 minutes.  I would like to show the witness the dates in the document.  I'm not going to get into the details of the disclosure, but the dates have been squarely put at issue here.

THE COURT:  All right.  Then take a piece of blank paper and put it over the text of that page leaving the top exposed, and you can ask him about the dates at the top.

MR. HAYNES:  Your Honor, can I ask him about the

dates in the revision history of this document?

THE COURT:  I don't think so.

MR. HAYNES:  I'll pull the document away.

Q.   (BY MR. HAYNES)  Let me ask you a general question.

In technical documents, is it common or uncommon that you write a version of the technical document and then you update it over time?

A.   It's very common.

Q.   Okay.  And when you update the document--say, for example, when you add a new feature--in your experience have you seen technical documents that have a revision history in them?

A.   All the time.

Q.   And that revision history, does that normally tell you what features were added at each point in time?

A.   That's a common feature of a revision history.

Q.   Okay.  Now, do you happen to recall what the first version or whether or not the first version of the document you cited, whether or not that was before or after the -- 2001?

A.   My recollection -- my best recollection, it was before.

Q.   Okay.  And in your -- the citations that they point to, is it your understanding that the features that are described in those citations, did they exist prior to 2001 in the RBS 2000 system?

1012

MR. HUGHES: Your Honor, I object. The explanation connecting the dots between what's in the 2003 document and anything that's actually prior art is non-existent in this witness' expert disclosures.

THE COURT: Mr. Hughes, you've opened the door with this document and the dates on it. The Defendants get a fair opportunity to cross or to readdress the issues that you've opened the door on. He's not offering an opinion here; this is a factual matter. I'm going to overrule your objection.

MR. HUGHES: Thank you, Your Honor.

Q. (BY MR. HAYNES) Let me re-ask my question, Dr. van der Weide.

The features that you set forth in your expert report for which you cited this document, did those features exist in the RBS 2000 prior to 2001?

A. Yes. I attempted to explain that during my response.

Q. Okay. Now, in your direct testimony, we put up some documents, I think there were five or six of them, and we walked through those documents and the -- and used them to explain features of the RBS 2000. Do you recall that?

A. Yes, I do.

Q. Were all of those documents that you relied on in court here today, were all of those prior to 2001?

A. Yes.

Q. Is there any doubt in your mind that the features that

you relied on in court today to show that the RBS 2000

invalidates these patents existed in the RBS prior to 2001?

A.   No.

          MR. HUGHES:  Objection; leading.

          THE COURT:  Restate your question in a non-leading

form, please.

Q.   (BY MR. HAYNES)  Dr. van der Weide, the features that you

testified about today, were those present prior to 2001 or

not?

A.   Yes.

Q.   Okay.  And the documents that you relied on today

describing those features, were they dated prior to 2001 or

not?

A.   Yes; prior.

Q.   Okay.  All right.  We were also asked some questions

about your prior work history.  Do you recall there was maybe

a suggestion that you only work for defendants?

A.   I recall that insinuation, if you will.

Q.   Okay.  Do you also work for patent owners?

A.   Yes, I do.

Q.   Okay.  And you were -- there was also a suggestion that

you only work for telecom companies, or at least a large

portion of your work is for telecom companies.  Do you recall

that?

A.   I do.

1014

Q.   Sir, what is your area of expertise?

A.   As I stated previously, I have worked in a lot of medical device disputes as well.  I also have done a lot of work on RFID systems.  In fact, my first court experience was in Judge Ward's courtroom here in Marshall, Texas in an RFID suit.

Q.   What about high frequency antennas?  Did you do some work in that area?

A.   Yes.

Q.   Do you consider yourself to be an expert in that area?

A.   Yes.

Q.   What about telecommunications?  Do you consider yourself to be an expert in telecommunications?

A.   Certain aspects.  It's a very broad field.

Q.   Okay.  As an expert in telecommunications, does it surprise you that a telecommunication company might want to hire you to explain to a jury telecommunications principles?

A.   I think it seems pretty sensible.

Q.   Okay.  Now, you know of a law firm -- you know that some of the counsel at the table over here work for a firm called Bartlit Beck?

A.   Yes.

Q.   Has Bartlit Beck hired you to explain complicated telecommunications principles in the past?

A.   RFID principles, yes.

Q.   Okay.  Are the opinions you gave today in any way

Shawn M. McRoberts, RMR, CRR
Federal Official Court Reporter

influenced by the fact that it was a telecommunications company that asked you to form those opinions?

A.    No.

Q.    If Bartlit Beck had hired you in this case, would you have given them any different opinions?

A.    If they were representing the Defendants -- I'd have to consider that.  I mean, I'm not -- I give opinions based on my evaluation.

Q.    Okay.

A.    Not based on who hires me, if that's the point of the question.

Q.    Okay.  Now, there was also a lot of questions about the Patent Office has looked at this, the Patent Office has made its own determination.  Do you recall that questioning, generally?

A.    I do.

Q.    Were you in the courtroom when Mr. Dacus asked one of the witnesses about how many patents that the Patent Office approved --

          MR. HUGHES:  Your Honor, I object.  This is improper.

          THE COURT:  Well, you're going to need more than it's improper, Mr. Hughes.

          MR. HUGHES:  Talking about statistics about whether or not patents are invalidated or not found infringed in other

1016

cases is highly prejudicial and improper and irrelevant to any issue before this jury.

THE COURT:  Well, you got close to bolstering the Patent Office that they couldn't make a mistake, and we're not going to denigrate the office that they make mistakes all the time.  We have two patents that have been issued by the Patent Office, and that's where we are.  We're not going to go behind that and either bolster or denigrate the Patent Office.  All right?

So let's move on.

MR. HAYNES:  Understood, Your Honor.

Q.   (BY MR. HAYNES)  Dr. van der Weide, in this case whose job is it to determine whether or not these two patents in this case are infringed or not infringed and valid or not valid?

A.   The jury.

Q.   Okay.  Now, there was also some discussion about the Patent Office did not have access to the RBS 2000 documentation.  Do you recall that?

A.   I do.

Q.   Does the jury have access to the RBS 2000 documentation?

A.   I don't know what the jury is being provided with.

Q.   Well, let me ask you this question.  The jury at least heard you explain that RBS 2000 documentation.  Right?

A.   Yes, they did.

Q.   Okay.  And if the jury reviews that RBS 2000 documentation and forms an opinion on validity, they're entitled to review that documentation and understand your opinions.  Fair?

A.   That would be my expectation.

Q.   All right.  There was also a lot of discussion about whether the claims cover mobile wireless networks.  Do you recall that?

A.   Yes.

Q.   Okay.  I just want to be clear on one thing.  When you say the claims cover mobile wireless, does that mean it covers every possible mobile wireless system?

A.   No.  That has to be evaluated on a circumstantial basis.

Q.   Right.  You actually need to make sure that that particular mobile wireless system meets all the other elements of the claims.  Is that right?

A.   Yes.  I agree with that.

Q.   Okay.  And just so there's no doubt, does T-Mobile's particular mobile wireless system infringe these claims?

A.   No.

Q.   Now, on the written description requirement, there was some discussion about whether or not -- if you just described one embodiment, whether that's enough or not.  And this gets into a legal issue, and I don't want to ask you about that.  But if the Court were to instruct the jury that the written

1018

description and enablement requirements require the inventor to describe and enable the full scope of the invention, would that require a description that describes and enables a mobile wireless access system?

A.    Yes.

Q.    And in your review of the specification in this case, does it describe and enable the claims of this patent in a full -- in a mobile wireless system?

A.    No.

Q.    Now, with respect to the '477 Patent, you were asked some questions about this 'collectively represents' requirement. Do you recall that?

A.    I do.

Q.                    MR. HAYNES:  And if we could bring up JX 1, '477 Patent, and look at column 6, lines 1 to 9.

Q.    (BY MR. HAYNES)  You looked at this a little bit in your direct examination, but does the patent give us any guidance as to what is needed to collectively represent a communication channel?

A.    Well, right in the middle starting at line 4, without reading the entire thing, or maybe line 3, "the profiles are updated as appropriate and include the information required by the demodulators"--I won't read all the way down to that--"to permit their operation to demodulate bursts of data received by the demodulators."

Q.   Okay.

A.   So 'collectively representative' should describe the information required by the demodulators to permit their operation to demodulate bursts of data received by the demodulators.

Q.   Okay.  And in T-Mobile's system, a mobile wireless access system, are equalization weights required by the demodulators to permit their operation to demodulate bursts of data received by the demodulators?

A.   They are.

Q.   Do the parameters that are actually stored in Ericsson's systems, is that enough to allow the demodulators to demodulate the data without the equalization weights?

A.   No.

MR. HAYNES:  No further questions, Your Honor.  I pass the witness.

THE COURT:  All right.  Is there further cross examination?

MR. HUGHES:  No, Your Honor.

THE COURT:  Then you may step down, Dr. Van der Weide.

Defendants, call your next witness.

MR. STEVENS:  Your Honor, Defendants call via video deposition Frank Maggio.  He was an independent contractor with ICAP.  The clip that we're going to see is 7 minutes and

22 seconds, of which 3 minutes and 6 seconds goes to the Plaintiff and 4 minutes and 16 seconds goes to the Defendant.

MR. SUMMERS:  And Your Honor, for the record we dispute he was in any way an independent contractor of ICAP. We just disagree with that characterization of this witness.

THE COURT:  Have a seat.

Let's proceed with the witness by deposition.  .

FRANK MAGGIO

BY VIDEO DEPOSITION

Q.  Are you also the founder of a company named Media IP Holdings, LLC?

A.  Yes, sir.

Q.  What is the business of Media IP Holdings, LLC?

A.  It holds real IP or intellectual property that I am related to or have created.

Q.  Mr. Maggio, do you recognize Exhibit 9 as an email exchange between you and Mr. Becker, together with an attachment that you sent to Mr. Becker?

A.  Yes, sir.

Q.  Did you send the top email in the chain on or about September 3rd, 2014?

A.  Yes, sir.

Q.  Did you send that email following your discussion on that same date with Mr. Hynek?

A.  Yes, sir.

Q.   The patents described in Exhibit 9 and the PDF amount, were those the patents that you understood General Access Solutions was looking to sell?

A.   Yes, sir.

Q.   Do you recall, in connection with Exhibit 6, your email to Mr. Hynek referring to the fact that he was going to let you know about the lowest range of offer as well as a Buy Now number?

A.   Yes, sir.

Q.   Do you see here in Exhibit 9 where you write, "Pricing confidential"?

A.   Yes, sir.

Q.   Do you see where you state, "Minimum:  15mm net of commissions (I believe this is fairly firm)"?

A.   Yes.

Q.   From whom did you obtain that minimum price information?

A.   I believe this is the result of my discussions with Skip regarding the lowest price that would stimulate a potential sale.

Q.   Do you see where you write in your email "Buy now:  30mm (please do not advertise)"?

A.   Yes, sir.

Q.   From whom did you receive that Buy Now figure?

A.   I don't recall if that's the number that Skip gave me or if that's the number that I ascertained through discussions

1022

would be of interest to them.

Q.    And when you say "ascertained through discussions," what discussions are you referring to, sir?

A.    The phone call that preceded this email where we were discussing this topic.

Q.    The phone call with whom, sir?

A.    With -- with Mr. Hynek.

Q.    Had you previously asked Mr. Hynek on September 2nd to provide you with a Buy Now number?

A.    Yes, I did.

Q.    And did you subsequently speak to Mr. Hynek on September 3rd?

A.    Yes, sir.

Q.    Do you see under the Buy Now you state, "has turned down soft offers sub $7M in the past several years"?

A.    Yes, sir.

Q.    Who was the source of that information?

A.    Mr. Hynek.

Q.    Mr. Maggio, did you ever speak about pricing for the General Access patent portfolio with anybody at General Access other than Mr. Hynek?

A.    I don't believe so.

Q.    In all of your discussions with Mr. Becker regarding the General Access patent portfolio, did you endeavor to be accurate with respect to the information that you were

communicating to Mr. Becker?

A.    Yes, sir.

Q.    Was it important to you that you be accurate in those communications?

A.    Yes, sir.

Q.    Do you consider price to be an important component of a patent's sale?

A.    Yes, I do.

Q.    Is that something in your practice that you endeavor to be accurate about, sir?

A.    Yes, sir.

Q.    Mr. Maggio, I just want to make sure the record is clear on a few points.  You were not an employee of ICAP, were you?

A.    No, sir.

Q.    What was your relationship with ICAP?

A.    I'm an independent contractor seeking to find patents that could be listed for sale by ICAP.

Q.    And was the arrangement that you would receive a referral fee?

A.    I would receive a payment in the event of a sale, on a commission structure.

Q.    Okay.  So your payment was contingent on the portfolio actually being sold?

A.    Yes, sir.

Q.    Was that a yes?

A.    Yes, sir.

Q.    Yes.  Am I Correct in understanding from your prior testimony that after the emails and telephone conversations we've discussed today, you basically handed General Access off to ICAP and had no further involvement?

A.    That is correct.

Q.    Did you have any involvement whatsoever in any subsequent efforts by ICAP to actually sell or auction the General Access portfolio?

A.    No, I did not.

Q.    Were you involved in any way in any subsequent discussions between Mr. Hynek and ICAP about an appropriate price for the portfolio?

A.    No, I was not.

Q.    Do you know if the General Access portfolio was ever offered at auction?

A.    I do not know.

Q.    Do you know what, if any, efforts were made by ICAP to sell the General Access portfolio?

A.    I do not.

Q.    To your knowledge, did General Access ever agree to sell its portfolio at auction?

A.    I have no knowledge.

Q.    Yes.  In your prior testimony, I believe you mentioned that you were looking for minimum bid and Buy Now prices that

you could include in the brokerage agreement.  Do you recall that?

A.    I don't -- I don't believe it was necessarily to be put into the brokerage agreement.  It was part of the discussions to be had when discussing it with ICAP.

Q.    To your knowledge, was it ICAP's practice to include pricing information in the brokerage agreement with the client?

A.    Yes, it was.

Q.    To your knowledge, did General Access ever enter into a brokerage agreement with ICAP that included any specific offer prices?

A.    No, sir.

            THE COURT:  Does that complete this witness by deposition?

            MR. STEVENSON:  Yes, Your Honor.

            THE COURT:  Counsel, approach the bench, please.

            (The following was had outside the hearing of the jury.)

            THE COURT:  As of the completion of this witness by deposition, the Plaintiff has 2 hours exactly of remaining trial time and the Defendant has an hour and 36 minutes.

    Now, you still intend -- you still have Dwyer and then you have Bennis?

A.            MR. STEVENSON:  Dwyer, Bennis will be short,

1026

and then we've got whatever cross of Madisetti, who I assume is the last witness of the trial.

THE COURT:  I'm just wanting both of you-all to be on notice where you are.  I don't care if you call 50 witnesses; you've just going to have to fit them within this space of time.

MR. STEVENSON:  I've been doing the math.  I think we finish by noon easy tomorrow.

MR. SUMMERS:  And Defendants have 1:36?  Did I hear correctly?

THE COURT:  An hour and 36 minutes.

I think we put Dwyer on and get her through the direct, and then we'll finish the cross in the morning.  Okay.  You have about a 30-minute direct?

MR. STEVENSON:  I do.

THE COURT:  All right.  Let's go.

(The following was had in the presence and hearing of the jury.)

THE COURT:  Defendants, call your next witness.

MR. STEVENSON:  We call Johanna Dwyer.

THE COURT:  All right.  Ms. Dwyer, if you'll come forward and be sworn, please.

(Whereupon, the oath was administered by the Clerk.)

THE COURT:  Please come around; have a seat on the witness stand.

All right, counsel.  You may proceed.

MR. STEVENSON:  Thank you, Your Honor.  .

JOHANNA DWYER,

Q.   having been first duly sworn, testified under oath as follows:

DIRECT EXAMINATION

Q.   BY MR. STEVENSON:

Q.   Good afternoon.  Good late afternoon, Ms. Dwyer.

A.   Good afternoon.

Q.   Will you please introduce yourself to the jury?

A.   My name is Johanna Dwyer.

Q.   Where do you live, Ms. Dwyer?

A.   I live in Ottawa, Canada.

Q.   Okay.  Did you grow up there?

A.   I grew up in the country, it's north of Toronto in Ontario.

Q.   Okay.  And what kind -- how big was the town you grew up in?

A.   It's a little village called Hockley Village, about 30 or 40 people; very small.

Q.   Okay.  And are you appearing here as an expert in the case?

A.   Yes, I am.

Q.   And before getting into your opinions, let's talk about your qualifications.

Can you tell us a little bit about your educational background?

A.    Yes.  I have a Bachelor's degree in applied science and engineering in mathematics, and that's from Queens University, which is a school in Kingston, Ontario, Canada.  I did Master's a Ph.D. course studies at the Ottawa-Carleton Institute for Electrical and Computing Engineering.  That's also in Canada.  And then I have an MBA from MIT.

Q.    Okay.  And in addition to your education, can you tell us a little bit about your professional experience?

A.    I started working in 1994.  I worked as an engineer for a signal processing job at a communications company.  I then spent over 12 years at BlackBerry, RIM, where I worked on mobile smartphones for wireless communications applications.

Q.    Okay.  And where do you work today?

A.    Now I work at a company called QIPWorks, which I founded in 2017.

Q.    And what's the nature of that business?

A.    That business helps our clients with technology and with patents.

Q.    Okay.  Have you ever designed demodulators?

A.    Yes, I have.

Q.    And tell us a little bit about that experience.

A.    I began designing modulator demodulators right out of school in 1994.  I designed the hardware and the software for

demodulation systems.

Q.    Do you read and write computer code?

A.    Yes, I do.

Q.    How regularly do you look at patents in connection with your work?

A.    I look at patents every day for my job.

Q.    Okay.  Have you published any articles or patent studies in your career?

A.    Yes.  In 2020 I undertook a study with two other authors where we looked at a sample of 200 patents that were related to 5G smartphones to see whether they were essential to the 5G standard.

Q.    Okay.  How much time did you spend analyzing the patents and writing the article?

A.    It was 200 patents and 10 hours each, so over 2,000 hours, yes.

Q.    Were you sponsored or funded in that article?

A.    Yes.  Ericsson funded that study.

Q.    Okay.  And are you being compensated for your time spent in this matter?

A.    My company is being compensated for my time, yes.

Q.    And what is your usually hourly rate?

A.    The usual hourly rate is $700 an hour.

Q.    I'd like to ask you next about what materials you reviewed to get up to speed on this case.

1030

Can you give the jury a thumbnail of what you looked at, please?

A.    Yes.  I looked at the asserted patents in the case, the '383 and the '477 Patent.  I read all the expert reports that were produced in the case as well as deposition testimony from several witnesses.  I also looked at several technical papers.  And I looked at licenses and a number of patents that the licenses covered.

Q.                  MR. STEVENSON:  Okay.  Your Honor, at this point    I tender Ms. Dwyer as an expert in the field of wireless telecommunications, including the subject matter of the patents, as well as the patent landscape in telecommunications.

THE COURT:  Is there objection?

MR. SUMMERS:  No objection, Your Honor.

THE COURT:  Without objection the Court will recognize this witness as an expert in those identified fields.

All right, Mr. Stevenson.  Please continue.

Q.    (BY MR. STEVENSON)  Will you please tell the jury at a high level what opinions you formed as a result of your study?

A.    I formed four opinions.  The first is that the General Access patents are narrow and not foundational patents.

The second is that the General Access patents do not drive the performance gains that General Access asserts that

Shawn M. McRoberts, RMR, CRR
Federal Official Court Reporter

they do.

The third is that there are many alternative ways of demodulation and parameter storage that are outside of the boundary of General Access' patents.

And the fourth related to the identification of technically comparable license agreements.

Q.   Okay.  Let's start with the '383 Patent and discuss that first.

Ms. Dwyer, does the '383 Patent claim a foundational invention?

A.   No, not in my opinion.

Q.   How would you describe the scope of the '383 claim?

A.   I find the scope of the '383 claim to be narrow and very specific.

Q.   Okay.  Explain what you mean by 'narrow', please.

A.   I believe that there are a number of limitations in the claims which require very specific functions to be carried out, and it is those things that make the claims very specific.

Q.             MR. STEVENSON:  May we have JX 2, please, which is the '383 Patent?  That's also at tab 2 of the jury notebooks.  And I'll ask that, Mr. Carrillo, you zoom in on claim 16.  Thank you very much.

Q.   (BY MR. STEVENSON)  Ms. Dwyer, with reference to claim 16, will you please explain to the jury what it is within the

claim that made you form the opinion it was narrow and not foundational?

MR. SUMMERS:  Your Honor, if I might, I would like to object.  I think this is cumulative of the testimony that the jury has already heard from Dr. Van der Weide.  The claims are the claims and the jury's already heard them, and we're going to have a parroting back of the same limitations.

THE COURT:  All right.  Your cumulative objection is overruled.

Go ahead, counsel.

Q.   (BY MR. STEVENSON)  Will you answer the question, please, Ms. Dwyer?  Or do you need me to repeat it?

A.   I can answer the question.  Thank you.

Q.   Go ahead.

A.   The claim specifically requires "selecting at which of a first demodulator and at least a second demodulator to apply the at least first data and second data signals, and wherein the first and second successive data signals and any subsequent data signals are alternately applied to the first and second demodulators."  That is an example.

Q.   Okay.  Do you have personal experience with designing multiple demodulator systems?

A.   Yes.  The modems I was building in 1994 had multiple demodulators on them.

Q.   Right.  In addition to your experience, do you have data

1033

that you can show the jury showing how widespread demodulators were in the field from a patent standpoint?

A.   Yes, I do.

Q.   Okay.  What did you do to generate the data?

A.   I undertook a search of publicly available U.S. patents in the U.S. Patent Office that had issued.  And I started with the claim 16 of the '383 Patent and the terms that were in the claim and I developed search terms specifically tailored towards those claims to find similar patents in technology areas.

Q.   Okay.  What were your search terms?

A.   My search terms were 'demodulator', 'receive', or 'modem', and 'controller', and I put those search terms into the Patent Office database.

Q.   Is this a publicly-available database?

A.   Yes, it is.

Q.   And do the search terms work like other searches -- like we may do on Google that return words with the -- return documents with the words in them?

A.   Yes.  In specific combinations which were detailed by my search.  That's right.

Q.   Did you put your results on a slide?

A.   Yes, I did.

Q.   Please orient the jury to how this slide is laid out and how they should interpret it.

1034

A.    Okay.  So this slide is showing counts of patents.  I've organized them by the year that they were filed.  And the stack of the patents is the total count in that year of patents.  They've all issued, all of the patents that are counted.

Q.    Okay.  How many total patents are there that satisfied your demodulator and wireless search criteria?

A.    As of 2020, there were over 4100 patents that have issued that met these terms.

Q.    Okay.  How many of those patents were filed before the '383 Patent was filed for?

A.    There were over 700 patents filed before Raze filed its patent that went on to issue.

Q.    Okay.  And what is the significance of this number of patents filed for before Raze?

A.    The significance that that many patents were filed before Raze's patents and went on to issue is that Raze's patent cannot be foundational because all these other patents had already essentially taken some of that turf, if you will.

Q.    Okay.  Now, we heard Dr. Madisetti say that the '383 Patent is necessary to enable a function called iterative channel estimation.  Do you recall hearing that?

A.    Yes, I do.

Q.    Okay.  Let me first ask you, what is channel estimation?

A.    So channel estimation is where you form a view of the air

1035

that the signal wave went through, so that when it gets to the other end you can take out any distortions that happen before you try to figure out what the bits were.

Q.   Okay.  What's the difference, now, between channel estimation and iterative channel estimation?

A.   So channel estimation on its own takes one data signal and unwinds the channel effects and gets the bits out. Iterative channel estimation is different because it takes that data signal and it does that more than once before it spits the bits out at the end.

Q.   And what do you mean by 'more than once'?

A.   So I can give like a real-world example.  So I like math, and one of my daughters likes math a lot.  When she does a math problem, I tell her, You should check your work before you hand your assignment in.  You should check your work because it will work out better that way.

       And that's like iterative channel estimation.  It essentially operates on the same problem more than once before it gives the answer.

           THE COURT:  Ms. Dwyer, could you slow down just a little bit?

           THE WITNESS:  Yes, Your Honor.

           THE COURT:  Thank you.

       Let's continue.

Q.   (BY MR. STEVENSON)  Is the '383 Patent a necessary

1036

foundation for iterative channel estimation?

A.    No, it is not.

Q.    And why do you say that?

A.    A couple of reasons.  First of all, the '383 Patent doesn't even mention iterative channel estimation; it operates one demodulation.

Q.    Okay.  Did you do any search for data to back up your opinion in this regard?

A.    Yes.  I did another patent search.

Q.    And what were your search criteria that you used to find out if the '383 is or isn't foundational for iterative channel estimation?

A.    I used, to start with, the search term 'channel estimation' or 'channel estimate', and then in addition to that, it had to have 'iterate' or 'iterative' or 'adapt', and all those had to be in either the claims or the title or the abstract of the patents.  And this is the results.

Q.    Okay.  Please tell us what the results of that search were in terms of total patents that had been issued that meet those criteria.

A.    I found that there were over 1200 issued United States patents that meet the criteria.

Q.    How many of them were filed for before Raze filed for the '383?

A.    There were more than 160 that were filed before Raze

filed the '383 Patent.

Q.   What's the significance of that to your opinion that the '383 Patent isn't foundational or a requirement for iterative channel estimation?

A.   Well, because all of these patents came before on iterative channel estimation.  It can't be the case that the '383 Patent is needed to do that technique.

Q.   Okay.  Now, on the subject of iterative channel estimation, Dr. Madisetti testified in his examination that he read a paper, a Master's thesis by Linden, to try to put a number on how much iterative channel estimation improves the performance of a transmission.

Did you read that paper he relied upon?

A.   Yes I did.

Q.   Please explain to the jury what the nature of that paper was?

A.   That paper was a Master's thesis product write-up by a student named Erik Linden, who was at the Swedish Institute of Technology.  So it's him summarizing the project he did for his studies.

Q.   Okay.  Has that paper been widely cited?

A.   It was completed in 2014.  It's been cited twice; once by a fellow Master's student working in the same area, and once by a foreign paper.

Q.   Okay.  Was it peer-reviewed?

1038

A.    Only so much as a thesis project is peer-reviewed before it goes on the shelf.

Q.    Now, Dr. Madisetti asserted that the Linden paper shows that the '383 Patent would provide a 4 percent gain in capacity of T-Mobile base stations.  Do you agree with that?

A.    No, I don't agree with that.

Q.    Explain why not.

A.    Those gains that Linden found from his iterative channel estimation algorithm depended on doing the problem more than once.  It depended on checking the work.  The '383 doesn't do that.  The '383 demodulates this one signal once and then it uses what it learns for the next signal, not for the same signal, so it can't take credit for the gains of Linden's algorithm.

Q.    Let me take a moment to make sure I really understand that and really unpack your answer.

When you said 'checking your math over and over again' in the Linden paper, can you explain to us exactly what math is being checked over and over again and what process of the demodulation process is that being done?

A.    That's the channel estimation part which is used to unwind the distortions before you actually get the signal into the bits.  So that part -- what Linden's algorithm said is estimate that, try to get the bits, then estimate it again and again as many times as you want before you output the

1039

bits.

Q. On the same transmission?

A. On exactly the same transmission.

Q. Okay. And that makes it four percent more accurate?

A. That's what Linden showed, yes.

Q. Is that what the '383 does?

A. No. The '383 operates only one on a burst and then it goes to the next burst, not the same one.

Q. Okay. Is it reliable to apply Linden to the '383?

A. No, I think it's improper to do that.

Q. Okay. Have you heard any testimony in this case regarding channel conditions and how they change in mobile?

A. Yes; Mr. Struhsaker for starters.

Q. Okay. Now, Dr. Madisetti said that there are no alternative designs to claim 16 of the '383 other than eliminating stored profiles. And that wouldn't be if that happened within the claim boundaries as he interprets them. Is that accurate?

A. I don't believe so, no.

Q. Okay. Can you give me an example of an alternative design that you think would be feasible and better than Dr. Madisetti proposed?

A. I'll try, yes.

So Dr. Madisetti said that of the million demodulator combinations, that any combination of that was a demodulator,

a million processors, and he drew a green box and an orange box around a couple of examples of a collection of processors that made a demodulator.  The claim requires alternating between a first demodulator which is a first of those million, and a second demodulator which is a second of those million, and then going back to the first and the second.  So if you didn't want to do that, you could pick any one of the 999,998 other demodulators and go there instead and that would be non-infringing and easy to do.

Q.   Okay.  Is that feasible to do?

A.   I think it's feasible, yes.

Q.   How would that, if at all, affect the performance of a base station if you were to have that just pick one of the other nearly million combinations?

A.   I don't believe it would affect the performance at all.

Q.   Have you done an estimate of what it would take in terms of cost to put up these kind of guardrails to make sure there's no even random possibility of alternating?

A.   Yes.  I believe that a fairly straightforward functional change could be done in software.  I think it would cost no more than a few hundred thousand, but certainly not much more than a million.

Q.   Okay.  And what experience do you have in this area to be able to make that estimate?

A.   So I've worked on products that have software upgrades

that get made regularly and pushed out to devices like we heard earlier.  I have some experience in this area.  I think that's a reasonable estimate.

Q.   Okay.  Let's turn to the '477 Patent now.

Does the '477 Patent claim a foundational invention?

A.   Not in my opinion, no.

Q.   How would you describe the scope of the '477 Patent claims that are being asserted here?

A.   I think they are very specific and very narrow.

Q.              MR. STEVENSON:  Okay.  Let's put up slide 1 from  the '477.

Q.   (BY MR. STEVENSON)  You understand this is an independent claim?

A.   Yes, I do.

Q.   And explain what the relationship, as you understand it, between independent claims and dependent claims is in terms of nesting or narrowness.

A.   I understand that an independent claim stands on its own and that dependent claims include the independent claim that they depend on.  So to do a dependent claim, first you have to do the independent claim and then add a specific extra step or steps.

Q.   Is it the case that if you're outside the boundaries of the independent claim, then by definition you're outside the boundaries of all the dependent claims?

1042

A.    Yes, that's what I understand.

Q.    Okay.  What about this claim when you read it made you or factored into your conclusion that it's specific and narrow?

A.    The claim requires many steps -- an apparatus to enable many steps.  So the first thing is that it determines parameters, and it determines parameters that need to be collectively representative of the burst signal that has been received.

But not just parameters; there has to be two different flavors.  So there has to be at least one signal-related parameter and at least one channel-related parameter.  And then you need to store those parameters, the ones that collectively represent the signal.  And then the place where you store them has to be coupled to but separate from the thing that determined them in the first place.

Q.    Okay.  And does the profile storage device, are there any requirements on what -- whether both flavors have to be stored there?

A.    The parameters that need to be stored there have to be all of the parameters that collectively represent the signal and are needed to demodulate it.

Q.    Okay.  Now, have you done any searches to augment your opinion about this being a specific narrow claim?

A.    Yes, I did.

Q.    Tell us about the search that you did.

1043

A.   So I started with 'profile' or 'parameter', and also had to include 'demodulator'.  And it also had to include 'store' or 'storage' or 'save'.  It also had to include 'subsequent' or 'successive' or 'sequential' because these get applied to next bursts.

Q.   Okay.  And does this slide show the results of your search as to profile and parameter?

A.   Yes.  This is the same kind of picture as we've already seen.

Q.   How many patents total met that criteria?

A.   It was over 2100 or so.

Q.   Okay.  How many of those patents were filed for before Raze filed for the '477 Patent?

A.   I found over 250 that were filed before the '477 Patent was filed.

Q.   And what's the significance in your mind of what this search tells you?

A.   This search tells me that the use and storage of parameters for demodulation was known before Raze filed its patent, and so the claims in Raze's patents have to be very specific and narrow.

Q.   Were you surprised by these results at all?

          MR. SUMMERS:  Objection, Your Honor.  I'm sorry I didn't make the objection sooner, but that's legally improper, erroneous, and a new opinion.  The idea that the claims have

to be tailored to get around patents that were not cited at the Patent Office were not prior art and this is --

THE COURT:  All right.  Approach the bench, please.

(The following was had outside the hearing of the jury.)

THE COURT:  I'm not going to let you get up and make a speech, Mr. Summers.  Just tell me what the problem is.

A.          MR. SUMMERS:  We're in the fantasy land now where she's trying to compare these patents and say that they're narrow because they somehow had to get around patents that she isn't disclosing or identifying, this unnamed body of patents.  I mean, it's just wrong.

THE COURT:  Well --

MR. SUMMERS:  And it's undisclosed.

THE COURT:  I will say this, Mr. Stevenson.  The expert's report here was struck as to her standard essential research.  It survived as to her word search component, but her word search component is limited to the issue of damages; not infringement and not invalidity.

MR. STEVENSON:  And I'm not going there.  This is damages --

THE COURT:  She just said these 250 patents mean that this was well-known.  'Well-known' is something that goes to validity.

MR. STEVENSON:  Crowded field of art, and when you

Shawn M. McRoberts, RMR, CRR
Federal Official Court Reporter

1045

are in a crowded field of art, there is a lot more design alternatives to design around a patent.  That's our point.

THE COURT:  I understand that --

MR. STEVENSON:  And I'm not going there with her. I'm -- that's my point.

THE COURT:  I want a clear line drawn between liability and damages --

MR. STEVENSON:  I will do that.

THE COURT:  -- with this witness.

MR. STEVENSON:  I will do that.

THE COURT:  All right.  Let's go forward.

(The following was had in the presence and hearing of the jury.)

THE COURT:  Let's proceed.

Q.  (BY MR. STEVENSON)  Ms. Dwyer, with regard to these results, have you had experience in the areas of parameters and parameter storage that you also applied to evaluate the patent search?

A.  Yes, I do.

Q.  What experience have you had in this area in which you were searching?

A.  As I earlier mentioned, when I was designing demodulators, which was basically from 1994 through at least 2005, and even now, I use parameters, I understand how they work, I know how they're used for demodulation.

Q.   Okay.  Now, let me go on to the technical benefits argued by Dr. Madisetti.  And he was asserting in his testimony that the '477 Patent is necessary to enable adaptive modulation and uplink beamforming.  Do you recall that?

A.   Yes, I do.

Q.   Tell us, please, what is adaptive modulation?

A.   Adaptive modulation is where--and this is in the uplink in this case--where you choose the way of sending the signal that will carry the most data that the channel will allow at any time; so the cleaner the channel, the more data you'll send in the same amount of time.

Q.   So we saw those QAMs before.  That's picking which QAM you're going to use for a given transmission?

A.   Yes; exactly.

Q.   What's uplink beamforming?

A.   Uplink beamforming is where the receiver at the base station essentially points itself to a specific transmitting station so that it can hear it better.

Q.   Okay.  Is the '477 Patent a necessary foundation for adaptive modulation?

A.   No, it is not.

Q.   How do you know that?

A.   Adaptive modulation and coding in the uplink was already, for example, standardized for 2G prior to the filing of this patent, so it's possible to do this without the patent.

Q.   Okay.  Is the '477 Patent necessary for uplink beamforming?

A.   No, not in my opinion.

Q.   Okay.  And how do you know that?

A.   Again, there were patents related to the use of uplink beamforming in receivers that were filed as early as 1992, so I don't believe it's a necessary foundation for that.

Q.   Now, you're not testifying that the patents are invalid like some of the other experts have testified before.  Right?

A.   No.  No, I'm not.

Q.   All right.  What's the -- are you just testifying about the patent landscape that was out there and whether the field of art was wide open or crowded?

A.   Yes; exactly that.

Q.   Okay.  Now, what other evidence have you looked at to see whether the '477 Patent is, in fact, foundational to adaptive modulation or uplink beamforming?

A.   I did another patent search specifically around those terms of 'adaptive modulation and coding' and 'uplink link adaptation', as we heard that's another word for it, as well as 'uplink beamforming'.

Q.   Are these the results of your search?

A.   Yes, they are.

Q.   And about how many patents are out there today on either adaptive modulation and coding or uplink beamforming?

A.    I found that there was over 900.

Q.    How many of those were filed for before Raze filed for the '477 Patent?

A.    Approximately 160 were filed before then.

Q.    And what's the significance of that to your opinion that the '477 Patent isn't foundational for these technologies?

A.    It confirms my experience and my opinion that these techniques can be done without using the '477 Patent that it isn't foundational for their use.

Q.    Do the claims of the '477 enhance uplink beamforming?

A.    No, I don't believe it does.

Q.    If adaptive modulation and uplink beamforming can be done just as well without using the '477 Patent, then can you attribute any capacity gains related to these features to this patent?

          MR. SUMMERS:  Objection; leading.  And the prior question goes beyond the scope of the report.

          THE COURT:  I'll sustain as to leading.

Q.    (BY MR. STEVENSON)  Okay.  What does this -- what does the work you've done and the data you've looked at indicate to you as to whether any capacity gains can be attributed to the '477 as to adaptive modulation and uplink beamforming?

A.    I don't think it would be proper to attribute the benefits provided by adaptive modulation in the uplink to the use of the claims in the '477 Patent because those techniques

1049

can be done without those claims being used at all.  Same for uplink beamforming.

Q.   Okay.  Have you looked into whether there are alternate ways--different tread patterns, in other words--to store parameters that would it be outside the boundaries of the '477 Patent?

A.   Yes, I have.

Q.   Okay.  Explain to me, in your view, what those would be.

A.   As I mentioned earlier, the '477 Patent requires that the parameters that collectively represent the signal--so which are needed for demodulation--have to be stored together on a storage, and it has to be at least one signal-related parameter and one channel-related parameter, and that that storage has to be coupled to the processor that determines them.  I think there are many other ways to store those parameters.

Q.   Okay.  Are there ways to store, for instance, the channel- and signal-related parameters on separate memory devices?

A.   Yes.  You can store them separately.  That would be one option.

Q.   Would that be outside the boundaries?

A.   Yes, it would be.

Q.   And are there -- could you store any of these parameters where they wouldn't be coupled to the determiner?

1050

A.    Yes.   I think you could store, for example, the signal-related parameters with the determiner itself.

Q.    Okay.   And how would that work?

A.    So in the products that are accused, the DSPs which are the determiner--Dr. Madisetti showed that--they have a memory called a cache memory.   It's rate integrated with the processor, and it has enough storage to store signal parameters.

Q.    Have you verified it has enough storage?

A.    Yes, I did do that.

Q.    Does each of the hundred-plus processors, DSPs, in the Ericsson base stations have this cache memory integral to it?

A.    Yes, all 128 DSPs have this cache memory.

Q.    Would they be able to store a parameter such as channel or signal?

MR. SUMMERS:   Objection, Your Honor.   He's going again beyond the scope of the report, the last three questions.   Move to strike and leading.

A.            THE COURT:   What's your response, Mr. Stevenson?

MR. STEVENSON:   It is in the report at -- the supplemental report at paragraph 44; also opening report, 349 and 362.

THE COURT:   All right.   Give me a minute.

MR. STEVENSON:   And I think, Your Honor, the opening

report is probably the first one to look at.

MR. SUMMERS:  What paragraph is that?

MR. STEVENSON:  Opening report, 349 and 362; supplemental report, 44 to 46.

THE COURT:  All right.  Opening report, what paragraph?

MR. STEVENSON:  349 and 362.

MR. SUMMERS:  Your Honor, I don't think I see anything about a cache.

MR. STEVENSON:  That's in the supplemental report at 44 to 46.

THE COURT:  I'll tell you what, gentlemen.  If I want to hear from you, I'll ask from you.  This is not a round-robin discussion.  You've raised a objection, you cited a paragraph in her report, I'm looking at the paragraph.  In the meantime, just stand there.  All right?

All right.  I've considered the sections of the reports cited by Defendant and I'm going to overrule the objection, and I'll charge this time to the Plaintiff.

Let's proceed, Mr. Stevenson.

Q.   (BY MR. STEVENSON)  Ms. Dwyer, to re-ask the question, are there cache memories associated with these DSPs that would have the capacity to store the parameters?

A.   Yes, I believe there are.

Q.   And are these available already on Ericsson boards?

1052

A.   Yes.  We've seen them on the boards, yes.

Q.   To do this, how much change would be required in terms of software and/or hardware?

A.   I don't believe it's a very complicated change to route the signal parameters to the DSP caches.

Q.   Is that just writing software?

A.   Yes, I think it's a software change.

Q.   No hardware changes?

A.   No, I don't believe so.

Q.   Dr. Madisetti issued a report in response to your report in which he opined that using the cache memory within the processors, the DSPs, wouldn't work because it would overheat the system.  Do you agree with that?

A.   I don't agree with that, no.

Q.   Explain why.

A.   The memory -- the cache memory in the DSPs has always been there to store information, and it doesn't know -- it's just 1s and 0s that are stored there.  It doesn't know what you're storing.  Moving information on and off those cache memories is what they're designed to do.  I don't think there's any overheating risk, no.

Q.   Okay.  Would this change in any way, shape, or form affect performance?

A.   No.  It might make it better.

Q.   Okay.  Have you estimated how much it would cost to make

a change of this nature?

A.    I did.  I think it's a simple functional change.  It's likely a software update.  I would suggest it would be between a few hundred thousand, but certainly no more than a million dollars.

Q.    All right.  Let me shift gears now and ask you about a couple of slides Dr. Madisetti showed.

MR. STEVENSON:  Your Honor, may I use the document camera?

THE COURT:  You may.

MR. STEVENSON:  Thank you.

Q.    (BY MR. STEVENSON)  Do you recall seeing this slide during Dr. Madisetti's direct examination yesterday?

A.    Yes, I do.

Q.    Okay.  And I'd like to ask you about the far right spectral efficiency plus 12 percent claim.  Do you see that?

A.    Yes, I do.

Q.    What did Dr. Madisetti assert as his basis for a 12 percent increase in spectral efficiency claim due to adaptive modulation with UL beamforming?  And this is I believe relevant to the '477 Patent.

A.    Yes.  He indicated that if adaptive modulation with parameters and uplink beamforming were used, that the proportion of time that these different modulation schemes would get used is what's shown in that pie chart.

Q.    Have you -- did you carefully listen to his testimony?

A.    Yes, I did.

Q.    Did you carefully review his report in this regard?

A.    Yes, I did.

Q.    Does he have any support at all for this assertion?

A.    Not through technical papers, no.  He supports it with his own experience.

Q.    Does he explain in any detail that you can discern how he got to this number?

A.    No; just that he chose these based on his experience.

Q.    Okay.  And then the next -- same questions for the -- another chart he put up.  This was his slide 35.  He asserted that adaptive modulation with signal and channel parameters would yield a 2 to 3 percent uplink throughput advantage.

A.    Yes.

Q.    Do you remember hearing that?

A.    Yes, I do.

Q.    Okay.  Again, did you, in addition to listening to his testimony, review his report carefully in this area?

A.    Yes, I did.

Q.    Okay.  What does he base this 2 to 3 percent increase in throughput on?

A.    Again, he chooses these percentages of the modulation use based on his experience and his professional credentials.

Q.    He doesn't cite to anything that is a study or simulation

1055

or anything that can be replicated?

A.    Not related to adaptive modulation, no.

Q.    Okay.  Do you think this is reliable?

A.    I don't think so, no.

Q.    Final topic, Ms. Dwyer.  You --

MR. STEVENSON:  May I approach the board, Your Honor?

THE COURT:  You may.

Q.    (BY MR. STEVENSON)  Do you recall these licenses that Mr. Dacus put on a flip chart that I believe our economic expert is going to testify about?

A.    Yes, I do.

Q.    I'd like to ask you about those.

Did you participate in identifying which licenses were technically comparable in terms of the patents licensed to the General Access patents?

A.    Yes, I reviewed patents and several licenses.

Q.    Is this something you have done before?

A.    It is.

Q.    Okay.  Can you tell us how you went about doing that? What was your process?

A.    So, as you know, I read both of the asserted patents in this case and understood them, and then I read patents identified in these licenses.  And I compared the scope of the technology of the claims, both what it pertained to but also

1056

the limitations and the general scope of the claims, and determined--whether or not I considered them to be technically comparable--to the two asserted patents.

Q.   What does 'technically comparable' mean as you're using that word?

A.   It means to me that it covers a similar technical area, that it provides potentially similar benefits, and that it has sort of similar scope as it's similarly narrow or broad, those sorts of things.

        MR. STEVENSON:  May I have the slides back, please, Ms. Brunson?  Thank you.

Q.   (BY MR. STEVENSON)  Will you please list off for the jury the licenses that you considered through the discovery process and analyzed that you believe licensed patents or patent portfolios that are technically comparable to the General Access patents-in-suit?

A.   I can.  So I looked at licenses that related to a couple of the parties here.  So IPComm with Ericsson was one license. IPComm with Sprint and T-Mobile was a further license.  All of these, by the way, had patents that were technically comparable to the asserted patents.  IP Bridge and Ericsson was another one.  Cellular Communications Equipment and Acacia Research Corporation with Ericsson was a further one.  And then two third-party licenses, which are Collision Communication with Nokia and IP Bridge with Nokia.

Q.   Thank you, Ms. Dwyer.

MR. STEVENSON:  I'll pass the witness.

THE COURT:  All right.  Ladies and gentlemen, we're going to recess for the evening, and we'll proceed with the Plaintiff's cross examination of Ms. Dwyer first thing in the morning.

If you will, take your notebooks with you to the jury room.  Leave them there overnight.

Please remember to follow all my instructions, including not to communicate with anyone about the case.

Travel safely to your homes, and we will plan to start tomorrow at 8:30.  If you'll make sure you're here in time for that.  Have a good evening.

And with that, the jury's excused for the evening.

(Whereupon, the jury left the courtroom.)

THE COURT:  All right, counsel.  Be seated, please.

You may step down, Ms. Dwyer.

THE WITNESS:  Thank you.

THE COURT:  At this time, counsel, the Plaintiff has remaining from its designated trial time 1 hour and 57 minutes.  The Defendant has remaining 1 hour and 2 minutes.  So that's 2 hours and 59 minutes, or call it 3 hours of remaining trial total.

Is there anything I need to hear from either party on before we recess for the evening.

Shawn M. McRoberts, RMR, CRR
Federal Official Court Reporter

1058

MR. STEVENSON:  Just a question, Your Honor.  Is Ms. Dwyer subject to sequestration --

THE COURT:  Yes, she is.

MR. STEVENSON:  Thank you.

MR. SUMMERS:  Nothing from the Plaintiff, Your Honor.

THE COURT:  All right.

MR. HAYNES:  Your Honor, may Dr. Van der Weide be released?

THE COURT:  He may be released.  He's free to stay; he's free to go.

MR. HAYNES:  Thank you, Your Honor.

THE COURT:  Let me see Mr. Stevenson and Mr. Summers, Mr. Dacus and Ms. Fair in chambers, briefly.

Other than that, we stand in recess until tomorrow morning.

(The proceedings were concluded at 6:37 p.m.)

Shawn M. McRoberts, RMR, CRR
Federal Official Court Reporter

.

I HEREBY CERTIFY THAT THE FOREGOING IS A

CORRECT TRANSCRIPT FROM THE RECORD OF

PROCEEDINGS IN THE ABOVE-ENTITLED MATTER.

I FURTHER CERTIFY THAT THE TRANSCRIPT FEES

FORMAT COMPLY WITH THOSE PRESCRIBED BY THE

COURT AND THE JUDICIAL CONFERENCE OF THE

UNITED STATES.

.

S/Shawn McRoberts                04/09/2025.

_____DATE_____.

SHAWN McROBERTS, RMR, CRR.

FEDERAL OFFICIAL COURT REPORTER.

.

.

.