IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF TEXAS
MARSHALL DIVISION

GENERAL ACCESS SOLUTIONS, LTD.,( CAUSE NO. 2:23-CV-158-JRG
                                )
          Plaintiff,            (
                                )
vs.                             (
                                )
T-MOBILE, USA, INC.,            (
et al.,                         ) MARSHALL, TEXAS
                                ( APRIL 10, 2025
          Defendants.           )  8:30 A.M.
_____

VOLUME 4

_____

TRIAL ON THE MERITS

BEFORE THE HONORABLE RODNEY GILSTRAP
UNITED STATES CHIEF DISTRICT JUDGE
and a jury

_____

SHAWN McROBERTS, RMR, CRR
100 E. HOUSTON STREET
MARSHALL, TEXAS  75670
(903) 923-8546
shawn_mcroberts@txed.uscourts.gov

A P P E A R A N C E S

FOR THE PLAINTIFF:    BARTLIT BECK, LLP - DENVER
                      1801 WEWATTA ST., SUITE 1200
                      DENVER, COLORADO  80202
                      (303) 592-3100
                      BY: MR. GLEN SUMMERS
                          MR. GIOVANNI SANCHEZ
                          MR. NOSSON KNOBLOCH
                          MR. JOHN HUGHES
                          MR. TAYLOR KELSON

                      BARTLIT BECK, LLP - CHICAGO
                      54 W. HUBBARD STREET, STE. 300
                      CHICAGO, ILLINOIS  60654
                      (312) 494-4400
                      BY:  MS. MEG FASULO

                      WARD, SMITH & HILL, PLLC
                      1507 BILL OWENS PARKWAY
                      LONGVIEW, TEXAS  75604
                      (903) 757-6400
                      BY:  MS. ANDREA FAIR

FOR THE DEFENDANTS:   ALSTON & BIRD, LLP - ATLANTA
                      ONE ATLANTIC CENTER
                      1201 WEST PEACHTREE STREET NW
                      #4900
                      ATLANTA, GEORGIA  30309-3424
                      (404) 881-7000
                      BY:  MR. JOHN HAYNES
                           MS. EMILY WELCH
                           MR. MICHAEL DEANE

                      ALSTON & BIRD, LLP - CHARLOTTE
                      1120 SOUTH TRYON ST., STE. 300
                      CHARLOTTE, NC 28203-6818
                      (704) 444-1000
                      BY:  MR. MATTHEW STEVENS

                      ALSTON & BIRD, LLP - DALLAS
                      2200 ROSS AVE., SUITE 2300
                      DALLAS, TEXAS  75201
                      (214) 922-3507
                      BY:  MR. TED STEVENSON
                           MS. EMILY FITZGERALD

```
                                    THE DACUS FIRM, PC
                                    821 ESE LOOP 323, SUITE 430
                                    TYLER, TEXAS  75701
                                    (903) 705-1117
                                    BY:  MR. DERON DACUS

            OFFICIAL REPORTER:      SHAWN M. McROBERTS, RMR, CRR
                                    100 E. HOUSTON STREET
                                    MARSHALL, TEXAS  75670
                                    (903) 923-8546
```

1060

THE COURT:  Be seated, please.

Are the parties prepared to read into the record those items from the list of pre-admitted exhibits used during yesterday's portion of the trial?

MR. HUGHES:  Yes, Your Honor.

THE COURT:  Please go to the podium and make that offer.

MR. HUGHES:  Good morning.  General Access moves the following exhibits into evidence.  The following are Joint Exhibits 12, 23, 27, and 43, and then the following Plaintiff's exhibits:  1, 4, 5, 7, 16, 25, 26, 28, and 29.

THE COURT:  All right.  Any objection to that rendition from the Defendants?

MR. STEVENSON:  Your Honor, Kyle cue nick will be appearing to handle exhibits for us this morning.

Consortium no objections, Your Honor.

THE COURT:  All right.  Do Defendants have anything additional to offer?

Consortium yes, Your Honor.

THE COURT:  Please go to the podium and let me hear from you.

Consortium Your Honor, Defendants move in exhibits DX 5, JX 41, JX 44, JX 45, and JX 74.

THE COURT:  All right.  Any objection from Plaintiffs?

MR. HUGHES:  No, Your Honor.

THE COURT:  All right.  Thank you, counsel.

Mr. Stevenson, were you still in the process of directing the witness when we stopped yesterday?

MR. STEVENSON:  I had passed the witness, Your Honor.

THE COURT:  All right.  Mr. Summers, are you prepared to cross the witness?

MR. SUMMERS:  I am, Your Honor.

THE COURT:  Ms. Dwyer, if you'll return to the witness stand, please.  I'll remind you, you remain under oath.

Mr. Summers, you may go to the podium.

And while he is doing that, you may bring in the jury, Mr. Estes.

(Whereupon, the jury entered the courtroom.)

THE COURT:  Welcome back, ladies and gentlemen.  Please have a seat.

All right.  When we ended the day yesterday, the Defendants had completed their initial direct examination of Ms. Johanna Dwyer, and we'll now hear Plaintiff's cross examination of Ms. Dwyer.

Mr. Summers, you may proceed.

MR. SUMMERS:  Thank you, Your Honor.

JOHANNA DWYER,

having been previously duly sworn, testified further under

oath as follows:

CROSS EXAMINATION

BY MR. SUMMERS:

Q.   Good morning, Ms. Dwyer.

A.   Good morning, Mr. Summers.

Q.   I'd like to start by making sure we're all on the same

page about the nature of your opinions in this case.

Yesterday afternoon you did not intend to offer any

opinions concerning the validity of the General Access

patents, did you?

A.   That's correct.

Q.   If anyone got that idea from your testimony, they would

be wrong.  Correct?

A.   That's correct.

Q.   And you also weren't here to testify on the issue of

infringement.  Is that correct?

A.   That's correct.

Q.   That was Dr. van der Weide.  Correct?

A.   Yes.  That's my understanding.

Q.   And, again, if anyone got the idea that you were

testifying about infringement, that would be incorrect.

A.   That's correct.

Q.   The reason you were called to testify was to provide

information that the Defendants believe is relevant to the issue of damages.  Correct?  How much the Defendants should pay if they're found to infringe for that infringement. Correct?

A.    I wouldn't characterize it that way.

Q.    But you understand that your testimony is being offered because the Defendants believe it relates and has some impact on the issue of damages.  Correct?

        MR. STEVENSON:  Your Honor, I object.  Calls for speculation into the state of mind of the attorneys and clients as to why she's called.

        THE COURT:  Well, she can testify as to what she understands the reason she's called.  She can't testify as to what other people think the purpose of her testimony is.

    Let's rephrase the question, please, counsel.

Q.    (BY MR. SUMMERS)  Ms. Dwyer, isn't that your understanding, that the testimony is being offered because it relates to damages?

A.    That is my understanding.

Q.    Now, just to be clear, you've never testified in any court of the United States on issues of infringement, validity, patent damages, or non-infringing alternatives. Correct?

A.    Yes, that's correct.

Q.    And you would agree that Dr. Madisetti is a well

1064

qualified technical expert in the area of wireless communication. Correct?

A. Yes, I agree.

Q. And you agree that Mr. Kennedy is a well qualified expert on the subject of patent damages. Correct?

A. Yes, I agree.

Q. Now, to change subjects for a moment, you value your relationships with Ericsson and T-Mobile, don't you?

A. Yes, I do.

Q. Ericsson is a leading manufacturer of 5G base station equipment. Correct?

A. Yes, they are.

Q. It's a big company. Correct?

A. Yes, it's a big company.

Q. T-Mobile is one of the biggest wireless carriers in the United States. Correct?

A. Yes, it is.

Q. And they're both involved from time to time in quite a bit of litigation, aren't they?

A. I believe that is correct.

Q. And they're good customers for a firm like yours which does a lot of consulting in litigation matters and provides expert witness services. Correct?

A. I consult in telecommunications so, yes, I agree.

Q. And this isn't the only case in which you have worked for

1065

lawyers hired by Ericsson and the big carriers.  Correct?

A.    That's correct.

Q.    Now, not too long ago, you were hired by a company called Solarity.  Correct?

A.    Yes, that's correct.

Q.    They were sort of like General Access; they were a smaller company prosecuting or planning to prosecute a case against the big carriers.  Right?

A.    Yes.

Q.    And they hired your firm to help develop a case against the big carriers--T-Mobile, AT&T, and Verizon.  Correct?

A.    I wouldn't characterize it that way, no.

        THE COURT:  Mr. Summers, it's improper for you to characterize your client as the small guy against the big guy and you're doing that by saying like General Access, a smaller company.

    The Court's prohibited that kind of David-and-Goliath comparison, and we're not going to allow it through a back door reference to some other company that you're putting in the same position as General Access.  These parties are to be treated equally under the law, and that's what the Court requires.  Understood?

        MR. SUMMERS:  Yes, Your Honor.

Q.    (BY MR. SUMMERS)  Let me rephrase the question or ask a different question.  Solarity was looking to license its

1066

patents.  Correct?

A.   I understand that's correct, yes.

Q.   And the case was eventually filed by Solarity against the big carriers.  Correct?

A.   That is correct.

Q.   T-Mobile, AT&T, and Verizon.  Right?

A.   I believe that's correct.

Q.   And Ericsson intervened in that case and became a defendant because they were manufacturing some of the equipment at issue.  Correct?

MR. STEVENSON:  Your Honor, objection.

THE COURT:  What is it, Mr. Stevenson?

MR. STEVENSON:  May we approach to discuss this?

THE COURT:  Approach the bench.

(The following was had outside the hearing of the jury.)

THE COURT:  Why are we talking about other litigation?

MR. SUMMERS:  She fired her client so that she could work for the big carriers.  It goes to bias, Your Honor, and that's all I'm going to cover.

THE COURT:  Well, it seems like it's a very drawn-out approach.

MR. SUMMERS:  I just have like two more questions, and I'm done.  I'm not getting into the matters Mr. Stevenson

1067

is concerned about.

MR. STEVENSON:  Your Honor, this --

THE COURT:  What's your comment, Mr. Stevenson?

MR. STEVENSON:  There was a disqualification motion filed in this Solarity case.  I don't think we need to relitigate the allegations of conflict that were made against her.  I think it's very, A, tangential; B, unfair.  We've already gone into litigation, and I think we've gone too far and passed the MIL.  I think this is irrelevant and completely prejudicial.

MR. SUMMERS:  Your Honor, just to be clear, I'm not going to ask her about the disqualification motion.  I'm not going to ask her about this conflict of interest.  Just that she fired the small client so she could --

THE COURT:  Tell me, Mr. Summers, exactly what you intend to ask.

MR. SUMMERS:  I want --

THE COURT:  Not what you're not going to ask her. Tell me what you intend to ask her.

MR. SUMMERS:  I'm just going to ask her that she switched sides and she fired her client so that she could put Ericsson on the big telecoms in that case.  That's all.

MR. STEVENSON:  Judge, that's not true because then we have to come back and say, no, there was a disqualification motion, that's not what really happened.  That isn't the truth

1068

of what happened, but the only way we unpack it is getting to this litigation and have a sideshow in front of the jury.  I think it's very unfair to us.

MR. SUMMERS:  The fact of the matter is she was found to have had confidential information, she was disqualified --

THE COURT:  Slow down.

MR. SUMMERS:  -- the motion for disqualification was filed, it was granted by Judge Payne and that she had received confidential information.  I'm not going to get into any of that, Your Honor.  Just that she changed clients for bias.  That's all.

THE COURT:  Okay.  We've gone far enough on this topic.  We're not going to go any further.

MR. SUMMERS:  Can I just finish it?  I would like to finish by saying she fired them.  That's all, Your Honor, because --

THE COURT:  Mr. Summers, slow down.  I can't hear you and I'm a foot-and-a-half away from you.

MR. SUMMERS:  Your Honor, I would just like to ask her, to finish this line of questioning so that it's clear why I was asking it, that she fired Solarity and so that she could work for the big carriers and Ericsson.  That's all.  I think that's very fair.  It doesn't violate anything, it's not prejudicial, and to not let me ask that question now begs the

1069

question of why I was asking any of these matters.

MR. STEVENSON: Your Honor, he shouldn't have gone down this road to begin with. This is completely divorced from anything that she's testified about anything, anything she has to do anything with, and what it does is it puts us in the position of then having to come back and make an explanation I don't want to make because then we get into a tangential discussion of that litigation.

MR. SUMMERS: It doesn't need to get into the disqualification to explain why she actually changed --

THE COURT: If one of you talks over the other one again, I'm going to sanction you. Now, how many times do I have to tell you one at a time so we can keep this record straight?

Mr. Summers, I will allow you to ask one more question and that question will be, Ms. Dwyer, did you and Solarity part company? In other words, did you cease to work for them? Not why, not anything else, and that's solely because you've gone this far down this road. But this is not germane to what's before the jury, and it does risk a sideshow, and I'm not going to allow any more than one question of, did you ultimately pass -- part company with Solarity.

MR. SUMMERS: Yes, Your Honor.

THE COURT: All right.

(The following was had in the presence and hearing

of the jury.)

THE COURT:  Let's proceed.

Q.  (BY MR. SUMMERS)  Ms. Dwyer, I just have one more question.  After the case was brought and Ericsson intervened, did you part company with Solarity and cease to work for them?

A.  That was actually before.

Q.  Before the lawsuit.  But you ceased to work for Solarity.

A.  I did cease to work for Solarity, yes.

THE COURT:  Let's move on, counsel.

Q.  (BY MR. SUMMERS)  And Ericsson has also funded research that you have conducted.  Correct?

A.  Yes, that's correct.

Q.  I think you testified yesterday that in 2020, they funded a study you conducted about standards essential patents.  Correct?

A.  Yes, that's correct.

Q.  And has that study that they funded allowed you to publish an article in the "Journal of Licensing Executives"?

A.  Yes, that's where the article was published.

Q.  That's a prestigious publication.  Correct?

A.  It is certainly an industry publication, yes.

Q.  Now, to change subjects briefly, you agree that a demodulator is a function.  Correct?

A.  Yes, it's a function on hardware and software, yes.

Q.  Demodulation can be performed by sub routines on a

1071

general purpose computer.  Correct?

A.   Yes, I agree.

Q.   And you can have multiple such demodulators running on a single piece of hardware.  Correct?

A.   I believe that's correct, yes.

Q.   Do you agree that adaptively selecting a modulation scheme can help to increase uplink throughput?

A.   Yes, I agree.

Q.   And you would agree that uplink beamforming can help to increase uplink throughput?

A.   Yes, I agree.

Q.   You don't dispute that the '477 Patent can facilitate uplink beamforming?

A.   Yes, I think it's one option.

Q.   In other words, to make it better, perhaps?

A.   I wouldn't characterize it that way, no.

Q.   Help to make it possible?

A.   It could make it possible.  It's one option, yes.

Q.   You don't dispute that the storing of profiles in accordance with the invention of the '477 Patent can facilitate demodulation by the base station?

A.   It's one option that it can facilitate it, yes.

Q.   Now, yesterday you offered some testimony on the issue of non-infringing alternatives.  I'd like to just follow up with a few questions about them.

Before I do that, do you understand that Dr. Madisetti disagrees with your opinions about the supposedly available non-infringing alternatives.

A.   Yes, I understand that.

Q.   And are you aware that he's going to testify again this afternoon on that subject?

A.   I wasn't aware, no.

Q.   But that wouldn't surprise you, would it?

A.   It would not, no.

Q.   Now, as I understand it, your proposed non-infringing alternative for the '477 Patent is to have the profiles stored in the DSPs rather than in memory.  Is that correct?

A.   Not entirely, no.

Q.   Was that the gist of it?

A.   No, I wouldn't characterize it that way.

Q.   How would you characterize it?

A.   I said that some of the profiles could be stored in the memory in the DSPs.

Q.   In what's called a cache.  Correct?

A.   Cache memory, yes.

Q.   So just to be clear, there are generally two categories of computing chips.  Correct?

A.   Could you be more specific?

Q.   We have processors and we have memory.  Correct?

A.   Those are two types of chips, yes.

1073

Q.   And DSPs are processors.  Correct?

A.   They're processors with memory.

Q.   And processors like DSPs can have limited memory called a cache.  That's what you called it yesterday.  Correct?

A.   Yes.

Q.   And the cache is designed to hold the few things that the digital signal processor needs to have immediate access to.  Correct?

A.   I think it can be used for a number of purposes.

Q.   But it's a limited resource.  Correct?

A.   It is a limited amount of memory, yes.

Q.   Were you here for Mr. McHardy's testimony?

A.   Yes.

        MR. SUMMERS:  If we could please put on the screen.

Q.   (BY MR. SUMMERS)  Are you aware that Mr. McHardy testified that the SE session, otherwise known as the UE context, that it's a very large structure, that there's a lot of data?  Were you here for that testimony?

A.   Yes, I was.

Q.   You didn't provide us with any analysis yesterday that all of this data of all of the UE profiles or UE context that there would actually be room to put that all in the little cache of these DSPs without affecting system performance.  You didn't provide us with any mathematics to show that that would be possible, did you?

A.    I did in my report.

Q.    You did not in court yesterday at all, did you?

A.    I did not yesterday, no.

Q.    Let's talk about your experience a little bit more. You've never designed base station equipment for wireless networks, have you?

A.    No, I have not.

Q.    And you've never designed or built an ASIC, one of those computer chips used in a macro base station, have you?

A.    Not for a base station, no.

Q.    And you testified yesterday that you've built demodulators.  You've never actually built a demodulator for use in a macro base station, have you?

A.    No.

Q.    And when I say macro base station, you understand that's the big cell towers at issue in this case.  Right?

A.    Yes, I do.

Q.    By the way, the word 'demodulator' is a very broad -- let me strike that.  Demodulators are used in lots of electronic products, aren't they?

A.    Yes, they are.

Q.    Virtually anything that communicates over the air would have at least one demodulator.  Correct?

A.    Yes, if there's modulation.

Q.    A walkie-talkie would have a demodulator.  Correct?

A.    Potentially.  I'm not that familiar with the technology.

Q.    And even things that communicate over wires engage in demodulation.  Correct?

A.    Yes, that's correct.

THE COURT:  Would both of you-all talk slower, please?

THE WITNESS:  Yes, Your Honor.

MR. SUMMERS:  Yes, Your Honor.

THE COURT:  It's not hard to do.  You just have to do it.  Let's continue.

Q.    (BY MR. SUMMERS)  Ms. Dwyer, you testified yesterday that the patents in your opinion are very narrow.  The other day Mr. Dacus made a big deal, when he was cross-examining Mr. Kennedy, that it's important to look at real-world information.  Do you recall that?

A.    Yes, I do.

Q.    And did you see the evidence with Mr. Kennedy that the folks at RSL did an extensive analysis, hired subject matter experts, and concluded that the General Access portfolio was seminal.  You're aware of that evidence now, aren't you?

A.    I haven't read the entire report.  I've just seen this little bit.

Q.    You weren't provided with this by the Ericsson legal team before you did your work in this case, were you?

A.    I don't believe I reviewed it in detail, no.

Q.   And you know that that work -- now you know that that worked included or those patents included the two patents-at-issue in this case.  Right?

A.   Again, I'm not familiar with the entirety of the report.

Q.   But you would agree this is real world information.  Correct?

A.   Again, I'm unfamiliar with the report.  I wouldn't want to speculate.

Q.   Right.  But you certainly would agree that your opinion that the patents is narrow, that's the exact opposite of a conclusion that the patents are seminal.  Correct?

A.   Again, I'm not familiar with what the report says.

Q.   But seminal patents and narrow patents are typically two different things.  Correct?

A.   I agree with that.

Q.   Now, I'd like to ask you about your opinions on the issue of technical comparability.  Yesterday you put this slide up that identified six license or settlement agreements that you say are technically comparable to the hypothetical license in this case.  Correct?

A.   Yes.

Q.   Now, to start, Ericsson and T-Mobile have a lot more than six license agreements.  Correct?

A.   I expect they do, yes.

Q.   Over the years presumably they've entered into any number

of settlement agreements and license agreements that cover patents.  Correct?

A.   I expect that's true.

Q.   And Mr. Dacus put up on this flip chart some numbers associated with each of these licenses.  Recall?

A.   Yes, I recall that.

Q.   How much was paid.  You don't have any idea how much they paid for any of the other licenses or settlement agreements they've entered into over the years, do you?

A.   No, I do not.

Q.   And that's because you didn't look at all of them, did you?

A.   No, that was not my role.

Q.   In fact, what happened here is Ms. Bennis, who's going to testify next for the Defendants, she provided you with a select list of patents to look at, didn't she?

A.   Yes, that's correct.

Q.   She identified one or more patents for each of these licenses and asked you to look at those specific patents to see if you would conclude that they are technically comparable.  Right?

A.   Yes, that's correct.

Q.   And you don't know how Ms. Bennis got to the list of patents that she provided you.  Correct?

A.   I understood they are the patents that were related to

the settlements.

Q.   But you don't know how she identified these six license agreements out of the many that these Defendants have entered into, do you?

A.   No.  I think that's a question for Ms. Bennis.

Q.   You don't know what information Ms. Bennis was provided. Correct?

A.   I do not.

Q.   She might have been given a small list of license agreements or a big list.  Right?

A.   I don't know that, yes.

Q.   You don't know.  And you don't know what she was given and how she got down to these six, do you?

A.   I do not.

Q.   You were here for Mr. Dacus' cross examination with Mr. Kennedy.  We've established that.  Do you remember he talked about the issue of comps?

A.   Yes, I do.

Q.   Sort of like looking at comps to see what a house is worth.  You would agree that in looking at comps, it wouldn't be fair if they were cherry-picked.  Right?

A.   I believe that makes sense, yes.

Q.   Now, I'd like to ask you about your interactions with Ms. Bennis.  The two of you had three meetings or video conferences.  Correct?

A.    Yes, that's correct.

Q.    And they were one or two hours each?

A.    I believe that's right.

Q.    And the Ericsson legal team was involved.  Correct?

A.    The legal team was involved in the cost.

Q.    My team was not involved, General Access was not told about these conversations.  Correct?

A.    That's my understanding.

Q.    And no recordings were made of these interactions.  Correct?

A.    That's correct.

Q.    No transcripts were made like we have here in court?

A.    That's correct.

Q.    And no notes were made.  Correct?

A.    No.  They were a readout of my report, so --

Q.    Oh, so it made it into your report somehow, but there's no separate notes.

A.    That's correct.

Q.    Nothing on a piece of paper.

A.    Correct.

Q.    No separate document where you type and said, notes of conversation with Ms. Bennis.

A.    That's correct.

Q.    Only what you decided to conclude or leave in your final report for us.

A.   That's right.

Q.   Okay.  Now, let's turn -- we talked about how the licenses are -- the patents you looked at were selected. Let's turn now to what you did to determine that these patents were technically comparable.

You didn't do anything to determine whether any of the patents-at-issue in these six licenses whether they are actually used in the industry, did you?

A.   No, I did not.

Q.   You didn't do anything to consider the magnitude of any financial benefits provided by the patents covered by these settlement agreements, did you?

A.   No, I did not.

Q.   You didn't do anything to determine whether the patents identified for you were valid or infringed, did you?

A.   No, I did not.

Q.   So for all you know, nobody ever used any of these patents.  Correct?

A.   I wouldn't know.

Q.   For all you know, they had no financial value.  Correct?

A.   Again, I don't know.

Q.   And for all you know, they were all invalid and non-infringed.  Correct?

A.   I don't know that.

Q.   Now, you didn't show the jury a single one of these

license agreements, did you?

A.   No, I did not.

Q.   Maybe we should focus on the patents because you just considered specific patents-at-issue or covered by these licenses.  Right?

A.   I analyze patents, correct.

Q.   You didn't show the jury a single patent covered by one of these agreements and actually show how it might be comparable to the two patents-at-issue in this case, did you?

A.   No, I did not.

Q.   Now, you testified yesterday about some word searches you performed.  Do you recall that?

A.   Yes.

Q.   You know, before I move on to that, let me just ask you another -- let me change subjects.

     Yesterday it sounded like you were criticizing Dr. Madisetti's technical benefits analysis.  Were you?

A.   I was saying I didn't agree with it.

Q.   Right.  And just so we're all clear about what we're talking about, you were criticizing the analysis that led him to conclude that depending on which patent and whether we're in FDD or TDD, he reached the conclusion that the benefits provided, the performance gain attributable to these patents is between 2 and 7 percent.  Right?  That's what you were attacking.  Correct?

1082

A.    Yes, that's correct.

Q.    Now, when I was listening to the examination, I sort of got the idea that you were suggesting that Dr. Madisetti is trying to take -- or give General Access credit for all of uplink beamforming and all of the benefits of adaptive modulation.  Were you suggesting that that's his analysis?

A.    I wouldn't characterize it that way.

Q.    Well, let me ask you this.  You know that what Dr. Madisetti set out to do was to apportion and to just get to the benefit provided by these inventions.  I mean, that was what he attempted to do.  Correct?

A.    That's my understanding.

Q.    He wasn't trying to say in his analysis that General Access is entitled to all the benefits of adaptive modulation, was he?

A.    I don't believe that, no.

Q.    And he wasn't trying to say that General Access gets the benefits of all of uplink beamforming.  Correct?

A.    No, I don't think so.

Q.    He was trying to quantify the performance gains attributable to the way in which these patents in his view make uplink beamforming and adaptive modulation better.  Correct?

A.    Yes, in his view.

Q.    Now, let's turn to the word searches and let's talk about

how you did those.

First, you'd agree that when a patent is issued, it becomes available to the public.  Correct?

A.   Yes, even before that.

Q.   That's part of the patent bargain, so to speak.  Right?

A.   Yes.

Q.   And the Patent Office has a website and you can search for patents on that website and they have a pretty powerful tool to do that.  Correct?

A.   Yes, it's my understanding.

Q.   That's what you used according to your testimony yesterday to do these word searches.  Right?

A.   I used a tool that accesses it, yes.

Q.   Right.  And you ran a variety of search strings that required certain words to be present in the patent for it to generate a hit.  Correct?

A.   Yes.

Q.   Now, you've never offered testimony in court about word searches like this ever before.  Correct?

A.   That's correct.

Q.   You don't know if word searches like this have ever been used in court before, do you?

A.   No, I do not.

Q.   And you didn't review all the patents that came up as a result of these searches to make sure that they were all

1084

closely related, did you?

A.    I audited the results, yes.

Q.    You didn't look at all of them, did you?

A.    I looked at a lot of them.

Q.    You did?

A.    Uh-huh.

Q.    Now, you didn't look to determine if those patents were actually used in the real world, did you?

A.    No, I did not.

Q.    You didn't look to see if any of the patents triggered by your searches had ever been licensed, did you?

A.    No, I did not.

Q.    You didn't look to see if any of them have ever been asserted in litigation, did you?

A.    No, I did not.

Q.    Okay.  Now, when we -- let's turn and look at those searches and talk about them for a moment here.  This is a slide that you put up -- or your counsel put up on the screen yesterday, and it looks like it shows the number of patents that had been filed that hit on your search terms relative to the '383 Patent.  Correct?

A.    Yes.

Q.    And I see there's a citation to figure 13.  Figure 13 lays out your search terms, doesn't it?

A.    Yes.

1085

Q.   It provides the exact terms you actually searched for. Right?

A.   Yes.

Q.   So if we look at figure 13, we have that in front of us, don't we?

A.   Yes, that's correct.

Q.   You searched to make sure the patent had wireless and communication, data, and demodulator or modem or receiver and controller.  Right?

A.   Yes, that's correct.

Q.   And this was to try to find patents that are closely related to the '383 Patent.  Correct?

A.   That's correct.

Q.   Well, let's talk about the search terms you did not include.  Do you understand that the '383 Patent is limited to a system or method with two or more demodulators.  Correct?

A.   Yes.

Q.   Sometimes a patent says multiple or plurality.  Correct?

A.   Yes.

Q.   You didn't include a search term limiting your search to patents that are directed to having multiple demodulators, did you?

A.   Well, there is an S that is allowed with the term demodulator so that would include that.

Q.   That's an optional term.  Correct?

A.    Yes, it is.

Q.    Yeah.  So there wouldn't have to be more than one for it to -- for a patent to trigger your search.  Correct?

A.    There is an S actually on all of the optional terms so I think it would.

Q.    And one other term you didn't look for at all is the term profile or profiles.  Correct?

A.    Yes, that's correct.

Q.    You understand that the '383 Patent requires you have multiple demodulators that are using the profiles for the users.  Correct?

A.    Yes, I understand.

Q.    You know, I -- before I move on, I had my team go through and double-check your work.  You thought it was important -- you testified yesterday it's very important sometimes to double-check your work.  Right?

A.    Yes.

Q.    So I asked my team to pull some of these patents, they didn't go through all of them, and I'd like to go through some of the patents that they identified and then I'm going to ask you some questions about them at the end.

We discovered one covering a portable safe.  It looks like a little gun safe.  We found one about video games with fantasy settings.  We found one about a football down marker.  We found one, another little gun container or gun holster.  We

found another one for a remote control fishing robot.  And we found one -- I'm a bit of a hunter.  We found one for a laminated bow.

Ms. Dwyer, are any of these patents similar technologically or closely related to the '383 Patent?

A.   I would have to look at the claim to know for sure.

Q.   Well, so maybe some of these you think are closely related in your judgment?

A.   Again, I would have to look at the claim to say for sure.

Q.   And whatever audit you did did not identify these patents, did it?

A.   I'm not sure I've seen these, no.

Q.   Let's turn now to your search relative to the '477 Patent.

THE COURT:  Ms. Dwyer, if you could speak up and slow down a little bit, it would be helpful.

THE WITNESS:  Yes, Your Honor.

Q.   (BY MR. SUMMERS)  Let's turn now to the '477 Patent and the search you did.  The search for the '477 related patents is identified for us in figure 14.  Correct?

A.   Yes.

Q.   That was a figure to your report.  Correct?

A.   Yes.

Q.   If we look at figure 14, these are the terms you searched for for patents that you would conclude now are closely

related to the '477.  Correct?

A.   Yes.

Q.   Well, let's look at terms you didn't search for.  You understand that the '477 Patent requires profiles and that these user profiles include at least one signal characteristic and one channel characteristic.  Correct?

A.   Yes.

Q.   You didn't search for the term signal or channel at all, did you?

A.   No.

Q.   So your list of patents could have patents that somehow mention a profile, but there's no discussion at all of using signal- or channel-related parameters.

A.   Correct.

Q.   Now, let's again do what we did before and look through some of the patents that we identified as ones that were identified by your search.  We found one about, you know, an attachment to a skid steer, found one about interactive talking dolls.  That's kind of my favorite.  We found one --

THE COURT:  Counsel, we don't need to know which one was your favorite.  You're not there to make statements.  You're there to ask questions.

MR. SUMMERS:  Yes, Your Honor.

Q.   (BY MR. SUMMERS)  We found one about an automated helmet gas bladder, maybe for firefighters or something.  We found

one about an automatic door, and we found one for an animal
trap that uses electrocution and then it has something that
shoots the animal out at the end called a sender.

Are any of these patents in your view closely related to
the '477 Patent?

A.   I haven't looked at any of these.

MR. SUMMERS:  Your Honor, I pass the witness.

THE COURT:  All right.  Is there redirect?

MR. STEVENSON:  Yes, Your Honor.

THE COURT:  Let's proceed with redirect.

                    REDIRECT EXAMINATION

BY MR. STEVENSON:

Q.   Ms. Dwyer, I'd like to ask you some questions about the
DSP caches and storage.

A.   Okay.

Q.   That was asked earlier in the examination.  So explain to
the jury why and what the relevance of your opinion is about
DSP caches as pertain to alternatives to the '477.

A.   So the relevance of this is that Dr. Madisetti says the
DSP is the determiner that determines the profiles, and the
cache memory is part of that.  And so if the profiles are
stored in the cache memory or part of them, say the signal
parameters, that means they're stored with the determiner and
not in a memory that's coupled to it, and the claim requires
that they're stored in memory that's coupled to it.

Q.    Okay.  And so is that a technical alternative that is not within the claims and that would be easy to implement?

A.    Yes, that's my opinion.

Q.    Okay.  And you understand you were asked some questions about financial benefits and, you know, financial uses and commercial uses of some of these things.  Is that your scope of testimony or Ms. Bennis' scope of testimony?

A.    That's not my scope of testimony.

Q.    Okay.  Let's talk about technical feasibility of doing this.

You were asked some questions about, well, how big is UE context, will it fit in the cache, and did you do mathematical analysis.  Can you explain to the jury, please, what you did to verify that storing some of the parameters in the cache would be feasible?

A.    I took the parameters that were related to the UE context that Dr. Madisetti referred to which I'm familiar with from my previous work in telecommunications as well, and I looked at how many bits each of those parameters actually take to store.

And then I added that up and looked at what that would look that for, say, a hundred different subscribers because there's 128 of these processors which could store this, and I found that that came to about 12.8 kilobits.  And each of the cache memories for each of those 128 DSPs is 64 kilobits, so I felt there was sufficient room to store these.

Q.   So that's 64 kilobits times 128 different processor caches?

A.   Yes.

Q.   Okay.  Is it even close that you would have enough room?

A.   I think there's sufficient room.

Q.   Okay.  And would you have room left over to do other things as well?

A.   Yes, I believe you would.

Q.   Now, you were asked some questions about Dr. Madisetti's apportionments.  Right?

A.   Yes.

Q.   And your, what were named, criticisms there.  Let me just ask you, did Dr. Madisetti try to do this apportionment correctly, in your view?

A.   I don't believe so.

Q.   Explain to the jury, please, what your criticism is of his attempt to apportion.

A.   My opinion is that he apportioned the benefits as though it was necessary to use the specific techniques of these two patents in order to get any of those benefits.  And it's my belief that you could do something very different, really similar, it didn't matter, but you don't need to use those specific techniques to get any of those benefits.  And that's where I think it's improper.

Q.   Okay.  Lastly, you were shown a handful of patents from

the thousands that you found in your searches.  Do you remember those, the ones at the end here?

A.    Yes.

Q.    Explain to the jury, please, what you did to audit your results.

A.    What I did to audit the results was I created initial search terms, and I ran the search, and then I checked all the titles of the patents and the assignees and I looked for things that stood out as being wrong.  And then I adapted the search terms, I put some exclusion terms, saying, you know, not in the medical field, for example, not in the insurance field.  It's like designing a fishing net that's tailored to catch a certain type of fish, so it catches all the big fish, it might miss a few, it might pull in a couple of frogs, maybe we've seen a couple I don't know if those are my actual results, but it does catch most of the big fish.  So I'm pretty confident that it's a representative sample.

Q.    Okay.  And if you take out the few frogs, does it really change, given the magnitude of patents that you have, your results and analysis at all?

A.    No.  I think even if you remove a few frogs, you're still getting a very large number.

Q.    Okay.  Thank you.

MR. STEVENSON:  Pass the witness.

THE COURT:  Additional cross?

MR. SUMMERS:  Yes, Your Honor, very briefly.

THE COURT:  The proof's in the pudding I believe we've been told.

RECROSS EXAMINATION

BY MR. SUMMERS:

Q.   Ms. Bennis [sic], you were asked about some potential redesigns and you testified that they were easy to implement.

A.   I'm not Ms. Bennis.

Q.   I'm sorry, Ms. Dwyer.  You know, these trials, we all get a little tired.  My apologies.

A.   It's okay.

Q.   But you testified that these changes you've testified about would be easy to implement.  Correct?

A.   Could you start the question again?

Q.   Yeah.  You've testified about a non-infringing alternative for the '477 Patent where you would move the storage of profiles or parts of the profiles to the DSP. Correct?

A.   Yes.

Q.   And you say this would be easy to implement.  Correct?

A.   Yes, I think it's --

Q.   I think yesterday you said it could be done just in software.  Correct?

A.   I expect so, yes.

Q.   And I think yesterday you said you even think it might

improve the system performance.  Correct?

A.    Yes.

Q.    You've heard the testimony that Ericsson has 30,000 engineers, didn't you?

A.    Yes, I do.

Q.    It has vast resources.  Correct?

A.    I believe that to be true.

Q.    Don't you think if this might improve system performance, that maybe one of those 30,000 engineers would have looked at it?

A.    They may already be doing it, sir.

Q.    In fact, they've had your opinions in this case since at least September.  Correct?

A.    November.

Q.    Well, your original report was dated September 30th, wasn't it?

A.    Yes, it was, yeah.

Q.    And they -- to your knowledge, they haven't done this, have they?

A.    Like I say, they may already have done it.

Q.    But you don't know?

A.    No, I don't.

Q.    If they've tried this, they have not shared the results with you, have they?

A.    No.

MR. SUMMERS:  No further questions.  I pass the witness, Your Honor.

THE COURT:  All right.  Any further direct?

MR. STEVENSON:  Nothing further.

THE COURT:  You may step down, Ms. Dwyer.

THE WITNESS:  Thank you, Your Honor.

THE COURT:  You're welcome.

MR. STEVENSON:  May Ms. Dwyer be excused, Your Honor?

THE COURT:  Yes, Ms. Dwyer is released.  She's free to stay; she's free to go.

Defendants, call your next witness.

MR. DACUS:  Good morning, Your Honor.  T-Mobile and Ericsson call Ms. Melissa Bennis to the stand.

THE COURT:  All right, Ms. Bennis.  If you'll come forward and be sworn, please.

(Whereupon, the oath was administered by the Clerk.)

THE COURT:  Please come around, have a seat on the witness stand.

All right, counsel.  Proceed with direct examination.

MR. DACUS:  Thank you very much, Your Honor.

MELISSA BENNIS,

having been first duly sworn, testified under oath as follows:

DIRECT EXAMINATION

BY MR. DACUS:

Q.    Good morning, Ms. Bennis.

A.    Good morning.

Q.    Would you please introduce yourself to the jury?

A.    Sure.  My name is Melissa Bennis.  Good morning.

Q.    And before we get into the details, would you just tell the jury at a high level why you're here to testify, please?

A.    Of course.  I have been asked by T-Mobile and Ericsson to assess the amount of damages that may be appropriate to award if and only if the jury finds any infringement of one or both of the patents and you find them valid.

Q.    Okay.  Tell the jury, if you would, please, Ms. Bennis, where you work.

A.    I am a managing director and co-leader of our national intellectual property practice at a financial advisory firm called Stout, and I work out of our Chicago office.

Q.    And what kind of work do you do there at Stout?

A.    I do a variety of financial consulting-type engagements for clients, although I do spend the majority of my time assessing damages in the case of litigation like this.

Q.    Okay.  And give the jury some indication of how long you've been doing this type of work and this type of analysis.

A.    So I believe I'm in my 27th year of practice.

Q.    Let me back up a little bit further on your qualifications.  Where did you go to college?

A.    I grew up in the Midwest.  And so after high school, I

attended the University of Illinois where I earned a Bachelor of Science in finance with an emphasis in accounting, and I graduated with honors.

Q.    Okay.  What did you do after you graduated from college?

A.    I was recruited at the end of college to join Arthur Andersen, which at that time was a big public accounting, in their specialty consulting practice.

Q.    What did you do after your work there at Andersen?

A.    After a few years spent there, I spent one year at KPMG in their specialty consulting practice.  That's another one of the big public accounting firms.  And the industry was changing at that point, and a group of about a dozen of us left at that point and started our own boutique consulting firm.  And I was a part of that for I think about 19 years.

And then about two-and-a-half years ago now, that firm was acquired by Stout, which is where I mentioned I am now.

Q.    Do you have any degrees beyond your Bachelor's degree from the University of Illinois?

A.    I do.  While I was pursuing my career, I applied for and was accepted into the master's of business program at Northwestern University also in the Chicago land area, and there I earned my MBA with majors in accounting, marketing, management, and strategy.

Q.    Okay.  Do you have any professional certifications that relate to the type of work that you do and the testimony that

you plan to give to the jury today?

A.    Yes.  I'm also a licensed certified public accountant, or CPA.

Q.    I know you've said you've done this type of work for 27 years.  Can you give the jury some indication of the magnitude of the experience that you have in these types of cases?

A.    Sure.  So I think -- thinking back over the course of my career, I've been retained to assist in the assessment of damages in nearly 200 cases.

Q.    Do you belong to any professional associations?

A.    I do.  I am a member of the Licensing Executive Society. Also as a CPA, I'm a member of the American Institute of Certified Public Accountants.  I'm a member of the Illinois CPA Society.

And although I'm not a lawyer, I do belong as an associate member to the American Bar Association which is intended for lawyers.  Just because my work interacts so much with the law, it's nice to keep up with the reading and the publications and things that are put out.

Q.    Have you received any awards with respect to this type of work that you've done?

A.    Yeah.  There is an industry group known as the IM Patent 1000, and I've been honored by them for I think the last six or seven years running as a recommended economic expert.  And several years ago I was honored by the Illinois CPA Society as

a woman to watch in the CPA industry.

MR. DACUS:  Your Honor, on this time based upon Ms. Bennis' education, training, and experience, we would offer her as an expert in this case related to damages evaluations related to patents and specifically to the two patents-in-suit.

THE COURT:  Is there objection?

MS. FAIR:  No, Your Honor.

THE COURT:  Without objection, the Court will recognize this witness as an expert in those identified fields.

Please continue.

MR. DACUS:  Thank you, Your Honor.

Q.  (BY MR. DACUS)  Ms. Bennis, have you prepared some slides to assist with your testimony this morning?

A.  I have.

Q.  And we're going to dig into the details here, but before we dig into the details, let's just start at a high level.

Have you come to a conclusion in this case as to what a reasonable royalty would be if the jury were to find that there's infringement and the patents are valid?

A.  Right.  If the jury were to come to that conclusion, it's my opinion that the reasonable royalty for payment to a license to these two patents would be a single up-front lump sum payment of $1.5 million for each patent, so summed

together, a total damages amount of $3 million.

Q.    Okay.  Now, does the fact that you and I are up here giving the jury testimony about damages, does that mean that T-Mobile believes it owes anything in this case?

A.    No.  And it's an important distinction because I realize it feels like a bit of a dichotomy.  Those in my shoes and, of course, Mr. Kennedy, who you heard from earlier this week, are asked to assume that there could be a finding of damages since that's the only instance in which damages is assessed.

Q.    As part of your work in this case, have you also had the opportunity to look at Mr. Kennedy's opinions in this case?

A.    Yes, I have.

Q.    Okay.  And have you also come to some conclusions that we'll talk about as related to his opinions?

A.    I have.

Q.    Let's start with sort of what I'll say is your affirmative opinion of a reasonable royalty.

Just for the jury, just to remind them, what is a reasonable royalty?

A.    A reasonable royalty is really a term, and I think you've now heard this, but that pertains to the amount of money that would be exchanged from a party seeking to utilize a patent to the party that holds the patent for rights to practice that patent.

Q.    Is there a common way or a common method to determine

these reasonable royalty amounts?

A.    Yes.  So I and in fact the jury are asked to assume that there would have been a hypothetical negotiation between these parties, so when they would have come together to negotiate what that right number would have been, it's what would have come out of that.  That's the hypothetical negotiation.

Q.    And I think Mr. Kennedy touched on this, but who would be the parties engaging in this hypothetical negotiation?

A.    It would be General Access on the one side as the owner of the patents and it would be T-Mobile on the other. However, given that the accused products here are manufactured and sold to T-Mobile by Ericsson, Ericsson would be reasonably interested in the hypothetical negotiation and consult --

Q.    So let's focus on that.  Why is it that Ericsson would have some participation in this negotiation?

A.    Well, what I've learned and what we've seen play out this week is that it's very common for Ericsson to step in when its own accused products that are involved are accused of infringement or potentially in need of a patent license.  So their experience and their other licensing activities for similar type patents becomes very relevant in this situation.

Q.    Now, in this negotiation that we're talking about, are there certain factors that the law says that you and the jury should be looking at?

A.    Yes.  So this is what's known as the *Georgia-Pacific*

factors.  *Georgia-Pacific* is a company that was involved in a lawsuit many years ago in which the set of factors was developed to help determine what the outcome of that hypothetical negotiation would be.

Q.    Now, under the facts of this case, are there certain of those factors that are more important that we should be focused on?

A.    Yes.  So with any case, often there are certain facts and circumstances that are more important than others, and in this case these are the four that I really pulled out to use most specifically to analyze the issues.

Q.    Okay.  Let's just take each one of these individually.  Is that okay?

A.    Yes.

Q.    So the first one says "Patent scope and landscape."  What -- when you say patent scope, what are you talking about?

A.    The scope of the patent becomes important when linking it to the economic value, and that is, what is the role that these particular patents play and how broad or how narrow are they.

Q.    Okay.  Is that part of the testimony that we heard from Ms. Dwyer?

A.    Yes.

Q.    Okay.  And when you say patent landscape, what are we

talking about?

A.   The patent landscape we've heard a lot about this week and that is that this is -- this happens to be a very crowded patent landscape.  There's lots and lots of technologies that are involved in these very complex base station products.  So when determining what the parties would have sat down and talked about with respect to just these two patents, the economic value then has to follow suit.

Q.   Were you here for Mr. Kennedy's testimony?

A.   I was.

Q.   And specifically when I cross-examined him?

A.   Yes.

Q.   Did you hear me ask him about the 4G and 5G technologies that are accused in this case and whether or not there were, in fact, tens of thousands of patents related to those 4G and 5G?

A.   I did.

Q.   Do you remember what he said?

A.   Yes.

Q.   What did he say?

A.   He agreed.

Q.   Okay.  So is that part of the landscape that you're talking about?

A.   Exactly.

Q.   So from an economic standpoint, help me and the jury

understand why does this scope matter and why does this landscape matter from an economic standpoint?

A.   It's really critical because at the end of the day, this is a business and they are making products and services to sell, and every economic value that's linked to any individual feature, functionality, or patent has to fit in to the economics of the product as a whole.  It has to make sense.

Q.   And we don't need to go through this because Ms. Dwyer just did, but the information that she gave related to the number of patents, is that something you considered in your evaluation of the royalty in this case?

A.   Yes.  So in addition to what you mentioned that you spoke about with Mr. Kennedy, the patents in the field, these were -- this was a specific search related to the patent or the areas of focus for these particular patents that was performed by Ms. Dwyer that confirms once again the crowded patent landscape that these patents play in.

Q.   So just to speak in a little more plain terms, when T-Mobile and Ericsson and General Access are sitting down at this table to negotiate a reasonable royalty, do they have in their mind that there are literally, according to Mr. Kennedy, tens of thousands of other patents out there that people want to get paid on?

A.   They have to.

Q.   Let's talk about the second critical consideration, and

that is what?

A.   That is the fact that there are lots licenses to comparable technology that the parties could have consulted. It's very similar to the housing analogy that we've now heard repeated several times, which is to say, you know, if you're going to take a license to certain patents, it's just like buying a house.  If you want to buy a house that looks a lot like the other houses on your block, you don't want to be the one that pays a hundred times what everybody else pays.  SO these licenses to similar patents are very helpful in this context.

        MR. DACUS:  Your Honor, may I have permission to use the flip chart?

        THE COURT:  You may.

        MR. DACUS:  Thank you.

Q.   (BY MR. DACUS)  You were here, Ms. Bennis, when I went through these licenses with Mr. Kennedy, were you not?

A.   I was.

Q.   And based on the work that you've done in this case, are these comparable licenses that you looked at in rendering your opinions in this case?

A.   Yes.

Q.   Okay.  So I want to ask about these licenses that I went through with Mr. Kennedy.  You looked specifically at them. Is that right?

1106

A.    Yes.   In fact, this is the list of licenses that I felt were both economically and technically comparable.

Q.    You're ahead of me, and that's what I was going to ask you.

Did you take the time to determine whether or not the patents involved in these licenses were technologically similar or comparable to the patents in this lawsuit?

A.    So that's, of course, a goal is to figure out if there are, in fact, licenses that have some economic similarities to what the license would look like here, are there patents within them that are technically comparable as well.

Q.    And did you undertake to determine that?

A.    That is where I consulted with somebody with a technical background which is not me.   That's where I consulted with Ms. Dwyer.

Q.    And we heard her testify about the fact that these patents in these licenses were technologically similar to the patents-in-suit.   Correct?

A.    That's correct.

Q.    Were you here when I asked Mr. Kennedy whether or not they bothered on their side to even take a look at that issue?

A.    I was.

Q.    Do you remember what he said?

A.    He said that they did not.

Q.    Okay.   And then with respect to each one of these

licenses, do you believe that they are economically comparable or similar to the patents-in-suit?

A.    I did find them to be economically comparable.

Q.    Did all these result from a negotiation?

A.    They did.

Q.    The lawyer for the Plaintiffs I think asked Ms. Dwyer whether or not Ericsson had other -- Ericsson and T-Mobile have other licenses.  Do you remember that?

A.    I do.

Q.    And think he may have said something about cherry-picked. Do you remember that?

A.    I do.

Q.    Did you actually look at more licenses than what we just have here on this flip chart?

A.    I do.  These are simply not cherry-picked licenses.  I've analyzed lots of licenses that were provided by the parties here, and these are the ones that fell out of that analysis of all of the licenses as being economically comparable.  And then, again, step two would be to figure out if there are patents within them that are technically comparable.

Q.    Just to make sure, you had a broader universe of licenses that you looked at and chose these because they're technically similar to these patents?

A.    Correct.

Q.    Now, with respect to these licenses, I know you've made a

slide that sort of reflects what I have here.  Tell the jury how you go about or how you would suggest to them that they go about using these to come to a number that is a reasonable royalty.  And is that what's reflected on this slide?

A.   It is.  So this is my attempt to show some of my work --

MR. DACUS:  Your Honor, I apologize.  May I seal the courtroom with respect to this information?

THE COURT:  Yes.  I'll accept counsel's request and order the courtroom sealed.

I'll direct that all persons present not subject to the protective order entered in this case excuse themselves until the courtroom is reopened and unsealed.  This will also seal this portion of the related transcript.

(Courtroom sealed.)

█████████████████████████████████████████
████████████████████████████████████.
███████████████████████████████████████.
██████████████████████████████.
████████████████████.
████████████████████████████████████████.
Q.  ███████████████████████████████████████
████████████████████████████████████████
███████████████████████████
A.  ███████████████████████████████████████████
███████████████████████████████████



Q. ███████████████████████████████████████

██████████████████████████████████████████

████████████████████████████████████████?

A. ████████████████████████████████████████

████████████████████████████████████████

███████████████.

Q. ████████████████████████████████████

███████████████████████████████████████

████████████████████████████████████?

A. ███████.

Q. ████████████████████████████████████

███████████████████████████████████

████████?

A. ████████████████████████████████████

███████████████████████████████████████

███████████████████████████████████████

███████████████████████████████████████

███████████████████████████████████████

██████████████

                    ████████████████████████████

███████████████████████████████████████

████████.

Q. ███████████████████████████████████████████

███████████████████████████████████████

███████████████████████████████████████████

███ ?

A. ████ .

Q. ████████████████████████████████████████

████████████████████████████████████████████

███████████████████████████████ ?

A. ███████████████████████████████████████

███████████ .

Q. █████████████████████████████████████

███ ?

A. ████████████████████████████████████████

████████████████████████████████████████

███████████████████████████████████████████

███████████████████████████████████ .

Q. ██████████████████████████████████████████

████████████████████████████████████████████████

███████████████████████████████████████

██████ ?

A. ████ .

Q. ████████████████████████████████████████████████

██████ ?

A. ████ .

Q. ████████████████████████████████



Q. █████████████████████████████████████████

███████████████████████████████████████?

A. ████████████████████.

Q. ███████████████████████████████████

███████████████████████████████████████

███████████████████████████████████████████

███████████████████████████████████████

████████████████████████?

A. ███████████████████████████████████████

████████████████████████████████████████.

Q. ███████████████████████████████████████?

A. █████.

Q. █████████

███████████████████████████████████████

████████████████████████.

████████████████████████████

███████████████████████████████████

█████████████████████.

                    (Courtroom unsealed.)

          THE COURT:  All right, counsel.  You may continue
with your direct examination.

          MR. DACUS:  Thank you, Your Honor.

Q.   (BY MR. DACUS)  What's the fourth critical consideration
that you would say, Ms. Bennis, the jury should consider, if
they were to reach this damages issue?

A.   The fourth consideration is what we call the availability of acceptable non-infringing alternatives.

Q.   And why does that matter and what should the jury consider in that regard?

A.   So the idea here is if we take ourselves back to that 2013 hypothetical negotiation, it's what would the parties have -- what would their choice have been.  Their choices were to take a license to these particular patents and practice them or have the right to, or do something different.

Q.   Okay.

A.   And naturally a rational economic actor would be looking to minimize their cost, so --

Q.   You were here.  I'm sorry.  I didn't mean to interrupt you.

A.   That's okay.

Q.   You were here when I asked Mr. Kennedy, well, if these folks over here leaned over and said we'd like $253 million, would T-Mobile and Ericsson think, well, do we have any other alternatives?  Is that basically what we're talking about?

A.   Exactly.

Q.   And I asked Mr. Kennedy whether or not the jury should consider those alternatives.  Do you remember what he said?

A.   He said yes.

Q.   But then he didn't do it, did he?

A.   No, he did not.

Q.   So are there alternatives that if these folks said we want $253 million, could T-Mobile or Ericsson have done these things in different ways?

A.   Yes.  So I learned from Ms. Dwyer and gained the general appreciation, even from conversations with Mr. Mueller, that these things can be accomplished in software changes.  For instance, specific with the '383 Patent, the acceptable alternative was to revise the software for the base stations so that the data signals are not alternately applied to a first and second demodulator, and this change or this -- I guess this implementation at the hypothetical negotiation could have been written and implemented for less than a million dollars.

Q.   Is that one of the things Ms. Dwyer just explained to the jury?

A.   Yes.

Q.   What about for the '477 Patent?  Were there alternative ways to perform these functions and features?

A.   Yes.  So we heard Ms. Dwyer testify and explain more eloquently than I can that the difference that can be made there is to store the signal-related parameter and the channel-related parameter separately.  And so implementing something like that within the software also can be done for less than a million dollars.

Q.   Were you here when I asked Mr. Kennedy whether or not he

had asked Dr. Madisetti about whether or not these alternatives were feasible?

A.    Yes.

Q.    And do you remember he said that Dr. Madisetti told him they were not?

A.    I do recall that.

Q.    So can you just give us a summary based on all this information of what you think the jury should look at if they were to reach this question related to a reasonable royalty and damages?

A.    Yes.  So, again, it's just looking for common sense metrics in the economic environment.  So here we have those per-patent value indicators based on the comparable licenses that are -- that range from $260,000 per patent to $1.96 per patent, million that is, the parties would have had the option to implement these non-infringing alternatives for less than a million dollars each.  And we have to bear in mind again the other market indicators like the fact that these patents were not successful in being even sold.

Q.    Is that basically the information that leads you to what you believe would be a reasonable royalty in this case for these two patents?

A.    It is.  So I've taken into account all the considerations that we talked through and more in my analysis to come to the conclusion that a reasonable royalty, should there need to be

one, would be no more than $1.5 million per patent.

Q.   Okay.  Let's talk briefly about what -- you looked at Mr. Kennedy's analysis and calculation that he did?

A.   I did.

Q.   Okay.  Let's talk about what your thoughts were there.

Did you think Mr. Kennedy had some, for lack of a better term, flaws in his analysis?

A.   Yes.

Q.   And what was the first thing that you saw that you wanted to note for the jury?

A.   So recall that Mr. Kennedy's analysis was the idea that T-Mobile would go out and buy all new additional equipment in total.  The calculation and the approach overall does not limit the damages assessment to the benefit these particular patents provide over what already existed.

So, again, the exercise is looking in the incremental value, not anything broader.

Q.   This goes to this issue of are these patents really broad or are they narrow?

A.   Correct.

Q.   Okay.  What else did you note with respect to Mr. Kennedy's analysis that you think is important for the jury to consider?

A.   So we also heard you walk through with Mr. Kennedy the fact that his damages calculation included all sorts of

1118

capital expenditures that extended well beyond these base stations that are even accused here, which is improper.

Q.   So give the jury -- you've actually looked at sort of all the costs that went into Mr. Kennedy's calculation.  Right?

A.   Yes.

Q.   Give the jury some indication or some examples of what additional costs beyond the base station that he put in his calculation.

A.   So there were examples within the capital expenditure information that he utilized, things like vehicles, which again are cars and trucks that employees might drive around in amongst the base stations.  Those aren't the base stations.

Similarly, there were capital expenditures for things, what they call site hardening, which would mean back-up generators and batteries, that should there be a power failure at the base stations, those are there just in case.  Well, once again, we are to be looking at the role that the patents play within the base stations, so it's extraneous.

Q.   Do you think it's improper or proper to have included those extra costs?

A.   It's improper because the effect of it is driving Mr. Kennedy's damages opinion way beyond where it should be.

Q.   Just a little bit beyond or significantly?

A.   Significantly beyond.

Q.   You heard me ask him if even though we don't agree with

his methodology, if we just limit it to base stations, even he admitted it would only be around $80 million rather than 250. Right?

A.    Right.  And that still doesn't work because it's still factoring in the purchase of equipment as a whole rather than focusing on the role and the patents within it.

Q.    What's the third piece of information that you'd like for the jury to consider with respect to Mr. Kennedy's analysis?

A.    So Mr. Kennedy's analysis also does not rely on the next best alternative.  We've heard that there are other software changes that can be implemented.  We heard the testimony and I believe Mr. Kennedy confirmed that his analysis would have been a last resort.

Q.    And did you hear Mr. Mueller testify from T-Mobile?

A.    Yes.

Q.    And I think that's what Mr. Kennedy was parroting that Mr. Mueller says buying base stations would be a last resort; we would go to other alternatives before that.  Right?

A.    Right.

Q.    And is it your understanding there were other alternatives available?

A.    Yes.

Q.    In addition, you were here for Mr. Mueller's testimony.

A.    I was.

Q.    Correct?

Do you agree with Mr. Kennedy or with Mr. Mueller that this alleged somewhere between 2 and 7 percent gain in efficiency had to be made up by buying base stations?

A.    Right.    That premise is also faulty.    It's not that -- for instance, if placed with this situation, T-Mobile would not go pay for additional base stations.  Ericsson under the contract between the parties would have to fill the gaps, if you will, behind any capacity shortcoming or anything that this may or may not create, and they're able to accomplish that through software pushes and things.

Q.    So let me stop you there.  Software push.  Is that something actually that I and the jury may be familiar with in our everyday lives?

A.    Yes, exactly.  So we can all imagine sitting on our iPhone or Android and a software push comes in to improve quality, to fix bugs.  This is exactly what Ericsson does under contract with T-Mobile if things like these arise.

Q.    So just like all of us who get these software updates on our phones or our computers, does T-Mobile have to pay extra for those from Ericsson?

A.    No.  Just like as cell phone customers, we don't pay for those, either.

Q.    And were you here when Mr. Mueller testified about whether or not there was excess capacity in the T-Mobile network during this 2017 to 2023 time period?

A.    Yes.

Q.    Do you remember what he said in that regard?

A.    He said there is always capacity.

Q.    Okay.  Let's -- now that we've talked about Mr. Kennedy's opinions, I kind of want -- what we're supposed to be doing here is coming to a reasonable royalty.  Right?

A.    Yes.

Q.    So can you tell the jury -- you put together this bar chart.  Tell them what this bar chart shows and how it relates to this question of whether or not what the Plaintiff is asking for is reasonable.

A.    So I hope that this could just put it all in a picture because sometimes a picture is worth a thousand words, as they say.  But we have all of these market value indicators and these costs to implement alternatives that are so, so much less.  And -- and not to say that they're nothing.

Q.    That's the things down here?

A.    Correct.

Q.    Okay.

A.    They're not nothing.  They're still a cost that would be taken on in the form of a license value.  But they're so far afield from Mr. Kennedy's royalty opinion, you have to sit back and ask, does this really make sense.

Q.    And just to make sure we're clear, from here to here are basically the per-patent royalties that are paid for similar

patents?

A.   Yes.

Q.   And then from here to here on your bar chart are the amounts that, as Ms. Dwyer testified, would be required to pay to implement these alternatives?

A.   Yes.

Q.   And then what you have here at the end of your bar chart is what?

A.   So what that is, you recall Mr. Kennedy testified to a total for both patents of $253 million.  So this bar represents only half of that, just to make it in line with really the other per-patent indicators on the other license bars, but even that, I mean, it's way out of line.

Q.   At the end of the day, what do you think, if the jury were to reach this question, would be the reasonable amount of a royalty for each of these patents?

A.   So, once again, it's my opinion that at that hypothetical negotiation, the parties would agree to a single up-front lump sum payment for each patent of no more than $1.25 million.

        MR. DACUS:  That's all the questions I have, Your Honor.  I pass the witness.

        THE COURT:  All right.  Cross examination by the Plaintiff.

        MS. FAIR:  Yes, Your Honor.

        THE COURT:  Proceed with cross examination, Ms.

Fair.

MS. FAIR:  Thank you, Your Honor.

CROSS EXAMINATION

BY MS. FAIR:

Q.   Good morning.

A.   Good morning.

Q.   We haven't met before, have we?

A.   We haven't.

Q.   I'm Andrea Fair.  I represent the Plaintiff.  I think you know that.  Right, Ms. Bennis?

A.   Yes.

Q.   Now, you and Mr. Kennedy take two completely different approaches to damages.  Is that fair?

A.   I would only disagree with respect to kind of the cost savings or the alternative evaluation that we made.

Q.   You look at non-infringing alternatives and some licenses, some settlements.  Right?

A.   Yes.

Q.   And he looks at cost savings.  Correct?

A.   Yes.

Q.   I mean, you couldn't correct his approach because you disagree with the very foundation of it.  Right?

A.   I do.

Q.   And you'd agree that the jury's the one, the group of people who are going to decide which model to believe.  Right?

Shawn M. McRoberts, RMR, CRR
Federal Official Court Reporter

1124

They're the judges of the credibility of the witnesses.  Do you agree with that?

A.   I do.

Q.   And you were here on Monday when the Court gave instructions on how we might evaluate the credibility of witnesses?

A.   Yes.

Q.   And some of the things to consider is, does the witness have a reason to not tell the truth.  Right?

A.   Yes.

Q.   Fair?

And another might be if the witness -- does the witness understand the questions and answer them directly.  Right, Ms. Bennis?

A.   Yes.

Q.   You do have a lot of experience in this area.  Right?

A.   I do.

Q.   I think 27th year of practice, you said?

A.   Yes.

Q.   You're a leader at your company, managing director?

A.   I am.

Q.   And you're even featured on your website for the intellectual property practice.  Right?

A.   I am.

Q.   And you have a video where you introduce yourself and

1125

your work and your philosophy.

A.   Yes.

Q.   And so you explain that your clients have a lot to lose or a lot to gain, and being an input into that equation is very motivating.  Right?

A.   Correct.

Q.   And your experience just to -- Mr. Kennedy has sat at the negotiating table before.  Right?

A.   Correct.

Q.   You didn't testify about any experience sitting at a table to negotiate a patent license.

A.   No.  That's not part of my practice.

Q.   The majority of your practice is litigation.  Right?

A.   Yes.

Q.   Providing opinions and then testifying in the context of patent infringement lawsuits?

A.   Yes.

Q.   And when you're hired, you know who your client's going to be.  Fair?

A.   I do.

Q.   So in this case you knew you would be working for T-Mobile and Ericsson when you were hired?

A.   Yes.

Q.   And they were on the defense side.  You knew that. Right?

A.   Yes.

Q.   And so you knew when you took on your assignment that they had a lot to lose.  Right?

A.   Yes.

Q.   And this isn't your only time working for T-Mobile and Ericsson in patent infringement lawsuits.  Right, Ms. Bennis?

A.   Correct.

Q.   In fact, you work for other telecommunications companies in patent infringement lawsuits on the defense side, too.  Right?

A.   I have.

Q.   I think I counted it from your CV, you've done something like 10 reports for telecommunications industry since 2022.  Sound about right?

A.   It sounds about right.

Q.   And all these companies pay for your work.  Fair?

A.   Yes.

Q.   $745 an hour in this case is what you're charging.

A.   Correct.

Q.   And it's not just you.  They also pay for other team members that help you in supporting your opinions.  Right?

A.   Yes.  I have a wonderful team.

Q.   And in this case, at least as of I believe it was November, you weren't quite sure was something about a hundred to 200 hours that you'd spent on this case.

A.   Sounds fair.

Q.   And that was just you, not your team members.  Right?
They would have also spent a fair amount of time?

A.   Yes.

Q.   And you're here working this week.  You've been in court
every day?

A.   Yes.

Q.   You've spent time preparing for trial as well?

A.   I have.

Q.   Do you have any idea how much the telecommunications
industry has paid for your work over the last three years?

A.   I don't.

Q.   And we know you're here as the damages expert.  Right?

A.   Yes.

Q.   You're here to give a number for the Defendants.  Right?

A.   Yes.

Q.   Not a technical expert.

A.   No.

         MS. FAIR:  Ms. Brunson, may I please have the
document camera?

Q.   (BY MS. FAIR)  So you showed us on your direct this slide
where you were criticizing -- you had some criticisms of Mr.
Kennedy.  Right, Ms. Bennis?

A.   Right.

Q.   This first one about whether or not Mr. Kennedy's

analysis is limited to the benefit that the inventions provide over what already existed, it's true that you don't actually have any independent technical opinions about the benefits of these patents.  Correct?

A.    Correct.

Q.    That comes from someone else.  Correct?

A.    Correct.

Q.    And on the costs -- it actually comes from Ms. Dwyer. Right, Ms. Bennis?  The benefit of the inventions over what already existed?

A.    My understanding in general of the technology came from both Ms. Dwyer and Dr. van der Weide.

Q.    You're not offering any opinions to say the patents don't provide the benefit that Dr. Madisetti testified about. Correct?

A.    I have not provided technical opinions.  That's correct.

Q.    So the first bullet here of the benefit of the inventions over what previously existed, that's someone else's opinion. That comes from someone else.  Right?

A.    Yes.

Q.    And the second one, the costs, you don't have any independent opinions about what costs are needed to build a base station.  Right, Ms. Bennis?

A.    I have not provided any independent opinion on that.

Q.    The lists of costs that you say Mr. Kennedy should have

excluded was actually fed to you was from T-Mobile, Mr. Garrow?

A.    T-Mobile's business records, yes.

Q.    A person from T-Mobile told you which costs within those business records should not have been included.  Correct?

A.    My understanding of those came from his deposition testimony with respect to questions he was asked about those capital expenditures.

Q.    Correct.  You didn't look at the business records yourself and decide what costs should not be included; you got that from a T-Mobile person.  Correct?

A.    I considered the T-Mobile representative testimony on the definitions of those capital expenditures.

Q.    So that also came from someone else.  Correct, Ms. Bennis?

A.    My understanding came from, like I mentioned, my appreciation of his testimony.  My opinions as to what was I suppose the accused product or not was my own examination.

Q.    And you understand that Mr. Kennedy's calculations are measuring what the costs would be if there are no infringing products.  Right?

A.    Can you repeat that question, please?

Q.    Mr. Kennedy's analysis of how many base stations, how much more T-Mobile would have spend on its network is in a network that cannot infringe, it's a cost savings analysis,

what costs would they have had with no infringing products. Right?

A.   Yes.

Q.   All right.  The third one that you have here, the next best alternative, you don't have any technical opinions about that, either.  Right, Ms. Bennis?

A.   Correct.

Q.   Understanding what the next best alternative is would be an analysis of the technology that's not your own.  Right?

A.   That's right.

Q.   And then this last one, you were here when Mr. Mueller testified.  Right?

A.   I was.

Q.   That spending billions building out and densifying their network is a last resort?

A.   Yes.

Q.   Right, Ms. Bennis?

A.   Correct.

Q.   And yet they've done it year after year after year. Correct?

A.   Naturally, yes.

Q.   Okay.  So your assignment was not technical; it was damages.  Right?

A.   Correct.

Q.   You'd agree that when we get to the damages question,

when the jury's answering that question, they should be awarding a reasonable royalty that compensates General Access for the infringement that they have found.  Right?

A.    Yes.

Q.    And that royalty should be based on the value that T-Mobile gains from the use of the two patents-at-issue in this case.  Fair?

A.    Yes.

MS. FAIR:  Mr. Svenson, may we please have Mr. Kennedy's slide 6?

Q.    (BY MS. FAIR)  I didn't see this in your slide deck, Ms. Bennis, but you're familiar with the damages statute.  Right?

A.    Of course.

Q.    We're looking for a royalty for the use made of the invention by the infringer.  Correct?

A.    Yes.

Q.    Okay.  So --

MS. FAIR:  Thank you, Mr. Svenson.

Ms. Brunson, may I please have the document camera?

Q.    (BY MS. FAIR)  And you gave us your critical considerations for your affirmative damages opinion.  Right?

A.    Right.

Q.    The first one here, patent scope and landscape, here you were talking about the word searches that Ms. Dwyer had done?

A.    In part, yes.

Q.   Well, you don't have any independent technical opinion about what the patent scope of either of these two patents is. Right?

A.   Right.

Q.   You don't have any independent opinions about what the landscape looks like.  Correct?

A.   Right.

Q.   That came from someone else.

A.   Yes.

Q.   Then non-infringing alternatives, No. 4, that also came from Ms. Dwyer?

A.   Yes.

Q.   And then No. 3, previous attempts to sell the patents-in-suit, you point to GP factor 13 for that?

A.   Yes.

Q.   And that's *Georgia-Pacific* factor 13?

A.   Yes.

Q.   And that factor is the portion of profit attributable to the invention distinguished from non-patented elements. Right, Ms. Bennis?

A.   Yes.

Q.   It's not the potential sale of a portfolio.  Right?

A.   Right.

Q.   And you're not somebody who could do the technical analysis to evaluate the portion of profit distinguished from

non-patented elements.  You're not someone that could look at the technology and say here's what's patented and here's what's not.  Right?

A.    I'm not the technical expert.

Q.    And yet you identified -- you've got that RSL and ICAP information here under *Georgia-Pacific* factor 13?

A.    It's where things of that nature are often considered, yes.

Q.    Well, just to be clear, this is your rendition of the *Georgia-Pacific* factors from the law.  Correct?

A.    It's the law, yes.

Q.    And it doesn't say anything about a sale, does it?

A.    Right.

Q.    It doesn't say anything about a potential sale of a patent portfolio.  Right?

A.    Right.

Q.    And a sale is different from a royalty.  Right?

A.    Correct.

Q.    When you sell something, there's a purchase price.

A.    That's correct.

Q.    And when you license something, you pay a royalty.  Fair?

A.    I agree.

Q.    And the price that you might pay for a piece of property doesn't necessarily tell us about the use of that property.  Fair?

A.    That can be fair.

Q.    You're familiar with oil and gas, Ms. Bennis?

A.    Yes.

Q.    You know that if Exxon comes in and pumps out billions of barrels of oil, they don't get to go to the property owner and say, well, I know you tried to sell this piece of property 10 years ago, but it never got anywhere so we shouldn't have to pay any more for our oil.  Right?

A.    Right.

Q.    It's a different calculation.  Correct?

A.    I'm not sure how to answer that.

Q.    The sale of a piece of land is a different calculation than how much use is made of the minerals underneath it. Right, Ms. Bennis?

A.    Yes.  I agree.

Q.    And that could be because when you're selling something -- you did hear the testimony that--right?--or at least you're familiar with Mr. Rushford's testimony.  You reviewed it in preparing your opinions?  Mr. Francis Rushford, the R of RSL?

A.    Yes.

Q.    And he testified that their evaluation was there was 2 to $3 billion in licensing revenue for these patents.  Right, Ms. Bennis?

A.    I recall that.

Q.   And he also was of the view that the sale price would be pennies on the dollar, 1 to 3 percent of that.  Right, Ms. Bennis?

A.   I agree.

Q.   Trying to get licenses, you would agree, is not easy. Right, Ms. Bennis?

A.   I agree.

Q.   It involves risk.  Right?

A.   Yes.

Q.   Expense?

A.   Yes.

Q.   And when you're not an industry player, you can't sign up for these convenient cross licenses we've heard that Ericsson has with other industry players.  Right?

A.   I'm not sure how to answer that.

Q.   You understand that a cross license is where two companies that are both in the industry share the property they own, the intellectual property they own.  Right?

A.   I agree with that.

Q.   And that wouldn't work in this situation, would it, Ms. Bennis?

A.   I don't know that's universally true.

Q.   You think General Access could take a cross license here?

A.   It could.  I'm -- of course.

Q.   It took -- well, we've been sitting here all week and

we've seen what it's taken for General Access to get to court.
Right, Ms. Bennis?

A.   Yes.

Q.   You got to find and hire experts.  Right?

A.   Yes.

Q.   There is document production between the parties?

A.   Yes.

Q.   You've got to sit for depositions?

A.   Yes.

Q.   Analyze all the information from T-Mobile and Ericsson.
Right, Ms. Bennis?

A.   I agree.

Q.   And all of that work might affect whether or not
someone's willing to take on T-Mobile and Ericsson.  Right,
Ms. Bennis?

A.   I agree.

Q.   We've also seen these -- some of these confidential
documents, the source code, the financial information,
testimony of witnesses.  None of this information was
available to the brokers that General Access was working with.
Correct?

A.   I agree.

Q.   They didn't have the information that the jury has seen
this week about T-Mobile's use of these patents.  Correct?

A.   Yes.

Q.    That use hadn't even begun at the time, had it, Ms. Bennis?

A.    If you could clarify the timing?

Q.    The time when Mr. Rushford was preparing his analysis about these patents, the broker.

A.    Apologies.  I'm recalling about the decade-span of time that the patents were for sale so I --

Q.    You understand that the original analysis was done at ICAP.  Right?

A.    Yes.

Q.    And that was Mr. Rushford while he was at ICAP.

A.    Okay.  I'm not recalling the exact details, but I take your representation.

Q.    T-Mobile's infringement started in 2013.  Fair?

A.    Yes.

Q.    And we have seen documents and you've read the testimony that Mr. Rushford's work was in 2010 to 2011.  Fair?

A.    I appreciate the refresher.

Q.    Okay.  So the last -- so we've talked about 1, 2, and 4. Oh, excuse me.  Excuse me.  We've talked about 1, 3, and 4 on your slide.  Right, Ms. Bennis?

A.    Yes.

Q.    Okay.  The last one, licenses to comparable technology, I want to take a little bit of a step back.  You talked a little bit about this in direct, but the framework that we're working

with for damages.  Okay?

Damages are based on something called the hypothetical negotiation.  We've heard that term this week?

A.    We have.

Q.    And here that hypothetical negotiation was in early 2013?

A.    I agree.

Q.    And as part of that, we assume infringement.  Yes?

A.    Yes.

Q.    We assume validity?

A.    We do.

Q.    I think on direct you said that we assume that there could be infringement, but it's actually we assume that there is infringement.  Right?

A.    I agree.

Q.    That's not what's happening here in the real world, is it?

A.    Correct.

Q.    T-Mobile and Ericsson are denying infringement.  Right?

A.    Oh, I see.  Yes.

Q.    They're asserting the patents are invalid.

A.    Yes.

Q.    In the hypothetical negotiation, we also have a willing licensor?

A.    Yes.

Q.    And a willing licensee?

A.    Correct.

Q.    You can't just get up and walk away?

A.    Correct.

Q.    And it's a cards up negotiation, we might say.  Right?
That's a fair characterization?

A.    Yes.

Q.    And what we mean by that is the information -- there's
not an information disparity or difference between the
parties.  Everybody has to share all of their information.

A.    I agree.

Q.    So that's the framework under which we analyze damages.
We agree on that?

A.    Yes.

Q.    And you pointed to, I believe it was, six agreements for
your comparable license, you called it?

A.    I believe there were seven.

Q.    Seven.  They weren't the only agreements produced in the
lawsuit?

A.    Correct.

Q.    I think there were more than three dozen agreements to
review?

A.    That sounds about right.

Q.    And you found the best ones you could as the damages
expert.  You took the first cut of which ones to hand to Ms.
Dwyer to do the technical comparability analysis.  Right, Ms.

Bennis?

A.    Based on economic comparability factors, yes.

Q.    And -- right.  You were looking at the economics of the licenses to make the first cut.

A.    Yes.

Q.    You found the most comparable ones you could.

A.    Yes.

Q.    And then Ms. Dwyer was the one who looked for comparable technology in the patents that were licensed?

A.    Correct.

Q.    And just to be clear, under the law, for the license or agreement to be reliable for a damages input, it has to be both technically and economically comparable.  Agreed?

A.    Yes.

        THE COURT:  Ms. Fair, if I could interrupt for a minute.  Your framework slide says assume invalidity.  We assume validity in the hypothetical negotiation, don't we?

        MS. FAIR:  My mistake.

        THE COURT:  Just don't want any confusion with the jury.

        MS. FAIR:  Yes, Your Honor.

        THE COURT:  Go ahead.

Q.    (BY MS. FAIR)  So if the agreements are not found to cover technically comparable patents, we cannot rely on them.  You'd agree with that?

A.    The goal is to find licenses that are both economically and technically comparable, yes.

Q.    And if there isn't technical comparability, we cannot rely on them.

A.    For --

Q.    Agreed?

A.    In part.

Q.    You have to at least have technical comparability.  That is the law, isn't it, Ms. Bennis?  I mean, you're a member of the ABA, the American Bar Association, or what -- as a non-lawyer, what is it called when you're affiliated with it?

A.    An associate member.

Q.    An associate member with a legal organization.  You know the law requires both technical comparability and economic comparability.  Correct?

A.    I'm aware of that.

Q.    And so if Ms. Dwyer's testimony falls on technical comparability, these agreements cannot be relied upon as an input to a damages calculation.  You know that's the law.  Right, Ms. Bennis?

A.    I understand.

Q.    And Ms. Dwyer did not show the jury a single patent from any of the agreements that you say we should be relying on.  Right?

A.    I understand that.

1142

Q.   Okay.

MS. FAIR:  Your Honor, at this time I'd ask we seal the courtroom.  I'm going to be getting into confidential license information.

THE COURT:  All right.  Based on that request from counsel, I'll order the courtroom sealed.  I'll direct all persons who are present and not subject to the protective order that's been entered in this case exit the courtroom and remain outside until it's reopened and unsealed.

(Courtroom sealed.)



Q.   █████████████████████████████████████

██████████████████████████████████████████

█████████████████████████████████████████

████?

A.   ███.

Q.   ████████████████████████████████████

█████████████████████████████████████?

A.   ███.

Q.   ████████████████████████████████████████ ████████████████████████████████████████████ ████?

A.   █████████████.

Q.   ████████████████████████████████████████████?

A.   ███.

Q.   ████████████████████████████████████████ ████████████████████████████████████████████ ████████████████████████████████████████████ ████████████████████████████████████████████ ██████████████████████████████?

A.   ███████.

Q.   ████████████████████████████████████████ █████████████████████████████████████████████?

A.   ███.

Q.   ██████████████████████████████████?

A.   ███.

Q.   ████████████████████████████████████ ████████████████?

A.   ███.

Q.   ████████████████████████████████████████████ ████████████████████████████████████?

A.   ███.

Q.    █████████████████████████████████████████████
████████████████████████?

A.    ████████████.

Q.    ████████████████████████████████████████████████
███████████████████████████████████████████

A.    ███.

Q.    ███████████████████████████████████████████████
███████████████████████████████████████████
████████████████?

A.    ███.

Q.    ███████████████████████████████████████████████
██████████████████████████████████████████████
███████████?

A.    ███.

Q.    ███████████████████████████████████████████████
███████████████████████████████████████████
████████████████████?

A.    █████████████████████████████.

Q.    ██████████████████████████████████████████████
████████████.

A.    ████████████.

Q.    ████████████████████████████?

A.    ███.

Q.    █████████████████████████████████████████████
█████████?

1145

A.    ████████████.

Q.    ██████████████████████████████
████████████████████████████████?

A.    █████

Q.    ████████████████████████████████
████████████████████████████████
██████████████████████████████?

A.    ████████████████.

Q.    ████████████████████████████████
███████████████?

A.    █████.

Q.    ███████████████████████████████
████████████████████████████
████████?

A.    ████████.

Q.    ████████████████████████████
███████████████████████████████
███████████?

A.    ██████████████████
████████████████████████████
██████.

Q.    ████████████████████████████████
████████████████████████████████?

A.    ████████████████.

Q.    ████████████████████████████████
█████████████████████████?

1146



A. ███████████████████.

Q. ███████████████████████████████████

████████████████████████████████████?

A. ████████████████████.

Q. ██████████████████████████████████████

█████████████████████████?

A. ████████████████.

Q. ████████████████████████████████████████

███████████████████?

A. ███.

Q. ███████████████████████████████████████████

███████████████████████?

A. ███.

Q. ████████████████████████████████████████

████████████████████████████████████████

████████████████████████████████████████

████████████████████████████████████████

████████████████████████████████████████

███?

A. ████.

Q. ██████████████████████████████████████

███?

A.    ██.

Q.    ████████████████████████████████

████████████████████?

A.    ██.

Q.    █████████████████████████?

A.    ██.

Q.    ████████████████████████████████

██████████████?

A.    ████████████████████████████████

█████████████.

Q.    ████████████████████████████████

████████?

A.    ████████████.

Q.    ████████████████████████████████

██████████████████████████?

A.    █████████████████.

Q.    ████████████████████████████████?

A.    ██.

Q.    ████████████████████████████████████

██████?

A.    ██.

Q.    ████████████████████████████████

████████████████████████████████

████████████████████████████████████?

A.    ████████████████.



Q. ████████████████████████████████████████
████████████████████████████████████████████
████████████████? 
A. ██.
        ████████████████████████████████████
        ████████████████████████████████████
        ██████
        ████████████████████████████████████
████████████████████████████████████████████
████████████████████████████████████████████
████████████████████████████████████████████
██████████████████████████████████████████.
        ████████████████████████████████████
████████████████████████████████████████████
████████████████████████████████.
        ████████████████████████████
        ████████████████████████████████████
████████████████████████████████████████████
        ████████████████████████████████████.
        ██████████████████████
        ████████████████████████████████████
        ██████████████████
        ██████████████████████████
Q. ██████████████████████████████████████████
████████████████████████████████████████████



A. ███.

Q. ███████████████████████████████████████ ████████████████████████████████████?

A. ███████████████████████████████████ ███████████████████████████████████████.

Q. ████████████████████████████████ ████████████████████████████████████████████

████████████████████████████?

A. ██████████████.

Q. ██████████████████████████████ ███████████████████████████████████████████?

A. ████████████████████.

Q. ███████████████████████████████████████ ████████████████████████████████████ ██████████?

A. ███.

Q. ████████████████████████████████ ████████████████████████████ ████████████████████ ██████████?

A. ████████████████████████████ ████████████████████████████ ████████████████████.

Q. ████████████████████████████



Q.   ██████████████████?

A.   ███████.

██████████████████████████████████████████.

██████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████

███████

(Courtroom unsealed.)

THE COURT:  All right, counsel.  You may continue.
The courtroom is opened and unsealed.

MR. DACUS:  Thank you, Your Honor.

Q.   (BY MR. DACUS)  Do you remember, Ms. Bennis, that you
were asked questions about in conjunction with usage and about
these previous attempts to sell the patents and something
about Exxon?  Do you remember those questions?

A.   Yes.

Q.   What -- if somebody like the Plaintiff is out there
trying to sell these patents for a full decade and nobody
makes an offer, what does that tell you about the usage of
these patents as an economic expert?

A.   From an economic perspective, it calls into question the
market value of these patents.

Q.   And does it call into question whether anybody's using
them?

A.   Yes.

Q.    I mean, just simple economics, supply and demand, if you're selling something and there's demand for it, people usually make an offer at least.  Right?

A.    I agree.

Q.    And I think Mr. Kennedy basically agreed with that.  Did you hear that?

A.    Yes.

Q.    And just to be clear, I think counsel asked you some questions about when this selling was occurring and whether or not it was during when they claim infringement.  Just to be clear, the selling was going on from at least 2018 to 2016 [sic].  Correct?

        MS. FAIR:  Objection, leading.  She did not know this on cross examination.

        THE COURT:  It is a leading question.  I'll sustain that.

Q.    (BY MR. DACUS)  Were you here when Mr. Hynek testified about these selling efforts?

A.    Yes.

Q.    Do you remember what years he admitted they were ongoing?

A.    Yes.  2008 to 2016 at least.

Q.    And they say, if they're to be believed, that infringement started in 2013.  Right?

A.    I agree.

Q.    Indeed they say that the 4G that they accuse, Mr. Hynek

testified that goes all the way back to 2008.

MS. FAIR:  Objection; leading, Your Honor.

THE COURT:  Sustained.

Q.   (BY MR. DACUS)  Do you remember what Mr. Hynek said as to when the 4G was actually implemented?

A.   I don't exactly.

Q.   Okay.  If there was demand and usage for these patents from an economic standpoint, would it make sense that folks would have made an offer for them?

A.   Yes.

Q.   Were you here when I asked Mr. Kennedy about whether or not he'd seen information as to whether or not these sophisticated brokers had actually discounted the sales price?

A.   Yes.

Q.   Do you remember what percentage he said they had discounted the sales price because of the risk of invalidity or no infringement?

A.   I believe it was on the order of 98 or 99 percent.

Q.   Right.  In other words, these sophisticated brokers who Ms. Fair said had done all this due diligence, Mr. Kennedy, not you but Mr. Kennedy, testified that they believed the risk of non-infringement or --

MS. FAIR:  Objection, Your Honor.  He's leading.

MR. DACUS:  I haven't finished my question.

THE COURT:  Let him finish the question and then

1156

I'll entertain your objection.

Q.   (BY MR. DACUS)  Do you remember that Mr. Kennedy said or do you not remember that Mr. Kennedy said the risk was somewhere between 98 or 99 percent that these patents were invalid or not infringed?

MS. FAIR:  Objection, Your Honor.  That is not what he said.

THE COURT:  Well, if you disagree with the substance of it, that's not in the Rules of Evidence or the Rules of Procedure.  That's not a valid objection.

MS. FAIR:  He is leading with an argumentative question that mischaracterizes the prior testimony.

THE COURT:  I'll sustain the leading objection.  You're going have to examine this witness in a non-leading fashion.

MR. DACUS:  I'll be happy to.

Q.   (BY MR. DACUS)  Do you have any memory of what Mr. Kennedy said about the risk of these brokers put for non-infringement and invalidity on these patents?

A.   I believe he agreed that there was a discount of that magnitude.

Q.   What magnitude?

A.   98 to 99 percent.

MR. DACUS:  That's all I have, Your Honor.  I pass the witness.

THE COURT:  All right.  Is there further cross examination?

MS. FAIR:  No, Your Honor.

THE COURT:  All right.  Then you may step down, Ms. Bennis.

THE WITNESS:  Thank you.

THE COURT:  You're welcome.

Counsel, approach the bench, please.

(The following was had outside the hearing of the jury.)

THE COURT:  You have 50 minutes remaining.

Mr. Summers, you have 15, thanks to Mr. Dacus.

MR. SUMMERS:  One five?

THE COURT:  Yes.  Now, you're going to rest your case in chief?

MR. STEVENSON:  Yes.

THE COURT:  Okay.  I'll ask you to call your next witness.  You can rest your case in chief.  And we'll take a short recess, and then we'll come back and do the rebuttal. All right?

MR. SUMMERS:  Thank you.

(The following was had in the presence and hearing of the jury.)

THE COURT:  Defendants, call your next witness, please?

1158

MR. STEVENSON:  Defendants rest their case in chief.

THE COURT:  All right.  Ladies and gentlemen, I expect there will be one witness in the Plaintiff's rebuttal case.  But before we transition to that, we're going to take a short recess.  If you'll leave your notebooks in your chairs, follow all my instructions, and we'll be back shortly to continue.

The jury's excused for recess.

(Whereupon, the jury left the courtroom.)

THE COURT:  Is there a request that Ms. Bennis be excused?

MR. DACUS:  Yes, Your Honor.  Thank you.

THE COURT:  Ms. Bennis is excused.  She's free to stay; she's free to leave.

All right.  We'll stand in recess for a few minutes.  Court's in recess.

(Brief recess.)

THE COURT:  Be seated, please.

All right.  Is the Plaintiff prepared to go forward with its rebuttal case?

MR. KNOBLOCH:  Yes, Your Honor.

THE COURT:  All right.  Let's bring in the jury.

(Whereupon, the jury entered the courtroom.)

THE COURT:  Please be seated, ladies and gentlemen.

Is the Plaintiff prepared to call its first rebuttal

witness?

MR. KNOBLOCH:  Yes, Your Honor.

THE COURT:  Call your first rebuttal witness, please.

MR. KNOBLOCH:  General Access calls Dr. Vijay Madisetti.

THE COURT:  Dr. Madisetti, if you'll return to the witness stand.  As I'm sure you're aware, you remain under oath.

THE WITNESS:  Yes, Your Honor.

THE COURT:  Please have a seat.

Mr. Knobloch, you may proceed with direct examination.

MR. KNOBLOCH:  Thank you, Your Honor.

VIJAY MADISETTI, Ph.D.,

having been previously duly sworn, testified further under oath as follows:

DIRECT EXAMINATION

BY MR. KNOBLOCH:

Q.   Good morning, Dr. Madisetti.

A.   Good morning, sir.

Q.   Now, I'd like to start with the '477 Patent, if that's okay.  Is that okay?

A.   Okay.

MR. KNOBLOCH:  And, Your Honor, may I approach the easel to place one of the patent boards on the easel?

THE COURT: You may.

MR. KNOBLOCH: Thank you, Your Honor.

Q. (BY MR. KNOBLOCH) Dr. Madisetti, do you recognize this patent board?

A. Yes.

Q. And how many claims from the '477 Patent are asserted in this case?

A. Three.

Q. In all of the three claims, what do you understand to be the key issue in dispute in this case?

A. This would be the collectively representative limitation, which is limitation 1b.

MR. KNOBLOCH: And, Your Honor, may I approach the easel just to underline that?

THE COURT: You may.

Q. (BY MR. KNOBLOCH) So is this the collectively representative limitation you mentioned, Dr. Madisetti?

A. Yes.

Q. Okay. Now, this collectively representative limitation, it's -- I'd like to start by talking about the limitation right before it, if I may. Okay?

Under the limitation right before the collectively representative one, how many signal-related parameters and channel-related parameters are required?

A. At least one of each.

Q.   So is that this language here, at least one signal-related and at least one channel-related?

A.   Yes.

Q.   If the profile parameter determiner in Ericsson's base stations determines at least one signal-related parameter and at least one channel-related parameter, is that enough to satisfy this claim?

A.   Yes.

Q.   Does Dr. van der Weide agree with you that only one signal parameter and one channel parameter could be sufficient to satisfy this claim?

A.   Yes.

Q.   Were you here for his testimony during this trial?

A.   Yes.

        MR. KNOBLOCH:  And I'd like to turn to trial transcript page 998, lines 4 to 8.  It's No. 6, Mr. Svenson.

Q.   (BY MR. KNOBLOCH)  Do you recognize this testimony?

A.   Yes, I do.

Q.   And what is this testimony?

A.   It says it would be sufficient for a product to use the invention with one signal-related parameter and one channel-related parameter so long as those parameters, when combined together, were collectively representative of the communication.

Q.   And did Dr. van der Weide agree with that?  Sorry.  Go

1162

ahead.

A.   He did.

Q.   Okay.  Was there also testimony from Ericsson's own representative confirming that your view that the signal- and channel-related parameters that are determined in Ericsson's base stations are collectively representative?

A.   Yes.

Q.   Whose testimony was that?

A.   That was Mr. Faxer, Ericsson's corporate representative.

Q.   All right.

        MR. KNOBLOCH:  And let's look at trial transcript page 796, lines 7 through 12, please.  It's No. 8.

        And, Mr. Svenson, if we could actually expand it to add the next three lines, 10 through 12, as well.  Thank you.

Q.   (BY MR. KNOBLOCH)  Dr. Madisetti, do you recall this testimony from Mr. Faxer here at the trial?

A.   Yes.

Q.   And what did he say about the GINR?

A.   When questioned about the GINR, which is the gain to interference and noise ratio, he confirmed that it measures the gain, which is an indicator of the strength of the signal, which is the signal on the plink from the user device to the base station.

Q.   In your own words, what is a gain calculation?

A.   It's a measure of the health of -- or the strength of the

1163

signal.

Q.   And is the gain calculation, in your view, represent collectively representative of the communication in Ericsson's base stations?

A.   Yes.

Q.   How so?

A.   Because it depends on certain channel- and signal-related parameters in the manner claimed.

Q.   Okay.  So I'd like to talk then about the parameters that go into this channel gain.

MR. KNOBLOCH:  Could we please turn to Joint Exhibit 5.  It's No. 9.

Q.   (BY MR. KNOBLOCH)  Dr. Madisetti, is this the document that Mr. Faxer was discussing when he testified about the gain calculation in T-Mobile's base stations?

A.   Yes.  It's part of this exhibit, JX 005.

Q.   All right.

MR. KNOBLOCH:  If we go next to page 281 in this document.  And if we could just go next to calling out that function at the bottom there.

Q.   (BY MR. KNOBLOCH)  What is this function?

A.   This function on page 281 is the uplink gain estimation.

Q.   And do you recall that what Mr. Faxer testified about the parameters that go into -- whether Mr. Faxer testified about the parameters that go into calculating this gain value?

1164

A.    Yes.  He mentioned six parameters.

MR. KNOBLOCH:  Could we turn, Mr. Svenson, to trial transcript page 797 to -98?  It's No. 12.  It's the last lines in 797 and then the first line in 798.

Q.    (BY MR. KNOBLOCH)  How many parameters did Mr. Faxer testify are determined in calculating the gain in Ericsson's base stations?

A.    Six input parameters, as his answer shows.

Q.    Okay.

MR. KNOBLOCH:  Now, turning back to Joint Exhibit 5, I'd like to turn to the following page in Joint Exhibit 5 from where we were.  So it's now page 282, and that's No. 13 or 14.

Q.    (BY MR. KNOBLOCH)  Now, Dr. Madisetti, are these the six parameters that Mr. Faxer was testifying about earlier in the trial?

A.    Yes.

Q.    And I'd like to highlight the one --

MR. KNOBLOCH:  Can you circle the one at the bottom for us, please?

Q.    (BY MR KNOBLOCH)  What is that parameter that you circled?

A.    It's uplink power spectral density, and it's also called the power head room report.  So it's a signal-related parameter that measures the signal on the uplink to the base station.

Q.   Does the uplink power parameter that you just circled, is it an example of a signal-related parameter of claim 1 of the '477 Patent?

A.   Yes.

Q.   Now, could you please circle the third one from the bottom?  I want to talk about that one next.

What is the parameter that you just circled?

A.   That's the post-equalizer SINR, and that's the post-equalizer signal to interference and noise ratio, and that's the channel-related parameter.

Q.   Why is the post-equalizer SINR a channel-related parameter?

A.   Because it's described as an equalizer parameter that is confirmed in the specification of the '477 as a channel-related parameter.

Q.   Is post-equalizer SINR an example of a channel-related parameter like the ones claimed in claim 1 of the '477 Patent?

A.   Yes.

Q.   Now, did Mr. Faxer also testify about post-equalizer SIN?

A.   Yes.

MR. KNOBLOCH:  And if we could pull up, please, trial transcript 798 at line 6 through 12?  It's No. 17.

Q.   (BY MR. KNOBLOCH)  Do you recall this testimony from Mr. Faxer yesterday?

A.   Yes.

Q.    And what did he testify about post-EQSINR, the parameter we were just looking at from Joint Exhibit 5?

A.    He also confirmed that it's one of the inputs to the GINR which is the gain calculation.

Q.    Did he also confirm that it relates to the equalizer?

A.    Yes.

Q.    Okay.

        MR. KNOBLOCH:  So turning back to Joint Exhibit 5 where we were at No. 14.

Q.    (BY MR. KNOBLOCH)  Are the parameters in the algorithm in Joint Exhibit 5 collectively representative of communication as described in claim 1 of the '477 Patent?

A.    Yes, because the gain is representative of the communication on the uplink and the six parameters are the inputs to that calculation.

Q.    Are these six parameters used collectively in Ericsson's base stations?

A.    Yes.

Q.    How are they used collectively?

A.    They all are inputs to the algorithm that we are discussing here in section 16.3.3.

Q.    Did Mr. Faxer also agree that these parameters are collectively used as inputs in Ericsson's base stations?

A.    Yes, in all base stations.

        MR. KNOBLOCH:  I'd like to turn, please, to trial

transcript page 798 at line 17 to 20.  It's No. 22.

Q.   (BY MR. KNOBLOCH)  What did Mr. Faxer testify about the six parameters that go into calculating gain in the algorithm in T-Mobile/Ericsson's base stations?

A.   That they collectively represent the inputs to this calculation.

Q.   Did Mr. Faxer also confirm that these inputs -- that -- I'm sorry.  That the gain is stored in the UE profile or the UE context?

A.   Yes.

MR. KNOBLOCH:  Could we please go to transcript page 812, lines 3 to 5?  It's No. 23.

Q.   (BY MR. KNOBLOCH)  Do you recall this testimony from Mr. Faxer yesterday in trial?

A.   Yes.  He confirmed that it is stored.

Q.   And we -- I see the term UE context in the question here.  Can you remind the jury what is a UE context?

A.   Yeah.  UE context is the profile that is stored for each UE or each user device in the base station.

Q.   Is there any dispute that you're aware of in this case whether the UE context is stored and used by T-Mobile's base stations?

A.   There's no dispute.

Q.   Is the information that is stored in the UE context as the result of this algorithm we've been talking about used to

1168

facilitate reception of subsequent bursts as required by element 1[d], the final element of claim 1 of the '477 Patent?

A.    Yes.

Q.    How so?

A.    Because it is used to determine the modulation scheme that is going to be used in subsequent transmissions and bursts, and Mr. Faxer as well agrees with that.

        MR. KNOBLOCH:  Can we turn, please, to trial transcript, it's No. 24.  It's 812, lines 3 to 9.

Q.    (BY MR. KNOBLOCH)  Do you recall this testimony from Mr. Faxer?

A.    Yes.

Q.    And what was this testimony?  How does this testimony support your view?

A.    Because he does not dispute that the gain calculation is used to determine the modulation scheme that is then used in subsequent transmissions from the user.

Q.    Now, did Mr. Faxer also agree not only that the modulation scheme is determined by the algorithm but that the modulation scheme determined by the algorithm is then used by Ericsson base stations in T-Mobile's network?

        MR. HAYNES:  Objection; leading.

        THE COURT:  Sustained.

Q.    (BY MR. KNOBLOCH)  Do you recall what Mr. Faxer testified about what happens with the modulation scheme determined by

the algorithm in Ericsson base stations in T-Mobile's network?

A.    Yes.  It is used in the demodulation and the demodulators for subsequent transmissions from the user.

Q.    Can the demodulators demodulate the signals in the subsequent bursts if they don't know from the UE context what modulation was assigned to that user for that burst?

A.    They cannot.  They rely on this information.

MR. KNOBLOCH:  Could we turn please to trial transcript page 812, lines 10 to 123.  It's No. 25.

Q.    (BY MR. KNOBLOCH)  Did Mr. Faxer agree that, in fact, the demodulators, in order to demodulate, need to know what the demodulation scheme had been?

A.    Yes, he confirms that.  That's correct.

Q.    Now, we've learned in this case that there are two types of base stations that Ericsson supplies to T-Mobile.  Do you recall that?

A.    Yes.

Q.    What are the two types of base stations?

A.    They are generally at a high level they are called frequency FDD and time domain TDD.

Q.    Okay.  To be clear, are the six parameters we've been talking about used, determined, and stored in all of the Ericsson base stations or just some of them?

A.    All accused 45,000 base stations.

Q.    And the six parameters we've been talking about, is at

least one of them a signal-related parameter?

A.    Yes.

Q.    Is at least one of them a channel-related parameter?

A.    Yes.

Q.    Are the parameters in the algorithm that Ericsson's base stations use collectively representative of communication?

A.    Yes.

THE COURT:  Counsel, approach the bench, please.

(The following was had outside the hearing of the jury.)

THE COURT:  Mr. Knobloch, your rebuttal case is limited to rebutting the invalidity evidence put on by the Defendants because they have the burden there.  You don't get to use a rebuttal case to remake your infringement or your infringement case, and that seems like to me that's what you're doing.

Is this going to target the invalidity issues?

MR. KNOBLOCH:  We will address the invalidity issues as well, but they are highly interconnected, the arguments are closely integrated.

THE COURT:  I understand there is some inter-relatedness here.

MR. KNOBLOCH:  Okay.

THE COURT:  But the emphasis needs to be on the invalidity case, not the infringement case.

1171

MR. KNOBLOCH:  All right.

THE COURT:  All right.  Let's continue.

(The following was had in the presence and hearing

of the jury.)

THE COURT:  Let's continue, please.

MR. KNOBLOCH:  Thank you, Your Honor.

Q.   (BY MR. KNOBLOCH)  Now, as far as you understand, Dr. Madisetti, are there other elements of the '477 Patent that are disputed?

A.   No.

Q.   Okay.

MR. KNOBLOCH:  Your Honor, may I move the board down for now?

THE COURT:  Yes, you may.

Q.   (BY MR. KNOBLOCH)  Now, Dr. Madisetti, we've also heard about the validity issues in this case.  We've heard -- do you recall that?

A.   Yes.

Q.   And I'd like to turn to the -- some of the validity issues in this case.

MR. KNOBLOCH:  Ms. Brunson, if I can present from the podium.

Q.   (BY MR. KNOBLOCH)  What is the written description requirement?

A.   The written description requirement is a way by which you

1172

can understand that the inventor had possession of the invention by looking at something that is present in the specification at a high level.

Q.   And in the '477 Patent, we've been talking about signal-related and channel-related parameters.  Do you recall that?

A.   Yes.

Q.   In the '477 Patent, does it describe the signal-related and channel-related parameters?

A.   It provides extensive written guidance, including examples.

Q.   Does the '477 Patent's written description also describe receiving stations?

A.   Yes, as used in the wireless network as a mobile wireless network.

Q.   And does the '383 Patent's written description also describe communication stations and subscriber stations?

A.   Yes, as used in a mobile wireless network.

Q.   Now, we've heard from Ericsson and T-Mobile a lot about fixed versus mobile base stations.  You heard about that?

A.   Yes.

Q.   And what does the patent specification tell us about the fixed examples in the specification of the patent?

A.   The patent, which is the '477 and the '383 specifications, JX 1 and JX 2, describe in the specification

column 9 that "the network 100 was chosen as a fixed wireless network only for the purposes of simplicity."

Q.   Is the examples in the patent specification, the ones that talk about a fixed example, are those limiting to the scope of the claims here?

A.   No.

Q.   Okay.  I'd like to turn --

MR. KNOBLOCH:  Ms. Brunson, can I have the document camera, please?

Q.   (BY MR. KNOBLOCH)  Now, Dr. Madisetti, in this -- do you recognize this figure?

A.   Yes.

Q.   What is this figure?

A.   It's figure 1 that shows an example of the wireless system.

Q.   And in this figure, what is the component in the center here?

A.   It's the receiving station also known as the base station.

Q.   And what are the homes around the base station?  What are those?

A.   Those are examples of locations of subscriber stations.

Q.   Okay.  Now, the examples here, those are homes.  Are those fixed or mobile?

A.   These are non-limiting examples of fixed locations.

Q.   Okay.  But what I want to ask you is, what component in this network the claims are focused on?

A.   They're focused on the base station.

Q.   Are the claims in this case focused on the subscriber located in the home?

A.   No.

Q.   What component in the network are they actually focused on?

A.   On the receiving station, which is the base station.

Q.   And turning back, if I can, to the podium presentation, what does the patent specification teach about how fixed wireless base stations operate as compared to base stations in a mobile system?

A.   The specification again for both patents in column 5, lines 23 through 33, confirm to a person of ordinary skill in the art that "the exemplary fixed wireless broadband systems use a group of transceiver base stations to cover a region in the same manner as the base stations of a cellular phone system."

Q.   Did you hear Dr. van der Weide say yesterday that he didn't see anything in the patents about wireless mobile networks?

A.   Yes, I heard that.

Q.   Do you agree with him?

A.   The specification does discuss cellular phone systems and

base stations as we can see here in column 5:23 to 33.

Q.   And does the -- in case there was any dispute or any doubt, does the specification further confirm what sort of arrangement the subscribers it is addressing can be located within?

A.   Yes.  It does not place any limits on the subscriber access device and confirms that it can be any suitably arranged subscriber integrated access device.  This is column 8 and column 7.

Q.   Okay.  And based on that, what is your view about the sufficiency of the written description in the '477 and '383 Patents?

A.   It is sufficient and there's no written description issues.  There are no written description issues.

Q.   Okay.  Turning to enablement, do you recall whether that is another defense that T-Mobile has asserted in this case?

A.   Yes.

Q.   And I've only listed -- you've only listed the '477 Patent here.  Why is that?

A.   Because I understand that T-Mobile only raised enablement with respect to the '477 Patent.

Q.   Now, so as far as you know -- as far as we're concerned in this case, there is no dispute that the '383 Patent satisfies the -- let me.  I withdraw that.

In this case, in this trial, is T-Mobile asserting that

the '383 Patent does not satisfy the enablement requirement?

A.    My understanding is that it does not question the enablement requirement for the '383.

Q.    Now, what is T-Mobile's principal argument about the enablement of the '477 Patent?  What's the principal issue they address?

A.    If you go to the next slide?

Q.    Let me ask it this way.  Does it relates to the fixed and mobile issue we've already talked about in the context of written description?

A.    Yes.

Q.    How so?

A.    Because it, again, questions whether the -- whether one of ordinary skill in the art would understand how to implement this system without undue experimentation in a mobile wireless network.

Q.    And I see you've listed here enablement factors.  Is that right?

A.    Yes.

Q.    Are these factors that you considered in your enablement analysis?

A.    Yes.

Q.    And what did you conclude about the '477 Patent's satisfaction of the enablement requirement?

A.    That the references disclosed and incorporated by

reference within the patents themselves, as well as other knowledge of one of ordinary skill in the art, would ensure that the '477 was enabled.

Q.   Now, I'd like to talk a little bit more about what the '477 Patent teaches about profiles.

Now, we've already talked about the profiles earlier in your testimony.  You recall that?

A.   Yes.

Q.   And those collectively representative profiles, how are they -- how does the patent describe them to be updated?

A.   It describes them as described here in columns 10 and 12.  It says that as channel conditions change, which is typical in mobile wireless networks, changes to values 318 are calculated and stored.  And these profiles are updated as conditions warrant.

Q.   Is this teaching from the '477 Patent relevant to your opinion about whether it meets the enablement requirement?

A.   Yes.  This shows that when -- in a mobile environment when conditions change, the patent and the specification ensure that they can be updated as needed.

Q.   Does the patent provide any teaching about how to -- I'm sorry.

In addition to what the patent itself says, does the patent also incorporate other materials that are relevant to the enablement analysis?

A.    Yes.   It incorporates by reference other related patented patent applications by Mr. Struhsaker that even cover handover-related inventions, which confirm that it is looking at not just fixed wireless networks, but also handover-related networks which are mobile wireless networks such as cellular networks.   And this is in column 2 and column 3, lines 56 and 14 to 17, respectively.

Q.    Now, you recall -- were you here for Mr. Mueller's testimony during trial?

A.    Yes.

Q.    And did he testify about mobility and handover?

A.    Yes.

Q.    Do you recall what he testified about with the connection between mobility and handover?

A.    He said it was -- again, I don't remember the exact words, but he linked handover as one of the challenges of mobile wireless networks.

Q.    Do you agree that handover is important for mobility?

A.    Yes.

Q.    And what did Mr. Struhsaker's other invention that was incorporated into the '477 Patent teach about handover?

A.    Exhibit PX 3 and page 24 confirms that Mr. Struhsaker's handover-related inventions would show that you can initiate handover of communications made responsive to the measurements of signal characteristics of communication signals.

Q.   Okay.  And in addition to the information that was either literally in the words of the specification or incorporated into the specification by reference for the enablement inquiry, do you also take other information into account?

A.   I didn't get the question.

Q.   So there is -- we've been talking about information that's explicitly in the specification.  Right?

A.   Yes.

Q.   Or that's incorporated into the specification?

A.   Yes.

Q.   Does -- in determining whether a claim satisfies the enablement requirement, does a person of skill also consider what other people would have known about it --

A.   Yes.

Q.   -- at the time?

A.   Yes.  And one would also construe the knowledge of the person of ordinary skill in the art, and typically that would include books and others that are at the time of the invention.

Q.   At the time of the invention, was mobility known?

A.   Yes.  And even Rappaport's book, which is -- which predates the asserted patents, confirms that a handover was known to a person of ordinary skill in the art.  Here is an example from page 503 of Theodore Rappaport's wireless communications book.

Q.    And we've been talking a lot about the differences between mobile and fixed.  What does this document tell you about the similarities between mobile and fixed networks?

A.    It confirms that 90 percent of the calls are made from fixed locations which are indoor, so even in a mobile wireless network, the amount of time you spend driving and calling is much less by a factor of an order of magnitude compared to the time you are inside a building.

Q.    Okay.  And so what did all of this information lead you to conclude about the enablement requirement for the '477 Patent?

A.    That the enablement requirements are fully met by the '477 Patent.

Q.    So in addition to written description and enablement, does T-Mobile also assert that the asserted claims are invalid because of the RBS 2000?

A.    Yes.

Q.    Okay.  And is that RBS 2000 asserted against both patents or just one of them?

A.    I believe it's for both.

Q.    Okay.  So we've talked a little bit about the '383 -- I'm sorry, about the '477 Patent.

        MR. KNOBLOCH:  Your Honor, if I may, I'd like to put up the '383 to talk about that next.

        THE COURT:  That's fine.

MR. KNOBLOCH:  Thank you, Your Honor.

Q.   (BY MR. KNOBLOCH)  Now, Dr. Madisetti -- give me a moment, please.

What do you understand to be the key issue in dispute regarding the '383 Patent?

A.   With respect to infringement?

Q.   Well, let's start there just to set the table.

A.   Okay.

THE COURT:  Just a moment.

Yes, Mr. Haynes?

MR. HAYNES:  Objection, Your Honor.  Outside the scope of the rebuttal case.

THE COURT:  What's your response, Mr. Knobloch?

MR. KNOBLOCH:  Dr. Madisetti is just explaining the issues in this case regarding the claim 16 of the '383 Patent. That's all I'm asking him to do.

THE COURT:  How does that relate directly to the rebuttal case --

MR. KNOBLOCH:  There is --

THE COURT:  -- as opposed to the infringement case?

MR. KNOBLOCH:  There were -- there was an extensive testimony from Dr. van der Weide about how he has two interpretations of the claims, one that he uses for infringement, and a different one that he uses for validity. And that was I think a complicated and difficult part of his

testimony, and I believe Dr. Madisetti's testimony would help clarify those issues.

THE COURT: Well, as you know, the Defendants have the burden of proof on invalidity. They've opened on that in their case in chief. That's the primary purpose of your rebuttal case. So you need to focus on the invalidity issue.

I understand your point, and I'm going to give you some latitude because of the complexity of that, but you need to focus on the invalidity case.

MR. KNOBLOCH: Yes, Your Honor.

THE COURT: All right. Let's proceed.

Q. (BY MR. KNOBLOCH) So, Dr. Madisetti, in the context of the infringement issues in this case, what did Dr. van der Weide -- how did Dr. van der Weide interpret this claim differently than you did?

A. Yes. So we are talking about the claim 16 of the '383 Patent. So he interpreted the selecting step in a different manner with respect to infringement and validity, and he cited my constructions for them in his analysis.

Q. And did he -- did Dr. van der Weide conduct his invalidity opinions based on your understanding of the selecting limitation?

A. That's what he says.

Q. Okay. So I'd like to walk you through your understanding of the selecting limitation to put that in context. Okay?

A.    Yes.

MR. KNOBLOCH:  Now, Your Honor, may I just approach the easel to underline some portions of the claim as we talk about it?

THE COURT:  Certainly.

MR. KNOBLOCH:  Thank you, Your Honor.

Q.    (BY MR. KNOBLOCH)  You mentioned the selecting limitation.  Is that this one here?

A.    Yes.

Q.    Okay.  So what happens at the selecting -- in the beginning of this selecting step of this claimed method?

A.    Yes.  So we start with the -- to put it in context, we have the preamble.

Q.    Okay.

A.    And the preamble describes that you have a first subscriber station and at least a second subscriber station. So that means that there are at least two or more subscribers that are feeding into the limitation that is selecting.  So you have two, maybe five, maybe a hundred subscribers that are used in the context of this claim.

Q.    And is there any dispute that this claim covers both the possibility of two and the possibility of many more subscribers?

A.    No.

Q.    Okay.  And what happens then in the selecting step of the

method?

A.    Yes.  In the selecting step, you'll notice that it says selecting at which of a first demodulator and at least a second demodulator.

Q.    And what does that mean?

A.    That tells me that there are two or more demodulators because when you say at least a second demodulator, it means that there could be more than one second demodulators.  So that means there are two or more demodulators in the claims, so they could be three, five, 128, or even a thousand demodulators.

Q.    And what happens in the selecting step after the first two or more demodulators are selected?

A.    Then there is this 'wherein' clause.

Q.    Is that the one that starts here?

A.    Yes.

Q.    And what happens in the 'wherein' clause?  What does that say?

A.    It says that the first and the second successive data signals and any subsequent data signals are ultimately to the first and second demodulators.

Q.    Okay.  So after the first and second and maybe many more demodulators are selected, what happens?

A.    So what happens is that, as I described, that the data signals, which are mentioned here, are applied to -- applied

1185

to one or more first and second demodulators.  So if you apply, for example, the data signals from a first set of users to a first DSP, you would apply the data signals from a second set of users or user to alternate DSPs which are available.

Q.   Now, for purposes of validity, as far as you know, does Dr. van der Weide agree with your understanding of claim 16?

A.   Yes.

Q.   And that -- and in that understanding of claim 16, that alternately applied limitation, how many demodulators could be involved in that?

A.   As many as are selected.  For example, up to more than two, five, 128, even a thousand or more.

Q.   I'm sorry.  And then for purposes of infringement, does Dr. van der Weide agree that the alternately applied limitation we've been talking about would include all of the first and second and many more that had been selected earlier in that method?

A.   I think your question is --

Q.   For purposes of infringement, Dr. Madisetti --

A.   Okay.

Q.   -- does Dr. van der Weide agree with you that when the alternately applied part of this method happens, that it could include more than just a first and second demodulator?

THE COURT:  Yes, Mr. Haynes?

MR. HAYNES:  Objection, Your Honor.  Outside the

scope of the rebuttal case.

THE COURT:  I'm going to sustain that objection.

Q.   (BY MR. KNOBLOCH)  All right.  So for purposes of the validity analysis, as far as you know, is there any dispute that the alternately applied limitation could include more than two demodulators?

A.   There's no dispute.  It could include alternate demodulators that are available.

Q.   But one thing that everybody agrees is required is at least two demodulators.  Right?

A.   Yes.

Q.   And are there two demodulators in the RBS 2000?

A.   No.

Q.   How many demodulators are there?

A.   Just one.  As you can see on Exhibit JX 43 on page 40, there is just one demodulator.

Q.   And are all the users demodulated by this block shown here?

A.   Yes.  It's called the BDem.

Q.   Did you hear Mr. Akesson's testimony about the RBS 2000?

A.   Yes.

Q.   And did he testify about how many demodulators the RBS 2000 had?

A.   He confirmed that there was just one.

Q.   Okay.  Now, I'd like to talk about the '477 Patent in

connection with the RBS 2000.

MR. KNOBLOCH:  So, Your Honor, if I may approach just to remove this board?

THE COURT:  You may.

Q.   (BY MR. KNOBLOCH)  And in the context of the '477 Patent, how many channel-related parameters are required?  Do you recall?

A.   It says in the claim at least one.

Q.   Is it enough to have only signal-related parameters or do you really need a channel-related parameter as well?

A.   You need one of each, at least one of each.

Q.   Does the RBS 2000 store and use a channel-related parameter?

A.   No.

Q.   Why not?

A.   It doesn't use them to -- it doesn't store channel-related parameters to process subsequent bursts.

Q.   Okay.  And looking here at this slide, do you recall seeing this slide presented by Dr. van der Weide?

A.   Yes.

Q.   What does Dr. van der Weide say are the channel-related parameters in the RBS 2000?

A.   He points to these parameters in yellow, which are receiver diversity and the radio link RxQual, RxLev, and RxLev B.

Q.    Now, is receiver diversity used for subsequent bursts in the RBS 2000?

A.    No.

Q.    How about in -- in Ericsson's accused system?  Are the channel-related parameters we talked about earlier, are those used in subsequent bursts in Ericsson's system?

A.    In the accused system?

Q.    Yes.

A.    Yes.

Q.    But the RxDiv feature that Dr. van der Weide pointed to in RBS 2000, is that used in subsequent bursts or just for the one burst in which it's received?

A.    It is used for the current burst only and not for any subsequent bursts.

Q.    And what does the -- what do the documents from Ericsson tell you about whether the so-called RxDiv is stored?

A.    Some of the documents produced, for example, ending in 797 at page 250 show that it is stored in something called a buffer for the DeMod.

Q.    Is this buffer for the DeMod used to store information between bursts or just within a burst?

A.    Just within a burst which is the current burst as shown again on page 15.

Q.    Now, I'd like to turn to the next channel-related parameter that Dr. van der Weide allegedly found in the RBS

1189

2000.  Is the radio link a channel-related parameter or a signal-related parameter?

A.    Dr. van der Weide calls them as channel-related parameters, they appear to be signal-related parameters.

Q.    And did you confirm that by looking at Ericsson's own documents?

A.    Yes.  The documents that were produced, the 797 Bates number at page 35 confirms that RX quality is an accumulated estimate of the bit errors.  And bit errors were disclosed in the specification as an example of a FED, or forward error correction, parameter, which is a signal-related parameter as per the specification of the '477.

Q.    Given what the specification of the '477 Patent says, is there any doubt in your mind that a parameter relating to the number of bit errors is a signal-related parameter?

A.    No.  It is a signal-related parameters.

Q.    Does Ericsson's own documents describe RxQual, the parameter we've been talking about, as signal related?

A.    Yes.  This is another document produced by Ericsson, which is JX 41, and that indicates and provides support that RxQual is a measure of signal quality and that is also a signal-related parameter.

Q.    Now, there was also some discussion yesterday about documents from the GSM standard.  Do you recall that?

A.    Yes.

Q.    And is the GSM standard something that you think is reasonable to rely on as evidence of what the RBS 2000 did?

A.    Again, I've not seen evidence that it's a reliable standard that the RBS 2000 can rely upon, and because, as I cite here, there are many differences and the differences are more significant than in its similarities.

Q.    And is -- given what you know about the RBS 2000, would a person of skill have been motivated to modify the RBS 2000 in a way that would make it at the time do the thing that's described in the claims that are asserted in this case?

A.    No, because, number one, it doesn't have multiple modulators.

Further, it does not do any adaptive modulation.  And all users use a single modulation, which is the GMSK.  There is no need to identify whether the link adaptation would even be needed or necessary.

There is no beamforming.  It lacked the hardware and software support for beamforming.

And the RBS channels are not related or tailored to user parameters.  They're simply assigned on a first come, first served basis.  So there's no reason to use user profiles in any way because you don't really know who the user is that is coming on that particular channel.

THE COURT:  Counsel, approach the bench, please.

(The following was had outside the hearing of the

1191

jury.)

THE COURT:  You're at about 3 minutes before you run out of time.

MR. KNOBLOCH:  Okay.  Thank you, Your Honor.  Appreciate it.

(The following was had in the presence and hearing of the jury.)

Q.   (BY MR. KNOBLOCH)  Dr. Madisetti, you heard Ms. Dwyer's testimony that the claim -- that the technical benefits of the claims could be achieved by simple software changes.  Do you agree with that?

MR. HAYNES:  Objection, Your Honor.  Outside the scope of the rebuttal case.

THE COURT:  Sustained.

Q.   (BY MR. KNOBLOCH)  Dr. Madisetti, in your opinion, are the claims asserted in this case valid?

A.   Yes.

Q.   Are the claims asserted in this case infringed?

A.   Yes.

Q.   Are the claims asserted in this case valuable?

A.   Very much so.

MR. KNOBLOCH:  I pass the witness, Your Honor.

THE COURT:  All right.  Cross examination by the Defendants.

MR. HAYNES:  Yes, Your Honor.

THE COURT:  You have leave to distribute binders, counsel.

All right, Mr. Haynes.  You may proceed with cross examination.

MR. HAYNES:  Thank you, Your Honor.

Can we bring up DDX 12.8?

CROSS EXAMINATION

BY MR. HAYNES:

Q.   Dr. Madisetti, you testified about some RxDiv parameters. Those are those A/B values in the RBS 2000.  Is that right?

A.   Yes.

Q.   Okay.  And it was your testimony on direct that those A/B values are not used to facilitate receive operations.  Is that right?

A.   I don't believe I used this slide.

Q.   Sir, that was your testimony, though, wasn't it?

A.   Yes.

Q.   Okay.  And the source code that you looked at to reach the conclusion that those values are not stored, this is an excerpt of it that we see on the screen right here from page 1606.

A.   Yes.

Q.   And when you reached your conclusion that those values are not stored, this is what you relied on.  Right?  You looked in the source code and you could not see any evidence

where it was stored and reused.  Is that right?

A.   I looked at the source code as well as the supporting documents provided by Ericsson.

Q.   Okay.

MR. HAYNES:  If we could go to DDX 12, the next slide, please, DDX 12.9.

Q.   (BY MR. HAYNES)  Now, this is the top of the page of the source code that you looked at.  Do you see here on the right where it says -- the very thing it says, .asm.  Do you see that?

A.   Yes.

Q.   ASM refers to assembly code.  Is that right, sir?

A.   Yes.

Q.   Okay.  And we heard some testimony from Mr. Akesson yesterday that there were two different sets of code pertaining to the layer one functionality where these RxDiv parameters might be used.  Do you recall that?

A.   Not specifically.

Q.   Do you recall that Mr. Akesson -- well, let's look at what he said.

MR. HAYNES:  Can we bring up DDX 12.11?  Can we see the trial transcript at 837 -- there we go.

Q.   (BY MR. HAYNES)  You were here for Mr. Akesson's testimony.  Is that right?

A.   Yes.

1194

Q.    Do you recall him testifying that if there's a debate later about what we're looking at, whether we're looking at the 1990s source code that we're relying on for prior art or different code, VHDL code would be from the 1990s, and assembly code would be later code from the future.  Do you recall that?

A.    Yes.  He mentions -- what he says here in line 25 --

THE COURT:  The question was answered when you said yes, Dr. Madisetti.

THE WITNESS:  Oh.  Yes.

Q.    (BY MR. HAYNES)  Okay.  So if I wanted to figure out what was actually happening in the RBS 2000 as it existed in the 1990s, that Defendants are relying on for prior art, I should have been looking at the VHDL code.  Correct, sir?

A.    I have to look at the dates.  I don't -- I cannot answer.

Q.    You have no reason, as you sit here today, sir, to believe that Mr. Akesson, who worked on this code in the '90s, doesn't know that it's the VHDL code that shows where those RxDiv parameters are used and stored and used for subsequent bursts.  Right, sir?

A.    I disagree.  I believe that the documents support my conclusion.

Q.    We didn't see any documents in your direct testimony on that, did we, sir?

A.    I disagree.  I showed the buffer specification.

Q.   You just told me, sir, that you looked at assembly code to determine that those values were not stored and reused for subsequent bursts.  Correct, sir?  You told me that?

A.   No.  I said assembly and documents.

Q.   Okay.  But what you should have looked at was the VHDL code that was actually what was running on the RBS 2000 prior art system.  Correct, sir?

A.   I cannot answer one way or the other.

Q.   Okay.  You also gave some testimony about written description and you walked through a few passages of the patent, and then we looked at a different patent application from Mr. Struhsaker.  Do you recall that?

A.   Yes.

Q.   Okay.  And that patent application that you referred to, the other one from Mr. Struhsaker, that's a completely different invention.  Right, sir?

A.   No.

Q.   Well, let's take a look at that.

     MR. HAYNES:  If we could bring up DDX 12.2.

Q.   (BY MR. HAYNES)  Sir, you looked at the provisional application that you were relying on when you suggested to the jury that that application showed that Mr. Struhsaker contemplated having a mobile device be -- communicate with his base station invention of the patents-in-suit.  Is that right?

A.   I said -- I mean, that's not what I said.  I said --

Q.   Well, sir, do you agree with me that this is a picture from that provisional application that you relied on that you said you just told me is not a different invention?

A.   Yes.  This is -- this is one of the diagrams.

Q.   Okay.  Now you've seen the diagram, sir, would you agree with me that what's in that provisional application is an entirely different invention?

A.   No.

Q.   All right.  Well, let's see what's going on here.  Do you see here we have a subscriber station right here.  Do you see that?

A.   I do.

Q.   And this IAD, that's that Starfire antenna that Mr. Struhsaker testified about.  Right?

A.   I don't see that.  It just says an IAD.

Q.   You don't know what the IAD is, sir?

A.   It's an internet access device.

Q.   You don't believe that that's the Starfire antenna that Mr. Struhsaker talked about?

A.   No.  It is a more generic form.  It can be anything else.

Q.   Well, certainly, it could be the Starfire antenna that Mr. Struhsaker talked about.  Right?

A.   As I said, no.

Q.   Okay.  Now, this box here that says WLAN TX, do you see that?

A.    Yes.

Q.    That's a WLAN transceiver.  Sometimes people call that WiFi.  Right?

A.    Yes, sometimes, yes.

Q.    Okay.  And what is happening in this invention -- well, let me just ask you, this box here, MS, you understand that's the mobile station?  That's what you're saying is mobile?

A.    Yes.  MS stands for mobile.

Q.    Okay.  And what this mobile station communicates with, we see this arrow right here, it communicates with the WLAN transceiver.  Correct, sir?

A.    In this example, yes.

Q.    Well, it's in all examples in this patent.  The mobile station only communicates with the WiFi transceiver.  Isn't that right, sir?

A.    I disagree.

Q.    You certainly didn't show the jury any examples in this patent at all, much less an example where the mobile station communicated with anything other than the WLAN transceiver. Right, sir?

A.    I didn't show the application if that's what you're asking.

Q.    Isn't it true, sir, that in this different invention from Mr. Struhsaker, he proposed addressing mobile subscribers by having a separate WLAN transceiver and letting the mobile

phone use WiFi to talk to the WLAN transceiver, and then have that WLAN transceiver talk to his fixed antenna which would then communicate back to the base station?  That's what he was proposing.  Right?

A.    As I said, I disagree.  This is an example.

Q.    Okay.  Well, we certainly don't see this mobile station right here moving around over here and actually communicating with the base station up there, do we?

A.    I can't say sitting here.

Q.    Sir, you just gave testimony about this provisional application.  Did you spend some time studying it?

A.    Yes.

Q.    Okay.  Having studied it, are you willing to represent to this jury that when they go back into the room and look at this document 3.30, PX 3.30, that when they look at it, they will find a single example where a mobile phone communicates with that base transceiver station?  Are you going to represent that to them today, sir?

A.    I have to look at it in detail and identify.  I can't answer it.

Q.    Okay.  Now, we saw some testimony from Mr. Faxer, and all I want to ask you is one very basic question.  You did not discuss any testimony from Mr. Faxer that I have on the slide here from the trial transcript at 786:7 through 20.  Correct, sir?

A.    I did not discuss this.

Q.    Okay.  And so you do not offer any testimony today to rebut Mr. Faxer's statement that one of the parameters in the accused products do not store equalization weights and reuse them for a subsequent burst.  Correct, sir?

A.    I didn't understand the question.

Q.    You did not offer any testimony to rebut what Mr. Faxer said in this testimony that in Ericsson's base stations, they do not store and reuse equalization weights.  Correct, sir?

        THE COURT:  You have four minutes of remaining trial time, Mr. Haynes.

        MR. HAYNES:  Thank you, Your Honor.

        THE WITNESS:  I'm not sure how to answer that question.  I...

        THE COURT:  Then let's move on.

        MR. HAYNES:  Can we bring up DDX 12.3?

Q.    (BY MR. HAYNES)  Sir, in your direct testimony, you quoted a portion of what I've shown on the screen here.  This is from JX 1, column 6, lines 6 down to the end, is what we have highlighted.  You testified a little bit about what was up here about how the profiles are stored -- or the channel- and signal-related parameters are stored.  Do you recall that?

A.    You're referring to the '477 Patent.

Q.    That's correct, sir.

A.    Okay.

Q.   Now, you agree with me, sir, that what the '477 Patent is directed to is a profile-creating apparatus.  Do you agree with that?

A.   I don't see that term in this slide.

Q.   Sir, I'm not asking about the slide right now.  I'm going to get to that in one second.

A.   Uh-huh.

Q.   You would agree with me that the '477 Patent is directed to a profile-creating apparatus.

A.   The claim covers a profile-creating apparatus, yes.

Q.   Okay.  And you would agree with me, sir, that the profiles that are created include the information required by the demodulators to permit their operation to demodulate bursts of data received by the demodulators.  You agree with that.  Right, sir?

A.   Again, I'm not sure what you're asking me.

Q.   Sir, you would agree with me that the claim profiles must have signal parameters and channel parameters and include the information required by the demodulators to permit their operation to demodulate bursts of data received by those demodulators.  Correct, sir?

A.   As I said, I cannot answer that question because I don't have -- I don't understand what you are asking.  Are you asking me to limit the profiles in a certain way?  I mean, I'm not sure.

MR. HAYNES: Move to strike as non-responsive, Your Honor.

THE COURT: Sustained.

MR. HAYNES: Your Honor, I have no further questions.

THE COURT: You pass the witness?

MR. HAYNES: I do pass the witness. Thank you, Your Honor.

THE COURT: All right. Is there further direct?

MR. SUMMERS: Your Honor, may we approach briefly?

THE COURT: Approach the bench.

(The following was had outside the hearing of the jury.)

MR. SUMMERS: Very briefly, Your Honor.

The issue of non-infringing alternatives is one where the Defendants bear the burden of proof and we did not address it in our case in chief. And I mentioned during Ms. Dwyer's examination that Dr. Madisetti would be responding to her afterward, and I wonder if we could just indulge the Court to ask if we could just briefly respond on the issue of NIAs given those circumstances. It would be just a couple of high level, very high-level questions.

THE COURT: Well, I think you have about two minutes and 40 seconds' worth of trial time.

You have about a minute, give or take.

So there's not much time to do much of anything.

What's your position on the request from Plaintiff, Mr. Haynes?

MR. HAYNES:  Your Honor, I don't know what they're going to do, but I allocated my time based on the direct that they gave.  So if they offer some new opinion, I'm not going to have any time to respond to it.  It's prejudicial to me.

THE COURT:  I'm assuming you're not offering anything new, Mr. Summers.

MR. SUMMERS:  Nothing, Your Honor.

MR. HAYNES:  When I said new, I mean new that requires more than 60 seconds to respond to, Your Honor.

MR. SUMMERS:  And we wouldn't have an objection if he has a follow-up question or two based on that, given he's adjusted his time.

THE COURT:  All right.  I'll tell you what.  You now both have 2 minutes and 30 seconds.  That's all there is.  You can go into the NIAs.

And that will give you at least equal amount of time to respond to it.  Okay?

MR. HAYNES:  Thank you, Your Honor.

(The following was had in the presence and hearing of the jury.)

THE COURT:  Redirect, Mr. Knobloch?

MR. KNOBLOCH:  Yes, Your Honor.

THE COURT:  Please proceed.

MR. KNOBLOCH:  Thank you, Your Honor.

Ms. Brunson can I have the document camera, please?

REDIRECT EXAMINATION

BY MR. KNOBLOCH:

Q.  Dr. Madisetti, you were asked about the equalization, and I just want to be really clear about one thing.  The post --

THE COURT:  Just a minute.

Yes, Mr. Haynes?

MR. HAYNES:  I'm going to let him finish his question, but I object; this is not the subject matter we just talked about.

MR. KNOBLOCH:  Your Honor, this is directly responsive to an issue that was addressed during cross.  I'm just following up.

THE COURT:  As long as it relates to the invalidity case and the matter we just discussed at the bench, then I'm going to permit it, Mr. Haynes.

MR. HAYNES:  Thank you, Your Honor.

THE COURT:  Let's proceed.

Q.  (BY MR. KNOBLOCH)  The post-equalizer SINR here, is that what counsel for Ericsson was talking about when he showed you the evidence from Mr. Faxer about equalization weights?

A.  No.

Q.  Is this post-equalized SInr used in Ericsson's base

stations?

A.   Yes, and it's stored.

Q.   Now, you heard about non-infringing alternatives from Ms. Dwyer.  Do you agree that Ericsson's base stations could have the same performance after just making minor software adjustments?

A.   Not at all.

Q.   Thank you.

        MR. KNOBLOCH:  I pass the witness, Your Honor.

        THE COURT:  All right.  Additional cross examination?

        MR. HAYNES:  Nothing further, Your Honor.

        THE COURT:  You may step down, Dr. Madisetti.

        THE WITNESS:  Thank you, Your Honor.

        THE COURT:  Plaintiff, does this c-o-m-p-l-e-t-e your rebuttal case?

        MR. SUMMERS:  It does, Your Honor.

        THE COURT:  Do both sides, subject to final instructions to the jury and closing arguments rest and close?

        MR. SUMMERS:  We do, Your Honor.

        MR. STEVENSON:  We do, Your Honor.

        THE COURT:  All right.  Ladies and gentlemen of the jury, that means you have now heard all the evidence in this case.  There are certain procedural matters I need to take up with counsel.  The good news for you is they do not require

1205

your presence.  I expect to be up here the rest of the day working through those procedural issues with counsel, but I am not going to need you back here until tomorrow morning.

I'm about to release you for the day.  I do want you to know that I understand lunch is in the jury room.  If you'd like to have lunch before you leave the building, it should be there for you.  If you'd like to leave and go about your business without staying for lunch, that is up to you as well.

Until you reappear tomorrow morning ready to go by 8:30, please double your efforts to continue to comport yourself consistent with all the instructions I've given to you.  We are very close to being through, and it would be an absolute travesty if all the work, effort, and expense gone into this process were jeopardized if there were to be conduct inconsistent with the instructions I've given you.  So please keep that in mind.

What you do with the rest of the day and the evening is strictly up to you, ladies and gentlemen.  It's a small repayment on keeping you late the last few days, but I hope you will enjoy it.

Take your notebooks to the jury room, if you will, leave them there, continue to follow my instructions, and please be back tomorrow morning ready to go by 8:30.

With that the jury's excused until tomorrow morning.

(Whereupon, the jury left the courtroom.)

THE COURT:  All right, counsel.  Be seated, please.

It is 10 minutes until noon.  We're going to take a recess until 12:45.  At 12:45 I'll be back on the bench and take up motions from either party pursuant to Rule 50(a) of the Federal Rules of Civil Procedure.

After I've heard your motions, your argument, and given you rulings on those matters, we will then conduct an informal charge conference in chambers where we'll review together informally and off the record your most current iteration of the proposed final jury instruction and verdict form.  There are a fairly limited number of areas of dispute.  I hope that will go expeditiously.

After we've had a fulsome discussion about both the charge and the verdict form, I will take your input into account, I will generate what I believe to be the final and appropriate charge to the jury and verdict form for use in this case, I'll provide it to you with an opportunity to review it, and then we'll conduct a formal charge conference on the record where any objections either side feel are necessary can be made, and I will then rule on them.

I cannot tell you if we will get that done today or if we may bring you back first thing in the morning before 8:30 to do the formal charge conference.  We'll see how the process goes this afternoon.

I'm well-aware that during the 50(a) motion practice it's

typical for those members of the trial team who haven't had a speaking role during the trial to have an opportunity to present to the Court.  I welcome that and am happy to see it.

Please remind your trial team members that I have been here the entire trial.  Please do not send someone to the podium who looks at me and says, "Your Honor, this is a patent case."  It's time for us to get down to the nub of the issues, and I think I have the understanding of the evidence from the competing parties to do that.  So please target and focus your motions and arguments under Rule 50(a).

Given the last colloquy at the bench about time, I don't know whether it's accurate to say you both had two and a half minutes left or one minute left, but you left very little time on the table.

All right.  Are there questions from either side before we recess for lunch?

MR. SUMMERS:  Nothing from the Plaintiff, Your Honor.

MR. DACUS:  Nothing from us, Your Honor.

With respect to the 50(a) and the informal conference, Your Honor, can those who expect to do closing be excused?

THE COURT:  Yes.  That is typical, and thank you for bringing that up, Mr. Dacus.

If you are going to participate in closing arguments, you're certainly not required to be here.  You're welcome to

be here, but you're certainly not required to be here.

Do we know at this point, counsel, who is going to be presenting closing for the respective parties?

MR. SUMMERS:  We haven't made a final decision, Your Honor.

THE COURT:  Who is in the running, Mr. Summers?

MR. SUMMERS:  Ms. Fair, Mr. Knobloch, and myself will be the candidates.

THE COURT:  What's the horizon look like for the Defendants?

MR. DACUS:  Mr. Stevenson and I will likely split it, Your Honor, with the Court's permission.

THE COURT:  All right.  Well, those five of you are not required to be here this afternoon.  Again, you're welcome to be, but you can use that time, if you choose to, to finalize your plans for closing arguments and prepare.

MR. DACUS:  Your Honor, may Mr. Haynes be excused with us to assist with the closing?  Mr. Stevens will be here on behalf of Ericsson and T-Mobile.

THE COURT:  Mr. Stevens is going to be here during the 50(a) practice?

MR. DACUS:  He will be, Your Honor.

THE COURT:  Okay.  That's fine.

MR. DACUS:  Thank you, Your Honor.

THE COURT:  One thing we have an abundance of in

this case is lawyers.

All right, ladies and gentlemen.  We stand in recess until 12:45.

(Lunch recess.)

THE COURT:  Be seated, please.

All right.  At this time the Court's prepared to hear and take up motions from either party offered pursuant to Rule 50(a) of the Federal Rules of Civil Procedure.

As those of you who've practiced before me in the past probably remember--I hope you do--it is typically my practice to ask each side to identify by subject matter the items they wish to seek relief on pursuant so Rule 50(a) and to give a rendition of those substantive areas from both sides, because it is often the case that there are diametrically opposed motions that can be argued concurrently for effectiveness and efficiency.

So with that, I'd like to hear from Plaintiff first, and if Plaintiff would identify for me as a part of the record the subject matter, if any, that it seeks relief on pursuant to Rule 50(a).

MR. KELSON:  Your Honor, Taylor Kelson for the Plaintiff.

General Access intends to move under Rule 50(a) for judgment that the Defendants have failed to carry their burden to demonstrate invalidity of any asserted claim pursuant to 35

U.S.C. § 102 or § 103 based on the RBS 2000.

Plaintiff additionally intends to move for judgment that Defendants have failed to demonstrate anticipation of the '383 Patent claim 16 based on the RBS 2000.

THE COURT:  Okay.  The first matter, no invalidity as to § 102 and § 103, that was to each particular patent?

MR. KELSON:  To all of the asserted claims.

THE COURT:  All right.  And then your second grounds was what again?

MR. KELSON:  No invalidity with respect to the RBS 2000 -- excuse me.  No anticipation with respect to the RBS 2000.  And that is specific to claim 16 of the '383 Patent.

THE COURT:  All right.  Are there other matters Plaintiff seeks relief on pursuant to Rule 50(a)?

MR. KELSON:  There are not, Your Honor.

THE COURT:  All right.  Let me hear from Defendant and Intervenor next.

What matter or matters do these parties seek relief on pursuant to Rule 50(a)?

MR. STEVENS:  Your Honor, Defendants seek relief under Rule 50(a) asking the Court to find as a matter of law that there's insufficient evidence to support direct infringement of all of the asserted claims 1, 3, and 6 of the '477 Patent and claim 16 of the '383 Patent.

In addition to that, a lack of evidence and seeking

judgment as a matter of law of no doctrine of equivalents as to claim 16 of the '383 Patent.  Moving on -- do you want me to keep going?

THE COURT:  Yes, please.

MR. STEVENS:  Moving on to willfulness, we believe that the evidence is insufficient to send the question of willfulness as to the '477 Patent to the jury.

As to invalidity, we're seeking judgment as a matter of law that the claims are invalid under § 102 and § 103 in light of the RBS 2000, and that's for each of the four asserted claims.

Additionally seeking judgment as a matter of law that each of the asserted claims fails the written description requirement under § 112.

And then as it relates to the three asserted claims of the '477 Patent, we're seeking judgment as a matter of law that they fail the enablement requirement of § 112.

And then, finally, the damages presentation by the Plaintiff is insufficient to send to the jury, and so we're seeking judgment as a matter of law that they have failed to present any evidence sufficient to find -- have any finding of damages.

THE COURT:  What else, Mr. Stevens?

MR. STEVENS:  That's everything for Defendants, Your Honor.

THE COURT: All right. Thank you.

Well, it does look like we do have overlapping motions with regard to the question of invalidity under § 102 and § 103 as to all claims and as to § 102 regarding claim 16 of the '383 Patent in light of the RBS 2000 prior art.

Unless there is a compelling reason to argue those separately, that seems to me it's appropriate to argue them concurrently.

And let me hear argument from Plaintiff on that matter first. I'll hear argument following from Defendant and Intervenor.

MR. KELSON: Your Honor, Taylor Kelson for the Plaintiff.

Before I begin, I did just want to clarify that our first motion with respect to the RBS 2000 is really directed to the prior art status of the RBS 2000. I don't know if that informs the Court's decision about how you want to hear argument, but I want to clarify the premise before then.

THE COURT: I appreciate that. But unless you have some other reason why it would be confusing or erroneous to hear these arguments together, I think the Court's able to separate them and consider them for what they are, so let's hear the argument on both of these issues.

MR. KELSON: No objection to that, Your Honor, and I'll proceed on that motion.

THE COURT:  All right.

MR. KELSON:  Plaintiff General Access moves for judgment under Rule 50(a) that Defendant's have failed to carry their burden to demonstrate invalidity of any asserted claim pursuant to 35 U.S.C. § 102 or § 103 based on the RBS 2000.

It is undisputed that Defendants' invalidity theories based on the RBS 2000 necessarily rely on information about that system that was not publicly disclosed in any way as of the priority date.  There is no dispute that this information could not have been learned by a person of skill in the art examining that system that Defendants contend was on sale. Mr. Akesson testified that at the transcript -- at the trial transcript at page 846, line 18, through page 847, line 5. And other testimony and evidence confirms the same conclusion.

Dr. van der Weide testified that the source code and many of the technical documents he relied on to support his invalidity arguments were confidential to Ericsson and not publicly disclosed as of the priority date, and, in fact, those documents are still not public today; they are confidential to Ericsson as of this litigation.  Dr. van der Weide confirmed at transcript 994, lines 1 through 16, among other places, and numerous other witnesses have testified to the same, including Mr. Akesson and Mr. Larsson.

Further, Dr. van der Weide confirmed that these

1214

non-public materials are a necessary premise of his invalidity arguments, and that his invalidity arguments can only be supported by reference to these non-public materials.  For example, on page 994 of the trial transcript beginning at line 19, Dr. van der Weide was asked, quote, "So many of the features of the RBS 2000 that you say invalidate the asserted claims are only -- you can only determine that they're present by relying on documents -- internal Ericsson documents that were not available or disclosed to the public or a person of skill in the art.  Correct?"

Answer:  "That's true."

These secret disclosures about the functionality of the RBS 2000 reflect information that was undisputedly not known or discernible by a POSA as of the priority date.  If these secret disclosures about the functionality of the RBS 2000 are not a proper basis for Defendants' invalidity arguments, which they are not, then Defendants' invalidity arguments under § 102 and § 103 fail as a matter of law.

THE COURT:  Let me ask you a question, counsel.  Are you telling me that any previous device or process that is in the public domain and functioning but may include software that is based upon non-public source code, that that can't be prior art because the source code is private and not in the public domain, even though the device or process is in commerce and functioning and available to be seen and

examined?  Are you telling me that the entire class of all prior -- potential prior art that has a software and source code component to it is *ipso facto* unable to be considered for invalidity?

MR. KELSON:  No, Your Honor.  I'm telling you that there are limits on what about that prior art system is appropriately considered as prior art in this context.  Plaintiff does not --

THE COURT:  And you believe that no reasonable jury could find that an examination of the RBS 2000 system without access to non-public source code could be properly considered as prior art in this case for invalidity purposes?

MR. KELSON:  We are not contending that the facts about the functionality of the RBS 2000 system that could have been gleaned by a person of skill at the time by, for example, examining Ericsson's public manuals or looking at the box itself, all of that information is properly considered by the jury.  We have no dispute there.  The issue is the information that can only be gleaned from the confidential source code and the confidential Ericsson internal technical documents.  And Dr. van der Weide conceded on cross examination that information that can only be gleaned from those confidential sources unknowable to a POSA are necessary predicates for his invalidity position.

THE COURT:  And it's your position that there's no

1216

dispute of fact over that; that there's not countervening evidence elsewhere in the record that draws into question whether or not this secret information was absolutely essential to determining whether or not the RBS 2000 functioned as a prior art device.  Correct?

MR. KELSON:  As a prior art device disclosing all of the limitations of the asserted claims, that's correct, Your Honor.  I believe Dr. van der Weide's admission at -- on page 994 of the transcript is pretty unequivocal that certain of his premises that support his invalidity argument are supportable only based on confidential documents and source code.

THE COURT:  All right.  What other argument do you have for me on this?

MR. KELSON:  So turning to the legal question here, Your Honor, the result here is that Dr. van der Weide's invalidity position is not legally supportable.  The law requires system art to put into public knowledge the disclosure about the features of -- that map onto the limitations of the asserted claims.  This Court has addressed precisely this question in the *TSQ* [sic] *Development versus 1800-Flowers* case, which is at 120 F.Supp 3d 600, and the Court evaluated Federal Circuit cases in this area, most notably the *Dey versus Sunovian* case.  That case held that if members of the public are not informed of and cannot readily

discern the claimed features of the invention in the allegedly invalidating prior art, the public has not been put in possession of those features and that secret or confidential third-party uses do not invalidate later-filed patents.

There are two other key points here.  First, *Dey* explains that there is an exception to this rule where it is the inventor who is engaging in the commercial exploitation or public use of the device.  But there is no dispute here that T-Mobile or Ericsson personnel and not the inventors in these patents are not T-Mobile's or Ericsson's.

Third-party system art must disclose each and every element of the claim to a POSA, and *Dey* ties that rule to the policy justification underlying § 102 and § 103 where the bargain of public disclosure for a time-limited monopoly, a patent is the underlying premise.  If confidential disclosure that was unknowable to a POSA through third-party system art is permitted to be invalidating in this way, then the third party can keep certain aspects of that system confidential forever, as T-Mobile and Ericsson have done here, and simultaneously block any third party from ever obtaining a valid patent covering the aspects of that system.  That cannot be the rule.

Defendants use of the RBS 2000 also fails under § 102(g) for the additional reason that any alleged invention reflected in the RBS 2000 was suppressed or concealed, and, in fact,

remains suppressed or concealed today because of the absence of any public disclosure of the confidential documents and source code.

And the arguments under § 103 are deficient for at least the same reasons.  These arguments suppose that a person of skill could have taken features of the RBS 2000 which were completely unknowable to that person of skill as of the priority date and modified them in order to allegedly arrive at the elements of the claimed invention in the asserted claims.

THE COURT:  All right.  What else?

MR. KELSON:  That's all I have, unless the Court has questions, Your Honor.

Plaintiffs move for judgment that all of Defendants' § 102 and § 103 invalidity arguments fail for the reasons I've articulated.

THE COURT:  Let me hear a response from Defendants on this issue.

MR. DEANE:  Thank you, Your Honor.  Michael Deane for the Defendants.

THE COURT:  Good afternoon, Mr. Dean.

MR. DEANE:  So we believe that the issue on this point is fairly straightforward.  General Access has set forth this secret prior art standard which is actually a narrow exception to a standard set forth under § 102(b).  Defendants

here have alleged the RBS 2000 is prior art under § 102(a), which requires both -- which requires either known or used in this country, and under § 102(b) under both the 'public use' bar and the 'on sale' bar.  The argument that General Access just set forth is a narrow exception under just the 'public use' bar.

Under that bar, the *Del-Ray* case cited by General Access states, "We ask whether the purported use was (1) accessible to the public, or (2) was commercially exploited."  And so here it's undisputable that the RBS meets the commercially exploited prong of that, but it's also undisputed that the RBS 2000 was prior art under § 102(a)'s 'known and used in this country'.  And that was the majority of the evidence that was set forth, you know, throughout this trial; evidence that was set forth by Mr. Gunnar Larsson, evidence that was set forth by Mr. Anders Akesson, and evidence that was set forth by Mr. Justin Mueller.

Going back to what General Access is actually arguing is that under the 'accessible to the public' prong of the public use bar under § 102(b), the question is whether that the claimed features are accessible to the public.  And even if we get to that exception under § 102(b), there is sufficient evidence on the record to support that the claimed features were accessible to the public.

So, for example, there is testimony on the record that

the public could have determined that the RBS 2000 was performing the claimed methods of the asserted claims at at least trial testimony page 923, lines 21 through 24, where, in connection with the public GSM standard of which it was readily accessible to the public that the RBS 2000 complied, it would have been known that the RBS 2000 followed the call establishment procedure that Dr. van der Weide set forth at length on the stand.  And that testimony that I just cited there said, "Is that call establishment procedure specified by one of those industry standards you talked about previously?

"Oh, yes.  That is just laid out in very, very great detail in the GSM standards."

And so even under this very narrow exception, the claim features of the invention were publicly accessible because a POSITA could have gone to the GSM standard, would have known that the RBS 2000 was compliant with said standard, and, therefore, would have known that the claimed features were in the art.

But again, Your Honor, from a legally sufficient standpoint, to survive under Rule 50(a) I don't think that we even need to get there because the argument that was set forth by General Access really didn't even touch prior art under the 'known and used in the United States' or the 'on sale' bar under § 102(b).

THE COURT:  All right.

MR. DEANE:  Are there any questions?

THE COURT:  No.  Thank you.

All right.  Let's move on to the motion under Rule 50(a) brought forward by Defendants regarding direct infringement asserting no indirect infringement regarding all claims.

Let me hear from Defendants on this.

MR. DAVISON:  Good afternoon, Your Honor.  Thomas Davison on behalf of Defendants.

THE COURT:  Good afternoon.

MR. DAVISON:  Would you like me to just address perhaps the '477 Patent first and then have General Access respond?  Or I could do both; whatever your preference.

THE COURT:  We're going to get there one way or the other.  It doesn't matter to me.

MR. DAVISON:  Okay.

THE COURT:  Mr. Hughes?

MR. HUGHES:  We had a second Rule 50(a) motion which went to whether or not the RBS 2000 prior art anticipated the asserted claim of the '383 Patent which we did not -- I just want a chance to put that on the record.  It will take me one minute.

THE COURT:  I assumed you had made your argument on that as a part of the earlier argument by your co-counsel.

MR. HUGHES:  I think in our mind we set them up as two things because one went to all the claims and one goes to

just one claim.

THE COURT:  Out of an abundance of caution, let's step back and let me hear from Plaintiff on what it believes it has sought relief under that hasn't been argued.

MR. DEANE:  If you may, Your Honor.  Likewise, Defendants had a similar view and we also didn't argue our affirmative validity motion.

THE COURT:  Let's just back up and we'll hear what Plaintiffs are identifying as their second Rule 50(a) motion on claim 16 of the '383 Patent, and then I'll hear from Defendants, and then we'll come back to you Mr. Davison.

MR. DAVISON:  Thank you so much, Your Honor.

THE COURT:  Go ahead, Mr. Hughes.

MR. HUGHES:  Thank you, Your Honor.

The Plaintiffs move under Rule 50(a) that we're entitled to judgment as a matter of law on claim 16 of the '383 Patent on Defendants' claim that that claim is anticipated by the RBS 2000 reference because the fact witness Mr. Akesson who came here to describe how that system worked testified unequivocally during his examination -- cross examination on page 845 of the trial transcript that that system only had one demodulator.  I asked him that several times on the record. There were unequivocal admissions.  And as the Court knows, the claim requires more than one demodulator.  Therefore, we're entitled to judgment as a matter of law on their

anticipation theory.

THE COURT:  All right.  In light of that, let me hear from Defendants.

MR. DEANE:  Thank you, Your Honor.

Before I get into addressing his counterargument, I'd also like to ask would the Court like me to address our affirmative argument as part of this, and also would the Court like me to wrap in our § 112 written description and enablement arguments as part of the argument up here right now?

THE COURT:  If you think they are conducive to concurrent argument, I'm happy to hear them.  We'll get them all done one way or another.  Feel free to do that if you think that would be beneficial.

MR. DEANE:  Absolutely.

So in response to the argument we just heard from General Access, Dr. van der Weide supported his argument that there was more than one demodulator as part of the '383 Patent under Dr. Madisetti's broad view of the claims.  And I think that that was made abundantly clear throughout the case that Dr. Madisetti had taken a varying view of what was and was not a demodulator, including whether a demodulator included logical blocks and hardware blocks and whether if you applied the UE context in connection with a demodulation process whether that alone constituted a demodulator.

1224

And so Dr. Madisetti's view was that the demodulators of the asserted products consisted of anywhere from one to two to a million different demodulators, and so Dr. van der Weide applied the same logic that Dr. Madisetti was applying to the RBS 2000, which Mr. Akesson stated had one physical hardware demodulator in it, but it still had the same logical software pieces that Dr. Madisetti said would lead to the potential of a million-plus demodulators.

And so we think that if under Dr. Madisetti's view the jury could find that there's a million demodulators in the asserted products, we certainly think that they could also find that there were two in the RBS 2000.

And so Dr. van der Weide has set that testimony, you know, forth in detail, and so we believe that, therefore, JMOL is not appropriate on that issue.

And, in fact, we think that there is enough testimony on the record for you to grant Defendants' judgment as a matter of law under Rule 50(a) that the claims of the '383 and '477 Patents are indeed invalid.  And that again is supported by the testimony of Dr. van der Weide who, again, applied Dr. Madisetti's broadened view of the claims.  And under that broadened view of the claims, we set forth evidence that the call establishment procedure met all the limitations of both the '477 and '383 Patents in excruciating detail.

In addition, Dr. van der Weide set forth an argument

under § 112 that the '383 and '477 Patents are invalid under the written description requirement.  And Your Honor, from this requirement, the only evidence that General Access set forth in response was generic statements in the written description that state that the embodiment shouldn't be limited to fixed wireless networks.

However, as this Court has held and as we set forth in the Huawei case cited in the motion that we just filed under Rule 50(a), we know that generic statements alone are insufficient to survive written description requirements where the claims are, in fact, broader.  And there's no other evidence in this case that there was a description of 'mobile' that could have conveyed to a POSITA the full scope of the claims.  And so we actually think that judgment as a matter of law is appropriate on that front as well.

And for very similar reasons, we also believe that the '477 Patent claims 1, 3, and 6 should be held as -- or should be -- we believe that that's also subject to judgment as a matter of law because, again, in the mobile environment there's nothing described there.  There's nothing to describe the use of the parameters and enable a POSITA to build a mobile system using the description in the patent.

THE COURT:  All right.  Thank you.

Do Plaintiffs have some argument they wish to offer with regard to the argument I just heard concerning written

1226

description and § 112?

MR. KELSON:  We do, Your Honor.

THE COURT:  Let me hear that, please.

MR. KELSON:  Your Honor, Plaintiffs submit that there is ample evidence for the question of written discriminate and enablement to be submitted to the jury.  On the characterization that there is no other evidence other than passing statements in the patent specifications is simply not correct.  The patent specifications make ample reference to the possibility that the claimed systems are equally applicable to mobile and fixed applications, including, for example, the disclosure in JX 2 that the system operates in the same manner for a cellular network, which is inherently a mobile network.

There are also incorporations by reference and other disclosures in the patent which were elicited in evidence--for example, through Dr. Madisetti--that characterized the claims and the specification in a way making clear that both mobile and fixed embodiments are described and enabled sufficient to meet the § 112 standard or, at the bare minimum, sufficient for a reasonable jury to conclude that § 112 is satisfied.

THE COURT:  All right.  Thank you.

Let me hear from Defendants with regard to their request for relief under Rule 50(a) concerning no doctrine of equivalents related to claim 16 of the '383 Patent.

MR. DAVISON:  Thomas Davison on behalf of Defendants, Your Honor.

THE COURT:  Please proceed, Mr. Davison.

MR. DAVISON:  Thank you.

Before I start, I'd like to re-raise the Defendants' firm belief that General Access' doctrine of equivalents theory is barred under *Festo*.  We filed a summary judgment motion, that was denied, and we understand that the Court may permit us to present our ensnarement argument at a future proceeding.

Additionally, though, two other limitations of that claim were firmly amended.  That's the 'alternately selecting' argument as well as -- or limitation as well as the 'maintaining profiles' limitation.  We think that Dr. Madisetti's doctrine of equivalents argument hits on those and is, thus, prohibited under *Festo*.

Moving to our 50(a) motion, we believe that no reasonable juror would find infringement under doctrine of equivalents because of the way the accused products operate.  While Dr. Madisetti has suggested that a DSP in Ericsson's base stations is equivalent to a demodulator, Dr. Madisetti's analysis fails for multiple reasons.

First, Dr. Madisetti's testified that the hardware accelerators in Ericsson products also perform demodulation steps.  And he previously opined that those hardware accelerators were demodulators themselves.  But for purposes

of his DoE theory here in this trial he excluded them.  The DSPs that remain cannot be the demodulators of the claim because they undisputedly do not perform the entire demodulation task.

Additionally, we presented evidence that Ericsson's base stations do not perform the demodulated function independently for different users.  Instead, the hardware accelerators act on multiple signals from  multiple users to help the jobs process together.

Our position is supported by evidence in the record from Dr. van der Weide, Sebastian Faxer, and admissions of Dr. Madisetti himself.

Your Honor, would you like me to turn to our non-infringement --

THE COURT:  Yes.

MR. DAVISON:  -- positions?

THE COURT:  Yes, please.

MR. DAVISON:  And I'll work backwards and stick with the '383 claim 16.

Defendants move for judgment as a matter of law that there is no literal infringement of claim 16.

First, General Access has failed to prove the method -- the use of the actual method claim.  It's not sufficient for General Access to show the products are capable of infringing claim 16; they need to come forward with actual evidence that

the base stations in the United States had been used in the way Dr. Madisetti has alleged infringement occurs.  There's been no evidence whatsoever, any tests or any studies, zero.

Next, there's two fundamental flaws with Dr. Madisetti's infringement interpretations, and I'd like to start with the limitation that requires all successive signals--yeah--any subsequent data signals are alternately applied to the first and second demodulators.  No reasonable juror applying the plain and ordinary meaning to that phrase can find the Ericsson base stations as used in the T-Mobile systems infringe.

Dr. Madisetti himself admitted that in the Ericsson products there could be a million different demodulators.  What this claim requires in the selecting step is I need to select a first and a second demodulator, then all the data transmissions have to go to that first demodulator and the second demodulator and every single subsequent data communication has to go back and forth.

The rest of the claim supports that.  There's two other steps.  You have to then demodulate at the first demodulator when it's selected, or demodulate at the second.  Dr. Madisetti's infringement theory has completely eviscerated that claim language, and no reasonable juror can find literal infringement of that claim.

Going to -- sticking with claim 16, there is also the

requirement that the signals are alternately applied to the first and second demodulators.  This is what we heard throughout this trial about a ping-pong, a back and forth.  And no reasonable juror can find that Dr. Madisetti's infringement theory satisfies that claim.  Our positions are supported by the evidence in the record of Dr. van der Weide, Sebastian Faxer, as well as admissions of Dr. Madisetti himself.

Turning, then, to the '477 Patent, no reasonable juror would find literal infringement of claim 1, and because of that as well the dependent claims, claim 3 and 6.

The '477 Patent sets forth a series of interrelated limitations that work together to define the bounds of the claim.  So first you need to determine that at least one signal- and at least one channel-related parameter, those parameters need to be collectively representative of communication of the first channel of the -- to the receiving station.  They then need to store values representative of those parameters and reuse them on -- for subsequent receive operations.  The parameters that Dr. Madisetti has set forth violate one or more of those limitations.

For example, the evidence shows that in Ericsson's base stations the alleged profile parameter determiner does not determine equalization weights and/or digital beamforming parameters for storage.  Without these key and necessary

parameters, the evidence shows the parameters Dr. Madisetti has identified are not and cannot be collectively representative.

Additionally, the parameters that Dr. Madisetti has pointed to fail the limitation of "to be used to facilitate receive operations performed at the receive station on subsequent bursts of the first burst data signal."  What Dr. Madisetti has pointed to are simply just not stored and then reused in the ways required by the claim.  And again, our positions are supported by the evidence submitted in the record.

THE COURT:  All right.  Thank you.

Let me hear from the Plaintiff.

MR. KELSON:  Taylor Kelson for the Plaintiff, Your Honor.

I'll start with the doctrine of equivalents of claim 16.

THE COURT:  That's fine.

MR. KELSON:  So, first of all, to be clear, the element that Dr. Madisetti alleged on the record and submitted extensive evidence about that is satisfied under the doctrine of equivalents is the claimed demodulator of claim 16 of the '383 Patent.  And there is extensive testimony from Dr. Madisetti on the record, including citations to a variety of Defendants' technical documents, demonstrating the equivalence of the hardware and software that Dr. Madisetti

1232

identified as equivalent to the claimed demodulator as satisfying the judicial tests for the doctrine of equivalents. There's ample evidence on the record for that question to be submitted to the jury.  And certain testimony from Defendants' own witnesses, Mr. Faxer most notably, confirms Dr. Madisetti's testimony about the functionality of the accused products.

THE COURT:  All right.  Do you want to proceed?  Let me hear your position on written description.

MR. KELSON:  On written description, Your Honor?  I apologize.  I thought we covered that one.

THE COURT:  I just want to make sure you have an opportunity to add anything you haven't already.

MR. KELSON:  I don't believe we have anything additional on written description, Your Honor.  I believe our position on that, as far as citations to the record, is fairly co-extensive with enablement, but I'm happy to go through any of that if it would be helpful to the Court.

THE COURT:  I'm trying to make sure out of an abundance of caution we don't cut somebody off.

MR. KELSON:  I appreciate it, Your Honor.

THE COURT:  All right.  Anything further at this juncture from your side?

MR. KELSON:  Yes, Your Honor.  I can address non-infringement of the '477 and '383.

THE COURT:  All right.  Please do that.

MR. KELSON:  I can start with the '383.

So at the baseline, there is really no evidence in the record to support Defendants' suggestion that the accused base stations don't actually perform all of the functionality that witnesses have spent the past week testifying about their capability to perform an actual performance of.  There has been no suggestion at all that all of the functionality discussed at trial is not actually what the base stations do in the real world every day.  There is ample evidence on the record for a reasonable jury to conclude that and, thus, conclude that the limitations of the method claim are satisfied.

With respect to "the at least a second demodulator language" of the claim, the claim language requires more than one demodulator; it covers two, it covers 17, it covers a million if they are configured as the claim requires.  And there is ample evidence on the record sufficient for a reasonable jury to conclude that a larger number of demodulators than two can be configured as the claims require and, thus, given satisfaction of the rest of the steps of the method, practice each of those method steps and, thus, infringe.

THE COURT:  All right.  Thank you, Mr. Kelson.

MR. KELSON:  And I can address the '477 infringement

as well, Your Honor.

THE COURT:  Please do.

MR. KELSON:  So with -- the two limitations that were specifically identified were the 'collectively represent' limitation and 'the use to facilitate' limitation. Dr. Madisetti's testimony introduced amply-sufficient evidence for a reasonable jury to conclude that those limitations are met.  He explained how a variety of different parameters are used within the accused base stations in a manner that satisfies those limitations; and similarly, Defendants' technical witnesses, including Mr. Faxer, testified to the functionality of the accused base stations and specifically to parameters that he confirmed satisfy those claim elements. There is sufficient evidence on the record for this question to go to the jury.

THE COURT:  All right.  Thank you.

MR. KELSON:  Thank you.

THE COURT:  Let's turn to Defendants' motion for judgment as a matter of law regarding no enablement of the '477 Patent.

MR. DEANE:  Your Honor, I already addressed the enablement requirement.

THE COURT:  As a part of your written description argument?

MR. DEANE:  Yes, Your Honor.  But I'm happy to

answer any questions that the Court has.

THE COURT:  No.  Those two theories are I think undisputedly intertwined.  I just wanted to make sure there wasn't anything further you held back that you wanted to present.

MR. DEANE:  Thank you, Your Honor.

THE COURT:  Anything regarding enablement of the '477 that Plaintiff hasn't been heard on?

MR. KELSON:  I don't believe so, Your Honor, no.

THE COURT:  All right.  Then let's turn to the issue of willfulness under the '477 Patent.

Let me hear from Defendant on this motion.

MS. WELCH:  Your Honor, Emily Welch on behalf of Defendants.

THE COURT:  Please proceed.

MS. WELCH:  The Court should grant T-Mobile's request for judgment as a matter of law on General Access' willful infringement claim, as there has been no evidence set forth in the record regarding pre-suit nor post-suit willfulness sufficient to meet the threshold.

General Access has failed to present any actual evidence that Mr. Hynek, its engaged patent brokers, or anyone else actually approached Ericsson or Defendant T-Mobile regarding the '477 Patent prior to suit.

Post-suit, the only evidence in the record is the

testimony of Mr. Mueller and Mr. Faxer regarding both companies' subjective belief of non-infringement in which both stated, Mr. Mueller on the record at 735:22, that he had personally investigated the patents and come to the conclusion that they did not infringe, and Mr. Faxer at 736:12, that it was Ericsson's position that they did not infringe the patents-in-suit.  As such there is insufficient evidence in the record to establish pre-suit or post-suit willfulness.

THE COURT:  So it's your view if, once a lawsuit's filed, if the Defendants' officers, quote, take a look and think there's no infringement, then that is some kind of a shield against a potential assertion or evidence of post-suit willfulness?

MS. WELCH:  Your Honor, it goes to the specific intent to infringe prong in which the party must be aware both of the patent and aware that it is committing infringement, which is not present here.

THE COURT:  Is there no room in the analysis for the fact that Mr. Faxer in this case or Mr. Mueller might be wrong and that there might, in fact, be infringement and that they might continue to be practicing the claims that are asserted in this trial?  That would not permit the proper submission of a willfulness question to the jury here?

MS. WELCH:  Your Honor, we don't believe that it would be proper on the evidence in the record, which does not

1237

establish the kind of disregard for the likelihood of infringement post-suit.

THE COURT:  All right.  Thank you, Ms. Welch.

MS. WELCH:  Yes, Your Honor.

THE COURT:  What's Plaintiff's position on this?

MR. HUGHES:  Your Honor, I don't have anything to add on post-suit willfulness.  I think you appreciate the issues there.

In terms of pre-suit willfulness, I would point Your Honor to the testimony of Mr. Mueller.  I think it's in trial transcript 405 and maybe the pages preceding and a little bit after where he was cross examined about Joint Exhibit 64, which I'm not sure is actually admitted, but that doesn't matter, because the testimony is that in the early 2010s, both T-Mobile and Ericsson were given a presentation by one of General Access' patent brokers that specifically referenced both of the patents at issue in this case.  And I believe there was also testimony from David Kennedy in his redirect to the same effect.  So there's evidence of pre-suit knowledge, and I think Your Honor understands the rest of the issues.

THE COURT:  All right.  Thank you, counsel.

Let's turn next to Defendants' motion for judgment as a matter of law that no damages are appropriate in this case.

Let me hear from Defendant.

Do you gentlemen need a moment?

MR. HUGHES:  Sorry, Your Honor.

MR. STEVENS:  No.  What we were discussing, Your Honor, my understanding was that in this case there was no accusation of pre-suit willfulness for the '477.  We were having a quick discussion about that.  Neither one of us are sure as we sit here.  And if we find out that that's not been pled or not been preserved, we'll jointly let you know.  It is my understanding that the accusation in this case was limited to post-filing on the '477.

THE COURT:  All right.  Well, run those questions to ground between now and the time we have the informal charge conference.

MR. STEVENS:  We will, Your Honor.

THE COURT:  Ms. Welch, let me hear your argument.

MS. WELCH:  Yes, Your Honor.

General Access' damages claim in this case has no basis in law and is unsupported by the facts.

First, General Access improperly valued the accused products as a whole and did not properly apportion the incremental value of the patented features.  Mr. Kennedy testified that he apportioned the value to the accused baseband units as a whole, and this is completely untethered from the alleged technical benefits that Dr. Madisetti contends the '383 and '477 Patents provide, such as adaptive modulation and coding, uplink beamforming, or iterative

1239

channel estimation, each of which Mr. Madisetti testified repeatedly are principally software --

THE COURT:  Could you slow down, Ms. Welch?

MS. WELCH:  Yes, Your Honor.  I apologize.

THE COURT:  Thank you.

MS. WELCH:  ...are principally software features and, thus, could be modified utilizing software.

The fact that the only apportionment Mr. Kennedy claims he performed was his ecosystem apportionment to exclude cell phone manufacturers, as discussed at 635:2 through 12, shows he failed to take the proper apportionment on this issue.

Similarly, Mr. Kennedy failed to properly apply the smallest saleable unit test because, again, he encapsulated the entirety of the base station hardware equipment.  On cross examination Mr. Kennedy, in fact, conceded that his $904 million initial starting point included the cost of items far beyond the base station, such as brick and mortar stores, buying new trucks, thus, untethering his final damages number from any actual association with the accused product.

And even on redirect he admitted that his -- that he provided no support for his inclusion of all these coasts, but merely stated that his analysis was based on his assumption of what it would cost to deploy the new hardware equipment.

Plaintiff's cost saving model further fails to account for the next best non-infringing alternative to support its

1240

densification theory.  As I mentioned previously, Dr. Madisetti repeatedly testified that the accused feature could be implemented in software, such as on the record at 488:18 through 20.

Despite this acknowledgement by Dr. Madisetti and, in fact, Mr. Struhsaker himself, who acknowledged that even at the time of Raze the accused feature could be performed in software--that's on the record at 315:16--Mr. Kennedy still insisted on putting forth his densification theory which is based solely on hardware replacement.  This is especially egregious in light of the fact Ms. Dwyer opined on multiple non-infringing alternatives derived from software modulations. That can be found on the record, Your Honor, at 1039:20 and at 1049:3.

Thus, Plaintiff's selection of its alleged next best alternative of hardware densification is unsupported by the facts and it is improper inflation of the damages theory.

Similarly, related to -- I'm sorry, Your Honor.  Would you like to ask any questions before I move to the next point?

THE COURT:  I've never been accused of being bashful, Ms. Welch.  If I have a question, I'll ask it.

MS. WELCH:  Thank you.

Related to the point praised by Mr. Davison regarding the requirement to prove actual performance of a method claim, Plaintiff failed to provide any evidence regarding how often

the method claim -- the method of asserted claim of 16 of the '383 Patent are such as when a base station is engaged in a connection with only one user where that method would not necessarily be performed by the base station.  And there was no testimony on the record regarding Mr. Kennedy's efforts to apportion out the value of those non-infringing instances, nor did Mr. Madisetti provide any testimony regarding efforts to account for those in his technical valuation of the asserted features.

Finally, Plaintiff's damages theory as a whole is not supported by the hypothetical negotiation factors set forth in *Georgia-Pacific*; most principally, *Georgia-Pacific* factor 8 and factor 2.

Under factor 8, Mr. Kennedy failed to address the established profitability of the product by ignoring the testimony of Mr. Struhsaker and Mr. Hynek regarding failed efforts to commercialize the Raze product and subsequent failed efforts to monetize the patents-in-suit.  Regarding factor 2, Mr. Kennedy ignored the rates paid by licensees for use of other patents comparable to the patents-in-suit when he declined to address the licenses produced by Defendant and intervenor in this case.

THE COURT:  All right.

MS. WELCH:  Thank you, Your Honor.

THE COURT:  Thank you.

Let me hear from Plaintiff on this issue.

MR. HUGHES:  Briefly, Your Honor.

Dr. Madisetti in his examination earlier in the week marched us through his technical benefits analysis and the benefits that T-Mobile receives from using the patent and the additional capacity and coverage benefits that they get. Mr. Kennedy then took that input into his analysis under the well-accepted cost approach to determine the additional costs that T-Mobile would occur in a world where they were not using the patented invention.  He explained in great detail how those costs would not only be the building of more base stations, but costs associated with doing that, and walked through his methodology.

He also walked through his several different methods for apportioning both the ecosystem apportionment and the bargaining split apportionment to arrive at his final number. Many of these issues, as you know, have been addressed in prior motion practice, so I won't belabor them.

As to the frequency of the practice of the method of claim 16, that's used effectively whenever two or more phones or users are connected to one of the towers in T-Mobile's network.  And, of course, the jury can infer from the ample evidence that they've heard this week that that's basically virtually whenever the T-Mobile network is operational.

That's all I've got.

1243

THE COURT:  All right.  Thank you.

All right.  Let me ask this.  Has any party failed to be heard on any matter they've requested relief on pursuant to Rule 50(a)?

Go ahead, Mr. Stevens, and then I'll hear from Mr. Hughes.

MR. STEVENS:  Just one final point, Your Honor.

If Your Honor is inclined to let the jury decide the issue of doctrine of equivalents, which we don't think they should, now that it's been represented that the equivalents analysis is limited to one single word, 'demodulator', we think the jury would need to know that in the event that Your Honor is going to let the jury decide it.  So we still move under 50(a); we don't think there's enough evidence, period; but now that there's been a representation that that is limited literally to one word, we think the jury needs to know that and not think that they're at liberty to look at other limitations vis-a-vis the doctrine of equivalents.

THE COURT:  Well, once I rule on the JMOL motion, if the DoE theory survives my JMOL ruling, then that's certainly something we should talk about as part of the charge conference, but let's take it one step at a time.

MR. STEVENS:  Otherwise we've been fully heard. Thank you.

THE COURT:  Mr. Hughes, do you have anything?

1244

MR. HUGHES:  We've been fully heard, Your Honor.  Thank you.

THE COURT:  All right, counsel.  With regard to your various requests for relief pursuant to Rule 50(a), the Court is always informed by the rule itself, which Rule 50(a)(1) provides that "If a party's been fully heard during a jury trial and the court finds a reasonable jury would not have a legally sufficient evidentiary basis to find for that party, the Court may grant judgment as a matter of law."

There is no imperative here, but exercising its role under the rule, the Court denies the 50(a) motions brought by the Plaintiff, both as to § 102 and § 103 based on all claims based on the RBS 2000 system art, and as regards the § 102 claim in light of the RBS 2000 concerning claim 16 of the '383.  Those motions are denied.

With regard to the issue of written description and a lack of enablement, the '477, that is denied.

With regard to the motion for judgment as a matter of law by Defendants that there is no supportable doctrine of equivalents theory regarding claim 16 of the '383 Patent, that, too, is denied.

With regard to Defendants' motion for judgment as a matter of law that there is no direct infringement as to all asserted claims, that is denied.

With regard to the Defendants' motion for judgment as a

1245

matter of law that there are no appropriate damages to be submitted to this jury, that is denied.

With regard to the issue raised by Defendants that there is no theory properly submittable to the jury concerning willfulness of the '477 Patent, as to willfulness that would be post-suit, that is denied, but as to willfulness that would be pre-suit as to the '477, the Court finds nothing in the record that would support that and, quite honestly, the Plaintiff's complaint alleges that the Defendants knew of the infringement "at least as of the filing of the complaint, possibly earlier."  That is as close to pleading pre-suit willfulness as the Plaintiffs claim.

In light of that enlightening pleading and based primarily on the lack of any evidence pre-complaint or pre-suit regarding willfulness, I'm going to grant the Defendants' motion of no willfulness as to the '477 Patent pre-suit.  The post-suit willfulness claim on the '477 does survive and will go to the jury.

Now, does either side believe I've overlooked anything as far as giving you complete rulings on what you've sought relief as to under Rule 50(a)?

MR. STEVENS:  I'm sure I can guess the answer, but I don't think explicitly you addressed our affirmative motions of invalidity under § 102 and § 103.  I think you did under § 112; I don't think explicitly you did under § 102 and § 103.

THE COURT: Well, to remove any doubt, Mr. Stevens, those are denied.

Are you aware of anything I've overlooked, Mr. Hughes?

MR. HUGHES: No, Your Honor.

THE COURT: Okay. Counsel, it's a quarter until 2:00. I'd like to take about a 20-minute or 25-minute break. If you will see me in chambers somewhere between 5 and 10 after the hour, we'll meet and take up the most current iteration of the final jury instructions and verdict form as a part of the informal charge conference.

You are certainly all included and invited, as well as your co-counsel that are not here, if they'd like to attend; but otherwise, as long as I have somebody that can speak to these issues from both sides, I'll be satisfied.

So with that, we stand in recess.

(The proceedings were concluded at 1:45 p.m.)

I HEREBY CERTIFY THAT THE FOREGOING IS A CORRECT TRANSCRIPT FROM THE RECORD OF PROCEEDINGS IN THE ABOVE-ENTITLED MATTER. I FURTHER CERTIFY THAT THE TRANSCRIPT FEES FORMAT COMPLY WITH THOSE PRESCRIBED BY THE COURT AND THE JUDICIAL CONFERENCE OF THE UNITED STATES.


S/Shawn McRoberts                     04/10/2025

_____DATE_____
SHAWN McROBERTS, RMR, CRR
FEDERAL OFFICIAL COURT REPORTER