IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF TEXAS
MARSHALL DIVISION

GENERAL ACCESS SOLUTIONS, LTD.,( CAUSE NO. 2:23-CV-158-JRG
)
        Plaintiff,          (
                            )
vs.                         (
                            )
T-MOBILE, USA, INC.,        (
et al.,                     ) MARSHALL, TEXAS
                            ( APRIL 11, 2025
        Defendants.         ) 8:00 A.M.
_____

VOLUME 5

_____

TRIAL ON THE MERITS

BEFORE THE HONORABLE RODNEY GILSTRAP
UNITED STATES CHIEF DISTRICT JUDGE
and a jury

_____

SHAWN McROBERTS, RMR, CRR
100 E. HOUSTON STREET
MARSHALL, TEXAS  75670
(903) 923-8546
shawn_mcroberts@txed.uscourts.gov

Shawn M. McRoberts, RMR, CRR
Federal Official Court Reporter

A P P E A R A N C E S

FOR THE PLAINTIFF:      BARTLIT BECK, LLP - DENVER
                        1801 WEWATTA ST., SUITE 1200
                        DENVER, COLORADO  80202
                        (303) 592-3100
                        BY: MR. GLEN SUMMERS
                            MR. GIOVANNI SANCHEZ
                            MR. NOSSON KNOBLOCH
                            MR. JOHN HUGHES
                            MR. TAYLOR KELSON

                        BARTLIT BECK, LLP - CHICAGO
                        54 W. HUBBARD STREET, STE. 300
                        CHICAGO, ILLINOIS  60654
                        (312) 494-4400
                        BY:  MS. MEG FASULO

                        WARD, SMITH & HILL, PLLC
                        1507 BILL OWENS PARKWAY
                        LONGVIEW, TEXAS  75604
                        (903) 757-6400
                        BY:  MS. ANDREA FAIR

FOR THE DEFENDANTS:     ALSTON & BIRD, LLP - ATLANTA
                        ONE ATLANTIC CENTER
                        1201 WEST PEACHTREE STREET NW
                        #4900
                        ATLANTA, GEORGIA  30309-3424
                        (404) 881-7000
                        BY:  MR. JOHN HAYNES
                             MS. EMILY WELCH
                             MR. MICHAEL DEANE
                             MR. KYLE CEUNINCK

                        ALSTON & BIRD, LLP - CHARLOTTE
                        1120 SOUTH TRYON ST., STE. 300
                        CHARLOTTE, NC 28203-6818
                        (704) 444-1000
                        BY:  MR. MATTHEW STEVENS

                        ALSTON & BIRD, LLP - DALLAS
                        2200 ROSS AVE., SUITE 2300
                        DALLAS, TEXAS  75201
                        (214) 922-3507
                        BY:  MR. TED STEVENSON
                             MS. EMILY FITZGERALD

                                THE DACUS FIRM, PC
                                821 ESE LOOP 323, SUITE 430
                                TYLER, TEXAS   75701
                                (903) 705-1117
                                BY:  MR. DERON DACUS

        OFFICIAL REPORTER:      SHAWN M. McROBERTS, RMR, CRR
                                100 E. HOUSTON STREET
                                MARSHALL, TEXAS   75670
                                (903) 923-8546

THE COURT:  Be seated, please.

Let me ask counsel if both sides are prepared to read into the record any items from the list of pre-admitted exhibits used during yesterday's portion of the trial.

MR. HUGHES:  Yes, Your Honor.

THE COURT:  All right.  Please proceed to do so.

MR. HUGHES:  Good morning, Your Honor.  General Access moves in Plaintiff's Exhibit 3.

THE COURT:  All right.  Any objection from Defendants?

MR. CEUNINCK:  No objection, Your Honor.

THE COURT:  Do Defendants have any items from the list of pre-admitted exhibits to read into the record?

MR. CEUNINCK:  Yes, Your Honor.

THE COURT:  Please do so.

MR. CEUNINCK:  Good morning, Your Honor.  Kyle Ceuninck on behalf of the Defendants.

Defendants move in DX 31, DX 35, JX 66, JX 67, JX 68, and JX 69.

THE COURT:  Any objection from Plaintiff?

MR. HUGHES:  No objection, Your Honor.

THE COURT:  All right.  Thank you, counsel.

I'll note that at the close of the evidence yesterday the Court heard, considered, and ruled on various motions offered by the competing parties under Rule 50(a) of the Federal Rules

of Civil Procedure.  Thereafter the Court conducted an informal charge conference in chambers where the parties, through their counsel, and the Court had an opportunity to review in detail the most current iteration of the final jury instructions and verdict form.  There was a fulsome discussion, after which the Court spent several hours taking into account what the parties had offered by way of input.

And reflecting on the various issues and disputes discussed, the Court has since then issued or prepared its final jury instructions and verdict form that it believes are proper and appropriate for use in this case with this jury, and has furnished it to counsel for the competing parties with an opportunity to review it.

And the Court will now conduct a formal charge conference on the record where either side may lodge such objections to both the verdict form and the final jury instructions as they believe are necessary and appropriate.

Counsel, in case you are not aware, I suspect you are, but the Court's typical process in this regard is to ask each side to present a single spokesperson who will go to the podium.  Both spokespersons will remain there.  We will begin with the final jury instructions.  We'll review them on a page-by-page basis, and at any juncture through that process where you believe an appropriate objection should be made either as to something included or something excluded, the

1250

Court will hear your objection, rule on it, and we will then continue walking through page-by-page these documents to ensure that there's complete coverage of the parties' positions and any objections thereto.

So with that, whoever's going to speak for Plaintiff and whoever's going to speak for Defendant, please go to the podium.  We'll begin with the final jury instructions.  Quite honestly, keeping you both there at the podium saves us a lot of time if you walk back and forth.

MR. STEVENS:  I might be able to make it easier from Defendants' point of you.  We're not going to have an objection to the instructions.  We do have a couple of things on the verdict form, but we don't objections to the instructions.

THE COURT:  All right.  I'll note for the record Defendants don't have any objections to the final jury instructions.

MR. STEVENS:  Would you like me to remain at the podium, or just be seated?

THE COURT:  Just hold on a minute.

What's Plaintiff's position?

MR. KELSON:  Taylor Kelson for the Plaintiff, Your Honor.

The Plaintiff, likewise, does not have objections to the jury instructions.

THE COURT:  Well, counsel, I will tell both of you, I think that's the first time that's ever happened, but it's a very welcome indication.

I do want to do this while I have you both there.  I want to confirm on the record that the issue of willful infringement have been dropped by both sides and there's no objection to the dropping of willfulness from the case or the submission of the case to the jury.

MR. KELSON:  That's correct from the Plaintiff, Your Honor.

MR. STEVENS:  So from the Defendants' point of view, we don't have an objection to it not being included in what's being charged to jury.  We do think the jury should be informed that legal and factual reasons exist why that question is not being submitted to them since they were told at the beginning of the week it would be submitted.  So we would ask Your Honor to have your typical practice where something doesn't go to the jury that they heard about at the beginning and just tell them that it is not going to be before them.

THE COURT:  All right.  I will consider that request, noting it's not an objection.

MR. HUGHES:  If I may on that one, we did not open on willfulness.  I don't think the jury has in its mind that's something that's in the case, and I think it would be more

confusing than helpful to raise that at this point.  And it kind of makes -- that puts us in a tough position because it looks like we had some claim that we've dropped which has not been at all the focus of the evidence in the case.  And obviously you understand the reasons why we dropped it yesterday.

THE COURT:  Well, I did discuss willful infringement in the preliminary instructions.  I did tell the jury in the preliminary instructions that the Plaintiff not only asserts that the Defendants have infringed the asserted claims, but that that infringement is willful.  Now, you may not have made a big deal of it in the case, and the reason it's not going to the jury is nobody made a big deal about it in the case, but I did instruct the jury that that was your position, and as we started the trial that was the Plaintiff's position.

I think, Mr. Hughes, this can be handled in a very generic way to just indicate that the Court's -- that -- well, I'll consider your competing requests, and either I'll not instruct the jury at all on the issue of willfulness being dropped or, if I do, I will do my best to make it extremely generic and not indicate any weakness or fault on either party's side.

MR. HUGHES:  I believe this same sequence of events or something similar to it happened in the Verizon trial last summer and you just didn't mention it.

1253

And I guess the other point I would make is I assume we're not going to hear about us dropping a claim in closing given the --

THE COURT:  Well, we have a limine order about dropped claims --

MR. HUGHES:  Yes, I understand.  We just didn't want to stand up and object in anybody's closing.

THE COURT:  Okay.  Let's don't start the day with talking over each other.  When I talk if you'll stop, and when you talk I'll try to talk.  Okay?

MR. HUGHES:  Yes, Your Honor.

THE COURT:  All right.  I'll consider it.  Every case is different.  Every set of facts are different.  I'll think about this issue and either will touch on it very lightly or not touch on it at all.  Okay?

All right.  Let's turn to the formal charge conference.  And then in light of what I've been told, let's turn to the verdict form.

We'll begin with the first page or the cover page of the verdict form.  Are there objections here from either Plaintiff or Defendant?

MR. KELSON:  Not from the Plaintiff, Your Honor.

MR. STEVENS:  Not from the Defendants, Your Honor.

THE COURT:  All right.  Turning, then, to page 2 of the verdict form where various definitions are included, are

there any objections here from either party?

MR. KELSON:  Not from the Plaintiff, Your Honor.

MR. STEVENS:  I'm sorry.  I don't see definitions on page 2.

THE COURT:  Well, it's where General Access refers to General Access Solutions, Inc.  Is there a question about you having an accurate copy, Mr. Stevens?

MR. STEVENS:  There must be.

It's easier when I have the right copy.  We don't have an objection to page 2, your Honor.  I apologize.

THE COURT:  Then we'll turn to page 3 of the verdict form where some instructions are given.  Any objections here?

MR. KELSON:  Not from the Plaintiff, Your Honor.

MR. STEVENS:  Not from the Defendant, Your Honor.

THE COURT:  All right.  Then turning to page 4 where Questions 1A and 1B are situated regarding the issue of infringement, are there any objections here from either party?

MR. KELSON:  Not from the Plaintiff, Your Honor.

MR. STEVENS:  We would just note our objection on the '383 Patent not having a separate DoE question.

THE COURT:  Duly noted and overruled.

All right.  Then let's turn to page 5 where Questions 2A and 2B are situated regarding invalidity.  Any objections here from either party?

MR. KELSON:  Not from the Plaintiff, Your Honor.

MR. STEVENS:  Not from the Defendant.

THE COURT:  Okay.  Turning, then, to page 6 where additional instructions are included, are there any objections here?

MR. KELSON:  Not from the Plaintiff, Your Honor.

MR. STEVENS:  So, Your Honor, I note that I think logically the second paragraph might not be accurate for this verdict form because invalidity is not conditional.  So if they answer 'no' to 1 and 2, they do not need to reach Question 3.

THE COURT:  All right.  Do either party have the objection to basically -- or do either party have an objection to the Court deleting the second instruction beginning with "In other words," and just leave the first instruction there?  The second paragraph is just for further explanation.

MR. KELSON:  No, Your Honor.  Plaintiff has no objection to that.

MR. STEVENS:  And neither does Defendant.

THE COURT:  All right.  Then I'll delete the second instruction on page 6 beginning with "In other words," and keep the first instruction.

There was some question, counsel, as I was drafting the verdict form about Defendants' position on invalidity whether it was merely defensive or counterclaim, and it's clearly a counterclaim so the jury's got to answer the invalidity

question regardless.

All right.  Let's turn to page 7 where Question 3 is found.  Is there any objection here?

MR. KELSON:  Not from the Plaintiff, Your Honor.

MR. STEVENS:  Not from Defendants.

THE COURT:  All right.  Turning to page 8, which is the final page of the verdict form, are there any objections here?

MR. KELSON:  Not from the Plaintiff, Your Honor.

MR. STEVENS:  And not from the Defendants.

THE COURT:  All right.  That will complete the formal charge conference.  I will now make eight copies of the unobjected-to final jury instructions, all 42 pages of them, and have them available for each member of the jury when they retire to deliberate.

This will take a few minutes.  It is 11 minutes after 8:00.  We should be able to start very closely to 8:30, as I instructed the jury yesterday when they were excused.

Is there anything else I need to hear from either party on before the Court takes recess?

MR. SUMMERS:  Nothing for the Plaintiff, Your Honor.

MR. DACUS:  Nothing from the Defendants, Your Honor.

THE COURT:  I would like to note this, if I can.  I understand from email traffic last night that Mr. Summers and Ms. Fair are going to offer the Plaintiff's closing arguments.

Could you give me some idea of the order--who's going to go first who's going to go second?

MR. SUMMERS:  Yes, Your Honor.  I expect to go first.  Ms. Fair will handle the rebuttal.  I'll probably take about somewhere between 20, 25 minutes.  I'm hoping for 20, but it's probably going to be closer to 25.  You know how that goes.

THE COURT:  All right, Ms. Fair.  Be prepared to have two minutes left.

MS. FAIR:  I'll do my best with what I'm left with, Your Honor.

THE COURT:  I've seen that movie before.

How about your side, Mr. Dacus?

MR. DACUS:  Mr. Stevenson and I will give it.  Mr. Stevenson will go first for, I'm told, approximately 20 minutes.  I'll go second.  I have both a 20-minute closing and a 2-minute closing.

THE COURT:  Be prepared is the motto I was raised with.

All right.  Thank you, counsel.  The Court stands in recess.

(Brief recess.)

THE COURT:  Be seated, please.

Counsel, I'm about to bring in the jury, proceed to give them my final jury instructions followed by your closing

arguments.

The Court considers its final instructions to the jury and counsels' closing arguments as the most serious part of an inherently serious proceeding.  Consequently, and I'm speaking to everyone in the courtroom, particularly those in the gallery, I do not want any noise, I do not want any disruptions, I do not want anything that may distract the jury's attention from either my instructions or counsel's closings.

If you have any kind of an electronic device, on pain of death make sure it does not go off.  If you need to pass something, if you need to say something, if you need to move, do it now before I bring the jury in.  I want complete silence and for lack of a better term reverence as we proceed to give the jury their final instructions and counsel present their closing arguments.

Is there anything further I need to hear from either Plaintiff or Defendant on before we bring in the jury and proceed with the final instructions?

MR. SUMMERS:  Nothing from the Plaintiff, Your Honor.

MR. STEVENSON:  Nothing from Defendants.

THE COURT:  All right.  Let's bring in the jury, please.

(Whereupon, the jury entered the courtroom.)

THE COURT: Good morning, ladies and gentlemen of the jury. Good to see you again. Please have a seat.

Ladies and gentlemen of the jury, you've now heard all the evidence in this case, and I'm now going to instruct you on the law that you must apply.

Each of you are going to have your own printed copy of these final jury instructions that I'm about to give you orally. I give a copy of the instructions to each member of the jury for two reasons: One, so that you'll have them and can refer to them during your deliberations and, two, so that you can give me your complete attention now and not feel compelled to take notes knowing that you're going to have your own printed copy to look at later.

So, with that, it's your duty to follow the law as I give it to you. And on the other hand, and as I've told you, you, the jury, are the sole judges of the facts in this case. Do not consider any statement that I have made over the course of the trial or I may make as a part of these instructions as an indication that I have any opinion about the facts in this case.

Now, you will shortly hear closing arguments from the attorneys for both sides. Statements and arguments of the attorneys, ladies and gentlemen, are not instructions on the law, and they are not evidence. And they are intended only to assist you, the jury, in understanding the evidence that's

been presented during the trial and the parties' competing contentions.

A verdict form has been prepared for you, and you'll take this verdict form with you when you retire to deliberate, and you will have your foreperson, after you've selected them, fill in your answers to the questions in the verdict form after you have reached unanimous decisions as to how to answer these questions.

Answer the questions as directed in the verdict form from the facts as you find them to be.  Do not decide who you think should win this case and then answer the questions to reach that result.  Your questions to the answers -- your answers to the questions in the verdict form must be unanimous.

Now, in determining whether any fact has been proven in this case, you may, unless otherwise instructed, consider the testimony of all the witnesses, regardless of who may have called them, and you may consider all the exhibits received and admitted into evidence, regardless of who may have introduced them.

You, the jury, are the sole judges of the credibility of all the witnesses and the weight and effect to give to all of the evidence.  In deciding the facts in this case, you may have to decide which testimony to believe and which testimony not to believe.  In weighing the testimony, you alone are to determine the questions of credibility or truthfulness of the

witnesses.

And you may consider in this process the witnesses' manner and demeanor on the witness stand, any feelings or interest they may have in the outcome of the case, any prejudice or bias about the case that the witness might have, and the consistency or inconsistency of their testimony, considered in the light of the circumstances.

Has the witness been contradicted by other evidence?  Has he or she made statements at other times and in other places contrary to what he or she said on the witness stand?  You, ladies and gentlemen, must give the testimony of each witness the amount of credibility and weight that you think it deserves.

You must also keep in mind that a simple mistake does not mean that a witness is not telling the truth.  You must consider whether any misstatement was an intentional falsehood or a simple lapse in memory, and what significance should be attached to that testimony.

As I've told you previously, the attorneys in this case are acting as advocates for their competing clients, and they have a duty to object when they believe evidence is offered that should not be admitted under the rules of the Court. When the Court sustained an objection to a question addressed to a witness, you must disregard that question entirely and you may draw no inference from its wording or speculate about

what the witness would have said if the Court had allowed them to answer the question.

On the other hand, if an objection was overruled, then you must treat the answer to that question just as you would any other question as if no objection had been made.

Now, by allowing the testimony or other evidence to be introduced over the objection of an attorney, the Court, in so doing, did not indicate any opinion as to the weight or effect of that evidence.  Again, applying the amount of weight that each bit of evidence requires and justifies is your decision, not my decision.

Now, at times during the trial, it's been necessary for the Court to talk to the attorneys outside of your hearing either at the bench or by calling a recess and talking to them while you were outside of the courtroom.  This happens because there are things that often arise in a trial that do not involve the jury.  You should not speculate or guess about what was said during any such discussions that took place outside of your presence.

Now, there are two types of evidence that you may consider in properly finding the truth as to the facts in this case.  One is direct evidence, such as the testimony of an eyewitness.  The other is indirect or circumstantial evidence, that is, the proof of a chain of circumstances that indicates the existence or non-existence of certain other facts.

As a general rule, the law makes no distinction between direct evidence or indirect, circumstantial, evidence, but simply requires that you find the facts based on all the evidence presented, both direct and circumstantial.

Now, certain testimony has been presented to you through the depositions of various witnesses.  A deposition is the sworn, recorded answers to questions asked to a witness in advance of the trial.  If a witness cannot be here to testify in person or if the rules of procedure otherwise permit, then the witness' testimony may be presented under oath in the form of a deposition.

Before the trial began, the attorneys representing the parties questioned these deposition witnesses under oath.  A court reporter was present at that time and recorded their sworn testimony.

Deposition testimony is entitled to the same consideration by you as testimony given by a witness in person in open court from the witness stand.  Accordingly, you should judge the credibility and the importance of deposition testimony to the best of your ability, just as if the witness had testified before you in person in open court.

Now, while you should consider only the evidence presented in this case, you are permitted, ladies and gentlemen, to draw such reasonable inferences from the testimony and the exhibits as you feel are justified in the

1264

light of common experience.

Let me say that another way.  You may make deductions and reach conclusions that reason and common sense lead you to draw from the facts that have been established by the testimony and evidence in this case.  However, you should not base any decision on any evidence not presented to you by the parties, including your own personal experiences with any of the parties, the products, or the services that might be at issue in this case.

Now, unless I instruct you otherwise, you may properly determine that the testimony of a single witness is sufficient to prove any fact, even if a greater number of witnesses may have testified to the contrary, if after considering all of the evidence you believe that single witness.

Now, when knowledge of a technical subject may be helpful to you, the jury, a person who has special training or experience in that technical field--we call them an expert witness--is permitted to state his or her opinions on those technical matters.  However, ladies and gentlemen, you are not required to accept the opinions of any expert witness or any witness, for that matter.  It's up to you solely to decide whether or not to rely upon that testimony.

Now, certain exhibits have been shown to you over the course of the trial that were simply illustrations.  We call these types of exhibits demonstrative exhibits, or simply

1265

demonstratives.  Demonstrative exhibits are a party's depiction, picture, or model of something to describe what might be involved in the trial.  If your recollection of the evidence differs from the demonstratives, then you should rely on your recollection of the evidence.

Demonstrative exhibits are sometimes called jury aids, and demonstrative exhibits themselves are not evidence, but a witness' testimony given while using a demonstrative is evidence.  Let me be clear.  Demonstrative exhibits are not going to be available for you to review or consider during your deliberations in the jury room.

Now, in any legal action, the facts must be proven by a required amount of evidence known as the burden of proof.  The burden of proof in this case is on the Plaintiff for some issues and on the Defendants for other issues.  And there are two burdens of proof that you will apply in this case.  They are the preponderance of the evidence and clear and convincing evidence.

Now, the Plaintiff in this case, General Access Solutions, Limited, which you've heard referred to throughout the trial either as General Access or simply as the Plaintiff, it has the burden of proving patent infringement by a preponderance of the evidence.  General Access also has the burden of proving damages for any patent infringement by a preponderance of the evidence.

A preponderance of the evidence means evidence that persuades you that that claim is more probably true than not true.  Sometimes this is talked about as being the greater weight and degree of credible testimony.

Now, the Defendant in this case is T-Mobile USA, Inc. And in addition to T-Mobile USA Inc., Ericsson, Inc., has intervened in this case on the side of T-Mobile USA, Inc., and it is known as an intervenor.  As an intervenor, Ericsson, Inc., is working cooperatively with T-Mobile to defend against the allegations brought by General Access, which have been brought against T-Mobile USA, Inc.

T-Mobile USA, Inc., may be referred to and you've heard them referred to throughout the trial simply as the Defendant or as T-Mobile.  And Ericsson has been referred to throughout the trial simply as Ericsson or Intervenor.  And you've heard the term Defendants used in the plural sense, and in that case it refers to both T-Mobile and Ericsson.

T-mobile and Ericsson have the burden of proving invalidity of Plaintiff's patent claims by clear and convincing evidence.  Clear and convincing evidence means evidence that produces in your mind an abiding conviction that the truth of the party's factual contentions are highly probable.

Although proof to an absolute certainty is not required, the clear and convincing evidence standard requires a greater

degree of persuasion than is necessary for the preponderance of the evidence standard.  If proof establishes in your mind an abiding conviction in the truth of the matter, then the clear and convincing evidence standard has been met.

Now, as I've previously told you, ladies and gentlemen, these two burdens of proof are not to be confused with a third and altogether different burden of proof known as beyond a reasonable doubt, which is the burden of proof applied in a criminal case and which has no application in a civil case such as this.  Beyond a reasonable doubt is a higher burden of proof than both the preponderance of the evidence and clear and convincing evidence.

Now, as I did at the start of the trial, I'll first give you a summary of each side's contentions in the case, and I'll then provide you with detailed instructions on what each side must prove in order to win on each of its contentions.

As I've previously told you, this is an action for patent infringement.  General Access contends that T-Mobile infringes certain claims of the two patents-in-suit.  Remember, there are two United States patents-at-issue.  They are United States Patent No. 6,947,477, which you've heard referred to throughout the trial as the '477 Patent, as well as United States Patent No. 7,099,383, which you've heard referred to as the '383 Patent throughout the trial.  And I may refer in these instructions to those two as the asserted patents or as

the patents-in-suit.

Now, the Plaintiff General Access contends that the Defendant T-Mobile infringes the following claims of the two asserted patents:  Claims 1, 3, and 6 of the '477 Patent and claim 16 of the '383 Patent.  And these are referred to and you've heard them referred to during the trial as the asserted claims.

Now, General Access contends that T-Mobile has infringed these asserted claims by making, using, offering for sale, selling, or importing into the United States certain base stations use that used T-Mobile's 4G and 5G networks, including T-Mobile's TDD and FDD networks.  And I may refer to T-Mobile's 4G and 5G networks as the accused products.

General Access contends that it is entitled to money damages in the form of a reasonable royalty for T-Mobile's infringement.  General Access has the burden to prove these issues by a preponderance of the evidence.

Now, the Defendant T-Mobile denies that it infringes any of the asserted claims.  And as I've previously told you, Ericsson intervened in this case after it was filed against T-Mobile, and intervenor Ericsson denies that the accused base stations that they produced infringe any of the asserted claims.

T-mobile denies that it makes, uses, offers for sale, sells, or imports into the United States any accused product

1269

that infringes any of the asserted claims.  Both T-Mobile and Ericsson deny that General Access is entitled to any money damages.

T-Mobile and Ericsson also contend that the asserted claims are invalid for anticipation, obviousness, lack of adequate written description, and lack of enablement. T-Mobile and Ericsson have the burden to prove invalidity by clear and convincing evidence.

Invalidity and infringement, ladies and gentlemen, are separate and distinct issues, and your job is to decide whether T-Mobile has infringed any of the asserted claims and whether any of the asserted claims are invalid.  If you decide that any asserted claim has been infringed and is not invalid, then you'll need to decide what amount of money damages, if any, to be awarded to General Access to compensate it for the infringement that you have found.

Now, before you can decide many of these issues in the case, you'll need to understand the role of the patent claims. The patent claims are those numbered sentences at the end of the patents.  And as you're aware, you have complete copies of both patents in your juror notebooks, and you may refer to them during your deliberations.

Now, the claims are important, ladies and gentlemen, because it's the words of the claims that define what a patent covers.  The figures and the text in the rest of the patent

provide a description or examples of the invention and they provide a context for the claims, but it is the claims themselves that define the breadth of the patent's coverage. Therefore, what a patent covers depends upon what each of its claims covers.

And you'll first need to understand what each claim covers in order to decide whether or not there is infringement of that claim and to decide whether or not the claim is invalid.

Now, the law says that it's my role to define the terms of the claims and it's your role to apply my definitions to the issues that you're asked to decide.  Therefore, as I explained to you at the beginning of the case, I have already determined the meanings of certain claim language and I have provided you with those definitions or constructions.  These definitions and constructions are also found in your juror notebooks and you may refer to them during your deliberations.

You must accept, ladies and gentlemen, my definitions of those words in the claims as being correct.  It's your job to take these definitions that I have supplied and apply them to the issues that you are asked to decide, including the issues of infringement and invalidity.

Now, you should disregard any evidence presented during the trial that contradicts or is inconsistent with the definitions or constructions of that claim language which I

have given to you.  For claim language or limitations that I have not construed--that is, limitations that I have not interpreted or defined--you are to use and apply the plain and ordinary meaning of that language as understood by a person of ordinary skill in the art, which is to say, in the field of the technology of the patents at the time of the alleged invention.

Now, the meaning of the words of the patent claims must be the same when deciding both infringement and when deciding invalidity.  And as I've told you, you have copies of these patents in your notebooks and you may refer to them.

Now, several times in these instructions I have referred to or will refer to a person of ordinary skill in the field of the invention, or a person of ordinary skill in the art.  As I've mentioned earlier, a person of ordinary skill in the art is a hypothetical person who is presumed to have known all of the relevant prior art that was available to the public, or publicly in use at the time of the claimed invention.

In deciding the level of ordinary skill in the field, you should consider all the evidence introduced at the trial, including but not limited to the following:

1.  The levels of education and experience of the inventor and other persons actively working in the field;

2.  The types of problems encountered in the field;

3.  Previous solutions to those problems;

1272

4.   The rapidity with which innovations are made; and

5.   The sophistication of the technology.

Now, a person of ordinary skill in the art at the time of the alleged invention for each of the asserted patents would have had at least a Bachelor's degree in computer science, electrical or computer engineering, or a related field, and at least two years of work or research experience in digital communications systems, such as wireless communications systems and networks, or the equivalent, or a Master's degree in electrical engineering, computer engineering, computer science, or a similar field.

Relative working experience would include experience with telecommunications and networking, radio-access networking, and/or service provisioning in wireless networks.  More education can supplement practical experience and vice versa.

Now, the claims are intended to define, in words, the boundaries of the inventor's rights.  Only the claims of a patent can be infringed.  Neither the written description nor the drawings of the patent can be infringed.  Each of the claims must be considered individually.

I'll now explain to you how a claim defines what it covers.

A claim sets forth in words a set of requirements.  Each claim sets forth its requirements in a single sentence. Claims may describe apparatuses, devices, or products such as

machines.  Such claims are called apparatus claims.  Claims may also describe processes or methods for making or using a product, and these claims are called method claims.

If a product satisfies each requirement of an apparatus claim or if a product or method performs each of the steps of a method claim, then it's said to be covered by the claim.  And there can be several claims in a patent and each claim may be narrower or broader than any other claim by setting forth more or fewer requirements.  The coverage of a patent is assessed on a claim-by-claim basis.

Now, in patent law, the requirements of a claim are often referred to as the claim elements or the claim limitations.  When a product meets all of the requirements of a claim, the claim is said to cover that product, and that product is said to fall within the scope of that claim.

In other words, a claim covers a product where each of the claim elements or limitations is present in that product.  And if a product is missing even one element or limitation of a claim, the product is not covered by the claim.  And if the product is not covered by a claim, the product cannot infringe the claim.

Now, when a process or method meets all the requirements of a claim, the claim is said to cover that process or method, and that process or method is said to fall within the scope of that claim.  In other words, a claim covers a process or a

method where each of the claim elements or limitations is present in that process or method.

If a process or method is missing even one limitation or element of a claim, the process or method is not covered by the claim.  And if the process or method is not covered by the claim, the process or method cannot infringe the claim.

Now, the beginning portion, or preamble, of a claim often uses the word 'comprising'.  The word 'comprising', when used in the preamble, means including but not limited to, or containing but not limited to.  When comprising is used in the preamble, if you decide that an accused product includes all of the requirements of that claim, the claim is infringed.  And this is true even if the accused product contains additional elements.

For example, a claim to a table comprising a tabletop, legs, and glue, would be infringed by any table that includes a tabletop, legs, and glue, even if the table also contains other structures, such as leaves that would expand the size of the tabletop or wheels that might go on the ends of the legs.  A claim's use of the comprising term does not change the requirement that the accused product must include each and every claim limitation to be infringing.

Now, this case involves two types of patent claims--independent claims and dependent claims.  In this case, claim 1 of the '477 Patent is an independent claim, and

claims 3 and 6 of the '477 Patent are dependent claims that depend from claim 1.  Claim 16 of the '383 Patent is an independent claim.

An independent claim, ladies and gentlemen, sets forth all the requirements that must be met in order to be covered by that claim.  As a result, it's not necessary to look at any other claim to determine what an independent claim covers.

However, a dependent claim does not itself recite all the requirements of the claim, but refers to another claim for some of its requirements.  And in this way, the claim depends on another claim.  A dependent claim incorporates all of the requirements of the claim to which it refers, or as we say, from which it depends.  And it also then adds its own additional requirements.

So to determine what a dependent claim covers, it's necessary to look at both the dependent claim itself and any other claim to which it refers, or from which it depends. Now, a product that meets all the requirements of both the dependent claim and the claim to which it refers or from which it depends is covered by that dependent claim.

Now, if a person or a corporation makes, uses, sells, or offers to sell within the United States, or imports into the United States what is covered by a patent claim without the patent owner's permission, that person or corporation is said to infringe the patent.

In reaching your decision on infringement, keep in mind that only the claims of a patent can be infringed. You must compare the asserted claims, as I may have construed them, to the accused products to determine whether or not there is infringement. And this, ladies and gentlemen, is the only correct comparison.

You should not compare the accused products with any specific example set out in the patent in reaching your decision on infringement. In deciding infringement, the only correct comparison is between the accused products and the elements or limitations of the asserted claims as the Court might have interpreted them.

You must reach your decision on each assertion of infringement based on my instructions about the meaning and scope of the claims, the legal requirements for infringement, and the evidence presented to you by both sides during the trial.

I'll now instruct you on the specific rules you must follow to determine whether General Access has proven that T-Mobile has directly infringed one or more of the asserted claims involved in this case.

Here General Access asserts that T-Mobile has directly infringed the asserted claims of the patents-in-suit by making, using, offering for sale, selling, and/or importing the accused products into the United States. A patent can be

directly infringed even if the alleged direct infringer did not have knowledge of the patent and without the direct infringer knowing that what it did was infringing the claim.

A patent may also be directly infringed even though the accused direct infringer believed in good faith that what it did was not infringing the patent.  Infringement does not require proof that a party copied its product from the asserted claims.

Now, you must determine, separately and for each asserted claim, whether or not there is infringement.  Therefore, there may be infringement as to one claim but no infringement as to another claim.  There may also be infringement as to one patent but not infringement as to another patent.

However, if you find that an independent claim on which other claims depend is not infringed, there cannot be infringement of any dependent claim that refers directly or indirectly to that independent claim.

On the other hand, if you find that an independent claim has been infringed, you must still decide separately whether the product meets the additional requirements of any of the claims that depend from that independent claim--that is, whether those claims have also been infringed.  A dependent claim, again, includes all the requirements of any of the claims to which it refers plus the additional requirements of itself of the dependent claim.

Now, you must determine separately for each asserted claim whether or not there is infringement by the accused products.  In order to prove direct infringement of a patent claim, General Access must show by a preponderance of the evidence that the accused products include each and every limitation or element of the claim and that the Defendant made, used, sold, offered for sale within, or imported into the United States a product or method that meets all the requirements of a claim literally.

In determining whether an accused product directly infringes a patent claim in this case, you must compare the accused product with each and every one of the requirements or limitations of that claim to determine whether the accused product contains each and every requirement or limitation recited in the claim.

If the accused product does not contain one or more of the requirements or limitations recited in the claim, then the accused product does not literally infringe that claim.

Now, as I've told you earlier, there can be apparatus claims and there can be method claims.  Unlike apparatus claims, method claims are not infringed by the sale or distribution of a product merely capable of performing the claimed process.

Infringement of a method claim occurs only when use of an accused product actually results in performance of each and

every step of a claimed method.  An accused product infringes an apparatus claim if it is reasonably capable of satisfying all of the claim elements, even though it may also be capable of non-infringing modes of operation.

A claim requirement is met if it exists in an accused product or method just as described in the claim language, either as I have construed or interpreted that language for you, or if I did not construe or explain it to you, as it would have been understood by its plain and ordinary meaning to a person of ordinary skill in the art.

If an accused product or method omits any element recited in a claim, then you must find that particular product or method does not infringe that claim.  Now, as long as an accused product meets each and every one of the claim requirements, infringement of that claim is shown, even if the product contains additional features or elements not required by the claims.

Now, for asserted claim 16 of the '383 Patent, if you do not find that the demodulator element of claim 16 is literally met, then you may still find infringement if you find that element is met under the doctrine of equivalents.  This instruction does not apply in this case to the asserted claims of the '477 Patent.

If a person makes, uses, sells, or offers to sell within the United States, or imports into the United States a product

that does not meet all of the elements or limitations of a claim and, thus, does not literally infringe that claim, there can still be direct infringement if that product or method satisfies the claim under the doctrine of equivalents.

Under the doctrine of equivalents, an accused product infringes a claim if it contains elements or limitations corresponding to each and every element or limitation of the claim that it is equivalent to, even though not literally met by, an accused product or method.

You may find that an accused product or method is equivalent to an element or limitation of a claim that is not literally met if a person having ordinary skill in the field of the technology of the patent would have considered the differences between them to be insubstantial or would have found that an accused product:  (1) performs substantially the same function; (2) in substantially the same way; (3) to achieve substantially the same result as the element or limitation of the claim.

In order to prove direct infringement by equivalents, General Access must prove the equivalency of the structure or action to the claim element by a preponderance of the evidence.  Thus, each element of a claim must be met by the accused product or method either literally or under the doctrine of equivalents for you to find infringement.

In order to prove direct infringement under the doctrine

of equivalents, General Access must prove by a preponderance of the evidence that for each claim element or limitation not literally present in the accused products, the equivalent of the claim element or limitation is present.

I'll now instruct you on the rules that you must follow in deciding whether or not T-Mobile and Ericsson have proven that any of the accused -- excuse me, any of the asserted claims of the patents-in-suit are invalid.

Patent invalidity, ladies and gentlemen, is a defense to patent infringement. An issued United States patent is accorded a presumption of validity based on the presumption that the United States Patent and Trademark Office, which you've heard referred to throughout this trial simply as the PTO or Patent Office, acted correctly in issuing the patent. This presumption of validity extends to all issued United States patents.

Now, in order to overcome this presumption, T-Mobile and Ericsson must establish by clear and convincing evidence that the claim is invalid. Like infringement, invalidity is determined on a claim-by-claim basis. And you must determine separately for each claim whether that claim is invalid. Now, if one claim of a patent is invalid, that does not mean that any other claim is necessarily invalid.

Claims are construed in the same way for determining infringement as for determining invalidity. You must apply

the claim language consistently and in the same manner for the issues of infringement and for the issues of invalidity.  In making your determination as to invalidity, you should consider each claim separately.

Now, when considering whether a particular reference predates a particular asserted patent--and is, therefore, prior art as to that patent--the relevant date is called the patent's priority date.  The priority date of the asserted patents in this case is January the 19th, 2001.

Now, as I explained earlier, a previous device, system, method, publication, or patent that predates the claimed invention is generally called prior art.  Prior art may include items that are publicly known or that have been used or offered for sale or references, such as publications or patents, that disclose the claimed invention or elements of the claimed invention.

Prior art may be authored or created by anyone.  An item of prior art may be called a prior art reference.  It is T-Mobile and Ericsson's burden in this case to prove by clear and convincing evidence that a particular reference or system, in fact, qualifies as prior art.  In evaluating the prior art to determine whether any invalidity defense has been proven by clear and convincing evidence, you may consider whether that prior art was or was not before the Patent Office.

In this case, T-Mobile and Ericsson contend that the

asserted claims of the patents-in-suit are invalid as anticipated or obvious in view of the following prior art: The RBS 2000 product or system.  In determining whether the RBS 2000 product or system anticipates or renders obvious the asserted claims of the patents-in-suit, you must determine whether the RBS 2000 product or system qualifies as prior art.

To do so, the product or system must have been patented or described in a printed publication in this or a foreign country or in public use or on sale in this country, more than one year prior to the date of the application for a patent in the United States.

To qualify as prior art, there must have been publicly available information at least one year prior to when the asserted claims were filed that would reasonably allow a person of ordinary skill in the art to conclude that the RBS 2000 product or system reads on and covers each element or limitation of the asserted claims.

Additionally, if information that was not then publicly available becomes subsequently available and has been presented to you during this trial, that information may be used to corroborate the public available information that was considered by a person of ordinary skill in the art.

I'll now instruct you on how to determine whether any of the accused claims of the patents-in-suit are invalid as anticipated.  In order for someone to be entitled to a patent,

the invention must actually be new.  In general, inventions are new when the identical method has not been used or disclosed before.

T-Mobile and Ericsson contend that the asserted claims of the patents-in-suit are invalid because the claimed inventions are not new.  In other words, T-Mobile and Ericsson contend that the patents are anticipated by the prior art.

Anticipation requires that all of the requirements of a patent claim be disclosed in a single prior art reference.  Also, the single prior art reference must disclose all elements of the claim arranged or combined in the same way as in the claim--as the claim has been construed or interpreted by the Court.  T-Mobile and Ericsson must prove by clear and convincing evidence that an asserted claim was anticipated by the prior art reference.  Anticipation must be determined on a claim-by-claim basis.

To anticipate the invention, the prior art does not have to use the same words as the claim, but all the requirements of the claim must have been disclosed, either stated expressly or implied, to a person having ordinary skill in the art in the technology of the invention, so that looking at that one reference, that person could make and use the claimed invention.

Keep in mind, ladies and gentlemen, that T-Mobile and Ericsson may not establish anticipation by arguing that the

1285

accused products practice the prior art, or by comparing the accused products to a prior art reference.  An item of prior art may anticipate without explicitly disclosing a feature of the claimed invention if that missing characteristic is necessarily present, or inherent, in the single anticipating reference.

T-Mobile and Ericsson also contend that the asserted claims of the patents-in-suit are invalid as being obvious. I'll now instruct you on how to determine whether any of the asserted claims are invalid as obvious.

Even though an invention may have not been identically disclosed or identically described in a single prior art reference before it was made by an inventor, in order to be patentable, the invention must also not have been obvious to a person of ordinary skill in the field of the technology of the patent at the time the invention was made.

T-Mobile and Ericsson have the burden of establishing obviousness by showing by clear and convincing evidence that the claimed invention would have been obvious to persons having ordinary skill in the art at the time the invention was made in the field of the technology of the patent.

In determining whether the claimed invention was obvious, you must consider the level of ordinary skill in the field that someone would have had at the time the invention was made, the scope and the content of the prior art, and any

differences between the prior art and the claimed invention.

Keep in mind that the existence of each and every element of the claimed invention in the prior art does not necessarily prove obviousness.  Most, if not all, inventions rely on the building blocks of prior art.

Now, in considering whether the claimed invention was obvious, you must first determine the scope and content of the prior art.  The scope and content of the prior art for deciding whether the invention was obvious includes at least prior art in the same field as the claimed invention.  It also includes prior art from different fields that a person of ordinary skill in the art would have considered when trying to solve the problem that is addressed by the invention.

Further, teachings, suggestions, and motivations may also be found within the knowledge of a person of ordinary skill in the art, including inferences and creative steps that a person of ordinary skill in the art would employ.  A person of ordinary skill may be able to fit the teachings of multiple pieces of prior art together like the pieces of a puzzle.  The person of ordinary skill in the art would have the capability of understanding the scientific and engineering principles applicable to the pertinent art.

In considering whether a claimed invention was obvious, you may, but you're not required to, find obviousness if you find that at the time of the claimed invention there was a

1287

reason that would have prompted a person of ordinary skill in the art to combine the known elements in a way the claimed invention does, taking into account such factors as:

1.  Whether the claimed invention was merely the predictable result of using prior art elements according to their known function;

2.  Whether the claimed invention provides an obvious solution to a known problem in the relevant field;

3.  Whether the prior art teaches or suggests the desirability of combining elements in the claimed invention;

4.  Whether the prior art teaches away from combining elements in the claimed invention;

5.  Whether it would have been obvious to try the combination of elements in the claimed invention, such as when there is a design need or market pressure to solve a problem, and there are a finite number of identified, predictable solutions; and

6.  Whether the change resulted more from design incentives or other market forces.

To find the invention obvious, you must find that the prior art provided a person having ordinary skill in the field a reasonable expectation of success.  Obvious to try is not sufficient in unpredictable technologies.

Now, in determining whether the claimed invention was obvious, consider each claim separately.  Do not use

hindsight; consider only what was known at the time of the invention.  In other words, you should not consider what a person of ordinary skill in the art would know now or what has been learned from the teachings of the asserted patents.

In making these assessments, you should take into account any objective evidence, sometimes called secondary considerations, that may have existed at the time of the invention and afterwards that shed light on the obviousness or non-obviousness of the claimed invention.

Now, the following are possible secondary considerations, but it's up to you, ladies and gentlemen, to decide whether secondary considerations of non-obviousness exist at all. These are:

1.  Whether the claimed invention was commercially successful as the result of the merits of the claimed invention, rather than the result of design needs or market pressure, advertising, or similar activities;

2.  Whether the invention satisfied a long-felt need;

3.  Whether the inventor proceeded contrary to accepted wisdom in the field;

4.  Whether others tried, but failed, to solve the problem solved by the claimed invention;

5.  Whether others invented the invention at roughly the same time;

6.  Whether others copied the claimed invention;

1289

7.   Whether others accepted licenses under the patents-in-suit because of the merits of the claimed invention;

8.   Whether the claimed invention achieved unexpected results;

9.   Whether others in the field praised the claimed invention;

10.   Whether there were changes or related technologies or market needs contemporaneous with the invention; and

11.   Whether persons having ordinary skill in the art at the time of the invention expressed surprise or disbelief regarding the invention.

Now, these factors are relevant only if there was a connection or a nexus between the factors and what differentiates the claims -- the claimed invention from the prior art.  General Access has the burden of establishing this nexus or connection.

Moreover, even if you conclude that some of the above indicators of objective evidence have been established, those factors should be considered along with all the other evidence in the case in determining whether T-Mobile and Ericsson have proven that the claimed invention would have been obvious.

In support of obviousness, you may also consider whether others independently invented the claimed invention before or at about the same time as the named inventor thought of it.

In making these determinations, a person of ordinary skill uses simple common sense and can rely on the inferences and creative steps that a person of ordinary skill in the art would employ.

Also, T-Mobile and Ericsson do not need to show that one of ordinary skill would actually have combined the physical structures of two references; one need only combine the teachings. Remember, as stated earlier, that prior art is not limited to patents and published materials, but includes the general knowledge that would have been available at the time to one of ordinary skill in the field of the invention. If you find that T-Mobile and Ericsson have proven the obviousness of a claim by clear and convincing evidence, then you must find that that claim is invalid.

Now, T-Mobile and Ericsson also contend that the asserted claims of the patents-in-suit are invalid for failure to satisfy the written description requirement. As I previously explained, to obtain a patent, one must first file an application with the U.S. Patent and Trademark Office. The process of obtaining a patent is called patent prosecution. The application submitted to the PTO includes within it what is called a specification.

The specification is required to contain a written description of the claimed invention, telling what the invention is, how it works, how to make it, and how to use it.

The written description requirement is designed to ensure that the inventor was in possession of the full scope of the claimed invention as of the patent's priority date.

To succeed on its claims of lack of an adequate written description as to the asserted patents, T-Mobile and Ericsson must show by clear and convincing evidence that a person having ordinary skill in the field reading the patent specification as of the priority date of the patent would not have understood that the specification describes the full scope of the invention as it is claimed in the claims of the patent.  If a patent claim lacks an adequate written description, it is invalid.

Now, in deciding whether the accused patents satisfy this written description requirement, you must consider the description from the viewpoint of a person of ordinary skill in the field of the technology of the patent as of the filing date of the patents-in-suit.

The specification must describe the full scope of the claimed invention, including each element thereof, either expressly or inherently.  A claimed element is disclosed inherently if a person having ordinary skill in the field as of the priority date would have understood that the element is necessarily present in what the specification discloses.

The written description does not have to be in the exact words of the claim.  The written description requirement may

be satisfied through an incorporation by reference only if the material incorporated by reference is a U.S. patent or U.S. patent application publication and the incorporated patent or patent application publication does not, itself, incorporate essential material by reference.

The requirement may be satisfied by any combination of words, structures, figures, diagrams, formulas, et cetera, contained in this patent specification.  Adequate written description does not require either examples or an actual reduction to practice of the claimed invention.

However, a mere wish or plan for obtaining the claimed invention is not adequate -- is not an adequate written description.  Rather, the level of disclosure required depends on a variety of factors, such as the existing knowledge in the particular field, the scope and content of the prior art, the maturity of the science or technology, and other considerations appropriate to the subject matter.

In evaluating whether the specification has provided an adequate written description, you may consider such factors as:

1.  The nature and scope of the patent claims;

2.  The complexity, predictability, and maturity of the technology at issue;

3.  The existing knowledge in the relevant field; and

4.  The scope and content of the prior art.

The issue of written description is decided on a claim-by-claim basis, not as to the entire patent or group of claims.

Now, another way that a patent can be invalid is if it fails to disclose sufficient information to enable or teach persons of ordinary skill in the field of the invention, as of the effective filing date, to make and use the full scope of the claimed invention without undue experimentation. This is known as the enablement requirement. T-Mobile and Ericsson contend that the asserted claims of the '477 Patent are invalid for a lack -- invalid for a lack of enablement. If a patent claim is not enabled, it is invalid.

In considering whether a patent complies with the enablement requirement, you must keep in mind that patents are written for persons of ordinary skill in the field of the invention. Thus, a patent need not expressly state information that persons of ordinary skill would be likely to know or could obtain without undue experimentation.

Factors that you may consider in determining whether persons of ordinary skill in the field of the invention would require undue experimentation to make and use the full scope of the claimed invention include:

1. The quantity of experimentation necessary and whether that experimentation involves only known or commonly used techniques. The question of undue experimentation is a matter

of degree.  Even extensive experimentation does not necessarily make the experiments unduly extensive where the experiments are routine, such as repetition of known or commonly used techniques.  But permissible experimentation is not without bounds;

2.  The amount of direction or guidance disclosed in the patent;

3.  The presence or absence of working examples in the patent;

4.  The nature of the invention;

5.  The state of the prior art;

6.  The relevant skill of those in the art;

7.  The predictability of the art; and

8.  The breadth of the claims.

No one or more of these factors alone is dispositive. Rather, you must make your decision about whether or not the degree of experimentation required is undue based upon all of the evidence presented to you.

You should weigh these factors and determine whether or not, in the context of the invention, and the state of the art at the time of the effective filing date, a person having ordinary skill would need to experiment unduly to make and use the full scope of the claimed invention.

The question of enablement, ladies and gentlemen, of the claimed invention does not turn on whether or not the accused

product is enabled or whether a commercially-viable product has been developed.

If you find that T-Mobile has infringed any valid asserted claim of the patents-in-suit, then you must consider what amount of damages, if any, to award to General Access.

I'll now instruct you about the measure of damages.  But by instructing you on damages, ladies and gentlemen, I am not suggesting which party should win this case on any issue.  If you find that T-Mobile has not infringed any valid asserted claim of the asserted patents, then General Access is not entitled to any money damages.

General Access has the burden to establish the amount of its damages by a preponderance of the evidence.  In other words, you should award only those damages that General Access establishes it more likely than not suffered as a result of T-Mobile's infringement.

Now, why General Access is not required to prove the amount of its damages with mathematical precision, it must prove them with reasonable certainty, and you may not award damages that are speculative.

The damages you award, if any, must be adequate to compensate General Access for any infringement that you may find.  You may not award General Access more damages than are adequate to compensate for that infringement.  You must keep in mind that the damages award is meant to compensate the

patent holder for the use of the claims and not to punish the infringer.

You also must not include in any damages award an additional amount for the purpose of punishing T-Mobile or anyone else or for the purpose of setting an example.

I'll now instruct you on how to calculate reasonable royalty damages.

In this case General Access seeks damages in the form of a reasonable royalty. A royalty is a payment made to a patent holder in exchange for the right to make, use, or sell the claimed invention. A reasonable royalty is the amount of a royalty payment that a patent holder and the alleged infringer would have agreed to in a hypothetical negotiation taking place at a time prior to when the infringement first began.

In considering this hypothetical negotiation, you should focus on what the expectations of the patent holder and the alleged infringer would have been had they entered into an agreement at that time, and had they acted reasonably in their negotiations. In determining this, you must assume that both parties believed the patents were valid and infringed and that both parties were willing to enter into an agreement.

The reasonable royalty that you determine must be a royalty that would have resulted from this hypothetical negotiation and not simply a royalty that either party would have preferred. Evidence of things that happened after the

infringement first began can be considered in evaluating a reasonable royalty only to the extent that the evidence aids in assessing what royalty would have resulted from a hypothetical negotiation.

Although evidence of the actual profits of an alleged infringer may be made -- may be used to determine an anticipated profit at the time of the hypothetical negotiation, the royalty may not be limited or increased based on the actual profits the alleged infringer made.

Now, the law requires that the royalty awarded to General Access correspond to the value of the alleged inventions within the accused products, as distinct from other unpatented features of the accused products.  And this is particularly true where the accused product has multiple features and multiple components not covered by the patent or where the accused product works in conjunction with other non-patented items.

If unpatented features contribute to the accused product, you must apportion that value to exclude any value attributable to unpatented features.  You must determine an appropriate royalty rate and an appropriate royalty base that reflect the value attributable to the patented invention alone.

Any damages you award must be apportioned so that the damages only relate to the infringing features as opposed to

the non-infringing features of the accused products.  In this case, the amount you decide to award as money damages must be based on the value attributable to the infringing features of the accused -- excuse me, of the patented invention, as distinct from unpatented features of the accused product or other factors such as marketing, advertising, or the size of -- the parties' size or market positions.

A royalty compensating the patent holder for damages must reflect the value attributable to the infringing features of the product, and no more.  The process of separating the value of the allegedly infringing features from the value of all other features is called apportionment.

When the accused infringing products have both patented and unpatented features, your award must be apportioned so that it is based only on the value of the patented features as distinguished from non-patented elements, the manufacturing process, business risks, or significant features or improvements added by the infringer.

In determining the reasonable royalty, you should consider all the facts known and available to the parties at the time the infringement began.  The date of the hypothetical negotiation would be in early 2013 for the asserted patents.

Some of the kinds of factors that you may consider in making your determinations are:

1.  The royalties received by the patentee for the

licensing of the patents-in-suit, proving or tending to prove an established royalty;

2.  The rates paid by the licensee for the use of the patents -- excuse me, for the use of patents comparable to the patents-in-suit.  Comparable license agreements include those covering the use of the claimed invention or similar technology;

3.  The nature and scope of the license as exclusive or non-exclusive, or as restricted or non-restricted, in terms of territory or with respect to whom the manufactured product may be sold;

4.  The licensor's established policy and marketing program to maintain its patent exclusivity by not licensing others to use the invention or by granting licenses under special conditions designed to preserve that exclusivity;

5.  The commercial relationship between the licensor and the licensee, such as whether they are competitors in the same territory in the same line of business;

6.  The effect of selling the patented specialty in promoting sales of other products of the licensee, the existing value of the invention of the licensor as a generator of sales of his non-patented items, and the extent of such derivative or convoyed sales;

7.  The duration of the patent and the term of the license;

8.   The established profitability of the product made under the patents, its commercial success, and its current popularity;

9.   The utility and advantages of the patented property over the old modes or devices, if any, that had been used for working out similar results;

10.   The nature of the patented invention, the character of its commercial embodiment of it as owned and produced by the licensor and the benefits to those who have used the invention;

11.   The extent to which the infringer has made use of the invention and any evidence probative of the value of that use;

12.   The portion of the profit or of the selling price that may be customary in the particular business or in comparable businesses to allow for the use of the invention or analogous inventions;

13.   The portion of the realizable profits that should be credited to the invention, as distinguished from non-patented elements, the manufacturing process, business risks, or significant features or improvements added by the infringer;

14.   The opinion and testimony of qualified experts; and

15.   The amount that a licensor (such as the patentee) and a licensee (such as the infringer) would have agreed upon (at the time infringement began) if both had been trying to

reasonably and voluntarily reach an agreement; that is, the amount which a prudent licensee who desired as a business proposition to obtain a license to the patented invention would have been willing to pay as a royalty and yet be able to make a reasonable profit and which amount would have been acceptable to a prudent patentee who was willing to grant a license.

You may have heard these factors referred to during the trial as the *Georgia-Pacific* factors.  No one factor is dispositive, and you can and should consider the other evidence that has been presented to you in this case as to each of these factors.  You may also consider any other factors which, in your mind, would have increased or decreased the royalty the alleged infringer would have been willing to pay and the patent holder would have been willing to accept, acting as normally prudent business people.

In determining a reasonable royalty, ladies and gentlemen, you may also consider whether T-Mobile had commercially acceptable non-infringing alternatives to taking a license from General Access that were available at the time of the hypothetical negotiation and whether that would have affected the reasonable royalty the parties would have agreed upon.  A non-infringing alternative is a way of providing the same or comparable functionality of achieving the same or a comparable result that does not require using the asserted

claims.  You may compare the patented invention to non-infringing alternatives to determine the value of the patented invention, including the utility and advantages of the patent over the old modes or devices, if any, that had been used to achieve similar results.

When determining a reasonable royalty, you may consider evidence concerning the amounts that other parties have paid for rights to the patent in question or for rights to similar technologies.  Thus, comparable license agreements are one factor that may inform your decision as to the proper amount and form of the reasonable royalty award, similar to the way in which the value of a house is determined relative to comparable houses sold in the same neighborhood.  Such licenses may include the patented inventions' economic value in the marketplace, and they may indicate the proper form of the royalty structure.

A license agreement need not be perfectly comparable to a hypothetical license that would be negotiated between the patent owner and the alleged infringer in order for you to consider it.  However, if you choose to rely upon evidence of any other license agreements, you must account for any differences between those licenses and the hypothetically negotiated license in terms of the technologies and economic circumstances of the contracting parties when you make your reasonable royalty determination.

If you find that an asserted claim has been infringed and is not invalid, you may not award any damages for activities occurring before the damages period begins.

The damages period for issues related to infringement of the '477 Patent in this case begin in April of 2017 and run through June 30th, 2023. If you award damages for the '477 Patent, the amount you award must reflect damages for acts of infringement during this period only.

The damages period for issues related to infringement of the '383 Patent in this case begin in April of 2017, and run through March the 6th, 2023. If you award damages for the '383 Patent, the amount you award must reflect damages for acts of infringement during this period of time only.

Now, ladies and gentlemen, we're at the point where the parties will present their closing arguments through their counsel. Given the length of these instructions, we are going to take a very short three- or four-minute recess, and when we come back we'll proceed to hear closing arguments from the attorneys in the case. You may simply leave your notebooks in your chairs. Please follow all my instructions, and we'll have you back in here as quickly as possible to hear closing arguments.

The jury's excused for recess.

(Whereupon, the jury left the courtroom.)

THE COURT: Be seated please. Counsel, so you know,

I thought it was better to take a recess at this point than risk a note being passed to me during closing arguments and have to break during those.

We're going to keep this to three or four minutes.

The Court stands in recess.

(Brief recess.)

THE COURT:  Be seated, please.

Let's bring in the jury, please, Mr. Richardson.

(Whereupon, the jury entered the courtroom.)

THE COURT:  Please be seated, ladies and gentlemen.

We'll now proceed with Plaintiff's first closing argument.

Mr. Summers, would you like a warning on your time?

MR. SUMMERS:  No, thank you, Your Honor.

THE COURT:  All right.  You may proceed with Plaintiff's closing argument, then.

MR. SUMMERS:  Thank you, Your Honor.

Men and women of the jury, good afternoon.  I want to start again by thanking you for your service on the jury. We've had some long days and some of the subject matter has been a little dry and a little technical, but I also want to say that we've noticed what close attention you've paid to the evidence.  You've clearly taken your job and your responsibility as jurors very seriously, and for that we really, really do thank you.

Now, in opening statements I told you that I thought the evidence would show that the two General Access patents at issue in this case are valid and that they've been infringed by T-Mobile's base station equipment, and I believe the evidence has shown that.

Now, as the Court just explained in its instructions, the standard of proof that applies to the issue of infringement is the preponderance of the evidence standard. If the evidence tips in our favor, even slightly, your verdict should be for General Access. But I think the evidence has shown and I'll explain to you that the evidence doesn't just tip slightly in our favor; it's overwhelmingly in our favor.

Now, let's start with the issue of infringement of the '477 Patent.

During the trial Dr. Madisetti went through every requirement of the three asserted claims and demonstrated, showing you exhibit after exhibit, source code, and testimony that all of the limitations have been met. The Defendants' expert Dr. van der Weide really disputed only one or two elements. As I think you saw as the trial unfolded, the entirety of the dispute on this patent came down to the language that I've put on the screen in front of you.

This part of claim 1 requires that there be at least one signal-related parameter and at least one channel-related parameter, that they be collectively representative of

communication of the first burst data signal--and we don't have all the language here, but that's the signal from the user to the base station--and that that be used to facilitate receive operations on subsequent bursts.  This is the heart of the case on the '477 Patent.

And what we saw as the trial unfolded is that these limitations are unquestionably satisfied by the GINR.  That is the gain to interference and noise ratio, sometimes just referred to as the channel gain or the gain.  And as Dr. Madisetti explained yesterday, it's like a credit card score--it's a number made up of about half a dozen parameters or inputs, and what it represents is the strength of the communication from the user to the base station, and that, in turn, is used to determine what modulation scheme to use on the next burst, and it's used by the demodulators to demodulate that signal.  There's no dispute--it's stored, it's used on subsequent bursts, and it's necessary to demodulate the signals.

Now, on the screen in front of you I've put up Joint Exhibit 5 on the right and some testimony from Mr. Faxer on the left.  You may recall that the Defendants never put Joint Exhibit 5 on the screen either with Mr. Faxer or Dr. van der Weide.  And when I asked Mr. Faxer about the GINR, you might recall on cross examination I pointed out that they never asked him any questions about it, and he candidly admitted

that the Ericsson legal team didn't really want it to come up. Why was that?

Then you'll recall on my cross examination I asked him a whole bunch of questions about the GINR, and at the time I'm not sure if anyone in the courtroom except for the Ericsson legal defense team and myself and my team knew the significance of what was happening, but Mr. Faxer had to testify truthfully here in this court of law, and I methodically went through the elements of the claims and he admitted that the GINR does everything required by the disputed elements.

Let's take a look at that evidence.  What we saw in Joint Exhibit 5 at page 282--you'll have it in your binder--and through his testimony is that the GINR is made up of six input parameters, and that collectively--I'm sorry--and that one of those is the power headroom report which he said was an indication of the power of the user.

And importantly, Dr. Madisetti testified -- there are lots of the little pieces of this trial we're now putting together for you.  Dr. Madisetti testified that that item is a signal-related parameter.  And critically, Dr. van der Weide never disputed this testimony, never said anything to the contrary.  I challenge the other side to show you if he did.

Next, you'll recall that I asked Mr. Faxer about the post-equalizer signal-to-noise ratio.  He agreed that that is

also one of the inputs to the GINR score.  And Dr. Madisetti testified that that is a channel-related parameter.  And again, his testimony is uncontroverted.  Dr. van der Weide never disputed this point.  I challenge them to show you testimony to the contrary.

Now, Mr. Faxer also agreed that the GINR is a number calculated from these six inputs that represents the strength of the communication from the user to the base station.  He agreed that it is stored in the UE context.  That is the user profile.  The '477, we're talking about the user profiles and the parameters and how they're used and what they do.  And he testified that they are used to determine -- that the GINR is used to determine the subsequent modulation scheme and that the demodulators use that information.  They need that information to do the demodulation.

Now, let me explain what this all shows.  In the accused Ericsson and T-Mobile equipment, when there is an initial burst from the user to the base station, the baseband unit at the bottom, the unit at the bottom, that computer takes these six input parameters, calculates the GINR, the input parameters include both channel- and signal-related parameters, they calculate the strength of the communication coming up, they figure out which modulation scheme should be used for the next burst, and they provide the appropriate modulation scheme information to the demodulators down in the

baseband unit so they can do their job.  That, ladies and gentlemen, is infringement of the '477 Patent.

And it wasn't just -- we didn't just present Mr. Faxer and Joint Exhibit 5.  Recall that in the opening statement I showed you this testimony and we played it during the trial from T-Mobile's corporate representative on these issues, and he pretty much admitted infringement of the '477 Patent in one question and one answer.

So the disputed elements of the '477 Patent, I submit to you, are infringed with uncontroverted, undisputed evidence.

Now, let's talk about what you heard from the Defendants. I asked you at the end of my opening statement -- I warned you to be on the lookout for misdirection.  I hoped we weren't going to have any, but we did.

Let me show you what happened.  Mr. Faxer when he testified on direct examination testified -- they elicited testimony from him that certain channel estimates or equalization values, that they were always calculated on-the-fly instantaneously.  But what they didn't tell you is that they weren't talking about the GINR or anything happening in that baseband unit that does the infringement.  What he was actually talking about, and this document you see on the left is the document they had on the screen when he was testifying about this on-the-fly stuff, it's up in the radio unit up at the top of the base station.  You can see that looking at the

document itself what he was talking about.

What we know from the testimony of Mr. Thomas and from the testimony of Dr. Madisetti is that the demodulation at issue in this case, the calculation of the GINR, the infringement occurs in the baseband unit, the computer at the bottom of the cell tower.  This was total and complete misdirection and attempt to confuse you.  The fact that they do something else somewhere else in their system at a different point in time early on in the process does not give them -- does not allow them to avoid infringement.  That is crystal clear from the Court's instructions on how you're to perform the infringement analysis.

Now, let's turn to the '383 Patent.  Again, as with the '477, Dr. Madisetti checked all the boxes and showed you that each and every limitation had been met.  And like the '477, the issue of infringement really comes down to one issue--the 'alternately applied' language.  And what the Defendants are essentially trying to do is they're asking you to cross out the 'at least' language from the claim and they're asking you to add words at the bottom.  They're asking you to read out of the claim the idea that there can be more than two subscribers or more than two demodulators.  They want to try to limit this claim to a system where there's only two subscribers and only two demodulators, and where they have to alternate between.  So the language is vague, the language is

general--'alternately applied'.  It contemplates a big systems with multiple subscribers and multiple demodulators.  They want to turn that language not to 'alternately applied' but to 'alternately applied between two modulator demodulators'.

And, you know, before we get to this, the -- what they're trying to do just doesn't make any sense.  No person of skill in the art would understand the claim the way they are presenting it.  And you heard it from the horse's mouth.  Mr. Struhsaker, when he testified, testified that the invention was not about rigidly ping-ponging, but that it, instead, was about distributing the demodulation work to the available resources.  And Dr. Madisetti, of course, agreed.

Now, we know that the invention is not limited to two subscribers from figure 3.  He had -- in the claim language it said 'at least two subscribers, but if we look at the figure - at figure 3 from the patent, it shows that there is a subscriber (3) and it shows a subscriber (n).  Recall what Mr. Struhsaker said subscriber (n) means--any number; can go on and on.  We can have 10 subscribers, a hundred subscribers. So the claim is not limited to two subscribers.

We also know the claim is not limited to two modems. Mr. Struhsaker explained this was just a simple rudimentary example to try to teach the basic concepts.  His system, the very basic prototype they create, in the beginning had four. And we know the claim language says at least two demodulators.

So let me just show you how the parties agree this very simple implementation could work.  You saw something like this from the Defendants earlier.  If we have two subscribers and two modems, they can just alternate back and forth or toggle back and forth.  But the problem with thinking of the patent in that limited way is that -- let me just --

Before I explain that, Dr. van der Weide's position was essentially that this is the only way in which the invention can possibly be done.  His testimony, in essence, is that even if you have -- no matter how many demodulators you have, no matter how many subscribers you have, the invention has to simply just toggle back and forth in a ping-pong way between two demodulators.

Now let's see how that would work in a real system. Let's say we have four demodulators, as we're showing on the screen.  Under his view of the invention, only two of them would ever be used.  Two subscribers, their work would all go to two demodulators.  The other two would I guess just sit there.  C and D would sit there idle and do nothing.

Let's expand the concept now.  Let's say we have six subscribers.  Under his view, again, only two of the modems or demodulators would be used.  The other two would just sit there idly.  And see subscribers 3 to 6?  I mean, I guess they'd just be out of luck because the invention, according to him, doesn't allow for more than two subscribers.  There's no

way in his view that their data could be processed.

So we've created an animation now to give you an illustration of how the invention actually could be used in a way that would make sense to a person of skill in the art. Let's say we have six subscribers and four demodulators. In this illustration the data signals alternate among all four demodulators. Instead of just alternating between two, they alternate among all four using the available resources. And this way all four demodulators are used; all six subscribers' data is being processed. This is how the invention would be understood by a person of skill in the art.

Now, the Defendants presented this graphic. We call it the confetti graphic. And, you know, we agree with a lot of what's in this graphic. They say this describes at a high level how this system works. We agree that there are multiple users. We agree, as shown here, that there are multiple demodulators. We agree that there are successive bursts of information. But what's interesting is that this graphic aligns precisely with how Mr. Struhsaker described his invention--as successive data signals are received by the base station, they're distributed, alternating amongst this large number of available demodulators.

And what's important to recall is that what's going on here in the slide, they kind of like it because it sort of implies that there's something random going on about where the

1314

data signals are going.  There's nothing random about their system at all.

As Mr. Faxer explained while I was cross examining him, their system uses something called a scheduler or a controller to decide which digital signal processor to send each demodulation job to.  And there is a formula, something called an algorithm.  It's math, and it determines where to send each signal for processing based on the availability of the processors.

Now, if there were any doubt in your minds as to whether their use of a mathematical formula to allocate data signals is literally the same as to alternately apply them, that issue is resolved by the doctrine of equivalents, which the Court just instructed you on.  As Dr. Madisetti explained in his testimony, at most that would be an insubstantial change to accommodate more demodulators; something simple that would be known to a person of skill in the art.  So again, as with the '477, we submit to you that the evidence of infringement on the '383 is decidedly in our favor.

Now let's turn to the issue of validity.  The issue of validity is different than infringement in terms of the burden of proof.  For validity, the burden of proof is not at mere preponderance of the evidence.  Because the Patent Office has already granted these patents, because they are essentially asking you to overrule the Patent Office, the patents are

entitled to a presumption of validity and they have to come forward with clear and convincing evidence.  The Court instructed you on that this morning.

Now, who did they bring to tell you that the patents are invalid?  They brought you Dr. van der Weide.  And as you heard in cross examination, he's the go-to guy for the telecom industry any time they need to try to invalidate the other side's patents.  You heard him explain that every time he has testified for his telecom clients in the last four years, his opinions, his conclusion has been that the patents are invalid.  Not once has he looked at patents from another side and said, You know, that a one's a good one, they got us there, it's legit, let's focus on some other issue; every single time when he's working for them he concludes -- he reaches the opinion the patents are invalid.  And I'll submit to you that Dr. van der Weide will rely on anything to reach these conclusions for his clients.

Let's dig into the RBS 2000.  And I'll explain what I mean.  You know, when Dr. van der Weide was cross examined by Mr. Hughes, recall that we elicited the fact that the main document he relied upon in his report to try to invalidate our patents based on the RBS 2000 was a document that was two and a half years after our inventions, two and a half years after the priority date.  And Mr. Hughes confronted him with the fact that in his report he never even provided the date of

that document, never disclosed it to us.  And he struggled with those questions.

But there is another problem with the opinions he offered.  Most of the documents he relied upon were confidential.  They're not prior art.  If you look at the Court's instruction to you on the definition of prior art, these confidential secret things are not prior art.  And he admitted that all this Ericsson stuff, whatever Mr. Akesson knew, whatever was in their confidential documents, that's not shared outside of Ericsson.  They keep their stuff very secret.  And he admitted that the features of the RBS 2000 that he was relying upon to try to invalidate our patents, that they were not available or disclosed to the public.  He admitted that.  He admitted that the RBS 2000 is not prior art.  He was relying on material that is not prior art.

And again, you can look at the Court's instruction on the issue of prior art.  It's crystal clear on this subject.

Now, if that weren't enough, the witness they flew in all the way from Stockholm, Sweden, Dr. Akesson, he admitted that the RBS 2000 had only one demodulator.  The '383 Patent is about multiple demodulators and how they work.  He admitted that the RBS 2000 couldn't do beamforming.  He admitted it had only one modulation scheme.  It didn't do the things that the '477 Patent is all about doing.  So again, it's not even close the idea that it's an anticipatory reference or renders these

1317

patents obvious; fails for multiple reasons.

Now, that takes care of the RBS 2000.  Let's turn now to Dr. van der Weide's back-up plan for trying to invalidate our patents.  That what's called the written description and enablement requirement.

First thing you need to know is that the Patent Office had the very same information as Dr. van der Weide.  They had the specification, they had the figures, they had the claims.  They allowed the claims.  When they did that, the examiners, the subject matter experts at the Patent Office, looked and said, These are all supported and these requirements are met.  He agreed with that.  The Patent Office made that determination already with the same information.

And, you know, the basic argument he's making is that the patent covers both fixed and mobile.  There's no dispute about that.  And he's arguing that, Well, since the patent talks mostly about 'fixed', that it, you know, doesn't cover 'mobile'.  That's his argument.

What you need to know is that the Court's instructions make clear that for enablement the question is not whether we teach in the patent how to do what they do; the question is not whether Mr. Struhsaker ever was able to build a commercially viable product before shutting down Raze.  Those are not the questions.  And there may have been a little diversion and some distraction with some of that evidence

during the trial, but that's not the test.  The test is whether the specific inventions at issue in this claim, whether he taught those inventions and whether he explained how to practice them.

Let's talk about what these inventions are in these patents.  They are about the base station.  They are about how the base station receives data signals from the users.  The base stations never move.  They're on giant concrete pads.  Whether the data signal comes from a mobile phone or some fixed antenna or a fixed wireless device at your house is of no consequence to these patents.  And we know that because the specification says that fixed and cellular systems are the same.  We know that because Mr. Struhsaker testified that he wouldn't have to do anything different to support mobile insofar as these inventions are concerned.

And we know it -- the proof is in the pudding.  As Mr. Mueller admitted, their systems, their base stations support both fixed and mobile devices.  The same network covers both.  These inventions apply both to fixed and mobile equally.

Another red herring diversion from them.

Now, the last issue you'll need to decide is the question of damages; what is a reasonable royalty for their infringement of our technology.  And -- sorry.  Remember the patent statute that I showed you in opening statements?  It

focuses on the use made of the invention by the infringer. They never presented any evidence on that subject at all. Mr. Kennedy did a detailed, conservative analysis, figured out that they saved over $900 million by infringing our technology, went through the *Georgia-Pacific* factors, and determined that a reasonable royalty would be about 28 percent, $253 million.

And what I've put on the screen, as the Court explained to you this morning, you don't have to find -- if you find one patent to be infringed doesn't mean you have to find the other--two different patents. We've provided the numbers for each. If you find infringement of the '477 only, it's $186 million. If you find infringement of the '383 only, it's $208 million. But I think we have clearly shown that both patents are infringed and that we're entitled to a reasonable royalty of $253 million.

They didn't present any real evidence to the contrary. They didn't do any analysis of how much they benefited. Why didn't they do that? If they haven't really saved $900 million, why didn't they have someone like Mr. Kennedy do a similar analysis--Ms. Bennis could have done it--and say, No, it was only 3-, 2-, 500 million. They didn't do that. Why?

Instead, they brought in Ms. Dwyer and they brought in Ms. Bennis. And I think you probably know from my cross examination of Ms. Dwyer how I feel about the subject, but the

bottom line is that they tried to have you look at the damages question from a different perspective. They wanted you to look at comps using cherry-picked licenses that weren't comparable at all. You may hear more about that from Ms. Fair. But I think you know my feelings.

Now, men and women of the jury, I have a lot more to say, but I am at the end of my share of this time, and my teammate Ms. Fair will address you in our rebuttal later this morning.

Thank you, Your Honor.

THE COURT: All right. Defendants may now present their closing argument.

Mr. Stevenson would you like a warning on your time?

MR. STEVENSON: Yes, Your Honor. I intend to pass the podium to Mr. Dacus at the 20-minute mark. I'd like to ask for a one-minute warning, and Mr. Dacus would like a five-minute warning, please.

THE COURT: All right. You may proceed with Defendants' closing argument.

MR. STEVENSON: May it please the Court.

Ladies and gentlemen of the jury, at the beginning of the week when we started this case and I had my first opportunity to speak with you, I told you that this was going to be a case where General Access was trying to expand the boundaries of its claims, and that started in opening statement. Their lawyer talked extensively about adaptive modulation, about

1321

beamforming, and it's because their entire damages ask hinges on convincing you that their patents either invented or are fundamentally required to do adaptive modulation or beamforming.  And that's why they spent so much time in that in their slides in opening.

But when Mr. Struhsaker testified and I got to ask him questions, a very different story emerged.  He admitted he didn't invent adaptive modulation.  The claims of the '383 aren't about applying demodulation.  Same for beamforming.  And on the '477 Patent, he said adaptive modulation doesn't appear in it and it doesn't apply to beamforming.

So then we got into the infringement case, and there we saw General Access expanding the boundaries once again.  This time through the testimony of Dr. Madisetti is how they did it.  Dr. Madisetti sat in the witness chair--you saw him--and he read highlighted portions of slides that the lawyers put up for about two and a half hours.  And he didn't try to educate; he didn't try to explain the theories of infringement.

And if you can't get your arms around the infringement theories, you may not be alone.  He's thrown out multiple infringement theories and fall-back positions.  And if you get into the jury room and you sit down and you look at every claim element and you really can't map that claim element to the evidence in the case, then you should find no infringement because General Access has not proved what it needs to prove.

And Dr. Madisetti also buried the claim requirements that weren't met in this blizzard of slides that you saw.  And that's how they tried to expand the claim boundaries without being noticed.  So when they got to the parts of the claim they couldn't prove, they sped through them; they glossed over them very quickly.

And so when we got the chance to question Dr. Madisetti, we asked about those claim limitations.  Now, you remember that the Court instructed you on the first day that in looking at the credibility of witnesses, you should consider whether the witness appeared to understand the question and whether he answered it directly.  And we're going to go into a lot of details about Dr. Madisetti's testimony and a lot of the specifics, but this is an overview of how it went on cross examination--I don't understand the question, I don't understand, maybe in some context, I cannot answer that.  Over and over again we heard this.

And you might also remember how on cross examination Dr. Madisetti's demeanor changed.  He wasn't testifying off a slide anymore and he answered very differently and that's when he started refusing to answer.

So let's now look at the '383.  This is the patent that requires applying alternately a signal to two demodulators, first and second ones like a ping-pong match back and forth. And we proved that Ericsson's base stations work fundamentally

differently than the '383.  Those are on the right.

And Mr. Summers really agreed in his closing remarks that this is an accurate representation of how Ericsson base stations work.  Hundreds of users can connect at the time, at any given time.  Up to 16 can send simultaneous bursts to be demodulated, and there are hundreds of processors working simultaneously, those bursts get broken up, they get farmed out to different processors, and these processors are assigned differently for every single burst.  And these things come in every millisecond with no alternation.

Ladies and gentlemen, this is not their patent.  It's not even close.

And General Access is now trying to distract you by saying, well, the '383 can allow more than two demodulators, and I think they're missing the point.  We don't dispute that claim 16 allows the base station to contain more than two demodulators, but only two of them can be working at any time.  And when those two do, they alternate until they finish their tasks and then two different ones are selected and they work until they finish their tasks.  And that's exactly what the claim says that's before you.  You have to first select from all the demodulators, and then you have to alternate successive and subsequent signals between the two that were selected.

And there's no at least language in the extremely

Shawn M. McRoberts, RMR, CRR
Federal Official Court Reporter

1324

important clause that says alternately applied to the first and second demodulators; no at least in there.  So that means first and second, two demodulators, alternately applied.

Now, the General Access theory now is that any subgroup of processors, no matter how large or how small, that's assigned to demodulate is somehow a single demodulator.  And to try to explain their theory to you, General Access' lawyer had to basically modify the patent figures that he put up.

They added four modems or 20 modems to it, and they had to add all those because they're not in the patent.  And that visual that you saw in Mr. Summers' closing, that ought to tell you everything you need to know about their theory.  They had to add demodulators to it to try to come up with an infringement theory and to try to explain it to you with stuff that's not in the patent.  And you can't change the patent after it's been issued.  You just can't do it.

Now, when we asked Dr. Madisetti about this theory, he agreed that there is millions of possible combinations of processors in Ericsson base stations, and he never showed you any proof, nothing.  The two different groups of processors are ever selected from this pool of millions of possible combinations.

And then he never showed you any proof that two successive signals actually bounce back and forth between the groups that have been put together from the millions of

combinations.  And that's what the claim requires.  And even under his own theory, he still can't connect the dots to what's in the claims, because it just isn't how Ericsson base stations work.  Whichever processors are available are assigned for each successive burst.  They change every transmission, no alternating, no ping-ponging back and forth.  And Dr. Van der Weide confirmed this, which is basically a common sense fact.

But if you don't buy that theory, General Access has a fall-back for you, and that's called the doctrine of equivalents.  And that requires them to show that the accused device works substantially the same way as the patent.  Right?  Insubstantial differences was the Court's instructions, tiny changes, and we've shown you it works the opposite way, and Dr. Van der Weide has confirmed, that they are not substantially similar.  In fact, they are not even a little bit similar.

Now, when we questioned Dr. Madisetti about his theories and we focused on the requirement that these successive bursts have to get alternately applied to the demodulators, he became evasive.  We started off asking him just to confirm the plain meaning of the claim.  Successive means one after another.  And what did he say?  Well, that's just an example.

So we pressed, and you remember that.  And after about 10 minutes of questions, multiple admonishments by the Court to

1326

answer the question and not to evade it, he finally admitted that in coming up with his theory, he had basically defined successive as just about anything.

We asked him if two users are transmitting at the same time, do you consider that to be successive?  He said -- he included successive as, following each other, which is I think the only correct definition, one after another, certain portions of the transmission could be occurring together, or certain portions could occur before and certain portions after.  It means just about anything.  That's how boundaries are expanded in a patent infringement case--by glossing over or taking overly-expansive views of what words mean.

And we further asked him, well, if 16 users transmit all at the very same time, do you consider that to be successive signals?  And he said, yes.  So basically successive means both one after another or at the same time or anything in between.  And that's how he was expanding the claim boundaries.

And he did the same thing with alternating.  We asked him, does he agree that when the patent says alternately applied, it means taking the first signal, applying it to the first demodulator, taking the second signal, applying that to the second demodulator?  And he said, well, that's one example.  That's just an example.

But, ladies and gentlemen, claim boundaries are not

examples.  They are the legal definition of the property. They allowed by the Patent Office, and they have to be respected both by the patent owner and people in the industry. And you'll remember in this examination, Mr. Haynes, who conducted it, he kept pressing, and he asked a very, very clear question:  If two signals are applied at the same time, is that alternating, in your view?  He said, I don't understand the question.

I don't know what there's not to understand there.  So we made it even simpler, and you'll remember Mr. Haynes raised both his hands and said, if I raise them both at the same time, am I alternating?  He said, I can't answer that. Alternating means simultaneous in his view or back and forth or anything in between.

And so to wrap up in this patent, in sum, Dr. Madisetti's theory, it isn't correct and it isn't credible.  He won't answer straightforward questions about it.  He has multiple theories and fall-backs.  And the lawyers are having to redraw the figures in the patent just to try to support it.  You should, therefore, find that the '383 Patent is not infringed.

Now, let me turn to the '477, and I'm going to talk about independent claim 1 because if independent claim 1 is not infringed, then the dependent claims 3 and 6 by definition can't be infringed because they have to be narrower.

Now, this claim has two components to it.  In the first

paragraph, it's a profile parameter determiner and a profile parameter storage device in the second large paragraph.  And the way it works is the profile is determined and stored, and then the claim requires it to be reused to basically facilitate reception of the next transmission.

But this profile, think of it as a model for the path between the user and the base station.  It contains information about the channel and the signal.  And each user is going to have a different path, so each user is going to have by definition a different profile.  Right?  Or a different set of parameters.

Now, this profile is determined based on the first signal that the user sends to the base station.  It does all the calculations, determines it, and then it gets stored and reused, which is the second set of the limitations here, to facilitate reception of the next burst.  And it's like a shortcut.  You don't have to calculate or recalculate, I should say all, the parameters every time.

Now, one important requirement here is that the profile needs to contain all the parameters that are collectively representative of communication; not just some, not just a couple, not just a GINR--all the parameters that are collectively representative or required.

You never heard anybody from General Access, Dr. Madisetti or anyone else, tell you, here is all the parameters

that are required and I've checked off that the Ericsson base stations store them all and reuse them.  You never saw that. They pulled out a couple of examples and they stopped there and that's insufficient proof, and that's why this patent isn't infringed.

And it's not just me saying that; it's the patent and the inventor who also agree on that.  The patent at column 6, line 4, said these profiles include all the information required by the demodulators to permit their operation to demodulate bursts.

And Mr. Struhsaker, the inventor, said they were going provide all the information for a modem to demodulate the signal.  Yes.  And it doesn't matter if others are stored, if critical parameters aren't stored, and one parameter you heard about that's probably the most important in this whole collection is equalization weights.  They're not stored and reused in Ericsson base stations--equalization weights.

And Dr. Van der Weide explained to you what they are with his lovely artwork.  But the point here was important, because they're required to demodulate the signal and clean up distortion in the radio signal every time the signal bounces off a building or a tree and gets distorted.  Equalization weights are essential and required.

And Mr. Struhsaker agreed.  When I asked him, will you agree with me that equalization weights are very critical to

1330

system performance?  They are.  And Raze's documents said they were necessary as well.  This is the WestEnd broadband, Raze's prior name, and it said these profiles provide all the information necessary for a modem to demodulate the signal, and the first one listed is equalization weights.

And Dr. Van der Weide also agreed:  Are equalization weights needed to receive and demodulate signals?  Absolutely they are.  So without equalization weights, any other parameters that may be stored in the profile are incomplete and they cannot, cannot, be collectively representative of the communication of the signal.

And this reason this patent is not infringed is Ericsson base stations do not store equalization weights and reuse them for the next signal.

Dr. Van der Weide reviewed base station code and technical documents and testified that doesn't happen, basically was unchallenged on this point.

Mr. Faxer also testified and said equalization weights are not stored.  He works with these base stations every day.  He knows more about them than anybody, maybe anybody in the company.

And then Ericsson's own documents confirm that these conditions, because they change instantaneously, equalization weights are instantaneously recalculated every time for every transmission.

And Mr. Summers said, well, that's a misleading document. That isn't the baseband.

I'll direct your attention to the lower left-hand corner where it says, RAN compute baseband.  A baseband is exactly what this is talking about, and that was a diversion because this document proves that they can't make their infringement case.

Now, we asked Dr. Madisetti about this, what's his position on equalization weights?  And this testimony is probably the most pivotal testimony in the entire trial on this patent, and I'm going to take my time and read it slowly because it's so important.

We asked him, It's your view and you based your infringement theory in this case on your belief that equalization weights get stored and reused for subsequent bursts.  Is that right?  And he agreed.  So now he's saying he based his infringement theory on this belief of equalization weights, which you didn't hear anything about in Plaintiff's first half of their closing argument.  They showed UE context, they talked about GINR, they didn't talk about equalization weights, they didn't show you any evidence of any equalization weights in that UE context.

But then he goes on.  And Dr. Madisetti said -- was asked, Okay.  Dr. Madisetti, look, if you're wrong about that, if it turns out and the jury hears all the testimony here and

they conclude that in Ericsson's base stations those equalization weights are not stored and reused, you'd agree with me your infringement theory is wrong.  Fair?

Answer, yes.  If it doesn't meet the claim, it doesn't.

So we confirmed he is wrong about whether Ericsson base stations store and reuse equalization weights, and if so, his infringement theory is wrong.

Now, interesting in this answer, he didn't come back and say oh, no, no, no, no, no.  Equalization weights, those are irrelevant, don't worry about those, it stores GINR, it's good enough for me.  He didn't say that.

THE COURT:  21 minutes are remaining.

MR. STEVENSON:  Because he knows you have to show equalization are stored and reused.  And that's something both experts agree on.  And basically when you look at all the language, everything that's in that '477 and you distill it down, you have one issue before you that decides infringement, that swings infringement of the '477 Patent--are equalization weights stored and reused in Ericsson base stations.  That's what everybody agrees to.

And they pointed to UE context, and you saw that discussion there.  There's no equalization weights that were ever pointed out to you in that, and that's the fatal flaw in the case and that's why there's no infringement.

But we didn't run away from it.  We asked Dr. Madisetti

about it just yesterday.  And we said, Dr. Madisetti, you know, basically, look, you've seen documents, Mr. Faxer has said there's no storage of equalization weights.  And we wanted to see, what is he going to say about that?  I mean, how does he defend his theory?

So you don't offer any testimony today to rebut Mr. Faxer's statement that one of the parameters in the accused products don't store equalization weights and reuse them.  Correct?

"I didn't understand the question."

Okay.  We tried again.  "You did not offer any testimony to rebut what Mr. Faxer said in his testimony that in Ericsson's base stations, they do not store and reuse equalization weights.  Correct, sir?

"I'm not sure how to answer that."

Ladies and gentlemen, in this context, when you've got to crux issue, you have got the question that hangs in the balance and the expert witness says, I don't know how to answer it, you can take that as a no, he doesn't have any evidence, he can't rebut the facts that we have put out.  And that's why you should find no infringement on the '477 Patent.

And you also heard there's a reason for this.  It isn't serendipity.  The reason is not storing and reusing equalization weights but, rather, recalculating them every time, makes the base stations work better.  It's a competitive

advantage; it's a conscious decision.  It improves performance.  That's why Ericsson does it.

Ladies and gentlemen, I'm about to turn the podium over to Mr. Dacus.  This will be my last opportunity to address you.  I want to say and echo the thanks for your service.  This has been a long week for you.  Thank you for paying attention, thank you for listening to us, and it has been good to be able to present our case to you.

And I'll turn the podium over to Mr. Dacus.

MR. DACUS:  Good morning.  I want to start this morning and talk about the evidence that you've seen related to the invalidity of these patents.  And I want to start at a really high level to start with, and that is, you've heard some things from this other table about whether or not the Patent Office determination on these patents is preliminary.  And I want to be crystal clear here:  It is the jury's constitutional right, in fact their constitutional obligation, to decide finally whether or not the patent is valid.

So in a day in time where individuals and juries are having their constitutional rights fall by the wayside, be absolutely clear, the Judge has told you in his detailed instructions, this is your decision.  That's how it gets made.  And these patents are invalid for two reasons here.  The first is that they fail this written description and enablement requirement.

I want you to go look when you go back in the jury room, for those of you that are note-takers, I want you to look at page 28, and it tells you what's required to meet this written description requirement.

Think about what a patent is.  It's a bargain and a promise.  The government says to the inventor, I'm going to give you 20 years of exclusivity.  In return, the inventor says, I'm going to describe, another way to say that is, I'm going to teach the public how to do this.  That's the promise that the inventor makes.

And so what the law requires and the Judge just read it to you, you can read it when you go back there, I wrote it down, they have to say what the invention is, they have say how it works, how it works, and how to make it in detail. They have to say that within the specification of the patent, the things that come before the claims.  And that's what they didn't do here.

Because these Plaintiffs claim, and they've told you over and over that they claim, a mobile wireless network.  They claim these inventions work in a mobile wireless network in addition to a fixed.  And what they failed to describe in the patent is how it works and how to make it in a mobile system.

Now, Dr. Van der Weide testified to you in detail about this, and he showed you that nowhere does the patent describe this.  Nowhere does the patent describe this mobile.  And you

remember on cross examination the lawyers from this table said to him, well, wait, there's a bunch of alternatives in here. And Dr. Van der Weide pointed out, yeah, every single one of those alternatives relate to a wireline system, wireline. Wirelines means you're connected to a wire, not mobile. Every example says that.

The only thing that these folks have pointed to in these patents -- and, by the way, the specifications are the same in each patent. The only thing they've pointed to are these particular passages in the patent to say, oh, we describe mobile. All this says is it's not limited to fixed.

Well, that begs the question, if you're going to claim mobile, where did you describe it, where did you meet your promise to the government. They then pointed to this and said, well, this thing can cover a cellular phone system. Well, cellular can be fixed or mobile, either one. Where are you describing how to do this in a mobile system?

Somewhat incredibly what they resorted to yesterday was to point to a different patent of Mr. Struhsaker. We know that these patents do not describe these inventions working in a mobile system, and the way we know it is by their actions. The proof is in the pudding. They pointed to a different Struhsaker patent and said, oh, here's mobile.

But do you remember what happened on cross examination of Dr. Madisetti after they pointed to it? Mr. Haynes said, hold

on, Dr. Madisetti; this is actually a fixed system that you're pointing to. This little mobile device over here the phone is connected to a WiFi fixed system, and that fixed system is communicating with the base station. This is a fixed system, sir.

Dr. Madisetti said, yeah, I think it is a fixed system, but it's just an example.

Mr. Haynes said, well, can you show us an example of where you actually described your invention in a mobile system? They never did it. Never did it.

The end result of this, folks, is these patents are invalid. They claim an invention in a mobile network system, and they didn't do what the laws of our country require, and that is, describe how it works and how to make it. They didn't do those things.

You can look on page 28 and you'll see that is exactly the requirement. And because they didn't meet it, these patents are invalid.

Now, the patents are invalid for another reason, and that is that this Ericsson RBS 2000 product came before these patents. You've -- you heard a lot of testimony on this, and I'm going to shortcut this because I know you remember it. If you believe what Dr. Madisetti says, if you believe his interpretation of these claims, if you allow him to expand the boundaries, which I submit to you you should not, but if you

do, then all of the things that he claims are in these two patents existed in the RBS 2000.

And you know how we know that?  Because the only thing Dr. Madisetti disputed in this '477 related to the storage of values related to receiving.  And I know you remember yesterday he pointed to this source code, the computer code of how he said the RBS 2000 operated.

And then when Mr. Haynes cross-examined him, what did we discover?  Dr. Madisetti is actually looking at the wrong computer code.  You remember this ASM code up here is assembly code?  That's the code Dr. Madisetti was looking at.  And we know from the Ericsson witness, he should have been looking at VHDL, folks.  As basically insane as that sounds, it's true. He spent all those hours and looked at the wrong code.

The RBS 2000 does everything, everything that the '477 Patent describes, if you believe Dr. Madisetti's interpretation.  And it's the same on the '383 Patent. Remember the only thing Dr. Madisetti pointed to was to say through this block diagram of the RBS 2000, there's only one demodulator.

Well, when he was on the infringement stand, when Dr. Madisetti was talking about infringement, remember he said, well, that one demodulator, it could be multiple demodulators if -- if -- there are two different user profiles being used in that modulator.

You can't have it both ways.  The Judge just said to you, and you can look in your instructions, you have to use the same definition for infringement as you do for invalidity. You can't talk out of both sides of your mouth, Dr. Madisetti. So it's one way or the other.  Either there's no infringement, or if there is, then the patent's invalid.  It can't be both. So these patents are both invalid; and we would ask, when you get to that question, that's what you find.

Now, I'm going to talk to you about a topic that I have no desire to talk to you about and that is the amount of money these folks want and the amount of damages.  And I don't do it because we believe we owe anything.  But you remember in opening we said to you, please pay attention to the methods and the processes that these people use to try to get to ask for a quarter of a billion dollars, because it tells you a lot about, first and foremost, what this case is really about.

Plaintiffs always stand up and tell you what they want to believe a case is about, but when you get to damages and you start seeing the overreaching, you kind of get a quick picture of what these things are really about.  And it also goes directly to their credibility.

For damages, you brought -- when you walked through that door on Monday, you brought everything you needed to decide damages, and that was your common sense.  That's all you need. We're going to talk about the Judge's law, but really all you

need is common sense and take that back to the jury room with you.

Four points I want to make on damages. All of these are found in the Court's instructions, and I'll point you to where they are as we go through this.

The first is, what do third parties, not General Access, not us, what do third parties say about the value and the benefits of these patents? We know. We know. They tried to get investments for multiple years. They literally tried to sell these patents for the better part of a decade, and no one in the industry, no one in the industry, wanted these things. No one outside the industry wanted them. They went to more than 200 companies, 200 companies. Nobody even made an offer for these patents they want you to believe are worth a quarter of a billion dollars.

And there's something else. I know you heard this from Mr. Kennedy, but I want to emphasize it. Mr. Kennedy, their expert, said these experienced investment bankers and brokers they were going to to sell these things, those folks told these people, you need to discount whatever price you're asking for 98 percent for the risk and possibility that these things are likely invalid and not infringed by anyone.

There's a second point to make, and that is what you're supposed to be doing in damages is looking at comps, just like you're house shopping. The Judge literally just gave you that

very example.  You can look on page 37 and 38 in your jury instructions.  He told you this is how you're supposed to do it, just like you're house shopping.

I'm not going to flip over the chart, but we looked at the comps, both from Ericsson, from T-Mobile, and from other industry players like Nokia.  We gave you the comps.  There's eight of them on that chart.  You remember them.  And it shows when people actually have patents in this area, people pay roughly a million dollars a patent for a license.  It's really a little less, but we'll just say in round numbers a million dollars.

Now think about this.  A trial is about evidence.  The Court has just told you, look at the comps.  How many comps did these folks bring you?  Not a single one.  In this area where there are tens of thousands of patents and people are out there licensing patents, they bring you exactly zero comps.  The Judge says, look at comps, and they bring you none.  And they have the burden of proof.

The third thing, the Judge's instructions, page 37, you can look at them, says, look and see if there are any alternatives out there.  In other words, did T-Mobile really need to pay $250 million?  The Court says, under the law look to see if they had alternatives.  And, of course, they did here.  We know they did.

Mr. Mueller testified, look, if we had somewhere between

the 2 and 7 percent loss, even if we give credit to what the Plaintiff says, we had plenty of excess capacity between 2017 and 2023.  In addition, we get these software updates from Ericsson that increases our capacity by some 5 to 10 percent per year.  We don't need to go buy a bunch of more base stations.

In addition to that, you remember that Ms. Dwyer did her analysis to determine if we were at this negotiating table, could T-Mobile just make some changes or Ericsson make changes to these base stations?  And in both situations under the '383 and the '477, it would just require software changes, some changes to the computer programming.

THE COURT:  Five minutes remaining.

MR. DACUS:  Thank you, Your Honor.

THE COURT:  Five minutes remaining.

MR. DACUS:  Both of which would have cost less than a million dollars.  That's something the Court says you have to consider.

Let's talk about Mr. Kennedy's calculation that he came up with.  A few things to point out.  One is he assumes that T-Mobile would need to densify or buy more base stations.  He relies solely on Dr. Madisetti for that assumption by his own admission.

Dr. Madisetti then tells him, well, there would be a saving of somewhere between 2 percent to 7 percent.  That

1343

comes directly from Dr. Madisetti.  And we know from the cross examination of Dr. Madisetti that he based these percentages on articles and research papers that had nothing to do, nothing to do, with the patented features.

Mr. Kennedy even admits, look, if Dr. Madisetti's calculations aren't reliable, neither are mine.  And they aren't, folks.  But I'll say this.  Mr. Kennedy didn't stop there.  He's got some fault to bear here, too, because you heard he actually took costs and expenses that T-Mobile -- he said T-Mobile would incur that go beyond the base stations.  Do you remember that?

The only thing accused here are base stations.  No one disputes that.  Yet Mr. Kennedy said, yeah, I took a bunch of costs and expenses beyond that.

And I said, well, did you do a calculation that would relate to base stations?

Yeah, that was about 80 million, but I'm going to ask for 250.

I mean, it's just -- it bears directly on the credibility of these folks.

I'm going to wrap up here.  Our United States patent system supposed to be about promoting outstanding progress of science.  The reason T-Mobile and Ericsson are here in large part is because they believe very much in the patent system and they believe in the purpose of it.  And they believe that

what's going on in this courtroom and what's gone on in this lawsuit is not about promoting the progress of science.

And you know what?  I agree with them.  Our system puts the responsibility and the obligation on jurors to stop this kind of stuff.  You need to stop--stop--patent owners from trying to expand their boundaries on their patent, you need to stop innovators who claim inventions where they never even described them to the public, they never even met their promise to the government.  And you need to stop them from asking for, I'll say, unreasonable, maybe even exorbitant, amounts of money.

I can't stop it, Mr. Mueller can't stop it, Mr. Stevenson can't stop it, Mr. Faxer can't stop it, none of the people at T-Mobile and Ericsson can stop it.  But you can.  And at the end of the day, that's why you're here.  You remember in jury selection, we said the only thing you want when you're falsely accused is for somebody to sit and listen to your side of the story, make a decision, and let the chips fall where they may, and that's where we are.  And that's all we ask for.

And for you giving us that opportunity, we say thanks. And I want to be clear.  That thank you is not conditional. It's completely unconditional.  Whatever your verdict is, you gave us that opportunity, and for that I know Mr. Mueller, Mr. Faxer, and all the men and women at T-Mobile and Ericsson are deeply appreciative.

Thank you, Your Honor.

THE COURT:  All right.  Plaintiff may now present its final closing argument.

You have 13 minutes and 37 seconds left.  Ms. Fair, would you like any warning?

MS. FAIR:  Yes, Your Honor.  I would like a three-minute warning, please.

THE COURT:  I'll give you a warning when you have three minutes remaining.  You may proceed.

MS. FAIR:  Your Honor, may I have just a moment to grab the clicker?  I apologize.  I left it at the table.

THE COURT:  That's fine.

MS. FAIR:  I was the first lawyer that got to talk to you-all on Monday and I'm the last that you have to listen to.  And I'm the last that's going to say thank you.

I know Mr. Summers thanked you for being attentive, but I want to say a special thanks about that, because Mr. Dacus has tried cases like this, I've tried cases like this, too, and the amount of misdirection that we are hearing from the Defendants to try and confuse the issues here is beyond what I have seen in a long time.  They have made it murky, they have made it confusing, and I thought some of this was at least put to bed during the trial.

And that's why I think you'll see all these yellow stickies that I had to make notes of, things that I thought we

had already dealt with.  And you-all have paid attention through all of that, and so thank you for that.

Their misdirection, just to highlight a couple of things, they showed you Dr. Madisetti not understanding questions. They were asking nonsensical questions based on their own view of the technology and not following the instructions.  They can't even address the patents in the same order that we've talked about them and in the same order that you're going to be answering the questions on the verdict form.  Why are they doing this?

I think that in their view if things had stayed murky just a little bit longer, maybe they could get away with it. But I think when we look at all of the rules they're not following, all of the claim language they're not paying attention to, we know who we can trust and who we can believe. We don't have to leave our common sense at the door.  They make inconsistent arguments, and they are not following the Judge's instructions.

There's three questions that you need to answer, and I think if we look at the instructions, it's not going to be as difficult as it seems like.

On infringement, starting with the '477 Patent, which is where the verdict form starts, not where the Defendants started, I didn't think that we were going to need to talk much about this, but we're still talking about the

collectively representative limitation and whether or not they have to keep all of those parameters.

Mr. Svenson, can we please have slide 35?

Their own technical expert gave away that argument when he testified on the stand, and their lawyers just got up here and tried to tell you that all of the parameters have to be kept.  Is there anywhere that says that if you don't keep every parameter, somehow that means that you necessarily don't infringe?

He was asked, there's no requirement in the claim to keep every parameter.  Correct?

I don't see a requirement like that.

They just told you that's the reason they don't infringe because they don't keep them all.  Their own expert admitted that is not what is required by the claims.

Then they were telling us about these equalization weights and Dr. Madisetti not understanding the question.  Do you remember there's pre-equalization weights and post-equalization weights?  We heard about that, and Mr. Summers showed us the picture:  The signals come in at the antenna, and there's pre-equalization weights.  No doubt about it.  That is irrelevant to infringement.

The equalization weights that matter are the ones in the baseband unit in Exhibit 5, JX 5, that you will have that they don't want to talk about, that Mr. Faxer didn't want to talk

to the lawyers about, that their expert wouldn't talk about. The equalization weights that matter are the ones in the baseband unit at the bottom of the tower. Those go into the GINR, and they're used. So they're not even talking about the same part of the equipment where the infringement is.

They got their sound bite of Dr. Madisetti not understanding the question because they weren't giving him the information he needed to give an accurate answer. What equalization weights? The pre-equalization weights don't matter.

The '383 Patent. This one, they say that we're rewriting the claims. I want to look at the claim language. This is the limitation --

Ms. Brunson, if you -- thank you very much.

This is the limitation we're talking about. They say that we've modified the figure by adding demodulators. That is exactly what the claim says--at least a second demodulator. It is derived directly from the claims. But you know what's not in the claims?

Mr. Svenson, if we could go back to the presentation, and can we go to slide 5, please?

This is their slide. They showed it to you in opening. They showed it to you again. And I was really surprised to see it because they have added the word 'between'. See it up here in the top left? So that they can get their read of

alternately just like they want it.

They are not following the claim language and they are not following the law.  And what their read of the '383 Patent is, is that Mr. Struhsaker, who was the chair of WiFi, who developed one of the first 4G chips in cellular, who went on to be chief technology officer at Texas Instruments in one of their divisions, that he used the limited resources of a start-up company to go to the Patent Office and ask for a patent that only allowed two subscribers to go through two demodulators.  That makes no sense.  Their read of the claim makes no sense.

So on infringement the answer is yes.  Do not be deceived by their misdirection.

On invalidity, I'm not going to spend a lot of time on this because I think that the inconsistency of what they're doing is apparent.

The jury instructions -- if we could have slide 6, please, Mr. Svenson.

We just heard Mr. Dacus tell us that you can't talk out of both sides of your mouth.  This is on page 20 of the jury instructions.  Dr. Van der Weide admitted he did not follow the rules.  The claims are construed the same way for determining infringement as for determining invalidity.  You have to apply the claim language consistently.  He admittedly didn't do that.

1350

We just heard about his interpretation on infringement, which makes no sense, and then he went to another one on invalidity.  That is not the law.  He had to twist the claims on infringement so they could get out from under it.  And on invalidity, he switched theories, he switched horses and said, well, if we're wrong about infringement, well, then the claims are invalid.

We asked him about his interpretation.  You remember he kept saying, I'm not an attorney, I'm not an attorney, I'm not an attorney.  He works for the telecommunications industry on patent cases all the time.  He knows the law.  He just didn't want to apply it.

Written description and enablement, I just want to briefly touch on this.

If we could advance two slides, please, Mr. Svenson.

What we are comparing here, what we are looking for, is the invention as it is claimed in the claims of the patent compared to the specification, not all the different implementations where it could go --

These claims are about the base station, what's happening at the base station.  It doesn't matter if that signal comes from something that's fixed, something that's mobile, a cell phone, a router, whatever it is, we all know that the code that we looked at is what's happening at the base station. That is the invention.

1351

He's trying to tell you that mobility has to be described and enabled, but mobility is nowhere in the claims.  Go look at the claims.  The claims are about processing signals at the base station.

The one other thing I want to say on invalidity is if we look at the two theories that they have on the RBS 2000 and enablement, I think we can see an inconsistency that maybe hasn't been crystallized yet.  They are telling you that no one could have made this invention at the time.  That's their enablement defense, that is what that means.  And then the same witness is taking the stand and telling you, oh, no, no, no, Ericsson had already made it in this RBS 2000.  That does not make sense because they are setting up a false test.

On invalidity, they have not met their burden to prove by clear and convincing evidence that these patents are invalid.

THE COURT:  Three minutes remaining.

MS. FAIR:  Thank you, Your Honor.

I'm going to end with damages.  I think part of the reason why they've thrown so much at the wall to see if it would stick is because we know we're on a limited clock and there's only so much that we have time for.

On this one, if we could go to slide 37, please, Mr. Svenson.

It all comes back to the statute.  Damages are about the use made of the invention.  Dr. Madisetti provided an analysis

about the efficiencies of the use of this technology in their base stations, and that's what Mr. Kennedy used to measure damages.

They criticized the analysis that Dr. Madisetti did, but did you notice that the expert that they call, Dr. Van der Weide was an expert on testing equipment?  And they didn't show up with any tests of their own equipment, and that tells us one of two things--either, one, they know that the test would have shown something that they don't like, that maybe Dr. Madisetti was right, or maybe it's an even higher benefit; or this technology is so important that they can't go turn it off and measure what the system looks like without it because they need it.

They want to talk about comps, housing comps.  And remember what the framework was for how we know if it's a comparable license.  Assume infringement, assume validity, willing licensor, willing licensee, cards-up negotiation.  And because there aren't always comps out there, that's why we have the instruction on page 37.  I was surprised when we heard their lawyer tell you that it sounded like you have to go look at these.

That's not what the instruction says.  I encourage you to look at it on page 37.  The instructions tell us comparable license agreements are one factor that may inform your decision.  If you're looking at a comparable house and you're

1353

trying to figure out the price and you don't know the square footage and you don't know what neighborhood it's in and you don't know how much land it's on and you don't know how old the house is and you don't know how many bedrooms there are, that's not helpful.  That's not helpful to understand how they are using this technology.

If you look at page 36 and 35 of the instructions, there's a series of other factors to look at, and that is what we encourage you to look at here is the use made of the technology.

For damages, I think we have proven to you that the comps are not the way to go.  They don't help us figure out how much the use of the invention is here.  The damages in this case, these patents have benefited T-Mobile and Ericsson to the tune of $904 million.  And when they sit down at the hypothetical negotiation, $253 million is how much we say would go to General Access in a negotiation.

THE COURT:  Your time's expired, counsel.

MS. FAIR:  We await your verdict and we thank you for your time.

THE COURT:  All right.  Ladies and gentlemen of the jury, you've now heard closing arguments from the competing parties.  I have just a few final instructions to give you before you begin your deliberations.

You must perform your duty as jurors without bias or

prejudice as to any party.  The law does not permit you to be controlled by sympathy, prejudice, or public opinion.  All parties expect that you will carefully and impartially consider all the evidence, follow the law as the Court has given it to you, and reach a just verdict regardless of the consequences.

Answer each question in the verdict form based on the facts as you find them to be, following the instructions that the Court has given you about the law to apply.  Again, do not decide who you think should win and then answer the questions to reach that result.  One more time let me remind you that your answers to the questions in the verdict form must be unanimous.

You should consider and decide this dispute or this case, rather, as a dispute between persons of equal standing in the community, of equal worth, and holding the same or similar stations in life.  This is true where one party is small and this is true where one party is large.  It should make no difference.  This applies in patent cases between corporations, partnerships, and even individuals.

A patent owner is entitled to protect his or her rights under the laws of the United States, and this includes bringing a suit in a United States District Court for money damages based on allegations of infringement.  And by the very same token, an accused infringer is entitled under the law to

1355

defend itself against all assertions of infringement, including by arguing that it does not infringe the patents and the asserted patents are, in fact, invalid.

The law recognizes no distinction between types of parties, and all corporations, partnerships, and other business organizations stand equal before the law regardless of their size, regardless of who owns them, and they are to be treated as equals.

Now, when you retire to the jury room to deliberate on your verdict, you're each going to have your own printed copy of these final instructions that I've given you.  If during your deliberations you desire to review any of the exhibits which the Court has admitted into evidence over the course of the trial, you should advise me by written note signed by your foreperson asking for a certain exhibit or exhibits.  You should then deliver that note to the Court Security Officer, who will bring it to me, and I will then send you that exhibit or those exhibits.

However, ladies and gentlemen, as I've told you, demonstratives that you have seen during the trial are not evidence and I will not be able to send you those during your deliberations.

Once you retire, you should first select your foreperson and then conduct your deliberations.  If during your deliberations you decide to recess for any reason, follow all

the instructions that the Court has given you about your conduct during the trial.

After you have reached a verdict, your foreperson should fill in your unanimous answers to the questions in the verdict form, date it, and sign it on behalf of the jury, then advise the Court Security Officer that you have reached a verdict. Do not reveal your answers until such time as you are discharged, unless otherwise directed by me, and you should never disclose to anyone, not even to me, your numerical division on any unanswered question.

Any notes that you've taken over the course of the trial, remember, they are aids to your memory only. You still have to rely on your memory of all the evidence. And if your memory should differ from your notes, then you should rely on your memories and not your notes. The notes are not evidence.

And a juror who has not taken notes or taken very few notes still has to rely on their own independent recollection of the testimony and the evidence and should not be unduly influenced by the notes of other jurors. Notes are not entitled to any greater weight than the recollection or impression of each juror who took them about the testimony that was received.

Now, if you want to communicate with me at any time during your deliberations, you should give a written message or a question signed by your jury foreperson in writing to the

Court Security Officer, who will then bring it to me.  And I will then either respond as promptly as possible through writing or by having you brought back into the courtroom where I can address you orally.

And you should be aware that if I receive a note from you, I will always disclose to the attorneys in the case your message and my intended response before responding to you.

Now, after you have reached a verdict and I have accepted your verdict and discharged you as jurors, I want you to understand at that point you will not be required in any sense to discuss with anyone your service as jurors in this case. But by the very same token, at that point if you choose to, you will be completely free to discuss with anyone your experience as a juror in this case.  At that point, ladies and gentlemen, it will be 100 percent up to you.

I'll now hand eight printed copies of the Court's final jury instructions and one clean copy of the verdict form to the Court Security Officer to deliver to you in the jury room.

Ladies and gentlemen of the jury, you may now retire to the jury room to deliberate on your verdict.  We await your decision.

(Whereupon, the jury left the courtroom.)

THE COURT:  Be seated, please.

Counsel, you are welcome to wait here in the courtroom while the jury deliberates.  You are welcome to leave a

1358

representative in the courtroom if the bulk of you will be off-site.  If you are off-site and away from the courthouse, make sure your cell phones remain on so that we can reach you and get you back up here quickly if we receive either a note from the jury or receive the return of their verdict.

Awaiting either a note from the jury or the return of their verdict, the Court stands in recess.

(Jury deliberates.)

THE COURT:  Be seated, please.

Counsel, I've received the following note from the jury. I'm going to read it into the record and then I'll hand the original note to the Courtroom Deputy.  And I have two Xeroxed copies of the note for each side.  After I've handed her the original, if you like you may approach and each side get two copies of this note.

And for identification purposes, I'm going to mark this note in the upper right-hand corner with a '1' since it is our first note from the jury during this trial.

The note reads as follows:  "Your Honor, the jury would like to request the JX 5, if possible.  Also, if there is any evidence that corresponds to the RBS 2000 and their dates/timeline, we would like to view those if it is allowed. Thank you."  Signed by Karen Sierra, who is Juror No. 1, and is dated with today's date, April 11th, 2025.

I'll hand the original note to the Courtroom Deputy, and

I'll allow you to approach for copies of the note if you'd like.

Also, I have pulled JX 5--I don't think there's any question that's what they want--and I propose to send that back to them.

I have looked at the list of exhibits that have been admitted and used during trial.  The only exhibit I can find that appears to me to correspond to this second request is JX 41, and unless you can convince me otherwise, I would propose to send back JX 41 along with JX 5.  If you have other exhibits you think fall within the bounds of this request, I'm happy to hear from you.

MR. STEVENS:  Your Honor, there are three documents that we submitted that have date information regarding that. I'm going to ask one of my team to pull the records, but one was the sales agreement with Omnipoint that became VoiceStream, one was the actual date of the reference manual, and then the third was the composite source code file where we pulled up two pieces of source code, one dated '98 and one dated '93.

THE COURT:  Well, the reference manual is JX 41 and it has April 28, 2000 on it as a date.

MR. STEVENS:  Yes, sir.  There's also the -- I wish I knew the exhibit number off the top of my head; I can get it for you.  It is the agreement with VoiceStream for the

1360

purposes of those documents -- of those products --

THE COURT:  Let's do this, Mr. Stevens.  Why don't you find what you think is relevant to the request, then once you've located it and identified it, consult with the Plaintiff and you-all meet and confer over it.  If the Plaintiff believes that there's something else that needs to be sent back to correspond to this request or if you have an objection to what Defendants want to send back as corresponding with this request, then I'll hear from both sides.  Okay?

Let's go off the record.  You-all take a minute to see what you can work out then we'll go back on the record.

(Pause in proceedings.)

THE COURT:  All right.  Let's go back on the record again.

Having met and conferred over the jurors' note, what's the position of the parties with this request after JX 5 and the note corresponding to the RBS 2000?  What's Defendants' position; what's Plaintiff's position?  I hope we have some agreement, but let me hear from you.

MR. STEVENS:  The Defendants' position is that the jury should be sent back JX 41, JX 43, JX 44, JX 45, JX 74, and then two pages of JX 8.  Those pages are JX 8.1622 and JX 8.1628.  I'm sorry.  If I said 2, I mean JX 8.1628.

THE COURT:  And JX 8.1622 as well?

MR. STEVENS:  That's correct, Your Honor.

THE COURT:  All right.  What's Plaintiff have to say?

MR. HUGHES:  Your Honor, we're fine with those exhibits going back to the jury.  I think we already resolved it as to JX 5.

THE COURT:  I don't think there's any question --

MR. HUGHES:  I'm just making sure because he didn't say that.

And then in addition to that, Your Honor, and I believe the Defendants don't think this is necessary, but the jury note did ask for evidence that corresponds to the RBS 2000 and their dates and timelines, and we believe the Court should also include an instruction that the witness testimony concerning dates is also evidence and they should rely on their memories of the witness testimony concerning dates for additional information concerning the timeline but that the transcript of witness testimony is not available for review.

THE COURT:  All right.  Give me a moment.

All right, counsel.  I've got the following response in writing prepared.  I'll read it to you and then I'll see if anyone has any comments or objections.

This is entitled "Response To Jury Note No. 1."

"Members of the jury, in response to Jury Note No. 1, I am sending you Exhibit JX 5 as requested.

"With regard to your additional request regarding evidence relating to the RBS 2000, I am sending you the following exhibits:  JX 41, JX 43, JX 44, JX 45, JX 74, JX 8.1622 and JX 8.1628.

"The evidence regarding RBS 2000 also includes the sworn testimony of any witnesses who addressed the RBS 2000 during the trial."

Dated and signed.

Any objection from Plaintiff or Defendant?

MR. HUGHES:  No objection.

MR. STEVENSON:  No objection.

THE COURT:  All right.  I'll print it and we need to full pull the physical exhibits.  I have here at the bench JX 5 and JX 41.

Ms. Brunson, if you'll pull the other named exhibits for me.

All right.  Mr. Richardson, I've got the physical exhibits with the written response from the Court in this box. I'm going to hand it to you and direct you to deliver it to the jury.

I'm going to hand a signed duplicate of the written response to the Courtroom Deputy.  I have one additional copy for each side.  If you'd like it for your files, you can get it from the Courtroom Deputy once I leave the bench.

Unless there are other matters we need take up, the Court

will stand in recess.

(Deliberations continue.)

THE COURT:  Please be seated.

Counsel, I've received the following note from the jury: "Your Honor, the jury has reached a verdict."  It is signed by Ms. Sierra as jury foreperson and is dated with today's date.

I'm going to mark it with a '2' in the upper right-hand corner for identification and hand the original note to the Courtroom Deputy.

All right.  Is there anything I need to hear from either party on before I bring in the jury and consider their verdict?

MR. SUMMERS:  Nothing from the Plaintiff, Your Honor.

MR. STEVENSON:  Nothing from Defendants.

THE COURT:  Let's bring in the jury, please.

(Whereupon, the jury entered the courtroom.)

THE COURT:  Please be seated.

Ms. Sierra, I understand you are the foreperson of the jury.  Is that correct?

THE PRESIDING OFFICER:  Yes, Your Honor.

THE COURT:  Has the jury reached a verdict?

THE PRESIDING OFFICER:  Yes, Your Honor.

THE COURT:  Would you hand the completed verdict form to the Court Security Officer who will bring it to me?

Ladies and gentlemen of the jury, I am going to announce the verdict into the record at this time. I'd like each one of you to listen very carefully because after I've announced the verdict into the record, I'm going to poll the jury to make sure and confirm that this is, in fact, the unanimous verdict of all eight members of the jury.

Turning to the verdict form and beginning on page 4 where Questions 1A and 1B are found, Question 1A: "Did General Access prove by a preponderance of the evidence that T-Mobile infringed any of the following claims of the '477 Patent?"

The jury's answer as to claim 1 is "No."

The jury's answer as to claim 3 is "No."

The jury's answer as to claim 6 is "no."

Question 1B: "Did General Access prove by a preponderance of the evidence that T-Mobile infringed the following claim of the '383 Patent?"

The jury's answer as to claim 16 of the '383 Patent is "No."

Turning to page 5 of the verdict form where Questions 2A and 2B are found, Question 2A: "Did T-Mobile prove by clear and convincing evidence that any of the following claims of the '477 Patent are invalid?"

The jury's answer as to claim 1 of the '477 Patent is "No."

The jury's answer as to claim 3 of that patent is "No."

The jury's answer as to claim 6 of that patent is "No."

Question 2B:  "Did T-Mobile prove by clear and convincing evidence that the following claim of the '383 Patent is invalid?"

As to claim 16 of the '383 Patent, the jury's answer is "No."

Turning to page 7 where Question 3 is found, consistent with the instructions in the verdict form, Question 3 is left unanswered, and that complies with the instructions in the verdict form.

Turning, then, to page 8, which is the final page of the verdict form, I find it's dated with today's date, April the 11th, 2025, and it is signed by Ms. Sierra as the foreperson of the jury.

Ladies and gentlemen of the jury, let me make sure that this verdict unanimously reflects the decision of all eight members of the jury.  If this is your verdict as I have read it, would you please stand up?  Thank you.  Please be seated.

Let the record reflect that all eight members of the jury immediately rose and stood in response to the Court's question to poll the jury.  The Court finds based on that that this is the unanimous verdict of all eight members of the jury.  The Court accepts the jury's verdict, and I'll hand the original verdict form to the Courtroom Deputy.

Ladies and gentlemen, this now completes the trial of

this case.  From the very beginning I have given you explicit instructions and, as you heard, I have repeated them over and over, that you not communicate with anyone about the case and that you follow various other conduct -- matters of conduct during your role as jurors.  Having accepted your verdict, I am now releasing you from those instructions and I am discharging you as jurors in this case.

Also, ladies and gentlemen, I know that this is a Friday afternoon, I know it's been a long week, but I'm going to ask for a favor from you before you leave the courthouse today. In just a minute I'm going to ask you to leave the jury box and go back into the jury room and let me have the privilege--because I do consider it a privilege--to come into the jury room, because I would like to shake one of your hands and look each one of you in the eye and tell you personally how much the Court appreciates your service as jurors in this case.  You have rendered very real and important public service as American citizens, and I think it warrants a word of special thanks and individual attention from the Court to you.

I am confident that I am speaking not only for myself but for all the members of the Court staff, and, in fact, all the members of both trial teams--regardless of who wins or who loses, everyone in this courtroom appreciates and values your service.

And if you would do me that favor before you leave, I would consider it a personal privilege to have an opportunity to shake each hand and to thank each person personally before you go.  It has been a long week, and I promise you I will not keep you more than just a couple of minutes, if you will afford me that honor.

Also, ladies and gentlemen, I do need to tell you this. I've been practicing law in this community -- I began practicing law in this community a long time ago, about 40 years ago, and I've been on the bench here -- I'm working on my 14th year.  From the time I got to this area until the present, there has been a custom and practice in this courthouse when the jury returns a verdict, and it is this: That the members of these two trial teams, who would very much like to know what you thought about this trial and you thought about their participation and performance in this case, they cannot initiate any communication or conversation with you about your service.  They're prohibited from doing that.  You, however, have the ability now that you've been discharged as jurors, as I told you at the end of my instructions before you retired to deliberate, you're free to talk about your experience with anybody in this case that you'd like to. You're also free not to, and no one can force you to.

So the way that's worked over the last 30 to 40 years that I know of from personal experience, there's one way out

of this building and that's down those front steps.  Do not be surprised when you go down those front steps if you don't find a smattering of lawyers standing on the sidewalk making it convenient if you'd like to stop and initiate a conversation with them.  You're under no obligation to do so.  And they will not initiate a conversation with you and they will not impede your progress in any way.  However, if you want to stop and talk, they will talk as long as you want to, I promise you.  But it is up to you.  But you need to know not to be surprised when you leave the building if that's not the case, and decide for yourselves whether you want to stop and visit or whether you don't.

Also, you know, when we started I told you that unless you lived alone at home -- alone, you were going to get a question the first night and you couldn't answer that question.  You can now answer that question if you want to.  You can tell whoever you live with, whoever you know, you can talk about your service as jurors.  I hope it's been a positive experience.  You're not required to.  It's strictly 100 percent up to each of you individually.

With that, ladies and gentlemen, thank you again so much for your service.  If you'll do me that honor, I will meet you in the jury room in just a minute.

Counsel the Court has accepted the jury's verdict.  I have discharged the jury.  That completes the trial, and you

are excused.

(The proceedings for concluded at 2:25 p.m.)

Shawn M. McRoberts, RMR, CRR
Federal Official Court Reporter

I HEREBY CERTIFY THAT THE FOREGOING IS A CORRECT TRANSCRIPT FROM THE RECORD OF PROCEEDINGS IN THE ABOVE-ENTITLED MATTER. I FURTHER CERTIFY THAT THE TRANSCRIPT FEES FORMAT COMPLY WITH THOSE PRESCRIBED BY THE COURT AND THE JUDICIAL CONFERENCE OF THE UNITED STATES.


S/Shawn McRoberts                04/11/2025

_____DATE_____
SHAWN McROBERTS, RMR, CRR
FEDERAL OFFICIAL COURT REPORTER